1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

───────────────────────────

FRANCISCO L. HERRERA and )
JOANNA HERRERA, CO-WRONGFUL )
DEATH REPRESENTATIVES, for )
the exclusive benefit of )
the beneficiaries of MONICA )
HERRERA, deceased, who have )
sustained damages for her )
wrongful caused death, )
            Plaintiffs, )
  )
     vs. ) Civil Action No.:
  ) 15-CV-128-F
GREGORY BUCKINGHAM and )
DEBORAH BUCKINGHAM, both in )
their individual capacities )
as Trustees of the BUCKINGHAM )
FAMILY TRUST; and GREGORY )
BUCKINGHAM and DEBORAH )
BUCKINGHAM as individual )
defendants; and WYOMING )
MECHANICAL, INC., a Wyoming )
Corporation; )
TRIANGLE TUBE/PHASE III CO., )
INC., a New Jersey Corporation;)
and, M&G GROUP DURAVENT, INC.,)
a New York Corporation, )
          Defendants. )

───────────────────────────

TRANSCRIPT OF DEPOSITION OF
JAMES SONDGEROTH


Taken at
235 East Broadway
Jackson, Wyoming
April 25, 2016
9:20 a.m.


COURT REPORTER: Denise Nowak
Certified Shorthand Reporter
and Notary Public

1    Q.    Have you been asked to give any opinions with

2    regard to DuraVent's conduct in this matter?

3    A.    No.

4    Q.    You've had a chance to read Mr. Cuzzillo's

5    deposition?

6    A.    Umm --

7    Q.    He's the expert engineer from California.

8    A.    Yes.

9    Q.    Is there anything that he testified about in

10   his deposition that you disagreed with?

11   A.    No.

12   Q.    Have you been asked to give opinions with

13   regard to the conduct of the Buckinghams?

14   A.    No.

15   Q.    Have you been asked to give opinions with

16   regard to the conduct of Wyoming Mechanical?

17   A.    No.

18   Q.    What is your understanding of what you've been

19   asked to give opinions on in this case?

20   A.    I'm not sure I follow your question.

21   Q.    I just asked you if you'd been asked to give

22   opinions on the conduct of any of the defendants

23   and you said no, correct?

24   A.    Correct.

25   Q.    So what have you been asked to give an opinion

72

```
 1   A.    Just that -- I mean, they're talking about how
 2   it's wet in there and how it was foggy.
 3   Q.    And what did that mean to you?
 4   A.    There was a leak.  I mean fossil fuels leak,
 5   put off condensation.
 6   Q.    And what do you think was causing that
 7   condensation, from your review of everything in
 8   this case?
 9   A.    The flue.
10   Q.    The flue coming apart?
11   A.    Yeah.
12   Q.    Let me hand you Exhibit 37, which is a rather
13   long narrative summary.  And my understanding was
14   that was provided to you by Mr. Lewis?
15   A.    Correct.
16   Q.    And was he the author of that document?
17   A.    I don't know.
18   Q.    Was there anything you felt was significant
19   with regard to his narrative in connection with
20   giving your opinions in this case?
21   A.    I'd have to read through it again.
22   Q.    You can't think of anything?
23   A.    Not offhand, no.
24   Q.    So if I'm understanding you, you intend to
25   give opinions in this case at trial about what
```

1  caused the carbon monoxide exposure, which is there

2  was a hard start that caused the vent to come

3  apart?

4       MR. LEWIS:  I don't believe that's what he

5  said.

6       MS. TIEDEKEN:  Well, I'll let him answer.

7       MR. LEWIS:  I have an objection to misstating

8  testimony here; you're misrepresenting something to

9  him that's not in his designation.

10       MS. TIEDEKEN:  Go ahead.

11  BY MS. TIEDEKEN:

12  Q.   Is that your intent with regard to testifying

13  at trial?

14  A.   My intent is --

15       MR. LEWIS:  Objection.  Go ahead.

16       MS. TIEDEKEN:  Just make an objection, don't

17  tell your client what to say then make an

18  objection.

19       MR. LEWIS:  I'm just going to --

20       MS. TIEDEKEN:  You can make an objection, just

21  don't tell him what to say.

22       MR. LEWIS:  Hold on.  You can open your eyes,

23  Julie, it's not that bad.

24       MS. TIEDEKEN:  Go ahead.  Make an objection.

25       MR. LEWIS:  I'm just saying you asked him if

74

1    he was misrepresented.  I don't know what was

2    misrepresented, if anything, or if anything has

3    been misrepresented to him.

4         Read that back to me, what she said, I got

5    upset when she was closing her eyes on me.

6         (Record read.)

7         MR. LEWIS:  And my objection is that that's

8    not what was in his designation as to what he's

9    testifying to.  You can answer the question.

10   BY MS. TIEDEKEN:

11   Q.   Go ahead.

12   A.   I'd give my opinion of what I thought

13   happened, but that's all I would give.

14   Q.   Okay.  And am I correct that it's your opinion

15   that the boiler was hard starting, and that caused

16   the vent to come apart?

17   A.   With the information that I have, the boiler

18   was hard starting and the flue did come apart.

19   Q.   And is it your opinion that it was the hard

20   start that caused the flue to come apart?

21   A.   Yes.

22   Q.   Okay.  And just to clarify, it's my

23   understanding that you do not intend to give any

24   opinions on the conduct of Wyoming Mechanical or

25   its employees; is that correct?

75

```
 1   A.    Correct.
 2         MS. TIEDEKEN:  I think that's all I have at
 3   the moment.  I'm going to turn you over to either
 4   Mr. Waltz or Mr. McGill or Ms. Mead.
 5         MR. WALTZ:  I'm happy to.  Do you want to
 6   change places?
 7         MS. TIEDEKEN:  Yes, let's change places, I
 8   think that would be easier.
 9         MR. WALTZ:  Are you ready?
10                         EXAMINATION
11   BY MR. WALTZ:
12   Q.    Mr. Sondgeroth, my name is Dick Waltz, I
13   represent M&G DuraVent.
14         If I ask you a question today and you don't
15   understand it, please tell me and I'll try to
16   rephrase it.  Okay?
17   A.    Okay.
18   Q.    If you don't say something to me, I'm going to
19   take it you understood what I asked.  All right?
20   A.    Correct.
21   Q.    You've been put under oath, it's like being in
22   front of a judge and jury in this case if we should
23   go to trial.  Do you understand that?
24   A.    Yes.
25         MR. WALTZ:  Has this been marked?
```

1    the language that appears on page 5 of 9 in Exhibit

2    44.  Please turn to that.

3    A.    (Witness complies.)

4    Q.    And it starts out saying, "Mr. Sondgeroth will

5    further testify that."  Do you see that?

6    A.    Yes.

7    Q.    There's no change from that paragraph in the

8    supplemental that was filed.  Please read that

9    paragraph to yourself.

10   A.    (Witness complies.)  Okay.

11         MR. LEWIS:  Just a second.  Hold on just a

12   second.  The substance is the same, it's not

13   exactly the same language.

14         MR. WALTZ:  Okay.

15   BY MR. WALTZ:

16   Q.    With the understanding that the substance is

17   the same, have you been asked to talk about what

18   appears in Exhibit 44 on page 5 of 9, the first

19   full paragraph?  Have you been asked to talk about

20   that at trial?

21   A.    Dave and I have talked about it, what I would

22   say.  I mean, that's -- like I have here.

23   Q.    I understand that.  Did he say that he

24   anticipated asking you about these matters that

25   appear on page 5 of 9, the first full paragraph?

81

1    A.    He didn't say he would ask me that at trial.

2    Q.    Okay.  Is everything that's in there true,

3    from your perspective?

4    A.    Yes.

5          MR. LEWIS:  When you say this, are you talking

6    about that paragraph we just looked at?

7          MR. WALTZ:  Yes, sir.

8          MR. LEWIS:  Okay.  He's talking about this, is

9    this all the truth.

10         THE WITNESS:  Yes.

11   BY MR. WALTZ:

12   Q.    All right.  You agree with me that my client

13   doesn't appear in that paragraph, DuraVent?

14   A.    Correct.

15         MR. WALTZ:  Mark this as the next exhibit.

16         (Deposition Exhibit No. 45 was marked for

17   identification.)

18   BY MR. WALTZ:

19   Q.    I'm handing you Exhibit 45.  I believe this to

20   be a photograph of the installation guidelines that

21   appeared on the Triangle Tube installed at the

22   Buckingham residence.  You have not seen this

23   before, correct?

24   A.    I have not.

25   Q.    And you have not seen the actual boiler or the

210

```
 1   A.    Not that I can remember that there was.

 2   Q.    It's my understanding from prior testimony

 3   that you have never had a customer call and

 4   complain that the vent pipe had come apart,

 5   correct?

 6   A.    Correct.

 7   Q.    As I understand it, you had one incident where

 8   I think you said a boiler or the venting in the

 9   boiler was no longer working or had just broken

10   down, something like that; is that correct?

11   A.    Correct.

12   Q.    And when you got out to the home, you saw that

13   the boiler wasn't running and so you turned it off?

14   A.    No, the boiler wasn't running and the flue had

15   holes in it.  So I didn't fix it that night, I went

16   back the next day and fixed it.

17   Q.    Okay.  And what did the customer tell you over

18   the phone during that call?

19   A.    Their boiler wasn't running.

20   Q.    Okay.  What instructions did you give to the

21   customer, if any?

22   A.    I'll be down.  It was on my way home, so I

23   said I'll stop in on my way home.

24   Q.    And you did not advise during that call to

25   turn off the boiler, correct?
```

251

```
 1   might decide to wait until Monday, can't you?

 2   A.    Not with carbon monoxide.

 3         MR. WALTZ:  Good luck.

 4         MS. TIEDEKEN:  Just follow up on that.

 5                 CONTINUED EXAMINATION

 6   BY MS. TIEDEKEN:

 7   Q.    You had testified earlier that you don't

 8   purport to be an expert in the field, that you are

 9   an installer, correct?

10   A.    Correct.

11   Q.    And you don't know of any codes that apply to

12   boiler installation?

13   A.    I have never had -- I'm sure there's codes,

14   I've never had a Teton County inspector walk into

15   my boiler room or any of my guys' boiler rooms and

16   say this is a problem.  He walks in -- they walk

17   in, look around and leave.

18   Q.    No, my question wasn't whether a Teton

19   inspector has ever walked in and said there was a

20   problem.  My question was, you are unaware if there

21   are any codes that apply to boiler installation,

22   correct?

23   A.    Correct.

24   Q.    And so you know personally what you would do

25   in your own company, correct?
```

252

1    A.    Yes.

2    Q.    And you've given your opinion, if you got a

3    call such as the one that has just been described

4    to you by Mr. Waltz, you have given your opinion on

5    what you would do if you got that call, correct?

6    A.    That's correct.

7    Q.    But you've never gotten such a call like that,

8    and so you are giving your opinion with the

9    hindsight of what occurred in this case, correct?

10   A.    No.  I know if I had that call, I would go no

11   matter what.

12   Q.    No, but my question is, you've never gotten

13   that call, correct?

14   A.    I've never had a boiler flue blow apart.

15   Q.    And you've never had someone say I put it back

16   together, and I'll have my caretaker, Dave Schuler,

17   here who's going to keep an eye on it and I'm

18   leaving, so there will be no one at a home and can

19   you come Monday.  You've never gotten that kind of

20   call, correct?

21   A.    No, I haven't.

22   Q.    Do you know of any other plumbing and heating

23   contractor in Jackson, Wyoming that's received such

24   a call?

25   A.    Not that I'm aware of.

253

1    Q.    Okay.  And so you don't know what any other

2    plumbing and heating contractor may do if they got

3    such a call, correct?

4    A.    Just the ones that I talked to.

5    Q.    Well, have you talked to any other plumbing

6    and heating contractor about this case?

7    A.    Not about this case, no.

8    Q.    Has any other plumbing and heating contractor

9    that you know read this deposition testimony and

10   given their opinion on what they would do to you?

11   A.    No.

12   Q.    Okay.  So you really don't know what anybody

13   else would do in that circumstance, correct?

14   A.    No.  I know --

15   Q.    Other than what you might speculate that

16   someone might do.

17   A.    I know one guy that did it.

18   Q.    And who is that?

19   A.    Jack from Jack's Heating.  And it was on the

20   Prestige case where he was the tech that was called

21   and his CO monitor went off and he cleared the

22   house.

23   Q.    But are you familiar with what call Jack

24   received in that case?

25   A.    That his boiler -- I think it was the boiler

254

```
 1   -- wasn't running or the furnace wasn't running or

 2   something.

 3   Q.    I was actually in that case, so I know

 4   intimately what the call was, and I'll ask you to

 5   assume it was nothing like the call in this case.

 6   You're aware that Jack did not receive a call that

 7   a vent had come apart, correct?

 8   A.    No.

 9   Q.    And that they put it back together, and that

10   the caretaker would be keeping an eye on things and

11   it was okay to come back Monday because no one

12   would be in the house.  Jack didn't receive that

13   kind of a call, correct?

14   A.    Not that I'm aware of.

15   Q.    So you really aren't aware of anybody else

16   that has received that kind of call; isn't that

17   right?

18   A.    No.

19   Q.    Are you aware of any best practices in the

20   industry that says what you're supposed to do if

21   you receive a call like that, where someone says a

22   vent has come apart but it's been put back

23   together, we're leaving, no one is going to be in

24   the house, our caretaker will keep an eye on it,

25   can you come out Monday?  Is there any best
```

255

1   practices in the industry that says what you're

2   supposed do if you receive a call like that?

3   A.    Just common sense.

4   Q.    Okay.  And you don't really need an expert to

5   give a common sense opinion, correct?

6         MR. MCGILL:  Objection.  Foundation.

7         MS. TIEDEKEN:  Go ahead.

8         THE WITNESS:  What was the question again?

9   BY MS. TIEDEKEN:

10  Q.    You don't need an expert to give a common

11  sense opinion?

12  A.    You don't.

13  Q.    Would an individual's knowledge of the

14  caretakers competence have any bearing on what you

15  might trust a caretaker to keep an eye on or to do?

16  A.    If it was one of my caretakers, there's only

17  one that I would trust.

18  Q.    And who is that?

19  A.    Pete Freiman.

20  Q.    And why would you trust him?

21  A.    Because he's more paranoid about CO and fires

22  than I am.

23  Q.    And do you believe he's competent and has

24  abilities to keep an eye on things?

25  A.    Pete is.

David G. Lewis, Wyoming Bar No. 4-1150
Attorney at Law
P.O. Box 8519
Jackson, Wyoming 83002
(307) 739-8900
(307) 739-8902 (fax)
davelewis@bresnan.net

Attorney for Plaintiffs


# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| FRANCISCO L. HERRERA, and JOANNA HERRERA, CO-WRONGFUL DEATH REPRESENTATIVES, for the exclusive benefit of the beneficiaries of MONICA HERRERA, deceased, who have sustained damages from her wrongfully caused death. )))))))) | |
| Plaintiffs, )) | |
| vs. )) | |
| ) | Case No. 15-cv-128-F |
| GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM, but in their individual capacities as Trustees of the BUCKINGHAM FAMILY TRUST; and, GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM as individual defendants; and, WYOMING MECHANICAL, INC. a Wyoming Corporation; )))))))) | **PLAINTIFFS' EXPERT WITNESSES** |
| Defendants. )) | |

Comes now Plaintiffs, by and through their attorney, David G. Lewis, and

designate their Expert Witnesses as follows:


EXHIBIT
S-44
4/25/16

## RETAINED EXPERT WITNESSES

Plaintiff has retained the following individuals as expert witnesses to testify in this litigation. Plaintiff will provide these experts, without subpoena, for deposition at Defendants' expense. As discovery is on-going, Plaintiffs reserve the right to supplement this designation as new information is made known to the Plaintiffs or their experts. Plaintiff reserves the right to supplement this designation in response to any expert designation by Defendants, and any corresponding deposition of any expert designated by the Defendants. All depositions and discovery responses are therefore incorporated by this reference herein.

1.    BERNARD CUZZILLO, Ph.D., P.E.
       President, Mechanical Engineer, and Fire Scientist
       Berkeley Research Company
       600 Addison St.
       Berkeley, CA 94710-1920
       (510) 868-4350

Bernard Cuzzillo, Ph.D., P.E., is an expert mechanical engineer and fire scientist. Dr. Cuzzillo obtained his B.S. from U.C. Berkeley in Mechanical Engineering in 1989; his M.S. in Mechanical Engineering from U.C. Berkeley in 1982; and he completed a Doctorate in Mechanical Engineering from U.C. Berkeley in 1997. Dr. Cuzzillo is a registered mechanical engineer in the State of California, and a member of ASM International, the National Fire Protection Association, the American Society of Mechanical Engineers, and the Society of Forensic Engineers and Scientists. Dr. Cuzzillo is an invited lecturer in Mechanical Engineering 290F, a graduate class entitled Case Studies in Fire Safety Engineering Science, at the University of California at Berkeley.

He has twice (2000, 2007) been the co-chairman of the seminars, Society of Forensic Engineers and Scientists. Plaintiff retained Dr. Cuzzillo to investigate and reconstruct the cause and circumstances leading to the January 30, 2015 carbon monoxide exposure incident that killed Monica Herrera.

**Summary of testimony / comprehensive statement of each of the opinions of such witness and the factual basis for each opinion:**

a.    Dr. Cuzzillo's written report - including a summary of his opinions and a comprehensive statement of each of his opinions and the factual basis for each opinion - is attached;

b.    Dr. Cuzzillo's curriculum vitae, including a list of all publications authored within the last ten years, is attached;

c.    A listing of any other cases in which he has testified as an expert at trial or by deposition in the preceding four years is attached;

d.    Dr. Cuzzillo does not insist on any special conditions or requirements for taking his deposition. Dr. Cuzzillo charges $450 per hour for consulting, and for deposition and trial testimony, including traveling and waiting time. In the case of deposition testimony the charges begin at the appointed time.

If called as a witness at trial, Dr. Cuzzillo will testify to the facts and opinions contained in this report. Plaintiff anticipate that the Defendants will take Dr. Cuzzillo's deposition prior to the discovery cut-off. Dr. Cuzzillo may also testify at trial regarding any facts and opinions discussed during his anticipated deposition.

Dr. Cuzzillo reserves the right to supplement his opinions based upon review of additional information acquired, and he reserves the right to provide rebuttal testimony to any facts or opinions offered by the defendants' experts.

2.    James Sondgeroth
Quarter Circle 4 Heating and Plumbing, Inc.
P. O. Box 7212
Jackson, Wyoming 83002

Mr. Sondgeroth is the owner and operator of Quarter Circle 4 Heating and Plumbing Company, Inc.. He began working in plumbing and heating as a youngster from 1972 to 1976, working for and with his grandfather and father, both plumbers. He attended the University of Colorado on a wrestling scholarship, and graduated from there with a degree in education in 1980. Since 1980, he has worked full time as a plumber. From 1990 to 2005, he was the foreman for the Defendant Wyoming Mechanical. In 2005, Mr. Sondgeroth formed Quarter Circle 4 Heating and Plumbing. Mr. Sondgeroth is a Master Plumber. (copy attached)

Mr. Sondgeroth has installed many boilers and hydronic heating systems in businesses and residences in Teton, Park, Sublette, and Lincoln Counties. Among these are boilers manufactured by Triangle Tube, including the Prestige 175. His plumbing experience with Triangle Tube over the past years is that when properly installed, the Prestige Boiler is reliable and safe. He will also testify that the tech support at Triangle Tube always make themselves available to him by telephone during an installation or repair of one of their boilers. Triangle Tube has a bar code on each of their boilers which gives them the history of the particular boiler the plumber is working on. The

support personnel remain available for whatever time is necessary to resolve any problem with one of their boilers.

Mr. Sondgeroth will further testify that he is very familiar with the practice of plumbers in Quarter Circle 4, as well as the plumbers in Teton County, as regards carbon monoxide problems. He will further testify that if a customer calls his company with a flue pipe leaking combustion gases into a home or business, he would immediately tell them to shut the boiler off, leave the premises immediately, and relate that he or one of his employees would immediately go to that site and address the problem. His experience is that other plumbers in Jackson Hole would do the same.

Mr. Sondgeroth charges $125.00 per hour to give a deposition or to testify in a Courtroom, plus any travel expenses.

3.     Rick Hirschi, Ph.D.
Economic Consultant
1763 N. 3000 W.
Rexburg, Idaho 83440
(208) 496-3806

Dr. Hirschi is professor of economics at BYU-Idaho in Rexburg. He has been retained by Plaintiffs to calculate the losses suffered by Plaintiffs as a result of the wrongful death of their Wife, Mother, Aunt, and Grandmother, Monica Herrera. Dr. Hirschi's evaluation of losses Preliminary Report has been specifically prepared for this case, and it is incorporated herein by this reference as a part hereof.

Dr. Hirschi is presently unavailable for the remainder of this week, but he will provide a history of legal cases with which he has had an involvement as an expert

witness. As soon as the same is provided, it will be given to supplement this report, and copies provided to counsel.

Dr. Hirschi may have other opinions, and will certainly elaborate on the opinions expressed above. After the development of further facts and the rendering of other economic loss opinions, this designation may be amended or supplemented. Dr. Hirschi may also respond to the opinions of other economic experts who may be retained in this matter by other parties. When the deposition of Dr. Hirschi is taken, the opinions which he expresses therein are to be incorporated into this designation statement.

Dr. Hirschi's fee for giving a deposition is $600 for a deposition given in southeastern Idaho; and, $750 for a deposition taken outside southeastern Idaho. Any deposition lasting longer than three hours will be billed at $200 per hour. Travel to and from any destination is $75 per hour for deposition. All actual expenses incurred for travel, lodging, and meals, and any other expenses necessary for deposition travel or attendance shall be reimbursed at the amount of the cost incurred.

**Summary of testimony / comprehensive statement of each of the opinions of such witness and the factual basis for each opinion:**

a.    Dr. Hirschi's written report - including a summary of his opinions and a comprehensive statement of each of his opinions and the factual basis for each opinions - is attached;

b.    Dr. Hirschi's curriculum vitae, including a list of all publications authored within the last four years is attached;

c.    A listing of any other cases in which he has testified as an expert at trial or by deposition in the preceding four years will be provided a described above;

d.    Dr. Hirschi does not insist on any special conditions or requirements for taking his deposition. Dr. Hirschi's deposition charges are included in the description of his charges, above.

Neither of the Defendants provided in their initial discovery the tax returns and other financial information upon which punitive damages could be calculated; even though the grounds and prayers for punitive damages are clearly alleged.  The case for punitive damages against the Defendants Buckingham and Wyoming Mechanical is strong and based upon uncontroverted evidence.  The foreseeable and avoidable CO exposure caused acute carbon monoxide poisoning and Monica Herrera's death.  The failure of the Buckinghams to provide a reasonably safe place to work was of highly unreasonable conduct, an extreme departure from ordinary care in a situation where the need for a high degree of care was apparent.  Wyoming Mechanical's intentional, self-imposed ignorance and avoidance of the mortal dangers to the occupants is also beyond reckless.

Defendants should not postpone providing their financial information regarding the probable applicability of punitive damages in this matter.  Once that financial information is provided, Plaintiffs can assess the full extent of their recoverable damages, and provide reasonable demands for settlement.

If called as a witness at trial, Dr. Hirschi will testify to the facts and opinions contained in his report.  Plaintiffs anticipate that the Defendants will take Dr. Hirschi's

deposition prior to the discovery cut-off. Dr. Hirschi may also testify at trial regarding any facts and opinions discussed during his anticipated deposition.

Dr. Hirschi reserves the right to supplement his opinions based upon review of additional information acquired, and he reserves the right to provide rebuttal testimony to any additional facts or opinions offered by the Defendants' experts.

## NON-RETAINED EXPERT WITNESSES

4.      Lars T. Conway, MD
        Teton Pathology, P.C.
        Anatomic & Clinical Pathology
        P. O. Box 4940
        625 E. Broadway
        Jackson, Wyoming 83001
        (307) 733-6418

Dr. Conway is a Jackson, Wyoming pathologist who has practiced as such for 22 years. He performed an Autopsy on Monica Herrera following her death at the Buckingham Residence in Teton County, Wyoming. The autopsy was performed by Dr. Conway in order to determine the cause of Monica's death, at the Teton County Morgue in Jackson at the request of Brent A. Blue, MD, Teton County, Wyoming Coroner. Dr. Conway's final anatomical diagnosis at the autopsy was "Carbon monoxide poisoning (carboxyhemoglobin level 76%)."

This is an extraordinarily high concentration of CO in the blood stream.

**Summary of testimony / comprehensive statement of each of the opinions of such witness and the factual basis for each opinion:**

a.      Dr. Conway's written Autopsy Report is attached;

b.      Dr. Conway's curriculum vitae, is attached;

c.      A listing of any other cases in which he has testified as an expert at trial or by deposition in the preceding four years is attached;

d.      If Dr. Conway's deposition is to be taken in the morning, it would have to be taken in his office at the hospital, where he must be available to examine surgical samples. If in the afternoon, it may be possible to take his deposition outside the hospital. Dr. Conway charges a fee of $600 for his deposition.

If called as a witness at trial, Dr. Conway will testify to the facts and opinions contained in this report.

Respectfully submitted on this 5th day of November, 2015.

David G. Lewis
Attorney for Plaintiffs
P. O. Box 8519
Jackson, Wyoming 83002

## CERTIFICATE OF SERVICE

This is to certify that on the 5th day of November, 2015, I served a true and accurate copy of the above and foregoing by electronic transmission as follows:

Julie Tiedeken, Esq.
jtiedeken@mtslegal.net

Katherine L. Mead
kate@meadlaw.net