```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF WYOMING

_____
                              )
FRANCISCO L. HERRERA and      )
JOANNA HERRERA, CO-WRONGFUL   )
DEATH REPRESENTATIVES, for    )
the exclusive benefit of      )
the beneficiaries of MONICA   )
HERRERA, deceased, who have   )
sustained damages for her     )
wrongful caused death,        ) Case No.: 15-CV-128-F
                              )
              Plaintiffs,     )
                              )
      vs.                     )
                              )
GREGORY BUCKINGHAM and        )
DEBORAH BUCKINGHAM, both in   )
their individual capacities   )
as Trustees of the BUCKINGHAM )
FAMILY TRUST; and GREGORY     )
BUCKINGHAM and DEBORAH        )
BUCKINGHAM as individual      )
defendants; and WYOMING       )
MECHANICAL, INC., a Wyoming   )
Corporation,                  )
                              )
              Defendants.     )
_____
```

                    TRANSCRIPT OF
                DEPOSITION OF DAVID GIECK

                       Taken at
                     MEAD & MEAD
                   Jackson, Wyoming
                  November 19, 2015

COURT REPORTER: Denise Nowak
Certified Shorthand Reporter
and Notary Public

```
                              36
 1          MS. TIEDEKEN:  Just send a request for
 2   production or whatever.
 3          MR. LEWIS:  That's what I'm talking about.
 4   BY MR. LEWIS:
 5   Q.    So is the telephone call or the message that
 6   you said the day before Thursday, so Wednesday, is
 7   that a message that is on a recorder?
 8   A.    Yes, the message is a voicemail.
 9   Q.    It's what?
10   A.    It's a voicemail.
11   Q.    A voicemail.  And that's recorded and we have
12   that?
13   A.    Yes.
14          MR. LEWIS:  Could we listen to those two?
15          MS. TIEDEKEN:  Sure.  Do you want her to
16   record it or just go off the record?
17          MS. MEAD:  I think it would be great to have
18   it recorded.
19          MR. LEWIS:  We are going want a recording of
20   it, but I think we might as well have, if you can,
21   we will try to, yeah, I think it would be best.
22          MS. TIEDEKEN:  Let's see if we can find it.
23   BY MR. LEWIS:
24   Q.    Since we are on the record, before it the
25   starts would you please say for the record what we
```

37

1   are going to get ready to hear?
2   A.   This is an e-mail that I sent to Julie this
3   morning of a voicemail I received from Mr.
4   Buckingham on Wednesday, the 28th.
5        "David, Greg Buckingham, 733-7436.  Leaving
6   town in the morning, so if you get a chance to call
7   me this afternoon, that would be great.  I want to
8   chat with you about coming out here Monday.  I know
9   you have it on your schedule already and who you
10  are bringing, so you don't waste your time.  It
11  sounds like a car that's hitting the wall, it's
12  getting so loud when it bangs.  And you may need to
13  bring out the guy that sold you the boiler is what
14  I'm thinking, but you definitely need two people.
15  Okay, thanks.  Bye."
16       MS. LEWIS:  And then David called back on the
17  29th.
18  BY MR. LEWIS:
19  Q.   Is that recorded?
20  A.   Not to my knowledge.
21  Q.   What did you say to him on the 29th?  When I
22  say him, let's make it clear, Mr. Buckingham.  You
23  called him on the 29th?
24  A.   I called Mr. Buckingham around 9 o'clock.
25  Q.   In the morning?

38

1   A.    In the morning on the 29th.
2   Q.    In response to this message he had left you
3   the day before?
4   A.    Yes.  He had called me and asked me to call
5   him back.  I called him back.  We talked about the
6   boiler.  Originally we were scheduled to go to the
7   Buckinghams that Monday because they were going to
8   be out of town.
9   Q.    The 2nd?
10  A.    Yes.
11  Q.    February 2nd?
12  A.    Yes.
13  Q.    And that original appointment was to put
14  glycol in the system to bring it up to the 30
15  percent that we recommend for freeze protection,
16  and also at that point to look at the leak in the
17  slab that we were unable to find back in November
18  after the boiler installation.  That appointment
19  had been set up, I would think, in the end of
20  December between my father and Greg.  And it was
21  set up such that they wouldn't be in town, and it
22  was after the holidays and we could get in the
23  house and do what we needed to do.  So I had that
24  scheduled for that second of February to do those
25  things.

39

1     This Wednesday was the first I had heard of
2     the banging problems with the boiler and the flue
3     coming apart, that's why we talked on -- when I
4     talked to him on Thursday he said Deborah and I are
5     leaving town shortly.  I'm confirming that you are
6     coming out Monday.  The vent is back together.
7     There is nobody going to be around.  And I was told
8     that Dave Schuler would be on site paying
9     attention.
10         I confirmed yes --
11         MS. TIEDEKEN:  Wait for a question.
12    Q.   Okay, I think you were still describing?
13    A.   And I confirmed that, yes, we will be there
14    Monday.
15    Q.   According to the cross-claim filed by Wyoming
16    Mechanical in this case, excuse me, against Wyoming
17    Mechanical in this case, that's document 8 in the
18    visual court file, it's paragraph 4.  It states "On
19    January 27, 28, for the first time Buckinghams
20    noticed that the piping associated with the boiler
21    unit had come apart.  Buckinghams and their
22    caretaker put the piping back together and called
23    Wyoming Mechanical Inc. to come to their home and
24    make whatever repairs were necessary."
25         Do you recall that conversation where you were

41

1  Q.     Okay.  It would have been your goal to make
2  sure that the boiler ran properly and safely
3  though, would it not?
4  A.     Yes.
5  Q.     And was there a guarantee from the company or
6  from Triangle Tube or from your company, a two-year
7  guarantee period pertaining to the operation of the
8  Triangle Tube boiler?
9  A.     I know the Triangle Tube has a warranty.  What
10 that warranty exactly is I would have to look.
11 Q.     Maybe we can probably get that.  Okay the next
12 sentence in that same paragraph says.
13        "Were they allowed to, defendant Buckinghams
14 would point out to the Court that they had no
15 knowledge whatsoever that the loose piping that
16 they discovered associated with the boiler could
17 possibly result in the death of Mrs. Herrera or
18 themselves."
19        And then the next sentence.
20        "Presumably Wyoming Mechanical knew of the
21 dangers but failed to communicate them to defendant
22 Buckinghams."
23        Did you ever communicate to Mr. and Mrs.
24 Buckingham that the loose piping they discovered
25 associated with the boiler could possibly result in

50

1  Q.    Okay, but at certain levels it would become
2  deadly?
3  A.    Yes.
4  Q.    "Had defendant Buckinghams known of the danger
5  of carbon monoxide poisoning, they would have moved
6  out of the home and allowed no one to enter until
7  Wyoming Mechanical had made the necessary repairs."
8  I guess that's their statement.
9        Do you have any comment about that?
10       MS. TIEDEKEN:  Objection, it calls for
11 speculation.  Go ahead.
12 A.    I was told that the Buckinghams would not be
13 in the home, that they were out of town.  When I
14 spoke to Mr. Buckingham Thursday morning I was told
15 that they were en route to leaving town that
16 Thursday and that nobody would be in the home.  We
17 would have arrived that there Monday with nobody
18 there.
19 Q.    Okay.
20       MR. LEWIS:  Okay, I'll pass this on to Kate.
21 I may have a few more questions.
22       MS. MEAD:  Okay.
23                    EXAMINATION
24 BY MS. MEAD:
25 Q.    Mr. Gieck, I'm Kate Mead.  We've met before.

```
                                51
 1    I represent the Buckinghams in this matter.
 2         So my understanding is that you're dad, Steve
 3    Gieck, was the one who did the planning for the
 4    Triangle Tube system that was placed in November of
 5    2014?
 6    A.    Yes.
 7    Q.    Was there a proposal provided to the
 8    Buckinghams, a written proposal of their options
 9    for this install?
10    A.    Not to my knowledge.
11    Q.    And I know that you would have produced it if
12    there was one available, but I just wanted to be
13    sure.
14    A.    I believe it was a -- we were instructed to
15    replace the system.  We came up with a plan and an
16    estimated cost for the system, at which point we,
17    Steve Gieck, I'm being told from him that he spoke
18    with Mr. Buckingham and agreed upon the estimated
19    pricing and made a plan to move forward with the
20    project.
21    Q.    Okay.  Do you know if when your dad made that
22    proposal he would have given the Buckinghams any
23    option about what boiler to use?
24    A.    I don't know that.
25    Q.    At that time Wyoming Mechanical was
```

62

1  Q.  But he does work on weekends; is that right?
2  Was Aaron correct?
3  A.  If required or if requested, yes.
4  Q.  Okay.
5  A.  We do 24-hour emergency service.
6  Q.  Why didn't you send him out to the
7  Buckinghams?
8  A.  Because I was told that the boiler flue was
9  together and that the Buckinghams would be out of
10 town, and that Monday would be fine when we came
11 out there to work on the system.
12 Q.  You testified previously that you thought Mr.
13 Buckingham said that the caretaker would keep an
14 eye on it.  He was a person, right, going into that
15 garage that could have been injured as well,
16 correct?
17 A.  Yes.
18 Q.  And I think you said several times that you
19 did not warn Mr. Buckingham about the dangers
20 associated with the pipe coming loose and the
21 delayed ignition?
22 A.  I didn't know about the delayed ignition at
23 that point.
24 Q.  But you didn't warn him about the possibility
25 of carbon monoxide as a result of the pipe coming

63

1  loose?
2  A.    No.
3  Q.    I guess I just wonder why not.
4  A.    Because the pipe had been put back together,
5  because the Buckinghams were leaving town, and I
6  was told nobody would be around.
7  Q.    If you had to do it again, would you have told
8  him?
9  A.    Yes.
10 Q.    I think you said that you typically do not go
11 out on a job to do an inspection after the job is
12 done, such as the job that was done at the
13 Buckinghams in November 2014.
14 A.    I run around the field all day long, so
15 sometimes yes sometimes no, it just depends on the
16 day.  It depends on the job.  But I do inspect lots
17 of work all day long.  This particular job I was
18 not -- I did not inspect after the completion of
19 it.
20 Q.    Now when you spoke about the fact that the --
21 was it combustion test was not done on this product
22 after Mr. McCormick and his crew put it in?  Would
23 that have indicated -- would that have shown
24 anything that might have indicated this delayed
25 ignition problem?