IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

FRANCISCO L. HERRERA and  )
JOANNA HERRERA,           )
CO-WRONGFUL DEATH         )
REPRESENTATIVES for       )
exclusive benefit of the  )
Beneficiaries of MONICA   )
HERRERA, deceased, who    )
have sustained Damages    )
from her wrongfully       )
caused death,             )
                          )
        Plaintiffs,       )
                          )
vs.                       )  Case No.
                          )  15-CV-128-F
GREGORY BUCKINGHAM and    )
DEBORAH BUCKINGHAM, but   )
in their individual       )
capacities as Trustees of )
the BUCKINGHAM FAMILY     )
TRUST; and, GREGORY       )
BUCKINGHAM and DEBORAH    )
BUCKINGHAM as individual  )
defendants; and, WYOMING  )
MECHANICAL, INC., a       )
Wyoming Corporation;      )
TRIANGLE TUBE/PHASE III   )
CO. INC., a New Jersey    )
Corporation; and, M&G     )
GROUP DURAVENT, INC., a   )
New York corporation,     )
                          )
        Defendants.       )
_____  )

DEPOSITION OF
GARY BENNETT
Wednesday, August 17, 2016

TAKEN AT
Jackson Hole Court Reporting
Jackson, Wyoming

COURT REPORTER:
Michelle L. Cunningham

1

APPEARANCES:

FOR THE WITNESS GARY BENNETT:

LAW OFFICES OF BAYER & CAREY, P.C.
BY:  Mark W. Gerganoff, Attorney at Law
1660 Downing Street
Denver, CO 80218
(303) 830-8911
Mgerganoff@bayerlaw.com

FOR THE PLAINTIFFS:
LAW OFFICES OF DAVID G. LEWIS
BY:  David G. Lewis, Attorney at Law
PO Box 8519
Jackson, WY 83002
(307) 739-8900
Davelewis@bresnan.net

FOR THE DEFENDANT WYOMING MECHANICAL, INC.;
CROSS DEFENDANT:
LAW OFFICES OF McKELLAR, TIEDEKEN & SCOGGIN
BY:  Julie Tiedeken, Attorney at Law
712 Randall Avenue
Cheyenne, WY 82001
(307) 637-5575
Jtiedeken@mtslegal.net

FOR THE DEFENDANT TRIANGLE TUBE/PHASE III:

LAW OFFICE OF FOLEY, BARON, METZGER & JUIP,
JPLLC
BY:  Joseph P. McGill, Attorney at Law
38777 Six Mile Road, Suite 300
Livonia, MI 48152
(734) 742-1825
Jmcgill@fbmjlaw.com

///
///

2

FOR THE DEFENDANT/CROSS COMPLAINANTS
BUCKINGHAMS:

LAW OFFICE OF MEAD AND MEAD
BY:  Katherine L. Mead, Attorney at Law
PO Box 1809
Jackson, WY 83001
(307) 733-0166
Kate@meadlaw.net

FOR THE DEFENDANT DURAVENT:
WALTZ/REEVES
BY:  Christopher Reeves, Attorney at Law
1660 Lincoln Street, Suite 2510
Denver, CO 80264
(303) 830-8800
Creeves@waltzreeves.com

Also Present:
Migs Lewis, Law Office of David Lewis

3

INDEX OF EXAMINATION

EXAMINATION BY:   Mr. Reeves      Page 6

EXAMINATION BY:   Mr. McGill      Page 48

EXAMINATION BY:   Ms. Tiedeken    Page 56

EXAMINATION BY:   Mr. Lewis       Page 63

EXAMINATION BY:   Mr. Reeves      Page 70

4

Pages 1 to 4

**Exhibit A**

**Page 5**

INDEX OF EXHIBITS

EXHIBIT NO.    DESCRIPTION    REFERENCE

224    (State Farm Certified
Policy Record)    Page 13

225    (Handwritten List)    Page 30

226    (Typewritten List)    Page 30

**Page 6**

1  BE IT REMEMBERED that, pursuant to
2  Notice of Deposition, and on Wednesday,
3  August 17, 2016, commencing at the hour of
4  2:00 p.m., thereof, at the offices of
5  Jackson Hole Court Reporting, Jackson,
6  Wyoming, before me, MICHELLE L. CUNNINGHAM,
7  a Freelance Shorthand Reporter and Notary
8  Public in and for the County of Sublette,
9  State of Wyoming, there personally appeared
10      GARY BENNETT,
11 called as a witness by the Defendant M&G
12 DuraVent, and who, being first duly sworn,
13 was thereupon examined and testified as
14 hereinafter set forth.
15      EXAMINATION OF GARY BENNETT
16      BY MR. REEVES
17 Q.  Mr. Bennett, my name's Christopher Reeves
18 and I represent M&G DuraVent, one of the
19 defendants in this case.
20 A.  Okay.
21 Q.  Have you ever heard of M&G DuraVent
22 before?
23 A.  No.
24 Q.  Have you ever given a deposition before?
25 A.  No.

**Page 7**

1  Q.  It's effectively a question/answer
2  session.  We want your answers to be honest
3  and forthcoming.  There's no pressure, you
4  know, it's -- it's not an endurance test --
5  A.  Okay.
6  Q.  -- so if you need to take a break, let me
7  know.
8  A.  All right.
9  Q.  If at any point in time, you don't
10 understand my question, let me know --
11 A.  Okay.
12 Q.  -- because that frequently happens that --
13 that I may ask a question that makes
14 absolutely no sense and you just say, Mr.
15 Reeves, you know, I don't understand what
16 you're asking me.  Okay?
17 A.  Okay.
18 Q.  At any point in time if you need to take a
19 break or anything like that, all I ask is
20 that with get an answer to you to the extent
21 that a question is pending before we take a
22 break.
23      I don't see that we'll be here too long
24 today.  We just have some questions based
25 upon some information we've gathered in this

**Page 8**

1  litigation.  Okay?
2  A.  Okay.
3  Q.  Can you please state your full and
4  complete name for the record?
5  A.  Gary Dennis Bennett.
6  Q.  And when are you currently employed?
7  A.  State Farm Insurance.
8  Q.  Are you an employee of State Farm
9  Insurance or are you an independent agent?
10 A.  I am an independent agent.
11 Q.  Okay.
12      How long have you been an independent
13 agent for State Farm?
14 A.  I've been with State Farm 35 years.
15 Q.  Okay.
16 A.  Five of those years, I was an agency
17 manager in Houston, Texas, but the rest of
18 that time I was an agent.
19 Q.  And I -- I heard the accent.  It's
20 somewhere in Texas.  Is that where you're
21 from is Houston?
22 A.  No, I'm from west Texas.
23 Q.  And when did you move to Jackson, Wyoming?
24 A.  December of '03.
25 Q.  And did you transfer within the -- the

1   State Farm network to an agency here?
2   A.  Yes.
3   Q.  Was it already an existing agency --
4   A.  Yes.
5   Q.  -- or a new one?
6   A.  Existing.
7   Q.  All right.
8      And what's the address of that agency?
9   A.  It's 1110 Maple Way.  Of course
10  everything in Jackson is P.O. Box, but...
11  Q.  Okay.
12     And you said in 2001 you moved here?
13  A.  No.  I took over the agency February
14  the 1st of 2004.
15  Q.  2004.
16  A.  Yes.
17  Q.  Okay.
18     And do you have any colleagues that work
19  with you at the agency, other agents?
20  A.  I have many licensed staff.
21  Q.  Okay.
22  A.  Okay.  But no agents.  I'm the only
23  agent.
24  Q.  Okay.
25     And as part of -- or as an insurance

9

1   agent, does State Farm provide you any
2   training on how to handle claims if one of
3   your insureds comes to you and says, Hey, I
4   may have an issue?
5   A.  Absolutely.
6   Q.  And is that written training or is that
7   computer training?  What type of training are
8   we talking about?
9   A.  Well, all types --
10  Q.  Okay.
11  A.  -- all types, really.
12  Q.  And is the training something that occurs
13  routinely or you just do it once and as long
14  as you feel you're competent, you're done
15  with it?
16  A.  We have recurring training.  If they
17  change systems or if they change anything
18  that -- that we normally do --
19  Q.  Um-hum.
20  A.  -- you know, we will have a new
21  training program.
22  Q.  Do you, at your office, maintain any type
23  of manuals or guidelines on how to handle
24  when a insured comes to you with a potential
25  claim?

10

1   A.  No.
2   Q.  Okay.
3      And would you rely upon documents
4   issued to you by State Farm?
5   A.  Yes.
6   Q.  Is there any State Farm forms or -- and
7   let me correct that.
8      Are there any State Farm written physical
9   forms or is it all computerized as of today?
10  A.  All computerized.
11  Q.  Would it have been computerized in January
12  of 2015?
13  A.  Absolutely, yes.
14  Q.  And would you print out any documentation
15  as to any claims that you would make for your
16  insureds?
17  A.  No.
18     (Moving head from side to side.)
19  Q.  Would it all be, again, computerized as it
20  relates to your files?
21  A.  Yes.
22  Q.  All right.
23     Do you know Wyoming Mechanical?
24  A.  Yes.
25  Q.  How do you know Wyoming Mechanical?

11

1   A.  When I took over the agency, they were
2   already insured with the agency.
3   Q.  I see that they have a property casualty
4   policy.  Are you aware of them having any
5   other policies?
6   A.  Commercial.
7   Q.  Through State Farm?
8   A.  Yeah.  I mean, they have several
9   through State Farm.  The family's had
10  insurance through State Farm for a long
11  time, so we've had many policies on the --
12  on the Geick family.
13  Q.  And what we're gonna do is we've
14  already -- we're doing rolling exhibits --
15  A.  Um-hum.
16  Q.  -- so we're gonna actually mark this as
17  exhibit number, I think it's 224 --
18  A.  Okay.
19  Q.  -- so -- and that's just our
20  identification for what we're providing here.
21     And this is a certified copy --
22  A.  Okay.
23  Q.  -- of Wyoming Mechanical's policy --
24  A.  Okay.
25  Q.  -- as it relates to this case.

12

1    (Whereupon, Deposition Exhibit 224 was
2    marked for identification.)
3    Q. (By Mr. Reeves)  Have you seen -- and I'm
4    providing to you 224.  Have you seen that
5    insurance policy before?
6    A.  When -- when changes occurred in the
7    State Farm system, they used to mail
8    policies to our office, but now they do
9    not --
10   Q.  Okay.  But --
11   A.  -- they mail it direct to the client.
12   Q.  Would it have been mailed to the office in
13   2014, which I think is the year --
14   A.  No.
15   Q.  -- this was issued?
16   A.  No.
17   Q.  It would have been mailed to the client --
18   A.  Yes.
19   Q.  -- directly?
20   A.  Um-hum.
21   Q.  Is a full and complete copy -- I used to
22   do coverage work for State Farm --
23   A.  Uh-huh.
24   Q.  -- and it usually comes like onion
25   paper --

13

1    Q.  Okay.
2    A.  -- because they've told us to only file
3    a claim when a claim is -- is submitted to
4    us.
5    Q.  Who has told you that?
6    A.  State Farm systems.
7    Q.  Okay.
8        And -- and there's -- have you read a
9    property casualty form such as the one
10   before you recently?
11   A.  Many, many -- not recently, no.
12       (Moving head from side to side.)
13   Q.  Okay.
14   A.  Many years ago.
15   Q.  Would you say that you're familiar with
16   the form?
17   A.  Yes.
18       (Moving head up and down.)
19       Um-hum.
20   Q.  And the policy clearly delineates the
21   duties the insured has --
22   A.  Um-hum.
23   Q.  -- as it relates to any potential claim --
24   A.  Um-hum.
25   Q.  -- claim or potential claim; correct?

15

1    A.  Yeah.
2    Q.  -- thin, thin paper --
3    A.  Um-hum.
4    Q.  -- little packet.
5    A.  Right.
6    Q.  Is that what would be sent to the client?
7    A.  Yes.
8    Q.  Okay.
9        And would you maintain a copy of that
10   even in digital form in your office?
11   A.  No.
12       (Moving head from side to side.)
13   Q.  What is your role as it relates to
14   insureds once they've signed a policy with
15   your agency?
16   A.  Um-hum.
17       I'm basically the conduit between the
18   client and State Farm, the company.
19   Q.  Okay.
20       And so, like in this case, if there's a
21   potential claim, what would you do as an
22   agent?
23   A.  Okay.  I'm gonna take the word
24   potential.  If there's not a claim, I don't
25   do anything, I can't do anything --

14

1    A.  I mean, there may be a potential claim
2    but I don't file it until it's a claim.
3    Q.  Do you notify State Farm of a potential
4    claim?
5    A.  No.
6    Q.  Okay.
7        Potential claim.  And -- and I'll tell
8    you, having done work for State Farm --
9    A.  Um-hum.
10   Q.  -- that's not usually the position they
11   take --
12   A.  Okay.
13   Q.  -- in litigation.
14       MS. TIEDEKEN:  Well object to -- if
15   that's a question, object to the form.
16       MR. MCGILL:  Form.
17       MS. MEAD:  Join.
18   Q.  (By Mr. Reeves)  Are you -- have you ever
19   notified State Farm of a potential claim?
20   A.  No.
21       (Moving head from side to side.)
22   Q.  Okay.
23       Let's go to the policy before you.  And
24   let's go to -- let's go to page, what has
25   been Bates-stamped 051 of the insurance

16

1  policy.
2      MR. REEVES:  And I did not print out a
3  full copy because it's, like, 80 pages.
4      THE WITNESS:  051.
5  Q.  (By Mr. Reeves) Yeah.  It's Page 1 of the
6  business coverage.  So -- and generally
7  speaking, this policy provides for insurance
8  for property damage and for liability;
9  correct?
10  A.  Correct.
11  Q.  Page 1, we've got the property damage and
12  then on Page 2, we've got a liability table
13  of contents; correct?
14  A.  Correct.
15  Q.  And then if we go to --
16      MS. TIEDEKEN:  And, Chris, you did not
17  bring copies for anybody else; right?
18      MR. REEVES:  That's correct.
19      MS. TIEDEKEN:  Can you identify, is
20  that the policy I produced in discovery?
21      MR. REEVES:  That is the certified
22  policy.
23      MS. TIEDEKEN:  Thank you.
24      MR. REEVES:  Yeah, and I'll have him
25  read what he's -- what we're referring to

17

1  Q.  If we -- can you read Paragraph 3?
2  A.  (Reading)  Prior to the policy period,
3  no insured listed under Paragraph 1A of
4  Section 2 --
5  Q.  And I'll interrupt you.  I didn't mean
6  that paragraph.
7  A.  I'm sorry.
8  Q.  The --
9  A.  Or you're on --
10  Q.  The full Paragraph 3.
11  A.  Oh, sorry.
12  Q.  Not sub -- Sub-Paragraph 3, but
13  Paragraph 3.
14  A.  (Reading)  Bodily injury or property
15  damage which occurs during the policy
16  period and was not prior to the policy
17  period, known to have occurred by any
18  insured listed under Paragraph 1A of
19  Section 2, who is an insured or any
20  employee authorized by you to give or
21  receive notice of an occurrence or claim
22  includes any continue -- I'm sorry,
23  continuation, change or resumption of
24  bodily injury or property damage after the
25  end of the policy period.

19

1  just so everybody'S on the same page.
2  Q.  (By Mr. Reeves)  If you'll go to Page 23,
3  which is Bates-stamped 073.
4  A.  (Reviewing document.)
5      And what's the title of that section?
6  A.  Liability.
7  Q.  Section 2, Liability; is that correct?
8  A.  Um-hum.  Section 2, Liability.
9  Q.  Is -- and if you go to coverage L,
10  business liability, .2.
11  A.  Okay.
12  Q.  Can you read 2 through 2(a)(1)?
13  A.  "This insurance applies to bodily
14  injury and property damage only if the
15  bodily injury, property damage is caused by
16  an occurrence that takes place in the
17  covered territory."
18  Q.  Okay.
19      And "bodily injury" is in quotes; correct?
20  A.  Correct.
21  Q.  And so is "occurrence"; correct?
22  A.  Yes.
23  Q.  And those are terms that are defined by
24  the policy; correct?
25  A.  Yes.

18

1  Q.  So do you read that as the notice would be
2  either on the company or its employee as it
3  relates to bodily injury?
4      MS. TIEDEKEN:  Object to the form.
5      MR. GERGANOFF:  Foundation.
6      THE WITNESS:  Yeah, that's basically
7  what it says, yes.
8  Q.  (By Mr. Reeves) Okay.  So can you read
9  Paragraph 4 for me?
10  A.  (Reading)  Bodily injury or property
11  damage will be deemed to have known to have
12  occurred at the earliest time when the
13  insured listed under Paragraph 1A of
14  Section 2, who is an insured or an employee
15  authorized by you to give or receive notice
16  of an incurrence or claim -- occurrence or
17  claim.  I'm sorry.
18  Q.  Okay.  And Subsection A?
19  A.  Report -- "reports all or any part of
20  the bodily injury or property damage to us
21  or any other insurer."
22  Q.  Okay.  And so stop there.
23      So notice to the insured would be
24  triggered at the time they report that notice
25  to the insurance company --

20

1    MR. GERGANOFF: Form. Foundation.
2    Q. (By Mr. Reeves) -- under that provision;
3    correct?
4    A. Yes.
5    Q. Okay.
6        And then there's a -- there's other
7    options as well. So can you read Section B?
8    A. Receives a written or verbal demand or
9    claim for damages or other relief because
10   of the bodily injury -- because of the
11   bodily injury or property damage -- you
12   want me to read the rest of it?
13   Q. And so in this case, when Wyoming
14   Mechanical called you on -- did they call you
15   on January 30th or 31st; do you recall?
16   A. I don't recall the exact day.
17   Q. Do you recall whether it was night or
18   during the day?
19   A. Day.
20   Q. And so I would suspect, then, it was the
21   31st, which would be the first daytime after
22   the death of Miss Herrera. Does that sound
23   consistent with your memory?
24   A. I truly do not remember.
25   Q. Okay.

21

1    Q. No, Section 2 general conditions. State
2    Farm does that where they call it Section 2
3    but then they give a specific name; isn't
4    that correct?
5    A. Yeah.
6    Q. If you can go to Paragraph 3.
7    A. Okay.
8    Q. What's the title of that paragraph?
9    A. "Duties in the event of occurrence,
10   offense, claim, or suit."
11   Q. Okay. If you could read Subsection A.
12   A. (Reading) You must see to it that we
13   are notified as soon as practicable of any
14   occurrence or -- or offense which may
15   result in a claim. To the extent possible
16   notice should include...
17   Q. And hold off there.
18       So at least under Section 3A, Wyoming
19   Mechanical had a duty to State Farm to notify
20   State Farm of a occurrence that may result in
21   a claim; correct?
22       MR. GERGANOFF: Form.
23       THE WITNESS: Yes.
24   Q. (BY Mr. Reeves) Okay.
25       And when -- what information did Wyoming

23

1        At that time, did Wyoming Mechanical tell
2    you they received a written or verbal demand
3    for damages -- for claim for damages?
4    A. No.
5    Q. Okay.
6        How about Subsection C?
7    A. (Reading) Becomes aware by any other
8    means that bodily injury or property damage
9    has occurred or has began -- or has begun
10   to occur.
11   Q. Now under that option, Wyoming Mechanical,
12   by the time they called you in January, was
13   aware that bodily injury had occurred;
14   correct?
15   A. Yes, they knew that she -- that they
16   died.
17   Q. Okay.
18       And then if you go to Page 33, which is
19   Bates-stamped 83 --
20   A. Um-hum.
21   Q. -- and -- and can you give me the title of
22   that section too?
23   A. Of -- of the general conditions.
24   Q. Is that the title?
25   A. Section 2, I'm sorry, "Deductibles."

22

1    Mechanical tell you in their very first
2    conversation about the death of Miss Herrera?
3    A. Basically he said that the lady died in
4    this gentleman's house and he did not give
5    me any specifics at that time of what
6    occurred.
7    Q. Did he tell you -- well, why was he
8    calling? He didn't believe he had a problem
9    that he needed to report to his insurance --
10   A. Um-hum.
11   Q. -- was he calling you because you're a
12   personal friend?
13   A. No.
14   Q. Was he calling you because you were his
15   lawyer?
16   A. No.
17   Q. Was he calling you for anything other than
18   to advise his insurance company that there
19   may be a problem for which my insurance may
20   be --
21       MR. GERGANOFF: Form. Foundation.
22       THE WITNESS: I'm not sure what that
23   means.
24   Q. (BY Mr. Reeves) Yeah. And you can -- you
25   can go ahead and --

24

1  A.  When I -- I don't want to be verbose in
2  this explanation.
3  Q.  Yeah.
4  A.  When I took over the agency, there was
5  a wrongful death suit several years prior
6  to my taking over the agency --
7  Q.  Um-hum.
8  A.  -- that Wyoming Mechanical was involved
9  in, that Steve Geick was involved in, and I
10  felt like when David came in, there was
11  concern because of what had happened way
12  back in the past to his father.
13  Q.  Okay.
14  A.  And so that was my assumption when he
15  came in because he wasn't specific about
16  anything else.
17  Q.  What was the wrongful death circumstances
18  of that other incident?
19  A.  I -- I don't know.  That was before my
20  time here.
21  Q.  Did it involve their commercial policy or
22  their personal policy?
23  A.  Commercial policy.
24  Q.  Okay.  So it would certainly be a death
25  that resulted in some way or fashion because

25

1  of their professional activities?
2  A.  I don't --
3      MR. GERGANOFF:  Form.
4      THE WITNESS:  -- I don't know.
5  Q.  (By Mr. Reeves)  Okay.
6  A.  I didn't know the details of the claim.
7  It was long before I got here.
8  Q.  Okay.
9      Are you aware of Wyoming Mechanical being
10  in the business of -- let me change that
11  question.
12      Was Wyoming Mechanical installing
13  boilers when you came to Wyoming and took
14  over the State Farm agency?
15  A.  I don't know.  I mean, they're a
16  plumbing contractor.  I would assume --
17  Q.  Okay.
18  A.  -- that they would be doing that.
19  Q.  Are you aware of any change in their
20  business after you came to Wyoming?
21  A.  No, I -- I didn't have -- I wasn't that
22  close of a relationship with them.
23  Q.  Okay.
24      So when Mr. Geick -- and was it David
25  Geick or Steven Geick that called you?

26

1  A.  David.
2  Q.  And David is the son of Steven; is that
3  correct?
4  A.  Yes.
5  Q.  And when Mr. Geick called you, was -- was
6  it a first attempt, a second attempt, a
7  message left?  What was going on?
8  A.  He called and I answered the phone --
9  Q.  Okay.
10  A.  -- yeah.
11  Q.  And did he say, Hey, I've got a problem,
12  or anything like that?  Or did he just say,
13  Hey, I just want to tell you this is what's
14  going on?
15  A.  It's been a long time ago.  I truly
16  don't remember the verbiage he used, so...
17  Q.  Okay.
18      Did he make it -- did you get a sense from
19  talking to him it was important?
20  A.  Of yours.  Yeah.
21  Q.  And at that time, did he tell you it
22  involved an installation of a boiler by
23  Wyoming Mechanical in the house where Miss
24  Herrera died?
25  A.  No.

27

1  Q.  Did he -- did he tell you at that time
2  that he knew that his -- his employee had not
3  performed certain required calibrations of
4  the boiler?
5      MS. TIEDEKEN:  Objection to form --
6      THE WITNESS:  No.
7      MS. TIEDEKEN:  -- assumes facts not in
8  evidence.
9      THE WITNESS:  No.
10  Q.  (By Mr. Reeves)  Did he tell you that he
11  had gotten notice from a -- one of the
12  employees about the death the night of the
13  death?
14      MS. TIEDEKEN:  Objection as to form.
15  Assumes facts not in evidence.
16      MR. REEVES:  And what's -- what --
17  what's not in evidence?  He -- he received
18  a call the night of the death relating to
19  Miss Herrera's death and that's what
20  prompted him to --
21      MS. TIEDEKEN:  What's not in evidence
22  is that he -- he had -- what the employee
23  had told him at the time he called
24  Mr. Bennett.
25      MR. REEVES:  Okay.

28

1    MS. TIEDEKEN:  I think his testimony's
2  been on his way out to the Buckingham home
3  was he was talking to.
4    Q.  (By Mr. Reeves)  Okay.  So -- so what I'll
5  show you is a portion of his deposition where
6  he said he talked to McCormick prior to
7  talking to you.
8    A.  Well --
9    Q.  And did he mention he had talked to the
10  employee --
11    A.  No.
12    Q.  -- about the incident?
13    A.  No.
14    Q.  Okay.
15    And you said that you talked to him --
16  or, actually, let's go to -- it's out of
17  order.
18    I'm gonna show you what's been
19  previously marked as Exhibit 87.  I think
20  my office previously provided you a copy of
21  this document.  And let me --
22    A.  (Reviewing document.)
23    Q.  Have you ever seen that document before?
24    A.  No.
25    Q.  Okay.

                                                    29

1    A.  Not a written.  I saw a typed document.
2    Q.  Okay.
3    And then I'm gonna provide you what we're
4  gonna mark as 225, which is a less redacted
5  version that was provided to us about three
6  weeks ago.
7    A.  Um-hum.
8    (Whereupon, Deposition Exhibit 225 was
9  marked for identification.)
10    Q.  (By Mr. Reeves)  And so you can see those
11  are the same document, that just has less
12  redactions on it.
13    A.  (Reviewing document.)
14    Q.  Now, I'm gonna provide you Exhibit 89,
15  which has been previously marked as
16  Exhibit 89.
17    A.  Um-hum.  This is what --
18    Q.  And then we're gonna mark the less
19  redacted version as 226.
20    (Whereupon, Deposition Exhibit 226 was
21  marked for identification.)
22    MR. REEVES:  Can I get that copy?
23  That's my copy that I highlighted.
24    MR. GERGANOFF:  And I wrote on it, I'm
25  sorry about that, Chris.

                                                    30

1    MR. REEVES:  No, that's fine.  There's
2  nothing special about my highlights.
3    Q.  (By Mr. Reeves)  Okay.  Have -- you said
4  you have not seen the handwritten version?
5    A.  No.
6    Q.  When Wyoming Mechanical ultimately asked
7  you to -- to provide State Farm with notice
8  of this claim, did they provide you any
9  materials?
10    A.  No.
11    (Moving head from side to side.)
12    Q.  Did you have any conversations with them
13  about that time?
14    MR. GERGANOFF:  And I just want to caution
15  the witness just to answer the question "yes"
16  or "no" and not reveal any conversations that
17  you may have had, the substance of the
18  conversations, if you had them?
19    MR. REEVES:  In August of 2015,
20  correct, when the Complaint was filed?
21    MR. GERGANOFF:  Yeah.
22    MR. REEVES:  Okay.
23    MR. GERGANOFF:  The Complaint was filed
24  August 5th.  Is that agreed?
25    MR. REEVES:  That's correct.

                                                    31

1    MR. GERGANOFF:  Okay.  Thank you, then
2  that's agreed.
3    THE WITNESS:  The answer's no.
4    Q.  (By Mr. Reeves)  Did they just say, Hey,
5  we need to provide notice?  Is that it?  Was
6  that the end of the conversation?
7    A.  No.
8    Q.  And I don't mean to ask what they may have
9  told you otherwise, but was it simple as
10  that?
11    A.  They didn't tell me anything.  I did
12  note speak with David.
13    Q.  Okay.
14    So they didn't go through you to provide
15  notice to State Farm?
16    A.  No.
17    Q.  Okay.
18    So they went on State Farm's website and
19  filed a claim and --
20    A.  I have many licensed people in my
21  office who take claims all day.
22    Q.  Okay.
23    Well, let me ask you that question.  Prior
24  to August 5th of 2015 --
25    A.  Um-hum.

                                                    32

Pages 29 to 32

1  Q.  -- did Wyoming Mechanical have
2  conversations with anyone else in your office
3  related to this claim?
4  A.  Not that I'm aware of.
5      (Moving head from side to side.)
6  Q.  Okay.
7      If you can look at the typewritten
8  version, which we've marked as 226, I
9  think.
10  A.  Um-hum.
11  Q.  Not that one.  The less typewritten -- I
12  think it's right here.  Okay.  So --
13  A.  (Reviewing document.)
14      MR. LEWIS:  Are we talking about 226,
15  Chris?
16      MR. REEVES:  226, yeah.
17  Q.  (By Mr. Reeves)  And you see on
18  January 30th at 9:45?  Do you see that?
19  A.  Um-hum.
20  Q.  And I'll represent to you this is a
21  outline that Mr. Geick put together.
22  A.  Okay.
23  Q.  You see where he was notified by one of
24  his employees about the Herrera death on the
25  night of the death?

33

1  A.  Okay.
2  Q.  Did he tell you that when he called you on
3  January 31st?
4  A.  That he'd been notified?
5  Q.  That he had been notified by an employee
6  as to the death.
7  A.  No.
8  Q.  Did he tell you that it involved carbon
9  monoxide exposure?
10  A.  No.  He just said that somebody had
11  died.
12  Q.  All right.
13      The wrongful death action that happened
14  prior to you taking over the agency, did it
15  involve carbon monoxide exposure?
16  A.  I don't know.
17      (Moving head from side to side.)
18  Q.  Okay.
19      Did Mr. Geick tell you that he had
20  talked to his lawyer prior to calling you
21  about this claim?
22  A.  No.
23  Q.  Okay.
24      And then you see on January 31st, he has a
25  notation relating to you?

34

1  A.  (Reviewing document.)
2      Yes.
3  Q.  Okay.
4      And can you read that into the record?
5  A.  (Reading)  I called and briefed my
6  insurance agent, Gary Bennett.  He advised
7  hold tight and see what happens.
8  Q.  Does that sound like something you would
9  tell your insured is to hold tight and see
10  what happens?
11  A.  No.
12      (Moving head from side to side.)
13  Q.  Do you know what he's talking about when
14  he says that you told him to hold tight and
15  see what happens?
16  A.  I said if there's a claim presented,
17  we'll file it.
18  Q.  What's -- what's the purpose of notifying
19  an insurance company of a pot- -- of a claim?
20  Since you say that they don't give notice of
21  potential claims, what's -- what's
22  the intent, as you understand it as a agent
23  for State Farm, in providing notice of a
24  claim?
25  A.  To notify the claims offices that there

35

1  is a claim that's been presented to me.
2  Q.  Okay.
3      And why does the insurance company want
4  notice as soon as practical, as defined by
5  the policy?
6      MR. GERGANOFF:  Foundation.
7      Go ahead and answer.
8      THE WITNESS:  I would assume to
9  investigate that there was a claim.
10  Q.  (By Mr. Reeves)  Okay.
11      And would investigating a claim where the
12  death is six months, seven months earlier, be
13  beneficial to State Farm?
14      MR. GERGANOFF:  Foundation.
15      THE WITNESS:  I have had thousands of
16  claims in my career.
17  Q.  (By Mr. Reeves)  Um-hum.
18  A.  I've always presented claim when
19  someone's presented the claim to me.  I
20  would never advise someone to do anything
21  other than that.
22  Q.  And when you mean claim, you mean suit
23  papers?
24  A.  I mean do you have a claim.  Insurance
25  is contract law, obviously.

36

1  Q.  Yeah.
2  A.  Okay.  Do we have a claim?
3  Q.  Um-hum.
4  A.  If we have a claim, we file it.  Simple
5  as that.  That's the way I've been told my
6  entire career.
7      They want agents to remove themselves
8  as best we can from the claims, because I
9  was in the management once upon a time,
10 they feel like claim -- the agents can
11 muddy the water if we try to get involved
12 in a claim so we don't get involved.
13 Q.  As an agent, do you advise your policy
14 holders as to how to deal with situations
15 that may result in a claim?
16 A.  No.
17     (Moving head from side to side.)
18 Q.  So if -- if Wyoming Mechanical or any
19 other policy holder came to you and said, I
20 think there may be a claim, what should I do
21 about this, do you just say, I -- I can't
22 advise you as to that?
23 A.  No.  I tell them, If you feel like
24 there's a claim, I will file it with the
25 claims office --

37

1  Q.  Okay.
2  A.  -- and have the claims adjuster speak
3  with you.
4  Q.  Okay.
5      So based upon that, was there any
6  conversations between you and Wyoming
7  Mechanical on the 31st where you asked them,
8  Do you feel you have a claim?
9  A.  I asked him if he had a claim to
10 present --
11 Q.  Okay.
12 A.  -- and he didn't say he did.
13 Q.  And it would be up to Wyoming Mechanical
14 to advise you of whether or not they felt
15 that there may be some exposure or a claim
16 for you to report?
17 A.  To respond, yes.
18 Q.  Okay.
19     Does State Farm provide any training to
20 you as to how to deal with evidence once a
21 claim is made?
22 A.  Any evidence, any written document that
23 we receive is submitted along with the
24 claim when it's filed.
25 Q.  Do you advise your clients as to whether

38

1  or not they should change evidence or not
2  change evidence in anticipation of a possible
3  claim?
4  A.  Of course not.
5  Q.  No, no.  And I don't mean that you
6  instruct them to.  Do you give them advise --
7  A.  No.
8  Q.  -- as to what to do?
9  A.  No.
10 Q.  Okay.
11     So if they have those types of questions,
12 you would refer them to State Farm?
13 A.  Absolutely.
14     (Moving head up and down.)
15 Q.  Okay.
16     Are there any manuals or materials that
17 State Farm provides you, as an agent, as to
18 what to do when a claim is made and how to
19 deal with potential evidence related to that
20 claim?
21 A.  Okay.  There used to be hard manuals
22 years ago --
23 Q.  Um-hum.
24 A.  -- and they took all those away
25 15 years ago.

39

1  Q.  Okay.
2  A.  Okay.
3      So we don't have the written manuals
4  like we used to, and we don't -- as an
5  agent, we rarely have any claim -- any
6  claim classes or things of that nature
7  unless they make a change in the system.
8  Q.  Okay.
9  A.  Okay.
10     And there has not been a change in the
11 system for years.  It's basically if
12 your -- if a claim is reported to you, you
13 file it and step away.
14 Q.  If a client said, I'm going to tinker with
15 potential evidence, what would be your advice
16 to them?
17     MR. GERGANOFF:  Form.
18     THE WITNESS:  I would never advise a
19 client to do anything like that.
20 Q.  (By Mr. Reeves)  Okay.  So -- and -- and
21 the reason I ask that, it appears that on
22 February 2nd --
23 A.  Um-hum.
24 Q.  -- that you had another conversation with
25 Wyoming Mechanical.  Do you recall having a

40

1  second conversation with Wyoming Mechanical?
2  A.  When he called about the homeowner
3  making a request of him, yes, I recall that
4  conversation.
5  Q.  Okay.
6      And can you read that sentence that starts
7  with, "I made a call to Gary Bennett"?
8  A.  (Reading)  I made a call to Gary
9  Bennett with State Farm and told him that
10 Greg had requested and he gave his blessing
11 to honor the owners' request to figure out
12 what was going on with the boiler system.
13 Q.  Okay.
14     Did you give Wyoming Mechanical blessing
15 to figure out what was going on with the
16 boiler system?
17 A.  No.  What I said was that would be
18 completely between you and the homeowner.
19 Q.  Okay.
20     And did he tell you that he would
21 potentially be making changes to the boiler
22 system and trying to figure out what happened
23 to it?
24 A.  No.  He said nothing to me like that.
25 All he said was, The homeowners asked me to

41

1  come out and get the heat going again.
2  Q.  Had he told you that he made changes to
3  the boiler system, would you have provided
4  him any advice or insight as an agent?
5  A.  Well, first of all, I didn't know what
6  was going on --
7      MR. GERGANOFF:  Form.
8  Q.  (By Mr. Reeves)  Um-Hum.
9  A.  -- so the answer to that question is
10 no.
11 Q.  As an agent, were you interested in what
12 was going on?
13 A.  Of course.
14 Q.  Did you ask and he didn't give you any
15 information?
16 A.  I was listening to David --
17 Q.  Okay.
18 A.  -- okay?  That's all I was responding
19 to David's questions, but I would never
20 give somebody any blessing or anything like
21 that --
22 Q.  Okay.
23 A.  -- to do anything to damage the
24 circumstances.
25 Q.  Okay.

42

1  A.  I'm too honest for that.
2  Q.  Okay.
3      Have you had conversations with
4  Mr. Geick since -- up to August -- or
5  August 5th, 2015, relating to his
6  understanding or his representation as to
7  your statements to him?
8  A.  Not at all.
9      (Moving head from side to side.)
10 Q.  Did Mr. Geick inform you in March when he
11 was interviewed by the sheriffs officers as
12 to his installation of the boiler system in
13 the Buckingham home?
14 A.  No.
15     (Moving head from side to side.)
16 Q.  Would that have been something that would
17 concern you if one of your insureds was being
18 questioned by sheriffs officers related to a
19 project they were involved with?
20 A.  It would be of concern but I wasn't
21 aware he was being investigated by the
22 sheriff's department.
23 Q.  Did -- when Mr. Geick called you on
24 February 31st and February 2nd, did he tell
25 you that?

43

1      MS. TIEDEKEN:  I think you said
2  February 31st.
3      MR. GERGANOFF:  Yeah.
4  Q.  (By Mr. Reeves)  Oh, I'm sorry.  January
5  31st and February 2nd --
6  A.  Okay.
7  Q.  -- did he tell you that he had not
8  obtained a building permit for purposes of
9  installing the boiler?
10 A.  No discussion like that ever came up.
11     (Moving head from side to side.)
12 Q.  Okay.
13     Did Mr. Geick tell you -- and I'll
14 provide this to you first.  This is
15 previously marked Exhibit 221.
16 A.  Um-hum.
17 Q.  Have you seen that document before?
18 A.  No.
19     (Moving head from side to side.)
20 Q.  Did Mr. Geick tell you that prior to the
21 death of Miss Herrera that the homeowner had
22 called him and specifically requested some
23 type of maintenance on the boiler at issue?
24 A.  When I spoke to David and he said he'd
25 spoken with the homeowner --

44

1  Q. Um-hum.
2  A. -- and he said the homeowner would like
3  him to come out and fix the -- get the heat
4  going again.
5  Q. No, no, no. This is prior to the death.
6  A. Oh.
7  Q. This is on January 28th.
8  A. No, then. I'm -- I'm sorry.
9  Q. Okay.
10 A. He talked to me after the fact.
11 Q. He had talked to you after the fact?
12 A. Yeah.
13 Q. And he told you there was a death at a
14 location he had installed a boiler or did he
15 just say there was a death?
16 A. No, he said there was a death at a home
17 he had worked at.
18 Q. Okay.
19 A. He didn't -- he didn't imply boiler.
20 Q. Okay.
21    And did he inform you that prior to the
22 death, two days before the death, he had
23 received a phone call from the home --
24 homeowner expressing concerns about the very
25 work he had done?

45

1  Q. (By Mr. Reeves) Um-hum.
2  A. I didn't have knowledge of any of that
3  so I -- I guess I -- I have no answer to
4  that --
5  Q. Okay.
6  A. -- I didn't know anything about that.
7  Q. I know you've talked to Miss Tiedeken.
8  A. Yeah.
9  Q. Did you talk to her prior to August 2nd,
10 2015? Or, I'm sorry, August 5th, 2015.
11    THE WITNESS: I don't remember -- I
12 don't the exact day.
13    MS. TIEDEKEN: You might have to ask
14 him before or after the lawsuit was filed.
15 Q. (By Mr. Reeves) Yeah. Did you talk to
16 her before the lawsuit was filed?
17 A. No.
18 Q. I note in Mr. Geick's outline that he had
19 a family friend attorney named Jack Edwards.
20 Did you talk to jack Edwards before
21 August 5th of 2015?
22 A. I don't know who Jack Edwards -- no.
23 Q. Okay.
24 A. No.
25 Q. Is Jack Edwards a lawyer who practices

47

1  A. No.
2     MS. TIEDEKEN: Object to the form.
3  Q. (By Mr. Reeves) Did he inform you that
4  the homeowner had described noises that
5  sounded like a car hitting a wall --
6  A. No.
7  Q. -- when he talked to you?
8  A. We -- we had no conversation about his
9  conversation with the homeowner other than
10 the homeowner wanted him to come fix the
11 heat.
12 Q. After the -- after the accident?
13 A. After the accident, yeah.
14 Q. Would it -- would knowledge of a
15 homeowners complaint about the boiler he had
16 installed and that his employee had not done
17 a configuration of the boiler been something
18 that would have been helpful to you to
19 determine whether or not a claim should be
20 filed with State Farm?
21    MS. TIEDEKEN: Object to the form.
22    THE WITNESS: I don't --
23    MR. GERGANOFF: Objection.
24    THE WITNESS: First of all, I don't
25 assume anything.

46

1  here in town?
2  A. I don't know him --
3  Q. Okay.
4  A. -- I don't know.
5  Q. One second.
6     I think that's all the questions I have
7  right now.
8        EXAMINATION OF GARY BENNETT
9            BY MR. MCGILL
10 Q. Mr. Bennett, my name's Joseph McGill --
11 A. Um-hum.
12 Q. -- I represent a company named Triangle
13 Tube. They're involved in the lawsuit you're
14 here on today.
15 A. Okay.
16 Q. I just have a couple questions for you.
17 A. Sure.
18 Q. Did Wyoming Mechanical, when you bound
19 their coverage during the time period that
20 would have covered November of 2014, did they
21 make any financial disclosures to you?
22 A. No. Those -- those are automatic
23 renewals unless there's some significant
24 change in the policy.
25 Q. Okay.

48

Pages 45 to 48

1    Did Mr. Geick, either Steven or David
2  Geick, provide you with copies of any --
3  any materials involved in this lawsuit,
4  other than the Complaint?
5  A.  No.
6  Q.  Did Mr. Geick or anyone from Wyoming
7  Mechanical consult with you prior to any
8  inspections or testing of the boiler that's
9  involved in this lawsuit?
10  A.  No.
11    MR. GERGANOFF:  Could you -- could you
12  put it in a time frame, please, Mr. McGill?
13  Q.  (By Mr. McGill) At any -- at any time
14  after January 30th, 2015?
15  A.  No.
16    MR. GERGANOFF:  And after August 5th.
17  Q.  (By Mr. McGill) At any time before
18  January 30th, 2015, did either Mr. -- anyone
19  from Wyoming Mechanical contact you to
20  communicate with you concerning any testing
21  or inspection of the boiler that's involved
22  in this lawsuit?
23    MR. GERGANOFF:  I'm gonna instruct the
24  witness not to answer to the extent he has
25  to draw on information that was obtained

49

1  after the date this lawsuit was filed
2  August 5th, 2015.
3  Q.  (By Mr. McGill) Okay.  After August 5th,
4  2015?
5    MR. GERGANOFF:  No, that's my
6  instruction:  He's not gonna refer to any
7  information that he collected after the
8  lawsuit was -- was filed.
9    MR. MCGILL:  Okay.  Then before.
10    MR. GERGANOFF:  Before, correct.  No,
11  between January and August 5th he should
12  answer the question.
13    MR. MCGILL:  Okay.
14    MR. GERGANOFF:  And after August 5th,
15  he's instructed not to answer.
16    MR. MCGILL:  Thank you for that
17  clarification.
18  Q.  (By Mr. McGill) Do you understand that
19  question?
20  A.  Or can you restate it, if you don't
21  mind.
22  Q.  Sure.
23    Did anyone from Wyoming Mechanical
24  communicate with you between January 30th,
25  2015, and August --

50

1    MR. GERGANOFF:  5th.
2  Q.  (By Mr. McGill) -- 5th, 2015, about any
3  tests or any inspections concerning the
4  boiler that's involved in this lawsuit?
5  A.  No.
6  Q.  So between that time period, January 30th,
7  2015, and August 5th, 2015, can you just
8  relate for me your best recollection of any
9  communications you had with Wyoming
10  Mechanical?
11  A.  The first call was to let me know that
12  someone had died where he'd been working.
13  The second call was he asked me -- you
14  know, he was -- asked me -- he told me he
15  was contacted by the homeowner and was
16  asked to go out and fix the heat because
17  it's February and I said, David, that's --
18  you know, I -- I don't know, that's between
19  you and the homeowners.  I don't have any
20  jurisdiction over anything like that so I
21  had no reason to approve or disapprove.
22  Not my call.
23    MS. MEAD:  Mr. Bennett, can you speak
24  up a little?  I'm having a hard time down
25  here because of the air conditioning.

51

1    THE WITNESS:  I apologize.
2    I just said I had no reason to approve
3  or disapprove anything like that because
4  that was between he and the homeowner and
5  that's what I said.
6  Q.  (By Mr. McGill) Okay.
7    Any other conversations that you can
8  recall during that time period?
9  A.  I haven't spoken to David after that
10  personally.
11  Q.  During that time period that we're talking
12  about here, January --
13  A.  Um-hum.
14  Q.  -- the August time period --
15  A.  Um-hum.
16  Q.  -- would your agency have any type of
17  filing materials that you would maintain
18  outside of a claim file?
19  A.  No.
20    (Moving head from side to side.)
21    We don't make a hard file anymore at
22  all.
23  Q.  How about anything electronic?
24  A.  There -- there was nothing to file.
25  What we sent in was the claims, that report

52

1  was -- was what we had and David presented
2  that, that day, we sent it in.  It was -- I
3  think it was the suit papers.
4  Q.  Okay.  So that's -- that's later in
5  August?
6  A.  Um-hum.
7  Q.  Okay.
8      MR. GERGANOFF:  I've got to remind the
9  witness not to provide to any information
10 that you received --
11     THE WITNESS:  Okay.
12     MR. GERGANOFF:  -- after August 5th,
13 2015.
14     I'm sorry, Counsel.
15     THE WITNESS:  Okay.
16 Q.  (By Mr. McGill)  So can you tell me a
17 little bit -- when you took over the agency,
18 you mentioned that there was a prior wrongful
19 death claim, was that involving Wyoming
20 Mechanical, Steven Geick, David Geick?  What
21 recollection do you have of that?
22 A.  I really have no recollection of any
23 specifics of the claim, because I -- it
24 was -- I don't even know how many years it
25 was before I took over.  I just know that

53

1  there was a wrongful death claim somewhere
2  out in the Village at a hotel.
3  Q.  I see.
4  A.  And then one of my employees told me
5  that.
6  Q.  Was it the Snake River Lodge; do you
7  recall?
8  A.  I don't know.  I don't remember which
9  one it was because the lady that told me,
10 you know, just told me that there was a
11 claim out there, because I was getting to
12 know the clients, that's all --
13 Q.  I see.
14 A.  -- so...
15 Q.  So that was a claim.  Do you recall if it
16 was a claim against Wyoming Mechanical?  Mr.
17 Steven Geick?  David Geick?
18 A.  That's way before me.
19 Q.  Do you -- I think you mentioned that when
20 you first took over the agency and when --
21 when David Geick was coming into Wyoming
22 Mechanical to take it over or work with his
23 father --
24 A.  Yeah.
25 Q.  -- that they came in -- someone came in

54

1  and spoke with you about this wrongful death
2  claim; that there was some concern when David
3  joined Wyoming Mechanical.  I think that's
4  kind of what you testified to.
5      MS. TIEDEKEN:  Object to the form.
6  Misstates his testimony.
7      MS. MEAD:  Object to the form.  Join.
8  Q.  (By Mr. McGill)  Okay.  So what
9  conversations did you have, either with David
10 or Steven Geick, about this wrongful death
11 claim?
12 A.  None.
13 Q.  All right.
14     So when you took over the agency, you
15 mentioned that this claim had already
16 happened, you don't know much about it, but
17 there was some concern about David Geick
18 joining Wyoming Mechanical --
19 A.  No.
20 Q.  -- and this wrongful death claim?
21     MS. TIEDEKEN:  Object to the form.
22     THE WITNESS:  No.
23     MR. GERGANOFF:  Join.
24 Q.  (By Mr. McGill)  I may have misunderstood
25 you.  Do you know where that claim was

55

1  litigated?
2  A.  I don't -- I truly don't know any of
3  the facts of that claim.
4  Q.  Did you give any instruction to anyone at
5  Wyoming Mechanical about preserving evidence
6  involved in this lawsuit?
7  A.  No.
8  Q.  Prior to the lawsuit being filed, did you
9  speak with either David Geick or Steven Geick
10 about risks associated with preserving
11 evidence in a lawsuit?
12 A.  No.
13     MR. MCGILL:  I will pass the witness at
14 this time.
15     Thank you very much, sir.
16     THE WITNESS:  Sure.
17     MS. MEAD:  I have no questions.
18        EXAMINATION OF GARY BENNETT
19            BY MR. LEWIS
20 Q.  Mr. Bennett, is all the coverage that
21 State Farm is applying to this incident, is
22 it all that coverage in Exhibit 224?
23     MR. GERGANOFF:  Foundation.
24     THE WITNESS:  This right here?
25 Q.  (By Mr. Lewis)  The insurance policy.

56

1     MR. GERGANOFF:  Form.
2     THE WITNESS:  Yes.
3 Q. (By Mr. Lewis)  And is State Farm insuring
4 Wyoming Mechanical or any of the principals
5 in Wyoming Mechanical -- Wyoming Mechanical
6 under any Reservation of Rights?
7     MS. TIEDEKEN:  Objection.  Foundation.
8     MR. GERGANOFF:  Form.
9     MR. REEVES:  You can still answer the
10 question.
11     THE WITNESS:  I can still answer the
12 question?  I don't know what all this
13 means, okay?
14 Q. (By Mr. Lewis)  When objections are all
15 stated, then you can answer the question
16 unless your counsel tells you not to answer
17 the question.
18 A.  Okay.
19 Q.  All right.  And I'll ask you the question
20 again.
21 A.  Ask me again.
22 Q.  Is State Farm insuring Wyoming Mechanical
23 or any of its principals under a Reservation
24 of Rights?
25 A.  None that I'm aware of.

57

1     MS. TIEDEKEN:  Objection.  Foundation.
2     MR. GERGANOFF:  Join.
3 Q. (By Mr. Lewis)  And how -- let me ask you
4 about how you were informed.  Would you
5 typically be informed about that situation in
6 an incident where a death was involved under
7 a policy that your office had sold?
8     MS. TIEDEKEN:  Are you asking if the
9 insurance is under reservation or if this
10 defense is under reservation?
11     MR. LEWIS:  Well, I'm talking about the
12 defense, whether the defense is under
13 reservation.
14     MS. TIEDEKEN:  Okay.
15     MR. LEWIS:  I guess I'm not drawing a
16 distinction between whether the coverage is
17 under reservation or whether the defense is
18 being providing under --
19     MS. TIEDEKEN:  I think the question
20 was -- was were they insured under
21 reservation, so that's why I wanted a
22 clarification.
23 Q. (By Mr. Lewis)  Well, I don't -- I don't
24 want to leave anything vague --
25 A.  Yeah.

58

1 Q.  -- if -- if -- if -- so let me start over again
2 with that.
3 A.  Okay.
4 Q.  Is the coverage provided in -- what is the
5 amount of the coverage under the policy?
6 A.  It -- here it is.
7     MR. GERGANOFF:  Speaks for itself.
8     THE WITNESS:  (Reviewing document.)
9     That's not -- that's not the
10 liabilities policy.
11     MR. GERGANOFF:  Let the record reflect
12 the witness is referring to Exhibit 224.
13     THE WITNESS:  (Reviewing document.)
14     $2 million with an aggregate of four
15 million.
16 Q. (By Mr. Lewis)  And is that coverage
17 provided, or is that coverage -- well, let me
18 ask -- what I mean by -- you're providing a
19 defense to David Geick and Wyoming
20 Mechanical, or the principals of Wyoming
21 Mechanical; isn't that true?
22     MS. TIEDEKEN:  Object to the form.
23     MR. GERGANOFF:  Form.  Form.
24 Q. (By Mr. Lewis)  State Farm is providing --
25 A.  Yes.

59

1 Q.  -- coverage; isn't that correct?
2 A.  Yes.
3 Q.  And that coverage is not under any
4 Reservation of Rights, is it --
5     MS. TIEDEKEN:  Object to foundation and
6 form.
7     MR. GERGANOFF:  Foundation.
8 Q. (By Mr. Lewis)  -- that you know of?
9     THE WITNESS:  None that I'm aware of.
10 Q. (By Mr. Lewis)  And is -- are any of the
11 defendants being -- well, I think it's
12 covered, but are any of the defendants being
13 defended under any Reservation of Rights?
14     MR. GERGANOFF:  Foundation.
15     MS. TIEDEKEN:  Well, I mean, any of the
16 defense other than Wyoming Mechanical?
17     MR. LEWIS:  Well, I think are the
18 principals covered as well?
19     MS. TIEDEKEN:  They're not named as
20 parties in the lawsuit so there's no
21 defense being provided.
22     MR. LEWIS:  Well, they aren't yet.  I
23 assume there won't be.
24     THE WITNESS:  This -- this policy was
25 with Wyoming Mechanical.

60

1    Q. (By Mr. Lewis) But does the policy
2    language -- do you know whether the policy
3    language covers the principals of the
4    company?
5        MS. TIEDEKEN: Object to form and
6    foundation.
7        THE WITNESS: As being a part of the
8    company, they are covered if -- if they
9    are -- that's the best way to say it.
10    Q. (By Mr. Lewis) Okay.
11        Under -- under forms of vicarious
12    liability; is that -- is that correct?
13        MS. TIEDEKEN: Objection --
14        MR. GERGANOFF: Foundation.
15        -- form and foundation.
16        THE WITNESS: Vicarious liability.
17        MR. REEVES: If you don't understand
18    the term, tell him.
19        THE WITNESS: I'm not sure what
20    direction you're going with that vicarious
21    liability, but, you know, liability
22    coverage extends to not only the owner but
23    the -- the -- the employees of the company.
24    Okay? So...
25    Q. (By Mr. Lewis) Okay. That's -- that

61

1    -- and that answers my question.
2    A. Okay.
3    Q. Thank you.
4    A. Vicarious.
5    Q. And are the events that would trigger the
6    excess coverage or the -- this $2 million
7    coverage with $4 million --
8    A. Aggregate.
9    Q. -- aggregate, what -- what would
10    constitute aggregate under the policy?
11        MR. GERGANOFF: Foundation.
12        MS. TIEDEKEN: Objection. Form.
13    Foundation.
14        THE WITNESS: More than one claim; if
15    there's an additional claim.
16    Q. (By Mr. Lewis) So per claim there's only
17    $2 million coverage for any one claim?
18        MR. GERGANOFF: Foundation.
19        THE WITNESS: Correct. Correct.
20    Q. (By Mr. Lewis) Okay.
21        That's all I have. Thank you.
22    A. Okay.
23        MS. TIEDEKEN: I don't have anything.
24        ///
25        ///

62

1        FURTHER EXAMINATION OF GARY BENNETT
2            BY MR. REEVES
3    Q. I have a few more just to clear up the
4    coverages.
5        Are you -- as an agent, would you receive
6    notice that there's Reservation of Rights on
7    any claim?
8    A. No.
9        (Moving head from side to side.)
10    Q. Okay.
11        Are you, nonetheless, aware in this
12    case of any Reservation of Rights?
13    A. I'm not aware of any.
14    Q. Okay.
15        And the policy generally has two
16    benefits: You get a defense when there's a
17    claim and litigation --
18    A. (Moving head up and down.)
19    Q. -- and you get indemnity when there's a
20    claim and litigation; correct?
21    A. True.
22    Q. And those are two separate benefits under
23    the policy; correct?
24    A. Correct.
25    Q. So the insurer, State Farm can give them a

63

1    defense but not indemnity should they be
2    found ultimately liable; correct?
3    A. If they're found ultimately liable,
4    we'd provide indemnity for that.
5    Q. To the extent that that liability isn't
6    excluded under the policy language; correct?
7    A. Correct.
8    Q. Okay.
9        And the reason I ask that is if you'll
10    look at Page 24 of that exhibit, there's an
11    exclusion for contractual liability.
12    A. (Reviewing document.)
13        Twenty-four?
14    Q. Of the business policy, so it'd be
15    Bates-stamped number 74 in the teeny tiny
16    Bates numbers.
17    A. Yeah. Yeah.
18    Q. Do you see "Exclusions" and then on
19    Paragraph 2, it's "Contractual Liability"?
20    A. Um-hum.
21    Q. Are you aware that there is a breach of
22    contract claim against Wyoming Mechanical by
23    the homeowners?
24        MS. TIEDEKEN: Objection. Form.
25    Foundation.

64

1  Q.  (By Mr. Reeves)  To the extent that the
2  homeowners are successful in that claim,
3  would this policy provide for indemnity?
4     MR. GERGANOFF:  Form.  Foundation.
5     THE WITNESS:  This is why they leave
6  agents out of the claim.
7  Q.  (By Mr. Reeves)  Um-hum.  Yep.  Yep.
8  A.  Exactly why.
9  Q.  Okay.
10    Have you had any discussions with
11  Wyoming Mechanical as to their coverages
12  for this litigation?
13  A.  No.
14    (Moving head from side to side.)
15  Q.  Okay.
16    I did recall there was one more
17  communication between you and Wyoming
18  Mechanical.  On February 9th, 2015, if
19  you'll look at Exhibit 226, and it's on the
20  second page, I think.  Third page.
21  A.  Okay.
22  Q.  You see in the middle of that paragraph
23  under February 9th, 2015, it says, "I spoke
24  with Gary Bennett."  Can you read that out
25  loud?

65

1     Do you recall him ever giving you
2  notice that someone had invited him to an
3  inspection at the house?
4  A.  I truly don't remember that
5  conversation.
6     The last conversation I remember with
7  David was the conversation he had with the
8  homeowner.
9  Q.  Okay.
10    Would it concern you if one of your
11  insureds was being in -- invited to an
12  inspection where a death had occurred?
13  A.  Okay.  Would it concern me?  Of course.
14  Q.  And would it concern you to the point that
15  you would feel the need to notify State Farm
16  of a potential claim?
17  A.  No --
18  Q.  Okay.
19  A.  -- I'm gonna respond, because in all my
20  years, we've been told if there is a claim
21  file it; if there's not a claim, don't file
22  it.
23  Q.  Okay.
24    Is there a difference between a claim and
25  suit papers?

67

1  A.  Yes.
2     (Reading)  I spoke with Gary Bennett
3  with State Farm to see if he wanted to have
4  any representation president -- present,
5  and her stated State Farm would not be
6  involved until we file a claim and at that
7  point felt no reason to file a claim.  He
8  told me I was welcome to be a part of the
9  meeting.
10  Q.  When do you recall that conversation, a
11  conversation on February 9th?
12  A.  You know, I had a conversation with
13  David February the 9th.  I don't remember
14  but --
15  Q.  Okay.
16  A.  -- you know -- and, once again, I
17  always instruct a client that if there is a
18  claim filed, State Farm will represent you.
19  Q.  Um-hum.
20    Did you tell him that State Farm would not
21  be involved until a claim is filed, even at
22  this inspection?
23  A.  I do not recall that conversation or
24  that statement to David.
25  Q.  Okay.

66

1  A.  Suit papers means there's a claim
2  filed.
3  Q.  But do you have to have suit papers to
4  have a claim?
5  A.  No --
6  Q.  Okay.
7  A.  -- but if -- if -- I mean, at that
8  point, without suit papers, David has no
9  claim.
10  Q.  So --
11  A.  If he's not responsible monetarily for
12  some reason --
13  Q.  Um-hum.
14  A.  -- and the suit paper says, Okay, you
15  could be responsible monetarily --
16  Q.  Um-hum.
17  A.  -- then that, to me, presents a claim.
18  Q.  Okay.
19    So is it left up to the insured as to
20  whether or not they -- they need the
21  benefit of their insurance policy such that
22  they need to file a claim?
23  A.  There is no benefit under the contract
24  unless he has a claim.
25  Q.  Okay.

68

Pages 65 to 68

1    Did you tell him that he was more than
2  welcome to be part of that meeting?
3  A.  I don't recall that at all.
4    (Moving head from side to side.)
5  Q.  Okay.  Does that sound consistent with
6  something you would tell your insured, based
7  upon the facts that you knew at that time?
8  A.  I mean, I wouldn't -- first of all, I
9  wouldn't make an assessment on that at all,
10  because that's not my area of concern in
11  terms of whether he does or does not go to
12  that meeting.
13  Q.  What would be your instruction to him if
14  he told you he had been invited to a meeting
15  where a death had occurred?
16  A.  My instruction would be to go ahead.
17  Q.  Okay.
18  A.  I mean, I would -- I would never avoid
19  anything that's related to the necessary
20  gathering of information.
21  Q.  Would you caution that on, But don't touch
22  or change or modify any of the -- the
23  evidence related to it?
24  A.  I wouldn't say that to a client.  I
25  mean, I've known that family since I've

69

1  been in Jackson, and I feel like they're
2  very responsible people, from my personal
3  involvement with them, which is, other than
4  just business relation, that's all.  I
5  mean, I don't have any personal involvement
6  with them.
7  Q.  So you would not say to them, because you
8  don't think they would actually do those
9  types of things?
10  A.  I think they're very respectful people.
11  Q.  And what's your definition of respect as
12  it relates to this; that they would not
13  change the evidence or they would change the
14  evidence?
15  A.  No, my -- my assumption --
16  Q.  Um-hum.
17  A.  -- and that's all it is, that David's
18  not the type that would change evidence.
19  Q.  Okay.
20  A.  That's all.
21    MR. REEVES:  Any further questions?
22    FURTHER EXAMINATION OF GARY BENNETT
23      BY MR. MCGILL
24  Q.  Mr. Bennett, you've got the policy there
25  in front of you?

70

1  A.  Yeah.
2  Q.  First of all, I'd like to ask you:  Are
3  there any exclusions that you're aware of in
4  this policy, which has been marked as
5  Exhibit 224, for illegal acts?
6  A.  Illegal acts?
7  Q.  Yes, sir.
8  A.  I would think that on any policy an
9  illegal act would be excluded.
10  Q.  Do you know whether or not under State
11  Farm's policy or under -- under this specific
12  policy, if it was required by law, for
13  example, to pull a permit before the boiler
14  was involved -- that was involved in this
15  lawsuit was installed -- if there was -- a
16  permit was required and no permit was pulled,
17  whether or not State Farm would consider that
18  an illegal act and deny coverage?
19    MS. TIEDEKEN:  Well, objection.
20  Foundation.
21    THE WITNESS:  I have no idea.
22    MS. TIEDEKEN:  Form.
23    THE WITNESS:  That's -- that's a claim
24  question --
25  Q.  (By Mr. McGill)  Okay.

71

1  A.  -- I wouldn't know the answer to that.
2  Q.  Fair enough.
3    And no one from Wyoming Mechanical ever
4  informed you that the boiler that's
5  involved in this lawsuit was installed
6  without any permit being pulled, did they?
7  A.  No conversation.
8    (Moving head from side to side.)
9  Q.  And --
10  A.  No.
11  Q.  -- in fact, no one from Wyoming Mechanical
12  informed you that the boiler that was
13  installed after the one in this -- that's
14  involved in this lawsuit at Buckingham ranch
15  was installed without a permit?
16    MR. GERGANOFF:  And the witness is
17  instructed to answer only with respect to
18  communications prior to August 5th, 2015.
19  Q.  (By Mr. McGill)  Correct.
20  A.  No.
21  Q.  I want you to assume that there's a claim
22  that's pending against my client by Wyoming
23  Mechanical for indemnification?
24  A.  All right.
25  Q.  Did anyone from Wyoming Mechanical talk to

72

1  you about cross-claim against a company
2  called Triangle Tube for indemnification?
3  A.  No conversation that I recall.
4  Q.  Did Ms. Tiedeken, who's sitting to your
5  left, talk to you about such a claim?
6  A.  No.
7  Q.  Could you take a look at Page 2 of -- is
8  it Exhibit 224?  And it's -- it's just the
9  second page of that exhibit.
10 A.  Oh.
11    MS. MEAD:  Which exhibit are you
12 looking at, Joe?
13    MR. MCGILL:  224, which is the
14 certified policy.
15    MS. MEAD:  Oh, okay.
16 Q.  (By Mr. McGill)  You see at the top there,
17 reading left to right, it identifies State
18 Farm Fire and Casualty Company and then
19 there's the words "Declarations" --
20 A.  Um-hum.
21 Q.  -- following that, it says, "Amended
22 November 14th, 2014"?
23 A.  Um-hum.
24 Q.  Do you know why this policy was amended as
25 of the date that the boiler that's involved

73

1  in this case was fired and turned over to the
2  property owner, Brad and Deborah Buckingham?
3  A.  No.  I have no idea.
4  Q.  Does this Declaration page indicate to you
5  that there was an amendment to the policy?
6  A.  Sure.  Right in the middle.
7  Q.  Okay.
8     And what amendments were included as of
9  the date that this boiler was installed,
10 which is November 14th, 2014?
11    MR. GERGANOFF:  Foundation.
12    THE WITNESS:  It says, "Additional
13 insured added, premium adjustment on form
14 CMP47868.
15 Q.  (By Mr. McGill)  Okay.  Who was the
16 additional insured who was added?
17 A.  I have no idea.
18 Q.  Would that be reflected in this exhibit
19 anywhere?
20 A.  (Reviewing document.)
21    I don't -- there should be an
22 additional insured somewhere listed on
23 here.
24    The schedule of additional interest is
25 on Page 6 of 7 of the policy --

74

1  Q.  Okay.
2  A.  -- and it's got Big D and On-Site
3  Management, Inc. as additional --
4  additional interests.
5  Q.  Okay.
6  A.  I have no idea why they were added.
7  Q.  Do you know, what is Big D?
8  A.  Surely don't know.
9  Q.  Do you know what On-Site Management, Inc.
10 is?
11 A.  No.
12 Q.  And were you involved with the processing
13 of this amendment to the policy?
14 A.  No.
15    I -- I have 21,000 policies insured.  I
16 have several employees.  I -- there's
17 changes occurring in the office every day,
18 and I have no idea what they are.
19 Q.  Okay.
20    Just so I'm clear --
21 A.  Yeah.
22 Q.  -- the process would be the insured would
23 call you and say something to the extent, I
24 want to add an additional insured --
25 A.  Yeah.

75

1  Q.  -- and the licensed people in your office
2  would handle that, you wouldn't necessarily
3  handle it?
4  A.  I rarely do that.  That's a service
5  activity I would never touch.
6  Q.  And coverage for those entities is dated
7  back to November 14th, 2014.
8  A.  Correct.
9  Q.  And you have no idea why that's the case?
10 A.  No.
11    (Moving head from side to side.)
12    MR. MCGILL:  I will pass the witness at
13 this time.
14    Thank you, again, sir.
15    THE WITNESS:  Surely.
16    MR. REEVES:  I think we're done.
17    Thank you, sir, for coming in.
18    THE COURT REPORTER:  Read and sign?
19    MR. GERGANOFF:  Send it to me.
20    (Whereupon, the deposition of Gary
21 Bennett was ended at 4:05 p.m.)
22
23
24
25

76

Pages 73 to 76

1  STATE OF:_____)
                            )
2  COUNTY OF: _____)
3
4      I, the undersigned, declare under penalty
5  of perjury that I have read the foregoing
6  transcript, and I have made any corrections,
7  additions or deletions that I was desirous of
8  making; that the foregoing is a true and
9  correct transcript of my testimony contained
10 herein.
11 Executed this ____day of _____, 2016
12 at _____,_____.
        (City)          (State)
13
14 _____
   (Deponent's Name- please print)
15
16 _____
   (Deponent's Signature)
17
   Subscribed and sworn before me _____
18
   This ___ day of_____, 2016
19
20 _____  _____
   Notary Name      Notary Signature
21
   Seal
22
23
24 My commission expires: _____, _____
25
                                              77

1  STATE OF WYOMING   )
                      )
2  COUNTY OF SUBLETTE )
3      I, Michelle L. Cunningham, Deputy and
4  Freelance Shorthand Reporter and notary Public
5  in and for the State of Wyoming, do hereby
6  certify that the foregoing proceeding was
7  reported by me and was thereafter transcribed
8  under my direction into typewriting consisting
9  of pages 1 to 78; that the foregoing is a full,
10 complete and true record of said proceedings to
11 the best of my ability.
12     I further certify that I am not of counsel
13 or attorney for either or any of the parties in
14 the foregoing proceeding and caption named, or
15 in any way interested in the outcome of the
16 cause named in said caption.
17     In witness whereof, I have hereunto set my
18 hand and affixed my seal this day.
19     Date: _____, 2016
20 _____
       Michelle L. Cunningham
21     Deputy and Freelance Reporter
           Notary Public
22
23
24
25
                                              78

**A**

ability
78:11
absolutely
7:14 10:5 11:13 39:13
accent
8:19
accident
46:12,13
act
71:9,18
action
34:13
activities
26:1
activity
76:5
acts
71:5,6
add
75:24
added
74:13,16 75:6
additional
62:15 74:12,16,22,24
75:3,4,24
additions
77:7
address
9:8
adjuster
38:2
adjustment
74:13
advice
40:15 42:4
advise
24:18 36:20 37:13,22
38:14,25 39:6 40:18
advised
35:6
affixed
78:18
agency
8:16 9:1,3,8,13,19 12:1
12:2 14:15 25:4,6
26:14 34:14 52:16
53:17 54:20 55:14
agent
8:9,10,13,18 9:23 10:1
14:22 35:6,22 37:13
39:17 40:5 42:4,11
63:5
agents
9:19,22 37:7,10 65:6
aggregate
59:14 62:8,9,10
ago
15:14 27:15 30:6 39:22
39:25
agreed
31:24 32:2
ahead
24:25 36:7 69:16
air
51:25
amended
73:21,24
amendment
74:5 75:13
amendments
74:8
amount
59:5
answer
7:1,20 31:15 36:7 42:9
47:3 49:24 50:12,15

57:9,11,15,16 72:1
72:17
answered
27:8
answers
7:2 32:3 62:1
anticipation
39:2
anybody
17:17
anymore
52:21
apologize
52:1
appearances
2:1
appeared
6:9
appears
40:21
applies
18:13
applying
56:21
approve
51:21 52:2
area
69:10
arent
60:22
asked
31:6 38:7,9 41:25
51:13,14,16
asking
7:16 58:8
assessment
69:9
associated
56:10
assume
26:16 36:8 46:25 60:23
72:21
assumes
28:7,15
assumption
25:14 70:15
attempt
27:6,6
attorney
2:4,9,15,21 3:3,8 47:19
78:13
august
1:21 6:3 31:19,24
32:24 43:4,5 47:9,10
47:21 49:16 50:2,3
50:11,14,25 51:7
52:14 53:5,12 72:18
authorized
19:20 20:15
automatic
48:22
avenue
2:16
avoid
69:18
aware
12:4 22:7,13 26:9,19
33:4 43:21 57:25
60:9 63:11,13 64:21
71:3

**B**

b
21:7
back
25:12 76:7
baron

2:20
based
7:24 38:5 69:6
basically
14:17 20:6 24:3 40:11
bates
64:16
batesstamped
16:25 18:3 22:19 64:15
bayer
2:3
bayerlaw
2:6
began
22:9
begun
22:9
believe
24:8
beneficial
36:13
beneficiaries
1:5
benefit
1:5 68:21,23
benefits
63:16,22
bennett
1:21 2:2 6:10,15,17 8:5
28:24 35:6 41:7,9
48:8,10 51:23 56:18
56:20 63:1 65:24
66:2 70:22,24 76:21
best
37:8 51:8 61:9 78:11
big
75:2,7
bit
53:17
blessing
41:10,14 42:20
bodily
18:13,15,19 19:14,24
20:3,10,20 21:10,11
22:8,13
boiler
27:22 28:4 41:12,16,21
42:3 43:12 44:9,23
45:14,19 46:15,17
49:8,21 51:4 71:13
72:4,12 73:25 74:9
boilers
26:13
bound
48:18
box
2:10 3:3 9:10
brad
74:2
breach
64:21
break
7:6,19,22
bresnan
2:11
briefed
35:5
bring
17:17
buckingham
1:10,11,12,13,14 29:2
43:13 72:14 74:2
buckinghams
3:1
building
44:8
business

**C**

c
2:3 22:6
calibrations
28:3
call
21:14 23:2 28:18 41:7
41:8 45:23 51:11,13
51:22 75:23
called
6:11 21:14 22:12 26:25
27:5,8 28:23 34:2
35:5 41:2 43:23
44:22 73:2
calling
24:8,11,14,17 34:20
cant
14:25 37:21
capacities
1:12
caption
78:14,16
car
46:5
carbon
34:8,15
career
36:16 37:6
carey
2:3
case
1:9 6:19 12:25 14:20
21:13 63:12 74:1
76:9
casualty
12:3 15:9 73:18
cause
78:16
caused
1:7 18:15
caution
31:14 69:21
certain
28:3
certainly
25:24
certified
5:3 12:21 17:21 73:14
certify
78:6,12
change
10:17,17 19:23 26:10
26:19 39:1,2 40:7,10
48:24 69:22 70:13,13
70:18
changes
13:6 41:21 42:2 75:17
cheyenne
2:16
chris
17:16 30:25 33:15
christopher
3:8 6:17
circumstances
25:17 42:24
city
77:12
claim
10:25 14:21,24 15:3,3
15:23,25,25 16:1,2,4
16:7,19 19:21 20:16
20:17 21:9 22:3
23:10,15,21 26:6
31:8 32:19 33:3

17:6 18:10 26:10,20
64:14 70:4

34:21 35:16,19,24
36:1,9,11,18,19,22
36:24 37:2,4,10,12
37:15,20,24 38:8,9
38:15,21,24 39:3,18
39:20 40:5,6,12
46:19 52:18 53:19,23
54:1,11,15,16 55:2
55:11,15,20,25 56:3
62:14,15,16,17 63:7
63:17,20 64:22 65:2
65:6 66:6,7,18,21
67:16,20,21,24 68:1
68:4,9,17,22,24
71:23 72:21 73:5
claims
10:2 11:15 32:21 35:21
35:25 36:16 37:8,25
38:2 52:25
clarification
50:17 58:22
classes
40:6
clear
63:3 75:20
clearly
15:20
client
13:11,17 14:6,18 40:14
40:19 66:17 69:24
72:22
clients
38:25 54:12
close
26:22
cmp47868
74:14
colleagues
9:18
collected
50:7
com
2:6,23 3:10
come
42:1 45:3 46:10
comes
10:3,24 13:24
coming
54:21 76:17
commencing
6:3
commercial
12:6 25:21,23
commission
77:24
communicate
49:20 50:24
communication
65:17
communications
51:9 72:18
company
14:18 20:2,25 24:18
35:19 36:3 48:12
61:4,8,23 73:1,18
competent
10:14
complainants
3:1
complaint
31:20,23 46:15 49:4
complete
8:4 13:21 78:10
completely
41:18
computer
10:7

computerized
11:9,10,11,19
concern
25:11 43:17,20 55:2,17
67:10,13,14 69:10
concerning
49:20 51:3
concerns
45:24
conditioning
51:25
conditions
22:23 23:1
conduit
14:17
configuration
46:17
consider
71:17
consistent
21:23 69:5
consisting
78:8
constitute
62:10
consult
49:7
contact
49:19
contacted
51:15
contained
77:9
contents
17:13
continuation
19:23
continue
19:22
contract
36:25 64:22 68:23
contractor
26:16
contractual
64:11,19
conversation
24:2 32:6 40:24 41:1,4
46:8,9 66:10,11,12
66:23 67:5,6,7 72:7
73:3
conversations
31:12,16,18 33:2 38:6
43:3 52:7 55:9
copies
17:17 49:2
copy
12:21 13:21 14:9 17:3
29:20 30:22,23
corporation
1:15,17,18
correct
11:7 15:25 17:9,10,13
17:14,18 18:7,19,20
18:21,24 21:3 22:14
23:4,21 27:3 31:20
31:25 50:10 60:1
61:12 62:19,19 63:20
63:23,24 64:2,6,7
72:19 76:8 77:9
corrections
77:6
counsel
53:14 57:16 78:12
county
6:8 77:2 78:2
couple
48:16

course
9:9 39:4 42:13 67:13
court
1:1,23,24 6:5 76:18
coverage
13:22 17:6 18:9 48:19
56:20,22 58:16 59:4
59:5,16,17 60:1,3
61:22 62:6,7,17
71:18 76:6
coverages
63:4 65:11
covered
18:17 48:20 60:12,18
61:8
covers
61:3
cowrongful
1:4
creeves
3:10
cross
2:14 3:1
crossclaim
73:1
cunningham
1:25 6:6 78:3,20
currently
8:6

**D**
d
75:2,7
damage
17:8,11 18:14,15 19:15
19:24 20:11,20 21:11
22:8 42:23
damages
1:6 21:9 22:3,3
date
50:1 73:25 74:9 78:19
dated
76:6
davelewis
2:11
david
2:9,9 3:13 25:10 26:24
27:1,2 32:12 42:16
44:24 49:1 51:17
52:9 53:1,20 54:17
54:21 55:2,9,17 56:9
59:19 66:13,24 67:7
68:8
davids
42:19 70:17
day
21:16,18,19 32:21
47:12 53:2 75:17
77:11,18 78:18
days
45:22
daytime
21:21
deal
37:14 38:20 39:19
death
1:4,7 21:22 24:2 25:5
25:17,24 28:12,13,18
28:19 33:24,25 34:6
34:13 36:12 44:21
45:5,13,15,16,22,22
53:19 54:1 55:1,10
55:20 58:6 67:12
69:15
deborah
1:11,13 74:2
deceased

1:6
december
8:24
declaration
74:4
declarations
73:19
declare
77:4
deductibles
22:25
deemed
20:11
defendant
2:13,14,19 3:1,7 6:11
defendants
1:14,19 6:19 60:11,12
defended
60:13
defense
58:10,12,12,17 59:19
60:16,21 63:16 64:1
defined
18:23 36:4
definition
70:11
deletions
77:7
delineates
15:20
demand
21:8 22:2
dennis
8:5
denver
2:5 3:9
deny
71:18
department
43:22
deponents
77:14,16
deposition
1:20 6:2,24 13:1 29:5
30:8,20 76:20
deputy
78:3,21
described
46:4
description
5:2
desirous
77:7
details
26:6
determine
46:19
didnt
19:5 24:8 26:6,21
32:11,14 38:12 42:5
42:14 45:19,19 47:2
47:6
died
22:16 24:3 27:24 34:11
51:12
difference
67:24
digital
14:10
direct
13:11
direction
61:20 78:8
directly
13:19
disapprove
51:21 52:3

disclosures
48:21
discovery
17:20
discussion
44:10
discussions
65:10
distinction
58:16
district
1:1,2
document
18:4 29:21,22,23 30:1
30:11,13 33:13 35:1
38:22 44:17 59:8,13
64:12 74:20
documentation
11:14
documents
11:3
doing
12:14 26:18
dont
7:9,15,23 14:24 16:2
21:16 25:1,19 26:2,4
26:15 27:16 32:8
34:16 35:20 37:12
39:5 40:3,4 46:22,24
47:11,12,22 48:2,4
50:20 51:18,19 52:21
53:24 54:8,8 55:16
56:2,2 57:12 58:23
58:23 61:17 62:23
66:13 67:4,21 69:3
69:21 70:5,8 74:21
75:8
downing
2:4
draw
49:25
drawing
58:15
duly
6:12
duravent
1:17 3:7 6:12,18,21
duties
15:21 23:9
duty
23:19

**E**
earlier
36:12
earliest
20:12
edwards
47:19,20,22,25
effectively
7:1
either
20:2 49:1,18 55:9 56:9
78:13
electronic
52:23
employed
8:6
employee
8:8 19:20 20:2,14 28:2
28:22 29:10 34:5
46:16
employees
28:12 33:24 54:4 61:23
75:16
ended
76:21

endurance
7:4
entire
37:6
entities
76:6
event
23:9
events
62:5
everybodys
18:1
evidence
28:8,15,17,21 38:20,22
39:1,2,19 40:15 56:5
56:11 69:23 70:13,14
70:18
exact
21:16 47:12
exactly
65:8
examination
4:1,2,3,4,5,6 6:15 48:8
56:18 63:1 70:22
examined
6:13
example
71:13
excess
62:6
excluded
64:6 71:9
exclusion
64:11
exclusions
64:18 71:3
exclusive
1:5
executed
77:11
exhibit
5:2 12:17 13:1 29:19
30:8,14,16,20 44:15
56:22 59:12 64:10
65:19 71:5 73:8,9,11
74:18
exhibits
5:1 12:14
existing
9:3,6
expires
77:24
explanation
25:2
exposure
34:9,15 38:15
expressing
45:24
extends
61:22
extent
7:20 23:15 49:24 64:5
65:1 75:23

**F**
fact
45:10,11 72:11
facts
28:7,15 56:3 69:7
fair
72:2
familiar
15:15
family
1:12 12:12 47:19 69:25
familys
12:9

farm
5:3 8:7,8,13,14 9:1
10:1 11:4,6,8 12:7,9
12:10 13:7,22 14:18
15:6 16:3,8,19 23:2
23:19,20 26:14 31:7
32:15 35:23 36:13
38:19 39:12,17 41:9
46:20 56:21 57:3,22
59:24 63:25 66:3,5
66:18,20 67:15 71:17
73:18
farms
32:18 71:11
fashion
25:25
father
25:12 54:23
fbmjlaw
2:23
february
9:13 40:22 43:24,24
44:2,5 51:17 65:18
65:23 66:11,13
feel
10:14 37:10,23 38:8
67:15 70:1
felt
25:10 38:14 66:7
figure
41:11,15,22
file
15:2 16:2 35:17 37:4
37:24 40:13 52:18,21
52:24 66:6,7 67:21
67:21 68:22
filed
31:20,23 32:19 38:24
46:20 47:14,16 50:1
50:8 56:8 66:18,21
68:2
files
11:20
filing
52:17
financial
48:21
fine
31:1
fire
73:18
fired
74:1
first
6:12 21:21 24:1 27:6
42:5 44:14 46:24
51:11 54:20 69:8
71:2
five
8:16
fix
45:3 46:10 51:16
foley
2:20
following
73:21
foregoing
77:5,8 78:6,9,14
form
14:10 15:9,16 16:15,16
20:4 21:1 23:22
24:21 26:3 28:5,14
40:17 42:7 46:2,21
55:5,7,21 57:1,8
59:22,23,23 60:6
61:5,15 62:12 64:24
65:4 71:22 74:13

forms
11:6,9 61:11
forth
6:14
forthcoming
7:3
found
64:2,3
foundation
20:5 21:1 24:21 36:6
36:14 56:23 57:7
58:1 60:5,7,14 61:6
61:14,15 62:11,13,18
64:25 65:4 71:20
74:11
four
59:14
frame
49:12
francisco
1:3
freelance
6:7 78:4,21
frequently
7:12
friend
24:12 47:19
front
70:25
full
8:3 13:21 17:3 19:10
78:9
further
63:1 70:21,22 78:12

**G**
g
1:17 2:9,9 6:11,18,21
gary
1:21 2:2 6:10,15 8:5
35:6 41:7,8 48:8
56:18 63:1 65:24
66:2 70:22 76:20
gathered
7:25
gathering
69:20
geick
12:12 25:9 26:24,25,25
27:5 33:21 34:19
43:4,10,23 44:13,20
49:1,2,6 53:20,20
54:17,17,21 55:10,17
56:9,9 59:19
geicks
47:18
general
22:23 23:1
generally
17:6 63:15
gentlemans
24:4
gerganoff
2:4 20:5 21:1 23:22
24:21 26:3 30:24
31:14,21,23 32:1
36:6,14 40:17 42:7
44:3 46:23 49:11,16
49:23 50:5,10,14
51:1 53:8,12 55:23
56:23 57:1,8 58:2
59:7,11,23 60:7,14
61:14 62:11,18 65:4
72:16 74:11 76:19
getting
54:11
give

19:20 20:15 22:21
23:3 24:4 39:6 41:14
42:14,20 56:4 63:25
**given**
6:24
**giving**
67:1
**go**
16:23,24,24 17:15 18:2
18:9 22:18 23:6
24:25 29:16 32:14
36:7 51:16 69:11,16
**going**
27:7,14 40:14 41:12,15
42:1,6,12 45:4 61:20
**gonna**
12:13,16 14:23 29:18
30:3,4,14,18 49:23
50:6 67:19
**gotten**
28:11
**greg**
41:10
**gregory**
1:10,13
**group**
1:17
**guess**
47:3 58:15
**guidelines**
10:23

**H**
**hand**
78:18
**handle**
10:2,23 76:2,3
**handwritten**
5:4 31:4
**happened**
25:11 34:13 41:22
55:16
**happens**
7:12 35:7,10,15
**hard**
39:21 51:24 52:21
**havent**
52:9
**head**
11:18 14:12 15:12,18
16:21 31:11 33:5
34:17 35:12 37:17
39:14 43:9,15 44:11
44:19 52:20 63:9,18
65:14 69:4 72:8
76:11
**heard**
6:21 8:19
**heat**
42:1 45:3 46:11 51:16
**hed**
34:4 44:24 51:12
**helpful**
46:18
**hereinafter**
6:14
**hereunto**
78:17
**herrera**
1:3,3,6 21:22 24:2
27:24 33:24 44:21
**herreras**
28:19
**hes**
17:25 35:13 50:6,15
68:11
**hey**

10:3 27:11,13 32:4
**highlighted**
30:23
**highlights**
31:2
**hitting**
46:5
**hold**
23:17 35:7,9,14
**holder**
37:19
**holders**
37:14
**hole**
1:23 6:5
**home**
29:2 43:13 45:16,23
**homeowner**
41:2,18 44:21,25 45:2
45:24 46:4,9,10
51:15 52:4 67:8
**homeowners**
41:25 46:15 51:19
64:23 65:2
**honest**
7:2 43:1
**honor**
41:11
**hotel**
54:2
**hour**
6:3
**house**
24:4 27:23 67:3
**houston**
8:17,21

**I**
**id**
71:2
**idea**
71:21 74:3,17 75:6,18
76:9
**identification**
12:20 13:2 30:9,21
**identifies**
73:17
**identify**
17:19
**iii**
1:16 2:19
**ill**
16:7 17:24 19:5 29:4
33:20 44:13 57:19
**illegal**
71:5,6,9,18
**im**
8:22 9:22 13:3 14:17
14:23 19:7,22 20:17
22:25 24:22 29:18
30:3,14,24 33:4
40:14 43:1 44:4 45:8
45:8 47:10 49:23
51:24 53:14 57:25
58:11,15 60:9 61:19
63:13 67:19 75:20
**imply**
45:19
**important**
27:19
**incident**
25:18 29:12 56:21 58:6
**include**
23:16
**included**
74:8
**includes**

19:22
**incurrence**
20:16
**indemnification**
72:23 73:2
**indemnity**
63:19 64:1,4 65:3
**independent**
8:9,10,12
**index**
4:1 5:1
**indicate**
74:4
**individual**
1:11,14
**inform**
43:10 45:21 46:3
**information**
7:25 23:25 42:15 49:25
50:7 53:9 69:20
**informed**
58:4,5 72:4,12
**injury**
18:14,15,19 19:14,24
20:3,10,20 21:10,11
22:8,13
**insight**
42:4
**inspection**
49:21 66:22 67:3,12
**inspections**
49:8 51:3
**installation**
27:22 43:12
**installed**
45:14 46:16 71:15 72:5
72:13,15 74:9
**installing**
26:12 44:9
**instruct**
39:6 49:23 66:17
**instructed**
50:15 72:17
**instruction**
50:6 56:4 69:13,16
**insurance**
8:7,9 9:25 12:10 13:5
16:25 17:7 18:13
20:25 24:9,18,19
35:6,19 36:3,24
56:25 58:9 68:21
**insured**
10:24 12:2 15:21 19:3
19:18,19 20:13,14,23
35:9 58:20 68:19
69:6 74:13,16,22
75:15,22,24
**insureds**
10:3 11:16 14:14 43:17
67:11
**insurer**
20:21 63:25
**insuring**
57:3,22
**intent**
35:22
**interest**
74:24
**interested**
42:11 78:15
**interests**
75:4
**interrupt**
19:5
**interviewed**
43:11
**investigate**

36:9
**investigated**
43:21
**investigating**
36:11
**invited**
67:2,11 69:14
**involve**
25:21 34:15
**involved**
25:8,9 27:22 34:8
37:11,12 43:19 48:13
49:3,9,21 51:4 56:6
58:6 66:6,21 71:14
71:14 72:5,14 73:25
75:12
**involvement**
70:3,5
**involving**
53:19
**isnt**
23:3 59:21 60:1 64:5
**issue**
10:4 44:23
**issued**
22:8,13
**itd**
14:13 15
**itd**
64:14
**ive**
8:14 27:11 36:18 37:5
53:8 69:25,25

**J**
**jack**
47:19,20,22,25
**jackson**
1:23,23 2:10 3:4 6:5,5
8:23 9:10 70:1
**january**
11:11 21:15 22:12
33:18 34:3,24 44:4
45:7 49:14,18 50:11
50:24 51:6 52:12
**jersey**
1:16
**jmcgill**
2:23
**joanna**
1:3
**joe**
73:12
**join**
16:17 55:7,23 58:2
**joined**
55:3
**joining**
55:18
**joseph**
2:21 48:10
**jpllc**
2:21
**jtiedeken**
2:17
**juip**
2:20
**julie**
2:15
**jurisdiction**
51:20

**K**
**kate**
3:5
**katherine**
3:3
**kind**
55:4

**knew**
22:15 28:2 69:7
**know**
7:4,7,10,15 10:20
11:23,25 25:19 26:4
26:6,15 34:16 35:13
42:5 47:6,7,22 48:2,4
51:11,14,18,18 53:24
53:25 54:8,10,12
55:16,25 56:2 57:12
60:8 61:2,21 66:12
66:16 71:10 72:1
73:24 75:7,8,9
**knowledge**
46:14 47:2
**known**
19:17 20:11 69:25

**L**
**l**
1:3,25 3:3 6:6 18:9
78:3,20
**lady**
24:3 54:9
**language**
61:2,3 64:6
**law**
2:3,4,9,9,15,15,20,21
3:2,3,8,13 36:25
71:12
**lawsuit**
47:14,16 48:13 49:3,9
49:22 50:1,8 51:4
56:6,8,11 60:20
71:15 72:5,14
**lawyer**
24:15 34:20 47:25
**leave**
58:24 65:5
**left**
27:7 68:19 73:5,17
**lewis**
2:9,9 3:13,13 4:5 33:14
56:19,25 57:3,14
58:3,11,15,23 59:16
59:24 60:8,10,17,22
61:1,10,25 62:16,20
**liabilities**
59:10
**liability**
17:8,12 18:6,7,8,10
61:12,16,21,21 64:5
64:11,19
**liable**
64:2,3
**licensed**
9:20 32:20 76:1
**lincoln**
3:9
**list**
5:4,5
**listed**
19:3,18 20:13 74:22
**listening**
42:16
**litigated**
56:1
**litigation**
8:1 16:13 63:17,20
65:12
**little**
14:4 51:24 53:17
**livonia**
2:22
**location**
45:14
**lodge**

54:6
**long**
7:23 8:12 10:13 12:10
26:7 27:15
**look**
33:7 64:10 65:19 73:7
**looking**
73:12
**loud**
65:25

**M**
**m**
1:17 6:4,11,18,21
76:21
**mail**
13:7,11
**mailed**
13:12,17
**maintain**
10:22 14:9 52:17
**maintenance**
44:23
**making**
41:3,21 77:8
**management**
37:9 75:3,9
**manager**
8:17
**manuals**
10:23 39:16,21 40:3
**maple**
9:9
**march**
43:10
**mark**
2:4 12:16 30:4,18
**marked**
13:2 29:19 30:9,15,21
33:8 44:15 71:4
**materials**
31:9 39:16 49:3 52:17
**mccormick**
29:6
**megill**
2:21 4:3 16:16 48:9,10
49:12,13,17 50:3,9
50:13,16,18 51:2
52:6 53:16 55:8,24
56:13 70:23 71:25
72:19 73:13,16 74:15
76:12
**mckellar**
2:15
**mead**
3:2,2,3 16:17 51:23
55:7 56:17 73:11,15
**meadlaw**
3:5
**mean**
12:8 16:1 19:5 26:15
32:8 36:22,22,24
39:5 59:18 60:15
68:7 69:8,18,25 70:5
**means**
22:8 24:23 57:13 68:1
**mechanical**
1:15 2:13 11:23,25
21:14 22:1,11 23:19
24:1 25:8 26:9,12
27:23 31:6 33:1
37:18 38:7,13 40:25
41:1,14 48:18 49:7
49:19 50:23 51:10
53:20 54:16,22 55:3
55:18 56:5 57:4,5,5
57:22 59:20,21 60:16

60:25 64:22 65:11,18
72:3,11,23,25
**mechanicals**
12:23
**meeting**
66:9 69:2,12,14
**memory**
21:23
**mention**
29:9
**mentioned**
53:18 54:19 55:15
**message**
27:7
**metzger**
2:20
**mgerganoff**
2:6
**mi**
2:22
**michelle**
1:25 6:6 78:3,20
**middle**
65:22 74:6
**migs**
3:13
**mile**
2:22
**million**
59:14,15 62:6,7,17
**mind**
50:21
**misstates**
55:6
**misunderstood**
55:24
**modify**
69:22
**monetarily**
68:11,15
**monica**
1:5
**monoxide**
34:9,15
**months**
36:12,12
**move**
8:23
**moved**
9:12
**moving**
11:18 14:12 15:12,18
16:21 31:11 33:5
34:17 35:12 37:17
39:14 43:9,15 44:11
44:19 52:20 63:9,18
65:14 69:4 72:8
76:11
**mtslegal**
2:17
**muddy**
37:11

**N**
**name**
8:4 23:3 77:14,20
**named**
47:19 48:12 60:19
78:14,16
**names**
6:17 48:10
**nature**
40:6
**necessarily**
76:2
**necessary**
69:19

**need**
7:6,18 32:5 67:15
68:20,22
**needed**
24:9
**net**
2:11,17 3:5
**network**
9:1
**never**
36:20 40:18 42:19
69:18 76:5
**new**
1:16,18 9:5 10:20
**night**
21:17 28:12,18 33:25
**noises**
46:4
**normally**
10:18
**notary**
6:7 77:20,20 78:4,21
**notation**
34:25
**note**
32:12 47:18
**notice**
6:2 19:21 20:1,15,23
20:24 23:16 28:11
31:7 32:5,15 35:21
35:23 36:4 63:6 67:2
**notified**
16:19 23:13 33:23 34:4
34:5
**notify**
16:3 23:19 35:25 67:15
**notifying**
35:18
**november**
48:20 73:22 74:10 76:7
**number**
12:17 64:15
**numbers**
64:16

**O**
**o**
9:10
**object**
16:14,15 20:4 46:2,21
55:5,7,21 59:22 60:5
61:5
**objection**
28:5,14 46:23 57:7
58:1 61:13 62:12
64:24 71:19
**objections**
57:14
**obtained**
44:8 49:25
**obviously**
36:25
**occur**
22:10
**occurred**
13:6 19:17 20:12 22:9
22:13 24:6 67:12
69:15
**occurrence**
18:16,21 19:21 20:16
23:9,14,20
**occurring**
75:17
**occurs**
10:12 19:15
**offense**
23:10,14

**office**
2:20 3:2,13 10:22 13:8
13:12 14:10 29:20
32:21 33:2 37:25
58:7 75:17 76:1
**officers**
43:11,18
**offices**
2:3,9,15 6:4 35:25
**oh**
19:11 44:4 45:6 73:10
73:15
**okay**
6:20 7:5,11,16,17 8:1,2
8:11,15 9:11,17,21
9:22,24 10:10 11:2
12:18,22,24 13:10
14:8,19,23 15:1,7,13
16:6,12,22 18:11,18
20:8,18,22 21:5,25
22:5,17 23:7,11,24
25:13,24 26:5,8,17
26:23 27:9,17 28:25
29:4,14,25 30:2 31:3
31:22 32:1,13,17,22
33:6,12,22 34:1,18
34:23 35:3 36:2,10
37:2 38:1,4,11,18
39:10,15,21 40:1,2,8
40:9,20 41:5,13,19
42:17,18,22,25 43:2
44:6,12 45:9,18,20
47:5,23 48:3,15,25
50:3,9,13 52:6 53:4,7
53:11,15 55:8 57:13
57:18 58:14 59:3
61:10,24,25 62:2,20
62:22 63:10,14 64:8
65:9,15,21 66:15,25
67:9,13,18,23 68:6
68:14,18,25 69:5,17
70:19 71:25 73:15
74:7,15 75:1,5,19
**once**
10:13 14:14 37:9 38:20
66:16
**onion**
13:24
**onsite**
75:2,9
**option**
22:11
**options**
21:7
**order**
29:17
**outcome**
78:15
**outline**
33:21 47:18
**outside**
52:18
**owner**
61:22 74:2
**owners**
41:11

**P**
**p**
2:3,21 6:4 9:10 76:21
**packet**
14:4
**page**
4:2,3,4,5,6 5:3,4,5
16:24 17:5,11,12
18:1,2 22:18 64:10
65:20,20 73:7,9 74:4

74:25
**pages**
17:3 78:9
**paper**
13:25 14:2 68:14
**papers**
36:23 53:3 67:25 68:1
68:3,8
**paragraph**
19:1,3,6,10,13,18 20:9
20:13 23:6,8 64:19
65:22
**part**
9:25 20:19 61:7 66:8
69:2
**parties**
60:20 78:13
**pass**
56:13 76:12
**penalty**
77:4
**pending**
7:21 72:22
**people**
32:20 70:2,10 76:1
**performed**
28:3
**period**
19:2,16,17,25 48:19
51:6 52:8,11,14
**perjury**
77:5
**permit**
44:8 71:13,16,16 72:6
72:15
**personal**
24:12 25:22 70:2,5
**personally**
6:9 52:10
**phase**
1:16 2:19
**phone**
27:8 45:23
**physical**
11:8
**place**
18:16
**plaintiffs**
1:8 2:8
**please**
8:3 49:12 77:14
**plumbing**
26:16
**po**
2:10 3:3
**point**
7:9,18 66:7 67:14 68:8
**policies**
12:5,11 13:8 75:15
**policy**
5:3 12:4,23 13:5 14:14
15:20 16:23 17:1,7
17:20,22 18:24 19:2
19:15,16,25 25:21,22
25:23 36:5 37:13,19
48:24 56:25 58:7
59:5,10 60:24 61:1,2
62:10 63:15,23 64:6
64:14 65:3 68:21
70:24 71:4,8,11,12
73:14,24 74:5,25
75:13
**portion**
29:5
**position**
16:10
**possible**

74:25
**pot**
35:19
**potential**
10:24 14:21,24 15:23
15:25 16:1,3,7,19
35:21 39:19 40:15
67:16
**potentially**
41:21
**practicable**
23:13
**practical**
36:4
**practices**
47:25
**premium**
74:13
**present**
3:12 38:10 66:4
**presented**
35:16 36:1,18,19 53:1
**presents**
68:17
**preserving**
56:5,10
**president**
66:4
**pressure**
7:3
**previously**
29:19,20 30:15 44:15
**principals**
57:4,23 59:20 60:18
61:3
**print**
11:14 17:2 77:14
**prior**
19:2,16 25:5 29:6
32:23 34:14,20 44:20
45:5,21 47:9 49:7
53:18 56:8 72:18
**problem**
24:8,19 27:11
**proceeding**
78:6,14
**proceedings**
78:10
**process**
75:22
**processing**
75:12
**produced**
17:20
**professional**
26:1
**program**
10:21
**project**
43:19
**prompted**
28:20
**property**
12:3 15:9 17:8,11
18:14,15 19:14,24
20:10,20 21:11 22:8
74:2
**provide**
10:1 30:3,14 31:7,8
32:5,14 35:20 38:19
44:14 49:2 53:9 64:4
65:3
**provided**
29:20 30:5 42:3 59:4
59:17 60:21
**provides**
17:7 39:17

**providing**
12:20 13:4 35:23 58:18
59:18,24
**provision**
21:2
**public**
6:8 78:4,21
**pull**
71:13
**pulled**
71:16 72:6
**purpose**
35:18
**purposes**
44:8
**pursuant**
6:1
**put**
33:21 49:12

**Q**
**question**
7:1,10,13,21 16:15
26:11 31:15 32:23
42:9 50:12,19 57:10
57:12,15,17,19 58:19
62:1 71:24
**questioned**
43:18
**questions**
7:24 39:11 42:19 48:6
48:16 56:17 70:21
**quotes**
18:19

**R**
**ranch**
72:14
**randall**
2:16
**rarely**
40:5 76:4
**read**
15:8 17:25 18:12 19:1
20:1,8 21:7,12 23:11
35:4 41:6 65:24
76:18 77:5
**reading**
19:2,14 20:10 22:7
23:12 35:5 41:8 66:2
73:17
**really**
10:11 53:22
**reason**
40:21 51:21 52:2 64:9
66:7 68:12
**recall**
21:15,16,17 40:25 41:3
52:8 54:7,15 65:16
66:10,23 67:1 69:3
73:3
**receive**
19:21 20:15 38:23 63:5
**received**
22:2 28:17 45:23 53:10
**receives**
21:8
**recollection**
51:8 53:21,22
**record**
5:3 8:4 35:4 59:11
78:10
**recurring**
10:16
**redacted**
30:4,19
**redactions**

30:12
reeves
3:8,8 4:2,6 6:16,17
7:15 13:3 16:18 17:2
17:5,18,21,24 18:2
20:8 21:2 23:24
24:24 26:5 28:10,16
28:25 29:4 30:10,22
31:1,3,19,22,25 32:4
33:16,17 36:10,17
40:20 42:8 44:4 46:3
47:1,15 57:9 61:17
63:2 65:1,7 70:21
76:16
refer
39:12 50:6
reference
5:2
referring
17:25 59:12
reflect
59:11
reflected
74:18
relate
51:8
related
33:3 39:19 43:18 69:19
69:23
relates
11:20 12:25 14:13
15:23 20:3 70:12
relating
28:18 34:25 43:5
relation
70:4
relationship
26:22
relief
21:9
rely
11:3
remember
21:24 27:16 47:11 54:8
66:13 67:4,6
remembered
6:1
remind
53:8
remove
37:7
renewals
48:23
report
20:19,24 24:9 38:16
52:25
reported
40:12 78:7
reporter
1:24 6:7 76:18 78:4,21
reporting
1:23 6:5
reports
20:19
represent
6:18 33:20 48:12 66:18
representation
43:6 66:4
representatives
1:4
request
41:3,11
requested
41:10 44:22
required
28:3 71:12,16
reservation

57:6,23 58:9,10,13,17
58:21 60:4,13 63:6
63:12
respect
70:11 72:17
respectful
70:10
respond
38:17 67:19
responding
42:18
responsible
68:11,15 70:2
rest
8:17 21:12
restate
50:20
result
23:15,20 37:15
resulted
25:25
resumption
19:23
reveal
31:16
reviewing
18:4 29:22 30:13 33:13
35:1 59:8,13 64:12
74:20
right
7:8 9:7 11:22 14:5
17:17 33:12 34:12
48:7 55:13 56:24
57:19 72:24 73:17
74:6
rights
57:6,24 60:4,13 63:6
63:12
risks
56:10
river
54:6
road
2:22
role
14:13
rolling
12:14
routinely
10:13

_____
S
_____
saw
30:1
says
10:3 20:7 35:14 65:23
68:14 73:21 74:12
schedule
74:24
scoggin
2:15
seal
77:21 78:18
second
27:6 41:1 48:5 51:13
65:20 73:9
section
18:5,7,8 19:4,19 20:14
21:7 22:22,25 23:1,2
23:18
see
7:23 12:3 23:12 30:10
33:17,18,23 34:24
35:7,9,15 54:3,13
64:18 65:22 66:3
73:16
seen

13:3,4 29:23 31:4
44:17
send
76:19
sense
7:14 27:18
sent
14:6 52:25 53:2
sentence
41:6
separate
63:22
service
76:4
session
7:2
set
6:14 78:17
seven
36:12
sheriffs
43:11,18,22
shorthand
6:7 78:4
show
29:5,18
side
11:18,18 14:12,12
15:12,12 16:21,21
31:11,11 33:5,5
34:17,17 35:12,12
37:17,17 43:9,9,15
43:15 44:11,11,19,19
52:20,20 63:9,9
65:14,14 69:4,4 72:8
72:8 76:11,11
sign
76:18
signature
77:16,20
signed
14:14
significant
48:23
simple
32:9 37:4
sir
56:15 71:7 76:14,17
sitting
73:4
situation
58:5
situations
37:14
six
2:22 36:12
snake
54:6
sold
58:7
somebody
34:10 42:20
someones
36:19
son
27:2
soon
23:13 36:4
sorry
19:7,11,22 20:17 22:25
30:25 44:4 45:8
47:10 53:14
sound
21:22 35:8 69:5
sounded
46:5
speak

32:12 38:2 51:23 56:9
56:16 61:19 74:6
speaking
17:7
speaks
59:7
special
31:2
specific
23:3 25:15 71:11
specifically
44:22
specifics
24:5 53:23
spoke
44:24 55:1 65:23 66:2
spoken
44:25 52:9
staff
9:20
start
59:1
starts
41:6
state
5:3 6:9 8:3,7,8,13,14
9:1 10:1 11:4,6,8
12:7,9,10 13:7,22
14:18 15:6 16:3,8,19
23:1,19,20 26:14
31:7 32:15,18 35:23
36:13 38:19 39:12,17
41:9 46:20 56:21
57:3,22 59:24 63:25
66:3,5,18,20 67:15
71:10,17 73:17 77:1
77:12 78:1,5
stated
57:15 66:5
statement
66:24
statements
43:7
states
1:1
step
40:13
steve
25:9
steven
26:25 27:2 49:1 53:20
54:17 55:10 56:9
stop
20:22
street
2:4 3:9
sub
19:12
sublette
6:8 78:2
submitted
15:3 38:23
subparagraph
19:12
subscribed
77:17
subsection
20:18 22:6 23:11
substance
31:17
successful
65:2
suit
23:10 25:5 36:22 53:3
67:25 68:1,3,8,14
suite
2:22 3:9
sure

24:22 48:17 50:22
56:16 61:19 74:6
surely
75:8 76:15
suspect
21:20
sustained
1:6
sworn
6:12 77:17
system
13:7 40:7,11 41:12,16
41:22 42:3 43:12
systems
10:17 15:6

_____
T
_____
table
17:12
take
7:6,18,21 14:23 16:11
32:21 54:22 73:7
taken
1:22
takes
18:16
talk
47:9,15,20 72:25 73:5
talked
29:6,9,15 34:20 45:10
45:11 46:7 47:7
talking
10:8 27:19 29:3,7
33:14 35:13 52:11
58:11
teeny
64:15
tell
16:7 22:1 24:1,7 27:13
27:21 28:1,10 32:11
34:2,8,19 35:9 37:23
41:20 43:24 44:7,13
44:20 53:16 61:18
66:20 69:1,6
tells
57:16
term
61:18
terms
18:23 69:11
territory
18:17
test
7:4
testified
6:13 55:4
testimony
55:6 77:9
testimonys
29:1
testing
49:8,20
tests
51:3
texas
8:17,20,22
thank
17:23 32:1 50:16 56:15
62:3,21 76:14,17
thats
12:19 16:10,15 17:18
20:6 28:19 30:23
31:1,25 32:2 36:1
37:5 42:18 48:6 49:8
49:21 50:5 51:4,17
51:18 52:5 53:4,4
54:12,18 55:3 58:21

59:9,9 61:9,25 62:21
69:10,19 70:4,17,20
71:23,23 72:4,13,22
73:25 76:4,9
thereof
6:4
theres
7:3 14:20,24 15:8 21:6
21:6 31:1 35:16
37:44 48:23 60:20
62:15,16 63:6,16,19
64:10 67:21 68:1
72:21 73:19 75:16
theyre
26:15 48:13 60:19 64:3
70:1,10
theyve
14:14 15:2
thin
14:2,2
things
40:6 70:9
think
12:17 13:13 29:1,19
33:9,12 37:20 44:1
48:6 53:3 54:19 55:3
58:19 60:11,17 65:20
70:8,10 71:8 76:16
third
65:20
thousands
36:15
three
30:5
tiedeken
2:15,15 4:4 16:14
17:16,19,23 20:4
28:5,7,14,21 29:1
44:1 46:2,21 47:7,13
55:5,21 57:7 58:1,8
58:14,19 59:22 60:5
60:15,19 61:5,13
62:12,23 64:24 71:19
71:22 73:4
tight
35:7,9,14
time
7:9,18 8:18 12:11
20:12,24 22:1,12
24:5 25:20 27:15,21
28:1,23 31:13 37:9
48:19 49:12,13,17
51:6,24 52:8,11,14
56:14 69:7 76:13
tinker
40:14
tiny
64:15
title
18:5 22:21,24 23:8
today
7:24 11:9 48:14
told
15:2,5 28:23 32:9
35:14 37:5 41:9 42:2
45:13 51:14 54:4,9
54:10 66:8 67:20
69:14
top
73:16
touch
69:21 76:5
town
48:1
training
10:2,6,7,7,12,16,21
38:19

78:7
77:6,9
transfer
8:25
triangle
1:16 2:19 48:12 73:2
trigger
62:5
triggered
20:24
true
59:21 63:21 77:8 78:10
truly
21:24 27:15 56:2 67:4
trust
1:13
trustees
1:12
try
37:11
trying
41:22
tube
1:16 2:19 48:13 73:2
turned
74:1
twentyfour
64:13
two
45:22 63:15,22
type
10:7,22 44:23 52:16
70:18
typed
30:1
types
10:9,11 39:11 70:9
typewriting
78:8
typewritten
5:5 33:7,11
typically
58:5

**U**

uhhuh
13:23
ultimately
31:6 64:2,3
umhum
10:19 12:15 13:20 14:3
14:16 15:19,22,24
16:9 18:8 22:20
24:10 25:7 30:7,17
32:25 33:10,19 36:17
37:3 39:23 40:23
42:8 44:16 45:1 47:1
48:11 52:13,15 53:6
64:20 65:7 66:19
68:13,16 70:16 73:20
73:23
undersigned
77:4
understand
7:10,15 35:22 50:18
61:17
understanding
43:6
united
1:1
usually
13:24 16:10

**V**

vague

verbal
21:8 22:2
verbiage
27:16
verbose
25:1
version
30:5,19 31:4 33:8
vicarious
61:11,16,20 62:4
village
54:2
vs
1:9

**W**

w
2:4
wall
46:5
waltz
3:8
waltzreeves
3:10
want
7:2 21:12 25:1 27:13
31:14 36:3 37:7
58:24 72:21 75:24
wanted
46:10 58:21 66:3
wasnt
25:15 26:21 43:20
water
37:11
way
9:9 25:11,25 29:2 37:5
54:18 61:9 78:15
website
32:18
wed
64:4
wednesday
1:21 6:2
weeks
30:6
welcome
66:8 69:2
went
32:18
west
8:22
weve
7:25 12:11,13 17:11,12
33:8 67:20
whats
9:8 18:5 23:8 27:13
28:16,17,21 29:18
35:18,18,21,21 70:11
whereof
78:17
whos
73:4
witness
2:2 6:11 17:4 20:6
23:23 24:22 26:4
28:6,9 31:15 32:3
36:8,15 40:18 46:22
46:24 47:11 49:24
52:1 53:9,11,15
55:22 56:13,16,24
57:2,11 59:8,12,13
60:9,24 61:7,16,19
62:14,19 65:5 71:21
71:23 72:16 74:12
76:12,15 78:17
wont

60:23
word
14:23
words
73:19
work
9:18 13:22 16:8 45:25
54:22
worked
45:17
working
51:12
wouldnt
69:8,9,24 72:1 76:2
written
10:6 11:8 21:8 22:2
30:1 38:22 40:3
wrongful
25:5,17 34:13 53:18
54:1 55:1,10,20
wrongfully
1:7
wrote
30:24
wy
2:10,16 3:4
wyoming
1:2,14,15,23 2:13 6:6,9
8:23 11:23,25 12:23
21:13 22:1,11 23:18
23:25 25:8 26:9,12
26:13,20 27:23 31:6
33:1 37:18 38:6,13
40:25 41:1,14 48:18
49:6,19 50:23 51:9
53:19 54:16,21 55:3
55:18 56:5 57:4,5,5
57:22 59:19,20 60:16
60:25 64:22 65:11,17
72:3,11,22,25 78:1,5

**X**

**Y**

yeah
12:8 14:1 17:5,24 20:6
23:5 24:24 25:3
27:10,20 31:21 33:16
37:1 44:3 45:12
46:13 47:8,15 54:24
58:25 64:17,17 71:1
75:21,25
year
13:13
years
8:14,16 15:14 25:5
39:22,25 40:11 53:24
67:20
yep
65:7,7
york
1:18
youll
18:2 64:9 65:19
youre
7:16 8:20 10:14,14
15:15 19:9 24:11
48:13 59:18 61:20
71:3
youve
47:7 70:24

**Z**

**0**

00

6:4
000
75:15
03
8:24
05
76:21
051
16:25 17:4
073
18:3

**1**

1
17:5,11 18:12 78:9
1110
9:9
13
5:3
14th
73:22 74:10 76:7
15
39:25
15cv128f
1:10
1660
2:4 3:9
17
1:21 6:3
1809
3:3
1a
19:3,18 20:13
1st
9:14

**2**

2
6:4 17:12 18:7,8,10,12
18:12 19:4,19 20:14
22:25 23:1,2 59:14
62:6,17 64:19 73:7
2001
9:12
2004
9:14,15
2014
13:13 48:20 73:22
74:10 76:7
2015
11:12 31:19 32:24 43:5
47:10,10,21 49:14,18
50:2,4,25 51:2,7,7
53:13 65:18,23 72:18
2016
1:21 6:3 77:11,18
78:19
21
75:15
221
44:15
224
5:3 12:17 13:1,4 56:22
59:12 71:5 73:8,13
225
5:4 30:4,8
226
5:5 30:19,20 33:8,14
33:16 65:19
23
18:2
24
64:10
2510
3:9
28th
45:7

2nd
40:22 43:24 44:5 47:9

**3**

3
19:1,10,12,13 23:6
30
5:4,5
300
2:22
303
2:5 3:10
307
2:11,17 3:4
30th
21:15 33:18 49:14,18
50:24 51:6
31st
21:15,21 34:3,24 38:7
43:24 44:2,5
33
22:18
35
8:14
38777
2:22
3a
23:18

**4**

4
20:9 62:7 76:21
45
33:18
48
4:3
48152
2:22

**5**

56
4:4
5th
31:24 32:24 43:5 47:10
47:21 49:16 50:2,3
50:11,14 51:1,2,7
53:12 72:18

**6**

6
4:2 74:25
63
4:5
6375575
2:17

**7**

7
74:25
70
4:6
712
2:16
7330166
3:4
734
2:23
7398900
2:11
74
64:15
7421825
2:23
78
78:9

**8**

80
17:3
80218
2:5
80264
3:9
82001
2:16
83
22:19
83001
3:4
83002
2:10
8308800
3:10
8308911
2:5
8519
2:10
87
29:19
89
30:14,16

**9**

9
33:18
9th
65:18,23 66:11,13