**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

FRANCISCO L. HERRERA and  )
JOANNA HERRERA,           )
CO-WRONGFUL DEATH         )
REPRESENTATIVES for       )
exclusive benefit of the  )
Beneficiaries of MONICA   )
HERRERA, deceased, who    )
have sustained Damages    )
from her wrongfully       )
caused death,             )
                          )
      Plaintiffs,         )
                          )
vs.                       )  Case No.
                          )  15-CV-128-F
GREGORY BUCKINGHAM and     )
DEBORAH BUCKINGHAM, but    )
in their individual        )
capacities as Trustees of  )
the BUCKINGHAM FAMILY      )
TRUST; and, GREGORY        )
BUCKINGHAM and DEBORAH     )
BUCKINGHAM as individual   )
defendants; and, WYOMING   )
MECHANICAL, INC., a        )
Wyoming Corporation;       )
TRIANGLE TUBE/PHASE III    )
CO. INC., a New Jersey     )
Corporation; and, M&G      )
GROUP DURAVENT, INC., a    )
New York corporation,      )
                          )
      Defendants.         )
_____  )

DEPOSITION OF
BOYD ROBERTS
Thursday, August 18, 2016

TAKEN AT
Jackson Hole Court Reporting
Jackson, Wyoming

COURT REPORTER:
Michelle L. Cunningham

**Page 2**

1   APPEARANCES:
2
3   FOR THE WITNESS BOYD ROBERTS:
    WILLIAMS, PORTER, DAY AND NEVILLE
4   BY:  Jason Neville, Attorney at Law
    P.O. Box 10700
5   Casper, Wyoming 82602
    (307) 265-0700
6   Jneville@wpdn.net
7
8   FOR THE PLAINTIFFS:
9   LAW OFFICES OF DAVID G. LEWIS
    BY:  David G. Lewis, Attorney at Law
10  PO Box 8519
    Jackson, WY 83002
11  (307) 739-8900
    Davelewis@bresnan.net
12
13
    FOR THE DEFENDANT WYOMING MECHANICAL, INC.;
14  CROSS DEFENDANT:
15  LAW OFFICES OF McKELLAR, TIEDEKEN & SCOGGIN
    BY:  Julie Tiedeken, Attorney at Law
16  712 Randall Avenue
    Cheyenne, WY 82001
17  (307) 637-5575
    Jtiedeken@mtslegal.net
18
19
    FOR THE DEFENDANT TRIANGLE TUBE/PHASE III:
20
    LAW OFFICE OF FOLEY, BARON, METZGER & JUIP,
21  JPLLC
    BY:  Joseph P. McGill, Attorney at Law
22  38777 Six Mile Road, Suite 300
    Livonia, MI 48152
23  (734) 742-1825
    Jmcgill@fbmjlaw.com
24                  ///
25                  ///

**Page 3**

1   FOR THE DEFENDANT/CROSS COMPLAINANTS
    BUCKINGHAMS:
2
    LAW OFFICE OF MEAD AND MEAD
3   BY:  Katherine L. Mead, Attorney at Law
    PO Box 1809
4   Jackson, WY 83001
    (307) 733-0166
5   Kate@meadlaw.net
6
    FOR THE DEFENDANT DURAVENT:
7   WALTZ/REEVES
8   BY:  Christopher Reeves, Attorney at Law
9   1660 Lincoln Street, Suite 2510
    Denver, CO 80264
10  (303) 830-8800
    Creeves@waltzreeves.com
11
12  Also Present:
13  Migs Lewis, Law Office of David Lewis
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1   INDEX OF EXAMINATION
2
    EXAMINATION BY:   Mr. McGill     Page 6
3
    EXAMINATION BY:   Mr. Reeves     Page 41
4
    EXAMINATION BY:   Ms. Tiedeken   Page 62
5
    EXAMINATION BY:   Mr. Lewis      Page 68
6
    EXAMINATION BY:   Mr. McGill     Page 71
7
    EXAMINATION BY:   Mr. Reeves     Page 78
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Exhibit U**

Page 5

1          INDEX OF EXHIBITS
2    EXHIBIT NO.   DESCRIPTION        REFERENCE
3    227      (Email exchange)    Page 27
4    228      (Chain of Custody
             Log)        Page 31
5
     229      (Insurance Policy)  Page 38
6
     230      (Color Photos)      Page 40
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1          BE IT REMEMBERED that, pursuant to
2    Notice of Deposition, and on Thursday,
3    August 18, 2016, commencing at the hour of
4    3:00 p.m., thereof, at the offices of
5    Jackson Hole Court Reporting, Jackson,
6    Wyoming, before me, MICHELLE L. CUNNINGHAM,
7    a Freelance Shorthand Reporter and Notary
8    Public in and for the County of Sublette,
9    State of Wyoming, there personally appeared
10            BOYD ROBERTS,
11   called as a witness by the Defendant
12   Triangle Tube/Phase III, and who, being
13   first duly sworn, was thereupon examined
14   and testified as hereinafter set forth.
15        EXAMINATION OF BOYD ROBERTS
16          BY MR. MCGILL
17   Q. Good afternoon, Mr. Roberts my name's
18   Joseph McGill. I represent Triangle Tube
19   Corporation in this action that's been filed
20   by the Herrera family.
21      Could you please state your name for the
22   record?
23   A. Full name?
24      Boyd --
25   Q. Yes.

Page 7

1    A. -- Boyd Leon Roberts.
2    Q. And, Mr. Roberts, did you have a chance to
3    look at our subpoena and deposition notice
4    that we provided to you and your counsel
5    in -- I'll show you another copy of it. I
6    don't think we need to make an exhibit of it.
7    A. Yes.
8    Q. And do you have any responsive documents
9    that you can produce as a result of that
10   subpoena?
11      I know your counsel, before we went on the
12   record made a very clear explanation of
13   what's happening with those.
14   A. As far as everything that's documented,
15   they have it, to my understanding.
16   Q. Okay.
17      MR. MCGILL: Do you just want to place
18   a statement on the record?
19      MR. NEVILLE: The only responsive
20   documents that we have in the claims file
21   or, rather, that -- that Boyd says exists
22   and that we have found in the claims file
23   is one, and it's been an exhibit
24   previously, it's a chain of custody form
25   that Boyd signed off on at Joe Freeman's

Page 8

1    place with the -- when he transferred the
2    boiler.
3      Secondly, and as he will speak about
4    here, I'm assuming shortly, he thinks he
5    took about eight photographs, and you'll
6    get to where he's -- he took those.
7      I'm not able to differentiate where
8    those are right now in the claims file, and
9    I'm trying to track that down and as soon
10   as I do, I'll -- I'll get those up to you.
11      MR. MCGILL: Great. Thanks very much.
12   Q. (By Mr. McGill) Have you spoken with
13   anyone other than your attorney regarding
14   your testimony today?
15   A. No.
16   Q. Okay.
17      Have you reviewed anything in preparation
18   for your testimony today?
19   A. Yes.
20   Q. What -- what documents or things have you
21   reviewed?
22   A. I just reviewed the claim file briefly
23   and then the filing that you'd placed on --
24      MR. LEWIS: I'm sorry. Could you speak
25   up a little bit?

Page 9

1    THE WITNESS:  Just a claims file that I
2  had a document where I was served.  That's
3  it.
4  Q.  (By Mr. McGill)  Okay.
5  A.  Yeah.
6  Q.  Have you ever given a deposition before?
7  A.  Once.
8  Q.  Okay.
9    So the basic ground rules are to speak
10  up --
11  A.  Sure.
12  Q.  -- so the court reporter can hear you;
13  don't talk over the other attorneys; and some
14  of the attorneys may have objections as well
15  so they'll try and interpose those before you
16  answer.  And you have to answer verbally as
17  opposed to a nod of the head or saying
18  "um-hum" or "yeah."
19    Is that okay?
20  A.  Yes.
21  Q.  Great.
22    Have you been involved in any other
23  litigation before, either personally or in
24  your capacity with Farm Bureau?
25    MS. MEAD:  Objection.  Form.

Page 10

1    THE WITNESS:  What are you -- my
2  question would be what do you mean by
3  litigation as far as involved in.
4  Q.  (By Mr. McGill)  Well, let me ask you
5  this:  Have you ever been involved in a
6  lawsuit involving a boiler?
7  A.  No.
8  Q.  Okay.
9    Have you ever been involved in lawsuit
10  regard being any type of gas-fired
11  appliance?
12  A.  No.
13  Q.  And when I say "involved," I mean either
14  as a witness or a party?
15  A.  No.
16  Q.  Today you're here as a witness.
17  A.  (Moving head up and down.)
18  Q.  Okay.
19    Any involvement in any lawsuit
20  involving a product liability issue?
21  A.  Not that I recall.
22    (Moving head from side to side.)
23  Q.  And any lawsuits involving death or
24  personal injury?
25  A.  Yes.

Page 11

1  Q.  All right.  Tell me what -- what your
2  involvement was in those suits.
3  A.  Just as an adjuster for a auto
4  accident.
5  Q.  And were you working for insurance company
6  or independently?
7  A.  Insurance company.
8  Q.  Tell me a little bit about your employment
9  history, please.
10  A.  How extensive history?  Farm Bureau's
11  history or --
12  Q.  Sure.  Say for the last ten years.
13  A.  Last ten years I've worked for Farm
14  Bureau only.
15  Q.  Did you go to college?
16  A.  Yes.
17  Q.  Did you graduate?
18  A.  No.
19  Q.  Okay.
20    Do you have any licenses?
21  A.  Yes.
22  Q.  What do you have?
23  A.  A Wyoming adjuster's license.
24  Q.  And is that renewed annually or...
25  A.  Every four years -- or two years.

Page 12

1  Q.  Do you haves to take a test for that?
2  A.  Take a test to start with and after
3  that, it's just continuing education and
4  submit upon renewal.
5  Q.  Okay.
6    And as part of that adjuster's -- what's
7  your current title with Farm Bureau?
8  A.  Claims representative.
9  Q.  Do you do any adjusting as a claims
10  representative?
11  A.  Yes.
12  Q.  And can you tell many me, with respect to
13  your role as adjuster, whether or not in that
14  capacity you've had either any formal
15  education or training on the job with respect
16  to preservation of evidence?
17  A.  We've had discussions about that, yes.
18  Q.  Where and when?  Can you give me a little
19  more context of that?
20  A.  (Moving head from side to side.)
21    Probably -- I mean, anything from
22  seminars that they put on for continuing
23  education to classroom settings within Farm
24  Bureau.
25  Q.  Okay.  But all pretty much at Farm Bureau?

Page 13

```
 1   A.  Probably a little of both.
 2   Q.  Okay.
 3        Where else have you received any training
 4   as adjuster that might have dealt with
 5   preservation of evidence, other than Farm
 6   Bureau?
 7   A.  None.
 8   Q.  Do you know an individual by the name of
 9   Scott Dawson?
10   A.  Yes.
11   Q.  Who is Scott?
12   A.  He is one of our managers in Laramie,
13   at our home office.
14   Q.  Where are you based?
15   A.  I'm based here in Jackson.
16   Q.  And who do you report to?
17   A.  My first supervisor is Scott Fabricius.
18   Q.  And do you know an individual by the name
19   of Steve Johnson?
20   A.  The name does not sound familiar, no.
21        (Moving head from side to side.)
22   Q.  What's your relationship with Mountain
23   West?
24   A.  What do you mean by "relationship"?
25   Q.  I mean are you employed by Mountain West
```

Page 14

```
 1   or are you employed by Farm Bureau?
 2   A.  Yes, I'm employed by Mountain West Farm
 3   Bureau.
 4   Q.  Okay.
 5        And so when you said you were with Farm
 6   Bureau for the last ten years, was that with
 7   Mountain West --
 8   A.  Mountain West --
 9   Q.  -- Farm Bureau?
10   A.  Yes.
11   Q.  Can you describe for me -- your counsel
12   did an excellent job explaining the situation
13   with the documents.  Can you describe for me
14   the photographs he mentioned just a few
15   moments ago?
16   A.  Just have photo -- photographs I took
17   upon first inspection -- my first
18   inspection, I should say.  Only inspection.
19   Q.  And what was the date of that, if you
20   recall?
21   A.  I believe February 3rd.
22   Q.  In 2015?
23   A.  Yes.
24   Q.  Did -- did you refresh your recollection
25   about the visits you might have had to the
```

Page 15

```
 1   Buckingham property before you came to your
 2   deposition today?
 3   A.  Yes.
 4        (Moving head up and down.)
 5   Q.  Okay.
 6        So by looking at the claims file,
 7   et cetera, that kind of thing?
 8   A.  Yes.
 9   Q.  So what did the photos depict?
10   A.  There was one photo of the archway over
11   the driveway as you enter into the property
12   that designates the property; one photo of
13   the exterior of the building; and then the
14   other photos are photos of the boiler and
15   the exhaust system.
16        MR. NEVILLE:  I'm sorry.  Were you
17   finished?
18        THE WITNESS:  Yeah.
19        MR. NEVILLE:  I just have -- I just got
20   them.
21        Is there a way, Michelle, I can e-mail
22   them and we can get quick printed out?
23   There's nine of them.
24        Or unless you want to keep going.  It's
25   up to you.
```

Page 16

```
 1        MR. MCGILL:  Why don't we keep going
 2   and when we take a break, we can see if we
 3   can get them printed off.
 4        MS. TIEDEKEN:  I'm wondering -- pardon
 5   me.
 6        MR. MCGILL:  Sure.
 7        MS. TIEDEKEN:  I'm just wondering if he
 8   emailed them to Jackson Hole Court
 9   Reporting -- because we'd have to print
10   them off here; right?  I mean, you could
11   give him that email address.
12        MR. MCGILL:  We do.
13        Why don't we go off the record for a
14   second and see if we can facilitate this.
15        (Whereupon, a discussion was held off
16   the record.)
17   Q.  (By Mr. McGill)  Mr. Roberts, again, the
18   photographs you mentioned, the exterior of
19   the building, archway above the -- garage
20   doors, and photos of the boiler.  Did you
21   take any photographs of the exhaust venting
22   or did you just sort of take wide shots of --
23   of the boiler?
24   A.  There's some pictures of both the
25   boiler and the exhaust.
```

1    Q. It sounds like we're probably gonna have
2    copies of those soon so I won't belabor the
3    point on that.
4        Now, you mentioned that you looked at
5    the claims file before you came in today
6    and -- and I'm curious, does this
7    February 3rd, 2015, date, was that the only
8    time that you were at the property?
9    A. No.
10   Q. Okay.
11       When was the next time you were at the
12   property?
13   A. The 9th, I believe.
14   Q. The 9th.
15       Okay. So on -- on February 3rd, who was
16   there with you, if anyone?
17   A. Just the caretaker.
18   Q. Is that Mr. Schueler?
19   A. Yeah, Dave Schueler.
20   Q. How long was the visit?
21   A. Just a few minutes.
22   Q. Did you physically touch either the
23   exhaust vent or the boiler itself?
24   A. No.
25   Q. And so you were there on February 9th as

1    well?
2    A. Yes.
3    Q. And how long was that visit?
4    A. Good portion of the day.
5    Q. And then have you had any other visits to
6    the Buckingham residence either before or
7    after this unfortunate incident?
8    A. One other time I was there between the
9    two.
10   Q. Between February 3rd and February 9th you
11   were also out at the property?
12   A. Yes.
13   Q. And when was that?
14   A. Maybe the 4th.
15   Q. What was the reason for that visit?
16   A. To drop off some temporary heat fans.
17   Q. Was anyone there that you spoke with?
18   A. I don't recall.
19   Q. Did you just drop the fans off and -- and
20   leave from there or did someone receive them?
21   A. If I recall, I showed Blue Sky, which
22   is a mitigation company here in town -- I
23   just -- they followed me out there, because
24   they had the fans.
25   Q. I see.

1        So Blue Sky. Who -- who -- I'm
2    presuming that you contacted Blue Sky to
3    provide the fans?
4    A. Yes.
5        (Moving head up and down.)
6    Q. And they followed you up to the ranch and
7    then you left after that?
8    A. Yes.
9        (Moving head up and down.)
10   Q. Okay.
11       On any one of these visits did you
12   speak with Mr. Buckingham?
13   A. A little bit on the 9th.
14   Q. All right.
15       Do you recall anything that you might have
16   discussed?
17       MR. NEVILLE: Well, I'm gonna interject
18   here. If -- if he's discussing things with
19   the insured as a result of the accident,
20   that's protected by Thomas versus Harrison.
21       MR. MCGILL: Okay. That's fine.
22   Q. (By Mr. McGill) So anything other than
23   the claim? Did you talk about -- did you
24   talk with Mr. Buckingham about anything other
25   than the claim on the 9th?

1    A. Maybe a little bit about his family,
2    how they're doing.
3    Q. Okay.
4        Do you know when the claim was filed?
5    A. I believe it was February 3rd.
6    Q. When did you first learn of the claim?
7    A. February 3rd.
8    Q. And with respect to the -- the
9    Buckinghams' boiler that was involved in
10   claim, did you participate at all in any of
11   the testing or inspection of the boiler?
12   A. Not really, no. I was present but I
13   wasn't involved.
14   Q. Who would primarily have been responsible
15   for those duties on behalf of the
16   Buckinghams, to your knowledge?
17   A. As far as the insurance is concerned
18   with regards Buckinghams would have been
19   Jay Freeman.
20   Q. When was Mr. Freeman retained?
21   A. Probably a couple days before, I want
22   to say maybe the 4th and 5th is when we
23   contacted him.
24   Q. And who made the decision to retain
25   Mr. Freeman?

Page 21

1    MR. MCGILL:  Is that another one of
2  those --
3    MR. NEVILLE:  No.  No, I think that's
4  that fine.  I'm just -- as far as
5  foundation, if he knows.
6    MR. MCGILL:  Oh, sure.
7    THE WITNESS:  I wasn't fully involved
8  in that --
9  Q.  (By Mr. McGill)  Okay.
10  A.  -- I was just notified that that's who
11  it would be and...
12  Q.  Took it from there.  Okay.
13    Have you been involved in claims before
14  where you've actually collected a piece of
15  evidence that's in -- well, an artifact,
16  let's say, that's involved in the claim?
17  A.  Yes.
18  Q.  On how many occasions have you done that?
19  A.  Probably a dozen times, if not more.
20  Q.  And you may have in a roundabout way
21  answered this but I'll ask:  Have you ever
22  been involved in a claim where you've
23  collected the boiler as an artifact of the
24  claim?
25  A.  Boiler, no.

Page 22

1  Q.  What's the largest item you've collected
2  as an artifact?
3  A.  Probably that boiler.
4  Q.  Okay.
5    And what's the most sensitive item that
6  you've collected as an artifact?
7    MS. MEAD:  Objection.  Form.
8  Q.  (By Mr. McGill)  You can answer.
9  A.  Probably some evidence that was
10  involved in a fire had already been
11  compromised due to the fire itself.
12  Q.  (By Mr. McGill)  I see.
13    And in your training as -- as an adjuster
14  and with respect to collecting artifacts
15  or -- or evidence -- I know evidence has a
16  legal meaning, but just refer to as
17  artifacts -- what is your understanding of
18  manner in which artifacts are to be collected
19  and -- and documentation of that process?
20  A.  They should be secured, protected as
21  much as possible from any kind of damage,
22  being able to be damaged, I should say.
23  Usually there's signatures on transfer
24  evidence sheets and sometimes it's shipped.
25  Q.  When you use the term "secured," what are

Page 23

1  you referring to?
2  A.  You want to have it secured to where --
3  that it won't be damaged.
4  Q.  So are you using the term "secured" and
5  "protected" as one and the same?
6  A.  Yes.
7  Q.  Are there any transfer evidence sheets
8  related to the Buckingham boiler?
9  A.  Yes.
10  Q.  And where are those?
11  A.  I -- there's a copy of it in the file.
12  Q.  And just --
13    MR. MCGILL:  Counsel, maybe you could make
14  a record with respect to your position on
15  the -- the claims file.
16    MR. NEVILLE:  Sure.
17    Anything -- so with -- with respect to
18  anything in -- in the claims file, the
19  position of Mountain West Farm Bureau is
20  that -- is that it is protected both with
21  respect to Thomas versus Harrison, it's
22  done in preparation to defend its insured
23  as well as it's overly broad and doesn't
24  have anything to do with the claims being
25  litigated.

Page 24

1    So with respect -- that's -- that's
2  where we are with respect to the claims
3  file.
4    MR. MCGILL:  Okay.
5  Q.  (By Mr. McGill)  You also mentioned
6  securing or obtaining shipping?
7  A.  Yes.
8  Q.  What's been your experience with respect
9  to that, because I notice in -- in -- with
10  respect to the Buckingham boiler, it looks
11  like it was personally delivered by -- by
12  you, I believe --
13  A.  Yes.
14  Q.  -- to Mr. Freeman's lab.
15  A.  Yes.
16  Q.  But -- so can you tell me a little bit
17  about your experience in actually shipping
18  artifacts?
19  A.  Kind of depends on the size.  You know,
20  I haven't shipped anything as big as a
21  boiler before, but my understanding is --
22  because I have seen other things that been
23  transferred, such as bottle of -- that's
24  been transferred, they basically wrapped it
25  to make sure no parts would fall off or

Page 25

1  anything like that. Some smaller items,
2  sometimes we'll crate them up if it's being
3  shipped, like, by UPS. Sometimes it might
4  just be a box; sometimes it might be an
5  envelope --
6  Q. Um-hum.
7  A. -- just depends on what the artifact or
8  evidence is.
9  Q. Okay.
10     Do you have any familiarity with
11  respect to common carriers and shipping
12  things with cushion rides or extra
13  protection, anything like that?
14  A. No, I'm not -- as far as education or
15  real familiarity, no.
16     (Moving head from side to side.)
17  Q. Okay.
18     And was that correct that you were the one
19  that delivered the Buckingham boiler to
20  Mr. Freeman's lab?
21  A. Yes.
22  Q. And tell me a little bit about that.
23  First and foremost, what type of vehicle did
24  you use?
25  A. It was a 2014 Chevy Silverado.

Page 26

1  Q. And that's a pickup truck?
2  A. Yes.
3  Q. And how did you -- how did you secure the
4  boiler -- well, first of all, how long did it
5  take you to get down there?
6  A. To drive down there?
7  Q. Yeah.
8  A. From here to there's probably eight-,
9  nine-hours drive.
10  Q. Did you go all in one day?
11  A. Yes.
12  Q. And then how did you secure the boiler in
13  the Silverado?
14  A. I used straps to secure it in in the
15  back, in the bed of the truck.
16  Q. Did you have the boiler in any kind of
17  packing or crating?
18  A. No.
19  Q. So the boiler was, essentially, just
20  ex- -- laid on the back bed of the Silverado,
21  strapped down but not any exterior cushioning
22  or packing or anything like that?
23  A. The bed of the truck had a plastic
24  liner in it.
25  Q. Okay.

Page 27

1     But no cushioning on that liner?
2  A. No cushioning on it, no.
3  Q. Was it raining or snowing when you --
4  well, what was the day that you delivered it?
5  A. March 2nd or 3rd, I think.
6  Q. Okay.
7     And was it raining or snowing when you
8  were driving down there?
9  A. No.
10  Q. And did you go by yourself?
11  A. Yes.
12  Q. The manner in which you delivered the
13  boiler to Mr. Freeman's lab, is that
14  consistent with Mountain West policy with
15  respect to transferring a piece of evidence
16  or artifacts, if there is a policy?
17  A. There is no policy that I'm aware of.
18     (Whereupon, Deposition Exhibit 227 was
19  marked for identification.)
20     MR. NEVILLE: Make sure to read the
21  whole thing before he asks you a question.
22     THE WITNESS: (Reviewing document.)
23     MS. TIEDEKEN: Do you have any other
24  copies, Joe?
25     MR. MCGILL: I'm sorry, I don't. You

Page 28

1  guys can look at this one if you want.
2     MS. TIEDEKEN: Thanks.
3     MR. NEVILLE: Were you gonna mark this
4  as something?
5     THE WITNESS: Yeah, it's marked as 227.
6     MR. NEVILLE: Oh, it is?
7     MR. MCGILL: Yeah.
8     MR. NEVILLE: Okay.
9     MR. LEWIS: Are you looking to mark
10  this?
11     MR. MCGILL: Thanks.
12  Q. (By Mr. McGill) Mr. Roberts, have you had
13  a chance to take a look at Exhibit 227?
14  A. Yes.
15  Q. For the record, this is email chain
16  between Mr. David Schueler and Rick
17  Buckingham and it references Boyd in here --
18  and they're talking about the manuals for the
19  Triangle Tube boiler.
20     Do you have any knowledge at all or did
21  any one of those individuals contact you
22  concerning the Triangle Tube boiler manuals?
23  A. No.
24  Q. So you don't know whether the manuals that
25  were found with the boiler were -- well, let

Page 29

1  me ask you it this way: Were any of the
2  manuals that were found with the boiler ever
3  in your possession?
4  A. If I recall, they put them on the
5  inside panel of the boiler at the time of
6  removal and that's where they were at, if I
7  recall.
8  Q. Did they stay inside there when you drove
9  the boiler down to -- to Denver?
10 A. Yes. The panel was never taken off
11 while it was in my possession.
12 Q. How's the ride in the Silverado in the
13 bed?
14 A. It's smooth.
15 Q. Smooth in the cab. How about the bed; do
16 you know?
17 A. Smoother than most trucks.
18 Q. Okay.
19 A. Some people compare it to riding in a
20 Cadillac.
21 Q. Sure.
22    So when you strapped the boiler down in
23 the back of the Silverado, did it move around
24 at all while you were driving down to Denver?
25 A. No.

Page 30

1  Q. And did you experience any damage to the
2  boiler while you were en route to Mr.
3  Freeman's lab?
4  A. No.
5  Q. Did you speak with Mr. Freeman at all in
6  terms of how the boiler should be taken from
7  the Buckinghams' ranch to his lab in -- in
8  Colorado?
9  A. The only direction that I got was until
10 it was delivered, it needed to be in a
11 secured, warm place.
12 Q. Okay.
13    And did you follow his instruction?
14 A. Yes.
15 Q. Where did you secure the boiler?
16 A. In a closet --
17 Q. In --
18 A. -- that's in our office building.
19 Q. Okay.
20    How long did you have the boiler before
21 you delivered it to Mr. Freeman's lab?
22 A. Less than a month.
23 Q. Was the closet that the boiler was in, was
24 that locked?
25 A. Yes.

Page 31

1  Q. And who had access to the closet?
2  A. Myself and the agents in the office.
3  Q. How many agents are in the office?
4  A. At that time, I believe there was five
5  agents.
6  Q. Do you have any reason to believe that the
7  manuals that were kept in the cabinet of the
8  boiler were switched or that those weren't
9  the manuals that were found with the boiler?
10 A. No reason to believe they weren't what
11 was with it.
12    (Whereupon, Deposition Exhibit 228 was
13 marked for identification.)
14    THE WITNESS: (Reviewing document.)
15    MR. MCGILL: Showing the witness what's
16 been marked as Exhibit 228, which is a
17 chain of custody form from AEI Corporation,
18 Mr. Freeman's -- Mr. Freeman's lab.
19    THE WITNESS: (Reviewing document.)
20 Q. (By Mr. McGill) You ready?
21 A. Sure.
22 Q. Sure. Okay.
23 A. Yes.
24 Q. Have you seen this form before?
25 A. Yes.

Page 32

1  Q. Do you recall seeing it before -- or,
2  actually, do you -- does your signature
3  appear on the form?
4  A. Yes.
5  Q. And was it an accurate description that I
6  gave of it; that it's a chain of custody form
7  from AEI Corporation?
8  A. Yes.
9  Q. Okay.
10    Are the items that are listed under the
11 "Artifact Description," do those accurately
12 reflect what you delivered to Mr. Freeman's
13 lab?
14 A. (Reviewing document.)
15    It appears so, yes.
16 Q. Whose handwriting is on this form?
17 A. (Reviewing document.)
18    I believe Daniel's, aside from my
19 signature.
20 Q. Okay. So --
21 A. My portion that I filled out.
22 Q. Okay.
23    So the "transferred by" portion, is that
24 the portion that you filled out?
25 A. Only portion I filled out was my

1 signature on there, the phone number, and
2 the email address.
3 Q. So during the time period when the boiler
4 was in your office, was it inspected by
5 anyone?
6 A. No.
7 Q. Was it operated by anyone?
8 A. No.
9 Q. And to your knowledge, did anyone open
10 that closet and -- and look at the boiler?
11 A. To my knowledge, no.
12    (Moving head from side to side.)
13 Q. When it was in the closet in your office,
14 was it packaged in any way: Shrinkwrapped or
15 bubble wrapped, anything like that?
16 A. No.
17 Q. And it wasn't shrinkwrapped or bubble
18 wrapped when you drove it down to the Denver
19 area?
20 A. No.
21 Q. With respect to this exhibit, it talks --
22 Exhibit 228, it talks about three-inch PVC
23 fresh air piping. You see that there?
24 A. Yes.
25 Q. And there's an item number two: Sections

1 of vent pipe polypropylene. You see that
2 there?
3 A. Yes.
4 Q. There's a -- next to that -- that language
5 in the artifact identification line, there
6 appears to be a -- a drawing. Do you know
7 what that references --
8 A. No.
9 Q. -- it's like a horizontal line with an
10 arrow in the middle of it?
11 A. No.
12 Q. Okay.
13    When you transported the -- the vent
14 piping, either the polypropylene or the
15 PVC, how did you secure that in the
16 Silverado?
17 A. It was strapped down as well.
18 Q. And was it completely -- well, tell me, if
19 you can, what your recollection is of the
20 polypropylene venting in terms of the sizes
21 of the sections and whether they were clipped
22 together and that type of thing.
23 A. Some sections were -- had been taken
24 apart prior to my possession of them to be
25 put in the bed because they were longer

1 than the bed of the truck.
2 Q. And --
3 A. And they're approximately three inches
4 in diameter, probably, I assume, maybe six
5 feet in length. I'm not sure how long they
6 were.
7 Q. Okay.
8    So who took the vent pipe sections apart?
9 A. I don't recall exactly.
10 Q. But that was at the -- the Buckinghams'
11 ranch?
12 A. Yes.
13    (Moving head up and down.)
14 Q. And did you further disassemble the vent
15 piping, whether the PVC or the polypropylene,
16 when you took those -- those materials, those
17 artifacts to your office for storage?
18 A. I did not.
19    (Moving head from side to side.)
20 Q. And then when you transported them to
21 Denver, did you break them down any further
22 and take -- in other words --
23 A. No, I --
24 Q. -- take the piping apart?
25 A. -- did not.

1    (Moving head from side to side.)
2 Q. Do you have any photographs of the -- the
3 boiler or the vent piping sort of during the
4 process of either taking it from the
5 Buckinghams' ranch and securing it at your
6 office or when you -- from your office down
7 to Denver?
8 A. No, I do not.
9    (Moving head from side to side.)
10 Q. So you were at the Buckinghams' ranch and
11 you saw the boiler as it was installed at the
12 time, or at least in the days after Monica
13 Herrera's death. Is that a fair statement?
14 A. Yes.
15 Q. And do you recall the vent piping being
16 installed on what are known as unistruts?
17 A. I'm not familiar with unistruts, but
18 they were on some kind of a support.
19 Q. Yeah. Some kind of a wall-mounted
20 bracket?
21 A. Something like that, from what I
22 recall.
23    (Moving head up and down.)
24 Q. All right.
25    Did you collect the wall-mounted

1  brackets as artifacts related to this
2  claim?
3  A.  I don't believe so.
4      (Moving head from side to side.)
5  Q.  Do you recall that on those brackets there
6  were also clamps that held the piping in
7  place that were mounted on the brackets?
8  A.  I don't recall.
9  Q.  Do you recall whether or not you collected
10  any one of those clamps?
11  A.  I possibly -- possibly.  I don't
12  recall.
13  Q.  So was -- was there any reason why you
14  didn't also collect the wall-mounted brackets
15  as artifacts related to this claim?
16  A.  It wasn't my decision what was
17  collected, it was the people that were
18  there --
19  Q.  Okay.
20  A.  -- such as yourself.
21  Q.  Yeah, I know I was there on the 9th
22  observing.
23  A.  Yeah.
24  Q.  So you -- did you have any conversations
25  with Mr. Freeman about those brackets at all

1  in terms of whether to take them or leave
2  them?
3  A.  I did not, no.
4      (Moving head from side to side.)
5      (Whereupon, Deposition Exhibit 229 was
6  marked for identification.)
7      MR. MCGILL:  Showing the witness what's
8  been marked Exhibit 229.
9      Here's a copy for you as well, which,
10  for the record, is the Buckinghams'
11  insurance documents, a certified copy
12  thereof.
13      THE WITNESS:  (Reviewing document.)
14      It's their policy then?  Okay.
15  Q.  (By Mr. McGill)  I certainly am not going
16  to ask you to read the whole thing before
17  you --
18  A.  I hope not --
19  Q.  -- if --
20  A.  -- we'll be here for a while.
21  Q.  Sure.
22      If -- if you flip through it, does it
23  appear to be complete?
24  A.  (Reviewing document.)
25      MR. NEVILLE:  And just so we're clear,

1  I wasn't aware -- I mean, we weren't
2  requested to bring this or to provide
3  somebody to testify about the policy.
4      MR. MCGILL:  That was gonna be my next
5  question, because we had sent out notices
6  for a representative for Mountain West as
7  well --
8      MR. NEVILLE:  Um-hum.
9      MR. MCGILL:  -- and was wondering if
10  Mr. Roberts, is he testifying on behalf of
11  the agency as well?
12      MR. NEVILLE:  Yeah, yeah, he can, but I
13  was never put on notice that we were gonna
14  talk about the policy, and he's certainly
15  not prepared to talk about the policy.
16      MR. MCGILL:  Okay.
17      THE WITNESS:  If I had a large time to
18  go through all of this, I can't say it's
19  the entire thing, but it looks like it is.
20  Q.  (By Mr. McGill)  Okay.  So is -- just to
21  confirm with what your counsel said, are
22  you -- are you able to answer questions about
23  the policy that's involved in this case,
24  which is, actually, the policy is not
25  necessarily involved but it's the Buckinghams

1  policy for the time period?
2      MR. NEVILLE:  Well -- and just -- and
3  I'll interject here.  You're saying whether
4  he's available to -- We weren't requested to
5  supply somebody to talk about it so we're
6  not supplying somebody to talk about it.
7  Q.  (By Mr. McGill)  So you're not here to
8  answer questions about this policy?
9  A.  Right.
10  Q.  Okay.
11      Okay.  I will pass the witness at this
12  time.
13      Thank you very much, sir.
14  A.  You're welcome.  Thank you.
15      MR. NEVILLE:  Do you want to get those
16  photographs?
17      MR. MCGILL:  Well, actually, can we
18  take a break and then I'll pass him?
19      (Whereupon, a break was taken from 2:42
20  p.m. to 2:58 p.m.)
21      (Whereupon, Deposition Exhibit 230 was
22  marked for identification.)
23      MR. MCGILL:  Showing the witness what's
24  been marked Exhibit 230, which I have also
25  numbered individual pages of it as well at

Page 41

```
1   the bottom, and these are purported to be
2   the photographs that Mr. Roberts took at
3   the Buckingham ranch.
4   Q. (By Mr. McGill)  Sir, could you take a
5   look at that exhibit and verify that those
6   are your photographs?
7   A. Yes, they are.
8   Q. And, again, can you remind he of the date
9   that those were taken again, please?
10  A. I believe it was February 3rd.
11  Q. And did you receive any instruction from
12  anyone with respect to which types of
13  photographs to take and what different shots
14  to be collected?
15  A. For this specifically, no.
16     MR. MCGILL:  I will pass the witness at
17  this time.
18     I'm just gonna look at your
19  photographs, and I may have a couple more
20  questions for you.
21     THE WITNESS:  That's fine.
22     MR. MCGILL:  Thank you very much, sir.
23        EXAMINATION OF BOYD ROBERTS
24            BY MR. REEVES
25  Q. Mr. Roberts, we met off the record before
```

Page 42

```
1   the deposition.  My name is Christopher
2   Reeves and I represent M & G DuraVent, who
3   manufactures the vent pipe that was attached
4   to this boiler.
5      Have you ever heard of M&G DuraVent
6   before?
7   A. No.
8   Q. And how long have you been with Mountain
9   Farm Bureau?
10  A. With Mountain West Farm Bureau.  Ten
11  years.
12  Q. Ten years.
13     And had you been with any other insurance
14  companies before then?
15  A. No.
16  Q. Did they provide you any training on how
17  to do your job?
18  A. No specific training, no.
19  Q. Did they provide you manuals or internet
20  training on how to be adjuster?
21  A. No.
22  Q. No.
23     How did you learn how to be adjuster?
24  A. Classroom setting, you know, for the
25  most part.  Some of it's learn-as-you-go.
```

Page 43

```
1   Q. Okay.
2      Did you work under somebody?  Is there
3   some apprentice that's done or --
4   A. There's a little bit of following of
5   another adjuster in the beginning, you
6   know, just to kind of learn to scope things
7   out a little bit --
8   Q. Okay.
9   A. -- kind of have some direction on, you
10  know, what to take photos of, not to touch
11  things, that type of thing.
12  Q. Okay.
13     And -- and that was one of the -- the
14  areas I was gonna go into.  Is -- is there a
15  rule when you're an adjuster to not touch
16  things?
17  A. On our initial inspection, yeah, for
18  sure.
19     (Moving head up and down.)
20  Q. Okay.
21     And when you say "when the initial
22  inspection happens," when do you get
23  involved?
24  A. Usually as soon as possible just so we
25  can have an eye on things to see what we're
```

Page 44

```
1   dealing with.
2   Q. And how does an adjuster get involved in
3   the first place?
4   A. A -- a insured will submit a claim to
5   the agent's office and then they -- they
6   process through the home office, they set
7   up a claim number and then they route it
8   out to an adjuster to -- to start an
9   investigation.
10  Q. And I think you testified that you believe
11  the claim was submitted -- or at least to
12  your knowledge, the claim was submitted on
13  February 3rd of 2015; is that correct?
14  A. Yes.
15  Q. And at that same time or that same day,
16  you went out and visited the property; is
17  that correct?
18  A. Yes.
19  Q. And how -- to your knowledge, was there a
20  demand made as of February 3rd, 2015, for a
21  claim to be made to the insurance company?
22  A. A claim from, like --
23  Q. Was there a demand from someone else --
24  A. No, there was not.
25  Q. -- at this juncture?
```

Page 45

1  A. There was not, no.
2  Q. Is that pretty consistent that an adjuster
3  gets involved even prior to a specific demand
4  being made against an insurer?
5  A. Yes.
6  Q. Okay.
7    And do you have any knowledge as to
8  whether or not Mountain States has a position
9  on how early they should be notified of a
10 potential claim or potential situation that
11 may involve its insurance policy?
12   MR. NEVILLE: Mountain West.
13   MR. REEVES: Mountain West. I'm sorry.
14   THE WITNESS: Most policies state that
15 insurance, as soon as a loss takes place,
16 they should notify their insurance company,
17 so that kind of varies when people do that.
18 Some people are more spontaneous than
19 others.
20 Q. (By Mr. Reeves)  Okay.  And in this case,
21 it appears as though Mountain West received
22 notice within a couple days of the loss; is
23 that correct?
24 A. Yes.
25 Q. And were you accompanied by anyone on

Page 46

1  February 3rd when you went out to the
2  property?
3  A. When I drove out there --
4  Q. That's correct.
5  A. -- no.
6    (Moving head from side to side.)
7  Q. But I believe you indicated the caretaker
8  was there, Mr. Schueler; is that correct?
9  A. He met me there, yes.
10 Q. Did he stay with you while you did your
11 initial investigation?
12 A. Yes.
13 Q. And generally speaking, what's entailed in
14 that initial investigation when you first go
15 out?
16 A. Take some photos and find out a little
17 bit about what they know as far as the
18 events, how things took place.
19 Q. Okay.
20   And was it at that time that you were
21 notified by someone that Wyoming Mechanical
22 had installed the boiler?
23 A. I was aware that Wyoming Mechanical
24 installed it by Buckinghams that day prior
25 to inspection.

Page 47

1  Q. Okay.  Was that part of the notice, the --
2  notice to the insurance company or that
3  was information you obtained?
4  A. I talked to Mr. Buckingham briefly
5  earlier that day --
6  Q. That --
7  A. -- that's how I got directions out to
8  the property.
9  Q. Is there any policy as a adjuster as to
10 identifying potentially responsible parties
11 or -- or people that should just be put on
12 notice that a loss has occurred?
13 A. We try to do that the best we can,
14 yeah.
15   (Moving head up and down.)
16 Q. Okay.
17   And we've had some testimony that there
18 was a specific request by Mr. Freeman to
19 notify all relevant parties.  Were you
20 present when he made that request?
21 A. I was not present, no.
22 Q. Okay.
23   Were you aware of his request that all
24 relevant parties be notified of the loss?
25 A. I wasn't made specifically aware of it,

Page 48

1  but I would assume that he would do that,
2  because it's pretty typical and protocol
3  most of the time.
4  Q. Are you aware of ever providing any notice
5  to M&G DuraVent at the time of the loss or
6  even months after the loss?
7  A. I know immediately -- the -- at the
8  start of our investigation, we did not know
9  who had manufactured who the vent was at
10 that time.
11 Q. In transporting the vent pipes, there are
12 labels on the -- the vent pipes that identify
13 the manufacturer; correct?
14 A. I don't recall if there is or is not.
15 Q. Okay.
16   Would that have been something you would
17 have looked for or would you rely on the
18 expert or --
19 A. At that point I pretty much relied on
20 the expert; that's why we brought them in.
21 Q. Fair enough.
22   And so to the extent if he told you who
23 should be notified, would that be your job or
24 someone else's job?
25 A. Usually that would be Tracy Wilson's or

Page 49

1     some -- our -- our subrogation manager.
2     Q. Okay.
3         And would you provide her --
4     A. And --
5     Q. And, I'm sorry, I stepped on your answer.
6     A. Usually she's the one that puts those
7     parties on notice, and she'll try to send
8     them out letters if parties are identified.
9         MR. NEVILLE: And if you'd just wait a
10    beat after his question --
11        THE WITNESS: Sure.
12        MR. NEVILLE: -- that way...
13    Q. (By Mr. Reeves) And how does Tracy get
14    that information?
15    A. Situation like this it would have been
16    from Jay Freeman.
17    Q. On February 3rd, just so I'm correct, you
18    did not change the configuration of either
19    the boiler or the vent pipe; is that correct?
20    A. It was not touched.
21    Q. Okay.
22        And then were you made aware that
23    Wyoming Mechanical was out there on
24    February 2nd?
25    A. Yes.

Page 50

1     Q. Were you aware of that on February 3rd
2     when you first went out there?
3     A. I don't recall if it was specifically
4     before I went out there or while I was
5     there, I don't recall.
6     Q. Okay.
7         And -- and --
8     A. I -- I was aware that day but I don't
9     recall when.
10    Q. So some -- sometime February 3rd you
11    were --
12    A. Yes.
13    Q. -- made aware of Wyoming Mechanical had
14    been there the day before you even arrived --
15    A. Yes.
16    Q. -- correct?
17    A. (Moving head up and down.)
18    Q. And were you made -- were you made aware
19    that Wyoming Mechanical had made changes to
20    the boiler and vent pipe?
21    A. Not aware of anything with the vent
22    pipe, no.
23        (Moving head from side to side.)
24    Q. Okay.
25        Were you aware that they had made changes

Page 51

1     to the boiler?
2     A. I was made aware that they did try to
3     do something with the boiler, as far as
4     what, I don't know.
5     Q. Okay.
6         Did you have any conversations with
7     Wyoming Mechanical on February 3rd?
8     A. No.
9     Q. What about February 4th when you went out
10    there?
11    A. I may have talked to them on the 4th.
12        (Moving head up and down.)
13    Q. And what did he tell you?
14        MS. TIEDEKEN: Who's "he"?
15        THE WITNESS: Dave Geick, I believe's
16    how you pronounce his last name --
17    Q. (By Mr. Reeves) Okay. And can --
18    A. -- Geick.
19    Q. -- can you tell me what your conversations
20    with Mr. Geick were?
21    A. Just a little bit of about their
22    company; when they installed it; that they
23    were aware that there'd been an issue and
24    that they'd been scheduled to come out for,
25    I believe, the 3rd, which was that Monday,

Page 52

1     if I recall. They were already -- he -- he
2     was already in discussion, if I recall,
3     with our insured at that time about putting
4     a different boiler in there because our
5     insured was scared to death at that
6     point --
7     Q. Okay.
8     A. -- about --
9     Q. Did he tell you in that -- in that
10    conversation that he had made any changes to
11    the boiler?
12    A. About that boiler.
13        I don't recall.
14    Q. Regardless of what time, when you were
15    notified of changes to the boiler by Wyoming
16    Mechanical, did they provide you any
17    specific, We did this, that, or the other, or
18    was it just generally, We made changes?
19    A. He mentioned a few things, said that he
20    had taken pictures of what he had done and
21    that -- that -- that's all I recall.
22    Q. Did you make a request of Wyoming
23    Mechanical and put their insurer on notice?
24    A. Yes.
25    Q. Okay.

```
 1       And did they advise you that they
 2  intended to do that or had already done
 3  that?
 4  A.  I believe he said he'd already informed
 5  his agent, and his agent had said, Let's
 6  hold off until a claim is made.
 7  Q.  Okay.
 8       And --
 9  A.  And I advised him that he should still
10  pursue it.
11  Q.  Okay.
12       So even though his agent was telling him
13  not to file a claim, you had told him --
14  A.  Best interest, it would be wise to do
15  so, yes.
16       (Moving head up and down.)
17  Q.  Okay.
18       And why -- why would you say that?
19  A.  To where he could have his experts --
20  his insurance could have their experts
21  there as soon as possible for the
22  investigation for the site inspection.
23  Q.  Do you have an understanding of why an
24  insurance company wants to be put on notice
25  promptly at the time of the loss?  Do you
```

```
 1  have any understanding of why that is?
 2  A.  I would think to where they can be
 3  involved in the process investigating early
 4  on instead of behind the eight ball and
 5  trying to figure things out from the back
 6  end.
 7  Q.  Okay.
 8       On February 4th, you indicated that you
 9  went out there with Blue Sky remediation
10  company; is that correct?
11  A.  Blew Sky, yeah.
12  Q.  And they were the supplier of the fans?
13  A.  Temporary heating fans, yes.
14  Q.  Temporary heating fans.
15       Just to be clear, when you left, did they
16  leave with you?
17  A.  I don't recall.
18  Q.  Okay.
19       Are you aware of Blue Sky touching the
20  boiler or changing the boiler, or anything
21  like that?
22  A.  I would think not, because they knew
23  that we were investigating that.  I would
24  think --
25  Q.  Okay.
```

```
 1  A.  -- so I would think they wouldn't touch
 2  it, just given the mitigation company's
 3  history with losses.
 4  Q.  Okay.
 5       And then you went out there again on --
 6  did you go out there on February 6th when Jay
 7  Freeman first went out there?
 8  A.  I don't recall.
 9  Q.  Okay.
10       And -- and that would have just been Jay
11  Freeman and maybe some of the Buckinghams'
12  representatives; it would not have been
13  Triangle Tube and everybody?
14  A.  Right.
15       (Moving head up and down.)
16  Q.  So what about February 9th?  Do you recall
17  that inspection where they actually started
18  up the boiler and took it apart?
19  A.  I remember being present, yes.
20       (Moving head up and down.)
21  Q.  Do you recall any representative of
22  Wyoming Mechanical being present?
23  A.  There was not.  The attorney for -- I
24  mean, at the time was supposed to be there
25  but he didn't show up.
```

```
 1  Q.  Okay.
 2       How -- how were you notified that a
 3  attorney for Wyoming Mechanical would be
 4  there?
 5  A.  Because that attorney had said that he
 6  would be there originally.
 7  Q.  He had called you?
 8  A.  I had talked to him, and he said that
 9  he would be.
10       (Moving head up and down.)
11  Q.  Okay.
12       And then he then just did not show up?
13  A.  He didn't show up, but my understanding
14  was he didn't show up because he had
15  something, court -- something with court
16  down in Kemmerer that he had to go to that
17  day.
18  Q.  Okay.
19       I -- my understanding from the
20  testimony is Mr. Geick showed up later that
21  day during that inspection.
22  A.  That is correct.
23  Q.  And there's some video where someone's
24  holding up a phone just to kind of show where
25  one screw was originally at and then where
```

Page 57

1  Wyoming Mechanical had turned it. Do you
2  recall that happening during that inspection?
3  A. Vaguely.
4  Q. Were you the one holding the phone?
5  A. No.
6  Q. Okay.
7     See, I just thought I recognized the
8  voice, so I was trying to figure it out.
9     Once all the -- the -- whatever
10  happened on the 9th as far as the testing
11  was completed, who identified what should
12  be taken and preserved?
13  A. I don't recall one specific person. I
14  believe it was kind of a mutual thing with
15  those experts that were on-site.
16  Q. Okay.
17     And did you remove the boiler and the
18  vent pipe or did someone else and you were
19  just a transporter?
20  A. I did not remove it.
21  Q. Okay.
22  A. I -- I helped load a little bit of it.
23  Q. And I'm just trying to understand how it
24  was transported. You know, sometimes you see
25  these wooden crates and things --

Page 58

1  A. Right.
2  Q. -- that hold equipment. Was a wooden
3  crate used at all?
4  A. No.
5  Q. Were the straps physically attached,
6  either by wrapping or some other way, to the
7  boiler and then to the edges of the bed of
8  the truck?
9  A. They were not wrapped, no, but they
10  were positioned to where it would prevent
11  stuff from sliding around and then strapped
12  to the side of the truck --
13  Q. Okay.
14  A. -- inside the sides of the truck.
15  Q. Were -- were -- did the straps come in
16  physical contact with the boiler?
17  A. Yes.
18     (Moving head up and down.)
19  Q. And then -- are you talking you created a
20  barrier so it wouldn't slide in the bed or
21  was it connected to something on the boiler
22  so the boiler wouldn't slide?
23  A. It was --
24  Q. I'm just trying to get an understanding?
25  A. It was just overlaid on top of the

Page 59

1  boiler --
2  Q. Okay.
3  A. -- to -- to secure it. A few straps
4  were placed where it wouldn't slide.
5  Q. So -- so this bottle --
6  A. So, it was like this bottle. It was
7  draped over it such to such. (Indicating.)
8  Q. Okay, so you draped over it and
9  attached it to --
10  A. I don't remember if it was straight
11  acrossed or if it was an X pattern and then
12  another strap down the back end of it so...
13     MR. NEVILLE: She's gonna kill somebody
14  if you guys keep talking over each other.
15     THE WITNESS: Sorry about that.
16  Q. (By Mr. Reeves) And -- and just so I
17  can -- and tell me if I'm just hearing this
18  correctly, that you would lay the strap over
19  the top --
20  A. Yes.
21  Q. -- so that there's friction holding the
22  boiler down; correct?
23  A. Yes.
24  Q. Okay.
25     And -- and so how tight were those

Page 60

1  straps on the boiler to prevent it from
2  sliding in that plastic bed?
3  A. Tight enough that it wouldn't move but
4  not tight enough to put any physical force
5  to damage the product.
6  Q. Okay.
7     What about the vent pipes; how were
8  they placed in the truck?
9  A. To the side of the boiler.
10  Q. Were they slid under some of those straps
11  against the body of the boiler and the strap
12  or -- or --
13  A. Yes.
14  Q. What do you mean? So, effectively, you
15  just used that empty space between the bed
16  and boiler?
17  A. In part, yes.
18  Q. Okay.
19     And my understanding is when you got back
20  to your office, you placed the evidence in
21  the closet. Who would have -- did you move
22  that equipment into the closet or who did
23  that?
24  A. Me and one agent assisted me and moved
25  the boiler, itself. The pipes, I moved

Page 61

1  myself.
2  Q. And so we're talking about muscle power
3  here; you lifted the boiler --
4  A. Right.
5  Q. -- there's no lift or anything?
6  A. Right.
7     MR. NEVILLE: You've got to wait --
8     THE WITNESS: Sorry.
9     MR. NEVILLE: -- you've just got to
10 wait for his question to end and you can
11 start your answer.
12    And then another thing, when he's
13 talking, don't Yes, Yes, Yes, because then
14 it gets all messed up.
15    I'm far enough from her so she can't
16 kick me, but she can kick you.
17    MR. MCGILL: I'm closer to her.
18 Q. (By Mr. Reeves) And it -- is it accurate
19 to say that the boiler and the vent pipes
20 stayed in the closet from the time you placed
21 it there until the time you reloaded it back
22 in the truck for transport to Denver?
23 A. Yes.
24 Q. Was it ever moved because you needed
25 something in the closet -- are we talking

Page 62

1  about a closet, closet? Just like as a
2  closet in the building or what are we talking
3  about?
4  A. A closet in the building.
5  Q. Okay.
6     And was there ever a time it got moved
7  because something, maybe, that was also in
8  the closet?
9  A. No.
10 Q. Okay.
11    And would it have been moved from the
12 closet to the bed of the truck the same
13 way; through muscle power?
14 A. The boiler itself, yes.
15    (Moving head up and down.)
16 Q. The boiler itself.
17    And it would have been secured the same
18 way in which it was secured previously?
19 A. Yes.
20 Q. Okay.
21    That's all the questions I have.
22       EXAMINATION OF BOYD ROBERTS
23          BY MS. TIEDEKEN
24 Q. Hello, Mr. Roberts. I'm Julie Tiedeken.
25 I'm representing Wyoming Mechanical. We just

Page 63

1  met briefly before the deposition.
2     You have indicated that you spoke to an
3  attorney for Wyoming Mechanical that was
4  going to come to the inspection on
5  February 9th. That attorney was not me;
6  correct?
7  A. Correct.
8  Q. That was someone else?
9  A. Yes.
10 Q. Okay.
11    If you want to look at that first
12 picture of Exhibit 230, do you see what
13 looks like a plastic sleeve stuck to the
14 side of the boiler?
15 A. Yes.
16 Q. You had testified previously that you
17 believe that the manuals for the boiler were
18 put inside the cabinet. When we were down in
19 Denver for inspections of the boiler and I
20 was present, the manuals were inside that
21 plastic sleeve. Might it be that the manuals
22 were in the plastic sleeve rather than inside
23 the cabinet?
24 A. If I recall, the plastic sleeve and the
25 manuals were placed inside.

Page 64

1  Q. Both of them inside?
2  A. I believe so, yes.
3     (Moving head up and down.)
4  Q. Okay.
5     And who did that?
6  A. I don't specifically remember who did
7  it, other than it was with the experts that
8  were there.
9  Q. When you talked about where the manuals or
10 how the manuals were transported, you said
11 "if I remember," so I -- I keep -- I'm
12 wondering, do you have a clear memory of
13 whether that occurred or didn't occur?
14 A. Not a hundred percent, no.
15 Q. Okay.
16    You've indicated that you went out
17 there on February 3rd, but then later on in
18 your testimony you said you thought that
19 February 3rd was a Monday. February 2nd
20 was actually the Monday. Did you go out
21 there the Monday after Mrs. Herrera passed
22 away --
23 A. No, I did not.
24 Q. -- or Tuesday?
25 A. It would have been that Tuesday then.

Page 65

1  Q. Tuesday. Okay.
2     And when you got there, you indicated
3  that Mr. Schueler, the caretaker, was the
4  only one that was there with you on
5  Tuesday --
6  A. Yes.
7  Q. -- correct?
8     Did Mr. Schueler touch the boiler at all
9  while you were there?
10  A. No.
11  Q. For example, he didn't turn it on?
12  A. No.
13  Q. Or move anything, anything like that?
14  A. No.
15     (Moving head from side to side.)
16  Q. Okay.
17     On February 9th, you've indicated that
18  you were there to observe an inspection by
19  Mr. Freeman and others; correct?
20  A. Yes.
21  Q. Was Mr. McGill there on February 9th,
22  Triangle Tube's attorney, that is here today?
23  A. Yes.
24  Q. And was -- do you recall a Mr. Sink, a
25  representative of Triangle Tube also being

Page 66

1  present?
2  A. I don't recall if that was his name.
3  There was another gentleman there, yes.
4     (Moving head up and down.)
5  Q. And do you recall that Triangle Tube had
6  their own expert engineer, Mr. Kogimoto
7  (phonetic) present at that inspection?
8  A. If that's his name, yes. I don't
9  recall the name.
10  Q. Do you recall that Triangle Tube --
11  A. Yes.
12  Q. -- had their own expert engineer there?
13  A. (Moving head up and down.)
14  Q. Did Mr. -- or did Triangle Tube's expert
15  engineer participate in the inspection as far
16  as what you could observe?
17  A. Yes.
18  Q. When it was determined that the boiler
19  would be dismantled and that you would
20  transport the boiler down to Mr. Freeman's
21  office, did anyone from Triangle Tube, either
22  their attorney, their company representative,
23  or their expert engineer object to that?
24  A. To my knowledge, no.
25  Q. Did either Mr. McGill or the Triangle

Page 67

1  Tube's expert engineer, or company
2  representative give you any direction on how
3  the boiler should be packaged and
4  transported?
5  A. No.
6  Q. To your knowledge, was there any damage to
7  the boiler between the time you took it from
8  the Buckingham home and the time it was
9  delivered to Mr. Freeman's office?
10  A. No damage.
11     (Moving head from side to side.)
12  Q. As far as you know, was it in the same
13  condition when you delivered it to
14  Mr. Freeman as when you took it from the
15  Buckingham home?
16     MR. MCGILL: Objection. Foundation.
17     THE WITNESS: Yes.
18  Q. (By Ms. Tiedeken) Was anyone with you
19  when you delivered that boiler to
20  Mr. Freeman?
21  A. Nobody was with me. I met them at
22  their office building.
23  Q. But nobody was --
24  A. Nobody.
25  Q. -- traveled with you in your vehicle?

Page 68

1  A. Was traveling with me, no.
2  Q. Okay.
3     That's all that I have.
4     MR. LEWIS: Kate, real quick?
5        EXAMINATION OF BOYD ROBERTS
6            BY MR. LEWIS
7  Q. Mr. Roberts, the boiler was in the same
8  condition, as you testified, when you
9  delivered it to Mr. Freeman. Was there any
10  difference in the pipe other than the fact
11  that it had been taken down and dismantled
12  from the garage?
13  A. No.
14  Q. That wasn't a very good question. Let me
15  do it again.
16     When the pipe was taken out of the garage,
17  was it broken down in segments or was it
18  preserved in a length?
19  A. I think part of it was broke down.
20  Q. Can you describe to me how it was broken
21  down?
22  A. No.
23     (Moving head from side to side.)
24  Q. I'm just trying to -- could -- could you
25  tell me what segments may have been pulled

Page 69

1  apart?  Let me show you -- oh, you've got
2  pictures.  Do you ever see the picture
3  that's -- it shows a view of the freezer and
4  the pipe and the boiler, it's kind of a -- a
5  wide view.  There you are.
6  A.  Okay.  Yes.
7      MS. TIEDEKEN:  What -- what page number
8  is that, if you could identify that?
9      THE WITNESS:  Six.
10     MS. TIEDEKEN:  Six of Exhibit 230.
11  Q.  (By Mr. Lewis)  Okay.  We're looking at
12  Page six; right?
13  A.  Yes.
14  Q.  So the -- as you look straight on,
15  parallel with the wall, there's -- there's a
16  long stretch of pipe.  Do you see that?
17  A.  Yes.
18  Q.  Was that one piece of pipe or was that in
19  segments, do you recall, from one elbow to
20  the next elbow?
21  A.  I don't recall entirely, no.
22     (Moving head from side to side.)
23  Q.  Did you take any pictures of the venting
24  pipe before or after it was put into your
25  vehicle?

Page 70

1  A.  No.
2  Q.  Or while it was in your closet?
3  A.  No.
4  Q.  And when you delivered it to Mr. Freeman
5  in Littleton, did you examine to see whether
6  it had been damaged at all?
7  A.  Not directly, no.
8  Q.  Did it appear -- did you see any apparent
9  damage to the pipe?
10  A.  No.  No damage.
11  Q.  Was -- was the pipe -- you may have
12  answered this but I want to make sure:  Was
13  the pipe secured so that it could not move
14  about in the -- in the bed of the truck?
15  A.  Yes.
16  Q.  And as you were driving it down the road,
17  did you hear it bouncing around or...
18  A.  Did not hear anything.
19     (Moving head from side to side.)
20  Q.  No pieces flew out of the truck?
21  A.  No.
22  Q.  And I take it, it was your intention to
23  preserve the boiler and the pipes in -- in as
24  exact condition as they were when you --
25  A.  Yes.

Page 71

1  Q.  -- they were delivered to you; correct?
2  A.  Yes.
3  Q.  You don't remember the name of the lawyer
4  that was supposed to come to -- or go out to
5  the -- the Buckingham house to -- to observe
6  with you?
7  A.  I remember.
8  Q.  What is the name?
9  A.  Jack Edwards.
10  Q.  Mr. Edwards, he -- he represents Wyoming
11  Mechanical, doesn't he, or is that your
12  understanding?
13  A.  I don't know entirely whether he was
14  retained or just counsel.
15  Q.  You didn't hear anything from David Geick
16  about his -- what Jack Edwards' position was?
17  A.  Not directly, no.
18     (Moving head from side to side.)
19  Q.  I mean, he didn't say, My lawyer's jack's
20  gonna be up here --
21  A.  If I recall, he just said that Jack
22  Edwards was advising him, if I recall.
23  Q.  While you were at the -- at the Buckingham
24  residence on any occasion, was -- well, let
25  me ask:  During the testing occasion on the

Page 72

1  9th of February, how long -- how long were
2  you there?
3  A.  I don't know exact time.  I was there
4  from the time that it started to the time
5  that we finished and departed.
6  Q.  Perfect.  Thank you.
7  A.  Approximately eight hours, maybe.
8  Q.  So you -- you were basically there all day
9  but -- you were there, certainly, all during
10  the testing?
11  A.  Yes.
12     (Moving head up and down.)
13  Q.  Was anybody -- did it appear to you that
14  there was any one individual that was in
15  charge?
16  A.  Not entirely sure, no.
17  Q.  So was it -- there group discussions of
18  what may be done from one -- one time to
19  another as they were --
20  A.  Yes.
21  Q.  That's all I have.  Thank you.
22  A.  You're welcome.
23     MS. MEAD:  I have no questions.
24     FURTHER EXAMINATION OF BOYD ROBERTS
25        BY MR. MCGILL

Page 73

1    Q. Mr. Roberts --
2    A. Yes.
3    Q. -- when you spoke with Dave Geick from
4    Wyoming Mechanical for the first time and
5    discovered he'd made adjustments to the
6    boiler before you had a chance to get out to
7    the Buckingham property, did that -- as a
8    claims representative on the claim, did that
9    cause you some concern?
10       MS. TIEDEKEN: Objection. Form.
11       MS. MEAD: Join.
12   Q. (By Mr. McGill) You can answer.
13   A. Yes.
14   Q. Tell me what the nature of your concern
15   was, please.
16       MS. TIEDEKEN: Objection. Form.
17       MS. MEAD: Join.
18       THE WITNESS: Contamination.
19   Q. (By Mr. McGill) Okay.
20       What types of contamination were you
21   concerned about?
22       MS. TIEDEKEN: Same objection; form.
23       THE WITNESS: Product not being in its
24   original form.
25   Q. (By Mr. McGill) Did you come to any

Page 74

1    conclusions after speaking with Mr. Geick on
2    that occasion and then later on in your
3    interactions or observances of the boiler,
4    did you have any conclusions that the boiler
5    was contaminated after Mr. Geick had done
6    whatever he did to it?
7        MS. MEAD: Objection. Form of the
8    question.
9        MS. TIEDEKEN: Objection. Form.
10       THE WITNESS: I couldn't tell you on
11   that.
12   Q. (By Mr. McGill) But you -- you were
13   concerned his contact with the boiler when
14   you were up there as the claims
15   representative presented significant risk of
16   contamination?
17       MS. MEAD: Objection to form.
18       MS. TIEDEKEN: Objection to form.
19       MR. NEVILLE: Yeah, I -- let me just --
20   I'm gonna correct me, here, but misstates
21   his testimony.
22   Q. (By Mr. McGill) You can answer.
23   A. I had concern that it might be.
24   Q. Okay.
25       Did you do anything to follow up on that

Page 75

1    concern?
2    A. I told him to not touch anything from
3    that point on until the experts had been
4    able to look at it.
5    Q. And so that conversation took place on
6    the -- was that on the 3rd?
7    A. I don't recall.
8    Q. But it was after he had been to the
9    property before you had a chance to get out
10   there?
11   A. I believe it was after I'd been out
12   there the first time.
13       (Moving head up and down.)
14   Q. Okay.
15       I think you testified that the boiler
16   was in the same condition when you received
17   it as it was when you delivered it to
18   Mr. Freeman's lab in Littleton, Colorado.
19   Did you -- when you first received the
20   boiler and it was 100 percent in your
21   possession, did you do anything to attempt
22   to document the condition of the boiler,
23   say, for example, with respect to its
24   dimensions or any photographs of it other
25   than the ones you provided?

Page 76

1    A. I did not.
2        (Moving head from side to side.)
3    Q. And when you physically took the boiler
4    from the closet in your office down to
5    Littleton, eight or nine hours away, did you
6    do anything at that point when you turned
7    over possession of the boiler to
8    Mr. Freeman's lab, to document its condition
9    in terms of, say, for example, any damage to
10   it or anything like that?
11   A. I did not.
12   Q. So as far as --
13       MR. NEVILLE: Hold on a second. You --
14   you need to ask me something?
15       THE WITNESS: Yeah.
16       MR. NEVILLE: Yeah.
17       Just a second.
18       MR. MCGILL: Sure.
19   Q. (By Mr. McGill) Was there something you
20   wanted to add to your last response?
21   A. No.
22   Q. Okay.
23       So just so I'm clear, at the time that
24   you took possession of the boiler, who --
25   whose -- who was the actual owner of the

Page 77

```
1    boiler?  In other words, like, for example,
2    if there's a car crash and an insurance
3    company gets involved and they total the
4    car, the insurance company owns the car.
5    A.  (Moving head up and down.)
6    Q.  You -- you kind of understand where I'm
7    going?
8    A.  Yes.
9    Q.  And so --
10       MS. MEAD:  Objection.  Form.
11   Q.  (By Mr. McGill) -- so when you took
12   possession of the boiler, who was the owner
13   of the boiler?
14       MR. NEVILLE:  If -- if you know.  I
15   mean, don't guess.  If you don't know --
16       THE WITNESS:  I don't know for sure.
17   Q.  (By Mr. McGill)  Did Mr. Buckingham
18   request the boiler to be returned to him?
19   A.  No.
20   Q.  And did Mr. Buckingham give any
21   instructions with respect to what should
22   happen to the boiler after the death of
23   Mrs. Herrera?
24   A.  No.
25   Q.  And you took all that instruction from
```

Page 78

```
1    Mr. Freeman?
2    A.  What instruction?
3    Q.  In terms of what should happen to the
4    boiler; where it should be located, where
5    it -- all the transportation of it, all those
6    things.
7    A.  As far as me taking it from the
8    Buckingham palace [sic], it was kind of a
9    mutual agreement of parties that were there
10   that I would take it because they all were
11   on flights and couldn't take it themselves
12   and they weren't -- I got the impression
13   they weren't comfortable with trying to
14   crate it and have it moved that way that
15   day and that's why I took possession of it.
16   Q.  So when you had possession of the boiler,
17   did you do anything or any type of inspection
18   to it to either confirm or disavow the
19   concerns that you had about Mr. Geick having
20   access to the boiler before you did?
21       MS. TIEDEKEN:  Object to the form.
22       MS. MEAD:  Join.
23   Q.  (By Mr. Gill)  You can answer.
24   A.  No.
25   Q.  I think that's all I have.
```

Page 79

```
1    Thank you very much, sir.
2        MR. REEVES:  Just a few follow-up.
3        THE WITNESS:  Okay.
4        FURTHER EXAMINATION OF BOYD ROBERTS
5            BY MR. REEVES
6    Q.  How many conversations would you say that
7    you had with any representative of Wyoming
8    Mechanical?
9    A.  Two or three at most.
10   Q.  Okay.  And what would have been the first
11   communication you had with Wyoming
12   Mechanical?
13   A.  My contact with David Geick.
14   Q.  Okay.  And that would have been -- sounds
15   like it was after --
16   A.  Somewhere --
17       MR. NEVILLE:  Sorry, I just don't want
18   you guys to talk over one another.
19       MR. REEVES:  Yeah.
20   Q.  (By Mr. Reeves)  Was it after your
21   February 3rd or after your February 4th visit
22   to the property?
23   A.  I believe it was the 4th.
24   Q.  Okay.
25       And what was the -- is that the
```

Page 80

```
1    conversation you previously talked about
2    where he just kind of told you some history
3    about the boiler and that he had concerns
4    about -- or the concerns had been expressed
5    to him prior to the death?
6        MS. TIEDEKEN:  Object to the form.
7        THE WITNESS:  I wasn't following you on
8    that either.
9    Q.  (By Mr. Reeves)  So I think you had
10   previously testified that the homeowner had
11   called him about concerns with the boiler
12   prior to the death; is that correct?
13       MS. TIEDEKEN:  Object to the form.
14   Misstates his prior testimony.
15       MR. NEVILLE:  I don't remember that,
16   but...
17   Q.  (By Mr. Reeves)  Okay.
18       It -- did Wyoming Mechanical tell you that
19   the Buckinghams had called them about the
20   boiler prior to the death?
21   A.  He didn't volunteer the information but
22   he confirmed that.
23   Q.  Okay.
24       And did he express any opinions as to
25   the severity that he interpreted that phone
```

Page 81

1   call from -- or the -- the seriousness of
2   that call from the Buckinghams?
3   A.  I didn't understand your question.
4   Q.  Okay.
5       Did he say that -- did he make any
6   opinion as to whether or not he thought
7   their concerns were serious enough to come
8   out immediately versus waiting until the
9   appointment on the 2nd?
10      MS. TIEDEKEN:  Object to the form.
11      THE WITNESS:  There was no discussion
12  on that, if I recall.
13  Q.  (By Mr. Reeves)  Okay.
14      And then what would have been the second
15  and third or second and -- what was the next
16  conversation?
17  A.  I believe the next conversation was
18  just letting him know that we were bringing
19  experts to look at it, not to touch it and
20  to make sure that he put his insurance on
21  notice.
22  Q.  Okay.
23      And did he tell you about Jack Edwards
24  during that conversation or was it another
25  conversation?

Page 82

1   A.  I believe it was that conversation.
2   Q.  And --
3   A.  He'd said he'd already been in contact
4   with him, if I recall.
5   Q.  Did you ever, personally, have
6   conversations with Jack Edwards?
7   A.  One brief conversation.
8   Q.  And what did Mr. Edwards tell you?
9   A.  If I recall, he just wanted to know
10  when the inspection was happening.
11  Q.  Have you -- did you speak to Mr. Edwards
12  after the inspection?
13  A.  No, I did not.
14      (Moving head from side to side.)
15  Q.  Did you speak to Wyoming Mechanical after
16  the inspection?
17  A.  No.
18  Q.  Have you spoke to them to date?
19  A.  No, I have not.
20      (Moving head from side to side.)
21  Q.  Those are the all the questions I have.
22      MS. TIEDEKEN:  I have nothing further.
23      MR. LEWIS:  Nothing further.
24      MS. MEAD:  Nothing further.
25      MR. REEVES:  Great.

Page 83

1       Thank you, sir.
2       MR. NEVILLE:  We'll read and sign.
3       (Whereupon, the deposition of Boyd
4   Roberts was ended at 3:41 p.m.)

Page 84

1   STATE OF:_____)
                             )
2   COUNTY OF: _____)
3
4       I, the undersigned, declare under penalty
5   of perjury that I have read the foregoing
6   transcript, and I have made any corrections,
7   additions or deletions that I was desirous of
8   making; that the foregoing is a true and
9   correct transcript of my testimony contained
10  herein.
11  Executed this ____day of _____, 2016
12  at _____,_____.
13    (City)          (State)
14  _____
    (Deponent's Name- please print)
15
16  _____
    (Deponent's Signature)
17
18  Subscribed and sworn before me _____
19  This ___ day of_____, 2016
20  _____  _____
21  Notary Name      Notary Signature
22  Seal
23
24  My commission expires: _____, _____
25

Page 85

```
 1    STATE OF WYOMING   )
                         )
 2    COUNTY OF SUBLETTE )
 3         I, Michelle L. Cunningham, Deputy and
 4    Freelance Shorthand Reporter and notary Public
 5    in and for the State of Wyoming, do hereby
 6    certify that the foregoing proceeding was
 7    reported by me and was thereafter transcribed
 8    under my direction into typewriting consisting
 9    of pages 1 to 85; that the foregoing is a full,
10    complete and true record of said proceedings to
11    the best of my ability.
12         I further certify that I am not of counsel
13    or attorney for either or any of the parties in
14    the foregoing proceeding and caption named, or
15    in any way interested in the outcome of the
16    cause named in said caption.
17         In witness whereof, I have hereunto set my
18    hand and affixed my seal this day.
19         Date: _____, 2016
20         _____
                Michelle L. Cunningham
21            Deputy and Freelance Reporter
                    Notary Public
22
23
24
25
```