Katherine L. Mead, Esq.
Mead & Mead
WY State Bar # 5-2432
1200 N. Spring Gulch Rd.
P.O. Box 1809
Jackson, WY 83001
(307) 733-0166
(307) 200-0233 fax
kate@meadlaw.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| FRANCISCO L. HERRERA, and JOANNA HERRERA, CO-WRONGFUL DEATH REPRESENTATIVES, for the exclusive benefit of the beneficiaries of MONICA HERRERA, deceased, who have sustained damages from her wrongfully caused death. | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CA 15-cv-128-F |
| GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM, but in their individual capacities as Trustees of the BUCKINGHAM FAMILY TRUST; and, GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM as individual defendants; and, WYOMING MECHANICAL, INC., a Wyoming Corporation; TRIANGLE TUBE/PHASE III CO., INC., a New Jersey Corporation; and, M&G DURAVENT, INC., a New York Corporation, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANT GREGORY BUCKINGHAM'S RESPONSES TO M&G DURAVENT'S FIRST SET OF DISCOVERY TO GREGORY BUCKINGHAM

Defendant Gregory Buckingham, by and through counsel undersigned, responds to Defendant

M&G DuraVent First Set of Discovery to Gregory Buckingham as follows:

**Exhibit V**

## INTERROGATORIES

1.     If you intend to use at trial a simulation (computer or actual), experiment, test, or analysis, describe each simulation, experiment, test, or analysis, identify the person who created or performed it or who intend to perform it, and identify each document that refers to it.

ANSWER: At this time, Buckinghams to not plan on using any of the above.

2.     State the date, place, and circumstances under which you, or your agents, first became aware the exposure to our use of DuraVent venting system [or any substantially similar product] may be harmful or hazardous, identify each source of information leading to your awareness, and identify the harm or hazards of which you became aware.

ANSWER: Defendant Buckingham became aware of the opinion of Plaintiffs' expert, Dr. Bernard Cuzzillo on June 17, 2016 that the DuraVent venting system was defective. This is the only opinion indicating that the DuraVent product is defective of which Defendant Buckinghams' are aware.

3.     State the date, place, and circumstances for each notice, warning, and/or other advisement you, or your agents, received from Wyoming Mechanical (or their representatives/agents) as to the dangers posed by carbon-monoxide gas created by a boiler system.

ANSWER: Defendant Buckinghams were never provided notice, warning, and/or other advisement by Wyoming Mechanical of the danger posed by Carbon Monoxide gas created by a boiler system. Further, Wyoming Mechanical did not direct Defendant Buckinghams or their caretaker Dave Schuler to review the manuals associated with the boiler and piping.

4.     State the date, place, and circumstances for each notice, warning, and/or other advisement you, or your agents, gave to Monica Herrera that the boiler venting pipe was coming apart.

ANSWER: Neither Defendants Buckingham nor their caretaker Dave Schuler warned Monica Herrera that the boiler pipe was coming apart. Defendant Buckinghams and their caretaker were unaware that any danger to Monica Herrera or themselves was posed by the boiler system.

5.     State the date, place, and circumstances of when you, or your agents, first gave notice to this defendant of either the death of Monica Herrera or a potential claim against this defendant for her death.

ANSWER: Defendant Buckinghams did not give notice to M&G DuraVent because they had no reason to believe that a defect in the piping caused Mrs. Herrera's death.

6.    State the date, place, and circumstances for each notice, advisement, or invitation you, or your agents, gave to this defendant as to any inspection, removal, or testing of the boiler system at issue in this litigation.

ANSWER: Defendant Buckinghams did not give notice to M&G DuraVent of testing. Defendant Buckinghams were under the impression that Wyoming Mechanical's lawyer Jack Edwards was notifying the boiler and vent manufacturer of the incident. Mr. Edwards notified Triangle Tube.

7.    If you contend that you, or your agents, did not give authority/consent of Wyoming Mechanical, after the death of Monica Herrera, to take apart and/or reassemble the DuraVent venting system at issue in this litigation, described the conversation(s) as specifically as possible (if any), including when it/they occurred and with whom it occurred.

ANSWER: Defendant Buckinghams do not contend that Wyoming Mechanical did not have authority from them.

8.    If you contend that you, or your agents, gave authority/consent to Wyoming Mechanical, after the death of Monica Herrera, to take apart, reassemble the DuraVent venting system at issue in this litigation, state when such authority/consent was issued and to whom.

ANSWER: Defendant Buckinghams gave consent to Wyoming Mechanical to service the boiler on Monday, February 2, 2015. This was an appointment that had been made before Mrs. Herrera's death for the purpose of repairing the garage in-floor heat and to address the loud banging noise and the problem with the pipe coming apart. Following Mrs. Herrera's death, Greg Buckingham knew that Dave Geick planned to visit the Buckingham residence to take a look and to see what went wrong. Greg Buckingham was unaware of whether taking apart the DuraVent piping was part of Wyoming Mechanical's plan. Greg Buckingham did not specifically authorize Dave Geick to take apart the DuraVent piping but when he spoke to Dave Geick on the Monday morning after Mrs. Herrera's death, he was aware that in trying to determine what went wrong, the piping might be examined.

9.    If you contend that you, or your agents, did not give authority/consent to Wyoming Mechanical, after the death of Monica Herrera, to take apart, reassemble and/or recalibrate the Triangle Tube boiler at issue in this litigation, described [sic] the conversations(s) as specifically as possible (if any), including when it/they occurred and with whom it occurred.

ANSWER: Buckinghams do not contend that they did not give authority or consent to Wyoming Mechanical to investigate the boiler.

10.    If you content that you, or your agents, gave authority/consent to Wyoming Mechanical, after the death of Monica Herrera, to take apart, reassemble and/or recalibrate the

Triangle Tube boiler at issue in this litigation, state when such authority/consent was issued and to whom.

ANSWER:  See response to Interrogatory No. 8 above.

11.    Identify each and every real property you owned, or that is owned by a trust maintained by you, such as the Buckingham Family Trust, as of January 29, 2015.

ANSWER: 8950 Ditch Creek Road, Jackson, WY  83001

12.    For each property identified in Interrogatory No. 11, please state which, if any properties, had carbon-monoxide detectors as of January 29, 2015.

ANSWER:    Neither the main house nor cabins at 8950 Ditch Creek Road had carbon monoxide detectors as of January 29, 2015.

13.    Please state with specificity the extent of your knowledge as of January 29, 2015 as to carbon monoxide, is [sic] cause, its sources, and it health effects.

ANSWER:    As of January 29, 2015, Greg Buckingham was aware that it is dangerous to leave a car running in a closed area because of the possibility of carbon monoxide poisoning.  As of January 29, 2015, Greg Buckingham was unaware that a boiler system like that of the Buckinghams or any other household appliance could create carbon monoxide at levels sufficient to cause death.

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.    Please produce copies of any and all documents, evidence, or other materials – whether in physical, electronic or other format – collected by means of subpoena or information request as part of your investigation, evaluation, your claims and/or defense of the Plaintiffs' claims related [sic] the above-styled action.

RESPONSE:   All documents responsive to the requests for production have been produced pursuant to Defendant Buckinghams' Rule 26 Disclosures; Supplemental Rule 26 Disclosures, Defendant Buckinghams' Response to Wyoming Mechanicals' 1st and 2nd Request for Production to the Buckinghams, Defendant Buckinghams' Responses to Plaintiff's Request for Production of Documents to the Buckinghams, and Defendant Buckinghams Responses to Triangle Tube's First Set of Requests for Production of Documents to the Buckinghams.

2.    Please produce copies of any memoranda, notes, diaries, journals, calendars, or other items that relate to:

    a)    The replacement of the boiler at 8935 E. Ditch Creek Road, Teton County, Wyoming in 2014;

    b)    Problems, issues, maintenance and/or concerns with the boiler and/or venting system on the boiler;

    c)    Monica Herrera's death; and/or

    d)    Remedial measures/action taken after Monica Herrera's death.

RESPONSE: Documents responsive to this request for production either do not exist or have already been provided in Defendant Buckinghams' Rule 26 Disclosures; Supplemental Rule 26 Disclosures, Defendant Buckinghams' Response to Wyoming Mechanicals' 1st and 2nd Request for Production to the Buckinghams, Defendant Buckinghams' Responses to Plaintiff's Request for Production of Documents to the Buckinghams, and Defendant Buckinghams Responses to Triangle Tube's First Set of Requests for Production of Documents to the Buckinghams.

3.    Please produce copies of the entire file of any insurance company to whom bills, correspondence or other documentation with respect to the accident involving the deceased, Monica Herrera.

RESPONSE: Buckinghams do not have documents responsive to this request.

4.    Please produce copies of all files, records, communication, or other materials relating to any and all services or work performed by Wyoming Mechanical at 8935 E. Ditch Creek Road, Teton County, Wyoming.

RESPONSE: Documents responsive to this request for production either do not exist or have already been provided in Defendant Buckinghams' Rule 26 Disclosures; Supplemental Rule 26 Disclosures, Defendant Buckinghams' Response to Wyoming Mechanicals' 1st and 2nd Request for Production to the Buckinghams, Defendant Buckinghams' Responses to Plaintiff's Request for Production of Documents to the Buckinghams, and Defendant Buckinghams Responses to Triangle Tube's First Set of Requests for Production of Documents to the Buckinghams.

5.    Please produce copies of each and every expert witness' original file that you have retained for testimony at trial, including but not limited to, all current and up to date billing records, current and up to date curriculum vitae, electronic and hard copy of all materials from the expert's computer, a copy of all drafts of reports and expert disclosures, all notes, records, charts, diagrams, test results, correspondence or email correspondence of any kind, including all file materials and all photographs.

RESPONSE: Defendant Buckinghams provided all counsel with a thumb drive containing Jay Freeman's expert file on July 21, 2016 at the Waltz Law Offices in

Denver, Colorado.

6.      Please produce copies of any settlement agreement between you and any party to this action, and/or its agents, insurers, or representative.

RESPONSE: Defendant Buckinghams have not entered into any settlement agreements and therefore have no documents responsive to this request.

7.      Please produce copies of any and all records, evidence, documents, or other materials in your possession, custody and/or that relate to M&G DuraVent, Inc., M&G Group, DuraVent, PolyPro venting systems, or other related entities or products.

RESPONSE: The only documents in Defendant Buckinghams possession regarding M&G DuraVent are those documents used by M&G DuraVent as deposition exhibits or those documents produced by M&G DuraVent and Wyoming Mechanical during the course of this litigation.

8.      Please produce copies of any and all communications, including notations of any such communications, you had with M&G DuraVent, Inc. or other related entities from 2014 to the present.

RESPONSE: Defendant Buckinghams have had no communications with M&G DuraVent or other related entities from 2014 to present. Their attorney has conferred and conversed with attorneys for M&G DuraVent.

9.      Please produce copies of any and all documents, evidence, or other materials whether in physical, electronic or other format for which you have possession, custody and/or control that are relevant to any claim or defense by any party to this litigation – regardless of your intent to use them in this litigation.

RESPONSE: Please see all discovery listed in response to number 4 above.

10.     Please produce copies of any and all simulations (computer or actual), experiments, tests, analysis, demonstrative evidence, or demonstrative exhibits you may use at trial.

RESPONSE: Defendant Buckinghams have not yet identified its trial exhibits but will do so consistent with the Court's Scheduling Order.

11.     Please produce copies of any schematic, drawing, CAD plans or layout of the complete boiler system, including pipes/loops, in the home and garage at 8935 E. Ditch Creek Road, Teton County, Wyoming.

RESPONSE: Defendant Buckinghams have not seen nor do they have in their possession

any drawings, schematics or CAD plans or layouts of either the Triangle Tube boiler system or the Lochinvar boiler system.

DATED this _____ day of August, 2016.

_____
Gregory Buckingham

_____
KATHERINE L. MEAD, WY Bar # 5-2432
Mead & Mead
P.O. Box 1809
Jackson, WY 83001
(307) 733-0166
(307) 733-7590 fax
kate@meadlaw.net

## CERTIFICATE OF SERVICE

This is to certify that on the _____ day of August, 2016, I served a true and accurate copy of the above and foregoing via U.S. Mail as follows:

David G. Lewis, Esq.
PO Box 8519
Jackson WY 83002-8519
davelewis@bresnan.net

Julie Tiedeken, Esq.
PO Box 748
Cheyenne WY 82003-0748
jtiedeken@mtslegal.net

Christopher R. Reeves, Esq
Richard A. Waltz, Esq.
The Waltz Law Firm
1660 Lincoln Street, Ste 2510
Denver, CO 80264
creeves@waltzlaw.com

Cameron S. Walker, Esq.
Judith A. Studer, Esq.
Schwartz, Bon, Walker & Studer, LLC
141 South Center Street, Suite 500
Casper, WY  82601
cam@schwartzbon.com
jstuder@schwartzbon.com

Joseph P. McGill, Esq.
Foley, Baron, Metzger & Juip, PLLC
38777 Six Mile Road, Suite 300
Livonia, MI  48152
jmcgill@fbmjlaw.com

Katherine L. Mead



# ENGINEERING INVESTIGATION REPORT

**Francisco Herrera vs. Greg Buckingham, et al**

| | |
|---|---|
| Case No.: | 15-CV-128-F |
| Representing: | Greg Buckingham |
| Loss Location: | 8935 E Ditch Creek Road, Kelly, Wyoming |
| Date of Loss: | 01/30/15 |
| AEI Project No.: | 12400 |



**Exhibit W**



Advanced
Engineering
Investigations
www.AEIengineers.com

# ENGINEERING INVESTIGATION REPORT

## Francisco Herrera vs. Greg Buckingham, et al.

Case No.: 15-CV-128-F

Representing: Greg Buckingham

Loss Location: 8935 E Ditch Creek Road, Kelly, Wyoming

Date of Loss: 01/30/15

AEI Project No. 12400

## Report Prepared for:

Mead & Mead

Katherine Mead

PO Box 1809

Jackson, WY  83001

**Submitted by:**

**AEI Corporation**

John M. Freeman, Jr., MS, PE, CFEI            January 4, 2016
President & Principal Engineer                      Date

This report and its contents are the Work Product of AEI Corporation.  This report should only be duplicated or distributed in its entirety.  This report may contain confidential or court protected information; please contact an authorized entity prior to distributing.

Copyright AEI Corporation© 2016 - All Rights Reserved



# TABLE OF CONTENTS

INTRODUCTION .............................................................................................................................. 4

BACKGROUND ............................................................................................................................... 4

INVESTIGATION TASKS ............................................................................................................... 4

REVIEWED ITEMS .......................................................................................................................... 4

SITE EXAMINATIONS AND TESTING .......................................................................................... 5

LABORATORY TESTING ............................................................................................................... 8

DISCUSSION ................................................................................................................................... 9

CONCLUSIONS ............................................................................................................................ 10

ATTACHMENTS ........................................................................................................................... 11

Katherine Mead
January 4, 2016
AEI P/N: 12400
Page 4 of 11



# INTRODUCTION

AEI Corporation (AEI) was asked to investigate the carbon monoxide incident that occurred on January 30, 2015, at the Greg and Deborah Buckingham residence, located at 8935 E. Ditch Creek Rd., Kelly, Wyoming.  At that time the housekeeper, Monica Herrera, was found dead at the residence.  Carbon monoxide that caused Mrs. Herrera's death was believed to have come from the boiler in the garage.

# BACKGROUND

On January 30, 2015, Monica Herrera was found deceased in the mud room adjacent to the garage at the Buckingham residence.  It was believed that the boiler in the garage was involved. The new boiler had been installed several months before, in November, 2014, by Wyoming Mechanical.  During the week of January 26, 2015, there had been some problems with the boiler with delayed ignitions and separations of the vent pipe.  Wyoming Mechanical, the installer, had been contacted that week to come out and try to diagnose and correct the problem. Wyoming Mechanical scheduled a repair visit for Monday, February 2, 2015.  After the death of Monica Herrera, AEI Corporation was asked to conduct an investigation and testing and to review various documents to see what the causal factors of the incident were.

# INVESTIGATION TASKS

The following tasks were performed by AEI during the course of the investigation:

1.  Conducted a site inspection and some testing of the boiler on February 6, 2015.

2.  Conducted a site examination and additional testing of the boiler with numerous parties on February 9, 2015.

3.  Conducted additional testing of the boiler in the AEI laboratory with a number of parties present on October 27, 2015.

4.  Reviewed various documents, listed below.

# REVIEWED ITEMS

The following items were reviewed in whole or in part by AEI during the course of the investigation:

Katherine Mead
January 4, 2016
AEI P/N: 12400
Page 5 of 11



1.  Prestige Vent supplement

2.  Prestige Solo natural to propane instructions

3.  Prestige Control Application Supplement

4.  Prestige Solo 175 installation and maintenance manual

5.  Deposition of Bernard Cuzzillo

6.  Deposition of Gregory Buckingham

7.  Deposition of Francisco Herrera

8.  Deposition of David Schuler

9.  Deposition of Shan Noe

10. Deposition of Matthew Seals

11. Deposition of Aaron McCormick

12. Deposition of Deborah Buckingham

13. Deposition of Stephen Gieck

14. Deposition of Sara Gessford

15. Exhibits to the depositions

16. Installation instructions for the DuraVent PolyPro pipe dated 08/2014

17. Engineering Bulletin regarding Prestige Boilers Ignition Error Troubleshooting #092414

18. Amended Complaint

## SITE EXAMINATIONS AND TESTING

The first site examination and testing was conducted at the Buckingham residence in Kelly, Wyoming, by this author on February 6, 2015. The boiler was installed in a two-car garage which was attached to the house. The boiler was made by Triangle Tube and the model was a Prestige Solo 175. The serial number was PT0042495 and the boiler was equipped for use with propane gas at a maximum inlet pressure of 13 inches water column and a minimum 5 inches water column. The manifold pressure was 0.04 inches water column. The boiler conforms to ANSI Z 21.13. The input for the boiler was 170,000 BTUs per hour, the minimum input was 50,000 BTUs per hour and the date of manufacture was 2014.

There were two lengths of plastic piping connected to the boiler that ran out the side of the

Katherine Mead
January 4, 2016
AEI P/N: 12400
Page 6 of 11



garage and connected to a DuraVent termination. There was white PVC pipe for combustion air which connected to the boiler cabinet and there was also some gray polypropylene piping, marked DuraVent, for the exhaust gases from the boiler. There was rust on some of the locking clasps for the exhaust piping. See Figure 1.

The boiler was used for in-floor radiant heating, supplying hot water to a fan coil unit for hot air for the residence and for domestic water. No alterations were made to the boiler during this first inspection. The burner was fired on high fire and after a short warm-up period the carbon monoxide levels were about 190 part per million (ppm) in the flue gases. During the testing, there was one hard start that shook the boiler. The boiler was shut down after testing.

An additional site inspection was conducted on February 9, 2015. There were numerous parties present, including representatives of Triangle Tube. The depth to the top of the throttle screw was measured. The numbers varied between 0.553 inches and 0.555 inches. The boiler was fired a number of times without any changes to the as-found position of the throttle screw. A series of 6 tests were conducted. On high fire the carbon monoxide levels in the flue gas were typically 185 to 190 ppm. During some of the starts there were minor delayed ignitions. On the low fire setting the carbon monoxide readings in the flue gas were on the order of 25 ppm.

The gas valve and venturi were removed from the boiler to check the size of the orifice. The orifice measured 0.219 inches and had the number 22 stamped on it. This is the proper orifice for propane.

The throttle screw was then turned counterclockwise a little over ½ a turn to try to get it to the original factory set point. The depth of throttle screw was then 0.541 inches. The boiler was re-fired and the combustion analyzer was reading about 3.6% oxygen, 150 ppm carbon monoxide, 11.5% $CO_2$ and about 18% excess air.

For test number 6, the DuraVent polypropylene vent pipe was disconnected from the elbow, which was downstream of the long horizontal run from the boiler. See Figure 2. The garage doors were left closed and carbon monoxide readings were taken in the exhaust port, as well as the combustion air inlet, and the area above the top of the boiler. The boiler was fired at 3:00 PM. The wand of the Bacharach PCA3 was measuring the flue gases coming out of the boiler. During the testing the wand was moved to the top of the boiler briefly and also to the combustion air port on the boiler. When the boiler initially fired, the carbon monoxide levels in the flue gas were less than 100 ppm and oxygen was around 3.6%. After 26 minutes of operation with the flue gases spilling into the garage, oxygen was down to 2.2% and carbon monoxide was 486 ppm in the flue gases and climbing steadily. See Figure 3.

Katherine Mead
January 4, 2016
AEI P/N: 12400
Page 7 of 11





**Figure 1.  DuraVent exhaust piping. Note rust on locking band clasp. (12400 JMF 1-029).**



**Figure 2.  Disconnected vent pipe for test number 6 (12400 JMF 2-170).**

Katherine Mead
January 4, 2016
AEI P/N: 12400
Page 8 of 11





**Figure 3.  Disconnected vent pipe, CO vs time, for test number 6.**

## LABORATORY TESTING

On October 27, 2015, additional testing was conducted on the boiler at the offices of AEI Corporation.  Present for the testing were representatives of the plaintiffs, representatives of Wyoming Mechanical, the Buckinghams, and representatives of Triangle Tube.

The throttle screw was in the same position as the last test, namely the position that it was found in at the time of the accident.  The readings with the boiler on high fire were 3.6% oxygen, 180 ppm carbon monoxide and 11.4% $CO_2$.  The gas flow was clocked using a test meter and 3 ft.³ of gas flowed to the burner on high fire in two minutes and 52 seconds.  This corresponds to 62.8 ft.³ per hour.  Some delayed ignitions were observed during this testing.

Katherine Mead
January 4, 2016
AEI P/N: 12400
Page 9 of 11



Polyethylene sheeting was draped over the boiler and a piece of 4-inch flexible hose was used to direct the flue gases from the exhaust of the boiler down to the area below the boiler under the tent. Carbon monoxide readings under the tent climbed to about 13,000 ppm.

Additional testing was conducted with the 4 inch hose that was connected to the exhaust port of the boiler. The discharge of this hose was pointed at various locations at the bottom of the boiler, without the tent in place, with the boiler running. With the hose discharge at the bottom right corner of the boiler, the carbon monoxide readings coming out of the boiler went up dramatically and went off scale to over 20,000 ppm.

## DISCUSSION

The Buckinghams had a new Triangle Tube boiler installed at their residence in Kelly, Wyoming, in November 2014, by Wyoming Mechanical. During the week of January 26, 2015, loud noises were heard coming from the boiler. Mr. Buckingham described it as a car driving into a house or a huge quantity of snow falling on a roof. He found the DuraVent vent piping separated, pushed it back together and called Wyoming Mechanical. The decision was made to have Wyoming Mechanical come out on Monday, February 2nd and to make repairs to the system. The Buckinghams were going to be out of town until Monday and Wyoming Mechanical expressed no urgency in the need for repairs. No warnings were given to the Buckinghams about the dangers of a separated vent pipe or carbon monoxide.

On January 30, 2015, the housekeeper, Monica Herrera, had come by to clean the Buckingham residence. She was found later that day by David Schuler, the caretaker, on the floor in the mud room deceased from carbon monoxide poisoning. Mr. Schuler stated that the garage was very humid and that the vent pipe had separated from the boiler.

During this writer's first visit to the house, it was noted that there was rust on some of the locking band clasps on the DuraVent PolyPro vent piping. The boiler was tested by this writer on February 6th and February 9th and, that while it was putting out levels of carbon monoxide higher than recommended, it was not too far off specifications. The oxygen levels should be between 2.7 and 4.7%, $CO_2$ should be between 10.7 and 12.0%, and carbon monoxide should be less than 100 ppm. The boiler had apparently been adjusted by Mr. Dave Gieck on February 2nd, 2015. He used a combustion analyzer and turned the throttling screw clockwise about ½ turn to make the proper adjustment. When the boiler was initially installed, a combustion analyzer was not used to set up the boiler.

The vent pipe for the boiler was a single wall polypropylene pipe made by DuraVent. It consisted of a number of straight sections and some 90° elbows. The pipe is pushed together and

Katherine Mead
January 4, 2016
AEI P/N: 12400
Page 10 of 11



a gasket inside the female sections seals the pipe. A locking band clasp is used to hold the pieces of pipe together. A newer design has a tab on the pipe which makes it less likely for the pipe to separate if there is some longitudinal force on the pipe. At this point discovery is still ongoing in that regard.

Delayed ignitions, particularly larger ones, can cause pressures in the vent piping which apply a longitudinal force tending to separate joints. This is what occurred here. When the boiler was tested twice at the property and in the AEI Corporation laboratory, there were some hard starts and some puffs but nothing was observed of the magnitude that would separate the vent piping. The noises described by Mr. Buckingham are consistent with an extremely hard start or delayed ignition which can cause vent piping to separate. The bulletin provided from Triangle Tube deals with a modification of an igniter design to eliminate delayed ignition problems. At this point discovery is still ongoing in that regard.

When the boiler was tested by this writer, carbon monoxide levels were typically below 200 ppm in the flue gas. However, when the flue gas was dumped into the space containing the boiler, such as the garage, the oxygen levels in the garage were reduced and the carbon monoxide levels coming out of the boiler increased. This particular phenomenon was demonstrated in the testing conducted in our laboratory on October 27, 2015. There may be some issues regarding the sealing of the boiler cabinet from the internal environment. Discovery is ongoing in that regard.

Monica Herrera had a carboxyhemoglobin level of 76%. This means that she had to be breathing carbon monoxide concentrations in air of at a least 1000 ppm.

## CONCLUSIONS

The results of the investigation conducted by AEI indicate the following:

1. Monica Herrera died from carbon monoxide poisoning at the Buckingham residence due to a separated boiler vent pipe.

2. The vent pipe separated because the Triangle Tube boiler experienced delayed ignitions causing an increase in pressure in the piping.

3. The exhaust gases from the boiler were recirculated with the combustion air, which caused the carbon monoxide levels to rise dramatically.

4. There has been a design change of the igniter for the subject boiler to prevent delayed ignitions. Discovery is ongoing in that regard.

5. Discovery is still ongoing regarding the requirements for the sealing of the boiler cabinet.

Katherine Mead
January 4, 2016
AEI P/N: 12400
Page 11 of 11



6. The design of the locking band clasps assembly for the DuraVent vent piping was changed to improve retention of the joint by adding a locking tab and not relying on friction alone. Discovery is ongoing in that regard.

7. Greg Buckingham was not warned by Wyoming Mechanical about the potential hazard of carbon monoxide from a separated vent pipe.

The opinions expressed in this report are based upon a reasonable degree of engineering certainty and are based upon information known to this writer at the time the report was authored. AEI reserves the right to modify and/or supplement these opinions should new information become available. Discovery is still ongoing in this case. The investigation, methodology, analysis, findings, conclusions, and opinions detailed in this report are consistent with, and based upon, the recognized and accepted standards and practices of fire and explosion investigation including but not limited to applicable sections of the 2014 Edition of NFPA 921, *Guide for Fire and Explosion Investigations*.

## ATTACHMENTS

This writer charges $300 per hour for consulting time, and $350 per hour for deposition and trial testimony. Copies of this writer's resume, 4 year testimony record. list of publications, and AEI Corporation's Fee Schedule are also attached to this report.



**Exhibit X**







**Honeywell**

02920

1421 3 77813
1212 4

TYPE VK4115V    Tamb. -15...70 C/5...158F

CE-0063AP3090/6

CAT III Pmax. 60 mbar. 1/2 psi    Class. B+C

V1+V2: 110/120 Vrac 0.089/0.097 A

ANSI Z21.21-05 CSA6.5-05 Auto.Valves

Made in Czech Republic



02820                    1421  3           7761
TYPE VK4115V  1212  4
**Honeywell**  CE-0063AP3090/6    Tamb. -15...70 C/5...
CAT III Pmax. 60 mbar. 1/2 psi     Cla
V1+V2: 110/120 Vrac 0.089/0.097 A
ANSI Z21.21-05 CSA6.5-05 Auto.Valve
Made in Czech Republic





Made in Czech Republic

Amb. temp. - 15...70°C

TYPE  4590044⊕-052

02476

1424  4  67666

**Honeywell**



02478

TYPE  4590446-052

Amb. temp. -15...70°C

Made in Czech Republic

1424  4  67666

**Honeywell**



**Honeywell**

02920

TYPE VK4115V 1212 4

1421  3    77618

CE-0063AP3090/8

Tamb. -15...70 C/5...158F

CAT.III Pmax. 60 mbar. 1/2 psi    Class B+C

V1+V2: 110/120 Vrac 0.089/0,097 A

ANSI Z21.21-05 CSA6.5-05 Auto.Valves    CSA ᶜ us

Made in Czech Republic

























