072216js8/1/2016

**Page 1**

IN THE UNITED STATES DISTRICT COURT
Case No. 15-cv-128-F

_____

VIDEO DEPOSITION OF JOSEPH DANIEL SKAGGS
July 22, 2016

_____

FRANCISCO L. HERRERA, and JOANNA HERRERA,
CO-WRONGFUL DEATH REPRESENTATIVES, for the exclusive
benefit of the beneficiaries of MONICA HERRERA,
deceased, who have sustained damages from her
wrongfully caused death,

Plaintiffs,

vs.

GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM, but in
their individual capacities as Trustees of the
BUCKINGHAM FAMILY TRUST; and, GREGORY BUCKINGHAM and
DEBORAH BUCKINGHAM as individual defendants; and
WYOMING MECHANICAL, INC. a Wyoming Corporation;
TRIANGLE TUBE/PHASE III CO. INC. a New Jersey
Corporation; and M&G DURAVENT, INC. a New York
Corporation,

Defendants.

_____

**Page 2**

1    APPEARANCES:
2    DAVID G. LEWIS, ESQ.
          Attorney at Law
3          6540 North Upper Cascades Drive
          Jackson, Wyoming 83001
4              Appearing on behalf of Plaintiffs.
5    MEAD & MEAD
          By Katherine Lamere Mead, Esq.
6          1200 Spring Gulch Road
          Jackson, Wyoming  83001
7              Appearing on behalf of Defendants
              Buckingham.
8
          MCKELLAR, TIEDEKEN & SCOGGIN, LLC
9          By Julie Nye Tiedeken, Esq.
          702 Randall Avenue
10         Cheyenne, Wyoming  82001
              Appearing on behalf of Defendant
11            Wyoming Mechanical, Inc.
12   FOLEY BARON METZGER & JUIP, PLLC
          By Joseph P. McGill, Esq.
13         38777 Six Mile Road, Suite 300
          Livonia, Michigan  48152
14             Appearing on behalf of Defendant
              Triangle Tube/Phase III Co., Inc.
15
     THE WALTZ LAW FIRM
16         By Christopher R. Reeves, Esq.
          1660 Lincoln Street, Suite 2510
17         Denver, Colorado 80264
              Appearing on behalf of Defendant M&G
18            DuraVent.
19
     Also present: Migs Lewis, Bernard Cuzzillo,
20          Roger Stuart, CLVS
21
22
23
24
25

**Page 3**

1        Pursuant to Notice and the Federal
2    Rules of Civil Procedure, the video deposition of
3    JOSEPH DANIEL SKAGGS, called by Plaintiffs, was
4    taken on Friday, July 22, 2016, commencing at
5    8:28 a.m., at 1660 Lincoln Street, Suite 2510,
6    Denver, Colorado, before Sharon R. Dobson,
7    Registered Professional Reporter and Notary Public
8    within and for the State of Colorado.
9
10
11              I N D E X
12   VIDEO DEPOSITION OF JOSEPH DANIEL SKAGGS
13   EXAMINATION BY:              PAGE
14   Mr. Lewis                   5, 211
15   Ms. Mead                    181, 288
16   Ms. Tiedeken                40, 241, 283
17   Mr. McGill                  108, 272, 290
18   Mr. Reeves                  --
19
20
21
22
23
24
25

**Page 4**

1    EXHIBITS              INITIAL REFERENCE
2    Exhibit 199  Intertek Test Data Sheet,    176
          9/22/05
3
     Exhibit 200  Intertek Test Data Sheet,    177
4         9/26/05
5    EXHIBITS PREVIOUSLY MARKED   INITIAL REFERENCE
6    Exhibit 40  DuraVent PolyPro Installation  83
              Instruction Manual
7
8    Exhibit 48  Document              83
9    Exhibit 49  Triangle Tube vent supplement  147
10   Exhibit 60  Document              137
     Exhibit 130  Document entitled Locking    148
11            Bands, Commercial Locking
              Bands and Clamps
12
     Exhibit 180  Engineering drawing        32
13
     MARKED QUESTION:
14
15   Page 46, Line 16
16
17
18
19
20
21
22
23
24
25

Exhibit Z

5

1           P R O C E E D I N G S
2           JOSEPH DANIEL SKAGGS,
3  being first duly sworn in the above cause, was
4  examined and testified as follows:
5           EXAMINATION
6  BY MR. LEWIS:
7      Q    Mr. Skaggs, my name's Dave Lewis.  We've
8  seen one another at --
9      A    Yes, sir.
10     Q    -- three of these events at -- inspection
11 events at Jay Freeman's lab, correct?
12     A    Two events at Jay Freeman's lab, I think,
13 and one at the Buckingham residence.
14     Q    Okay.  I -- and you're here today --
15 you've been retained as an expert on behalf of
16 DuraVent to investigate this accident and give your
17 opinions as to causes of -- I guess the ultimate
18 causes of the -- of the death of Mrs. Herrera; is
19 that correct?
20     A    Well, I would say that I was retained to
21 evaluate the vent system and opine as necessary on
22 the cause of death of -- of Mrs. Herrera.
23     Q    And will your opinions -- the opinions you
24 have -- and I'm looking at what -- what you've
25 written --

6

1      A    Yes, sir.
2      Q    But will the ultimate -- let me -- maybe I
3  can do this a little bit better.  In your opinions
4  you had -- 4.9.2, you say, The testing performed to
5  date by all parties has been insufficient to
6  replicate the failure or eliminate all the
7  alternative theories.  I think I agree that's
8  probably true, but could you explain -- explain to
9  me what you mean by that, expand on that a little
10 bit?
11     A    Well, basically we have evidence based on
12 observations by Mr. Buckingham and Mr. Schuler, as
13 well as, I think, two other instances of behavior
14 within the system that are consistent with delayed
15 ignitions; however, the two sets of testing that I
16 have attended at Freeman's lab so far, when the
17 boiler has run we have not -- I have not seen
18 conditions that replicate those described by
19 Buckingham and Schuler.
20     Q    As a result of that inability to replicate
21 those -- some of those events, do you have a doubt
22 about any -- that -- do you have a doubt about what
23 those people described, Schuler and Buckingham and
24 so forth --
25     A    Well --

7

1      Q    -- on the basis of some sort of
2  inconsistency?
3      A    I would say I don't have any data on which
4  to base that kind of a doubt.
5      Q    So you -- you assume those -- you take
6  as -- assume as true the events that they've
7  described about the pipe coming apart, the noises
8  that it makes, and those sorts of things; you accept
9  those as -- at least as true for the purpose of
10 reaching your opinions.  Am I correct in that?  If
11 not -- if I'm incorrect, please explain what it --
12 what would be the case.
13     A    Yeah.  I guess my -- my answer to that
14 would be that I have no reason to disbelieve that
15 testimony and my opinions rely upon that testimony.
16     Q    You've been out to the Buckingham home on
17 how many occasions?
18     A    One.
19     Q    And that was the -- when they were
20 checking the vents -- the regulators?  Excuse me.  I
21 don't mean the vents.
22     A    That was in -- yes.  That was in -- yes,
23 that was in June.
24     Q    June, I think.
25     A    I don't recall the specific date.  But,

8

1  yeah, we -- we were out there.  We observed the
2  propane tank, the first stage regulator, the second
3  stage regulator.  Those were both collected by
4  Advanced Engineering.
5      Q    Have -- have you reached any opinions
6  about the involvement of the regulators in -- as a
7  causative factor in the malfunctioning that
8  ultimately led to Mrs. Herrera's death?
9      A    I would say I don't have any -- I don't
10 think I have an opinion on the involvement of the
11 regulators at this point.
12     Q    What is it that you understand about the
13 behavior of the reg -- of the regulators on the date
14 of her death?  Is that a -- that a question that
15 makes any sense?
16         MR. REEVES:  Object to form.
17     A    Yeah.  I -- I don't really know how to
18 answer that question.
19     Q    (By Mr. Lewis) Okay.
20     A    I mean, there were regulators there on the
21 date of her -- on -- on the date that Mrs. Herrera
22 died.  I was not there.  I can't tell you what the
23 performance of those regulators was on that date.
24     Q    So as you understood it, what was the
25 purpose of taking the regulator off of the propane

072216js8/1/2016

9

1  tank and the regulator off the house to be tested?
2  What -- what did you understand was going to be done
3  with those regulators?
4      A   I understood that what would be done was
5  that the regulators would be removed and would be
6  tested for pressure and flow under various
7  characteristics.
8      Q   Were you involved in any of that testing?
9      A   I was present for the testing.  I
10 witnessed the testing.
11     Q   Was that last Tuesday?
12     A   No.  That was Tuesday of this week.
13     Q   And tell me what you observed.  And if
14 you've drawn any opinions from your observations,
15 would you tell me what those opinions are?
16     A   In general, my observations were that
17 under the conditions that both of the regulators
18 were tested at, they behaved more or less as
19 expected.  When we dis -- when the regulators
20 were disassembled we observed that there was some
21 degree -- some debris in each of the regulators.
22 But based on the test results, I don't believe that
23 the debris affected the performance of the
24 regulators at the time of testing.
25     Q   What sort of debris?  Do you recall?

10

1      A   I don't think the data that we have can
2  tell us that yet.  I understand that there were
3  samples taken for analysis.  In the absence of those
4  results, I wouldn't want to speculate on what the
5  debris is.
6      Q   Is it unusual for debris to get into these
7  regulators over a period of years?
8      A   I don't think it's unusual.  It can
9  happen.
10     Q   What would that be, things like dirt and
11 grass and --
12     A   Well, I wouldn't expect grass so much
13 because the -- you know, the inside of the regulator
14 is exposed to whatever is in the -- the gas that's
15 flowing through it.  So grass is not the kind of
16 thing that I would expect.  But it's not uncommon
17 for us to see all kinds of different debris.
18 Everything from fragments of Teflon pipe tape to,
19 you know, fragments of rust.  We occasionally see
20 when the pipe -- there will be a small amount of
21 rust, particularly on older pipes.  And that could
22 be entrained in the gas and flow into the
23 regulators.  There are -- there are probably --
24 there's a lot of other things that could be there,
25 too.

11

1      Q   Since you've written your report -- let's
2  see.  The date of your report was I'm sure very
3  re --
4      A   June 1st.
5      Q   Since June 1st have you seen or been
6  informed of any aspects of your investigation and --
7  I'm going to start over again.
8      A   Very well.
9      Q   Has anything -- have -- have you seen or
10 inspected or been told anything that has -- would
11 affect any of the opinions you expressed in your
12 June 1st report?
13     A   To date, no, sir.
14     Q   So the information that's in your report
15 is -- reflects your opinions as you sit here today?
16     A   The information that's in that report
17 reflects my opinions as of the writing of that
18 report.  There have been -- there's been additional
19 work that's been done since then.  There have been a
20 lot of other materials that have been produced.
21     Q   And I -- and I -- and those other
22 materials as of yet have not caused you to have any
23 contrary opinions -- I think you just told me
24 that -- correct?
25     A   None of that information causes me to

12

1  rethink the opinions expressed in the June 1st
2  report.
3      Q   And does any of it cause you to want to
4  add something to the opinions you've expressed in
5  your June 1st report?
6      A   I would say probably.  But given that
7  there are still, you know, documents coming in and
8  out, and I was receiving documents as late as
9  yesterday, that -- I wouldn't say that those
10 opinions are -- are fully formed at this point.
11     Q   What sort of documents did you see as
12 soon -- as recently as yesterday?
13     A   Let's see, I received several supplemental
14 reports prepared by Dr. Cuzzillo.  I received some
15 additional documentation.  It was some of the
16 depositions that have occurred between June 1st and
17 today, as well as the exhibits to those depositions.
18     Q   Has -- have the attorneys who have
19 retained you in this given you production of
20 documents that have been produced by Triangle Tube,
21 the manufacturer of the boiler?
22     A   Yeah.  I understand there was -- there was
23 a large disclosure from Triangle Tube that was
24 included in those documents.
25     Q   And I think there's, I don't know, 7 --

072216js8/1/2016

13

1    maybe 8,000 or more.  Did -- that's -- that's just a
2    reasonable guess.  Is that how many of the documents
3    you've seen?  Do you think you've looked at all of
4    those documents or have your attorneys selected some
5    and asked you to look at them?
6        A   I have not had the time to review all of
7    those documents.
8        Q   Have you had the opportunity to do that if
9    you wanted to?
10       A   No, because I haven't had the time to do
11   it.
12       Q   Can you tell me which ones -- which of
13   those documents you have reviewed that have an
14   effect on -- on your opinions as you've expressed
15   them in your report?
16           MR. McGILL:  Objection.  Foundation.
17       A   The documents I think that most affect the
18   opinions that I've expressed so far include the
19   deposition of M&G's Rule 30 expert, so their --
20   their company expert, as well as some of the
21   Triangle Tube disclosures, particularly those that
22   indicate that the approved locking band for the
23   system was the commercial style locking band and not
24   the ones that were in place at the residence.
25       Q   (By Mr. Lewis) I believe your opinions

14

1    have given -- you've not only dis -- the opinions
2    that you formed about the DuraVent piping system --
3    venting system in the Buckingham house, those
4    opinions are also affected by what you've learned
5    about the Triangle Tube boiler system, isn't that
6    correct?
7        A   I would -- I would say that they're
8    supported by what I've learned in the Triangle
9    Tube documentation, specifically the conclusion
10   or the -- the opinion that I have that the system
11   was not installed according to the manufacturer
12   instructions from Triangle Tube.
13       Q   And that -- you're -- also have -- you
14   have measured and -- and considered and written
15   about the force of pressure that was sent out of
16   the -- out of the Triangle Tube down the venting
17   system?
18       A   I have not made such a measurement.  Those
19   measurements do not exist, to my knowledge.
20       Q   Okay.  Maybe we'll get to this in a little
21   bit.
22           You have made in your report three
23   hypotheses of failure.
24       A   Yes, sir.
25       Q   And all three of those, as I look at them,

15

1    1, the high pressures in the vent pipe, 2, relative
2    motion due to thermal expansion and, 3, improper
3    securing of the vent clip during installation is all
4    directed at the -- the DuraVent flue system -- or
5    not flue system, venting system in the Buckingham
6    house at the time of Mrs. Herrera's death, correct?
7        A   They're specifically concerning the
8    installation of the venting system.
9        Q   And I see that.  What about -- do you have
10   any opinions about the maintenance of the venting
11   system after it was installed?
12       A   I haven't expressed any opinions about
13   between the time of installation and the time that
14   the Buckinghams called Wyoming Mechanical to tell
15   them they were having problems, no.
16       Q   And from the time that Buckinghams -- or,
17   excuse me, that -- yeah, Buckinghams called Wyoming
18   Mechanical and Wyoming Mechanical started addressing
19   the problems in the venting system, have you formed
20   any of those opinions?
21       A   I'm not sure I understand what your
22   question is asking me.
23       Q   Well, the the maintenance -- when I talk
24   about the maintenance of the venting system, I'm
25   talking about the fact that we all know, and I'm

16

1    sure you do, too, that this venting pipe was coming
2    apart.
3        A   That's -- that's the testimony, and -- and
4    I relied upon that testimony, yes.
5        Q   And there are people who have testified
6    that they pushed those parts back together again.
7        A   Yes.  I understand that.
8        Q   That's what I'm calling maintenance.
9    Might not be very good maintenance, but that would
10   also be maintenance performed on the system.  And
11   that's what I'm asking you about, if you formed
12   opinions about those sorts of things.
13       A   I -- I guess I would qualify that as a
14   repair more than maintenance.
15       Q   I'm looking at an opinion you've expressed
16   on Page 12 of 32, and Item No. 5, where you make
17   this statement.  More fuel rich conditions would
18   promote delayed, slash, improper ignition without
19   enough access air to compensate for the -- for the
20   reduced air density.
21           Would you expand on that, what you mean by
22   that.
23       A   Yeah.  It's -- my -- my statement in that
24   was -- was essentially that when you deviate from
25   stoichiometric conditions, for whatever reason,

17

1  ignition tends to be a little harder.
2      Q   Do the -- do fuel rich conditions or --
3  fuel rich conditions make ignition more -- or -- I
4  don't know if easier is a better -- good word, but
5  do fuel rich ignition -- or let me start over again.
6      If the -- if the -- if the fuel is rich or
7  richer, does that make ignition easier for the --
8  for the boiler to --
9      MR. McGILL: Objection. Foundation.
10     A   Fuel rich conditions make ignition easier.
11 They can. I mean, there's so many other factors
12 involved in getting ignition, because you have
13 things like the power of spark igniter, as well as
14 the mixing of the gas as it comes in, as well as
15 charge air temperature. You know, how cold is the
16 air that's coming in there. There are a lot of
17 other factors involved as well. But that's, in
18 general, what I -- the behavior that I would expect.
19     Q   (By Mr. Lewis) Okay. Okay. In 4.1 of
20 your opinions, Page 11, you make this statement.
21 The subject Triangle boiler -- and by the way,
22 whenever I read these things and you -- I'd be happy
23 to show you or you can look at your notes.
24     A   Yeah, if there's -- if there's -- if
25 there's a copy of my report in the pile in front of

18

1  me here, I'd be happy to refer back to that.
2      Q   Okay. Well, I'm not trying to do a memory
3  contest with you, so --
4      A   Sure. Sure.
5      MR. REEVES: There is not, so you need a
6  copy of your report.
7      A   I would like to have one in front of me.
8  I think that will be helpful.
9      Q   (By Mr. Lewis) (Handing.)
10     A   Sure. Thank you, sir.
11     Q   I'm looking at Page 11, Item 4.1 -- or
12 Opinion 4.1. You say, The subject Triangle boiler
13 and its vent system were installed improperly and
14 illegally by the Wyoming -- or by Wyoming
15 Mechanical.
16     So would you explain to me -- I'm going
17 to ask you about both improper and illegal. What
18 was im -- how was the vent system installed
19 improperly?
20     A   The vent system was in -- installed
21 improperly because Wyoming Mechanical did not follow
22 the manufacturer's installation instructions.
23     Q   And more precisely, what are those
24 instructions?
25     A   Those instructions are the instructions

19

1  contained within the installation manual for the
2  boiler as well as the installation -- the vent
3  instructions that come from Triangle Tube. Those
4  vent instructions from Triangle Tube also refer back
5  to the DuraVent installation instructions for M&G.
6      Q   And what was the effect of the improper
7  installation? In other words, what -- how did that
8  affect the venting system that was installed?
9      A   Well, that's a difficult question for me
10 to answer. And the reason for that is because there
11 was so much alteration of the system as a whole
12 between the time that the incident happened and
13 between the time that I was retained to work on it.
14     So by the -- by the time I was retained,
15 that entire system had been dismantled and removed,
16 so I didn't have the opportunity to see it in situ.
17     However, we do know that there were
18 numerous components on that system that were not
19 approved components, according to the Triangle Tube
20 documentation. There are also at least some
21 observations and allegations that there are other
22 parts of the system that were improper, for example,
23 the -- the return slope of the vent pipe. All of
24 those observations were made by others at the
25 Buckingham residence before I had the opportunity to

20

1  view it.
2      Q   So the only place you've had an
3  opportunity to examine this, if I understand it, is
4  in Jay Freeman's lab, the venting system, where you
5  were able to observe it and watch it perform.
6      A   That's correct.
7      Q   Was the behavior of the system -- or while
8  you were there, was the -- the venting system that
9  had been in the Buckingham house -- did it perform
10 under the testing circumstances defectively as has
11 been alleged occurred in the Buckingham home?
12     MR. REEVES: Object to form.
13     A   I don't think the tests performed in the
14 Freeman lab were representative enough to make that
15 conclusion.
16     Q   (By Mr. Lewis) But, again, you have --
17 they didn't give you any reason -- just because you
18 couldn't duplicate them doesn't mean you have any
19 doubt about that they occurred in the Buckingham
20 home; is that correct?
21     A   The testimony is consistent with delayed
22 ignition events. I don't have any reason to doubt
23 that testimony.
24     Q   And then you say that the subject Triangle
25 boiler and its vent system -- and you say both

072216js8/1/2016

21

1 Triangle boiler and the vent system -- was installed
2 illegally by Wyoming Mechanical. Would you explain
3 to me what you mean by illegally.
4   A  Sure. The building codes are incorporated
5 by way of a statute, a legal statute within the
6 community that says you shall install according to
7 the codes. So when the installation does not
8 comport to code and does not obtain the building
9 permit that the code says it is required to have,
10 then that installation is not in keeping with that
11 statutory requirement.
12   Q  And when you make that statement and -- in
13 relation to this case, which -- can you describe or
14 define for me the codes -- not necessarily the
15 numbers, but the types of codes or the names of the
16 codes that would -- that would have shown that it
17 was installed illegally?
18   A  Well, the -- the building codes typically
19 start with a county building code or a state
20 building code that will then incorporate by
21 reference various model codes. The ones most
22 relevant to this installation -- or the one that is
23 most relevant to this installation by my
24 understanding is the 2012 edition of the
25 International Fuel Gas Code.

22

1   Q  And do you recall the specific sections
2 offhand or -- of -- of the International Gas Code
3 that would be -- that would make this installation
4 illegal?
5   A  Certainly. The first one is Section 106.1
6 of the 2012 International Fuel Gas Code, which
7 requires new installations to have a permit. There
8 are additional -- I also in Basis 4.1.5 refer back
9 to Section 305.1, which I'll just read from it here.
10 It says, Equipment and appliances shall be installed
11 as required by the terms of their approval in
12 accordance with the conditions of listing the
13 manufacturer's instructions and this code.
14   I also pointed -- referred to Appendix D
15 of the 2012 International Fuel Gas Code, which is
16 stated in the code that it is not a mandatory
17 appendix, but it does lay out the recommended
18 practices for inspection and testing of systems that
19 Wyoming Mechanical did not comport with.
20   Q  Okay. Is that all?
21   A  I believe those are all of my code
22 references expressed in my report. Yeah. I think
23 those are all the references to that code in my
24 June 1st report.
25   Q  Okay. I'm just running down here again.

23

1 Now I'm looking at Item 4.1.2. That's Page -- let
2 me see. Are you there?
3   A  I am not.
4   Q  Page 11.
5   A  Thank you. Yes, sir.
6   Q  You make this statement. Case --
7 referring to your company or to you. Case did not
8 have the opportunity to determine the potential
9 effect of the improper support of the vent system
10 because the evidence was altered by Wyoming
11 Mechanical prior to the scene investigation.
12   Does that mean you will not be offering an
13 opinion as to the effect of the presence or absence
14 of any installation -- excuse me, of any supports of
15 the -- of the venting system in the Buckingham
16 house?
17   A  Madam, could you read the question back,
18 please. I'm not sure I got all that.
19   (Last question read.)
20   A  No. I do not think that's the case. I
21 think that I will be offering opinions that we can't
22 determine the effect based on the data that's
23 available.
24   Q  (By Mr. Lewis) And so I guess that means
25 that you won't be offering an opinion, then, is that

24

1 correct, because there's -- the data isn't
2 available?
3   A  It's impossible to offer an opinion that
4 is supported by data at this time.
5   Q  Okay. You'd need more data, you're
6 saying?
7   A  Yeah, in essence.
8   Q  In 4.1.3, which is Page 12, you -- you
9 make the observation, The vent pipe systems had one
10 elbow in it was -- that was manufactured by
11 Centrotherm and not M&G DuraVent despite clear
12 instructions in the boiler installation manual not
13 to mix components from the different manufacturers
14 in the vent system, period.
15   Did the violation -- and I'm assuming
16 with you that that's what the regulations require,
17 that -- was that -- did that cause anything that led
18 to the death of Mrs. Herrera?
19   A  I don't think the use of the Centrotherm
20 elbow was a direct cause in the incident, but it --
21 it definitely speaks to the quality of work that
22 Wyoming Mechanical performed.
23   Q  And by that you mean that they -- they
24 appear -- it appears they weren't really paying a
25 lot of attention to the regulations and the

072216js8/1/2016

25

1   instructions of the manufacturers?
2       A   I understand that employees of Wyoming
3   Mechanical had testified that they never read the
4   instructions.
5       Q   Then 4.1.4 states, Testimony by employees
6   of Wyoming Mechanical indicated numerous failures to
7   follow the installation instructions.  Most
8   importantly, no combustion analysis was performed.
9       What was the -- I agree with you that
10  everybody agrees, including Wyoming Mechanical, they
11  did not do combustion analysis when they installed
12  the boiler.  What was the proximate result of that
13  failure?
14      A   Well, there are -- there are numerous
15  results of that failure.  The first result is the
16  fact that they didn't follow the instructions.
17      Q   Okay.
18      A   Goes back to --
19      Q   Back to the sloppy --
20      A   -- the improper and illegal installation.
21  It also indicates that combustion was not -- or may
22  not have been occurring ideally or in a way that the
23  boiler manufacturer intended for it to occur.
24      Q   Can you -- can you point out to me some --
25  any of the events that you've learned about in -- up

26

1   to the death of Mrs. Herrera that you feel was
2   directly affected by a failure to do a combustion
3   analysis by Wyoming Mechanical when they installed
4   the boiler?
5       A   Well, based on the results of the
6   combustion analyses that have been performed since
7   then, which assumed that the position of the
8   throttle screw -- or of the -- I'll just call it the
9   throttle screw, that was adjusted by Wyoming
10  Mechanical immediately after the event was
11  eventually put back into the position that it was in
12  at the time of the event.  So we're -- we're
13  making --
14      All of the measurements that have been
15  made to date assume that we -- we know what that
16  position was.  And all of those measurements with
17  the boiler operating at high fire had carbon
18  monoxide content over a hundred parts per million.
19  According to the installation manual for the boiler,
20  those high carbon monoxide levels in the flue gas
21  should have prompted a call to Triangle Tube's
22  engineering department in an attempt to fix the
23  problem.
24      And -- and I believe -- to be more
25  accurate about that, I think the manual says,

27

1   essentially -- and I'll paraphrase -- after
2   installing the boiler, do a combustion analysis.  If
3   the carbon monoxide levels are too high, use the
4   throttle screw to try to bring them into the
5   appropriate levels along with the access air in
6   reading.  And if you can't get it within the
7   appropriate levels, then call Triangle Tube
8   engineering for instructions.
9       Q   What is that -- what -- the quarter turn
10  that was made, would that in -- what would that
11  increase or decrease as far as the performance of
12  the ignition?
13      A   Honestly, I'd have to go back and review
14  my notes from the inspection.  It's -- that -- those
15  tests were done on Tuesday of this week.  It's now
16  Friday.  And I've had other work that I'm involved
17  in as well and I just haven't had time to go through
18  my notes and do that analysis yet.
19      Q   And is that something that would take you
20  any period of time if you -- you know, during your
21  deposition today -- I'm not going to ask you to do
22  them right now.  If you had the opportunity to do
23  that in a little while, would you be able to do
24  that, say, in 15 minutes?
25      A   I wouldn't want to sign up to being able

28

1   to do it in 15 minutes.  I need to go back and
2   review that data pretty carefully.  And I -- I want
3   to make sure that I'm doing a thorough job.
4       Q   All right.
5       A   So I would not volunteer to provide that
6   today or in any short amount of time.
7       Q   Perhaps I could get you to -- if -- if you
8   do perform, that you do that sometime in the next
9   five days, and you could ask Mr. Reeves if he would
10  send that information to me.  Would you -- would you
11  do that?
12      A   Well, I'll -- I'll do whatever my client
13  asks me to do.  So if you want to make that request
14  through counsel, and I'll have them to direct me as
15  they wish.
16      Q   But it would be something you could do in
17  the next -- over -- over a period of five days, you
18  could make that determination?
19      A   All other things being equal, but I
20  haven't looked at my calendar for next week.
21      MR. REEVES:  And, Counsel, I would object
22  that my client's not going to pay for tests that you
23  want done.  You have your own expert and your own
24  expert can do those tests.
25      MR. LEWIS:  Well, it's true.  But, you

AGREN BLANDO COURT REPORTING & VIDEO INC>

072216js8/1/2016

29

1    know, we're talking about this gentleman's testimony
2    for a jury.  And if you don't want to have him do
3    it, then that's fine.
4              (Break taken, after which time the
5    deposition was videotaped.)
6              THE VIDEOGRAPHER:  We are back on the
7    record at 9:30 a.m.  Today is July 22nd, 2016.  This
8    is Roger, your videographer.
9              Would counsel please now state their
10   appearances for the record.
11             MR. LEWIS:  My name is David Lewis.  I'm
12   the attorney for the plaintiffs.
13             MS. TIEDEKEN:  This is Julie Tiedeken,
14   attorney for Wyoming Mechanical.
15             MS. MEAD:  I'm Katherine Mead, attorney
16   for the Buckinghams.
17             MR. McGILL:  It's Joseph McGill for
18   Triangle Tube.
19             MR. REEVES:  Christopher Reeves for M&G
20   DuraVent.
21             THE VIDEOGRAPHER:  Thank you.  And if you
22   would, please continue, Counsel.  Thank you.
23             MR. LEWIS:  Yes.  Thank you.
24        Q    (By Mr. Lewis) Running down your opinions
25   and just -- 4.7 you say, None of the evidence --

30

1    excuse me.  Give you a chance to get there.  Says,
2    None of the evidence or testing to date indicates
3    that the vent pipe would have failed absent the
4    improper installation or malfunctioning of the
5    boiler.
6              What is -- what do you under -- do you
7    mean by the malfunctioning of the boiler?  Can you
8    describe that to me?
9         A    In that statement I'm -- I'm referring
10   mainly to the delayed ignition events.
11        Q    And the delayed ignition events are --
12   those have been described to you; is that correct?
13        A    I've read descriptions of those, mainly in
14   the testimony of Buckingham and Schuler, as well as
15   I think there was mention in the reports from, I
16   think, the first testing that I did not attend but
17   there may have been delayed ignitions in those tests
18   as well.
19        Q    And then in 4.9.2, the -- you make the
20   statement, The testing performed to date by all
21   parties has been insufficient to replicate the
22   failure or eliminate all the alternative theories.
23             Can you descr -- can you -- can you
24   elaborate on that for me, what you mean by that?
25        A    What I mean is that the -- the testing

31

1    that's been performed to date has not replicated the
2    delayed ignitions to the extent described by
3    Buckingham and Schuler.
4              It also -- the testing that's been
5    performed to date does not provide sufficient
6    information for us to evaluate the theory that
7    thermal expansion issues and the restraint of the
8    pipe played a role.
9         Q    What do you mean by the term "thermal
10   expansion"?
11        A    Well, any material when it gets hot or
12   cold tends to expand.  There -- there are very few
13   limit -- exceptions to that rule.  But in general,
14   and specifically for polymers, like polypropylene,
15   when it gets hotter, it gets a little longer.  And
16   in gets longer as a percentage of the length of
17   whatever the thing is that's getting hot.
18             So in a system like this where the
19   temperature of the vent pipe will cycle as the
20   boiler operates on and off, the vent pipe itself is
21   all getting a little bit longer and a little bit
22   shorter depending on the temperature transitions
23   that are happening in that location as well as all
24   along the length of pipe.
25        Q    And that -- that -- that heating and the

32

1    polypropylene in that flue -- it's always going to
2    have hot products going down through and out the
3    house or --
4         A    Well, not always.  It will -- it will have
5    hot flue glasses running through it when the boiler
6    is running.
7         Q    There's what I mean.
8         A    And then when the boiler is not running,
9    it will -- it will naturally cool until the boiler
10   runs again.
11        Q    Does that -- does that thermal expansion
12   have any effect on the -- or does it make the joints
13   of the -- of the vent more likely to come apart?
14        A    Well, it can.  And -- and what I'm
15   referring to with that statement is that we don't
16   have sufficient data to say whether it did or did
17   not.  But I recognize that it can, and so it's a
18   theory that at this point we can't disprove.
19        Q    Let me show you what's been marked in this
20   ca -- in this matter as -- as Exhibit 180.  I don't
21   think you have it.
22        A    Thank you.
23        Q    You -- I don't see you -- that you make
24   any comment about that -- how would you describe --
25   let me ask you first, what -- how do you -- how

072216js8/1/2016

33

1 would you describe that device?
2      A   Well, as it's -- as it's entitled on the
3 drawing, it's described as a 3-inch locking band
4 clamp.
5      Q   Have you -- are you familiar with that?
6 Have you seen that before?
7      A   I have seen the commercial style locking
8 band clamp that DuraVent sells.  It does not match
9 this drawing.
10      Q   Does it -- do you know why -- you don't
11 mention that -- that clamp in any of your comments,
12 isn't that true, your comments in your -- in your
13 report?
14      A   In the June 1st report, no.
15      Q   So had -- had you discussed with the --
16 the members of the Waltz firm the -- the effect
17 of -- of clamps involved in the separation of this
18 pipe?
19      A   Yes.  We've had discussions to that -- to
20 that end, sure.
21      Q   Were you asked not to include that in your
22 report or -- let me just -- do you think that isn't
23 important enough to be in your report?
24      A   Absolutely not.  That's critical.
25      Q   Why isn't it in your report?

34

1      A   At the time that I authored that report,
2 I was not aware of the requirement in the Triangle
3 Tube documentation to use the commercial style
4 clamp.
5      Q   And what -- what do you understand that
6 commercial style to be -- require?
7      A   Well, I guess I'll -- I'll in general
8 describe the commercial style clamp.  It's -- it's
9 very similar to the one that you see here in
10 Exhibit 180, except that instead of having three
11 straps on the sides, it has one.  Other than that, I
12 haven't had enough time to look at this drawing and
13 compare it to the other component to draw any
14 further conclusions from this drawing.
15      Q   And the -- you have -- you have the strap.
16 And what are the -- what are the rings?  Is that the
17 term you would use for the other?
18      A   Well, I'll -- I'll tell you how I would
19 describe it.  I'm -- and, actually, I will refer to
20 their parts list before I do that.  Well, it -- it's
21 not clearly described on the product, but what -- on
22 the drawing, rather.  But how I would describe is
23 it's a clamp that goes on either side of a joint on
24 the 3-inch pipe, that then the strap between the two
25 bands provides the restraint -- provides restraint

35

1 to the joint while at the same time accommodating
2 some of the -- accommodating the thermal mismatch or
3 the change in length due to differences in thermal
4 expansion.
5      Q   Is it -- is that sort of a clamp -- does
6 it more effectively or -- or does it more strongly
7 hold a joint together than the clamps that were on
8 this setup in the -- in the Buckingham garage?
9          MS. TIEDEKEN:  Objection.  Foundation.
10      A   I'm going -- I'm going to say this.  The
11 clamp that's pictured in Exhibit 180 I have never
12 seen.  I have seen these physical examples of the
13 similar commercial clamp that is specified by
14 Triangle Tube for use with this vent pipe.  I have
15 not measured the forces, although I understand from
16 reading the -- from reading DuraVent's Rule 30
17 witness's testimony that they did testing that
18 said -- that found that their commercial clamp
19 withstood more pull force than the -- the existing
20 locking rings.
21      Q   (By Mr. Lewis) What's the difference
22 between a -- a ring and a clamp?
23      A   I'm going to answer that specific to these
24 components.  The clamp uses a fastener, the -- the
25 nut and bolt that's depicted on each of the straps,

36

1 to physically tighten that clamp down on the pipe,
2 whereas the locking band relies upon a tab on the
3 end of the band sitting over one portion of the
4 pipe, and then the -- the -- the button or tab
5 that's on the other side of the pipe.  It relies
6 upon the interference of those two parts to generate
7 resistance to axial forces in that joint.
8      Q   Do you -- those -- those little -- the
9 things with the knobs to hold the -- the joints
10 together or in place, whether they -- I -- I call
11 them clamps and rings.  I don't know.  What --
12 what -- what do you prefer to call them?  You're
13 familiar with the one -- let me just start over
14 again.
15      A   Sure.
16      Q   You're familiar with the type of clamp
17 that was on this Buckingham vent pipe, aren't you,
18 that was holding the joints together?
19      A   I would refer to those as clips rather
20 than clamps.
21      Q   Clips.  Are the clips sufficient to
22 withstand the pressures that can be sent down the
23 pipe and hold the joint together, in your opinion?
24          MR. McGILL:  Objection.  Foundation.
25      A   Well, if you're asking me if the clips are

072216js8/1/2016

---

**37**

1 sufficient to withstand -- to withstand pressures
2 generated in the pipe in the Buckingham residence,
3 the answer is I don't know.  If the question is in
4 general is the design sufficient to withstand the
5 loads placed upon it, I would say that the -- the
6 design has been tested according to various
7 requirements, including the Canadian -- the CUL
8 standard.  I don't recall the standard number off
9 the top of my head.  But there's a hundred pound
10 pull requirement in that.  And I know that those --
11 that system with those clips has been certified to
12 that standard.
13     **Q   In your report, you have -- on Page 18 you**
14 **refer to peak overpressures, and -- in pounds per**
15 **square inch.**
16     A   18. 18. Yes, sir.
17     **Q   Is it your opinion that the -- the**
18 **Buckingham vent that separated in this case had**
19 **pressures as high as these peak overpressures that**
20 **you described in the columns?**
21     A   I don't have sufficient information to
22 answer that question.
23     **Q   What more would you need?**
24     A   We would need to know the specific
25 measurements on pressure impulse or pressure waves

---

**38**

1 moving through the vent pipe system at the
2 Buckingham residence resulting from delayed ignition
3 events.
4     **Q   From your experience, how -- how -- how --**
5 **how forceful can those delayed ignitions be coming**
6 **down the vent pipe?**
7     A   Well, in general, they could run the --
8 the entire gamut from being a very soft, long
9 duration, low pressure event to being a very short,
10 sharp high pressure event.
11     **Q   And in terms of psi, how would the**
12 **sharpest -- that you know of, sharpest event -- how**
13 **much psi would that be?**
14     MR. McGILL:  Objection.  Foundation.
15     A   I -- again, I don't have sufficient
16 information to answer that question because those
17 measurements -- that typically requires a direct
18 measurement.
19     **Q   (By Mr. Lewis) Well, in your experience,**
20 **whether it's about this -- I know you don't have any**
21 **experience with this boiler except what you've read**
22 **about it or looked at.  But in your experience, what**
23 **would be the most you've seen psi come out of a**
24 **boiler down the -- down the vent?**
25     MR. McGILL:  Objection.  Form.

---

**39**

1     A   I've never made those measurements.
2     **Q   (By Mr. Lewis) But you've referred to them**
3 **here as from 1 psi to -- that would shatter window**
4 **glass to 20 psi, which would decimate, I guess,**
5 **heavily built concrete buildings or severely damaged**
6 **or demolished, and fatalities would be up to a**
7 **hundred percent of people in that.  And so -- so you**
8 **have some opinion about what those pressures would**
9 **be, correct?**
10     A   Well, this -- this table is intended to
11 represent the fact that in an open pipe system -- or
12 in an open system such as you see with -- with blast
13 pressures, when we talk about pressures on the order
14 of 10 to 20 psi, we're talking about very high blast
15 pressures.  And -- and that's really the only intent
16 of this table.  I make no representation that any of
17 these numbers were achieved or not achieved in the
18 exhaust pipe at the Buckinghams' because there's
19 been no measurements made.
20     **Q   So you -- you just don't know how --**
21 **what -- or you -- or you don't have an opinion as to**
22 **the amount of pressure that was -- that -- that went**
23 **down that pipe with these delayed ignitions?**
24     A   That's correct.  Like I said, it has never
25 been measured.

---

**40**

1     MR. LEWIS:  Okay.  That's all I have.
2 Thank you.
3     THE DEPONENT:  You're welcome.
4     MS. TIEDEKEN:  You're done?  Can I go
5 second, then, or --
6     MR. McGILL:  Sure.
7     MS. TIEDEKEN:  -- or do you want to go?
8     THE VIDEOGRAPHER:  Actually, there's a
9 microphone right there, if you're going to ask
10 questions.
11     MS. TIEDEKEN:  Can I be over here and
12 you'll be okay?
13     THE COURT REPORTER:  Let's give it a try.
14     MS. TIEDEKEN:  Okay.  If you need me to
15 move, let me know.
16     THE VIDEOGRAPHER:  Actually, if you could
17 have it -- there you go.  Fasten it.
18     MS. TIEDEKEN:  Okay.
19     THE VIDEOGRAPHER:  Thank you, Counsel.
20     EXAMINATION
21 BY MS. TIEDEKEN:
22     **Q   Mr. Skaggs, my name is Julie Tiedeken.**
23 **And we've met kind of informally at the inspections**
24 **out at Mr. Freeman's lab because I represent Wyoming**
25 **Mechanical.  I have just a few questions for you.**

---

41

1   A   Yes, ma'am.
2   Q   I wanted to ask you a little bit about
3  your background.  As I understand it from the
4  information that's been provided to me by DuraVent's
5  attorney, you have an engineering degree in
6  metallurgical engineering.
7   A   I have two degrees in metallurgical and
8  materials engineering.  Those would be a bachelor's
9  degree and a master's degree.
10   Q   Okay.  And when did you obtain your
11  bachelor's?
12   A   My bachelor's degree would have been in
13  1994.
14   Q   And when -- how about your master's?
15   A   My mas -- I received my master's degree in
16  1997.
17   Q   And when you say you have two degrees, one
18  degree is in metallurgical engineering and one is in
19  materials engineering?
20   A   No, ma'am.  Both -- both degrees are in
21  metallurgical and materials engineering.
22   Q   Okay.  So metal -- metallurgical and
23  materials is one degree?
24   A   That's correct.
25   Q   Okay.  You are not a mechanical engineer,

42

1  correct?
2   A   I do not represent myself as a mechanical
3  engineer, correct.
4   Q   And you don't have a degree in mechanical
5  engineering?
6   A   I have a degree in engineering,
7  metallurgical and materials engineering, correct.
8   Q   So is it fair to say do you not have a
9  degree in mechanical engineering?
10   A   Yes.  That's fair to say.
11   Q   There is a separate degree that can be
12  obtained in that discipline, mechanical engineering,
13  am I right?
14   A   Well, and -- and this is an interesting
15  point because specific to the engineering
16  disciplines, my degrees are from the Colorado School
17  of Mines.  And the way their systems are structured,
18  they're -- they award degrees in engineering with a
19  specialty in a specific field.  So to be more
20  specific about those degrees, those are degrees in
21  engineering with a specialty in metallurgical and
22  materials engineering.  The School of Mines itself
23  represents itself as being a -- a very broad
24  spectrum engineering education that covers a lot of
25  different disciplines.

43

1   Q   Does the School of Mines offer a degree
2  in engineering with a specialty in mechanical
3  engineering?
4   A   They do.
5   Q   Okay.  And that is not the degree you
6  obtained, correct?
7   A   That is not the specialty I obtained.
8   Q   All right.  How would you describe the
9  difference between mechanical engineering and
10  metallurgical and materials engineering?
11   A   Well, there -- there are similarities and
12  differences between the two.  Specifically
13  metallurgical and materials engineers tend to focus
14  on, in a broad sense, the things that components
15  around us are made, whether that be metals, like
16  steel, aluminum, or polymers or plastics, concrete,
17  cast iron, asphalt.  Materials engineering covers
18  that whole spectrum of essentially the things that
19  the world around us is built of.
20       And then mechanical engineering --
21  typically people think of mechanical engineering as
22  being more concerned with the mechanics of things
23  around us.  Things like heat transfer or looking at
24  stress analysis, things like that.  But the two --
25  you can't necessarily pigeonhole one as one and the

44

1  other as the other because there's a great deal
2  of -- great -- great deal of overlap between those
3  two disciplines.
4   Q   Okay.  Would the mechanics of how things
5  work include how a boiler runs?
6   A   Sure.
7   Q   You have provided us with a listing of
8  cases in which you've given deposition or trial
9  testimony.
10   A   I have.
11   Q   And I've got that in front of me.  And I
12  don't see on the list -- or maybe I do see -- a
13  differentiation -- there's a -- a couple cases that
14  you've given trial testimony as opposed to
15  deposition testimony.  Was the last time that you
16  gave trial testimony November 15th of 2012, the
17  McCartney case?
18   A   I don't believe that that's correct.
19   Q   I'm --
20   A   I'm -- I'm sorry.  Did you say trial
21  testimony or --
22   Q   Trial.
23   A   -- testimony at all?
24   Q   Trial testimony.
25   A   Trial testimony, that could be correct.  I

072216js8/1/2016

45

1  don't think I've been on the stand since -- since
2  2012 in the courtroom.
3      Q  And tell me about the McCartney case.
4  What did that involve?
5      A  That case involved alleged construction
6  defects on a building in Golden, Colorado, related
7  to the failure of plumbing components and water
8  damage from them.
9      Q  So it was a flood, water damage, property
10  damage case?
11      A  As I recall it, yes.
12      Q  No personal injuries?
13      A  I don't believe so.
14      Q  And who hired you in that case?
15      A  That I'd have to refer back to my files
16  on. That's a five-year-old case, so I'd have to go
17  back to the files.
18      Q  Well, November of 2012 would be about a
19  3-1/2-year -- year-old case -- or you -- did you
20  start working on it five years ago?
21      A  Well, it was no -- I misspoke. Sure,
22  3-1/2 years old. Between now and November 2012 I've
23  worked on a lot of difference cases. I don't
24  specifically recall who the client was on that case,
25  and I would have to refer back to my files to get

46

1  that information.
2      Q  Do you recall if it was the plaintiff or
3  defendant in that case?
4      A  In this case I believe we were a
5  defendant.
6      Q  And what was the result of that case?
7      MR. REEVES:  I'm going to object and ask
8  you not to answer. It's not relevant, it's not
9  admissible, and it won't lead to the -- the
10  discovery of admissible evidence.
11      MR. LEWIS:  Are you instructing him not
12  answer?
13      MR. REEVES:  Yes.
14      MS. TIEDEKEN:  You're instructing him not
15  to answer?
16      Okay. Just mark that on the deposition
17  transcript and we'll take it up.
18      MR. REEVES:  Results are not admissible
19  and they don't lead to the admissibility of any
20  other evidence.
21      MS. TIEDEKEN:  Okay. We can take that up
22  with the judge.
23      Q  (By Ms. Tiedeken) And then the
24  November 8th, 2012, trial testimony, which would
25  have been about a week be -- prior to the McCartney

47

1  case is the Lane versus Safeway case. What did that
2  case involve?
3      A  That case involved a premises liability
4  incident. A -- an individual slipped and fell on an
5  icy sidewalk outside a store.
6      Q  And who were you retained by in that case?
7      A  In that case I was retained by Safeway.
8      Q  And what were you asked to give opinions
9  on in that case?
10      A  I was asked to opine on the slipperiness
11  of the sidewalk under the conditions at the time. I
12  was also asked to opine on Safeway's duty to place
13  or put warning signs of any type in place, as well
14  as to their interface with the contractor that was
15  doing the work on the sidewalk at the time. And I
16  will qualify that by saying I'm talking about a case
17  that I haven't worked on in a number of years. I'm
18  going off of my recollection alone.
19      Q  Okay. And what was the result of that
20  case?
21      MR. REEVES:  Same objection. Instruct you
22  not to answer the question.
23      Q  (By Ms. Tiedeken) Going back to the
24  McCartney case, what were you asked to give opinions
25  on in that case? I'm not sure if I asked you that.

48

1  The -- the pipe bursting water damage case.
2      A  I'm not sure if you did either, but -- and
3  I would have to refer back to the file to give you a
4  specific answer to that question.
5      Q  Just give me a rough answer to the --
6  what -- to the best of your memory, what were you
7  asked to give an opinion on?
8      A  Well, I -- I think as I -- as I stated
9  before, it was a case that had to do with failure of
10  plumb -- plumbing components in the building and the
11  water damage resulting from those components.
12      Q  And so were you asked to opine what --
13  if -- if there had been improper installation or the
14  plumbing components were defective? What?
15      A  I -- I do not want to answer that question
16  without referring back to my file because I don't
17  want to misstate what's in there. It's reasonable
18  to expect that that's what would have been asked,
19  but specifically specific to that case I need to
20  look back at the file because it's an old case.
21      Q  So you don't recall?
22      A  That's correct.
23      Q  Okay. Let's go to the June 14th, 2012 --
24  I guess that's not a trial testimony. So the only
25  two cases on your list which starts in -- on

072216js8/1/2016

49

1    October 16th, 2006, in which you've given trial
2    testimony -- I think I might have missed one.
3    Strike that question.
4            Let me go to the Sexton versus Kav --
5    Kavcak case, an August 4th, 2010, trial.  What was
6    that case about?
7        A    As I recall, that was a skier collision
8    incident.
9        Q    And what were you -- or who hired you in
10   that case?
11       A    In that case we were working for the
12   defendants.
13       Q    And what were you asked to give opinions
14   on?
15       A    We were asked to perform an analysis of
16   the terrain where the incident occurred and to make
17   measurements as to slope and visibility.
18       Q    And how did that case come out?
19       A    As I recall that case, I believe it was a
20   verdict for the plaintiff.
21       Q    And are those the only three cases that
22   you have given trial testimony in, the McCartney
23   case, the Lane case, and the Sexton case?
24       A    There -- there are others prior to 2006.
25       Q    So more than 10 years ago?

50

1        A    Correct.
2        Q    Okay.  Are any of the cases on your list
3    that's been provided -- the testimony list you've
4    been -- that's been provided to us involve a delayed
5    ignition incident?
6        A    Not to my recollection.
7        Q    Do any of the cases on that list involve
8    the operation of a boiler?
9        A    To answer that I would like to refer to
10   the list, if -- if you have it.
11       Q    Is it attached --
12       A    Then I can take back --
13       Q    -- to your --
14       A    Is it?
15       Q    -- designation there?
16       A    It should be.  Let's go to that.  Thanks
17   for the reminder.  I'm not sure that it's in this
18   copy of it.  Oh, here we go.  Would you repeat the
19   question, please.
20       Q    Did -- are any -- did any of the cases on
21   this list involve the operation of a boiler?
22       A    To my recollection, no.
23       Q    Did any of the cases on this list involve
24   a carbon monoxide exposure incident?
25       A    I don't believe so.

51

1        Q    Have you been retained in any other cases
2    in the last 10 years which involved the operation of
3    a boiler?
4        A    Yes, I have.
5        Q    And how many?
6        A    At least one, that I can recall.  No, two.
7    At least two that I can recall.
8        Q    Okay.  And when were you retained on the
9    first one, roughly?
10       A    Oh, boy.  It's difficult for me to recall
11   the exact date because I've worked on something like
12   over a thousand cases in the last 15 years, so one
13   case tends to run into the other.
14           The specific incident was one that was
15   pretty highly noted in the local media here in
16   Colorado.  It involved a family that was at a -- at
17   a residence in Aspen, Colorado, over the -- over the
18   Thanksgiving holiday of whichever year it was.  And
19   the family was overcome by carbon monoxide resulting
20   from a faulty connection in the vent from a Munchkin
21   boiler.
22       Q    And that's a case Mr. Passamaneck was also
23   involved in, correct?
24       A    Yeah.  I believe he was involved in that
25   case.

52

1        Q    Who retained you in that case?
2        A    Now I have to go back to the file.  I --
3    that was long enough ago, I would not want to say
4    without referring to the file.
5        Q    Okay.  And then what was the second case
6    that you were involved in that involved function of
7    a boiler?
8        A    The second case was -- was more recent.
9    And I was not retained directly.  I assisted one of
10   our other engineers.  There had been an explosion of
11   a steam boiler, and he had questions regarding
12   corrosion and other issues on that steam boiler.
13       Q    So the questions on corrosion would fall
14   within your field of metallurgy and materials?
15           MR. REEVES:  Object to form.
16       A    Absolutely.
17       Q    (By Ms. Tiedeken) Okay.  Have you been
18   involved in any other cases involving carbon
19   monoxide exposure which are not on this list in
20   addition to the Aspen, Colorado, family death case?
21       A    Yes, I have.
22       Q    And how many?
23       A    I can't give you an exact answer to that.
24   Probably less than 10.  But, again, I'd have to go
25   back through my files because there are a lot of

072216js8/1/2016

53

1    different cases.  I specifically recall one case in
2    Telluride, Colorado, that had to do with failure of
3    a previous generation of high temperature plastic
4    vent pipe on a boiler.
5           And I recall another case that also
6    happened to be in Telluride that involved carbon
7    monoxide that was due to recirculation of carbon
8    monoxide exhaust from an exhaust port through a
9    window.
10       Q   I didn't catch the last part.  Through an
11   exhaust port --
12       A   Recirculation of exhaust gas from an
13   exhaust port back through a window or possibly an
14   air intake.  Again, it's been quite a while on that
15   case.
16       Q   Okay.  And you did not give either
17   deposition testimony or trial testimony in either of
18   those Telluride cases?
19       A   I don't recall that I did, no.
20       Q   Okay.  You've indicated that you have been
21   provided with the Triangle Tube documents, correct?
22       A   I have been provided with numerous
23   documents from Triangle Tube, yes.
24       Q   And if I'm understanding your testimony,
25   you have not reviewed all of those documents.  Have

54

1    you reviewed any of those?
2        A   I have reviewed and relied upon the
3    Triangle Tube installation manual and the vent pipe
4    supplement to the installation manual.  What --
5        Q   Anything else?
6        A   Whatever the exact name is.  To date I
7    don't believe so.  I think those are the two things
8    I've -- I've read from the Triangle Tube documents
9    that were relevant to my opinions.
10       Q   Are you aware that in the last month
11   thousands of pages of documents have been produced
12   in connection with Triangle Tube's delayed ignition
13   problem on their Prestige TriMax boilers?
14       A   I am aware that those documents have been
15   produced, yes.
16       Q   But you have not reviewed any of those?
17       A   I have not reviewed them.
18       Q   Is it fair to say, then, without that
19   review you don't have an opinion on what was causing
20   the delayed ignition problem in the Prestige TriMax
21   boilers?
22           MR. McGILL:  Objection.  Foundation.
23   Form.
24           MR. REEVES:  Join.
25       Q   (By Ms. Tiedeken) Okay.  Go ahead.

55

1        A   I'm sorry.  Could you re -- repeat -- or
2    read the question back from the record, please.  I
3    just want to make sure I answer it properly.
4           (Page 54, Line 18 through Line 21, read.)
5        A   I'm not sure if this is a semantic
6    argument or not, but I have an opinion that the
7    testing that's been -- been done to date on the
8    subject boiler at the Buckinghams has not identified
9    the reasons for the delayed ignition.  That is
10   separate from anything that might be contained in
11   the documents produced by Triangle Tube.
12       Q   (By Ms. Tiedeken) Okay.  Are you aware
13   that Triangle Tube had a documented delayed ignition
14   problem in their Prestige TriMax boilers that
15   started in roughly 2012 and continued into 2015?
16       A   I am aware that there were issues related
17   to delayed ignitions in the -- in the Prestige
18   boilers.  I will accept at face value the dates that
19   you've given me.  I wouldn't -- I -- I can't speak
20   directly to the dates, but I know that those
21   documents exist and that that problem existed.
22       Q   And are you aware that the Triangle Tube
23   engineers and the ACV engineers spent a lot of time
24   trying to figure out what was causing the delayed
25   ignition issue?

56

1           MR. McGILL:  Objection.  Form.
2    Foundation.
3        A   I would expect that they're aware -- that
4    they're aware of that.  I don't know from my review
5    of the document -- from what few documents I
6    reviewed how much time or what the scope of their
7    work was.
8        Q   (By Ms. Tiedeken) And I take it you don't
9    know what, if anything, was concluded by the ACV
10   engineers and the Triangle Tube engineers with
11   regard to the cause of the delayed ignition problem
12   in the Prestige TriMax boilers?
13       A   I know that there were changes made to the
14   design of the igniters that were used in the
15   boilers.  I do not know if those design changes were
16   responsive to the delayed ignition event or with
17   other events.
18       Q   Okay.  And do you know if the changes made
19   by Triangle Tube corrected all of the problems they
20   were having with delayed ignition in their boilers?
21           MR. McGILL:  Objection.  Form.
22   Foundation.
23       A   I have no such knowledge.
24       Q   (By Ms. Tiedeken) Okay.  It's my
25   understanding from testimony that you believe that a

072216js8/1/2016

57

1 delayed ignition occurred with regard to the
2 Buckingham boilers prior to Mrs. Herrera's death.
3        MR. McGILL: Objection. Form.
4     A   I believe that the descriptions of the
5 events by Buckingham and others are consistent with
6 delayed ignition events, yes.
7     Q   (By Ms. Tiedeken) And if I'm understanding
8 your testimony, you haven't reviewed the Triangle
9 Tube massive documents that have been produced in
10 the last month to determine whether Mr. Buckingham's
11 descriptions are consistent with the hundreds of
12 customers of Triangle Tube that complained about
13 delayed ignitions in their boiler.
14        MR. McGILL: Objection. Form.
15 Foundation.
16     A   I haven't reviewed those documents, so I
17 can't -- I can't tell you what's in them.
18     Q   (By Ms. Tiedeken) Okay. Is it your
19 understanding from your review of the deposition
20 testimony that the boiler was operational around the
21 November 14th, 2014, time frame?
22     A   Yeah. I understand that the -- that the
23 boiler was operational in November of 2014 at some
24 point.
25     Q   And is it also your understanding that

58

1 roughly a week to two weeks before Mrs. Herrera's
2 death that the Buckinghams first heard the sounds
3 that they've described and which are consistent
4 which a delayed ignition?
5     A   I recall from reading the deposition
6 testimony of Mr. Buckingham that he at some point
7 prior to that incident made a connection between
8 noises that he had been hearing and the boiler. I
9 don't recall if that was a week, two weeks, or more
10 or less.
11     Q   Okay. Do you recall from the testimony
12 that at some point Mr. Buckingham had discovered
13 that the vent pipe had come apart, vent pipe for the
14 boiler?
15     A   Yes, I'm aware of that.
16     Q   And the discovery of the vent pipe coming
17 apart coincided with the sounds he had heard which
18 are consistent with the delayed ignition?
19     A   Yes. I'm aware of that as well.
20     Q   Okay. So do you have an opinion as to
21 whether those facts or circumstantial evidence that
22 the delayed ignition of the boiler was a causative
23 factor in the pipes coming apart?
24        MR. McGILL: Objection. Form.
25 Foundation.

59

1     A   What I state in my disclosure is that
2 there are several potential theories for that
3 incident. Delayed ignition is one of those
4 theories. But not all of the competing theories
5 have been ruled out.
6     Q   (By Ms. Tiedeken) You -- and your other
7 competing theory is the expansion of the PolyPro
8 piping, correct?
9     A   One of my other -- yes, one of the other
10 competing theories is -- is thermal expansion
11 effects in the PolyPro vent pipe.
12     Q   Presumably the thermal expansion effects
13 of the PolyPro piping had been going on from
14 November 14 up until the town -- time the sounds
15 were heard in the boiler, correct?
16     A   That's a fair presumption, yes.
17     Q   So the -- the thermal expansion effects
18 would have been going on from day one, from
19 November 14th, correct?
20        MR. McGILL: Objection. Foundation.
21     A   All other things being equal, yes.
22     Q   (By Ms. Tiedeken) But yet the pipe didn't
23 come apart until these loud explosion sounds were
24 heard with the boiler, correct?
25     A   That's correct.

60

1     Q   What's the significance of that, in your
2 view?
3     A   Well, the significance is that -- that I
4 think it's of greater probability that delayed
5 ignition events and -- and pressure excursions
6 within the -- the vent piping are more likely to be
7 the cause of the separation. But in the absence of
8 measurements and data on the specific system at the
9 time it was operating, I do not rule out the thermal
10 expansion issues as being causative or contributory
11 to the incident.
12     Q   When you use the terminology "more
13 likely," is that the same as more probable, in your
14 terminology?
15     A   In general, yes.
16     Q   You've given some testimony about the
17 force -- let me see if I can find my notes here, of
18 a short, sharp, high pressure event, correct?
19     A   Can you elaborate? I'm not sure if
20 you're --
21     Q   Well --
22     A   -- speaking to a particular point in my
23 disclosure or...
24     Q   Well, in your testimony earlier today in
25 response to Mr. Lewis' questioning --

AGREN BLANDO COURT REPORTING & VIDEO INC>

072216js8/1/2016

61

1    A    Okay.
2    Q    -- I thought I understood you to say that
3    a delayed ignition can cause a short, sharp, high
4    pressure event which could have caused the pipe to
5    come apart.
6    A    That was one of the things I said a
7    delayed ignition event can cause, yes.
8    Q    And you said you haven't been able to
9    measure this short, sharp, high pressure event,
10   correct?
11   A    I have not been able to measure the
12   pressure associated with any delayed ignition event
13   in the subject boiler and vent system.
14   Q    In order to measure it, the actual events
15   that occurred that were described by the
16   Buckinghams, you would have had to have been there that
17   day on the Buckingham property with measurements,
18   correct --
19       MR. McGILL: Object --
20   Q    (By Ms. Tiedeken) -- or with ability to
21   measure?
22       MR. McGILL: Objection.
23       MR. REEVES: Objection. Form.
24       MR. McGILL: Foundation.
25   Q    (By Ms. Tiedeken) Go ahead.

62

1    A    In order to take measurements on the
2    performance of the boiler, I would have needed to be
3    on-site with that boiler in the condition in which
4    it was operational in order to take those
5    measurements.
6    Q    Well, you could have been on-site with the
7    boiler in the condition it was, but no -- but if no
8    delayed ignition event occurred, you couldn't
9    measure it, correct?
10       MR. McGILL: Objection. Form.
11       MR. REEVES: Join.
12   A    That is correct.
13   Q    (By Ms. Tiedeken) And is it your
14   understanding that the Buckingham boiler was
15   experiencing intermittent delayed ignition events?
16       MR. McGILL: Foundation.
17   A    I wouldn't say that the testimony that
18   I've heard and the data that I have speaks to
19   whether it was intermittent or constant.
20   Q    (By Ms. Tiedeken) Well, they describe
21   hearing it twice, correct?
22       MR. McGILL: Same objection.
23   Q    (By Ms. Tiedeken) Over a period of a week?
24       MR. McGILL: Same objection.
25   Q    (By Ms. Tiedeken) Go ahead.

63

1    A    That's what they describe.
2    Q    So if they heard it twice over a period of
3    a week, wouldn't that be an intermittent event as
4    opposed to a constant event?
5        MR. REEVES: Object to form.
6        MR. McGILL: Join.
7    A    Not necessarily, because there could be
8    events that were occurring that they did not hear.
9    Q    (By Ms. Tiedeken) All right.  But to
10   actually measure the events that the Buckinghams
11   heard, you'd have to be there on the date they heard
12   it with your measurements in place, correct?
13       MR. REEVES: Object to form.
14       MR. McGILL: Join.
15       MR. REEVES: Argumentative.
16       MR. McGILL: Join.
17   Q    (By Ms. Tiedeken) Go ahead.
18   A    In order to -- in order to measure the
19   pressure wave from any specific delayed ignition
20   event, you would have to be there when the -- when
21   the event occurred.
22   Q    Okay.  You have not been able to measure
23   what occurred in the Buckinghams' boiler, but is
24   there literature where short, sharp, high pressure
25   events have been measured?

64

1    A    Certainly there is.
2    Q    Are -- is there literature that pertains
3    to this type of event, a short, sharp, high pressure
4    event caused by a delayed ignition or something
5    comparable?
6    A    Well, let me -- let me first state that I
7    said a -- a short, high pressure event is one of the
8    possible outcomes from a delayed ignition.  There
9    are other possible outcomes that have a lot to do
10   with the specific system in place.  I am skeptical
11   of relying upon calculations or other people's
12   testing on systems that are not identical because
13   these events are complex.  There is a complex
14   interaction between the pressure wave that is
15   generated at the point where ignition is occurring
16   and downstream effects, so measurements on one
17   system that is not in the same configuration may not
18   be and often are not representative of what would
19   have been taking place in the Buckingham residence.
20       MS. TIEDEKEN: Would you read back my
21   question, please.
22       (Last question read.)
23   A    In general, yes.
24   Q    (By Ms. Tiedeken) And who is authoritative
25   or what literature would be authoritative on that

072216js8/1/2016

65

1  subject, in your view?
2      A   In my view, authoritative literature is
3  literature that is a peer reviewed journal of
4  reasonable repute.
5      Q   And can you provide me with the name of
6  one on this issue?
7      A   One of the first ones I would probably go
8  to would be Fire and Materials.  And I'm sure there
9  are others as well.
10     Q   Who authors that?
11     A   Fire and Materials I believe is -- is an
12 Elsevier publication.  And they're -- they're one of
13 the major scientific journal publishers.
14     Q   Okay.
15         MR. McGILL:  Did you say Elsevier?
16         THE DEPONENT:  Yeah.  E-l-s-e-v-i-e-r I
17 think is the spelling.  I could be wrong on that.
18     Q   (By Ms. Tiedeken) One of the facts that
19 you've stated, if I'm recalling correctly in your
20 report, is that the DuraVent system, which was in
21 place at the Buckingham home was not designed to
22 withstand the force of a delayed ignition, correct?
23     A   I made no such testimony.
24     Q   Was there something -- I thought you said
25 some -- maybe you said the DuraVent system in place

66

1  anywhere was not made to withstand the force of a
2  delayed ignition.  Something along those lines.  Is
3  that correct?
4      A   Is there -- is there a specific location
5  that -- that you're referring to?
6      Q   Yeah.  Let me see if I --
7      A   Because I -- I'm -- I'm just trying to
8  make sure because I don't recall seeing anything to
9  that effect.
10     Q   4.6, if you look in your report.
11     A   4.6.  Thank you.
12     Q   I'm looking at 4.6 of your opinion, which
13 states, The DuraVent pipe was not designed for or
14 required to be designed for containing excess
15 pressure from a delayed ignition event.
16     A   That is what I stated.  The -- the
17 difficulty I was having with your question were the
18 words short and sharp, which I -- which I did not
19 use in that opinion.
20     Q   But you have given an opinion that, The
21 DuraVent pipe was not designed for or required to be
22 designed for containing the excess pressure from a
23 delayed ignition event --
24     A   That is --
25     Q   Correct --

67

1      A   -- my opinion, correct.
2      Q   And do you have an opinion as to whether
3  it should be designed for and required to be
4  designed for containing excess pressure from a
5  delayed ignition event?
6      A   My opinion is that that's an impossible
7  task because to do so would require to know the
8  potential pressures generated by a malfunction in
9  every type of boiler which DuraVent pipe might be
10 installed in or in conjunction with.
11     Q   And so --
12     A   And there's no mechanism by which DuraVent
13 would be able to know that.
14     Q   And so it's your opinion it would be
15 impossible to design for -- or require to be
16 designed for an excess pressure from a delayed
17 ignition event?
18     A   It would be -- it would be impossible for
19 DuraVent to anticipate the pressure generated in any
20 specific boiler by a delayed ignition event.  Would
21 it -- would it be possible for DuraVent to design a
22 system that's so strong that it could withstand
23 almost anything?  I suppose so.
24     Q   The DuraVent system with the clasp -- is
25 that the terminology you're using for the clasps

68

1  that were present at the Buckingham home?
2      A   Sure.
3      Q   -- was subject to a hundred pound pull
4  test, correct?
5      A   That system was subjected to a hundred
6  pound pull test.  The specific pipe at the
7  Buckingham residence was not.
8      Q   You in your report talk about the pull
9  tests that were performed in Mr. Freeman's lab on
10 the -- the pipe, correct?
11     A   I talk about one pull test that was
12 performed, yes.
13     Q   Well, you actually on Page 4 talk about
14 two pull tests, do you not?
15     A   Oh, you're correct.  The one test was a
16 separation test on joints that did not have a
17 retaining clip in place.  That test was performed on
18 two separate joints.
19     Q   And you indicate that a Mark-10 Digital
20 Force Gauge was used to determine the necessary
21 force to separate the joint, correct?
22     A   Yes.  That's correct.
23     Q   Do you think that test was adequate to
24 measure the force which was necessary to separate
25 the joint?

072216js8/1/2016

69

1    A    No.  I don't think it was.
2    Q    Why not?
3    A    Because the components had been
4  disassembled and reassembled several times.  There's
5  also the conditions within the vent pipe that would
6  potentially be different, particularly with respect
7  to the presence of condensate in and around the
8  joint.  That condensate can serve to lubricate the
9  gaskets which would make the separation -- which
10  would tend to make separation easier.  So, again,
11  the testing was not done under the identical
12  conditions as in the residence.
13    Q    The actual joints that were -- on which
14  the pull test was performed, had those been
15  separated or were they in the same condition that
16  they existed in the Buckingham home?
17    A    I doubt it because those pipes did not
18  have condensate in them.
19    Q    The -- is it your understanding that the
20  vent pipe and boiler were dismantled and transferred
21  down to Jay Freeman's lab in Denver at some point?
22    A    That's my understanding, yes.
23    Q    And some of the piping was taken apart at
24  the joints and some remained together at the joints
25  in order to ship it down to Denver, correct?

70

1        MR. REEVES:  Lack of foundation.
2    A    All that occurred before my involvement in
3  the case, so I have no way of knowing.
4    Q    (By Ms. Tiedeken) Well, you've seen the
5  pictures that Mr. Freeman took of the pipes in their
6  configuration as they were shipped, correct?
7        MR. McGILL:  Objection.  Foundation.
8        MR. REEVES:  Join.
9    A    I recall seeing -- I recall seeing those
10  photographs of the pipe.
11    Q    (By Ms. Tiedeken) And -- and Mr. Freeman
12  took, you know, photographs on how they were going
13  to be shipped, and those were all present in his lab
14  during the testing when -- when the pull test
15  occurred, correct?
16    A    Those pipes were present, correct.
17    Q    And do you recall if the joints where the
18  actual pull test was performed were joints that had
19  not been taken apart pri -- for shipping?
20    A    I don't know the answer to that question.
21    Q    Okay.  And the pull testing that was
22  performed in the lab showed peak separation forces
23  of at 44 and 80 LBF --
24    A    Um-hum.
25    Q    -- correct?

71

1    A    That's correct.
2    Q    What does LBF stand for?
3    A    LBF stands for pounds of force.
4    Q    And I understand your report, the pull
5  testing that's required in order to be listed by the
6  Canadian entity which listed this product is a
7  hundred LBF.
8    A    That is the criteria for the test as
9  specified in the -- in the Canadian standard, yes.
10    Q    Okay.  Does the U -- what is the UL
11  standard?  Is it the same, a hundred LBF?
12    A    I don't recall.
13    Q    So this 44 and 80 LBF would be below the
14  requirement of the Canadian standard --
15        MR. REEVES:  Objection.  Mis --
16    Q    (By Ms. Tiedeken) -- correct?
17        MR. REEVES:  Misstates his testimony.
18    A    Those would be irrelevant with respect to
19  the Canadian standard because those two pull tests
20  were performed without retaining clips in place.
21  And the Canadian standard does not contemplate that
22  configuration.
23    Q    (By Ms. Tiedeken) Okay.  Thank you.  The
24  testing at Jay -- there was testing at Jay Freeman's
25  labs with the retaining clip in place, correct?

72

1    A    Yes, there was testing done.
2    Q    And did you make notes of the results of
3  those tests?
4    A    No, I did not.
5    Q    Do you recall what the results of those
6  tests were?
7    A    No, I do not.
8    Q    Why didn't you document those test results
9  in your report if that was the more relevant
10  testing?
11    A    Well, I would disagree that that testing
12  was relevant in any way because it was not
13  accomplished in the same manner as described in
14  the -- in the -- the Canadian standard.  The test is
15  only relevant if it's performed in the same manner
16  and evaluated against the same information.
17    Q    Well, if that's true, why did you report
18  the results of the testing without the clips?
19    A    Because there's -- there is no standard
20  test for -- there's no standard test for that
21  configuration.
22    Q    Well, if I'm understanding your testimony,
23  so it's completely irrelevant, so why -- why is that
24  in your report, but the testing with the clips in
25  place is not in your report?

AGREN BLANDO COURT REPORTING & VIDEO INC>

072216js8/1/2016

73

1    A    The testing with the clips in place is
2    not in my report because it does not match the
3    configuration in the standards to which the pipe was
4    certified. The testing of the separation of the
5    pipe without a clip in place is relevant because it
6    allows us to assess a condition that might have
7    existed, which would be a joint that was put back
8    together improperly with a loose clip.
9        Q    Okay. I think I understand what you're
10   saying.
11       Let's talk about the joint being put back
12   together. Have you had a chance to review
13   Mr. Schuler's deposition?
14       A    I reviewed Mr. Schuler's depositions --
15   it's been a while since I've reviewed his -- unless
16   there's been another one taken recently that I'm not
17   aware of.
18       Q    Is it your understanding that on the date
19   of Mrs. Herrera's death, that at some point he had
20   gone over to the Buckinghams' house to check on
21   Mrs. Herrera?
22       A    I understand that he was -- he went over
23   to the home to check on Mrs. Herrera and found her
24   body. I don't know if she perished on that day or
25   the previous day.

74

1        Q    Do you understand that when he went over
2    to the home, that he went into the home by accessing
3    the garage?
4        A    I understand he entered through the
5    garage, yes.
6        Q    He entered -- he opened the garage door
7    and went in?
8        A    That's my understanding.
9        Q    Is it your understanding that he saw that
10   the vent had come apart at the same location where
11   it had previously come apart when he entered the
12   garage?
13       A    As I recall it, that's his testimony.
14       Q    And is it your recollection that he
15   immediately went over and put the vent pipe back
16   together?
17       A    Yes. I understand that -- that -- as I
18   recall it, both Schuler and Buckingham put together
19   loose pipes at different times.
20       Q    I'm not talking about different times.
21   I'm talking about on the day he discovered
22   Mrs. Herrera, he went into the garage and he saw
23   that the vent pipe had come apart, correct?
24       A    That's my understanding, yes.
25       Q    And he went over and he put it back

75

1    together, correct?
2        A    Yes. I believe he -- he's -- he's
3    testified to that as well, yes.
4        Q    All right. And then he later discovered
5    that Mrs. Herrera had -- had died in the Buckingham
6    home?
7        A    I -- I don't recall the specific sequence
8    of events, if -- if he found her body first and then
9    put the pi -- and then put the vent pipe back
10   together or vice versa. But I understand that one
11   of those two -- it happened in one of those two
12   ways.
13       Q    Okay. Is it also your understanding from
14   the depositions you've reviewed that when the --
15   that Mr. Schuler thought he had turned the boiler
16   off -- he -- he also attempted to turn the boiler
17   off and thought he had turned it off when he found
18   the vent pipe apart?
19       A    I don't recall that, but like I said, it's
20   been a while since I reviewed that deposition.
21       Q    Do you recall that Mr. Schuler was later
22   told that he had not turned the boiler off, it was
23   still running, and so emergency personnel turned it
24   off?
25       A    I don't recall who turned the boiler off

76

1    or when.
2        Q    And do you know how the boiler was turned
3    off?
4        A    I have -- I don't have that information.
5        Q    Okay. Is it your understanding, then,
6    that David Gieck went out to the home after being
7    asked to go there by Mr. Buckingham on February 2nd?
8        A    I understand he was out there shortly
9    thereafter. I don't recall which -- what date it
10   was off the top of my head, but I understand it was
11   very shortly thereafter.
12       Q    So when Mr. Gieck went out shortly after
13   Mrs. Herrera's death to the Buckingham home, the
14   vent pipe would not have been in the condition it
15   was at the time of Mrs. Herrera's death because
16   Mr. Schuler had put it back together, correct?
17       A    That's correct. The -- the vent pipe
18   would have been reassembled.
19       Q    And the boiler was not in the condition
20   that it would have been at the time of death because
21   it had been attempted to be turned off, and turned
22   off by someone unknown, correct?
23          MR. REEVES: Object --
24          MR. McGILL: Object --
25          MR. REEVES: Objection. Foundation.

**AGREN BLANDO COURT REPORTING & VIDEO INC>**

072216js8/1/2016

77

1   Form.
2       MR. McGILL: Join.
3       Q   (By Ms. Tiedeken) Okay. Go ahead.
4       A   Well, if -- if the boiler had been turned
5   off -- and -- and I don't have that specific
6   recollection. But if the boiler had been turned off
7   and back on, I do not expect that that would have
8   a -- big impact on the manner of operation of the
9   boiler.
10      Q   That wasn't my question. My question is
11  the boiler would not have been in the condition it
12  was at the time of death because it had been turned
13  off, correct?
14      MR. REEVES: Foundation and form.
15      MR. McGILL: Join.
16      A   In the condition it was at the time of
17  death. Well, no. But I may need to clarify that
18  later.
19      Q   (By Ms. Tiedeken) Well, at the time -- at
20  the time of death, the boiler was running, correct?
21      MR. McGILL: Objection. Foundation.
22      A   Well, that's an -- that's an assumption.
23  I -- I wasn't there at the time that Mrs. Herrera
24  was overcome. It could be that the boiler was not
25  running at the time and it was not in a heating

78

1   cycle, but there was still appreciable carbon
2   monoxide in the residence.
3       Q   (By Ms. Tiedeken) And Mr. --
4       A   I don't have any way to know whether the
5   boiler was running or not when Mrs. Herrera entered
6   the residence.
7       Q   Okay. At least when Mr. Schuler got there
8   to investigate, the boiler was running according to
9   his testimony, correct?
10      A   He testified that the garage was hot and
11  humid when he went in which I take to mean that the
12  boiler had been running recently. But I don't think
13  his testimony is specific as to whether the boiler
14  was firing when he walked into the garage or not.
15      Q   Okay. And that evening when they
16  discovered Mrs. Herrera, the boiler was turned off,
17  correct?
18      A   I think I've said I don't know if the
19  boiler was turned off or by whom.
20      Q   Okay. So if you assume it was turned
21  off -- I'll ask you to assume that just for purposes
22  of the next question. Assume the boiler was turned
23  off that evening when Mrs. Herrera was discovered.
24  Then when Mr. Gieck came out a few days later
25  shortly after the incident, the boiler would not

79

1   have been in the same condition it was that evening
2   at Mrs. Herrera's discovery, correct?
3       MR. REEVES: Objection. Form and
4   foundation.
5       MR. McGILL: Join.
6       Q   (By Ms. Tiedeken) Okay. Go ahead.
7       A   Assuming that -- as you say, assuming that
8   the boiler was turned off sometime between when
9   Mrs. Herrera died and Mr. Gieck came to the
10  residence, and he arrived at the residence -- if he
11  arrived at the residence and the boiler was still
12  powered off, then it would not be in the same
13  condition.
14      Q   Okay. When you were retained by the
15  counsel for DuraVent in this case to consult and
16  provide opinions, were you provided with the
17  Triangle Tube manuals?
18      A   Not initially, no.
19      Q   Were you provided with the Triangle Tube
20  manuals prior to the time you wrote your report on
21  June 1st -- or which is dated June 1st?
22      A   There are enough documents, I'd have to go
23  back and check. I think there are also multiple
24  versions. But there may have been one version or
25  another of the Triangle Tube manuals in there, sure.

80

1       Q   Well, one of -- some of your opinions in
2   your June 1st report pertain to whether Wyoming
3   Mechanical followed the directions in the man --
4   Triangle Tube manual, correct?
5       A   That's correct.
6       Q   So you must have reviewed the Triangle
7   Tube manual prior to writing your June 1st report --
8       A   I think it's --
9       Q   -- correct?
10      A   -- fair to say that, yes.
11      Q   Did DuraVent provide you with their own
12  manual?
13      A   I have copies of the DuraVent manual. I
14  have not been provided with any information directly
15  from DuraVent. Save that I may have downloaded a
16  current copy of that manual from that Web site, but
17  all of the DuraVent documents have been provided to me
18  through the Waltz firm.
19      Q   So you had a copy of the DuraVent manual?
20      A   That's correct.
21      Q   And you had that prior to your June 1st,
22  2016, report?
23      A   That's correct.
24      Q   Okay. And part of -- part of what you
25  were asked to do was give opinions on whether

81

1    Wyoming Mechanical had followed the instructions in
2    the Triangle Tube and DuraVent manuals, correct?
3        A    That's correct.
4        Q    And your report in June 1st, 2016, details
5    the problems you found with installation, correct?
6        A    That's correct.
7        Q    You did not mention in your June 1st,
8    2016, report that Wyoming Mechanical had not used
9    the correct connector rings or locking band clamps,
10   correct?
11       A    That's correct.  That's not stated in that
12   report.
13       Q    The report is silent with regard to that
14   issue, true?
15       A    With regard to the -- are you -- are you
16   asking with regard to the style of clip that was
17   installed?
18       Q    Yes.
19       A    Yes.  This report does not address that.
20       Q    Okay.  Is it your understanding from
21   review of the Triangle Tube manual that it states
22   that the installer should obtain a copy of the vent
23   manufacturer's instructions and to follow those
24   instructions?
25       A    I understand that what's in the Triangle

82

1    Tube manual says that the installer should obtain a
2    copy of the DuraVent manual if they don't have it.
3    And that in the event there is a conflict between
4    those two manuals, that they should use whichever
5    one is the most prescriptive.
6        Q    It's your understanding that Triangle
7    Tube's manual says that?
8        A    I believe that's the case.
9        Q    Is that what Mr. Reeves told you?
10       A    We had that discussion this morning.
11       Q    And so you -- you're -- that understanding
12   is based upon your discussions with Dura Vent's
13   attorney, correct?
14       A    That's a correct statement, yes.
15       Q    That's nothing that you knew about prior
16   to a discussion this morning, right?
17       A    It's nothing that I knew specifically
18   about.  It's a fairly common provision in -- in
19   installation manuals and standards, to use whichever
20   is the most prescriptive when there's a conflict.
21       Q    Are you aware that the DuraVent manual
22   states that the installer should follow -- well, let
23   me -- let me just get the language of the DuraVent
24   manual out.  Let's look at --
25       A    Sure.

83

1        Q    -- the DuraVent manual, which I believe is
2    Exhibit 48.  Let me see if I've got the right
3    exhibit number.  Yeah.  Do you have Exhibit -- is
4    Exhibit 48 here?
5            THE COURT REPORTER:  Not here.
6            MS. TIEDEKEN:  I think it might be in
7    this -- I think it might be in a --
8            THE DEPONENT:  Is it -- would you -- would
9    you mind if we went off the record just long enough
10   for me to refill my water?
11           MS. TIEDEKEN:  Sure.
12           THE VIDEOGRAPHER:  We are going off the
13   record at 10:36 a.m.
14           (Break taken.)
15           THE VIDEOGRAPHER:  We are back on the
16   record at 10:37 a.m.  Thank you, Counsel.
17       Q    (By Ms. Tiedeken) Is Exhibit 40 the
18   DuraVent PolyPro Installation Instruction Manual
19   that you were provided in this case?
20       A    It's -- it's not the specific one.  I -- I
21   mean, it's got the same Bates numbers, yes.  It's
22   not the same piece of paper, but I believe it to be
23   the same manual.
24       Q    All righty.  And then if you would turn to
25   Page 4 of the manual, Bates No. 554.

84

1        A    Yes, ma'am.
2        Q    Under General Instruction Notes, it says,
3    Read these instructions before beginning, correct?
4        A    That's correct.
5        Q    And then it goes on to state, You must use
6    only authorized M&G DuraVent PolyPro vent part --
7    parts or other parts specifically authorized in
8    these instructions and/or listed by the appliance
9    manufacturer in order to maintain a safe, approved
10   system.
11           Have I read that correctly?
12       A    Those are the words on the page, yes,
13   ma'am.
14       Q    And what is your understanding of the term
15   and/or?  Is that an optional terminology --
16           MR. McGILL:  Objection.
17       Q    (By Ms. Tiedeken) -- with regard to how
18   you understand that language?
19           MR. McGILL:  Objection.  Form.
20   Foundation.
21           MR. REEVES:  Join.
22       Q    (By Ms. Tiedeken) Go ahead.
23       A    Well, I would -- I would state it this
24   way.  The way that I read that, it says that you
25   must use parts that are authorized in the DuraVent

072216js8/1/2016

85

1  catalog and ones that are listed, or you have the
2  option of using parts that are listed with the
3  appliance, but potentially not in the DuraVent
4  catalog -- is how I would parse that statement. I
5  don't know if that's DuraVent's intent in that
6  statement or not.
7      Q   Okay. And then the DuraVent instructions
8  provide instructions with regard to how to use the
9  connector rings, correct?
10     A   They do provide instructions on the -- on
11 the retaining clips or connector rings, whichever
12 you want to call them, yes.
13     Q   Okay. Is it your understanding that
14 Ferguson Enterprises was the supplier of the
15 Triangle Tube boiler and the DuraVent system -- pipe
16 system and connector rings?
17     A   I -- that's my understanding, is that they
18 were purchased through Ferguson, yes.
19     Q   Did you understand that Ferguson had those
20 delivered to the job site?
21     A   I do not know if they were picked up at a
22 branch or delivered to the job site.
23     Q   Okay. Would you expect that Ferguson
24 would know as a supplier of the DuraVent product and
25 the Triangle Tube boiler which connector rings were

86

1  to be used with installation of the DuraVent piping
2  system?
3      A   No.
4          MR. McGILL: Objection. Objection. Form.
5  Foundation.
6          THE DEPONENT: Apologize, Counsel. I
7  didn't mean to step on you.
8          MR. McGILL: It's fine.
9      A   I don't expect a salesman at Ferguson to
10 know which to supply. I would expect that a
11 salesman at Ferguson would supply whatever was
12 ordered.
13     Q   (By Ms. Tiedeken) Okay. Have you --
14 have you ever been involved in the installation of
15 boilers?
16     A   No, I have not.
17     Q   Have you ever been involved in the
18 installation of any mechanical systems?
19     A   Sure. I've installed, for example, water
20 heaters. I -- I installed the water heater in my
21 office. I installed, you know, mechanical systems
22 in my own home, humidifier on my furnace, things
23 like that.
24     Q   So except for installing things in your
25 own home, you have not been involved in the

87

1  installation business, correct?
2      A   Not in a professional capacity as an
3  installer, no.
4      Q   Okay. So is it a fair to say that you
5  don't know what a professional installer might
6  expect of a supplier of a particular venting system?
7      A   Yeah. I guess I -- I would say I don't
8  know what the installer might expect from the
9  supplier or -- or, rather, from the distributor.
10     Q   You have been asked to look at
11 Exhibit 180.
12     A   Yes, ma'am.
13     Q   And 180 is a -- has a diagram of a Part
14 3PPS-LBC-01, correct?
15     A   That's correct.
16     Q   How does that part number correspond to
17 the part number in the Triangle Tube manual under --
18 under a listing of parts for M&G DuraVent?
19     A   The listing that I have read in the
20 Triangle Tube manual specifies the 3PPS-LBC, I
21 believe, but does not specify the following number
22 on that for 3-inch pipe.
23     Q   And you have been shown an exemplar of a
24 part from DuraVent by Mr. Reeves?
25     A   Well, I've seen that part in the hands of

88

1  both Mr. Reeves and Mr. Waltz, as well as I've held
2  it. So I don't recall who showed it to me first,
3  but, yes.
4      Q   And what is the part number on this
5  exemplar that you've been shown?
6      A   I don't believe the part -- I don't
7  believe I've read a part number on the exemplar.
8      Q   Okay. You said something about that this
9  diagram of 1 -- shown on Exhibit 180 differs from
10 the part sold by DuraVent, correct?
11     A   That was my statement, yes. Although, let
12 me -- let me go back and and clarify my answer to
13 the question that you just made. The part was sold
14 to the installer by Ferguson and not by DuraVent.
15 DuraVent sold it to Ferguson is my understanding.
16 So I just want to be clear on that.
17     Q   Yeah. I don't think that had anything to
18 do with my question.
19     A   Okay.
20         MS. TIEDEKEN: Would you read back the
21 question.
22         (Page 88, Line 8 through Line 10, read.)
23     A   Correct.
24     Q   (By Ms. Tiedeken) And presumably DuraVent
25 sells parts to Ferguson, correct?

**AGREN BLANDO COURT REPORTING & VIDEO INC>**

072216js8/1/2016

89

1         MR. McGILL:  Objection.  Foundation.
2     A    I think it's fair to presume that they
3  would sell their parts through Ferguson and other
4  distributors, sure.
5     Q    (By Ms. Tiedeken) And you understand in
6  this case that Wyoming Mechanical bought the
7  DuraVent parts from Ferguson?
8     A    Yes.  That's my understanding.
9     Q    Okay.  How does this Diagram 180 differ
10  from the part that was shown to you by Mr. Reeves
11  and Mr. Waltz?
12     A    Well, the -- that component has only one
13  of these hemispherical straps on it as opposed to
14  the three, so visually they are different.  I have
15  not seen -- I have not spent enough time with this
16  drawing to know if there are any other
17  inconsistencies between this drawing and the other
18  part.
19     Q    Do you know which one of these, if either,
20  the -- the part shown in Exhibit 180 or the exemplar
21  shown to you by Mr. Reeves and Mr. Waltz, is the one
22  that Triangle Tube approved?
23     A    My understanding, based on review of
24  the -- a parts list in the M&G documentation, shows
25  the commercial style clamp, which is what I'll refer

90

1  to the one with the two -- with the two clamps
2  connected by one or more bands.  That illustration
3  shows a part with one band on it, which is similar
4  to the exemplar part that I've seen in Mr. Waltz's
5  office.
6     Q    Do you know which -- which of the two has
7  been approved by Triangle Tube, the -- the clamp
8  that's shown in Exhibit 180 or the clamp that you've
9  seen in Mr. Waltz's office?
10         MR. McGILL:  Objection.  Form.
11  Foundation.
12     A    Based upon the part numbers and the fact
13  that there is not a 01 listed in the Triangle Tube
14  manual, I would assume it's more like the exemplar
15  with one strap on it.
16     Q    (By Ms. Tiedeken) But that --
17     A    But that's an assumption.
18     Q    That's an assumption.  You haven't seen
19  the parts number on that exemplar, correct?
20     A    I -- I have not read a part number on the
21  exemplar, if there is one there.
22     Q    Which would be stronger, in your view, the
23  one on 180 or the one in the exemplar?
24         MR. REEVES:  Objection.  Lack of
25  foundation.

91

1         MR. McGILL:  Join.
2     A    Well, strong -- stronger has a lot of
3  different connotations to it and -- and it means a
4  lot of different things.  I would expect that the
5  one shown in Exhibit 180 would be more robust.
6     Q    (By Ms. Tiedeken) And by "robust," you
7  mean, it would be more likely to hold the pipes
8  together if there was a short, sharp, high pressure
9  event?
10         MR. McGILL:  Objection.  Foundation.
11     A    If the limiting factor of the performance
12  of the commercial clamp is failure of the strap
13  between the two bands, then one with three straps
14  will be more robust and take higher loads than one
15  with one strap.  If the mode of failure is slipping
16  of the clamp frictionally over the pipe, then the
17  number of straps on it wouldn't be as relevant
18  because the limiting factor in that case is the
19  interface between the clamp and the pipe.
20     Q    (By Ms. Tiedeken) Okay.  If I'm
21  understanding your report and testimony, you haven't
22  performed any type of testing with either the
23  locking band clamps or the clasps that were used in
24  the Buckingham residence to determine the relative
25  strength in holding the pipe together if there is a

92

1  short, sharp, high pressure event.
2     A    I have not performed such testing.
3     Q    Both --
4         MR. LEWIS:  Do you --
5     Q    (By Ms. Tiedeken) -- types of clasps in
6  order to be listed under the Canadian standard would
7  be subject to a hundred pound pull test, correct?
8     A    That is one of the tests in the Canadian
9  UL standard, yes.
10     Q    They'd both be subject to all the same
11  tests, tr -- correct?
12     A    That would be my expectation, yes.
13     Q    And they'd only have to pass the same
14  tests?
15     A    The -- yeah.  I mean, the -- the -- the
16  pass-fail criteria in the standard are the same
17  irrespective of the design of the clasp.
18     Q    Okay.  Let's see.  In your report you have
19  given an opinion -- let me see if I can find it so
20  you can -- I can refer you to your report.
21         MR. LEWIS:  Julie, do you want to take
22  five minutes?
23     Q    (By Ms. Tiedeken) Yeah.  I think I've -- I
24  think I've got that.  If you look at Page 12 --
25         MS. TIEDEKEN:  If anybody -- are you okay?

AGREN BLANDO COURT REPORTING & VIDEO INC>

072216js8/1/2016

93

1    Does anybody want to take a break?
2       Q   (By Ms. Tiedeken) If not, let's go to
3    Page 12.
4       A   Yes, ma'am.
5          MS. TIEDEKEN:  I think I have the wrong --
6    I guess we better take a break.  I'm -- let's take a
7    quick five-minute break.  I'm on the wrong page for
8    my next line of questioning.  See if I can find
9    that.
10          THE VIDEOGRAPHER:  Off the record?  Off
11   the record, Counsel?
12          MS. TIEDEKEN:  Yes, please.  Thank you.
13          THE VIDEOGRAPHER:  We are going off the
14   record at 10:51 a.m.
15          (Break taken.)
16          THE VIDEOGRAPHER:  We are back on the
17   record at 11:01 a.m.  Thank you, Counsel.
18       Q   (By Ms. Tiedeken) If you would refer to
19   Page 10 of your report.
20       A   Page 10, you said; is that correct?
21       Q   Page 10.
22       A   Thank you.
23       Q   Paragraph 1.  One of the things that you
24   state is, Case is unaware of any data related to the
25   original position of the throttle screw -- screw or

94

1    combustion analysis at the time the boiler was
2    installed, correct?
3       A   That's what it says, correct.
4       Q   You are aware that Mr. Gieck took a
5    picture of the throttle screw as he found it shortly
6    after the incident, correct?
7          MR. REEVES:  Objection.  Lack of
8    foundation.
9       Q   (By Ms. Tiedeken) Go ahead.
10       A   I am aware that he took a photograph.
11   I -- I wouldn't want to say what his representation
12   of that photograph was because I don't recall off
13   the top of my head.
14       Q   If he -- if his representation is that he
15   took that picture showing the throttle screw at its
16   position when he found it shortly after the --
17   Mrs. Herrera's death, do you have any reason to
18   dispute that testimony?
19       A   No.  I -- I don't think I have a reason to
20   dispute the testimony based on the data we have now.
21       Q   Is it your understanding that when
22   Mr. Freeman went out to perform his testing, that he
23   used that picture that was taken by Mr. Gieck to
24   adjust the boiler back to the position it had been
25   at the time of -- that Mr. Gieck found it?

95

1       A   I -- that's -- yeah, that's my
2    general recollection of what he said about his
3    investigation.
4       Q   And have you seen the two pictures where
5    they -- they held up Mr. Gieck's pic -- picture, and
6    at the same time Mr. Freeman adjusted so they could
7    get it as exact as possible to the way it had been
8    when Mr. Gieck found it?
9       A   I -- I have -- I think I have a rec -- I
10   think I have a recollection of that, but --
11       Q   And --
12       A   -- sure.
13       Q   -- as far as you can tell, did Mr. Freeman
14   accurately do that, adjust the throttle screw back
15   to the location it had been when Mr. Gieck found it?
16       A   Well, I don't know.  I would say that
17   Mr. Freeman's photographs show the throttle screw
18   adjusted back to the position where Mr. Gieck says
19   he found it.
20       Q   Okay.  I just lost my page.  Okay.  So
21   then you -- and you indicate, By altering the set
22   points of the gas control valve after the incident,
23   Wyoming Mechanical prevented investigators from
24   determining the actual operating conditions at the
25   time of the incident.

96

1          When you refer to "gas control valve," are
2    you referring to the throttle?
3       A   The throttle is part of the gas control
4    valve, yes.
5       Q   And when you refer to "by altering the set
6    points of the gas control valve," you are referring
7    to Mr. Gieck's altering the throttle, correct?
8       A   That's correct.
9       Q   Okay.  You indicate, Investigators were
10   prevented from determining the actual operating
11   conditions at the time of the incident.
12          Isn't it fair to say that the actual
13   operating conditions at the time of the incident
14   couldn't be determined because Mr. Schuler had
15   reengaged the pipes?  Correct?
16          MR. REEVES:  Object to form.
17          MR. McGILL:  Join.
18       A   I don't know whether disconnecting and
19   reconnecting the vent pipe would affect the
20   operation of the boiler.  I would not expect it to,
21   in general.  But in the absence of any measurements
22   or data recorded before and after both of those
23   events, it's not -- you know, it's not a lock.  You
24   can't say for sure.  But normally I would not expect
25   just disconnecting and reconnecting the vent to

072216js8/1/2016

97

1    affect the combustion processes in the boiler.
2        Q    (By Ms. Tiedeken) But disconnecting and
3    reconnect -- connecting the vent for DuraVent's
4    purposes prevented -- Mr. Schuler doing that
5    prevented DuraVent from inspecting the venting as it
6    existed at the time of the incident, correct?
7        A    Yeah.  That's correct.
8        Q    Investigators were able to determine the
9    operation -- operating conditions at the time of the
10   incident by adjusting the throttle back to the
11   location it was at the time that Mr. Gieck found it,
12   correct?
13           MR. McGILL:  Obje -- objection to form.
14   Foundation.
15           MR. REEVES:  Join.
16       Q    (By Ms. Tiedeken) Okay.  Go ahead.
17       A    Not all of the conditions, no.
18       Q    The condition of the throttle, correct,
19   could -- could be adjusted back to where Mr. Gieck
20   found it by using his picture?
21           MR. McGILL:  Form.
22           MR. REEVES:  Form.  Foundation.
23           MR. McGILL:  Foundation.
24       A    Based on -- based on their representation,
25   I think that they could have put the throttle screw

98

1    back in the position where Mr. Gieck said it was
2    when he first arrived, yes.
3        Q    (By Ms. Tiedeken) Okay.  Was there
4    anything else that was altered so that the actual
5    operating conditions at the time of the incident
6    could not be determined?
7            MR. McGILL:  Objection.  Foundation.
8        A    There have been many things altered that
9    prevent determination of the actual operating
10   conditions.  I mean, the whole system has been
11   disassembled and brought to Denver, so it's not at
12   all in the same condition it was at the time.
13       Q    (By Ms. Tiedeken) Well, I'm talking about
14   when Mr. Freeman got there and videoed everything he
15   did and took a lot of pictures.  So let's -- let's
16   talk about that.  When Mr. Freeman got there and
17   began his investigation February 9th, 2016, what
18   else besides the throttle screw and Mr. Schuler
19   reengaging the pipes had been changed so that
20   determining the actual operating conditions at the
21   time of the incident were prevented?
22       A    Not having been there, I don't know for
23   sure.  Those are the two main things that I know of.
24       Q    Okay.
25       A    But not having had the opportunity to

99

1    inspect any of those parts prior to then or at that
2    time, I'm reliant upon both Schuler's and Freeman's
3    descriptions.
4        Q    And -- well, you're not only relying on
5    the descriptions, but you've got hours of Freeman's
6    videotape that you're able to review, correct?
7        A    Yes.  I -- I could review any of the tests
8    that Freeman performed on-site.
9        Q    And have you done that?
10       A    I have not watched all the videotape, no.
11       Q    And Mr. Freeman took many, many pictures
12   of what he did on February 9th, correct?
13       A    Yes.  There -- there are many photographs.
14       Q    And you've had the opportunity to review
15   those --
16       A    I have --
17       Q    -- correct?
18       A    I have reviewed the photographs, yes.
19       Q    And have you -- and you've reviewed those.
20   Okay.
21           And have you reviewed Mr. Freeman's data
22   that he was -- that he -- his notes and data from
23   his investigation?
24       A    I've reviewed the data.  I don't recall
25   specifically looking at Jay's notes from the

100

1    investigation, but I know I've looked at the data.
2        Q    So even though you weren't present on
3    February 9th, there was voluminous documentation
4    made of what occurred on February 9th, is that fair?
5        A    There was a lot of documentation, yes.
6        Q    If you were present on February 9th, what
7    additional testing would you have requested be
8    performed, if any, that was not performed by
9    Mr. Freeman?
10       A    The thing that I would have wanted to
11   capture and the thing that I would have advised had
12   M&G been retained at the time and -- and if I were
13   on-site would be to allow the boiler to operate over
14   a period of time, without any people in the house,
15   obviously.  I would want to add, most likely, a pair
16   of pressure transducers in the vent system in the
17   intent to capture that pressure wave that we're
18   discussing from delayed -- from one or more delayed
19   ignition events to characterize it.
20       Q    You have been present at least on two
21   occasions when testing of the boiler was conducted
22   in Denver at Mr. Freeman's lab, correct?
23       A    Two occasions, yes.
24       Q    Have you requested that pressure
25   transducers be placed in the vent so that if there

101

1    was a delayed ignition, it could be measured?
2        A    I have not.
3        Q    Did you have the opportunity during the
4    testing in Mr. Freeman's lab to do that or request
5    that?
6        A    Did I have the opportunity to request it?
7    I could have requested it.  However, given that we
8    did not observe any delayed ignition events on the
9    two dates that I was present while the boiler was
10   being operated, I can't comment as to whether that
11   data would be relevant.
12       Q    But until the testing was completed, you
13   didn't know if you were going to observe a delayed
14   ignition event or not, correct?
15       A    That's correct.
16       Q    That was the purpose of the testing, let's
17   see if, you know, we observe a delayed ignition
18   event -- that was one of the purposes, right?
19       A    I didn't write the protocol, so I won't
20   speak to the purpose of the testing.
21       Q    Well, isn't it fair to say that one of the
22   purposes on this voluminous testing that's been done
23   in Denver is to see if there was a delayed ignition?
24       A    I'll say it would have been really nice
25   had there been some delayed ignition events.  And --

102

1    and if we had observed a delayed ignition event in
2    Freeman's lab, I would have requested that we stop
3    work, instrument the vent pipe, as discussed, and
4    continue on.  But in the absence of any delayed
5    ignition events occurring during that testing, there
6    was no reason to make the request.
7        Q    Well, unless you had had a pressure
8    transducer in there while it was running, you
9    couldn't measure the pressure during a delayed
10   ignition if it had occurred, correct?
11       A    Well, because there are so many
12   differences between the installation at the
13   Buckingham residence and the installation in
14   Freeman's lab, there's no guarantee that a delayed
15   ignition event that occurred in the Freeman's lab
16   would even be comparable to a delayed ignition event
17   at the Buckingham residence.
18       Q    But the fact of the matter is you had the
19   opportunity, if you wanted to, to put a pressure
20   transducer in the piping in Freeman's labs and you
21   did not do that, correct?
22           MR. McGILL:  Objection.  Form.
23   Foundation.
24           MR. REEVES:  Join.
25       A    Nobody did that, correct.

103

1        Q    (By Ms. Tiedeken) You have in your report
2    identified some deficiencies in the installation of
3    the system by Wyoming Mechanical.  And one of those
4    deficiencies was that an elbow that was manufactured
5    by Centrotherm was used in the installation,
6    correct?
7        A    That is one of the deficiencies, correct.
8        Q    It's my understanding that it's your
9    opinion that that use of that elbow was not a
10   causative factor in the carbon monoxide exposure
11   event, correct?
12       A    That's correct.  I've stated that.
13       Q    You also stated that one of the
14   deficiencies was the failure of Wyoming Mechanical
15   to obtain a permit and an inspection, which is
16   required by code, correct?
17       A    That's correct.
18       Q    Have you read Mr. Sondergroth's
19   deposition?  He's the installation expert retained
20   by the plaintiff in this case.
21       A    I don't believe I have read his
22   deposition, no.
23       Q    Are you aware that Mr. Sondergroth has
24   testified that in his opinion the installation would
25   have been approved by the local officials?

104

1        A    I have no such awareness because I haven't
2    read that deposition.
3        Q    If you assume that to be true, do you have
4    any reason to disagree with Mr. Sondergroth's
5    assessment of what the local officials would
6    approve?
7            MR. McGILL:  Objection to form,
8    foundation.
9            MR. REEVES:  Join.
10       A    I think he assumed what -- I think he
11   assumes the behavior of the authority having
12   jurisdiction.  I -- I don't know what his basis is
13   for that.
14       Q    (By Ms. Tiedeken) Well, he's been a
15   contractor up in Jackson for many years, and based
16   on his experience he indicated that the installation
17   would have been approved, in his opinion.  Do you
18   have any reason to disagree with that?
19           MR. McGILL:  Objection.  Form.
20           MR. REEVES:  Join.
21       A    I don't have an opinion either way.
22       Q    (By Ms. Tiedeken) Okay.  You have given
23   your opinion that one of the installation errors was
24   the failure to perform a combustion analysis at the
25   time of installation, correct?

072216js8/1/2016

105

1    A    That is correct.
2    Q    Do you have an opinion as to whether the
3    combustion as it was on the date of the incident, if
4    you assume that David Gieck's picture correct --
5    correctly shows the location of the throttle was at
6    a level that would have produced a delayed ignition?
7         MR. McGILL:  Objection.  Form.
8    Foundation.
9    A    I don't have any data to base an opinion
10   on on that.
11   Q    (By Ms. Tiedeken) So you have no opinion
12   on that?
13   A    My opinion is that the data we have is
14   insufficient to determine whether that reading
15   indicates a delayed ignition would have happened or
16   not.
17   Q    Okay.  So I take it you can't say to any
18   kind of reasonable degree of engineering probability
19   that the combustion at that level would have caused
20   a delayed ignition?
21   A    I don't think anybody can say with a
22   reasonable degree of engineering probability.
23   Q    Okay.  You also indicated that one of the
24   installation errors you found was that there was a
25   segment of piping or two segments of piping that did

106

1    not have supports, correct?
2    A    Yes.  The two segments of piping -- the
3    final two segments of piping before the -- before
4    the through-wall adapter that was installed, neither
5    was supported.
6    Q    And it's my understanding that you do not
7    have an opinion, one way or another, whether if
8    there had been supports at those locations as
9    required by DuraVent, whether the pipe would have
10   come apart or not.
11   A    My opinion is that we don't have
12   sufficient data to say whether the pipe would have
13   come apart or not.
14   Q    So you can't say to any kind of degree of
15   medic -- or mechanic -- strike that.
16        You can't say to any kind of degree of
17   engineering probability that had the supports been
18   in place, the pipe would not have come apart,
19   correct?
20   A    That's a correct statement.
21   Q    It may still have come apart even with the
22   supports in place, as far as you know, correct?
23   A    Is that a question?  If it -- yes.  Yes.
24   Q    Those were the only defects with
25   installation that you identified in your report of

107

1    June 1st, 2016, correct?  We've discussed all the
2    defects that you've addressed in your report.
3    A    As of the writing -- as of that writing of
4    the report, yes.
5    Q    You have also indicated that you feel like
6    the Buckinghams failed to note the warnings on the
7    pipe, piping itself, the warning label.
8    A    Yes.  I think their actions are consistent
9    with not having noted the warning label on the pipe.
10   Q    Do you have an opinion as to whether the
11   warning labels were adequate so that Mr. Buckingham
12   and Mr. Schuler should have noted those warnings?
13   A    I have no opinion on the efficacy of the
14   warning labels.
15   Q    Is it your understanding that Mr. Schuler
16   has testified that he knew if the vent pipe came
17   apart, that was a dangerous situation because the
18   flue gas had carbon monoxide that would spill into
19   the garage?
20   A    I think I recall reading that in his
21   deposition.
22   Q    You have indicated that you believe that
23   the multi -- multiple circumferential witness marks
24   on the piping is an indication that the pipe came
25   apart gradually over a period of time, correct?

108

1    A    Yes.  That's my opinion.
2    Q    That's all that I have.  Just one
3    follow-up question.
4         If I understand it, you've -- you don't
5    have any changed or different opinions from this
6    June 1st, 2016, report that we have not discussed
7    already?
8    A    No.  I'm -- I'm not aware of any of the
9    data that's led me to reconsider any of those
10   opinions.
11        MS. TIEDEKEN:  That's all that I have.
12        THE VIDEOGRAPHER:  And if you just want to
13   pass that microphone to whoever is going to go next.
14        MS. TIEDEKEN:  Yeah.  Joe, do you want
15   this?
16        THE VIDEOGRAPHER:  Thank you, Counsel.
17             EXAMINATION
18   BY MR. MCGILL:
19   Q    Good morning, Mr. Skaggs.  Again, it's a
20   pleasure to see you again.  It's Joseph McGill for
21   Triangle Tube.  I have a couple of questions
22   regarding some of the answers you've provided so far
23   this morning.  Then I'm going to ask you some more
24   questions about your report.  Is that okay?
25   A    You bet.

072216js8/1/2016

109

1    Q    So you were asked questions by Mr. Lewis
2    concerning the regulators that were found at the
3    Buckingham residence.  Do you have any understanding
4    or experience with the service interval for such
5    equipment?
6    A    I have not evaluated the service intervals
7    for those regulators, no.
8    Q    Okay.  So you don't know whether or not
9    they were -- do you -- do you know what the service
10   interval for a regulator is, generally speaking?
11   A    In general I believe it's 10 years,
12   although it could be 15.  I would -- before I wanted
13   to speak authoritatively to that, I'd want to go
14   check with the manufacturer of the specific
15   regulator in question.
16   Q    Okay.  And throughout your report and
17   throughout your testimony today you've used the term
18   delayed ignitions.  And I -- I just want to make
19   sure that we're talking about the same thing when
20   I'm asking you my questions.
21        With respect to the term delayed
22   ignitions, I'm referring to the ANSI standard type
23   delayed ignition test that would be conducted on a
24   boiler.  Are you familiar with that test?
25   A    I am familiar that there is an ANSI

110

1    standard test.
2    Q    Okay.
3    A    I -- I wouldn't necessarily represent that
4    the events that occurred in this boiler mirrored the
5    events in the ANSI test.
6    Q    Right.  Okay.  So when you're using the
7    term delayed ignition throughout your report and
8    throughout your testimony today, are you talking
9    about that level of delayed ignition as -- as might
10   be seen in an ANSI test?
11   A    Not necessarily.  What I'm referring to
12   when I talk about delayed ignition is the ignition
13   of fugitive flammable gas mixtures within the system
14   as the boiler attempts to light off.
15   Q    Okay.  And would that be represented by
16   audible sounds?
17   A    They can be, yeah.
18   Q    All right.  When you use the term delayed
19   ignition, are you saying that basically anything --
20   anything other than a smooth startup and ignition of
21   the boiler?
22   A    Specifically when I say delayed ignition,
23   I'm -- I am referring to something that results in a
24   pressure excursion that travels down the vent pipe.
25   Whether that is the classical or the -- the

111

1    definition of delayed ignition as everybody else is
2    discussing I wouldn't want to say.  But what I'm
3    referring to is any event within the boiler that
4    generates those dynamic pressures within the venting
5    system.
6    Q    And those dynamic pressures, as you've
7    used -- as you're using those terms, are those
8    generated during the norm -- normal startup of a
9    boiler?
10   A    Well, I would expect that there would be
11   a -- a short term -- well, let me -- let me rephrase
12   that.  I would expect that there would be some
13   fluctuations in the pressure during the normal
14   startup operation of the boiler.
15   Q    And you've seen photographs of the boiler
16   installation at the Buckingham residence.
17   A    I've seen photographs of it, yes.
18   Q    And are -- you are familiar with the
19   Unistrut application that was used to mount the
20   exhaust venting?
21   A    Yeah.  I mean, Unistrut -- Unistrut was
22   used to mount the exhaust venting with a -- a
23   typical Unistrut band clamp from below.
24   Q    And do you have any opinion with respect
25   to the impact on the probability of the pipe coming

112

1    apart by the use of that mount system?
2    A    I can't say because I don't know how tight
3    those clamps were.
4    Q    So you've attended testing at
5    Mr. Freeman's lab on two occasions?
6    A    Correct.
7    Q    And were you there for the removal of the
8    regulators at the Buckingham residence?
9    A    I was.
10   Q    And so with respect to the testing that
11   was done at Mr. Freeman's lab, would you call
12   that -- or would you consider that or characterize
13   that as operation of the boiler under -- outside of
14   normal parameters and under stress conditions?
15   A    Outside of normal parameters.  Well,
16   it's --
17        MS. TIEDEKEN:  Object to the form.  Go --
18   go ahead.
19   A    It's certainly not a normal installation
20   of -- of a boiler like that because, for example, we
21   weren't heating or really recirculating the water.
22   It was just -- the water was just used to place a
23   load upon the boiler.
24   Q    (By Mr. McGill)  Um-hum.
25   A    And -- and I think there are other factors

AGREN BLANDO COURT REPORTING & VIDEO INC>

072216js8/1/2016

113

1   that make the testing in Freeman's lab not
2   necessarily representative of conditions in the
3   Buckingham household.
4       Q   Okay.  But the boiler was -- the boiler
5   was run under multiple different conditions?
6       A   It was run -- yes, as I recall, we did --
7   there was testing at what's called high fire, in
8   other words, running the boiler at a hundred percent
9   of its capacity.  And I believe there was testing
10  also performed at a -- at a lower firing rate.  I
11  want to say 50 percent, but I want -- I'd have to go
12  back to my notes to be sure.
13      Q   Okay.  You were also asked a number of
14  questions regarding the change of conditions at the
15  scene.
16      A   Yes.
17      Q   And you also responded by saying something
18  to the effect that reattaching at the vent pipe
19  wouldn't necessarily have any impact -- or have
20  any impact on the operation or the -- the
21  operational condition of the boiler at the time of
22  Mrs. Herrera's death.
23      A   Correct.
24      Q   Okay.  Can you explain for me why that is
25  the case?

114

1       A   Sure.  Because the -- looking at the
2   separation of the vent pipe, the vent pipe
3   essentially is receiving an input from the boiler in
4   terms of a flow of exhaust gas.  You know, typically
5   a -- relatively low pressures and smooth flow.
6   Based on Buckinghams' testimony and others, I
7   understand that it's likely there were pressure
8   excursions taking place that are consistent with
9   delayed ignition events.
10      Q   And the reattachment of the vent pipe
11  wouldn't have any impact on those pressure
12  excursions?
13      A   I would not expect it to, no.
14      Q   And so at any time during your
15  observations of the Triangle Tube boiler, have you
16  ever seen anything that comes close to a delayed
17  ignition?
18      A   I have not.
19      Q   You were also asked questions with respect
20  to the DuraVent manual, and in com -- comparison to
21  what was stated in the Triangle Tube -- I believe
22  it's the vent supplement.  Do you recall that
23  testimony?
24      A   I do.
25      Q   And you were asked to drill down and focus

115

1   in on the term, quote, and, slash, or, close quote,
2   within -- I believe it's the -- the DuraVent manual.
3       A   I'll agree with everything up to the
4   DuraVent manual.  And I don't remember which one we
5   were looking at now.
6       Q   Okay.
7       A   Although we could get it back from the
8   record if we need to.
9           MR. REEVES:  It's -- you have it in front
10  of you.
11      Q   (By Mr. McGill) But you --
12          MR. REEVES:  Oh, thank you, sir.
13      A   And that is in the DuraVent manual.
14      Q   (By Mr. McGill) Okay.  And you used the
15  term if there's a conflict to use the most
16  prescriptive approach.  And are you -- can you
17  explain that for me in a little more detail, please.
18      A   Sure.  Typically when there are multiple
19  sets of instructions and -- and they differ, as
20  instructed in this case, the installer is to use
21  whichever of those instructions is the -- the most
22  conservative or, in other words, the one that's --
23  that's the most limiting of what can be used.
24      Q   Okay.  Does it -- does conservative equate
25  to safety in any way?

116

1       A   Well, it can, but not necessarily.
2       Q   Okay.  Well, how was conservative used --
3   if you're -- if, I think, as counsel was trying to
4   suggest, an installer is hypothetically struggling
5   between looking at using a clip that DuraVent
6   manufactures versus the banded clamp, and he can't
7   decide which one is the -- the right because there's
8   some confusion in his mind, which is -- which is the
9   appropriate one to use?
10          MS. TIEDEKEN:  Object to the form.
11      A   Well, the question first presupposes that
12  the installer is reading the manual.  But if the
13  installer reads the manual and -- and there is a
14  discrepancy that the installer doesn't feel
15  comfortable resolving based on their own knowledge,
16  I would expect them to call either Triangle Tube's
17  engineering department or DuraVent's engineering
18  department to ask, Hey, how do I install this thing?
19      Q   (By Mr. McGill) Correct.  So to your
20  knowledge, Wyoming Mechanical had never installed a
21  DuraVent vent system before; is that correct?
22      A   My understanding is that Wyoming
23  Mechanical employees have testified that they had
24  not installed the DuraVent polypropylene vent system
25  before, and that they did not read the manuals prior

072216js8/1/2016

117

1    to installation.
2        Q    So this intellectual exercise that -- that
3    may or may not -- that -- that could possibly have
4    taken place in some other scenario with some other
5    boiler absolutely did not take place when it came to
6    the Buckingham boiler.
7        MS. TIEDEKEN: Object to the form.
8        Q    (By Mr. McGill) Is that a fair statement?
9        A    Well, I -- I'm not sure that I -- that I
10   understand what event you're referring to. Is there
11   another way to -- to rephrase that?
12       Q    Sure. Let me -- let me try -- try to be a
13   little more clear.
14       A    Sure.
15       Q    So you're not aware of any situation where
16   anyone from Wyoming Mechanical was struggling with
17   trying to make a decision between using the clips or
18   the banded clamp, are you?
19       MS. TIEDEKEN: Object to the form.
20       A    I have not read testimony to that effect,
21   no.
22       Q    (By Mr. McGill) So the DuraVent exhaust
23   system, I've heard it referred to as an engineered
24   system. Can you -- do you agree with that term and
25   can you tell me what that means?

118

1        A    Sure. Well, I -- I -- I agree that that
2    would be considered an engineered system. And I'll
3    tell you what my interpretation of engineered system
4    is. And -- and that's a system where all of the
5    components are designed to work in conjunction with
6    each other. And so they are not necessarily mix and
7    match capable.
8        Q    But that's, in fact, what happened in this
9    instance, there were components that were not
10   approved for use by DuraVent in the -- the
11   Buckingham system?
12       MS. TIEDEKEN: Object to the form.
13       A    The DuraVent instructions say don't use
14   any other manufacturers' products. Other
15   manufacturers' products were there. The -- the
16   listing documentation in the Triangle Tube
17   installation manual, specifically the vent
18   supplement to that manual, specifies the commercial
19   style band clamp. And that was not used on the
20   system either. Although like I said, that's in the
21   Triangle Tube supplement for venting and not in the
22   DuraVent manual. I think your question was specific
23   to the DuraVent manual.
24       Q    (By Mr. McGill) Either way, neither of the
25   manuals were consulted by anyone from Wyoming

119

1    Mechanical before they did the installation, during
2    the installation, or at the time they turned the
3    boiler over to the -- Mr. and Mrs. Buckingham?
4        A    That's my understanding of their
5    testimony.
6        Q    You've had a chance to review
7    Mr. Bertler's testimony from DuraVent who was their
8    corporate designee.
9        A    Yes, I have.
10       Q    Do you disagree agree with anything that
11   Mr. Bertler had to say?
12       A    Do I disagree with anything that
13   Mr. Bertler had to say.
14       Q    That's of substance to this litigation.
15       A    I think in -- in reading Mr. Bertler's
16   deposition, my impression from reading it at the
17   first was that -- was that even he was unaware that
18   Triangle Tube had specified only the commercial band
19   clamp. And so much of the deposition was -- was
20   involving the -- the different styles of clamps that
21   were available. That's one of the things that --
22   that I noted out of there. Other than that I'm sure
23   there are other statements within -- within that
24   deposition that I would disagree with, but I'd have
25   to look at them individually.

120

1        Q    Okay. And you're not aware of any phone
2    calls or any inquiry in any way by Wyoming
3    Mechanical about the clamp issue to either Triangle
4    Tube or DuraVent?
5        A    I have seen no documentation of that.
6        Q    Have you taken any -- or created any
7    diagrams related to your work in this case?
8        A    Have I created diagrams related to my work
9    in this case? Aside from sketches on my field
10   notes, I don't think so.
11       Q    And I don't know if we've requested it,
12   but do you -- do you maintain a file for your
13   retention in this case?
14       A    Oh, I do. Yes, sir.
15       Q    And can you just give me an idea of what's
16   contained in your file?
17       A    What's contained in my file are copies of
18   all of my photographs and notes, all of the
19   documents with which I have been provided, as well
20   as all of the -- as well as my report and anything
21   that I have produced. Essentially anything that's
22   been given to me in relationship to that case to
23   date is in that file, although we've had, you know,
24   quite a few documents trickle in over the last few
25   days. I have attempted to make sure that everything

072216js8/1/2016

121

1    was in there.
2        Q   And your report, which was authored on
3    June 1st of 2016, are you updating that report?  Are
4    you working on an update?
5        A   I will -- I will supplement that report as
6    directed by my client.
7        Q   Okay.  Certainly.  So have you conducted
8    any independent testing outside of what you've seen
9    at Mr. Freeman's lab?
10       A   No, I have not.
11       Q   I see you're also mention -- it's also
12   mentioned in your -- your vitae that you're a
13   certified fire and explosion investigator.
14       A   I am.
15       Q   Have you used any of those skills in your
16   retention for this matter?
17       A   Well, those -- those skills are -- are
18   basic investigative -- investigative skills that
19   while they are specifically laid out for the CFEI
20   designation as related to fires and explosions, the
21   practices described in the documents that CFEIs
22   refer to during fire investigations, many of those
23   principles apply.
24       Q   In your prior work experience since you
25   obtained your -- your credentials, did any of

122

1    that -- any of those positions involve issues that
2    might be relevant to the investigation of what
3    happened with this -- this vent system?
4        A   Yes, sir.
5        Q   Okay.  Could you explain to me which --
6    which work experience you might be relying on?
7        A   Sure.  After I received my master's degree
8    I went to work for a company called OEA,
9    Incorporated.  OEA was at the time a manufacturer of
10   pyrotechnically activated devices.  The company got
11   its start making pyrotechnic devices primarily for
12   the aerospace industry.
13           When I joined the company, the company was
14   spooling up production of early generation air bag
15   inflaters for cars.  We manufactured driver,
16   passenger, and side impact air bag inflaters in
17   multiple configurations.  All of those inflaters
18   work upon the principle of combusting a propellant
19   to add heat to a stored gas which then flows into an
20   air bag.  So the -- the types of combustion analysis
21   that we would do for air bag inflaters is similar,
22   but not identical, to the type of analysis one would
23   want to do in a situation like this.
24           Also, the pressure measurement and force
25   type work that we did during air bag development

123

1    would also apply in measuring pressure excursions in
2    the vent pipes in this case.
3        Q   And one of the tools that you would use to
4    measure that pressure would be a pressure
5    transducer?
6        A   That would be the primary tool, yes.
7        Q   Primary tool.
8        A   A pressure transducer in conjunction with
9    a data -- with a suitable data acquisition system.
10       Q   Um-hum.  And hypothetically speaking,
11   if -- if you were -- if you would have found -- if
12   you would have had -- had access to the -- the
13   Buckingham site immediately after Monica Herrera's
14   death, and let's assume for this hypothetical that
15   the fire department turned the boiler off, but
16   everything else was left the same -- are you with me
17   so far?
18       A   I'm with you so far, yes.
19       Q   Can you explain to me what approach you
20   would have taken to try and gather appropriate data
21   to assist you in your preparation of your report in
22   this case?
23       A   Sure.  I -- I think we started talking
24   about this -- this previously.  But the pieces of
25   information that I think would have been very useful

124

1    to collect are -- first, I would have wanted to see
2    the vent system instrumented with pressure
3    transducers in two locations, one close to the
4    boiler and then one farther down the system close to
5    the joint that reportedly separated.  And then I
6    would want to leave that in operation for a period
7    of time, an unknown period of time, in order to
8    capture as many ignition events as possible to
9    compare pressure excursions from what I'll call a
10   normal ignition or one that doesn't result in a --
11   in a delayed ignition to worst case pressure
12   excursions in the system.
13           The other thing I would also want to look
14   at or that -- that I would want to know is the
15   distribution of temperature in the exhaust pipe both
16   during startup and at steady state operation, which
17   goes to evaluating the -- the thermal expansion
18   theory that we have not yet been able to rule out.
19           I would also have wanted to either use
20   some sort of a transducer or even just mark lines
21   and take measurements on the relative engagement of
22   the various joints in the system as it was operating
23   in the Buckingham residence.
24           Those are the things that -- had I been
25   retained with the opportunity to suggest those

125

1    things, that's what I would have suggested.
2        Q   Okay.  Just on that last point, are you
3    talking about being able to measure the relative
4    position of the joints in the system as it heats and
5    cools?
6        A   Right.  Right.  That's -- that's one of
7    the things that's important.  And -- and if we're
8    measuring the relative positions of the joints in
9    realtime, which is why a transducer is a better
10   instrument for this than just watch lines, we can
11   look at the changes in positions of those
12   components, not only as the system heats and cools,
13   but if there is a -- a pressure excursion, for
14   whatever reason, we can also look at the movement of
15   the joints with -- as that pressure excursion
16   happens.
17       Q   So it's twofold?
18       A   At least twofold.  Maybe more.
19       Q   Anything else you can think of that might
20   be relevant if you had the chance?
21       A   Well, I'm -- I'm trying to think back to
22   what I think I would have known walking in there
23   prior to any other investigations.  Typically when
24   we have -- when -- when we see issues related to the
25   firing of the gas fired appliance, we'll want to do

126

1    things like take gas samples in order to measure,
2    you know, compositions and water contents, things
3    like that, as well as to document the operation of
4    the system and -- and understand what the nominal
5    operating conditions on-site are.
6        Q   Tell me a little bit, in sort of freshman
7    high school-type language, what you mean when you
8    talk about the distribution of temperature in the
9    exhaust pipe.
10       A   Sure.  I'll -- I'll try not to be too
11   engineer.
12       Q   Okay.  And you're -- and you're doing
13   fine.
14       A   When you think about the exhaust system,
15   there is -- there are multiple states that that
16   system will be in.  If it's been in the garage for a
17   period of time without the boiler running, the pipe
18   will have equilibrated or nearly equilibrated with
19   the garage.  I would expect the vent pipe to all be
20   at about the same temperature and to be at about the
21   same temperature as the garage.
22           Then when the boiler begins to fire, we
23   start adding higher temperature exhaust gasses to
24   the inside of the vent pipe.  As the vent pipe gets
25   warmer, it is accepting heat from the exhaust gas

127

1    and the vent pipe warms.  Now, it doesn't do that
2    uniformly.  You know, we expect to see higher
3    temperatures near the boiler, lower temperatures
4    near the -- near the through-wall termination of the
5    pipe.
6            In order to evaluate issues of thermal
7    expansion, you need to know not just temperature,
8    but you need to know how much distributed amongst
9    the parts of the pipe so that you can -- if you're
10   going to model it or do any calculations, that you
11   know you're doing that based on data and not just
12   your assumptions about what the temperatures are.
13       Q   Okay.  Would the ambient temperature in
14   the garage space have an impact on the performance
15   of the pipe, in other words, if the garage space was
16   cold or below freezing?
17       A   It could.  I mean, the -- the -- the
18   change in length from thermal expansion has to do
19   with the difference in temperature between one
20   temperature and another.  So if you're starting from
21   a lower temperature, if, for example, the garage
22   were cold, and then heating the pipe to about the
23   same temperature as it would be when the boiler were
24   running normally, you expect to have more overall
25   change in length if you're starting from a very --

128

1    if you're starting from a colder initial condition
2    than you would if you were starting from a warmer
3    initial condition, all other things being equal.
4        Q   So if -- would it be fair to say if the --
5    if the vent pipe was colder, say anywhere around
6    32 degrees or somewhere in that range, it would --
7    it -- it's likely to ex -- become longer as it
8    heats?
9        A   The vent pipe will, in general, become
10   longer as it heats regardless of the starting
11   temperature up until we get to, you know, the glass
12   temperature and the plastic in places where the --
13   where the polymer starts to fail.
14       Q   Um-hum.
15       A   But, in general, yeah, as it gets warmer,
16   it's going to get longer.
17       Q   So that delta, that change is dependent on
18   temperature?
19       A   That change is dependent on both the
20   temperature and the length -- and the overall length
21   of the pipe initially.
22       Q   Do you have any opinion or -- well, do you
23   have any opinions with respect to the operation of
24   the Triangle Tube boiler in the Buckingham residence
25   under similar such conditions where the ambient

072216js8/1/2016

129

1  temperature is cold or below freezing?
2      A   I haven't expressed any opinions to that
3  point.  If you're asking me if I have any opinions
4  about it now, I think that, you know, those changes
5  in temperature can have an effect on the operation
6  of the boiler.  Particularly if it's cold in the
7  garage, I expect it's going to be cold outside.  So
8  the temperature of the air drawn -- of the
9  combustion air drawn into the boiler I would expect
10  to be lower, which could have effects on the
11  operation of the boiler and, in particular, its
12  propensity for delayed ignitions or pressure
13  excursions during light-off.
14      Q   So the delayed ignition or the -- the
15  propensity for these pressure events is increased in
16  if the boiler is in a cold environment?
17      A   Well, I don't know that.  I would expect
18  it might be different.  But I wouldn't want to say
19  whether it might be more likely or less likely or
20  more severe or less severe in the absence of any
21  data.
22      Q   Okay.  Are you aware of -- other than
23  the -- I believe it's the Jackson Hole Fire
24  Department and the sheriff doing their
25  investigation, would you characterize that as the --

130

1  the type of fire investigation that an in --
2  investigator might do with your certification?
3      A   Typically not.  With my certifi -- most
4  people with the -- with the CFEI certification
5  and -- and an engineering degree also, we are
6  typically private investigators as opposed to public
7  investigators.  The public investigator's mandate is
8  often different.
9          In particular, if you're talking about,
10  like, a police investigation into this type of
11  event, you know, they're -- they're there to
12  determine whether a crime has been committed that
13  they need to charge somebody with.
14          A fire department investigator's task in
15  fire investigations often is to decide is this an
16  event that's a probable arson or not, whereas a
17  private investigator typically has a much wider
18  scope that they're being asked to do.  What
19  happened, what made this happen, and, you know, is
20  there -- is there some component or party that's at
21  fault?  So the -- the mandate for those
22  investigators is often different.
23      Q   Do you have any understanding of what
24  the -- the temperature was in the Buckingham garage
25  while the boiler was operating?

131

1      A   Are you talking about at the time that
2  Mrs. Herrera was overcome by the carbon monoxide or
3  before that or after that?  I -- I think we have to
4  talk about --
5      Q   So --
6      A   Can you constrain that with respect it
7  time?
8      Q   I can, yes.  Let's constrain it to -- the
9  end point would be the moment at which Mrs. Herrera
10  is found at the residence.
11      A   Okay.
12      Q   And then, say, perhaps any time period
13  before that.
14      A   Well, Schuler testified that when he
15  entered the garage, he found it to be warm and humid
16  inside.  That is in keeping with what I would expect
17  if the boiler were directly venting exhaust into the
18  enclosed space of the garage.
19      Q   And are you aware of any other testimony
20  or any facts that would support a conclusion that
21  the boiler was operating in the garage under cold
22  conditions?
23      A   Well, like I said, the temperature in the
24  garage while the boiler was operating, provided that
25  the vent pipe is open, which -- which I'm taking is

132

1  the premise of your question, I would expect the
2  garage to be warm when the boiler is operating and
3  to cool off when the boiler is not operating.
4      Q   Um-hum.
5      A   So if the boiler is operating, I would
6  expect it to be warmer inside the garage at that
7  time.
8      Q   Okay.  And then if the vent pipe was
9  attached?
10      A   If the vent pipe was attached, that really
11  decouples the temperature of the garage to a certain
12  extent from the operation of the boiler because much
13  of the -- the heat generated by the boiler is going
14  into either heating the water, which the boiler
15  should be heating, or rejected out the end of
16  exhaust pipe.  So I would not expect the garage to
17  be as warm if the pipe were connected, all other
18  things being equal.  And I certainly would not
19  expect it to be as humid.
20      Q   And are you aware that the -- the
21  termination fixture that was used for the Buckingham
22  installation was also incorrect?
23      A   Yes.  I am aware that that was incorrect.
24      Q   Are you aware of the -- the various tests
25  that are run by independent testing agencies that

**AGREN BLANDO COURT REPORTING & VIDEO INC>**

072216js8/1/2016

133

1   certify direct vent boilers?
2       A   Yeah. I mean, I'm aware that there are --
3   that there are certain tests. I wouldn't say that I
4   know all of the minutiae of, for example, the UL
5   tests. But there are different standards and
6   different standards organizes that -- that the
7   independent testing labs will test to.
8       Q   And explain to me again why you -- when
9   the vent -- when the Buckingham vent pipe was tested
10  in Mr. Freeman's lab, and the clip was attached to
11  it, did it pass -- or, well, I'm not sure if pass is
12  the right term. But was it able to withstand
13  100 pounds of pull pressure?
14      A   I'm trying to remember. I think it did go
15  over a hundred pounds of force recorded during that
16  testing.
17      Q   But you dis -- not disregard, but are not
18  factoring that in because of the change in
19  conditions?
20      A   I'm not factoring that in because
21  there's -- there's nothing to compare the results of
22  that test to. Since that test was done by a
23  different method than the CUL test, the results
24  aren't directly comparable to each other.
25      Q   And have you had any experience with any

134

1   Triangle Tube boilers other than in this case?
2       A   I've worked on a couple of insurance cases
3   involving Triangle Tube boilers. As I recall, those
4   were mostly water damage losses and not carbon
5   monoxide incidents. And none of those, clearly,
6   because they're not on my -- on my record, went to
7   the point of testimony.
8       Q   Okay.
9       A   Are we coming up on a good place for a
10  break or -- I just need to take five minutes for
11  bio.
12      Q   Absolutely.
13      A   Okay.
14      Q   That's fine.
15      A   If that's all right, I'd like to do that.
16      MR. McGILL: Let's go off the record,
17  please.
18          THE VIDEOGRAPHER: We are going off the
19  record at is 11:52 a.m.
20          (Break taken.)
21          THE VIDEOGRAPHER: We're back on the
22  record at 12:04 p.m. Thank you, Counsel.
23      Q   (By Mr. McGill) Mr. Skaggs, do you have an
24  opinion with respect to the Triangle Tube boiler
25  and, in particular, if the Triangle Tube boiler is

135

1   installed correctly with the exhaust venting
2   attached, do you believe that it is reasonably safe
3   for its intended purpose?
4       MS. TIEDEKEN: Objection. Foundation.
5       A   I don't offer any opinions relative to the
6   Triangle Tube boiler.
7       Q   (By Mr. McGill) Do you have any criticisms
8   of the Triangle Tube boiler at issue in this
9   litigation?
10      A   I--
11      MS. TIEDEKEN: Objection. Foundation.
12      A   I offer no such criticisms.
13      Q   (By Mr. McGill) And no opinions
14  whatsoever?
15      MR. REEVES: Object to form.
16      MS. TIEDEKEN: Objection. Foundation.
17      A   I'm only prepared to offer opinions
18  relative to the boiler as they affect the vent pipe
19  and any pressure excursions within the vent pipe.
20      Q   (By Mr. McGill) Have you ever converted a
21  natural gas boiler to LP?
22      A   I have not.
23      Q   And are you familiar with the technical
24  service or the engineering bulletins that were
25  produced in this case?

136

1       A   I am -- I know that there were engineering
2   bulletins produced. I am not aware of their
3   content.
4       Q   You were present when the regulators were
5   detached from the Buckingham residence and as they
6   were tested in Mr. Freeman's lab.
7       A   I was.
8       Q   Can you -- and can you tell me, what --
9   what's the -- the normal environment for regulators
10  such as the Buckinghams' to be operated in? In
11  other words, were there any problems with the way
12  the regulators were installed at the Buckingham
13  residence?
14      A   Problems with the way -- as I recall from
15  my inspection, I don't recall that there was
16  anything problematic about the installation of the
17  primary regulator.
18          The second stage regulator, other than I
19  think there was a dryer vent nearby that one could
20  postulate maybe -- maybe could possibly cause
21  something to happen in the absolute worst
22  conditions. But, in general, I -- I didn't see
23  any -- any major, glaring problems with either
24  regulator.
25      Q   Do you offer any opinions with respect to

137

1  the standard of care of the installation of the
2  exhaust venting by Wyoming Mechanical?
3      A   I have offered the opinion that that
4  installation was improper and deficient and illegal.
5          THE COURT REPORTER:  Last word, deficient?
6      A   And illegal.
7      Q   (By Mr. McGill) Do you have Exhibit 60
8  there in front of you?
9      A   I could look.
10     Q   Might be in that book.
11     A   Oh, it's 60.  Maybe under the tab marked
12 60?
13     Q   You're the scientist.
14     A   All right.
15     Q   So I'm going to refer you to the Bates
16 numbers at the bottom.
17     A   Yes, sir.
18     Q   So I'm -- I'm going to be looking at
19 Pages 8 and 9.
20     A   I'm on Page 8.
21     Q   Okay.  Great.  So there's a section there
22 that talks about best practices.
23     A   Yes.  I see the word best practice on
24 the -- words best practice on the page.
25     Q   Do you believe in your analysis in this

138

1  matter that Wyoming Mechanical exercised the best
2  practices as required by the Triangle Tube materials
3  when it installed the exhaust venting for the boiler
4  at the Buckingham residence?
5          MS. MEAD:  Objection.  Form.
6      A   Based on Wyoming Mechanical's testimony
7  that they did not read the installation manuals, and
8  based on the deficiencies that I identified with the
9  installation, I would say that it does not follow
10 best practices.
11     Q   (By Mr. McGill) And could you turn to
12 Page 9, please.  There's --
13     A   I'm on Page 9.
14     Q   There's a warning there that's -- starts
15 with the heading, Qualified Installer.
16     A   Yes, sir.
17     Q   Could you just read that into the record,
18 please.
19     A   Sure.  Where shall I stop?
20     Q   Stop where it -- the next heading starts
21 at -- where it says homeowner.
22     A   Okay.  I'll -- I will stop before the word
23 homeowner.
24     Q   Okay.
25     A   That section reads as follows, in bold

139

1  text, Qualified installer, colon.  And then in
2  nonbold text, Prior to installing this product, read
3  all instructions included in this manual and all
4  accompanying manuals, slash, documents with this
5  appliance.  Perform all installation steps required
6  in these manuals in the proper order given.  Failure
7  to adhere to the guidelines within these manuals can
8  result in severe personal injury, comma, death or
9  substantial property damage, period.
10     Q   Thank you.  Is there anything that's
11 unclear to you about that warning?
12     A   I find the warning to be clear.
13     Q   Given that warning, is it your position
14 that Wyoming Mechanical's failure to read the
15 instructions and all the different things that
16 you've said was the cause of Monica Herrera's death?
17         MS. TIEDEKEN:  Objection.  Form and
18 foundation.
19     A   Mechanical's failure -- no.  I don't think
20 that the failure to read the manuals was the -- was
21 the direct cause of her death.
22     Q   (By Mr. McGill) Certainly was a
23 contributing cause?
24     A   I believe --
25         MS. TIEDEKEN:  Objection.  Form and

140

1  foundation.
2      Q   (By Mr. McGill) You can answer.
3      A   I believe that their failure to read the
4  manuals resulted in an installation that was
5  defective, and an installation that was not
6  according to code, and that those factors,
7  particularly the use of the wrong style of locking
8  band, may have been relevant in Miss Herrera's
9  death.
10     Q   Is there data that's available out there
11 that -- that you could gather that would be able to
12 make your opinion more definitive?
13     A   Well --
14         MS. TIEDEKEN:  Objection.  Calls for
15 speculation.
16         MR. REEVES:  And I object to the objection
17 as improper objection.
18     A   The data that would be necessary for me to
19 more fully evaluate the installation is the pressure
20 excursion data that we've previously discussed.  And
21 although there may be information out there in
22 literature or other sources, because the propagation
23 of that pressure width down the tube -- down the
24 exhaust venting is a geometrical consideration, in
25 other words, the -- the shape and length and

072216js8/1/2016

141

1    positions of elbows and all that in the tubing is
2    important, the size and shape of the pressure pulse
3    that is applied to the vent pipe at the location
4    where exhaust exits the boiler and into the vent
5    pipe is also critical in establishing what forces
6    were on the joints during pressure excursions in the
7    Buckingham residence. And any data that's out
8    there, unless it is specific to this model of boiler
9    operating under essentially the same conditions,
10   there's no guarantee or no -- no ability to rely on
11   that data as representative of what was happening
12   inside the home, inside that boiler.
13       Q    (By Mr. McGill) Can you explain for me how
14   surface area might have an impact on these pressure
15   excursions?
16       A    Can you define, the surface area of what?
17       Q    Well, the surface area of the piping --
18   the exhaust piping installed at the Buckingham
19   residence.
20       A    Well, sure. These -- these pressure
21   excursions, which are generated by both a
22   combination of the heating of the combustion
23   products that causes the gas inside the boiler and
24   the tubing to expand and -- and generates the
25   pressure waves, as well as the generation of gas by

142

1    evolving species as -- as propane and other gases in
2    the propane burns, that generates a pressure pulse.
3        That pressure pulse will have a certain --
4    if you plot that as pressure versus time, you end up
5    with a curve that will show pressure rising to a
6    peak at some point and then dropping off.
7        The actual forces that are generated on
8    the joints depend upon that peak pressure, what is
9    the peak pressure at that joint, and then what area
10   that pressure is applied over. So without knowing
11   the peak pressure specifically, and -- and to a
12   lesser extent the width and shape of that pressure
13   pulse, you can't accurately simulate or calculate
14   the loads that are applied on the individual joints
15   in the system.
16       Q    Thank you. Could you turn to Page 74 in
17   the manual there. It's --
18       A    Sure. Still on Exhibit 60?
19       Q    Yes, sir.
20       A    And 74 by the Bates numbers; is that
21   correct?
22       Q    I believe that's right.
23       A    Yes.
24       Q    Can you describe for the record what that
25   page is?

143

1        A    This -- this page is a section out of the
2    manual entitled Checkout Procedures. It's followed
3    by a heading and a notice, and then a checklist of
4    certain procedures for the installer to follow.
5        Q    And you've reviewed this manual before?
6        A    Yes, I have reviewed this manual before.
7        Q    What's the purpose of the checkout
8    procedures?
9        A    Well, the checkout procedures are --
10   are -- the way I read it is a checklist for the
11   installer to make sure that they have gone through
12   and installed the boiler properly and verified that
13   it is operating properly. That's how I interpret
14   it.
15       Q    And then the next page?
16       A    The next page is a fill-in form entitled
17   Installation Record.
18       Q    What's the purpose of that form?
19       A    Again, the way I read the form, it appears
20   to be a location for the installer to record various
21   data about the system.
22       Q    Okay. Why is it -- or what -- what's the
23   importance or the significance of those two forms?
24       MS. TIEDEKEN: Objection. Foundation.
25       A    Well, the -- the two forms are significant

144

1    in that the first page outlines the checkout
2    procedures that the installer should be following.
3    And the second page is a place for the installer to
4    record that they have done so and to record certain
5    information.
6        Q    (By Mr. McGill) Such as?
7        A    The information that is on the
8    Installation Record is the model and serial number
9    of the unit, date of installation, fuel type, and --
10   and input rate, as well as combustion readings and a
11   checklist for following and completing all
12   installation and checkout procedures, as well as
13   leaving the information with the homeowner. And
14   it also has a place for the installer to record
15   their -- their business address.
16       Q    Okay. And the combustion portion of that
17   form, would that also include CO readings as well?
18       A    CO readings are indicated on the form,
19   yes.
20       Q    And to your knowledge, Wyoming Mechanical
21   never completed that form either?
22       A    I would assume not, given that Wyoming
23   Mechanical's testified that they never read the
24   manual.
25       Q    Are you familiar with boiler operation in

072216js8/1/2016

145

1  terms of how to -- how the boiler's configured and
2  how you -- how you would set it up, those types of
3  things?
4      A   I'm -- I'm familiar with the operation of
5  these types of hydraulic boilers in general and how
6  they're normally set up.  I wouldn't say that I
7  have -- I wouldn't say that I would have any special
8  extra knowledge about the Triangle Tube boiler.
9      Q   Okay.  Are you aware that the boiler
10 involved in this incident since its fire date and
11 the date of Mrs. Herrera's death cycled more than
12 28,000 times?
13     A   I am aware of that.  I refer to that in my
14 my report.
15     Q   And why is that significant to your
16 report?
17     A   That's significant to my report because
18 for the amount of time that the boiler was in
19 operation, that seemed to me, at least on first
20 reading, to be a very high number of recorded
21 ignition cycles for a four-month period of time.
22 When I divided that out -- if you just take four
23 months of time, divide it by the number of ignition
24 cycles, that says to me that if that number is
25 correct, that boiler is recording an ignition cycle

146

1  on average approximately once every six-and-a-half
2  minutes.
3      Q   Do you characterize that as short cycling
4  in the heating and cooling industry?
5      A   I would say that sounds like an accurate
6  description.
7      Q   And why is that significant, the number of
8  cycles?
9      A   Well, I think the number of cycles is
10 significant because it indicates an abnormal
11 condition in the operation of the boiler.
12     Q   All right.  And do you know whether or not
13 there is a function identified as CH call blocking
14 in the Triangle Tube materials that would have
15 allowed for adjustment of that cycling feature?
16     A   I'm aware that that is in the Triangle
17 Tube materials.  I'm aware in that that feature exists
18 on the boiler.  I haven't read into it in great
19 depth.
20     Q   Is that something that the folks at
21 Wyoming Mechanical could have adjusted to address
22 the issue?
23         MS. TIEDEKEN:  Objection.  Foundation.
24     A   I'll say no, because according to their
25 testimony they never read the manual.

147

1      Q   (By Mr. McGill) Oh, okay.  Of course.  Had
2  they read the manual?
3      A   Hypothetically, had they read the
4  manual, I would -- I would -- I would say that they
5  at least had the information on how to do it.
6      Q   Could you turn to Exhibit 49, please.
7      A   49, yes, sir.  I have Exhibit 49.
8      Q   And then you're going to need to turn to
9  the table in the exhibit that -- actually, if you
10 can turn to Page 5.
11     A   By the page numbering in the manual, yes.
12 Yes, sir.
13     Q   Is that the portion of the manual that
14 identifies the 3PPSLBC clamp that's provided
15 appraised by Triangle for use in the Prestige Solo
16 TriMax 175?
17     A   That --
18         MS. TIEDEKEN:  Objection.  Foundation.
19     A   That identifies that the 3PPSLBC is the
20 approved locking band clamp.
21     Q   (By Mr. McGill) And to your knowledge,
22 DuraVent is an approve -- approved supplier of PP
23 piping for Triangle Tube boilers?
24     A   That is how I interpret Triangle Tube's
25 installation supplement of listing M&G DuraVent in

148

1  the table, yes.
2      Q   Okay.  Do you have Exhibit 130 in front of
3  you in that book?
4      A   Not in this book.  Is there a second book
5  of exhibits?  It looks like there's a second and a
6  third.
7          MS. TIEDEKEN:  Is -- what is Exhibit 130?
8          MR. McGILL:  It's this.
9          MS. TIEDEKEN:  I don't have that.  Do you
10 have a copy?
11         MR. McGILL:  Sure.
12         MS. TIEDEKEN:  Thanks.
13         MR. McGILL:  That looks kind of easy.
14         THE DEPONENT:  Thank you.
15     A   I have Exhibit 130.
16     Q   (By Mr. McGill) Would you mind -- would
17 you pop that out of the binder.
18     A   (Deponent complied.)
19     Q   And can you show for the jury which is the
20 locking band clamp that Triangle's approved for use
21 with its Prestige 175?
22     A   My understanding is that that is the
23 commercial locking band clamp.  It's the third item
24 down on the page.
25     Q   Okay.  And so earlier when you were

AGREN BLANDO COURT REPORTING & VIDEO INC>

**testifying about Exhibit -- I think it's 180, which is in front of you, which is the mechanical drawing of a commercial locking band clamp. Can you explain for the record the difference between the two clamps?**

A Well, and I may need to correct what I had stated previously, because I think previously I had stated that I thought that the commercial band clamp in here only had one leg as -- as opposed to three. When I reviewed this previously, it was on a copy of the document, and it was unclear. This copy is clear and it does appear to have three legs on it. But they're aligned so that it's still a little hard to tell.

**Q I see. Okay. So --**

A Whereas the drawing clearly shows three legs on the clamp.

**Q Yeah. If -- sometimes it's difficult to tell. You have to have the -- an eye for mechanical drawings somewhat. But I -- I agree with you. So what's depicted in the -- the DuraVent chart here is also depicted in the mechanical drawing as well?**

A They appear similar. Yes.

**Q Okay. Is it your belief that the Buckingham venting would not have come detached if**

**this commercial locking band clamp was used?**

MS. TIEDEKEN: Object to the form -- form and foundation.

A Would not have become detached. I -- I have to say, my opinion is that it would be less likely. But, again, in the absence of actual pressure data, we don't know what the loading was that was put on those joints.

**Q (By Mr. McGill) To a significant extent it's all academic because Wyoming Mechanical didn't use that clamp.**

MS. TIEDEKEN: Object to form and foundation.

A I would agree that -- well, no. Let me rephrase that. I don't necessarily think it's an academic argument because there's only one clamp that is on the sys -- that is specified by Triangle Tube as being approved for use. And that is not the clamp that Wyoming Mechanical installed. And as I said, I think that -- that it's possible that had the commercial locking band been installed, that the joint may have held together throughout the pressure excursions better, but with -- in the absence of actual pressure data, it's impossible to be more definitive than that.

**Q (By Mr. McGill) Have you formulated any opinions or are you intending to formulate any opinions with respect to the interaction between the Buckinghams, Greg Buckingham, in particular, and the people at Wyoming Mechanical when the phone calls were made about Wyoming Mechanical coming out to service the boiler before Monica Herrera's death?**

A I expressed an opinion in my report that Wyoming Mechanical had a duty to warn the Buckinghams to shut the boiler down, and that the boiler was not shut down.

**Q Do you have any opinion with respect to whether or not Wyoming Mechanical should have recommended the use of carbon monoxide detectors at the residence?**

MS. TIEDEKEN: Objection. Form. Foundation.

A I don't have an opinion to that statement.

**Q (By Mr. McGill) Are you aware that they have since Monica Herrera's death installed multiple carbon monoxide detectors in the residence?**

A I was unaware of that fact, but I'm unsurprised by it also.

**Q Could you take a look at your report, please.**

A Yes.

**Q At Page 9.**

A 9, you say. Yes.

**Q Yeah. Hypotheses of failure.**

A Yes, sir. I'm on that section.

**Q Okay.**

A The version that I'm looking at appears to be marked up from my original report because the heading Hypotheses of Failure is in a box that I would not normally use in my reports.

**Q Um-hum. No. 1 is the -- the heading is High Pressure in Vent Pipe. I just want to be certain here. Are you attributing high pressure in the vent pipe to any identified defect in the Triangle Tube Prestige Solo 175 boiler?**

A I identify high pressure in the vent pipe as resulting from combustion conditions within the boiler. I do not have an opinion as to whether the boiler itself was in a defective condition or not.

**Q Can these high pressure conditions in the vent pipe also arise from an improper setup of the boiler by the in -- installation technician?**

A I think it's reasonable to assume that. It could happen from that.

**Q Are you aware of any -- of any fact**

072216js8/1/2016

153

1  identified by anyone that would lead you to the
2  conclusion that there's a specific component part of
3  the boiler that caused these high pressure events in
4  the vent pipe?
5      MS. TIEDEKEN: Objection. Foundation.
6      A  I have no opinion as to the cause of the
7  high pressure excursion in the pipe. And -- and
8  thinking back on that, I want to further clarify
9  that. I have no opinion on whether a delayed
10  ignition causing a pressure excursion in the pipe
11  was due to a malfunction within the boiler or a
12  malfunction -- or an improper installation of the
13  boiler. I don't offer an opinion to either effect.
14      Q  (By Mr. McGill) Thank you. So I take it
15  that your hypothesis of Failure No. 3 is modified by
16  your testimony today, and that's the improper
17  securing of the vent clip during installation.
18      A  That is -- I would say that that
19  hypothesis should be modified based upon the
20  information that I reviewed since the report was
21  written with regards to which vent -- or with
22  regards as to which clip should have been used on
23  the vent system. So given the opportunity to
24  supplement my report, the discussion of that
25  hypothesis would be modified somewhat.

154

1      Q  Okay. In Page 10 of your report you talk
2  about the various limitations on the investigation.
3      A  Yes, sir.
4      Q  Could you -- I know you -- you've
5  identified five of them there. And I -- I don't
6  necessarily need you to read them into the record,
7  but could you explain them?
8      MS. TIEDEKEN: Which page are you on
9  again?
10      MR. McGILL: On Page 10.
11      MS. TIEDEKEN: Thank you.
12      Q  (By Mr. McGill) So No. 1 where you're
13  talking about the examination of the throttle screw
14  and -- et cetera.
15      A  Sure. And -- and I guess the point that
16  I'm -- I'm making with No. 1 is that we have not
17  been able to independently determine what the
18  position of the screws on the gas control were at
19  the time that the investigations were ongoing. We,
20  therefore, have to rely upon Mr. Gieck's description
21  of what he did with the screw. And if that
22  description is inaccurate, then that means that our
23  findings related to that may all -- or the data
24  related to that may also be inaccurate.
25      Q  Okay. So can I just stop you for a

155

1  second?
2      A  Sure.
3      Q  So when you say "independently determine"
4  the position of the screw, how would you go about
5  determining independently what the position of the
6  screw was at the time?
7      A  Well, you can't -- it can't be done now.
8  If I were to do that independent -- independently as
9  an investigator, I would have to be there before any
10  adjustments were made to the screw --
11      Q  Sure.
12      A  -- to do that independent of Mr. Gieck's
13  description of what he did.
14      Q  And you were there at Mr. Freeman's lab
15  earlier this week?
16      A  Yes, sir.
17      Q  And you were there when the throttle
18  screw was adjusted to the -- to the O2 level that
19  Mr. Gieck said he found it at when he came to the
20  property on February 2nd, 2015.
21      A  That's -- yeah. My understanding of that
22  exercise was that it was an attempt to replicate
23  Mr. Gieck's description of where the screw was.
24      Q  All right. And that -- was that based on
25  the O2 reading?

156

1      A  It was based upon both the number of
2  turns. And then I believe there was also an attempt
3  to replicate a -- an O2 reading.
4      Q  And do you recall what the CO reading when
5  it got to the O2 point that Mr. Gieck said he found
6  it at, which I believe was 2.1?
7      A  I don't recall the exact number, but I do
8  recall that it was excessive. It was over the
9  hundred parts per million limit.
10      Q  Was it closer to 300 parts per million?
11      A  I'd have to look back at my notes to say
12  for sure.
13      Q  Okay. Anything else that you can tell us
14  about Point No. 1 on the throttle screw position as
15  a limiting factor?
16      A  No. I think that's -- I think that
17  explores what I was state -- stating in No. 1.
18      Q  And no on-site testing replicating -- or
19  replicated the failure mode. What are you referring
20  to there?
21      A  Right. Well -- well, the ultimate failure
22  of the system, as described in the testimony and the
23  observations at the site, was that the vent pipe
24  separated, likely as -- likely, but not definitively
25  confirmed, as the result of a pressure excursion

072216js8/1/2016

157

1  causing the pipe to separate. We've never seen
2  that happen since then. There are two reports, at
3  least, of a pressure excursion happening while
4  investigators were present, but the vent pipe in
5  those situations was not reported to have separated.
6      Q   Which -- I'm sorry. Are you referring to
7  the inspection on February 6th -- was it, or -- was
8  it February 6th or -- or February 9th?
9      A   I don't want to say the date because I was
10 not there. But one of the -- one of the on-site
11 investigations that was performed prior to our
12 retention, there is data from the combustion
13 analyzer that includes a large peak in CO production
14 that is reported as being -- that is reported as
15 occurring at the same time as a -- as a pressure
16 excursion. So that's one.
17     And then if I recall correctly, I think
18 there may have been a description of one also
19 occurring at the very first round of testing at Jay
20 Freeman's lab, which I was not at.
21     Q   And under neither one of those scenarios
22 or neither one of those pressure excursion events
23 did the exhaust venting become detached?
24     A   That's my understanding. Correct.
25     Q   Point No. 3 where you talk about no data

158

1  on the tightness of the support bracket as a
2  limiting factor, why is that important?
3      A   Well, it -- No. 3 goes to our ability to
4  confirm or refute a thermal expansion hypothesis.
5  Any -- any time you have piping systems that are
6  changing temperature, whether they carry water or
7  steam or exhaust, those piping systems need to be
8  able to accommodate the thermal expansion of the
9  pipe as it heats and cools. There are a lot of
10 different ways to do that. However, that's all
11 limited by the fact that the pipe does have to be
12 able to move to a certain extent to accommodate that
13 mismatch.
14     So if all the clamps are very tight, you
15 can end up with a situation where the forces that
16 are generated due to the pipe's attempt to change
17 length can be substantial. They can be very high.
18 And because of the configuration of piping, I can't
19 say for sure whether those thermal expansion forces
20 would tend to force the pipe tighter together or
21 tend to force it apart unless I know how tight those
22 clamps are, because if the clamps are loose or
23 relatively loose, the pipe can move in the axial
24 direction, and if they're tight, the pipe can't
25 really move in that direction very much.

159

1      Q   These thermal expansion forces, are
2  they -- would they be sufficient to cause the --
3  the -- the pipe to -- to burst or to crack?
4      A   I -- I wouldn't characterize it as a
5  burst, but forces from thermal expansion can be very
6  significant, because regardless of how -- in this
7  case a pipe. If you have a section of the vent
8  pipe, and you fix it very firmly at both ends so it
9  can't move on either, and then you change the
10 temperature of the pipe, as the pipe warms up and is
11 attempting to get longer, right, if the ends are
12 very tightly fixed, you end up with high compressive
13 stresses within the pipe.
14     Similarly, if you take a pipe that's warm,
15 clamp the ends very tightly, and then allow it to
16 cool down, you will develop high tensile stresses in
17 the pipe. And I have seen situations where not just
18 polymer, but metallic pipes have been torn apart by
19 these thermal expansion forces because they are very
20 -- they can be very powerful.
21     Q   I see. Now, in a situation similar to the
22 Buckinghams' installation where if you assume that
23 where the pipe came apart -- for purposes of my
24 question --
25     A   Um-hum.

160

1      Q   -- assume where the pipe came apart that
2  that clamp that's on the Unistrut is tightened down,
3  and there's no support downstream from that clamp,
4  for my -- purpose of my hypothetical. Where would
5  you expect the thermal forces to have the most
6  impact?
7      MS. TIEDEKEN: Objection. Foundation.
8      A   It's not something that we can determine
9  very well at this point because in order to
10 determine what those forces would be we need to know
11 the temperature of the pipe at each location along
12 pipe. So we'd need to know what's the temperature
13 of the pipe to compute how much thermal expansion
14 took place, and then model the distribution of any
15 forces related to that and the clamping situation.
16     It's -- it's the kind of thing that we do
17 when we have enough data to support making a model
18 that -- that makes sense in the -- in the physical
19 world. But in the absence of having some sort of
20 data upon which to base our model, it's just a
21 guess.
22     Q   (By Mr. McGill) I see. But can you -- can
23 you say -- assume -- if you assume that both that
24 clamp where the joint came apart and the clamp
25 that's further upstream from it are both tightened

072216js8/1/2016

161

1    down, is there a direction that you would expect the
2    thermal expansion to take or would it expand in all
3    directions?
4        MS. TIEDEKEN: Objection. Foundation.
5        A    Thermal expansion in -- in a material for
6    the most part happens in all directions.  And the
7    extent to which thermal expansion takes place
8    depends on the material involved, the difference in
9    temperature, and the length of the dimension that
10   you're interested in.  In other words, we -- we
11   typically express thermal expansion in terms either
12   of a number per inch or a percent per inch -- I'm
13   sorry, a number per degree or a percent per degree
14   because the units are actually inches per inch per
15   degree.
16       So, for example, on -- on pipe like we
17   have here where the pipe is very much longer in one
18   dimension, the length dim -- the axial dimension
19   than it is in diameter, the thermal expansion will
20   necessarily be much more in the length dim --
21   dimension than in the diametral dimension.
22       Q    (By Mr. McGill) Right.  Okay.  What about
23   Point No. 4?
24       A    Point No. 4 I think goes back to something
25   that we already discussed, which was if we don't

162

1    know what the pressure is, either input to the vent
2    system as a whole or recorded at any specific
3    location of the vent system, we can't really compute
4    the forces that that pressure impulse is causing at
5    any location on the vent system.
6        Q    Point No. 5 talks about the difference in
7    the altitude between where Jay Freeman's lab is
8    located and the Buckinghams' residence, and then the
9    fuel air mixture.  Can you explain why that's a
10   limiting factor in your analysis?
11       A    Sure.  The available -- the availability
12   of oxygen to combust gas is one of the really
13   critical parameters in looking at how well and how
14   fast that gas will combust as well as what the total
15   energy output from combustion of that gas will be.
16       And the point that I'm trying to make
17   there is that conditions are necessarily different
18   because there's a difference in altitude.  And as to
19   how different those conditions are, I have -- I
20   haven't made or tried to make that calculation.
21       Q    Okay.  Then when you move to your opinions
22   and bases, I believe you've already testified about
23   4.1.
24       A    Yes, I've already testified about 4.1.
25       Q    4.2.

163

1        A    Opinion 4.2, let me turn to that.  Yes,
2    I've testified as to Opinion -- I've testified today
3    as to Opinion 4.2.
4        Q    Then with respect to both of those
5    opinions, do you have any criticisms of Triangle
6    Tube?
7        MS. TIEDEKEN: Objection. Foundation.
8        A    Neither of those opinions involves
9    Triangle Tube.
10       Q    (By Mr. McGill) Same can be said for 4.3?
11       A    That's correct.  4. -- Opinion 4.3 is not
12   relative to Triangle Tube.
13       Q    4.4.
14       A    Opinion 4.4 does address the boiler.  And
15   it -- in 4.4 I state that the evidence says that the
16   boiler was experiencing multiple delayed ignition
17   events or multiple pressure excursion events over
18   time.
19       Q    Um-hum.  You talk about in this opinion --
20   or you use the term multiple malfunctions over time.
21   Based on your testimony this morning, I'm -- I'm
22   much clearer as to what you meant there.  But just
23   for purposes of the record, when you use the term
24   multiple malfunctions over time, you're not
25   attributing that necessarily to Triangle Tube -- to

164

1    a defect in the Triangle Tube boiler?
2        A    I don't think that opinion necessarily
3    says there's a defect in the Triangle Tube boiler.
4    What that opinion is saying, if you, for example,
5    replaced the words multiple -- if you replace the
6    word malfunctions with pressure excursions over
7    time --
8        Q    Um-hum.
9        A    -- I think that's the point I was getting
10   at with that, and I think that's an -- an equivalent
11   statement.
12       Q    So is pressure excursions a better
13   description of what you were -- the -- point you
14   were trying to make there?
15       A    It's a different description.  I don't
16   know if I'd characterize it as better or not because
17   I don't know what other things might have been
18   happening with the boiler while it was still
19   installed at the residence because I didn't have the
20   opportunity to inspect it at the residence.
21       Q    Okay.  But there's a term -- when you use
22   the term malfunctions, are you equating that to any
23   specific defect that's identified in the boiler?
24       A    No.
25       Q    In 4.5 you talk about the boiler

072216js8/1/2016

165

1  exhibiting symptoms of delayed ignitions prior to
2  the incident. Again, the source of those delayed
3  ignitions, as you're using the term there, which I
4  don't believe is the -- is the ANSI styled use of
5  the term -- again, is that an opinion that's
6  relative to or a criticism of Triangle Tube or the
7  boiler?
8     A  It's relative to the boiler in that the
9  opinion deals with the boiler. I don't offer an
10  opinion as to whether the boiler was defective or
11  not. In other words, I'm -- I'm -- I was retained
12  by the vent manufacturer. I'm mainly concerned with
13  the downstream effects of whatever was going on in
14  the boiler; what -- what effect does that have on
15  the vent and the eventual separation of the vent.
16     Q  In 4.6 you talk about the excessive
17  pressure and the design of the -- the -- the vent
18  piping. First of all, can you explain for me how,
19  if at all, that's relevant to my client, Triangle
20  Tube?
21     A  I don't think that Opinion 4.6 is relevant
22  to Triangle Tube.
23     Q  Okay. Do you know whether or not the
24  DuraVent polypropylene vent system that was used on
25  the Triangle Tube boiler or those component parts

166

1  are tested for delayed ignitions?
2     A  I don't have any information to that
3  effect. I think you'd have to ask DuraVent that
4  question.
5        MR. LEWIS: Joe, let me interrupt a
6  second. We got to check out. Could we take a break
7  or something? Are you going to be much longer?
8        MR. McGILL: Let's go off the record.
9        MR. LEWIS: I'm sorry.
10        MR. McGILL: That's okay.
11        THE VIDEOGRAPHER: We are going off the
12  record at 12:47 p.m.
13        (Lunch break taken from 12:47 p.m. until
14  1:50 p.m.)
15        THE VIDEOGRAPHER: We are back on the
16  record at 1:50 p.m. Thank you, Counsel.
17     Q  (By Mr. McGill) Mr. Skaggs, in 4.6.2 of
18  your report -- are you there?
19     A  I am looking at that, yes.
20     Q  Could you explain to me the -- the units
21  of measure there. And, in particular, is the --
22  the -- the units of measure that you're indicating
23  there an operating pressure?
24     A  Are you talking about in Section 4.6. --
25  or in -- under Base 4.6.2?

167

1     Q  Yes.
2     A  Well, the units there -- the -- the
3  Canadian UL requirement is -- uses a pressure unit
4  called pascals, which is typically used as part of
5  the SI system or -- or metric measurements.
6  Pascals -- one pascal is a very low pressure. So I
7  wanted to put that into a context that -- that an
8  audience would understand better, which would be
9  the -- the psi reading. And as you can see there, a
10  hundred pascals is equal to 14,000s of a psi. It's
11  a very low pressure.
12     Q  Then in 4.6.4 you're talking about
13  pressure exerted on a clip, whatnot. Is it -- is it
14  true that the -- that the pressure is actually, in
15  effect, lower because it's working on a smaller
16  surface area?
17     A  I'm not sure that I follow your -- your
18  question there. The -- the pressure that's being
19  discussed would be the pressure wave that is the
20  result of an excursion within the -- within the
21  boiler system. And when that pressure acts upon an
22  area, that results in a force.
23     Q  Okay. And so is the force
24  determinative -- or is the amount of the force
25  determined by or in -- influenced by the surface

168

1  area that it's being exerted against?
2     A  Yes, it is.
3     Q  Okay. And did you factor that into your
4  analysis with respect to these pressure pulses that
5  were working on the DuraVent pipes?
6     A  Well, what -- like I have stated before,
7  we don't know the magnitude or the time duration of
8  these pressure pulses. We -- we surmised that they
9  happened based on testimony. Pardon me. I have a
10  little something in my throat.
11     Q  Take your time.
12     A  So we surmised that these pressure pulses
13  occur based on the testimony that's happened. As a
14  first order calculation, in other words, just an
15  order of magnitude guess, the question was if you
16  were going to apply that pressure or if you were
17  going to allow that pressure to force a joint to
18  separate on the basis of the static pressure alone,
19  the static pressure that would correspond to
20  44 pounds force applied across a 3-inch diameter --
21  which, again, this is a first order calculation.
22  The -- the outside diameter of the pipe is a little
23  different from 3 inches. But with regards to order
24  of magnitude, that's all this calculation is -- is
25  intended to represent. And I would say, okay,

072216js8/1/2016

169

1    that -- that would require about an 8 psi static
2    overpressure or an 8 psi pressure difference between
3    one side of the joint and the other.
4        Q    And that 8 psi pressure, is that -- in --
5    in your hypothesis is that considered a high degree
6    of pressure, a low degree of pressure?
7        A    For an uncontained system like this, in
8    other words, for one that is open to the atmosphere,
9    in order to generate a pressure pulse of 8 psi,
10   that's a very energetic event.
11       Q    Okay.  And let's stop there for a second.
12   When you're talking about an open system, again, can
13   you explain that in -- in kind of layman's terms?
14       A    Sure.  It's -- it's something that's --
15   that's essentially open to the atmosphere.  It's not
16   closed off.  So, for example, if you have -- if you
17   cap both ends of the pipe, then it would be a closed
18   system and it wouldn't exchange any air with the
19   outdoor -- with the outside environment.
20           But in this case, because the pipe -- or
21   the -- the vent pipe is open at the end of the
22   termination, you have to put a lot of -- in order to
23   reach a peak of 8 psi, that's a -- an -- a very
24   energetic event.
25       Q    Okay.

170

1        A    And -- and the -- the actual energy
2    depends on the -- the width of that pressure pulse.
3        Q    And so since it's an open system, in order
4    to hit this 8 psi level, it would have to be a
5    significant event, a loud delayed ignition.
6        A    That's -- that's how I interpret this
7    rough calculation that I made, yes.  It would have
8    to be a pretty significant event.
9        Q    And do you categorize what Mr. Buckingham
10   has testified to that he heard as that type of an
11   event?
12       A    I don't recall the exact words he used in
13   his testimony, but I do recall that when I read it,
14   I thought, wow, that does sound like a pretty
15   significant event.
16       Q    And since -- and so just based on
17   Mr. Buckingham's testimony and, I guess,
18   Mr. Schuler's -- what -- what -- well, do you recall
19   Mr. Schuler's testimony?
20       A    I recall that he testified hearing a loud
21   noise.  I don't remember how he characterized it,
22   though.
23       Q    Do you charac -- do you consider the --
24   the noise that Mr. Schuler described as sig --
25   significant or of the same magnitude that

171

1    Mr. Buckingham's describing?
2        A    Significant in magnitude.  I mean, that
3    sort of implies a measurement, and there really
4    isn't any measurement that's been applied to these.
5    But I would say that both of them have separately
6    described what I would consider to be an energetic
7    event, something that is outside normal operation,
8    for sure.
9        Q    And that energetic-type event has never
10   been able to be replicated on the Triangle Tube
11   boiler involved in this case?
12       A    I'm not aware of that event being
13   replicated in the same way.  I'm aware of two
14   pressure excursions that happened during
15   examination, but I don't recall those being
16   described as being that loud of an event.
17       Q    Could you turn to 4.7 of your opinion.
18       A    I will.
19       Q    Again, you're using the terminology here
20   malfunctioning of the boiler.  Could you just
21   confirm for me, when you're using that term, you're
22   not identifying or suggesting any defect in the
23   Triangle Tube boiler involved in this case.
24       A    I don't identify a specific defect in the
25   boiler.  My examination has been focused on the

172

1    effects on the vent pipe.
2        Q    Is there a reason that you -- you've
3    used -- I mean, other -- you've described earlier
4    your -- I think your thought process for using the
5    term malfunctioning of the boiler throughout these
6    opinions.
7        A    Sure.
8        Q    Is there anything that you can add to that
9    to provide further clarification as to why you --
10   you continually used that term, malfunction?
11       A    Because I believe that pressure excursions
12   of the magnitude that have been described are a
13   malfunction.
14       Q    You're not attributing any particular
15   conduct of Triangle Tube to that malfunction?
16       A    I do not opine as to the cause of the
17   delayed ignition events or malfunction or pressure
18   excursions, whichever you want to call them,
19   relative to the boiler.
20       Q    You've talked a lot about what I'll
21   characterize as data collection.  And in your report
22   you've noted several limitations on your ability to
23   collect data to formulate opinions in this case.
24       A    Yes, sir.
25       Q    Can you tell the jury why it's important

072216js8/1/2016

173

1    to have the ability to collect that data?
2        A    Well, the -- the practice of engineering
3    is based upon collecting and analyzing and
4    responding to real data.  And in my experience as an
5    engineer, as a person who has designed products, as
6    a person who has designed products that involve
7    combustion, no matter how carefully and accurately
8    we attempt to simulate any given situation, in the
9    absence of data that says what's going on in the
10    real world, we do not have the necessary information
11    to either develop a model that says this is what we
12    think the forces were, or should we develop the
13    model, we do not have the necessary information to
14    calibrate our model and tell ourselves whether it's
15    any good or not.
16        In my experience particularly with
17    combustion processes, when we start working with
18    textbook values or rule of thumb formulas or
19    anything that is not calibrated against some kind of
20    real world testing, we very quickly find ourselves
21    in situations that could be far outside what
22    actually happened.  And the only way to know that is
23    to know and measure what actually happened.
24        Q    Have you reviewed Dr. Cuzzillo's various
25    reports in this case?

174

1        A    I reviewed a number of them, yes.
2        Q    And do you believe that he's co -- in --
3    in your review of those reports, do you have an
4    opinion with respect to -- or belief with respect to
5    the data that he's collected in formulating his
6    opinions?
7        A    As -- as I've said before, I don't believe
8    that anybody has collected sufficient data to
9    understand what was actually going on inside that
10    boiler or inside the vent pipe while it was in
11    operation at the residence.
12        Q    And I know you gave us a -- very
13    detailed answer with respect to how you would
14    collect data for the vent pipe.  Do you have any
15    opinion or understanding as to what would be ne --
16    what data would be necessary to collect from the
17    boiler to solidify any -- any of these opinions?
18        A    Well, that's -- that's kind of outside the
19    scope of my engagement since I was engaged to talk
20    about the vent pipe, so I haven't given it a great
21    deal of thought.
22        Q    Okay.  And that problem with data
23    collection and the limitations that you mention in
24    your report, is that the -- the basis upon which you
25    come to your conclusion in 4.9 that the root cause

175

1    of the separation of the vent pipe is undetermined?
2        A    So am I understanding your question right,
3    you're asking is the absence of data one of the
4    things or -- or the reason why I say that the cause
5    of the separation is undetermined?
6        Q    Yes.
7        A    Yes.  The absence of data is -- is one of
8    the reasons --
9        Q    Okay.
10        A    -- that I say that.
11        Q    Other than the absence of data, what are
12    the other reasons that the root cause of the
13    separation of the vent pipe is undetermined?
14        A    Well, because we can't rule out the theory
15    that thermal expansion had a role to play, that
16    means that there is more than one theory that could
17    potentially explain the situation.  If you have more
18    than one theory, and you cannot eliminate one or --
19    one of them or more to leave yourself with one
20    theory that survives all of the tests of the
21    scientific process, then you have to say it's
22    undetermined.
23        MR. McGILL:  Can we go off the record for
24    just a second, please.
25        THE VIDEOGRAPHER:  We are going off the

176

1    record at 2:03 p.m.
2        (Break taken.)
3        THE VIDEOGRAPHER:  We are back on the
4    record at 2:06 p.m.
5        MR. McGILL:  Would you mark that.
6        THE COURT REPORTER:  Yes.  199.
7        (Exhibit 199 marked.)
8        A    Thank you.
9        MR. LEWIS:  Do we have copies?
10        MS. TIEDEKEN:  Did you give one to --
11        MR. LEWIS:  What's the number?
12        THE COURT REPORTER:  199.
13        (Exhibit 199 marked.)
14        Q    (By Mr. McGill) Mr. Skaggs, you testified
15    earlier that you were generally familiar with the
16    testing that may be done to certify a boiler for --
17    as a direct vent boiler.  Do you recall that
18    testimony?
19        A    I do.
20        Q    And could you identify for the record what
21    Exhibit No. 9 -- 90 -- 199 is, please.
22        A    Exhibit 199, Bates No. Triangle 006889, is
23    an Intertek Test Data Sheet.  It appears to have
24    been prepared by Ray Donhauser for a Prestige Solo
25    250 boiler.

072216js8/1/2016

177

1    Q    And of the tests that were performed that
2    are indicated on this sheet, does it indicate that
3    all those tests were passed?
4    A    It does indicate that all tests passed.
5         THE COURT REPORTER:  200.
6         (Exhibit 200 marked.)
7    A    Thank you.
8    Q    (By Mr. McGill) Sir, could you identify
9    Exhibit 200 for us?
10    A    Exhibit 200 is a document Bates
11    No. Triangle 006949.  It is an Intertek Test Data
12    Sheet, again prepared by Ray Donhauser for a
13    Prestige Solo 250 boiler.
14    Q    Do these two exhibits appear to be the
15    tests that would be performed to certify a boiler
16    for -- as a direct vent boiler?
17         MS. TIEDEKEN:  Objection.  Foundation.
18    A    These tests, based on what's printed on
19    the document here, appear to be tests conforming to
20    both the ANSI Z21.13 standard as well as the CSA 4.9
21    standard.
22    Q    (By Mr. McGill) Which are applicable to
23    direct vent -- vent boilers?
24    A    The CSA sta -- yeah, both are applicable
25    to direct vent boilers.

178

1    Q    And then on Exhibit 200, does it indicate
2    that of all the tests that were performed, that the
3    boiler passed?
4    A    All of the statements on the page are that
5    the boiler passed.
6    Q    Do you have any understanding or belief or
7    suspicions as to why the exhaust venting inside
8    the -- the termination fixture at the Buckingham
9    boiler became detached from it?
10         MS. TIEDEKEN:  Objection to form of the
11    question.
12    A    I haven't given it a great deal of
13    thought.  I would expect that the -- the direction
14    of the forces in the axial direction working to
15    separate, in this case, the pipe from the
16    termination kit or from the terminator, that could
17    have very similar causes as to the separation of the
18    vent pipe or not.
19    Q    (By Mr. McGill) In your work with boilers,
20    is it your understanding that fu -- that improper
21    fuel-air mixtures can cause delayed ignitions?
22    A    Yes.
23         MS. TIEDEKEN:  Objection.  Foundation.
24    A    That's my understanding.
25         THE VIDEOGRAPHER:  I'm sorry.  You both

179

1    were speaking at the same time.
2         MS. TIEDEKEN:  Objection.  Foundation.
3         THE VIDEOGRAPHER:  Thank you, Counsel.
4    A    I apologize for walking on your objection.
5    The answer is yes.
6         THE VIDEOGRAPHER:  Thank you.
7    Q    (By Mr. McGill) The vent termination that
8    I was referring to before that you just answered
9    about, is there a possibility that flue gas from
10    that defective termination could recirculate into
11    the combustion gas for the boiler --
12         MS. TIEDEKEN:  Objection.  Foundation.
13    Q    (By Mr. McGill) -- combustion air for the
14    boiler?
15         MS. TIEDEKEN:  And -- and to form.
16         THE COURT REPORTER:  I'm sorry.  The --
17    the end of your --
18         MR. McGILL:  Combustion air.
19         THE COURT REPORTER:  Thank you.
20    A    Termination.  So to understand your
21    question, you're saying if the vent -- if the
22    termination kit is improperly installed or if it's
23    the improper termination kit or both?
24    Q    (By Mr. McGill) No.  The question is if
25    the exhaust vent that travels through the center of

180

1    that termination kit is not properly seated in the
2    fixture itself and is leaking flue gas, could it
3    recirculate with the combustion air back to the
4    boiler?
5    A    If it were not properly sealed, then it's
6    possible it could, yes.
7    Q    And if flue gas is recirculating in the
8    combustion air for a boiler, can it cause it to run
9    rough?
10         MS. TIEDEKEN:  Objection.  Foundation.
11         MR. LEWIS:  Cause it to what did you say?
12         MR. McGILL:  Run rough.
13    A    It could.  If the -- if the mixture is too
14    far off from nominal operating parameters, it could
15    affect the operation of the boiler.
16    Q    (By Mr. McGill) And you recall seeing the
17    photographs from the law enforcement of the
18    termination at the Buckingham property where it
19    appears as though that gray pipe inside that fixture
20    is detached from its seating?
21    A    I have seen those photographs.
22    Q    Did the icicles that appear on the --
23    in -- in that photograph on that fixture lead you to
24    any conclusion?
25    A    I'd have to look at the photograph again

181

1    because I do not recall exactly where the icicles
2    were, aside from the -- you know, clearly leads to
3    the conclusion that it was cold outside.  But before
4    commenting further on that, I'd want to look at the
5    photograph.
6        MR. McGILL:  Those are all the questions I
7    have at this time.  Well, actually, let me say this.
8    I will pass the witness at this time.  Thank you
9    very much, sir.
10       THE DEPONENT:  You're welcome.
11       MS. MEAD:  I have some questions.
12       THE VIDEOGRAPHER:  If you could, please
13   pass the microphone.  Thank you.
14       MS. MEAD:  Thank you.  You don't want me
15   to yell into it?
16            EXAMINATION
17   BY MS. MEAD:
18    **Q    Mr. Skaggs, I'm Katherine Mead.  I**
19   **represent the Buckinghams.  As you, I'm sure, are**
20   **well aware, my clients are horrified that a good**
21   **friend of theirs just died in their house as a**
22   **result of a new boiler that they had put in less**
23   **than six months before -- or six weeks before her**
24   **death occurred.**
25        **So I'm going to ask you some questions**

182

1    **about your report in an effort to try to more**
2    **clearly understand before we go to trial what**
3    **happened.**
4        **One of the problems in this case that I**
5    **find is that all of you engineers use different**
6    **language about the same thing.  Sometimes the same**
7    **thing, sometimes not.  But the gradient can be quite**
8    **subtle.  So first I want to ask you about the**
9    **difference between a pressure transient and a**
10   **pressure wave.**
11    A    They are essentially the same thing.
12    **Q    Thank you.  Another thing I wanted to ask**
13   **you, you have referred repeatedly to pre -- pressure**
14   **excursions.  Are the -- is that the same as a -- a**
15   **pressure impulse?**
16    A    It can be.  The word impulse has to do
17   with the shape.  If you look at the -- the -- if you
18   plot pressure versus time --
19    Q    Um-hum.
20    A    -- impulse refers to that increase in
21   pressure that occurs across a relatively short
22   duration of time.  A pressure transient could also
23   be a change in pressure that occurs over a longer
24   time period, although I do not believe that that
25   happened in this case.

183

1    Q    Okay.
2    A    In other words, I believe that the
3    pressure excursions that I refer to that -- in the
4    context of what was happening in the boiler, in the
5    exhaust system, are equivalent to each other.
6    Q    Okay.  And detonation, pressure
7    detonations, what are those?
8    A    Okay.  That's a very different situation.
9    When you have materials that burn --
10   Q    Okay.
11   A    -- we refer to the rate at which the flame
12   front propagates through the material.
13   Q    Um-hum.
14   A    If the propagation of that flame front
15   occurs slower than the speed of sound in that
16   material, we will call that a deflagration,
17   typically.  It's -- it's a burning event that while
18   it can be very energetic, does not represent same
19   kind of shock wave that a detonation does.  In
20   instances where the flame front from combustion is
21   propagating through the material at speeds that
22   exceed the speed of sound.
23   Q    Okay.
24   A    So I would not necessarily characterize --
25   well, never mind.  I don't want to go any further

184

1    than that right now.
2    Q    With regards to delayed ignition, would
3    you characterize that as a detonation event?
4    A    Not necessarily.  I do not believe that
5    the data that's available allows us to make the
6    distinction as to whether that is a detonation or a
7    deflagration.
8    **Q    Okay.  It is not your position, is it,**
9    **that this piping, the DuraVent piping, would have**
10   **come apart in the ordinary day-to-day operations of**
11   **this Triangle Tube boiler?**
12    A    I'm going -- I'm going to state that as --
13   as a positive state rather -- instead.  I believe
14   that if the vent pipe had been installed properly
15   and if the boiler were operating under nominal
16   conditions that the vent pipe would not ever have
17   come apart.
18   Q    Okay.  Even without clips, correct?
19   A    I don't have an opinion as to whether the
20   pipe would or would not have come apart without
21   clips because an installation without clips is not
22   something that's -- that's contemplated by any of
23   the installation standards or instructions.
24   **Q    But you did do some testing -- pull**
25   **testing without clips, didn't you?**

072216js8/1/2016

185

1    A   I did a pull test on one joint without
2  clips, yes.  And based on the result of that one
3  test, the boiler, under normal operation, would not
4  develop the pressure necessary to cause that to
5  separate.
6    Q   Okay.  Great.  So if a person were to
7  order -- and maybe you don't have any expertise in
8  this area, but you can tell me if that's the case.
9  If -- if an installer were to order PolyPro piping,
10  do the clips come in the box with the piping?
11    A   I don't -- I don't think there's enough
12  information to say one way or the other.
13    Q   Okay.  Do you know if instructions come in
14  the box with the piping?
15    A   I -- I know that instructions should come
16  in the box with piping.  I don't know that they
17  always do.  And I don't know if they did in this
18  case.
19    Q   Okay.  Thank you.  So we've talked about
20  the clips.  And as I understand it, those are the
21  round rings with a clip attached to it that goes
22  under the -- is it the female side of the piping?
23    A   Yes, ma'am.  I understand the -- I
24  understand the part you're referring to.
25    Q   Yeah.  Oh.  And we've talked about clamps.

186

1    A   Yes, ma'am.
2    Q   And that is the clamp that is a screw-on
3  clamp; is that right?
4    A   Those -- those are what I've referred to
5  as the commercial style clamp.
6    Q   Commercial style clamps.  Okay.  Great.
7    A   And I believe that's the terminology also
8  in the Triangle Tube manual.
9    Q   Okay.  And clasps is probably not an
10  appropriate terminology for these connectors, is it?
11    A   I would say that's equivalent to the --
12  the clips that we've discussed.
13    Q   Okay.
14    A   If -- if I were to use the word clasp in
15  the context of this case, that is what I would be
16  referring to.
17    Q   Okay.  Great.  You can imagine my
18  confusion when everybody is using all the different
19  ones.
20       And you have testified that you reviewed
21  some of the Triangle Tube manuals.
22    A   Some of them, yes.
23    Q   Okay.
24    A   I -- I think -- to be more clear, I think
25  my testimony was I reviewed some of the -- Triangle

187

1  Tube's disclosure materials, but the manuals were
2  among the things that I referred --
3    Q   All right.
4    A   -- that I reviewed.
5    Q   And you needed to read those to learn that
6  the clamp that we discussed earlier was what was
7  suggested or recommended or required by Triangle
8  Tube?
9       MS. TIEDEKEN:  Object to the form and
10  foundation.
11    A   Based on my reading of those instructions,
12  the commercial style clamp was the only clamp style
13  approved for installation with -- with DuraVent
14  PolyPro vent piping on the Triangle Tube Prestige
15  175 boiler.
16    Q   (By Ms. Mead) Okay.  Great.  You mentioned
17  earlier that with regards to the testing that was
18  done at the -- at Jay's Lab, AEI, that you felt that
19  the pull test with the clips -- you didn't think it
20  was relevant or met the standards of a pull test.
21  Did you bring that up with Jay or Mr. Cuzzillo at
22  the time of the testing?
23    A   No.  I didn't see the reason to.
24    Q   All right.  Wouldn't you have wanted to
25  know what -- how much pull it took to affect the

188

1  integrity of that clip?
2    A   I would want to know that if I had any
3  information on the forces that were actually applied
4  to the joint --
5    Q   Um-hum.
6    A   -- while the system was in operation.  But
7  in the absence of that data, the only information
8  that a pull test like the one in the Canadian UL
9  standard tells us is whether it passes or fails with
10  respect to the pull test.  It doesn't tell us
11  anything about the performance of the system until
12  we know what forces were applied to the joint.
13    Q   Well, isn't the opposite true, then, if
14  you have a clip on a pipe, such as the one at the
15  Buckinghams' house, and let's just say it was
16  properly installed --
17    A   Sure.
18    Q   -- wouldn't -- wouldn't a pull test of the
19  strength of that clip give you information with
20  regards to what kind of forces it took to pull
21  apart?
22    A   I think it's safe to say that if the clip
23  is properly installed, and the components behave as
24  they did in whatever testing was done to certify it
25  at a UL 636 standard, that the answer to that would

072216js8/1/2016

189

1  be yes.  Then you would be able to bracket the --
2  kind of the lower bound of the force that might have
3  been applied to the joint.
4      **Q   Oh.  So with your understanding of the**
5  **parameters of this piping system, given the**
6  **hypothetical that -- at the Buckinghams' house, the**
7  **clips were properly installed in that pipe where it**
8  **came apart, what does that tell you about how much**
9  **pressure was in that pipe?**
10     A   Well -- well, first off, I -- I have to
11  reject the hypothet (sic) because I don't think
12  there's any data that tells us that all of those
13  clips were properly installed at the time because
14  they've been manipulated many times since then.
15     **Q   Oh, I'm just asking you to assume it for**
16  **the purposes of a hypothetical.**
17     A   Okay.  For the -- for the purposes of your
18  question, if those clips were properly installed,
19  and the rest of the system were properly installed,
20  then the pull testing done for UL 636 -- or, I'm
21  sorry, CUL 636 certification would establish a
22  reasonable lower bound for how much force it would
23  take to separate that joint.
24     **Q   And how much is that?**
25     A   The Canadian UL standard is for a

190

1  100 pounds dead weight pull test.  And the only
2  thing that is done on that test -- never mind that.
3  I'm speaking out of turn.  I think I've answered
4  your question.
5      **Q   Yes, you have.  Thank you.  I'm going to**
6  **pull up your -- I'd like you to take a look at your**
7  **Figure No. 7 in your report.  And I think you asked**
8  **a question -- or were asked a question about this**
9  **before, but I wanted to follow up with you.  See how**
10  **that reads Warning, avertissement.  Show off my**
11  **French.  It says, Risk of carbon monoxide, CO**
12  **poisoning, and risk of fire is --**
13     A   I believe --
14     **Q   I can't see what that says.**
15     A   -- that says, if improperly installed.
16     **Q   Okay, if improperly installed.  Follow all**
17  **cautions, warnings and instructions regarding**
18  **installation of the vent -- vent pipe system.**
19        **Do you think that warning is aimed at the**
20  **installer?**
21     A   I -- I think I testified before that I
22  don't -- I have not have an opinion as to the efficacy
23  of the warning labels.
24     **Q   I'm just asking you, plain English, do you**
25  **think it's aimed at the installer?**

191

1      A   Well, since it doesn't say to the
2  installer, I think it's -- it -- it could be
3  interpreted as being aimed at anybody who reads it.
4  The fact that it says follow the installation
5  instructions presupposes that you have the
6  installation instructions.
7      **Q   Um-hum.  Fair enough.  In your**
8  **Opinion 4.3, you indicate that, Wyoming Mechanical**
9  **should have shut down the boiler and advised**
10  **Buckingham of the unsafe condition when Wyoming**
11  **Mechanical became aware that the vent pipe had**
12  **separated.**
13        **Have I read that correctly?**
14     A   You did read that correctly.
15     **Q   All right.  And it's your impression that**
16  **Wyoming Mechanical did not advise the Buckinghams of**
17  **that unsafe condition?**
18     A   That is my understanding.
19     **Q   And that would have been a really easy fix**
20  **to this whole thing, wouldn't it?**
21     A   I might not say it in the same words.  But
22  I think that had Wyoming Mechanical made that
23  warning to the Buckinghams, and had the Buckinghams
24  heeded that warning, then the incident would not
25  have happened in the way it did.

192

1      **Q   All right.  Fair enough.  You indicated in**
2  **your testimony when Mrs. Tiedeken asked you a**
3  **question that installa -- the installation was**
4  **defective, and it may have been relevant in**
5  **Monica's -- Herrera's death, correct?  Do you**
6  **remember saying that?**
7      A   Yes, I do.
8      **Q   The malfunctioning of the triangle Tube**
9  **boiler may also have been relevant in Monica's**
10  **death, true?**
11     A   True.
12     **Q   Under your Opinion 4.6.4 -- I think you**
13  **answered this, but I wasn't sure that I understood**
14  **it completely -- you said based on the minimum**
15  **recorded separation force measured by you of**
16  **44 pounds of force without a locking clip, and**
17  **taking the outside diam -- diameter of the vent pipe**
18  **as 3 inches, Case, you, calculated the minimum**
19  **pressure required to displace the pipe from the**
20  **elbow to be in the order of 8 psi.**
21        **Now, my understanding from your subsequent**
22  **Table 1 is that 8 psi is a very significant figure**
23  **with regards to peak overpressure.  In your chart it**
24  **tells -- says that the maximum wind speed for 5 psi**
25  **is 163 miles per hour.  Then you go on to qualify**

072216js8/1/2016

193

1   that with your comment.  Could you explain that --
2   that comment to the jury, please.
3       A   Sure.  Let -- let me back up a little bit
4   because you -- you stated that -- you mentioned at
5   the start of this question talking about
6   Opinion 4.6.4.  4.6.4 is actually one of the bases
7   that supports Opinion 4.6.
8       Q   Okay.
9       A   So I just wanted to clarify that.
10      Q   Yep.
11      A   And then with respect to that, the comment
12  that I have on there, and I'll read it for the
13  record, it says, Blast overpressure from an
14  explosion and the pressure transient in an
15  open-ended pipe are not directly analogous to one
16  another.  However, despite the differences it is
17  instructive to consider that even, quote, low
18  overpressure on the order of a few psi can cause
19  high forces on elements of the system due to surface
20  area effects.
21      Q   So I take it because you included that in
22  your report, that you figure that even a few psi
23  could cause this piping to come apart --
24      A   Well --
25      Q   -- is that right?

194

1       A   -- what -- what I'm getting at with that
2   statement is that when you look at pressure, if you
3   want to talk about forces, you also have to consider
4   surface area.
5       Q   Um-hum.
6       A   So, for example, if you take that same
7   8 psi overpressure that I theoretically discuss
8   related to the exhaust pipe, and calculate a force
9   working to separate the exhaust pipe due to that 8
10  psi pressure in a 3-inch pipe, and then look, for
11  example, at the forces that would be applied, for
12  example, working to separate the combustion chamber
13  of the boiler which has a much bigger diameter,
14  those forces will be much higher.
15      Q   So the forces are higher in the pipe, is
16  that what you're saying?
17      A   What I'm -- what I'm saying is -- is that
18  if you want to talk about force and pressure, you
19  must also consider area.  Those -- those things are
20  in -- are inextric -- are inextricably linked to
21  each other.
22      Q   Okay.  And -- and that's sort of a good
23  segue or, as the politicians say, pivot.  Right?  So
24  if the --
25          THE VIDEOGRAPHER:  I'm sorry, Counsel.

195

1   You're covering your microphone up.
2           MS. MEAD:  Oh, I'm sorry.
3           THE VIDEOGRAPHER:  Thank you.
4           MS. MEAD:  Maybe it fell down.  There we
5   go.
6       Q   (By Ms. Mead) If the venting had not come
7   apart, and there had been a significant pressure
8   event, wouldn't another piece of the equipment blow
9   out if the piping didn't come apart?
10          MR. McGILL:  Objection.  Foundation.
11      A   I would have to say not necessarily.
12  Buckingham's testified that he heard sounds that are
13  indicative of an overpressure event or a delayed
14  ignition event.  And not every time that those
15  sounds were heard did something fall off of the
16  system or break on the boiler.
17      Q   (By Ms. Mead) Um-hum.
18      A   So a failure of any component in the
19  system is not a necessary result of an overpressure
20  condition.  However, given a high enough
21  overpressure condition, the weakest link in the
22  system would be the first thing to fail.
23      Q   Right.  And in this case, it apparently
24  was the DuraVent piping.  But if the DuraVent piping
25  in the hypothetical had been -- had been clamped

196

1   together property -- properly and it didn't fail,
2   something could have blown out, like -- just like
3   you just described in your description of the area
4   versus -- of the piping versus a larger area?
5           MS. TIEDEKEN:  Object to the form.
6           MR. McGILL:  Join.
7       A   With regards to the hypothetical question,
8   if the vent piping had been properly installed,
9   which it was not, and there were an overpressure
10  event that was of a low enough magnitude that it
11  wouldn't cause a stronger joint to separate, then,
12  no, the pipe would not have separated.
13      Q   (By Ms. Mead) Okay.
14      A   But that -- that presupposes a proper
15  installation, and it presupposes some pressure level
16  that we don't know what it was.
17      Q   Well, I guess you're just not going to
18  answer that question, so I'll move on.
19          You were concerned with the downstream
20  effect of what is going on with the boiler so you
21  didn't really have any opinions on whether the
22  Triangle Tube boiler was operating properly except
23  for pressure excursions; is that right?
24      A   That is correct.  That's -- that's what I
25  stated.

072216js8/1/2016

197

Q    Do you think it's foreseeable that Wyoming
Mechanical would have installed a boiler at the
Buckinghams' house improperly and illegally --
foreseeable by the Buckinghams?
        MR. LEWIS: Objection. Foundation.
        MS. TIEDEKEN: Objection. Foundation.
    A    I don't have any information as to what
the Buckinghams' expectation was, so I don't have
any -- any basis on which to answer that question.
    Q    (By Ms. Mead) Okay.
    A    I -- I think that -- well, let me -- let
me rephrase that. With the exception of that I -- I
think it is foreseeable and expected that an
installer of a system that is governed by code will
install the system according to code.
    Q    All right. And you -- are you aware of
whether Wyoming Mechanical obtained a permit for the
replacement boiler, the Lochinvar boiler that
replaced the double -- the Triangle T boiler?
    A    I have not checked to see if they obtained
a permit for that installation or not.
    Q    Okay.
    A    You were up there at the Buckinghams' home
for the regulator inspection, as I recall.
    A    I was for the removal of the --

198

    Q    Right.
    A    -- of the regulators. Yes, I was.
    Q    When you visited there, were you aware --
aware that those same regulators had been used since
this accident on the substitute Lochinvar boiler?
    A    I presumed so because they were still in
place on the piping at the time we arrived.
    Q    All right. Is a particular regulator
specified in the Triangle Tube manual for these
boilers?
    A    I don't believe so. I believe a -- a
specific input pressure and flow is specified.
    Q    So you would expect a propa -- propane
regulator to work with what other boiler it is used
with?
    A    I expect that a regulator has no knowledge
of what's downstream of it, so as long as the output
of the regulator meets the input specifications of
whatever it's connected to, then I would expect that
they would work together.
    Q    Okay. So you describe the malfunction in
the Triangle Tube boiler as an ongoing pattern of
behavior in your -- in your report. And you base
that on the testimony that you've read of the
Buckinghams, David Schuler, and -- I guess that's

199

it, Mrs. Buckingham, Mr. Buckingham, and David
Schuler?
        MR. McGILL: Objection. Objection. Form.
Foundation.
    A    Partially. I -- I also support that
statement with the number of observed ignition
cycles or the number of ignition cycles reported by
the boiler as well as the witness marks on the vent
piping itself.
    Q    (By Ms. Mead) Okay. The witness marks
suggested to you that there had been more than one
pressure event; is that right?
    A    Yes. That's an accurate way to
characterize that.
    Q    Okay. Are you aware of whether Triangle
Tube sent out bulletins to distributors warning of
problems with delayed ignitions?
    A    I am aware that there were bulletins that
were sent out involving delayed ignitions as well as
the design of the igniter. I have not reviewed all
of them.
    Q    Okay. Did you ever ask Jay Freeman or any
of the other parties in this case if they would turn
that boiler on and let it operate over a period of
time and put pressure transducers in the pipes to

200

measure the pressures?
    A    I did not.
    Q    Okay. But you think that that might help
to determine what the pressures were that may have
caused the venting to come apart?
    A    I think if that had been done while the
boiler was still installed and operational at the
Buckingham residence, it -- it might have resulted
in usable data. I think if that test were to be
done as the boiler was installed in -- in
Mr. Freeman's laboratory that the data would not
have been usable at that point because in all of the
testing that I witnessed, I never witnessed what
could be described as a delayed ignition or
overpressure event.
    Q    Um-hum. Your report indicates that that
boiler had been running for 1,100 hours since
installation, right?
    A    My report shows a photograph of the panel
on the boiler with an 1,100 hour run time indicated.
    Q    Right. Okay. With regards to the two
exhibits that Mr. McGill just provided you, 199 and
200, are you aware if there have been any changes in
the Triangle Tube boiler, Prestige Solo 250, since
2006 when this was approved -- when these were --

072216js8/1/2016

201

1    show that they were approved?
2       A   I have not looked into that at all, so I'm
3    not aware one way or the other.
4       Q   Are boiler systems anything like computers
5    in that, you know, they upgrade them very
6    frequently?
7          MR. McGILL:  Objection.  Foundation.
8       A   With regards to frequently, I do not know
9    the frequency of any particular boiler
10   manufacturer's updates.  Boilers -- modern boilers
11   are computer controlled.  They have firmware on them
12   that can be updated.  And I would expect that some
13   manufacturers would issue occasional updates.  I
14   would expect that other manufacturers might not.
15      Q   (By Ms. Mead) Okay.  Pretty sophisticated
16   equipment, though, these days, aren't they?
17      A   Well, I mean, it depends on what you put
18   them in comparison to.  If you com -- if you compare
19   a modern hydronic boiler, for example, to the oil
20   burning boiler that you might find in your
21   grandparents' home, yes, it's -- it's a much more
22   sophisticated device.  Compared to the space
23   shuttle, maybe less sophisticated.
24      Q   We'll hope so, hmm?
25          You testified that you did some work on an

202

1    explosion of a steam boiler.  It didn't involve CO,
2    but can you tell me a little bit about what caused
3    the ex -- explosion of that steam boiler?
4       A   In that particular case -- that was
5    insurance work that we were doing so it's not in the
6    legal record or anything like that.  That was a case
7    where an older steam boiler, a cast iron boiler, was
8    installed in a multifamily residence.  There was a
9    problem with the feed water coming into the boiler
10   and a malfunction in the water low level limit
11   switch that allowed the boiler to continue firing
12   when it should not have.  And so a part of the
13   boiler that should only have been filled with water
14   at 40 psi or so, whatever the incoming water
15   pressure was, that area, because the water level
16   dropped too low, it allowed that area to flash over
17   to steam which over pressurized the boiler, broke
18   out a portion of cast iron on the side of that
19   boiler, shot it through a wall, and -- and hit a
20   lady on the other side of the wall in the head.
21      Q   Jeez.  So -- and you -- you just have
22   characterized that as a malfunction, that wasn't a
23   defect?
24      A   I stated that that was a malfunction
25   of the incoming feed water valve combined with a

203

1    failure of the low water limit switch.
2       Q   Not a defect?
3       A   I -- I did not use the word defect.
4       Q   Okay.  Did you opine in that case that
5    there was a defect in that steam boiler?
6       A   We wrote a report for the insurance
7    company that described the failure essentially as
8    I've described it to you.
9       Q   As a malfunction?
10      A   As a malfunction --
11      Q   Okay.
12      A   -- of the boiler.
13      Q   All right.  So Mr. Cuzzillo has given us
14   an opinion that the DuraVent piping is defective.
15   What's your take on that opinion?  Or have you read
16   his reports, first of all?
17      A   I -- I have read them.
18      Q   Okay.
19      A   I do not believe that the DuraVent piping
20   when installed according to instructions and code on
21   a properly functioning boiler is a defective
22   product.
23      Q   All right.  Are there any other opinions
24   made by Mr. Cuzzillo that you don't agree with?
25      A   I'm sure there are.  I -- I only received

204

1    his most recent report within the last day or so,
2    and -- and I haven't had time to -- to completely
3    review that.  However, my review up to that point, I
4    believe that there's a lack of real data on which to
5    base the conclusions, and that many of them are
6    based on assumptions which are to this point
7    unproven.
8       Q   Okay.  Have you read Mr. Caggiano's
9    report?
10      A   Yes.  I have -- yeah, I've seen -- I've
11   read his report.
12      Q   Do you recall anything about his report
13   that you will disagree with when you're put on the
14   witness stand at trial?
15      A   I'd like to refresh my recollection of
16   that report before I answer that question.
17      Q   Well, I don't get a chance to redepose
18   you.  That's my problem.
19      A   Sure.  Well, if we can go off the record
20   for five minutes, I can look at it again.
21      Q   Well, maybe we'll do that before we end
22   here.
23      A   Sure.
24      Q   Okay?
25      A   Yeah.  That'd be fine.

072216js8/1/2016

205

1    Q    Similarly, have you read Mr. Freeman's
2    report?
3        A    I have read Mis -- did I read Freeman's
4    report?  I read Freeman's report, but it's been a
5    while since I read that one.
6        Q    So you would have the an -- same answer
7    that you -- if I asked you if you have any
8    criticisms of Mr. Freeman's report, do you want to
9    review it before you --
10       A    Yeah.  I -- I have not been asked to
11   critique Mr. Freeman's report previously, so I would
12   have to put some time and effort into that before
13   offering something.
14       Q    Okay.  Do you think that a homeowner would
15   have, you know -- strike that.
16           With regards to a case like this, you
17   know, a homeowner buys a boiler, they don't have any
18   knowledge of that boiler, they hire somebody to buy
19   them -- to get them a boiler, put it in.  With all
20   this stuff we're discussing, whether it's an
21   engineered system or not, do you think homeowners
22   have any idea about how their boiler system works
23   and whether it's put in properly when they hire
24   somebody to put it in?
25           MS. TIEDEKEN:  Objection.  Foundation.

206

1           MR. LEWIS:  Object to the foundation.
2           MR. McGILL:  Form.
3        A    I would expect that a homeowner who is
4    hiring a professional to install a piece of
5    equipment in their home, any piece of equipment,
6    would expect that professional to do their job, at
7    least to the minimum standards of the profession.
8    And if there are statutory or code requirements for
9    that, then I think the homeowner definitely can or
10   should be able to rely on the installer to meet
11   those statutory requirements.
12       Q    (By Ms. Mead)  Okay.  And further down the
13   line should the homeowner be able to rely on an
14   ostensibly reputable piping company to make sure
15   that the piping is -- is good enough for what it's
16   put in for?
17           MR. McGILL:  Foundation.
18       A    I'm not sure I follow your question.  Is
19   there any way you could be more specific about it?
20       Q    (By Ms. Mead)  Well, let's -- we'll start
21   with Triangle Tube.
22       A    Sure.
23       Q    The homeowner hires somebody to put in
24   their boiler.  And then the boiler is put in and it
25   has delayed ignitions that they are completely

207

1    unaware about -- of until they hear it.  Is there an
2    expectation in your industry that the homeowner has
3    some responsibility for that besides calling their
4    technician?
5           MR. McGILL:  Objection.  Form.
6    Foundation.
7        A    I -- I think that a homeowner has a
8    responsibility to ensure that the appliances in
9    their home are maintained.  Some home -- homeowners
10   may take that upon themselves.  Other homeowners may
11   hire somebody to do it.  But I think the homeowner's
12   responsibility is to ensure that the maintenance is
13   done, one way or the other.
14       Q    (By Ms. Mead)  Okay.  And if -- if they
15   call somebody and ask them to come and do the
16   maintenance and they don't come, that's on the
17   installer, right?
18           MS. TIEDEKEN:  Objection.  Foundation.
19           MR. LEWIS:  Foundation.
20           MS. TIEDEKEN:  Form.
21       A    I would say if I called somebody and said,
22   hey, I'm having this problem in my house, I want you
23   to come fix it, and they didn't show up, I probably
24   wouldn't call them again.
25       Q    (By Ms. Mead)  But in a case like this, if

208

1    you called somebody, you have indicated that you
2    would have told the -- or Wyoming Mechanical should
3    have told Buckinghams to shut it off, right?
4           MS. TIEDEKEN:  Objection.  Form and
5    foundation.
6        A    I have testif -- okay.  Now I'll answer.
7    I -- what I've testified is that I believe that
8    Wyoming Mechanical had the duty to inform the
9    homeowner, and that they did not do that.  And
10   then -- then you talked about me personally.  As --
11   as a professional engineer, the person with a
12   professional engineer's license, I have a -- a
13   highly enhanced duty to notify and warn the public
14   of any situation that I find that threatens the
15   public's health.
16       Q    (By Ms. Mead)  Do manufacturers of boilers
17   have that same obligation --
18           MR. McGILL:  Objection.  Foundation.
19       Q    (By Ms. Mead) -- if you -- if you know.
20           MR. McGILL:  Same objection.
21       A    I -- I think that manufacturers of
22   anything, be it a boiler, any device, any appliance,
23   they have the require -- they have the duty to
24   produce a product that performs its functions safely
25   when it's properly installed and running, and that

072216js8/1/2016

209

1  they have a duty to meet all of the applicable
2  standards and codes that are required.
3      Q   (By Ms. Mead) Do the -- are -- do those
4  standards and codes require informing the public of
5  problems that they might encounter with their
6  equipment?
7          MR. McGILL: Objection.  Form.
8  Foundation.
9      A   That's a very broad question, so I'm not
10 sure how I would answer it.  There -- there may be
11 some standards and codes that require that.
12     Q   (By Ms. Mead) You would --
13     A   I would have to -- I would have --
14     Q   You cited a lot of -- oh, excuse me.
15     A   I would have to go back and check the
16 standards that I've cited --
17     Q   Yes.
18     A   -- to see what they say with respect to
19 that because, for example, if -- if you make -- or
20 if a company made a toaster that generated exhaust
21 of some kind.
22     Q   Um-hum.
23     A   And the pipe that took the exhaust from
24 the toaster outside the house was broken, and the
25 toaster was, you know, dumping poison inside the

210

1  house, the company that makes the toaster has no way
2  to know that that pipe's broken.  So there are --
3  you know, there are details of that that depend on
4  an entity knowing that there's a problem.  And so
5  Triangle Tube or any other appliance manufacturer
6  can't address a problem unless they know there's a
7  problem.
8      Q   And you haven't read the many pages of
9  e-mails that we received from Triangle Tube
10 recently?
11     A   I certainly have not read all of them.
12 There's a lot of them.
13     Q   Okay.  All right.  I'll let you off on
14 that.
15         Are there other reasons for this pressure
16 pulse besides delayed ignitions?
17     A   Well, it does depend on the -- on the --
18 what we mean when we say the term delayed ignitions.
19 I understand from -- from other questions that you
20 know, there is a -- a specific definition that some
21 manufacturers use for delayed ignitions.  So when
22 you have pressure impulses, depending on what you
23 call a delayed ignition, they may or may not meet
24 that definition of delayed ignition, even if there's
25 still a pressure excursion or an impulse of one --

211

1  of one kind or another.
2      Q   What else would cause them besides what we
3  have described previously in this deposition as a
4  delayed ignition?
5          MR. McGILL: Objection.  Foundation.
6      A   In order to generate an impulse like that,
7  in the absence of -- well, let me rephrase that.
8          Off the top of my head I am not thinking
9  of anything that is not related to combustion and
10 ignition efficiency that would generate impulses
11 like that.
12     Q   (By Ms. Mead) Okay.  And that would
13 include pressure waves and pressure transients?
14     A   Right.  Right.
15     Q   Thank you.
16         MS. MEAD:  I don't have anything else.
17         MR. LEWIS:  I just have --
18         MS. MEAD:  Thank you very much.
19         MR. LEWIS:  I'm sorry.
20         THE DEPONENT:  You're welcome.
21              EXAMINATION
22 BY MR. LEWIS:
23     Q   Mr. Skaggs, have -- you said -- have you
24 read Dr. Cuzzillo's reports?
25     A   I have.

212

1      Q   Okay.  I think there are three.
2      A   Well, I was just going to say, I'm not
3  sure how many there are, and I think the most recent
4  one I received might have been the day before
5  yesterday.  So I don't know if there are any
6  furthers -- any further reports to be read.
7      Q   And that would -- that -- I think that was
8  dated Aug -- August 19th.  Is that consistent --
9      A   That sounds about right.
10         MS. MEAD:  July.
11     Q   (By Mr. Lewis) Okay.
12         MS. MEAD:  July.
13         THE COURT REPORTER:  Was there an
14 objection?
15     A   July 19th.  I'm sorry.
16     Q   (By Mr. Lewis) What did I say?  August?
17     A   You said August, and I agreed with you,
18 and both of us weren't thinking right, so I will --
19 I will amend my answer to say July 19th sounds like
20 about the right date.
21     Q   Okay.  Great.  Thanks.  Do you have --
22 what criticisms do you have --
23         THE VIDEOGRAPHER:  I'm sorry.  You were
24 covering your microphone when you started out.
25         MR. LEWIS:  Oh.  Okay.

072216js8/1/2016

213

1       THE VIDEOGRAPHER:  Thank you.
2       MR. LEWIS:  Okay.
3       Q   (By Mr. Lewis) You -- you testified a
4  short minute ago that you didn't agree with all the
5  data that Dr. Cuzzillo had -- I -- I think I'm
6  stating that right, that your criticism of
7  Dr. Cuzzillo's report was that you -- there is a
8  lack of real data in the report.
9       A   Yeah.  I -- I think I've answered that
10  question already, so maybe we could just go back in
11  the record and -- and refer back to that.  That was
12  one of the criticisms that I offered, though.
13      Q   Okay.  Well, just tell me -- we won't have
14  to go back through it.  Just tell me what you can
15  recall being the data that you --
16      A   Well, the -- the point that I was making
17  was that there is a lack of data upon which to --
18  to build a foundation for conclusions, and that
19  many of the conclusions appeared to be supported by
20  assumptions that had not been verified.
21      Q   Okay.
22      A   Beyond that, I am not offered -- or I am
23  not prepared to offer a complete critique of that
24  report today because I've not had the time to
25  prepare that and review it in light of all the

214

1  available data.
2       Q   To the extent that you can, can you tell
3  me what assumptions you think -- that you can recall
4  as you sit here he made that you think are
5  unsupported?
6       A   I -- I think that the assumption of -- and
7  I want to say a 250 psi maximum pressure was based
8  upon assumptions in the calculation that I don't
9  necessarily agree with.
10      Q   And what was the 250 psi?  What did that
11  refer to?
12      A   As I recall, Dr. Cuzzillo based that 250
13  psi upon a maximum achieved pressure in a closed
14  bomb test.  Open systems and closed bombs will
15  behave differently in combustion testing.  And that
16  it was -- and then a value -- that the value was
17  essentially arbitrarily doubled for whatever reason
18  to give a -- you know, whether that's an attempt
19  to give a conservative pressure or whatever.  I -- I
20  don't -- I don't agree with that methodology.  I
21  believe that you need to base conclusions like that
22  upon real data.
23      Q   Where -- where could I find the --
24  something that would describe 250 psi assumption as
25  being unreal data?

215

1       A   Well, it's difficult for me to say because
2  as I read the report, the -- the calculation and
3  the methodology behind that calculation was not listed
4  in the report.  So I don't have a -- I don't have a
5  place to tell you to go look at this.  I -- in a --
6  in a way that's an attempt to prove a negative.  I
7  mean...
8       Q   Well, I'm not trying -- and I'm not trying
9  to trick you.
10      A   Sure.  Sure.  I understand that.
11      Q   And I couldn't if I was trying to, I
12  don't think.  But I -- I'm just trying to understand
13  that -- what it is that -- that you disagree with
14  in -- in specifics.  Is that -- so you -- you gave
15  me the 250 psi.  Are there -- is -- are there others
16  that you can recall as you're sitting here, item --
17  data that you think is not real or that is assumed
18  and not established?
19      A   Well, like I said, that -- that was my
20  impression after an initial read through of the
21  report.  If -- if I'm to offer critique of that
22  report, I will need additional time to prepare that
23  critique since I only received it two days ago.  So
24  I -- I'm not prepared to -- to offer any other
25  comments on that now.

216

1       Q   What about Dr. Cuzzillo's depositions, did
2  you get an opportunity to read any of his
3  depositions?
4       A   Some.  But, again, it -- I believe the
5  last one was yesterday, and I've not had the
6  opportunity to go through that entire transcript.
7       Q   And I understand that, that you -- and you
8  weren't -- you weren't present during the -- his
9  deposition yesterday?
10      A   I was not, no.
11      Q   Nor did -- did anybody tell you what he
12  said?  Or let me ask that a different way.
13          Did -- did anybody come up to -- come to
14  you, and I mean specifically from the Waltz office,
15  and say, Dr. Cuzzillo said this in his deposition,
16  do you agree or disagree with that?  Did you have
17  that sort of a conversation with them?
18      A   No.  Not -- not with any specificity.
19      Q   Just in a general sense?
20      A   Yes.  In a general sense when -- when I
21  came in this morning Dick and Chris and I sat down
22  for a few minutes.  And how was your day?  And they
23  said, yes, we deposed Dr. Cuzzillo yesterday.  And
24  that was about the extent of the conversation.  They
25  didn't relay any of -- you know, we didn't converse

072216js8/1/2016

217

1    about the details of that deposition.
2        Q   And they didn't ask you to give an
3    assessment of -- of any particular aspect of whether
4    it was valid or invalid, true or not true?
5        A   They have not asked me to -- to provide
6    any such information.
7        Q   Harking back, then, to the deposition that
8    Dr. Cuzzillo gave in December of 2015 when your
9    client wasn't even a party -- or not your client,
10   but the people you -- who have retained you to
11   express opinions in this case, that is, the Waltz
12   firm, DuraVent wasn't even a party in December of
13   2015, nor was Triangle Tube.  Only Mr. and Mrs.
14   Buckingham and Wyoming Mechanical.  Do you remember
15   that deposition or did someone give you that
16   deposition to read?
17       A   I have read that deposition, but it was a
18   while ago.
19       Q   Do you have any recollection of -- any
20   data that was expressed by Dr. Cuzzillo in there to
21   support his opinion, data which you disagree with?
22       A   Not at this time, no.
23       Q   And then Dr. Cuzzillo gave -- actually had
24   a fairly long deposition.  I think -- believe it was
25   150 pages in June when we were in Oakland,

218

1    California, or Berkeley, Cali -- California.  And he
2    gave a deposition.  Have you had an opportunity to
3    read that deposition?
4        A   Yes.  I have read that deposition.
5        Q   And can you think of any data that was
6    expressed in there by Dr. Cuzzillo that supports his
7    opinions that you disagree with?
8        A   No.  And the reason I say no is because to
9    my knowledge there is no data upon -- on the
10   pressure characteristics from the subject boiler to
11   that vent tube under the conditions that existed
12   just prior to Miss Herrera's death.
13       Q   I'm sorry.  I didn't really follow what
14   you just said to me.
15       A   What I'm saying is that to my knowledge,
16   no party has any of the pressure data that's
17   necessary to understand what the forces that the
18   vent pipe in this installation, even though it was
19   improperly installed and all that -- we don't have
20   any data on what the pressure that was input to that
21   venting system is.
22       Q   Okay.
23       A   And so in the absence of that data,
24   assumptions -- any assumptions that have been made
25   by any party would need to be verified in some way.

219

1    The difficulty is that we no longer have a boiler or
2    a vent system that when put together and tested is
3    replicating the behavior that was found at the
4    Buckingham residence.
5        Q   As I understand, an assumption is to -- to
6    take as true, admitting it may not be, to an
7    establish -- to -- to test a particular proposition
8    as opposed to a conclusion where, saying, Okay, I --
9    I found this -- I found this in the -- in the boiler
10   when I examined it, I -- I read these reports that
11   said this and that, this and that, and then from
12   that I conclude.
13           So what I'm asking you, then, about is
14   conclusions, not any assumptions that were made --
15   he might make saying, Well, I assume anybody who
16   goes into a room with a machine that's making a
17   lot of noise has made a dec -- a terrible decision
18   and -- and it isn't surprising that they were
19   asphyxiated or some such stupid thing like that.
20   But -- and I'm not saying assumptions are stupid.
21   But I'm just saying they're different than
22   conclusions.  You would agree with me in that,
23   wouldn't you?
24       A   I would agree that assumptions are
25   different from conclusions, yes.

220

1        Q   And that's what I'm -- if you asked --
2    remember any data that Dr. Cuzzillo referred to that
3    was supported supported by data, whether it's data
4    you disagree with, in reaching a conclusion?
5        A   I'm not aware that there is data upon
6    which to support those conclusions.
7        Q   Okay.  Would you consider, for example,
8    the descriptions by Mr. and Mrs. Buckingham and
9    Mr. Schuler as to the sounds that they heard, over a
10   week or 10-day period, maybe two-week period, that
11   boiler was making, that it would be -- would that be
12   a fact that an engineer could make a valid
13   conclusion about?
14       A   Well, yes.  And -- and in the context of
15   what we've been discussing all day, I've stated in
16   my reports that what the Schulers -- or, I'm sorry,
17   what the Buckinghams have described and what is
18   described by Schuler and others is consistent with a
19   delayed ignition event.
20       Q   And --
21       A   While that -- while that is data, and I
22   agree with that, and -- and that some things can be
23   based on that, not all things can.  And I guess if
24   we're going to get more specific than that, then I
25   will need to --

**AGREN BLANDO COURT REPORTING & VIDEO INC>**

072216js8/1/2016

221

1    Q    To read it?
2    A    -- to look at a specific question in a
3  specific situation.
4    Q    And I appreciate that you want to be
5  cautious about your criticisms. And I -- and so --
6  and I -- but I guess where -- I'm probably not going
7  to get any farther with you because you do -- you do
8  want to be sure of yourself and the data that --
9  or -- that you -- the objections you make.
10    So I'll just leave this at one. Either
11  in his report or his conclusion -- or in his
12  depositions that you've read, can you recall now
13  any -- any conclusion he made based upon data that
14  you would accept as being if not true, probably
15  true?
16    A    Well, sure. And the example that you gave
17  is -- is a good one. I -- I believe that -- that
18  Dr. Cuzzillo has concluded in one or more of his
19  reports that there were delayed ignitions or
20  pressure excursion events taking place. I believe
21  that the testimony that we have represents data that
22  is consistent with that conclusion. So that's one
23  of the types of instances you've described.
24    Q    Okay. Did you read in Dr. Cuzzillo's
25  report that -- this is the latest report -- that

222

1  there is a maximum detonation pressure?
2    A    I read that statement in the report.
3    Q    Do you -- is it a statement you'd agree
4  with?
5    A    That statement in the report is not
6  supported with enough information about the
7  calculation or the closed bomb test that was
8  apparently used to support those numbers to make a
9  valid evaluation of it. In other words, if -- if
10  one makes an assumption as an engineer, which we
11  sometimes have to do -- you know, we assume
12  something specific and then we go do some
13  calculations. But if you're going to make
14  conclusions based on those assumptions, you have
15  to -- you have to go around and -- and verify
16  whether those assumptions are any good or not.
17    Q    Okay. And I -- I understand that. And
18  I -- but my question was -- is -- is there such a
19  thing as a maximum detonation press -- pressure
20  that's --
21    MR. REEVES: Object to form.
22    MR. McGILL: Join.
23    A    For -- for a given material that is
24  experiencing detonation, in a given closed bomb
25  configuration, as referred to Dr. Cuzzillo there

223

1  will be one. But that question also presupposes
2  that there was a detonation in the system. And as
3  I've discussed previously, I don't believe that
4  there's data that says yes, there was a detonation
5  or data that says no, there wasn't. I think you
6  have to consider both possibilities though.
7    Q    (By Mr. Lewis) The sounds they were
8  describing could -- that the witnesses -- the
9  Schuler -- or, excuse me, Mr. Schuler, Mr. and
10  Mrs. Buckingham are describing could have been
11  detonations, would you agree with that?
12    A    They could have been either.
13    Q    Would a deflagration by itself be
14  sufficient to separate the pipes as we know happened
15  in this case?
16    A    It could be, yes.
17    MR. McGILL: Objection. Foundation.
18    Q    (By Mr. Lewis) So that could be a def --
19  deflagration or a detonation, either one could do
20  that --
21    MR. McGILL: Same objection.
22    Q    (By Mr. Lewis) -- accomplish that?
23    MR. McGILL: Same objection.
24    A    Assuming that either of those events
25  generates the pressure necessary to overcome

224

1  whatever forces are retaining the joint in the
2  system, you know, even given that it was -- that
3  they weren't the right retaining clips and all of
4  that, if the pressure -- if whatever pressure
5  exceeds that, then -- then that's one of the
6  outcomes, yes.
7    Q    (By Mr. Lewis) Okay. I want to ask you
8  just a couple questions about thermal expansion,
9  which is --
10    A    Sure.
11    Q    Does -- a thermal expansion, I guess,
12  creates -- creates forces. Is that -- I don't know
13  if that's a very good way of describing it.
14    A    And the answer is not directly. Thermal
15  expansion creates a change in length of something.
16  If whatever thing that is experiencing a change in
17  length due to thermal expansion or contribution is
18  restrained in a way that limits its motion, then
19  forces will be developed.
20    Q    And those are the thermal forces -- forces
21  that you're --
22    A    Those -- those forces would be
23  attributable to thermal expansion.
24    Q    Are you familiar with the term free body
25  diagram?

072216js8/1/2016

225

1    A    Yes, sir.
2    Q    What is that?
3    A    A free body diagram is a tool that
4  engineers use to categorize all of the forces acting
5  on a particular body or system.
6    Q    Are you able to draw a free body di --
7  diagram?
8    A    Certainly.
9    Q    You could?
10    A    I can draw a free body diagram, yes.
11    Q    Okay. Would you do that for me?
12    A    What would you like a free body diagram
13  of?
14    Q    Well, why don't you -- why don't you --
15  would there be something that would be more
16  pertinent to what we're doing here than another?
17    MR. McGILL: Dave, can we take --
18    MR. LEWIS: How about the --
19    MR. McGILL: Dave, do you mind if we take
20  five minutes for the restroom?
21    THE VIDEOGRAPHER: We are going off the
22  record at 3:08 p.m.
23    (Break taken.)
24    THE VIDEOGRAPHER: We are back on the
25  record at 3:21 p.m.

226

1    Q    (By Mr. Lewis) This is a photograph that
2  we just visited about. You -- not you and I, but
3  Dr. Cuzzillo and -- and I, Migs. This is a -- do
4  you recognize this?
5    A    I do -- I recognize it.
6    Q    You were there. Were you -- you -- were
7  you in that -- that house that, Buckingham home?
8    MR. REEVES: And for the record --
9    A    I was not in the home --
10    Q    (By Mr. Lewis) Okay.
11    A    -- when this record was taken because it
12  shows a Triangle Tube Prestige boiler installed and
13  I was never in the home when there was a Prestige
14  boiler present there.
15    MR. REEVES: And just for the record, it
16  appears two pictures have been superimposed together
17  to provide a broader breadth of view at the time of
18  the, what, February 2nd -- or 6th, 2015, inspection.
19    MR. LEWIS: I can't -- I don't think
20  that's the case, but --
21    MS. LEWIS: February 9th, Jay Freeman.
22    MR. REEVES: February 9th. Okay.
23    MR. LEWIS: I -- I know, but in -- in --
24  what --
25    MR. McGILL: This -- this -- Bates --

227

1    MR. REEVES: Is there a Bates number?
2    MR. McGILL: If you look at the -- at the
3  bottom, the Bates line of the --
4    MR. LEWIS: Down here. So -- okay. So --
5    MR. McGILL: Yeah. You can tell it's two
6  photographs.
7    MR. REEVES: Yeah.
8    MR. LEWIS: It's an expansion.
9    Q    (By Mr. Lewis) But do you recognize the
10  run of the pipe as being basically what's been set
11  up in Jay Freeman's office a number of times?
12    MR. REEVES: Object to form.
13    MR. McGILL: Join.
14    A    I recognize that there is pipe there.
15  That configuration does not match what was set up in
16  Mr. Freeman's office. There is additional support
17  in this photograph that was not present during
18  our --
19    Q    (By Mr. Lewis) Okay.
20    A    -- during the examinations in Freeman's
21  lab.
22    Q    (By Mr. Lewis) That -- that -- it's --
23  it's a -- it's supported. So the question I was
24  having -- going to have with you -- or I just
25  asked -- my -- so just take this part of it of --

228

1  this piping comes and makes the curve. Can you make
2  a -- a free body diagram of that?
3    A    Of -- all right. So you're talking about
4  the section between this last piece of Unistrut
5  support?
6    Q    Yea. Just before -- before it makes the
7  turn and after it makes the turn.
8    A    Based on the available, I cannot.
9    Q    Okay.
10    MR. REEVES: And -- and just for the
11  record, you were -- plaintiffs' counsel was pointing
12  to the 90-degree elbow at issue in this litigation.
13    MR. LEWIS: The elbow --
14    MR. REEVES: That area.
15    MR. LEWIS: -- directly above the freezer.
16    MR. REEVES: Yep.
17    MR. LEWIS: And --
18    A    And -- and I gave an answer to your
19  question, and then I'm going to clarify that when
20  you're -- when you're ready for it.
21    Q    (By Mr. Lewis) Okay. Please do.
22    A    The reason that I cannot draw for you an
23  accurate free body diagram of that portion of the
24  system right now is because I don't know how tight
25  that clamp was because I never saw that clamp as it

AGREN BLANDO COURT REPORTING & VIDEO INC>

off

072216js8/1/2016

229

1  was installed at the home.
2      Q  We -- maybe -- maybe we can do something
3  about that because I'm going to show another one to
4  you.  Now, this -- I'll -- I'll represent to you
5  that this is a photograph that was taken by Jay
6  Freeman on February 9th in the Buckingham home.
7      MR. REEVES:  And for the record, it's File
8  Name 12400 JMF 2-176 PS.JPEG.
9      MR. LEWIS:  Exactly.
10     Q  (By Mr. Lewis) And can you by looking at
11 that draw that free body diagram for me?
12     A  Again, drawing a free body diagram
13 requires one to know the restraint conditions --
14     Q  Um-hum.
15     A  -- because restraints will apply a force
16 depending on how tight they are.  And I do not know
17 how tight that clamp is.
18     Q  Well, as -- assuming this -- if this is
19 clamped to the wall, I mean, that -- that is secure.
20 And this one does not appear to be clamped.
21     MR. REEVES:  And, Counsel, for the record,
22 can you state what "this" is, just so the record is
23 clear?
24     MR. LEWIS:  And that's a good point.
25     Q  (By Mr. Lewis) So the -- the --

230

1      MR. McGILL:  Why don't you show the
2  photograph.
3      A  Here.  Let's -- let's turn it around
4  and -- maybe so the jury can get a look at the
5  photograph.
6      Q  (By Mr. Lewis) Do you want to stand up
7  over here and you can point?  I think it --
8      A  I think -- can we -- this might work.  If
9  the --
10     Q  That way we can involve everybody.
11     A  That way I don't have to -- to hunch over
12 the whole table.  So did we have a question pending
13 or are you in the middle of it?
14     Q  Well, no.  I was just going to ask you if
15 you could draw a free body diagram of that -- of
16 that pipe section, assuming it was -- before it was
17 pulled -- pulled apart.  And if -- if there are --
18 are restrictions or exceptions that you need to take
19 in drawing it, make -- just make that clear.
20     A  Right.  As -- as I've stated previously,
21 unless I know how tight that clamp is, I cannot draw
22 an accurate free body diagram.
23     Q  Well, Jer -- Jay Freeman pulled it apart
24 with his hand, and so I -- presumably that gives you
25 an idea of the -- of the force that's -- that's

231

1  involved.
2      MR. REEVES:  Objection.
3      Q  (By Mr. Lewis) Does that give you any
4  assistance?
5      MR. REEVES:  Lack of foundation.  Or
6  Objection.  Foundation and form.
7      MR. McGILL:  Join.
8      THE VIDEOGRAPHER:  And, I'm sorry,
9  Counsel, if you're going to stand there, can I get
10 you to put your microphone back on, please.
11     MR. LEWIS:  Hello.
12     THE VIDEOGRAPHER:  Yes.  We can hear you
13 now.  Thank you.
14     Q  (By Mr. Lewis) Okay.  So let me see if I
15 can get to the --
16     MS. LEWIS:  It's fine, David.  It's
17 downloading.  I've downloaded this already.
18     MR. LEWIS:  I've got it.
19     Q  (By Mr. Lewis) Well, I don't know what
20 more I can say to you, then, that the -- that
21 Unistrut clamp is there and didn't have to be
22 loosened to pull the pipe apart.  And so with it --
23 it held in place, it was able to pull the loose part
24 a pipe -- apart.  Do -- do you agree with that
25 looking at it?

232

1      MR. REEVES:  It -- object to form.
2  Misstates the evidence.
3      MR. LEWIS:  Well, I'm not sure it does.
4  He can tell me if it misstates the evidence.
5      MR. McGILL:  Let him finish his objection,
6  please, Counsel.
7      MR. REEVES:  Well, it misstates the
8  evidence because there's a Gieck photo for which he
9  loosened the locking band for which you're asking
10 about the force.  So it misstates the evidence.
11     MS. TIEDEKEN:  Object to the speaking
12 objection to kind of clue your witness in to an
13 answer.
14     MR. LEWIS:  You know, I don't think this
15 is a difficult thing --
16     MS. TIEDEKEN:  Move that it be stricken.
17     MR. LEWIS:  I don't think this is a
18 difficult thing to answer.  And I'd -- if you
19 can't -- I mean, if you can make whatever provisions
20 or exceptions in draw -- in answering my question,
21 feel free to do it.  But I believe with what you
22 have there, you could answer the question I'm asking
23 you.  That's what I -- I think.
24     MR. REEVES:  Objection.  Argumentative.
25     MR. McGILL:  Join.  Also object, lack of

AGREN BLANDO COURT REPORTING & VIDEO INC>

072216js8/1/2016

233

1  foundation. Im --
2      MR. REEVES:  Join.
3      MR. McGILL:  -- improper form.
4      A   So the photograph that we have here shows
5  a pipe and a clamp on one end that is supported by
6  the Unistrut.
7      Q   (By Mr. Lewis) Right.
8      A   Correct?
9      Q   Um-hum.
10     A   And then it shows the other portion of the
11 vent pipe that is disconnected and is sitting on top
12 of the first.
13     Q   And it's -- it's been taken away from
14 there, as I represented to you, by Jay Freeman --
15     A   Okay.
16     Q   -- who pulled it apart on February 9th
17 and -- and set it up on top of the -- other
18 pipe.  And -- and so I'm just asking you if you can
19 look at that and tell me -- if you can tell me what
20 the -- the diagram is or the -- looking for the word
21 and I can't find it.  But show me where the forces
22 would -- would go on that pipe.  Is that a fair
23 way -- I mean, as the forces are coming up in a
24 thermal extension or a thermal stretching of that
25 pipe, where would the forces be going, if you can

234

1  just show me that?
2      MR. McGILL:  Objection.
3      MR. REEVES:  Objection.  Form and
4  foundation.
5      MR. McGILL:  Join.
6      A   Okay.  Okay.  Thanks for clarifying the
7  question that you're asking.  We're -- we're
8  discussing thermal expansion of the pipe at this
9  point.
10     Q   (By Mr. Lewis) Exactly.  Um-hum.
11     A   In general, because the pipes are so much
12 longer in the axial dimension than they are in the
13 diameter dimension, as we've discussed before, the
14 majority of force would be developed along the axis
15 of the pipe assuming that the pipe was not installed
16 in a way that allows it to accommodate for those
17 thermal expansion forces.  So the majority of the
18 force will be dir -- directed down the axis the
19 pipe.  However, when we have a situation like this
20 where there's a right angle, any forces acting along
21 the axis on one side of that right angle will also
22 tend to generate a torque on the components on the
23 other side.
24     We cannot put a magnitude of the forces
25 related to those right now because calculating the

235

1  forces that are generated by thermal expansion
2  requires knowing all of the restraint conditions in
3  the system which I do not know.  And it also
4  requires knowing the temperature distribution along
5  all of the components of that system, which we don't
6  have the data for.
7      Q   Okay.  And that -- but lacking that
8  precision, can you still talk about where the forces
9  are coming and how they're drawing down without
10 knowing how much the forces are?
11     A   I think I already answered that when I
12 said that the majority of the forces would be
13 directed along the axis of the pipe.
14     Q   Towards the -- towards the termination
15 point, correct, assuming the pipe on the right hand
16 is coming from the boiler?
17     A   Well, there -- there are many other
18 assumptions implicit in the statement that you're --
19 you're giving me right now.
20     Q   Okay.
21     A   Because as -- as I discussed before, a
22 pipe that is allowed to move, particularly in the
23 axial direction, to accommodate the thermal
24 expansion, when the pipe is not tightly restrained,
25 the pipe will move and does not tend to develop

236

1  forces of a magnitude that's -- will not tend to
2  develop forces.  The force is developed during
3  thermal expansion as a result of the restraint
4  conditions, and as a result of the temperature
5  change and the direction of the temperature --
6  temperature change.
7      For example, if you take something that's
8  very cold, and restrain it so that it can't get any
9  longer, and then allow it to warm up, very high
10 compressive -- compressive directed forces are --
11 are developed in the system.
12     Similarly, if it's allowed to become hot
13 and then restrained, then as it tend -- as it
14 contracts when it's cooling, it would develop
15 tensile directed forces.
16     But, again, particularly with thermal
17 expansion, those forces are developed in a system
18 that is restrained.  A system that is either not
19 restrained or restrained in such a way as to
20 accommodate the change in length that's necessary
21 through thermal expansion will not develop those
22 forces.
23     Q   And I -- but will -- you will -- will you
24 accept for me or will you not that that pipe on the
25 lower level of the two at the joinder there, that

072216js8/1/2016

237

1   that is held firmly against the wall by that
2   Unistrut bracket?
3          MR. McGILL:  Objection.
4          MR. REEVES:  Objection.  Lack of
5   foundation.
6          MR. McGILL:  Join.
7          MR. REEVES:  Form of question.
8          MR. McGILL:  Join.
9       A   We can post -- we can discuss
10  hypothetically what might happen if that joint were
11  tight, but I can't tell you from looking at it --
12      Q   (By Mr. Lewis) Okay.
13      A   -- if that joint is tight.
14      Q   Hypothetically if that joint were tight,
15  how would thermal expansion affect that -- the --
16  the taking of that pipe apart into two pieces at
17  that joint?
18         MR. REEVES:  Object to form.
19      A   Well, since --
20         MR. McGILL:  Join.
21      A   Since the pipe on the left side, this
22  short section that's part of the line --
23      Q   (By Mr. Lewis) Um-hum.  Right.  At the
24  elbow.
25      A   -- is -- is unsupported.  This -- this

238

1   center section, the straight run of pipe between the
2   two elbows, is unsupported and can move.  Because
3   the section of pipe that's shown as the straight
4   pipe here, between the place where, as you have
5   represented to me it is hypothetically firmly
6   supported right here --
7       Q   I want you to presume that it is.
8       A   On this side of the joint --
9       Q   On the right side.
10      A   -- presuming -- pre -- this would be the
11  left side of the joint as I'm looking at it.
12      Q   Oh, of the joint.  Okay.
13      A   On the left side of the joint, as I'm
14  looking at it, due to thermal expansion the forces
15  that would be generated in this area would be
16  minuscule because there's a very short length of
17  unsupported pipe in that direction.
18      Q   And where would the greater part of the --
19  of the expansion be -- or the -- the forces?  Would
20  they be on the pipe that's separated?
21      A   Well, from this -- would they be on the
22  pipe that's separated?  A pipe that is separated has
23  a free end.  And as a result of thermal expansion,
24  because the end is free the pipe can move and can
25  change in length to respond to thermal expansion,

239

1   and so it does not develop forces in the pipe due to
2   thermal expansion, because the free end can move to
3   accommodate the change in length that is required
4   as -- as part of thermal expansion.
5       Q   But if it's totally separated, the two --
6   if the -- if the looser pipe is separated totally
7   from the -- from the secured pipe, what forces
8   are -- are -- are moving that?  Aren't the forces --
9   aren't the forces moving that pipe away?
10         MR. REEVES:  Object to form.  Improper
11  hypothetical.
12         MR. LEWIS:  How do you know?
13         MR. REEVES:  Because I understand your
14  question.  And --
15         MR. LEWIS:  Okay.  Tell me what the
16  question is and do you know the answer?  When you
17  sit here and make these stupid objections that he's
18  not making.
19      Q   (By Mr. Lewis) And you understand what I'm
20  saying, don't you?  And if you don't, help -- help
21  me to ask you the question.
22         MR. REEVES:  Objection to form.
23      A   The way -- the way you're asking the
24  question, I do not understand what it is that --
25  that you're --

240

1       Q   (By Mr. Lewis) Okay.
2       A   -- trying to ask me.
3       Q   What separate -- assuming that the -- the
4   pipe on the right-hand side is held firmly by the
5   Unistrut --
6       A   Okay.
7       Q   -- and that the pipe on the left has been
8   pushed away from that by some sort of force coming
9   down that pipe, not a -- not an unnatural force like
10  somebody holding it apart, but that it was pushed
11  apart by thermal expansion.  So -- and so I'm asking
12  you, so where would the -- I want -- I don't even
13  know how to ask my question anymore.
14         So where -- what force is reacted upon the
15  separated part of the pipe?
16         MR. McGILL:  Objection to form.
17         MR. REEVES:  Object to form.
18      Q   (By Mr. Lewis) Where did they come from?
19         MR. McGILL:  Same objection.
20      A   Well, as -- as I've discussed in my
21  report -- well, let me back up.
22      Q   (By Mr. Lewis) I'm sorry.  Don't bother
23  with it anymore.
24      A   Okay.  Thank you.
25         (Discussion off the record.)

072216js8/1/2016

241

1           MR. LEWIS:  I don't know, do these --
2           THE COURT REPORTER:  Those are mine.
3           MR. LEWIS:  Let me get myself back in --
4     thanks, Mr. Skaggs.  That's all I have.
5           THE DEPONENT:  Okay.  You're welcome.
6                 EXAMINATION
7     BY MS. TIEDEKEN:
8        Q   Mr. Skaggs, I just have a few follow-up
9     questions with regard --
10          THE VIDEOGRAPHER:  Microphone is right
11    behind your --
12          MS. TIEDEKEN:  Oh, let me grab it.
13          THE VIDEOGRAPHER:  It's right behind
14    your --
15          THE DEPONENT:  Getting warmer, warmer,
16    warmer.
17          THE VIDEOGRAPHER:  There you go.
18          MS. TIEDEKEN:  Got it.
19          MR. McGILL:  There's a force working on
20    that.
21          MS. TIEDEKEN:  Okay.
22       Q   (By Ms. Tiedeken) Would you review
23    Exhibits 199 and 200 that you were provided by
24    Mr. McGill.
25       A   Yes, ma'am.  I have those in front of me.

242

1        Q   This Exhibit 199 pertains to the Prestige
2     Solo 250, correct?
3        A   That's how I interpret -- that's how I
4     interpret what's written on it, yes.
5        Q   Do you have an understanding that the
6     boiler in question is a Prestige Solo TriMax boiler?
7        A   Prestige Solo Tri -- the term I've
8     typically heard associated with this boiler are
9     Prestige Solo 175.  I -- it may be a TriMax, but I'm
10    not a hundred percent on that.
11       Q   Do you know what, if any, changes were
12    made to the jacket of the boiler between
13    September 22nd, 2005, when it was tested, when this
14    one shown on Exhibit 199 was tested, and the time
15    that the -- Wyoming Mechanical purchased the boiler
16    in question?
17       A   I haven't looked into that.  I have no way
18    to answer that question.
19       Q   So --
20       A   Or in other words, no.
21       Q   And then looking at Exhibit 199, can you
22    tell from this exhibit whether there was a leak test
23    performed on the jacket of the boiler?
24       A   I don't see a word on there that says leak
25    test.

243

1        Q   Can you tell if a leak test was required
2     to be performed on the jacket of the boiler from
3     Exhibit 199?
4        A   I would need to go back and -- and review
5     the Z21 and the CSA 4.9 standards to see if any of
6     those tests include the jacket leakage test.
7        Q   Okay.  And to see whether a jacket leakage
8     test was required?
9        A   Yeah.  I would need to go back and -- and
10    review to know that.
11       Q   Likewise, for Exhibit 200, which pertains
12    to a Prestige Solo 250, do you know what, if any,
13    changes were made to the Prestige Solo jacket --
14    boiler jacket between September 26th, 2005, when
15    this particular boiler was tested and the time that
16    Wyoming Mechanical purchased the boiler in question?
17       A   I do not know.
18       Q   And do you know if this Exhibit 200 shows
19    that leak testing was performed on the jacket of
20    this particular boiler depicted in 200?
21       A   I -- in the absence of the words leak
22    testing on there, I can't tell you that without
23    re-viewing the standards in relationship to the
24    tests that are listed.
25       Q   And -- Okay.  That's all I have on that.

244

1     Would you refer to Exhibit 130.
2        A   I can refer to it just as soon as I can
3     get it.  Okay.  I have Exhibit 130.
4        Q   Exhibit 130 is entitled Locking Bands,
5     Commercial Locking Bands and Clamps, correct?
6        A   That is the title on the document, yes.
7        Q   And it states underneath the title, Tips
8     to quickly identify and understand the differences
9     between the various locking bands and clamps used
10    with DuraVent PolyPro venting system, correct?
11       A   That's what it says, yes.
12       Q   If you look down in the left-hand corner,
13    it says, Revised November 13, 2014.  Do you see
14    that?
15       A   I see that as well.
16       Q   That is the very week that the boiler --
17    Buckingham boiler was installed, correct?
18       A   I believe that's the right time frame,
19    sure.
20       Q   Okay.  If you look at old style PPS-LB --
21    do you see that?
22       A   I do see it.
23       Q   Do you see the picture?
24       A   I do see the photograph.
25       Q   Is that the locking band style that was

072216js8/1/2016

245

1  installed by Wyoming Mechanical at the Buckingham
2  home?
3      A   That is -- that appears to be the type of
4  locking bands that were in place.
5      Q   And --
6      A   Yes.
7      Q   -- installed by Wyoming Mechanical?
8      A   Yes.
9      Q   Okay.  And -- and it states on here,
10  Production of this locking band ceased in the fall
11  of 2014.  While any remaining LBs you might have are
12  still approved for use, these locking bands are no
13  longer available from the factory.
14          Did I read that correctly?
15      A   Yes, you read that correctly.
16      Q   Do you understand that this Tips to
17  quickly identify and understand the differences
18  between the various locking bands is telling the
19  installer that the old style PPS-LB is still
20  approved for use on DuraVent PolyPro venting
21  systems?
22      A   Not necessarily, and here's why.  One, I
23  don't know if this document is provided to the
24  installer or if this is a marketing document that's
25  available on the Web site, so I don't know if an

246

1  installer would necessarily get this document when
2  purchasing things.
3          But assuming that an installer had
4  received this and -- and is reading this, even if
5  this says still approved for use according to the
6  Triangle Tube instructions that say when you have a
7  conflict between the Triangle Tube instructions and
8  any other instructions, use whatever is the most
9  prescriptive.  That's my word.  I think they use
10  whatever is more -- conservative I think is the word
11  that's in there.  But this document is not part of
12  an instruction set, so it's unclear as to whether --
13  as to how to handle that discrepancy between this
14  document and what's in the Triangle Tube
15  instructions.
16      Q   I would agree that it's unclear in how to
17  handle the discrepancy.
18          MS. TIEDEKEN:  Would you go back and read
19  my question.
20          (Page 245, Line 16 through Line 21, read.)
21      Q   (By Ms. Tiedeken) And as I -- I'm -- if
22  I'm understanding your answer, you don't know if
23  this -- these tips were directed towards the
24  installer, correct?
25      A   That's one of the things that is -- is

247

1  unclear about the question and the way that you
2  asked it.
3      Q   Okay.
4      A   Is that I -- I can't say for sure that
5  this was directed at the installer.
6      Q   But it does clearly state that the old
7  style PPS-LB are still approved for use, correct?
8      A   Those are the words that are on the
9  document, but I don't -- but I think that needs to
10  be clarified because in the United States you have
11  to consider the venting system in the context of the
12  appliance that it has been approved for use with.
13      Q   Okay.
14      A   So, for example, if I consider this
15  document in the context of the Triangle Tube
16  instructions that say only the commercial -- that
17  say only the commercial locking band is approved
18  with the Triangle Tube boiler, then I would parse
19  this to say that this -- this old style clip which
20  was not approved for the Triangle Tube boiler then
21  would still not be approved for the Triangle Tube
22  boiler after the change.
23          On some other kind of boiler for which the
24  PPS-LB clip had been approved at some point in time,
25  then this says to me that that would still be an

248

1  approved installation.
2      Q   I don't think you answered my question
3  again.  I know you want to give a little speech
4  about all that.  All I'm asking is does this
5  document say the old style locking bands are still
6  approved for use?  Is that what it says?
7          MR. McGILL:  Objection.  Form.
8  Argumentative.
9          MR. REEVES:  Join.
10      Q   (By Ms. Tiedeken) Go ahead.
11      A   The specific words that you refer to says,
12  While any remaining, capital, LB, apostrophe s, you
13  might have are still approved for use, comma, these
14  locking bands are no longer available from the
15  factory.
16      Q   Thank you.  And does LB -- is that an
17  acronym for locking bands, as far as you can tell
18  from this circular?
19      A   It would -- it would appear to be that,
20  yes.
21      Q   Okay.  Then if you go down to commercial
22  locking band, PPS-LBC, this Tips to quickly identify
23  and understand the differences between the various
24  locking bands and clamps used with DuraVent PolyPro
25  venting systems states that, This locking band is

072216js8/1/2016

249

1  part of our commercial products catalog.  Do you see
2  that?
3      A   I do see that.
4      Q   Was the installation at the Buckingham
5  home a commercial installation, in your view?
6      A   It was not installed in a commercial
7  setting, no.  It was installed in a private setting.
8      Q   And does this tips to quickly identify and
9  understand the differences state with regard to the
10 commercial locking band, PPS-LBC, This makes them
11 the ideal choice for use with old pipes without the
12 button tab and for customers that have run out of
13 old style locking bands?
14     A   I agree that it says that, yes.
15     Q   And so if an installer was reading this,
16 would it be fair to state an installer might assume
17 that you would use the commercial locking band if
18 you had run out of old style locking bands?
19         MR. McGILL:  Objection.  Form.  Assumes
20 facts not in evidence.  Foundation.
21         MR. REEVES:  Join.
22     Q   (By Ms. Tiedeken) Go ahead.
23     A   I think it's reasonable to assume that an
24 installer of the product would install the product
25 according to the directions that they're given.

250

1      Q   If the installer is told follow the in --
2  dir -- directions of the vent manufacturer, and the
3  vent manufacturer says use the commercial locking
4  bands if you have run -- if you have run out of the
5  old style locking bands, would it be fair to say
6  that the installer believed that the old style
7  locking bands should be used first, and then if you
8  run out of those then go to the commercial locking
9  band?
10         MR. McGILL:  Objection.  Foundation.
11         MR. REEVES:  Join.
12     A   I would hope that a competent -- that a
13 competent installer would interpret the instructions
14 in light of the system that they are installing on
15 as stated in the code requirement that says, Follow
16 the appliance manufacturer's recommendations.  And
17 granted the appliance manufacturers often say refer
18 back to some other catalog.
19         But the difficulty I'm having is that not
20 all installations of DuraVent pipe are the same
21 because different appliance manufacturers can
22 approve different hardware for use.  So when you
23 look at the instructions that's given to an
24 installer and what an installer should expect of
25 that, I think that if you assume that the installer

251

1  is a competent installer that they will interpret
2  those instructions in light of the codes and
3  standards that apply to the installation.
4      Q   (By Ms. Tiedeken) Well, my -- you know,
5  again you haven't answered my question.  My question
6  is if you  assume -- assume for purposes of this
7  questions that the installation manual for the
8  boiler says, Follow the vent pipe manufacturer's
9  instructions.  Let's assume that's true.
10     A   Okay.  We'll take that as a hypothetical.
11     Q   Can you assume that's true?
12     A   We'll take that as a hypotheticl.
13     Q   And the vent manufacturer says, Use the
14 commercial locking bands if you have run out of the
15 old style locking bands.  Let's assume that's true.
16     A   Assuming that both of those hypothets are
17 true, then --
18     Q   And so then the installer says, I still
19 have the old locking bands.  Would you use those
20 before you would go to the commercial locking band?
21         MR. REEVES:  Objection.  Lack of
22 foundation.  Improper hypothetical.
23     Q   (By Ms. Tiedeken) Okay.
24         MR. McGILL:  Objection.  Form.
25     Q   (By Ms. Tiedeken) Okay.  Go ahead.

252

1      A   Taking both of those hypotheticals as
2  true, that the appliance manufacturer would say
3  follow the DuraVent instructions, and assuming that
4  this were included as part of the instruction set,
5  then I think that the statement about the commercial
6  locking band that says this makes them the ideal
7  choice for use with old pipe without the button tab
8  and for customers that have run out of old style
9  locking bands -- I guess I could see it being
10 interpreted either way.  I could see an installer
11 saying, No, I still have the old style locking
12 bands, so I'll use those.  Or I could see an
13 installer saying, Well, if they had been approved
14 for use, then I'll just go ahead and use those.  So
15 I -- I think it's ambiguous assuming that the two --
16 the two statements upon which the question is
17 presumed are true.
18     Q   Okay.  Now, have you had a chance to look
19 at the new style PPS-LB2 which is identified in
20 Exhibit 130?
21     A   I have seen them, yes.
22     Q   And have -- do you have an opinion as to
23 whether the new locking -- the new style PPS-LB2 is
24 harder to pull -- or that was a bad start to the
25 question.

072216js8/1/2016

253

1    **Do you have an opinion as to whether the**
2    **DuraVent piping with use of a new style PPS-LB2 is**
3    **harder to pull apart than the old style PPS-LBs?**
4        A    I don't have an opinion on that either
5    way.
6        Q    **Okay. Have you seen the DuraVent**
7    **literature which talks about approval of the PPS-LB2**
8    **where they talk about we pulled it every which way,**
9    **and even up to 200 pounds it wouldn't pull apart?**
10        A    I have read those e-mails that state that
11    the -- that the -- the different clamp provides a
12    greater retention force. I do not recall off the
13    top of my head whether that e-mail was referring to
14    the PPS-LB2 clamp or the PPS-LBC clamp. I would
15    need to review it to refresh my memory on that.
16        Q    **If you assume it refers to the PPS-LB2**
17    **clamp, is it your opinion, then, that that clamp**
18    **would offer more resistance than the PPS-LB clamp?**
19        A    Do you mean resistance to --
20        Q    **Pulling apart.**
21        A    -- a force trying to separate the -- the
22    two?
23        Q    **Yes.**
24        A    If -- if they had been tested and it --
25    and that was the result of the testing, then, yes.

254

1        Q    **Okay. You read Mr. Caggiano's report,**
2    **correct?**
3        A    I have seen it. I read it. My
4    recollection of that report is not great at the
5    moment --
6        Q    **Do you re --**
7        A    -- but, sure.
8        Q    **Do you recall -- and Mr. Caggiano is the**
9    **consultant for Triangle Tube, correct?**
10        A    That's my understanding, yes.
11        Q    **Do you recall Mr. Caggiano saying anything**
12    **about Wyoming Mechanical using the old style PPS-LB**
13    **locking band instead of a commercial locking band,**
14    **PPS-LBC?**
15        A    I don't recall.
16        Q    **Would you have expected the Triangle Tube**
17    **consultant to mention that if that was an issue with**
18    **regard to Wyoming Mechanical correctly following the**
19    **Triangle Tube instructions?**
20        MR. McGILL: Objection. Form.
21    Foundation.
22        Q    **(By Ms. Tiedeken) Okay. Go ahead.**
23        A    Would I have expected that that was an
24    issue.
25        THE DEPONENT: I -- I'm sorry. Could you

255

1    read that back. I was thinking about the question
2    and lost the specific words of it.
3        (Page 254, Line 16 through Line 19, read.)
4        MR. McGILL: Same objection.
5        A    I would expect the consultant to be
6    knowledgeable about their products.
7        Q    **(By Ms. Tiedeken) And if Wyoming**
8    **Mechanical hadn't used the correct locking band, you**
9    **would have expected Mr. Caggiano to note that in his**
10    **report, correct?**
11        MR. McGILL: Same objection.
12        A    And I would say not necessarily because it
13    depends on whether he is -- well, let me -- the
14    complaint in this case talks about the old style
15    clamps. And so if he's responding to the statements
16    in that complaint, then I would expect him to talk
17    about those clamps.
18        At the same time, I think that yeah,
19    the -- the -- the Triangle Tube representative
20    should know the parts that are approved for use with
21    the system.
22        Q    **(By Ms. Tiedeken) And you read the**
23    **DuraVent Rule 30(b)(6) deposition. And I forget his**
24    **name. Who is the DuraVent witness?**
25        MR. REEVES: Bertler.

256

1        Q    **(By Ms. Tiedeken) Bertler. Help me out.**
2        A    Matthew Bertler.
3        Q    **You read Mr. Bertler's deposition,**
4    **correct?**
5        A    I did.
6        Q    **And Mr. Bertler did not know which style**
7    **locking band was approved for use with Triangle Tube**
8    **product even months after DuraVent had been sued,**
9    **correct?**
10        MR. McGILL: Objection. Form.
11        A    That's what I -- that's one of the things
12    I took away from that deposition, yes.
13        Q    **(By Ms. Tiedeken) So is it any surprise**
14    **that Ferguson Enterprise had no idea that the old**
15    **style PPS-LB locking band was not appropriate for**
16    **use in the Buckingham installation?**
17        MR. McGILL: Objection. Form.
18    Foundation.
19        MR. REEVES: Join.
20        A    I wouldn't expect Ferguson Enterprises to
21    know either way which parts are approved for which
22    boilers.
23        Q    **(By Ms. Tiedeken) A recognized dealer of**
24    **Triangle new -- products, you wouldn't expect them**
25    **to know what was approved for use with the product?**

072216js8/1/2016

257

1     MR. McGILL:  Same objection.
2     Q   (By Ms. Tiedeken) Is that your testimony?
3     MR. REEVES:  Join.
4     MR. McGILL:  Same objection.
5     A   Well, a dealer -- and I guess -- here's --
6  and I'm not trying to be evasive.  I'm trying to
7  answer your question -- your question correctly.
8  But within a com -- within a distributor like
9  Ferguson that distributes things like boilers, there
10  will be people who specialize in those boilers, and
11  then there may be people behind the front counter
12  at, you know, one of the Ferguson branches who's
13  there to fill orders.  So it depends on the person
14  who's looking at that information.  And if a -- if
15  somebody like a Wyoming Mechanical, or any other
16  installer, for that matter, makes an order to
17  Ferguson, I don't necessarily think that -- that
18  Ferguson would know that, oh, these are all supposed
19  to go together because they may not.
20     Q   (By Ms. Tiedeken) How familiar are you
21  with the Ferguson Enterprises store in Jackson Hole,
22  Wyoming?
23     A   I have not been to that store.
24     Q   Do you know how many employees they have?
25     A   I do not know how many employees that

258

1  branch has.
2     Q   Do you know who Stephen Gieck dealt with
3  when he ordered the PolyPro piping for the
4  Buckingham installation?
5     A   I do not know who Gieck spoke with.
6     Q   And you don't have any idea of that
7  person's qualifications?
8     A   No, I don't.
9     Q   Okay.  You have indicated that you've seen
10  the 28,000 figure on the Triangle Tube boiler and --
11  you know what I'm talking about?
12     A   The -- the number of ignition cycles
13  counted by the boiler?
14     Q   Yeah.
15     A   Is that what you're referring to?  Yes.
16     Q   The question I have, is that 20 -- does
17  that $28,000 -- 28,000.  Does that 28,000 figure
18  apply to successful ignitions or spark impulses?
19     A   I do not know.
20     Q   You've testified a couple times during
21  this deposition that Wyoming Mechanical testified
22  that they never read the manual, the Triangle Tube
23  manual.  Where do you get that information from?
24     A   I think -- I think I referenced that in my
25  report, so I'll refer back to that.

259

1     Q   Okay.  Show me in your report.
2     A   And if it's not there, then I think it
3  was -- it would have been in the deposition of the
4  fellow who did the installation, whose name I don't
5  recall off the top of my head.  I was wrong.  I did
6  not refer to that by chapter and verse in my report.
7     Q   And so you're referring to Aaron
8  McCormick's deposition?
9     A   That may be right.  I think --
10     Q   He's the individual who was the journeyman
11  plumber who installed the Buckinghams' boiler.
12     A   Okay.  I can acc -- I can accept that
13  that's who he is, sure.
14     Q   What's your understanding of how many
15  Triangle Tube boilers Aaron McCormick had installed
16  prior to the time of the Buckinghams' boiler?
17     A   I do not know how many Triangle Tube
18  boilers he had installed prior to the time.
19     Q   What's your understanding of whether prior
20  to the Buckingham install -- installation when he
21  had installed prior Triangle Tube boilers, whether
22  he read the instruction manuals or not?
23     A   My understanding is that he hadn't read
24  the instruction manuals.
25     Q   Where do you get that from?

260

1     A   Like I said, that's -- that's my reading
2  of -- of the -- of his deposition.
3     Q   Okay.  And you don't have anything you can
4  point me to in his deposition where Aaron indicated
5  that he had never read a Triangle Tube installation
6  manual?
7     A   Not without referring back to it, no --
8     Q   Okay.
9     A   -- and going through it.
10     Q   If you were the first one on the scene to
11  investigate what had occurred in the Herreras' --
12  with regard to Mrs. Herrera's death, and you wanted
13  to document the location of the throt -- throttle
14  screw when you got there, how would you go about
15  documenting that?
16     A   If I were the first person on the scene,
17  and I wanted to document the location of the
18  throttle screw, most likely I would take a
19  photograph.
20     Q   Okay.  Is -- is it your understanding
21  that's what Dave Gieck did?
22     A   I believe Gieck did take photographs.
23     Q   So he did the same thing you would have
24  done if you were the first one on the scene,
25  correct?

072216js8/1/2016

261

1    A    According to his testimony, yes.
2    Q    It's my understanding that you don't have
3    an opinion whether the multiple malfunctions of the
4    Buckingham boiler were caused by a product defect,
5    correct?
6    A    That's correct.
7    Q    If, in fact, the multiple malfunctions of
8    the Buckinghams' boiler was caused by a product
9    defect, and you assume that be -- to be true, and
10    you also assume to be true the fact that Triangle
11    Tube knew there was such a defect in their boilers
12    since approximately mid-2012, do you have an opinion
13    as to whether Triangle Tube should have provided a
14    warning to the public and to its installers of that
15    defect?
16        MR. McGILL: Objection. Form.
17    Foundation. Improper hypothetical.
18    A    Assuming that Triangle Tube had a -- some
19    sort of an issue with the product that they knew
20    about that made the product likely to malfunction,
21    then I believe they should have taken steps to
22    address whatever the de -- whatever that
23    hypothetical defect in the product is.
24    Q    (By Ms. Tiedeken) My question was do you
25    think they had a duty to warn the public about that

262

1    defect if they, in fact, were still distributing
2    that product with a known defect?
3        MR. McGILL: Objection. Foundation.
4    A    I think a company that sells a defective
5    product has a liability for the results of those
6    defects.
7    Q    (By Ms. Tiedeken) Do you have an opinion
8    on whether a company who know -- has a known defect
9    in their product, which is a known safety issue,
10    should -- whether they should continue to distribute
11    that product?
12        MR. McGILL: Objection. Form.
13    Foundation.
14    A    My opinion is that they should not.
15    Q    (By Ms. Tiedeken) If Triangle Tube had not
16    distributed their boilers with a known safety
17    defect, it -- it would have never been installed in
18    the Buckingham home, correct?
19        MR. McGILL: Objection. Form.
20    Foundation.
21        MR. REEVES: Join.
22    A    Okay. Going back to the hypothetical, if
23    the -- if the boiler had a known safety defect,
24    which is a hypothetical situation that I don't have
25    an opinion on -- if that boiler has a defect that

263

1    renders it unsafe for use, then it should not be
2    allowed to enter the stream of commerce.
3    Q    (By Ms. Tiedeken) Would you agree that
4    boilers which have a delayed ignition problem --
5    ongoing problem in -- where the boi -- the delayed
6    ignitions are described as explosions and backfires
7    and bangs is a safety hazard?
8        MR. McGILL: Objection. Form and
9    foundation.
10    A    I would characterize that as potentially
11    a -- a hazardous situation, yes.
12    Q    (By Ms. Tiedeken) And a boiler with such a
13    known safety hazard should not be allowed into the
14    stream of commerce, correct?
15        MR. McGILL: Objection. Form.
16    Foundation.
17    A    I think I just testified to that effect a
18    question or two ago. Yes.
19    Q    (By Ms. Tiedeken) David Gieck has
20    testified that he was unaware of the Triangle Tube
21    problems with delayed ignitions prior to
22    Mrs. Herrera's death. Do you have any reason to
23    disagree with that testimony?
24    A    I have no way of knowing what Mr. Gieck
25    did or didn't know prior to Mrs. Herrera's death.

264

1    Q    So you have no way to disagree with him
2    that he -- he was unaware that Triangle Tube was
3    having a delayed ignition problem?
4        MR. McGILL: Objection. Foundation.
5    A    Yeah. I have -- I have no information on
6    which to base such a -- such an assumption.
7    Q    (By Ms. Tiedeken) I'd like to refer you to
8    Page 14 of your report.
9    A    Of my report, yes, ma'am. I am on
10    Page 14.
11    Q    Your Opinion 4.3 states, Wyoming
12    Mechanical should have shut down the boiler and
13    advised Buckingham of the unsafe condition when --
14    when Wy -- Wyoming Mechanical became aware that the
15    vent pipe had separated.
16        And you cite as a basis for that opinion a
17    portion of the International Fuel Gas Code, which is
18    part of an appendix, correct?
19    A    That is correct.
20    Q    If I'm understanding your report, the
21    appendix is not a mandatory part of the code, but a
22    guideline, correct?
23    A    I don't know that I'd call it --
24    necessarily call it a guideline because I don't
25    recall if the code calls it a guideline. The code

072216js8/1/2016

265

1   does call it nonmandatory.
2       Q   Well, and the part you've actually cited
3   says, The following procedure is intended as a
4   guide --
5       A   That's what it says.
6       Q   -- correct?
7       A   Yes.
8       Q   Okay.  So the code does not require
9   installers who are called by their customer with a
10  problem to give any particular warnings to them,
11  correct?
12      A   I don't believe that's stated in the
13  International Fuel Gas Code, except in Appendix D,
14  which is a nonmandatory part of the code, correct.
15      Q   So I take it it's your opinion -- your
16  personal opinion that Wyoming Mechanical should have
17  shut down the boiler and advised Buckinghams of the
18  unsafe condition, correct?
19      A   That is my professional opinion.
20      Q   Okay.  And you -- you're basing that
21  professional opinion on what?
22      A   I'm basing my professional opinion on the
23  fact that Wyoming Mechanical knew that the situation
24  was potentially hazardous, and that, therefore, they
25  should have warned the Buckinghams that that was a

266

1   hazardous situation and needed to be dealt with
2   immediately.
3       Q   The -- David Schuler was an employee of
4   the Buckinghams, correct?
5       MR. McGILL:  Objection.  Foundation.
6       A   I'll say David Schuler worked for the
7   Buckinghams.  I don't know if you're asking about a
8   legal definition of employer or not.  But he worked
9   for the Buckinghams, yes.
10      Q   (By Ms. Tiedeken) And he got a free
11  place to live in exchange for his care-taking
12  responsibilities, correct?
13      A   That's my understanding, yes.
14      Q   And is it your understanding that David
15  Schuler was well aware that when the vent pipe came
16  apart, it was a dangerous situation because --
17      MS. MEAD:  Objection.  Form.  Misstates
18  the testimony.
19      MS. TIEDEKEN:  I'm -- I'm not done with my
20  question.
21      MS. MEAD:  Oh, sorry.
22      Q   (By Ms. Tiedeken) Okay. is it your
23  understanding that David Schuler was well aware that
24  when the vent pipe came apart it was a dangerous
25  situation because the fuel gas -- the products of

267

1   the fuel gases had carbon monoxide into it that
2   would spill into the garage?
3       MS. MEAD:  Objection.  Form.
4       A   I don't recall since it's been a while
5   since I read Schuler's deposition as to whether he
6   said he knew for sure.  But like I said, in -- in --
7   but as I stated in my report, there was -- there
8   were warning labels present that said the same
9   thing, that carbon monoxide could be produced.
10      Q   (By Ms. Tiedeken) So I'm going to ask you
11  to assume David Schuler's testified he knew that --
12  that when the vent pipe -- part -- pipe came apart
13  it was dangerous because there was carbon monoxide
14  in the fuel.
15      A   Okay.
16      Q   If you assume that to be true, then he
17  didn't need a warning from David Gieck because he
18  knew it without being told, correct?
19      MS. MEAD:  Objection.  Form.
20      A   Yeah.  I think it would be correct to say
21  he didn't need the warning from Gieck.
22      Q   (By Ms. Tiedeken) And is it your
23  understanding that David Schuler was told by
24  Mr. Buck -- Buckingham to keep an eye on the boiler
25  that weekend because Wyoming Mechanical was coming

268

1   Monday morning?
2       A   I understand that, you know, it was -- I
3   think it was a Thursday when the event happened, and
4   that Wyoming Mechanical was already scheduled to be
5   there on a Monday.  I don't recall at the moment
6   what it was that -- that Schuler was told by
7   Buckingham prior to that.
8       Q   Okay.  If -- if you assume that
9   Mr. Buckingham's employee, David Schuler, was told
10  to keep an eye on that vent pipe over the weekend,
11  would you have expected him as an employee of
12  Mr. Buckingham to do that?
13      A   I would expect an employee to do what he's
14  instructed to do, yes.
15      Q   And would you have expected when
16  Mr. Schuler saw Mrs. Herrera's car that morning at
17  the Buckingham residence, that he should have gone
18  over there and checked on the vent pipe knowing that
19  she'd be in that garage?
20      MR. McGILL:  Objection.  Form.
21  Foundation.
22      Q   (By Ms. Tiedeken) Go ahead.
23      MS. MEAD:  Objection.  Form.
24      A   I think that if any person knows that
25  somebody's entering a dangerous situation, that they

072216js8/1/2016

269

1    should tell them that that's a dangerous situation.
2        Q   (By Ms. Tiedeken) So David Schuler should
3    have gone over there, checked on the pipe, and if it
4    was apart, told Mrs. Herrera to get out of there, I
5    suppose.
6        A   He could have done that, sure.  And --
7    and -- should he have done that?  If he knew that
8    that was a dangerous situation, then -- or if he
9    knew that there was a hazard that existed inside the
10   home, then, yes, he should have told the housekeeper
11   that there was a potential hazard.
12       Q   It's your understanding, is it not, that
13   David Gieck was told that nobody would be in the
14   home that weekend, and he was unaware that
15   Mrs. Herrera was coming to clean?
16       A   Based on his testimony, I would say he was
17   unaware that she was coming to clean.  I don't
18   recall what he was told specifically.  I -- I think
19   he was told that the Buckinghams were leaving town,
20   but I don't recall if he was told that the home
21   would be empty or just that they were leaving town.
22       Q   It's true, isn't it, that David Schuler
23   was aware that Mrs. Herrera was coming to clean
24   because there's -- he was advised by e-mail from
25   Mr. Buckingham that Mrs. Herrera would be there

270

1    Friday morning cleaning.
2        A   Yeah.  I understand there was -- that he
3    was told she'd be there.
4        Q   So when the Buckinghams left town, David
5    Schuler was aware that if the vent pipe came apart,
6    it was a dangerous situation -- if you assume that's
7    his testimony -- correct?
8        A   Yes.
9        Q   And he was aware that he had been charged
10   by Mr. Buckingham to keep an eye on the vent pipe
11   over the weekend, correct?
12       A   Correct.
13       Q   And he knew that Wyoming Mechanical would
14   not be coming out till Monday morning to take a look
15   at the boiler?
16       A   Correct.
17       Q   He knew Mrs. Herrera was going to be there
18   Friday morning because he'd received an e-mail from
19   his boss, Mrs. Herrera is going to be there Friday
20   morning?
21           MR. McGILL:  Objection.  Form.
22           MS. MEAD:  Same objection.  Join.
23       A   Correct.
24       Q   (By Ms. Tiedeken) And so Mr. Schuler had a
25   duty to warn Mrs. Herrera of the dangerous condition

271

1    and/or check on it when he saw her car there,
2    correct?
3            MR. McGILL:  Objection.  Form.
4    Foundation.
5            MS. MEAD:  Objection.  Form.
6        A   Yeah.  I think he should have done that.
7        Q   (By Ms. Tiedeken) And if Mr. Schuler had
8    done that, Mrs. Herrera may still be alive?
9        A   She might.  She might not.
10       Q   Depending on how soon he got over there to
11   check on it?
12       A   Depending on how soon he became aware of
13   her arrival, and how much time she spent in the
14   structure, and what the specific exposure to carbon
15   monoxide in the structure was.
16       Q   Given the fact that he knew she was
17   coming, do you think he should have checked to see
18   what time she'd arrive so that he could check the
19   situation out and make sure it was safe?
20       A   I think he could have.  Should he have
21   done that?  I think if he was informed of what time
22   she would be arriving, that -- that he could have
23   gone and checked on her, sure.
24       Q   Should he have checked to see what time
25   she was arriving given his knowledge about the vent

272

1    pipe?
2        A   Should he have?  I don't know.  We're
3    getting into -- we're getting into an aspect about
4    his duty that I'm just -- I'm unaware of the -- the
5    differences between the duties owed by a person
6    versus an employee versus a contractor.
7            So should he have known what time she was
8    arriving?  Hypothetically speaking, if he knew what
9    time she was arriving, he could have warned her and
10   averted the problem, yes.  Should he have done that?
11   I want to say he should have, but I don't know if
12   that means he had a duty to do that.
13           MS. TIEDEKEN:  Okay.  I think that's all
14   that I have.
15              EXAMINATION
16   BY MR. McGILL:
17       Q   Mr. Skaggs, can you take a look at
18   Exhibit 180, please, and 130.  Those are the --
19           THE VIDEOGRAPHER:  I'm sorry.  Could you
20   pass the microphone, please.
21           MR. McGILL:  I'm sorry.
22           THE VIDEOGRAPHER:  Thank you.
23           MS. TIEDEKEN:  You'd think we'd remember
24   this by now.
25           MR. McGILL:  Of course not.

072216js8/1/2016

273

1    A    You'll remember three minutes before we
2  finish, I'm sure of it.
3        MR. McGILL:  Dragging the microphone out
4  of the room, you know.
5        MS. TIEDEKEN:  As we finish just as rush
6  hour starts.
7        THE DEPONENT:  Yeah.  I'll stop -- I'll
8  stop standing up with the microphone attached.
9    A    Is there another book of exhibits?  I stop
10  at 138 here.
11    Q    (By Mr. McGill) I think they might have
12  pulled 180 out.
13    A    Oh, is 180 already pulled out?
14        MR. McGILL:  The diagram.
15        MR. REEVES:  It's the diagram.
16        MR. LEWIS:  Could you hand me my report
17  that I gave you this morning.
18        THE DEPONENT:  Yes.  Sure.
19        MR. LEWIS:  Yeah.  Thanks.
20        THE DEPONENT:  You're welcome.
21        MR. REEVES:  Is it --
22        THE DEPONENT:  Is it under the notebook?
23  It is not.
24        MR. REEVES:  Dave, can you just look and
25  see if that diagram accidentally -- Dave, can you

274

1  see if that diagram accidentally got shoved in that
2  report?
3        THE DEPONENT:  I might have accidentally
4  stuck Exhibit 180 in that pile of paper.
5        MR. LEWIS:  I don't see it.  Do you see
6  it?
7        THE DEPONENT:  I don't see it in here.
8        MR. REEVES:  Here.  I got it in here.
9    A    Oh, it's the drawing of the part.  Okay.
10    Q    (By Mr. McGill) Right.
11    A    I have seen that before.
12    Q    Okay.  Just a quick -- quick -- quick
13  question.  Does the drawing of the part precede the
14  latest revision date if we presume that's the
15  revision date on Exhibit 130 of the marketing piece
16  from DuraVent?
17    A    I'm having a hard time reading the date on
18  that, actually, without a magnifying glass or
19  something.  It's pretty small.  Is there another
20  date on here aside from the date on the -- on the
21  title block for the print, because that is tiny.
22  Let me see if I can zoom in on it with my phone and
23  get a look at it.
24    Q    That's a good idea.
25    A    These eyes just don't see as close as they

275

1  used to.  Honestly, I can't tell from looking at
2  that date if that says 2003, 2011, 2013 or zoo.
3    Q    Well, it --
4    A    It's really hard to read.
5    Q    It certainly doesn't say 2014.
6    A    As uncertain as I am about what that is, I
7  don't want to say that either.
8    Q    Okay.  Fair enough.  Do you profess any
9  expertise in the discipline of human factors?
10    A    No, I do not.
11    Q    Do you profess any expertise in the
12  writing of manufacturer instruction manuals or
13  installation manuals?
14    A    I do not.
15    Q    So is it a fair statement that it -- it
16  would be impossible for the employee of Wyoming
17  Mechanical who installed the Buckingham boiler,
18  Aaron McCormick, to know which appropriate locking
19  clamp to use because he didn't consult either of the
20  Triangle Tube installation materials or the DuraVent
21  materials?
22        MS. TIEDEKEN:  Objection.  Foundation.
23    Q    (By Mr. McGill) You can answer.
24    A    I would agree that in the absence of
25  reading those manuals, there's no information to

276

1  direct him on which parts to buy.
2    Q    And just to confirm, that's all on the
3  installer, the person like Aaron McCormick who is
4  there actually overseeing the installation of the
5  boiler to know which part is appropriately to be
6  used in the installation of, for example, the vent
7  system?
8        MS. TIEDEKEN:  Objection.  Foundation.
9    A    The statutory requirement in the code
10  requires the installer to follow all of the
11  manufacturer's instructions.
12    Q    (By Mr. McGill) You were asked a question
13  about sort of being the first person on the scene,
14  so to speak.  Do you recall those questions?  I
15  think I asked you some of those questions, too.
16    A    Yeah.  Yeah.  We've had discussions along
17  those lines, sure.
18    Q    Hypo -- hypothetical discussions.  And
19  Miss Tiedeken asked you questions about, well, if
20  you're the first one -- person on the scene and you
21  wanted to test the -- or to -- to, you know, get a
22  record of where the throttle screw was at, you would
23  take a picture of the throttle screw, and you agreed
24  with that.
25    A    Yeah, I did.

277

1    Q   Okay.  Now, would you have done all of the
2  other things to the boiler that David Gieck did when
3  he showed up to the scene after Monica Herrera had
4  died, and after the local Teton County Sheriff had
5  cleared the scene as a crime scene -- would you have
6  done all of those things that David Gieck did
7  without attempting to collect any data?
8    A   Oh, no, I would not.
9       MS. TIEDEKEN:  Oh, object to the form of
10  the question.  Assumes no facts -- facts not in
11  evidence.
12       MR. LEWIS:  Join.
13    Q   (By Mr. McGill) You can answer the
14  question.
15    A   My answer was no, I would not do that.
16    Q   And you'd gather all the data that we've
17  already talked about, we don't need to go through
18  that again.  Or would you like to go through it
19  again?
20    A   Well, the thing that I would say is that
21  if I were the -- the first investigator on the
22  scene, the first thing that I would do is document
23  nondestructively as much as I possibly could.  And
24  then I would make sure that all of the potentially
25  affected parties were on notice and had the same

278

1  opportunity to see the scene before it was altered.
2    Q   I see.  Have you been involved in
3  investigations before -- accident investigations in
4  your area where there's also been a corresponding
5  criminal investigation being -- taking place?
6    A   Yes, but not during the course of the
7  criminal investigation.
8    Q   So you would have come on the scene
9  after the criminal investigation had been done?
10    A   That is more typical, yes.
11    Q   And have you ever seen -- or have you ever
12  been involved in an investigation in -- in your
13  field that had been cleared as a criminal crime
14  scene where the first person to come back to the
15  crime scene was not the investigator, but was
16  someone that was -- could potentially have been a
17  suspect in that crime?
18       MS. TIEDEKEN:  Object to the form.
19    Q   (By Mr. McGill) You can answer.
20    A   I don't think that's a situation I've
21  specifically encountered.
22    Q   You were asked to admit that David Gieck
23  did not have knowledge -- or has not testified to
24  having had knowledge of any delayed ignition
25  problems Triangle Tube was purportedly having with

279

1  its boilers.  Do you recall that?
2    A   I recall the discussion, yes.
3    Q   But is it fair to say that Mr. Gieck had
4  specific and direct knowledge of the delayed
5  ignition problems, as you've used the term, that the
6  Buckinghams were having before Monica Herrera died?
7       MS. TIEDEKEN:  Object to the form.
8    Q   (By Mr. McGill) You can answer.
9    A   Do you mean before or after the
10  Buckinghams called to say, hey, we're having a
11  problem with the boiler?
12    Q   As of the date that the Buckinghams call
13  Wyoming Mechanical, he's got that knowledge, isn't
14  that a fair statement?
15    A   Af --
16       MS. TIEDEKEN:  Object to the form.
17    Q   (By Mr. McGill) You can answer.
18    A   Upon the conclusion of the call, I would
19  expect him to have that knowledge.
20    Q   And in point of fact, when that call is
21  concluded, he also knows that the exhaust venting
22  for the boiler is exhausting into the garage on
23  those occasions when it becomes detached, is that a
24  fair statement?
25    A   I think that's a fair statement, yes.

280

1    Q   And it is your -- is it your understanding
2  that Triangle Tube had intended its Prestige Solo
3  175 boiler to be operated with the exhaust venting
4  dumping into the living space?
5    A   I would not expect that a -- that any
6  appliance manufacturer would approve of that.  I
7  guess -- the -- the issue here is you used the word
8  intent.  And I don't have any information on which
9  to testify to Triangle Tube's intent.  I would
10  testify that I would not expect an -- an appliance
11  manufacturer to allow or permit that situation to
12  happen if they knew about it.
13    Q   Particularly if the appliance is a direct
14  vent boiler?
15    A   I would say for any appliance that can
16  potentially generate carbon monoxide.
17    Q   All right.  And you would expect that
18  David Gieck, after he's done with that phone call,
19  knows that there is an appliance installed in the
20  Buckingham home that's exhausting carbon monoxide
21  into the living space, and he decided it was okay
22  with him to wait for four days before he went to the
23  site, is that a fair statement?
24       MS. TIEDEKEN:  Object to the form.
25  Misstates the facts.

072216js8/1/2016

281

1    Q    (By Mr. McGill) You can answer.
2    A    Well, as -- if I recall, the -- the
3 conversation between the Buckinghams and Gieck was
4 that there had been this problem and that they had
5 put the pipe back together. So I think that Gieck
6 may not have thought that the pipe was still
7 exhausting gas into the interior of the structure at
8 the time because the Buckinghams had said that they
9 had put it back together. But he should still have
10 known that there was the potential for that to
11 happen again.
12    Q    And he certainly knew that there was a
13 history of it?
14    A    I believe that -- yeah, I think that that
15 was -- part of the conversation also was that that
16 wasn't the first time that that had happened because
17 Buckingham and Schuler both had experienced the
18 delayed ignitions.
19    Q    Even if Mr. Gieck was told that no one was
20 going to be in the property between the time that he
21 finishes that phone call with Mr. Buckingham
22 sometime in that Wednesday before Mrs. Herrera's
23 death and the Monday when she dies if -- or
24 the Monday when he was supposed to have come out.
25 Even if he's told that no one is going to be in the

282

1 property, is it still not a dangerous condition to
2 allow that boiler to continue to run with the
3 history that it had?
4    MS. TIEDEKEN: Well, object to the form
5 insofar as it assumes the call was on Wednesday.
6    A    To answer the question, I would say that
7 after the call, whenever it happened, Gieck should
8 have known that even if the home was going to be
9 empty, that he still had the duty to ensure that the
10 boiler was shut down either by instructing the
11 Buckinghams to turn the boiler off or by going out
12 and making sure that the boiler was turned off.
13    Q    (By Mr. McGill) And he should have done
14 that immediately or in what time interval should
15 have -- that have taken place?
16    MS. TIEDEKEN: Objection. Form and
17 foundation.
18    A    I believe if he knew that the boiler was
19 malfunctioning, generating high pressure events, and
20 that that had the potential to separate the vent
21 pipe, then, yes, I believe he should have gone out
22 there immediately, if not that very same day, and
23 made sure that the boiler was shut down.
24    MR. McGILL: I will pass the witness at
25 this time. Thank you very much, sir.

283

1    THE DEPONENT: You're welcome.
2        EXAMINATION
3 BY MS. TIEDEKEN:
4    Q    Just a couple follow-ups.
5    MS. TIEDEKEN: Do you mind if I go or do
6 you want to go first, Kate?
7    MS. MEAD: I don't have any.
8    MS. TIEDEKEN: Okay.
9    Q    (By Ms. Tiedeken) You were asked about the
10 call at -- that --
11    MS. TIEDEKEN: Oops.
12    THE VIDEOGRAPHER: Thank you.
13    Q    (By Ms. Tiedeken) -- that was made between
14 Dave Gieck and Mr. Buckingham and what knowledge
15 Mr. Gieck would have had at that time. And did I
16 understand you to say that Mr. Gieck should have had
17 knowledge that there was a defect in the product at
18 that time? I mean, Mr. --
19    A    No. No. I --
20    Q    Okay. No.
21    A    I don't think I said that.
22    Q    Okay.
23    A    And -- and --
24    Q    Okay.
25    A    -- if that's how you interpret something I

284

1 said, then, yeah, I'd like to clarify that. I don't
2 believe that Gieck knew or should have known that
3 there was any kind of a hypothetical product defect
4 at the time.
5    Q    What he knew from the call with
6 Mr. Buckingham was that the boiler had made a loud
7 noise, that the vent had come apart, and that
8 Mr. Buckingham had put it back together, correct?
9    A    Yes. That's correct.
10    Q    That they were leaving town and no one
11 would be home, correct?
12    A    That's correct.
13    Q    That his employee, Mr. Schuler, would be
14 keeping an eye on the boiler over the weekend?
15    A    I think that was the -- the statements and
16 the conversation, yes.
17    Q    And that Mr. Buckingham wanted Mr. Gieck
18 to come out on Monday, correct?
19    MR. McGILL: Objection. Foundation.
20    Form.
21    A    I'm not sure that -- that I know --
22    MS. MEAD: Join.
23    A    -- what Mr. Buckingham wanted Mr. Gieck to
24 do. I believe that Mr. Gieck had already been
25 scheduled to come out on Monday.

AGREN BLANDO COURT REPORTING & VIDEO INC>

072216js8/1/2016

285

1    Q   (By Ms. Tiedeken) You've heard the re --
2  have you heard the recorded voice mail message that
3  Mr. Buckingham left prior to the time that he talked
4  to Mr. Gieck?
5    A   No.  I have not listened to the voice mail
6  message.
7    Q   Okay.  If you assume that Mr. Buckingham
8  asked Mr. Gieck to check on the sound when he came
9  out Monday, would that be -- or strike that.
10       I guess what I'm trying to get at, does
11  the customer have the right to say, I'm going to
12  have my caretaker watch it over the weekend.  I want
13  you to come on Monday because we're not going to be
14  home over the weekend?
15       MR. McGILL:  Objection.  Form.
16  Foundation.
17    Q   (By Ms. Tiedeken) Does the -- does the --
18  does the -- the homeowner has control over their
19  home and the boiler, correct?
20       MR. REEVES:  Object to form.
21       MR. McGILL:  Same objection.
22    Q   (By Ms. Tiedeken) Go ahead.
23       MS. MEAD:  Join.
24    Q   (By Ms. Tiedeken) Go ahead.
25    A   The homeowner -- I agree that the

286

1  homeowner does have control over the home and the
2  boiler.  However, I also believe that the fact that
3  the home was planned to be -- or that it had been
4  stated to Gieck that the home was going to be empty
5  for the weekend does not relieve him of the
6  responsibility to ensure that the boiler is shut
7  down until the dangerous condition is cleared, or at
8  the very least to warn the Buckinghams that that
9  boiler should be shut down.
10    Q   The Buckinghams have complete control over
11  when Wyoming Mechanical's allowed to be on their
12  property and service their boiler, correct?
13    A   Yes.  I would agree with that.
14    Q   Okay.  And this was the dead of winter in
15  Jackson, Wyoming, true?
16    A   It was February.  I don't know what the
17  weather was.  But, sure.  Yeah, it was definitely
18  wintertime.
19    Q   Is February the dead of winter?  Is that
20  an apt description?
21    A   You -- you can call it what you like.  It
22  was February.  It was winter in Jackson Hole.
23    Q   Okay.
24    A   I would imagine there was probably some
25  snow on the ground.

287

1    Q   And if the Buckinghams want to have their
2  boiler and their heat source going over the weekend
3  and have their caretaker taking -- watching the
4  boiler until Wyoming Mechanical came out on Monday,
5  they were perfectly -- they had every right to do
6  that, and Wyoming Mechanical had no right to tell
7  them otherwise, correct?
8    A   I believe that Wyoming Mechanical had the
9  duty to tell them that boiler should be shut down,
10  and that temporary heat should be brought in if you
11  don't want the house to freeze.
12    Q   You know, I guess they -- Wyoming
13  Mechanical took -- could have told them anything
14  they wanted to tell them, but the Buckinghams had
15  complete control over the -- their boiler and could
16  do what they want, correct?
17    A   I agree that, yes, the Buckinghams had
18  control over the boiler.  Yes.
19    Q   And they didn't have to shut it down if
20  they didn't want to?
21    A   I would say that they could not be forced
22  to shut it down if they didn't want to by Wyoming
23  Mechanical.
24    Q   And if they wanted Wyoming Mechanical to
25  come out on Monday, and -- and allowed access to

288

1  their home on Monday, Wyoming Mechanical had no
2  right to have access to the home any time sooner,
3  correct?
4       MR. McGILL:  Objection.  Form.
5    A   Well, I -- I think we're getting into
6  something that's more of a legal question than an
7  engineering question because I believe, as stated
8  in -- in my report, that Wyoming Mechanical had a
9  duty to warn the Buckinghams that there was an
10  issue.  And I think that Wyoming Mechanical has a
11  duty to say, That boiler should be shut down.
12       I don't believe that Wyoming Mechanical
13  can just come on to private property and make
14  whatever changes they need to to the boiler, but I
15  do believe that they have a duty, at the very least,
16  to advise the homeowner that that boiler should be
17  shut down.
18    Q   Okay.  I understand your opinion.
19       MS. TIEDEKEN:  That's all that I have.
20            EXAMINATION
21  BY MS. MEAD:
22    Q   I just have one more.  These questions
23  that Miss Tiedeken has asked you --
24       THE VIDEOGRAPHER:  Sorry.  I can barely
25  hear you.  Could I get you to -- thank you.

072216js8/1/2016

289

1    Q   (By Ms. Mead) These ques -- questions that
2  Mrs. Tiedeken just asked you, the homeowner,
3  Mr. Buckingham -- you've read his deposition?
4    A   I have.  It's been some time since I read
5  it, but I have read his deposition.
6    Q   But you remember from that deposition that
7  he did not know that the condition was dangerous
8  that was in his home that day?
9    A   I believe he stated that he had not been
10 warned that that was as dangerous a condition as it
11 was.
12       MS. MEAD:  Thank you.  That's all I have.
13       MR. McGILL:  Do you have anything, Dave?
14       MR. LEWIS:  No.
15       MR. McGILL:  Just a couple.
16       MR. REEVES:  Off the record.
17       MR. McGILL:  No.  I'm not --
18       MR. REEVES:  Oh, wait.
19       THE VIDEOGRAPHER:  Are we -- do you want
20 to go off or --
21       THE DEPONENT:  Joe, do you have a couple
22 more for me?
23       MR. McGILL:  Yes, sir.
24       THE DEPONENT:  Okay.
25       MR. McGILL:  This won't take long.

290

1        THE DEPONENT:  Let's -- let's get them
2  down.
3        MR. McGILL:  We will.
4        MS. MEAD:  Joe, I really need to get out
5  of here in 15 minutes.
6        MR. McGILL:  You're going to give me
7  15 minutes?
8        MS. MEAD:  15 minutes is all, Buddy.
9        MR. McGILL:  I don't know if I -- I can
10 come up with that many questions, but...
11       MR. REEVES:  Don't brew a storm.
12              EXAMINATION
13 BY MR. McGILL:
14    Q   So your understanding of the conversation
15 that took -- took place between Mr. Buckingham and
16 David Gieck on that week before Monica Herrera -- or
17 the -- you know, the days before Monica Herrera
18 passed away -- focused you on that -- that time
19 period.  When Mr. Buckingham tells David Gieck that,
20 well, my caretaker, Schuler, will take an eye -- or
21 keep an eye on the boiler.  That's what -- what I
22 want you to focus on.  Okay?
23    A   Okay.
24    Q   So is it not the case that David Gieck --
25 and not only has put -- just because of the fact

291

1  that he doesn't know that Monica Herrera is going to
2  be at the property to a certain extent is
3  irrelevant, is it not, because he knows that David
4  Schuler is going to go into an environment that
5  potentially could be contaminated by CO?  Is that a
6  fair statement?
7        MS. TIEDEKEN:  Object.  Object to the
8  form.
9    A   Well, I guess I -- I'm uncomfortable
10 testifying as to what Gieck knew or didn't knew
11 unless it's stated in, you know, one of the
12 documents or -- or in his deposition.
13    Q   (By Mr. McGill) But take it as a
14 hypothetical, then.
15    A   As a hypothetical, regardless of whether
16 the property was going to be empty or occupied over
17 the course of that weekend, he still had the duty at
18 the very least to advise the Buckinghams that that
19 boiler should be shut down and not in service.
20       MR. McGILL:  Nothing further.  Thank you
21 very much, sir.
22
23
24
25

292

1        THE VIDEOGRAPHER:  Any other questions?
2        MR. REEVES:  Off the record.
3        THE VIDEOGRAPHER:  This concludes today's
4  proceedings.  We're off the record at 4:38 p.m.
5        (The vide deposition concluded at 4:38 p.m.
6  on July 22, 2016.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

072216js8/1/2016

293

```
1         I, JOSEPH DANIEL SKAGGS, do hereby certify
2    that I have read the foregoing transcript and that
3    the same and accompanying amendment sheets, if any,
4    constitute a true and complete record of my
5    testimony.
6
7
8
9         _____
     SRD          Signature of Deponent
10
           (  ) No amendments
11         (  ) Amendments attached
12
13         Subscribed and sworn to before me this.
14         _____ day of _____,
15         _____.
16
17    Notary Public: _____
18    My commission expires _____
19    Seal:
20
21
22
23
24
25
```

294

```
1    STATE OF COLORADO  )
                         ) SS. REPORTER'S CERTIFICATE
2    COUNTY OF DENVER    )
3         I, Sharon R. Dobson, do hereby certify
4    that I am a Registered Professional Reporter and
5    Notary Public within the State of Colorado; that
6    previous to the commencement of the examination, the
7    deponent was duly sworn to testify to the truth.
8         I further certify that this deposition was
9    taken in shorthand by me at the time and place
10   herein set forth, that it was thereafter reduced to
11   typewritten form, and that the foregoing constitutes
12   a true and correct transcript.
13        I further certify that I am not related
14   to, employed by, nor of counsel for any of the
15   parties or attorneys herein, nor otherwise
16   interested in the result of the within action.
17        In witness whereof, I have affixed my
18   signature on August 1, 2016.
19        My commission expires January 8, 2019.
20
21
22
           _____
23         Sharon R. Dobson, RPR
           216 - 16th Street, Suite 600
           Denver, Colorado  80202
24
25
```

295

```
1    AGREN BLANDO COURT REPORTING & VIDEO, INC.
     216 - 16th Street, Suite 600
2    Denver, Colorado  80202
     4450 Arapahoe Avenue, Suite 100
3    Boulder, Colorado  80303
4    August 2, 2016
5    Christopher R. Reeves, Esq.
     The Waltz Law Firm
6    1660 Lincoln Street, Suite 2510
     Denver, CO  80264
7
     Re:  Video Deposition of JOSEPH DANIEL SKAGGS
8       Herrera, et al. vs. Buckingham, et al.
        Case No. 15-cv-128-F
9
     The aforementioned deposition is ready for reading
10   and signing.  Please attend to this matter by
     following BOTH of the items indicated below:
11
     _____ Call 303-296-0017 and arrange with us to
12        read and sign the deposition in our office
13   _XXX_ Have the deponent read your copy and sign
        the signature page and amendment sheets,
14      if applicable; the signature page is
        attached
15
     _____ Read the enclosed copy of the deposition
16      and sign the signature page and amendment
        sheets, if applicable; the signature page
17      is attached
18   _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
19   _____ By _____ due to a trial
        date of
20
     Please be sure the original signature page and
21   amendment sheets, if any, are SIGNED BEFORE A NOTARY
     PUBLIC and returned to Agren Blando for filing with
22   the original deposition.  A copy of these changes
     should also be forwarded to counsel of record.
23   Thank you.
24   AGREN BLANDO COURT REPORTING & VIDEO, INC.
25   cc:  All Counsel
```

296

```
1    AGREN BLANDO COURT REPORTING & VIDEO, INC.
     216 - 16th Street, Suite 600
2    Denver, Colorado  80202
     4450 Arapahoe Avenue, Suite 100
3    Boulder, Colorado 80303
4
5         JOSEPH DANIEL SKAGGS
          July 22, 2016
6       Herrera, et al. vs. Buckingham, et al.
        Case No. 15-cv-128-F
7
     The original video deposition was filed with David G.
8    Lewis, Esq., on approximately the 2nd day of August,
     2016.
9
     _____ Signature waived
10
     _____ Unsigned; signed signature page and
11      amendment sheets, if any, to be filed at
        trial
12
     _____ Reading and signing not requested
13      pursuant to C.R.C.P. Rule 30(e)
14   _XXX_ Unsigned; amendment sheets and/or
        signature pages should be forwarded to
15      Agren Blando to be filed in the envelope
        attached to the sealed original.
16
     Thank you.
17
     AGREN BLANDO COURT REPORTING & VIDEO, INC.
18
     cc:  All Counsel
19
20
21
22
23
24
25
```

**AGREN BLANDO COURT REPORTING & VIDEO INC>**

072216js8/1/2016

- AMENDMENT SHEET -
Video Deposition of JOSEPH DANIEL SKAGGS
July 22, 2016
Herrera, et al. vs. Buckingham, et al.
Case No. 15-cv-128-F

The deponent wishes to make the following changes in
the testimony as originally given:

Page  Line  Should Read          Reason
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____

Signature of Deponent: _____
Acknowledged before me this _____ day
of _____, 20____.

(seal) Notary's signature _____
       My commission expires _____.

**AGREN BLANDO COURT REPORTING & VIDEO INC>**