Joseph P. McGill (admitted pro hac vice)
Jennifer A. Cupples (admitted pro hac vice)
Foley, Baron, Metzger & Juip, PLLC
38777 Six Mile Road, Suite 300
Livonia, MI  48152
(734) 742-1825; Fax:  (734) 521-2379
Email:  jmcgill@fbmjlaw.com;
        jcupples@fbmjlaw.com

Judith A. Studer, Attorney No. 5-2174
Schwartz, Bon, Walker & Studer, LLC
141 South Center Street, Suite 500
Casper, WY  82601
(307) 235-6681; Fax (307) 234-5099
Email:  jstuder@schwartzbon.com

*Attorneys for Defendant Triangle Tube*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| FRANCISCO L. HERRERA and JOANNA HERRERA, Co-Wrongful Death Representatives, for the exclusive benefit of the beneficiaries of MONICA HERRERA, deceased, who have sustained damages from her wrongfully caused death, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -vs- | ) ) | Case No.:  2:15-cv-00128-NDF |
| GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM, but in their individual capacities as Trustees of the BUCKINGHAM FAMILY TRUST; and GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM, as individual defendants; and WYOMING MECHANICAL, INC., a Wyoming Corporation; TRIANGLE TUBE/PHASE III CO. INC., a New Jersey Corporation; and M&G GROUP DURAVENT, INC., a New York Corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

# CORRECTED EXHIBIT H
## TO TRIANGLE TUBE'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' STRICT PRODUCTS LIABILITY CLAIMS

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 7, 2016, I served **CORRECTED EXHIBIT H TO**

**TRIANGLE TUBE'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' STRICT**

**PRODUCTS LIABILITY CLAIMS** upon:

David Lewis
P. O. Box 8519
Jackson, Wyoming 83002
davelewis@bresnan.net

Christopher R. Reeves
Dick Waltz, Esq.
Waltz Law Firm
1660 Lincoln Street, Ste. 2510
Denver, Colorado 80264
creeves@waltzlaw.com
DWaltz@WaltzLaw.com

Julie Tiedeken
Sean W. Scoggin
P. O. Box 748
Cheyenne, Wyoming 82003
jtiedeken@mtslegal.net
sscoggin@mtslegal.net

Katherine L. Mead, Esq.
P.O. Box 1809
Jackson, Wyoming 83001
kate@meadlaw.net

via the Court's ECF filing system.

/s/Cheryl E. Ballew
Cheryl E. Ballew

1

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF WYOMING

3     _____ )
      FRANCISCO L. HERRERA and       )
4     JOANNA HERRERA, CO-WRONGFUL    )
      DEATH REPRESENTATIVES, for     )
5     the exclusive benefit of       )
      the beneficiaries of MONICA    )
6     HERRERA, deceased, who have    )
      sustained damages for her      )
7     wrongful caused death,         ) Case No.: 15-CV-128-F
                                     )
8                 Plaintiffs,        )
                                     )
9          vs.                       )
                                     )
10    GREGORY BUCKINGHAM and         )
      DEBORAH BUCKINGHAM, both in    )
11    their individual capacities    )
      as Trustees of the BUCKINGHAM)
12    FAMILY TRUST; and GREGORY      )
      BUCKINGHAM and DEBORAH         )
13    BUCKINGHAM as individual       )
      defendants; and WYOMING        )
14    MECHANICAL, INC., a Wyoming    )
      Corporation,                   )
15                                   )
                  Defendants.   )
16    _____

17

                 TRANSCRIPT OF DEPOSITION OF
18
                      DAVID R. SCHULER
19

20                     Taken at
                      MEAD & MEAD
21                  Jackson, Wyoming
                   November 18, 2015
22

23

24    COURT REPORTER: Denise Nowak,
      Certified Shorthand Reporter
25    and Notary Public

45

1  A.    Nope.

2  Q.    Why do you think he -- do you have any reason

3  why he would put that down?  Let me show you.  You

4  can read the whole paragraph.

5       (Witness complies.)

6  A.    I don't know why he would say I hadn't -- that

7  she hadn't been seen since 1330.  I didn't see her

8  at all that day until I went into the house that

9  evening.  I think maybe it might have been -- I

10  might have said something like she usually leaves

11  around 1:30; that's the only thing that I can think

12  of that might cause him to say that.  But I have no

13  idea to why he would say that, I hadn't seen her

14  that day.

15  Q.    And just to reiterate the part of the

16  statement to the sheriff's department now, not the

17  fire or EMS, "Schuler said Herrera usually arrived

18  around 1000 hours and usually leaves around 1330.

19  When Schuler noticed Herrera's vehicle still at the

20  residence at approximately 1800 hours, he went over

21  to check on her."

22  A.    The only issue I take with that is I did not

23  specifically go over there to check on her because

24  I saw her vehicle.  I went over there to do other

25  things, and that's when I noticed her vehicle.  And

46

1   when I noticed her vehicle, that's when I went

2   inside to check on her.

3   Q.    When you noticed the vehicle?

4   A.    Right.  I had gone over there for other

5   reasons.  And when I went over I thought there is a

6   vehicle still parked out there, that's odd.  So I

7   looked closer and I said that has Idaho plates,

8   that's not Deb's car.  That's odd.

9   Q.    And in the same paragraph, the previous

10  sentence you said, or two sentences before you

11  said, "Schuler told me he noticed Herrera's car in

12  the driveway of the main house at approximately

13  1000 hours, at approximately ten o'clock that

14  morning."

15  A.    Mm-hmm.

16  Q.    Do you recall that?

17  A.    Yes.

18  Q.    So when you saw that car at six o'clock, 1800

19  hours, when you saw it and you had seen it at 10, I

20  mean that was pretty alarming, wasn't it, that she

21  was there that long?

22  A.    Yes.

23  Q.    And did your mind go to the pipes that were

24  leaking in the house or broken in the house?

25  A.    Not immediately at that point.  Umm, I didn't

47

1    -- I thought there could be a number of reasons why

2    her car was still there.

3    Q.   You said one of them was you thought maybe she

4    got sick and took a nap?

5    A.   At the time there was a flu going around that

6    was taking -- a lot of people were getting sick.

7    And I thought, you know, maybe she is ill.  I was

8    just going through options in my mind like why

9    would this car still be parked in here?  The car is

10   broken, you know, it's how I think about things.  I

11   guess I go through a lot of options in trying to

12   narrow them down rather than jumping to

13   conclusions.

14   Q.   So how did you go into the house?

15   A.   Through the garage door.  The left side garage

16   door.

17   Q.   And that's when you noticed that it was very

18   humid and wet, water dripping off the cars and so

19   forth, correct?

20   A.   Yes.

21   Q.   And I assume what you told me a few minutes

22   ago about combusted gases being wet that you made

23   that connection, I think that's what you said

24   somewhere; is that...

25   A.   That's when I started putting it all together,

48

1    basically, narrowing down the possible causes and

2    started thinking that, you know, something was

3    wrong with the boiler that obviously -- because

4    it's not -- I go in and out of that garage on a

5    regular basis and it's not always humid.  And there

6    had been a problem with the boiler in the past, and

7    that's when I started thinking that something might

8    be really wrong.

9    Q.    I can show you where -- there is also a report

10   in here where it said that -- you went in through

11   the garage door.

12         And did you go into the house then, or did you

13   go back out and then come into the house?

14   A.    I went through the garage into the house.

15   Q.    Through what you call a man-door.  Is that

16   the --

17   A.    That's just a door like the one behind you.

18   It's just -- I call it a man-door.  In a garage

19   it's pretty normal nomenclature, you know, you have

20   your garage door, you have the man-door.  That's

21   why I called it the man-door.  It's the one that's

22   between the garage and house.

23   Q.    Okay.

24   A.    The exterior doors are locked, so the keypad

25   on the garage door is how I get in and out of the

1   house typically.

2   Q.    And then you went to the -- when you into the

3   man-door, you immediately saw Monica on the floor,

4   or am I...

5   A.    Yes.

6   Q.    And you checked her pulse.  Do you recall

7   that?  Let me see if I can help you.

8   A.    I have it in my notes.

9   Q.    I'm sorry, I thought I was waiting for you.

10  A.    I'm sorry, I thought you said hold on.

11        What's the question?  You sounded like you

12  were about to reference something.

13  Q.    Well, I was.  We should go through that.  You

14  said you entered the garage?

15        MS. MEAD:  Are you looking at Exhibit 19?

16        MR. LEWIS:  I'm looking at the second page,

17  the second full paragraph on the second page.

18  BY MR. LEWIS:

19  Q.    Do you see that?

20  A.    Yes.  When I opened the garage door?

21  Q.    No.

22  A.    The second full paragraph?

23  Q.    Full paragraph.

24  A.    Gotcha.

25  Q.    "I entered garage leaving the garage door open

50

1   and replaced the tool in the toolbox on the way to

2   the boiler.  I placed the ladder that was in the

3   garage from looking at the boiler pipes previously

4   against the refrigerator and hit the power button

5   on the boiler."  And I think that's what you said

6   in your statement to the sheriff, too, that you

7   turned the boiler off and then went out.

8       But as this statement goes on, I think you're

9   not sure that you did turn off the boiler because --

10  A.   I'm sure that I attempted to, yeah, but I'm

11  not sure that I turned it off, because Jim Tucker

12  had told me later that night that he had to turn it

13  off.

14  Q.   And you say, "I don't think that I shut it off

15  correctly because Jim Tucker later told me that

16  they had shut it down and there was still exhaust

17  blowing out the separated pipe."

18      So do you see that --

19  A.   Yes.

20  Q.   -- in your statement?  "But at the time I was

21  in a hurry to get it back together and get inside

22  the house to look for Monica and assumed that the

23  boiler was evacuating remaining fumes as it shut

24  down."

25  A.   Okay.  Some bad punctuation on my part.

51

1   Q.    Well, I'm not your judge on that.  Are you

2   saying here that you pushed the two pieces of pipe

3   together?

4   A.    Yes.

5   Q.    You are sure of that?  When you came back they

6   were apart again, so they must have come apart

7   in-between.  Is that what you are saying?

8   A.    No.  What I'm saying is -- maybe I can put

9   this more succinctly than I was able to write it.

10       So the sentence is a little confusing.  I do

11   remember I had put the ladder against it, I tried

12   to hit the button, I stepped up on the ladder to

13   put the part of the pipe that was separated back

14   together.  My thinking was that if that was the

15   problem, I didn't want more gas flowing into the

16   garage while I was in there, so I put it back

17   together.  And I remember that distinctly, because

18   as I was putting it back together there was hot

19   exhaust hitting me in the face from the pipe.  And

20   I think, at that time, I had already attempted to

21   turn it off, I thought I had hit the button, and it

22   was still exhausting, so I thought it was just

23   continuing to exhaust whatever gasses and whatever

24   was cycling down.

25       And I was starting at that point to be in a

52

1   hurry and starting to panic a little bit, so it's

2   hard for me to remember exactly what that was, but

3   I'm pretty sure here that what I was trying to say

4   was that that pipe was blowing exhaust out when I

5   tried to put it back together.  At the time I did,

6   the retaining clamp, that metal ring, was on the

7   refrigerator.  I picked it up and I put it on the

8   pipe before I put it back together.

9   Q.   Did you clip the pipe?  Did you caulk the pipe

10  or --

11  A.   Did I clip --

12  Q.   Caulk it.  I don't know if caulk is the right

13  word.

14  A.   I think you mean load it.

15  Q.   Load it, okay.

16  A.   I couldn't tell you.  Generally when I do

17  something I try to do it all the way, but I was in

18  a hurry at the time so...

19  Q.   If your recollection is correct, then the pipe

20  must have come apart again?

21  A.   That day?  Yes.

22  Q.   Yes.

23  A.   Since the last time I had seen it, yes.

24  Q.   Well, I'm talking about the time you put them

25  together, clipped it, and then went into the house

53

1    to find Monica.  But afterwards --

2    A.    I never touched it again after that.

3    Q.    Excuse me, I wasn't quite finished.

4    A.    Okay, sorry.

5    Q.    Afterwards, Tucker told you he put the pipe

6    back together again.  What I'm saying is apparently

7    it came apart again between you and Tucker?

8    A.    No.  Okay.  He didn't tell me that he had put

9    the pipe back together again, he told me they had

10   had to shut it down.  That's all he told me.

11   Q.    Let's see.  "Tucker later told me that they

12   had shut it down and there was still exhaust

13   blowing out the separated pipe, but at that time I

14   was in a hurry to get back together and get inside

15   the house to look for Monica and assumed that the

16   boiler was evacuating the remaining fumes as it

17   shut down.  I quickly replaced the retaining clamp

18   that was lying on the refrigerator and put the pipe

19   together then hurried to the man-door."  So...

20   A.    This was -- never mind.

21   Q.    Go ahead.

22   A.    This is what I was referring to when I said

23   bad punctuation on my part.  When I say, "and there

24   was still exhaust blowing out the separated pipe,"

25   I was referring to -- the time reference there

54

```
1    "still exhaust blowing" is referring to me there

2    was exhaust.  Jim didn't tell me there was still

3    exhaust blowing out the pipe, I was saying at that

4    time that I tried to shut it down that there was

5    still exhaust blowing out the pipe.

6    Q.    Could you tell me, Mr. Schuler, where on

7    Exhibit 28 or 27, and we've got all kinds of

8    pictures if it's not here.

9    A.    Mm-hum.

10   Q.    Where did you put the pipe together again in

11   the last event?

12   A.    I'm pretty sure it was this joint right here

13   that's to the right of the support (indicating).

14   Q.    Okay.  I'm going to give you a red pen.  Would

15   you circle on this Exhibit 28 where that break was?

16         (Witness complies.)

17   A.    And I can't tell you that I'm not a hundred

18   percent, but I'm pretty sure that was it.

19   Q.    95 percent?

20   A.    Let's say 95.  It could've been the one next

21   to it.  I remember just grabbing two pipes and just

22   slip the thing on and go like that.  If it was the

23   other one, it would have kind of a been a more

24   convoluted grab.  Like my hand wouldn't -- doesn't,

25   you know, it's a pipe, a band, all this stuff going
```

55

1    on.  I remember it being fairly simple just put my

2    hands around it and just push it together, so

3    that's why I think it was that one.  I do know it

4    was one of those two.

5    Q.    Pushing it back together again, do you have a

6    recollection of -- was that difficult?  I mean do

7    you remember whether was it wet and slippery?  Do

8    you remember?

9    A.    I don't remember if it was difficult or not.

10   I don't remember spending a lot of time doing that.

11   Q.    You are a physical man?

12   A.    Yeah.

13   Q.    Strong?

14   A.    It wasn't difficult for me.  I don't remember

15   it specifically being hard or easy.  I do remember

16   it was fairly quick.

17   Q.    And you were concerned about yourself, of

18   course?

19   A.    Yes, that's why I was trying to move quickly.

20   Q.    Did you know how high the content of CO was in

21   that house?

22   A.    I know now how high.  I knew that night that

23   the fire department told me that their meters had

24   basically maxed out, that's all.

25   Q.    At a thousand, which is --

94

1    morning, I generally check my e-mail early, and

2    then after work I check that account.

3    Q.    Okay.  When you went in Thursday night and

4    found that the clamp was off, did you try to

5    contact Wyoming Mechanical at all to tell them that

6    the pipe had come part again and in fact the clamp

7    had come off?

8    A.    I don't think so.

9    Q.    Again, if I'm understanding you, Friday

10   morning around ten o'clock in the morning, you did

11   see Monica's car or a car at outside the Buckingham

12   home that might have been Monica's?

13   A.    Yes.

14   Q.    And was ten o'clock the time she normally

15   showed up for the cleaning duties?

16   A.    It was more that there was a car there, and I

17   knew that Monica cleaned the house on Fridays

18   generally in the middle of the day.

19   Q.    What time did she usually arrive?  Do you

20   know?

21   A.    I don't really know.

22   Q.    Okay.  When you saw her car there, did you

23   know that she would probably be going in through

24   the garage?  Is that how she got into the house?

25   A.    Yeah, I think I knew that she usually goes in

95

1    through the garage, because it's how everybody but

2    the Buckinghams goes in and out of the house.

3    Q.    And uses -- there is a code on the garage or

4    something?

5    A.    There is a keypad.

6    Q.    Were you concerned at that point that the vent

7    pipe might have come apart again when you saw

8    Monica's car over there?

9    A.    No.  I wasn't really, you know, it had

10   happened twice over several days, so I didn't think

11   it was something that was happening all the time.

12   And it also, you know, basically like I felt like

13   Greg had called a contractor and that they were

14   dealing with it.  Greg didn't say, keep an eye on

15   it or make sure that, you know, basically he told

16   me what's in the e-mail, so I wasn't overly

17   concerned about it.

18   Q.    If Greg had said to you to keep an eye on this

19   over the weekend, what would you have done?

20   A.    You know, I probably wouldn't have done any

21   more than I did anyway.  I mean -- and this is

22   just, you know, it's hard to say what I would have

23   done because now I know what I know and then I

24   didn't know.

25   Q.    In hindsight?

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

_____
                                )
FRANCISCO L. HERRERA and        )
JOANNA HERRERA, CO-WRONGFUL     )
DEATH REPRESENTATIVES, for      )
the exclusive benefit of        )
the beneficiaries of MONICA     )
HERRERA, deceased, who have     )
sustained damages for her       )
wrongful caused death,          )
              Plaintiffs,        )
                                )
        vs.                     )   Civil Action No.:
                                )      15-CV-128-F
GREGORY BUCKINGHAM and          )
DEBORAH BUCKINGHAM, both in     )
their individual capacities     )
as Trustees of the BUCKINGHAM   )
FAMILY TRUST; and GREGORY       )
BUCKINGHAM and DEBORAH          )
BUCKINGHAM as individual        )
defendants; and WYOMING         )
MECHANICAL, INC., a Wyoming     )
Corporation;                    )
TRIANGLE TUBE/PHASE III CO.,    )
INC., a New Jersey Corporation; )
and, M&G GROUP DURAVENT, INC.,  )
a New York Corporation,         )
              Defendants.        )
_____


TRANSCRIPT OF DEPOSITION OF
DAVID RYAN SCHULER
VOLUME I


Taken at
235 East Broadway
Jackson, Wyoming
April 27, 2016
8:20 a.m.


COURT REPORTER: Denise Nowak
Certified Shorthand Reporter
and Notary Public

1    looking at the support that comes out the wall.

2    A.    Yes.

3    Q.    And you believe it's the joint to the right?

4    A.    Yes, that would be my best guess.

5    Q.    Okay.  I suspected that when I read your

6    deposition, but it just wasn't all that clear.

7    Thank you.

8    A.    Yep.

9    Q.    And you put it back together, and that's when

10   you went and looked inside and found Mrs. Herrera.

11   A.    Yes.

12   Q.    Is this the first time you put together the

13   flue?

14   A.    I don't think so.

15   Q.    Ah ha.  When do you think you put the flue

16   together before that?

17   A.    Well, I do remember previously the seal, the

18   white at the junction where the gray pipe goes in

19   the white pipe, I remember the night of -- I think

20   Thursday the 29th when I was in the house working

21   on things and Greg had asked me to look at it, I

22   looked at this.  And this was not in, so I just

23   kind of pushed that seal back in, I wiggled the

24   gray pipe back and forth, I pushed that seal back

25   in.

1          I don't remember -- I do remember putting --
2     finding the, you know, the steel retaining clip on
3     the refrigerator at some point.  I don't remember
4     if it was that night when I put it together, if I
5     slipped it back then, when, so I don't know -- I
6     don't specifically remember any other time putting
7     the flue back together I think is what I'm trying
8     to say.  If I looked at my notes that I took
9     shortly after that it might help jog my memory.
10    Q.    Okay.  Before you go to that --
11    A.    Yes.
12    Q.    -- take this red pen.
13    A.    Mm-hmm.
14    Q.    And I want to mark with the red pen the blue
15    seal that you adjusted somehow.
16    A.    Circle it?
17    Q.    Whatever.
18    A.    Point at it somehow?
19    Q.    Whatever.  Is it working?
20    A.    Yes.
21    Q.    What have you put on there?
22    A.    An arrow pointing to the seal that I was
23    talking about.
24    Q.    Describe more for me what you saw that
25    Thursday.

Case 2:15-cv-00128-NDF   Document 131   Filed 09/07/16   Page 20 of 30

1    A.    Specifically about the seal?

2    Q.    Yes, sir.

3    A.    The seal wasn't seated correctly.  I don't

4    remember if it was pushed out or in, I just

5    remember looking at it and that it wasn't sealed

6    correctly, it didn't look like it was creating a

7    seal, and you know like I kind of pushed the pipe

8    out a ways so I could get my fingertip in there

9    enough to kind of make the seal go where it was

10   supposed to and it looked like it was kind of

11   seated and sealing after that.

12   Q.    Did you think it was important that it was

13   sealed?

14   A.    Yes.  I figure if the manufacturer put a seal

15   there, it had a reason.

16   Q.    Now we are working on refreshing your

17   recollection.

18   A.    Mm-hmm, yes.

19   Q.    You've marked the seal.  Do you think on that

20   night you also reassembled some flue joint?

21         Here, we are going to look at Exhibit 19.

22         MR. WALTZ:  Let's take five minutes and read

23   that through, and I'm then I'm going to ask you

24   some questions.  We'll take a short break and then

25   we'll get started again.

1          (Brief recess taken.)

2          MR. WALTZ:  Are we ready to go here?

3          THE WITNESS:  I am ready.

4     BY MR. WALTZ:

5     Q.    Mr. Schuler, we took a break and asked you to

6     review Exhibit 19.  Have you done so?

7     A.    Yes.

8     Q.    Does that refresh your recollection?

9     A.    Yes.

10    Q.    I think the question I asked was, have you

11    done something with the flue prior to -- actually

12    about the time you worked on the seal?

13    A.    Yes, I did.

14    Q.    You did.

15    A.    Yes.

16    Q.    What did you do?

17    A.    The -- I had been working in the house.  I

18    came back and looked at the flue more closely.  I

19    work on the seal.  And while working on that seal,

20    I noticed that one of those metal retaining clips

21    was sitting on the top of the refrigerator, not on

22    the joint.

23    Q.    Okay.  Looking at Exhibit 58?

24    A.    I have it here.

25    Q.    Which of the joints did not have the metal

1   clamp?

2   A.     So here's where I would think it's that left

3   side joint, because there was moisture on the top

4   of the refrigerator when I picked up that clip and

5   put it back on, it leads me to believe, you know,

6   I'm making an assumption here, that you can see the

7   brown rust on the gray pipe is because that was the

8   clip that I picked up and put back on on the left

9   side.

10  Q.     We'll make a record.  So looking at this

11  photograph and seeing the support that comes out of

12  the wall.

13  A.     Yes.

14  Q.     It's the joint to the left of that support?

15  A.     Yes.

16  Q.     So how did you do that?

17  A.     I -- basically I pulled it apart.

18  Q.     How difficult was it to pull it apart?

19  A.     It took effort to pull it apart, even though

20  the clip wasn't on there it took some effort.  And

21  I think that I remember that I had pushed the seal

22  back in correctly first.  When I pulled it apart to

23  put the metal clip in, I put the clip in, put it

24  back together with the clip, and then looked at the

25  seal again because that piece of pipe had moved

1    while I was putting it back -- taking it apart and

2    putting it back together, and the seal had gotten

3    dislodged in a similar way, and so I put the seal

4    back like I had done before, so actually I had put

5    that seal back twice.

6    Q.    So you fixed the seal, then you take the

7    ladder, you stand really in the same place, right?

8    A.    Right in the same place.

9    Q.    And you take the metal clip.  How did you know

10   how to put it on the pipe?

11   A.    If you look at the other joints they are all

12   configured the same way.

13   Q.    So you put it on -- you take completely the

14   flue apart.  You put the metal clamp back on.  You

15   put the pipe back together.  And I assume you

16   fasten the clip?

17   A.    Yes.

18   Q.    And do you put it all the way over the

19   plastic?

20   A.    There is two teeth that go over a plastic rim

21   or a flange, and it's obvious that those are meant

22   to go over that, from looking at the other joints.

23   Q.    And you did that?

24   A.    Yes.

25   Q.    And it was after you did that activity that

1   you looked to see if you might have affected the

2   seal that you had repaired?

3   A.    Yes.

4   Q.    And you realized that it had distorted it?

5   A.    Yes.

6   Q.    And you went ahead and repaired it again?

7   A.    Yes.

8   Q.    And then you left it that way.

9   A.    Yes.

10  Q.    And this all occurred, you believe, which

11  date?

12  A.    This was Thursday night.

13  Q.    So the 29th?

14  A.    The 29th, yes.

15  Q.    This repair that you did, why were you in

16  there?

17  A.    Why was I in the garage?

18  Q.    Yes.

19  A.    That was the night after they had left, I

20  wanted to fix some lights on Debra's car, I was

21  fixing the hinge on the bench, and I was fixing a

22  toilet seat in the house.

23  Q.    It was all that night?

24  A.    It was all that night, yes.

25  Q.    Did you repair the flue and the seal --

1    strike that.

2         Did you repair the clamp and replace the clamp

3    and fix the seal before or after you did the work

4    inside?

5    A.    After.

6    Q.    Was -- how did you come to notice that there

7    was an issue?

8    A.    It was -- I was looking for it.  Greg had

9    mentioned in the e-mail that we talked about

10   earlier that he had put it back together again,

11   so...

12   Q.    Have you discussed with Mr. Buckingham which

13   joints he had seen become disengaged?

14   A.    No.

15   Q.    Let's go back to the e-mails.

16   A.    (Witness complies.)

17   Q.    I got distracted by going from page 2 of

18   Exhibit 73; just turn to page 2.

19   A.    Yes.

20   Q.    You say lastly the, "House is holding

21   temperature fine, around 60 in there this morning,

22   garage was at 50."  What was keeping the house

23   heated at this point?

24   A.    There is a small propane fired stove in the

25   hallway of the house that typically is not on.  I

1    Q.    And at that time they were recommending to

2    make sure that you had carbon monoxide detectors?

3    A.    We had already had them installed.

4    Q.    So they didn't really address that.

5    A.    No.

6    Q.    So on January 30, 2015 did you actually

7    witness Mrs. Herrera coming on to the property and

8    entering the house?

9    A.    No.

10   Q.    Did you see her vehicle go by?

11   A.    No.

12   Q.    Run through for me when was the first time you

13   noticed her vehicle.  First of all, did you notice

14   her vehicle at the site?

15   A.    So her vehicle is -- at that time I didn't

16   know what she was driving, previously she had

17   driven a red SUV and I knew that vehicle.  But

18   around late morning I took the dog out and I looked

19   over towards the house and saw a white Chevy Tahoe

20   and noticed it was there, and that's when I

21   remembered that, yeah, Monica is supposed to be

22   there cleaning that day.  And I thought, you know,

23   it was parked across from where Deborah normally

24   parks her car, so right next to that propane tank I

25   pointed out.

1   Q.    I see.

2   A.    So it was parked right there.

3   Q.    Right.

4   A.    I saw the front of the car from my house over

5   here.  You can just see a car parked there.

6   Q.    Right.

7   A.    And I didn't know it was Monica's car, but I

8   thought -- I realized that if there was a car

9   sitting there it had something to do with Monica

10  being there because she was the only person

11  supposed to be there.

12  Q.    When you say late morning, define that for me.

13  A.    Like 10 or 11.

14  Q.    And you had actually been in the structure,

15  the residence, the main ranch house, the day

16  before?

17  A.    The night before.

18  Q.    The night before.  When, approximately, did

19  you walk out of the residence?

20  A.    It was February, it was before I changed jobs,

21  I would say it was, you know, maybe 7 or 8 at

22  night.  It was after dark, it gets dark relatively

23  early at that time of year.  And at that time I had

24  a job where I had a fairly predictable time I got

25  home from work.  So I may have gone over there

1

1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF WYOMING

3

4   FRANCISCO HERRERA, and JOANNA          )
    HERRERA, CO-WRONGFUL DEATH             )
5   REPRESENTATIVES, for exclusive         )
    benefit of the beneficiaries of        )
6   MONICA HERRERA, deceased, who have     )
    sustained Damages from her             )
7   wrongfully caused death,               )
                                           ) Civil Action
8                   Plaintiffs,            ) No.
    vs.                                    ) 15-CV-128-F
9                                          )
    GREGORY BUCKINGHAM and DEBORAH         )
10  BUCKINGHAM, but in their individual    )
    capacities as Trustees of the          )
11  BUCKINGHAM FAMILY TRUST; and,          )
    GREGORY BUCKINGHAM and DEBORAH         )
12  BUCKINGHAM as individual               )
    defendants; and, WYOMING               )
13  MECHANICAL, INC., a Wyoming            )
    Corporation; TRIANGLE TUBE/PHASE       )
14  III CO. INC., a New Jersey             )
    Corporation; and, M&G GROUP            )
15  DURAVENT, INC., a New York             )
    Corporation,                           )
16                                         )
                    Defendants.            )
17

18            DEPOSITION OF DAVID SCHULER

19          Tuesday, May 3, 2016, 9:15  a.m.

20                  Jackson, Wyoming

21

22          BE IT REMEMBERED that the deposition of
    David Schuler was taken by the attorney for the
    defendants at The Wort Hotel, Goldpiece Room, 50,
23  located at 50 Glenwood Street, Jackson, Wyoming,
    before Shantae Miller, Court Reporter and Notary
24  Public, in and for the State of Idaho, in the
    above-entitled matter.

25

11

1    I've had to -- because I've gotten a trouble code

2    from that one.

3            Q.   Do you know if there is a low temp

4    sensor in the garage?

5            A.   I don't know for sure.

6            Q.   Okay.  It's my understanding from your

7    earlier testimony that Thursday evening, which would

8    have been January 29th, you went over to the

9    Buckingham house after work to perform some little

10   jobs around the house, correct?

11           A.   Yes.

12           Q.   Some little repairs.  And that after you

13   performed those repairs, you went to check on the

14   boiler vent system?

15           A.   Yes.

16           Q.   And the reason you went to check on it

17   was that Mr. Buckingham had asked you to keep an eye

18   on that because it had pulled apart?

19           A.   Yes.

20           Q.   Okay.  And as I understand it, when you

21   went to check on the venting system, it was together,

22   it was not pulled apart that Thursday evening?

23           A.   Yes.

24           Q.   But you found this ring on the

25   refrigerator?

12

1          A.    Yes.

2          Q.    So you pulled it apart, put the ring on,

3   and put it back together and then put the ring into

4   place?

5          A.    Yes.

6          Q.    When you put the ring into place, does

7   it snap into place, or how did you know you had it on

8   correctly?

9          A.    There is -- there are two hooks on one

10  side of the ring that grab a flare on the female side

11  of the joint, and then there's a ring that goes on

12  the male side of the joint, and it seems like the

13  ring is loaded or torqued on there, and that's what

14  holds it together.

15         Q.    Okay.  Did you get it on the first time

16  you tried, or did you have to try several times to

17  get it on?

18         A.    I think I got it on the first time.

19         Q.    Okay.  After you did that, pulled the

20  vent apart and put the ring on and put the ring into

21  place, did you call anyone at Wyoming Mechanical to

22  let them know you had done that?

23         A.    No.

24         Q.    Okay.  On the Monday after

25  Mrs. Herrera's death, you were present when Wyoming