Julie Nye Tiedeken
Wyoming Bar #5-1949
McKellar, Tiedeken & Scoggin, LLC.
702 Randall Avenue
P. O. Box 748
Cheyenne, WY  82001
(307) 637-5575
(307) 637-5515
jtiedeken@mtslegal.net
Attorney for Defendant, Wyoming Mechanical Company, Inc

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| FRANCISCO L. HERRERA and JOANNA HERRERA, CO-WRONGFUL DEATH REPRESENTATIVES, for the exclusive benefit of the beneficiaries of MONICA HERRERA, deceased, who have sustained damages for her wrongfully caused death. | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 15-cv-128-F |
| GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM, but in their individual capacities as Trustees of the BUCKINGHAM FAMILYTRUST; And GREGORY BUCKINGHAM and DEBORAH BUCKINGAM as individual defendants; and WYOMING MECHANICAL, INC a Wyoming Corporation; TRIANGLE TUBE/PHASEIII CO. INC., a New Jersey Corporation; and M&G GROUP DURAVENT, INC., a New York Corporation | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**WYOMING MECHANICAL'S OPPOSITION TO M&G DURAVENT INC.'S MOTION FOR SANCTIONS FOR SPOILIATION OF EVIDENCE AND TRIANGLE TUBE'S JOINDER IN THE MOTION**

COMES NOW Wyoming Mechanical Company, Inc., by and through its attorney, Julie Nye Tiedeken, McKellar, Tiedeken, & Scoggin LLC and submits the following Memorandum of Law in Support of its Opposition to M & G's Motion for Sanctions for Spoiliation of Evidence and Triangle Tube's Joinder in the Motion.

**M & G'S MISSTATEMENTS OF THE FACTS**

M & G has made several gross misstatements of the facts in their memorandum and proposed findings of fact in an effort to support their spoliation motion. M & G states as a fact that "This is not the first time Wyoming Mechanical, Inc. ("WYMech") has been involved in a wrongful death litigation" and cites to Gary Bennett's deposition as support for this statement. Gary Bennett testified as follows during his deposition when asked to clarify his prior testimony about an alleged wrongful death claim:

Q. (By Mr. McGill) So can you tell me a little bit -- when you took over the agency, you mentioned that there was a prior wrongful death claim, was that involving Wyoming Mechanical, Stephen Geick, David Geick? What recollection do you have of that?

A. I really have no recollection of any specifics of the claim, because I -- it was -- I don't even know how many years it was before I took over. I just know there was a wrongful death claim somewhere out in the Village at a hotel.

Q. I see.

A. And then one of my employees told me that.

Q. Was it the Snake River Lodge; do you recall

A. I don't know. I don't remember which one it was because the lady that told me, you know, just told me that there was a claim out there, because I was getting to know the clients, that's all –

Q. I see.

A. -- so..

Q. So that was a claim. Do you recall if it was a claim against Wyoming Mechanical? Mr. Stephen Geick? David Geick?

A. That's way before me.

(Bennett depo: 53:16-54:18)

\*\*\*

Q. (By Mr. McGill) I may have misunderstood you. Do you know where that claim was litigated?

A. I don't -- I truly don't know any of the facts of that claim.

(Bennett 55:24-56:3) (Emphasis Supplied)

In fact, neither Wyoming Mechanical, David Gieck nor Stephen Gieck have ever been involved in a wrongful death claim or wrongful death litigation of any type including any type of claim at Teton Village at a hotel. (See David Gieck Affidavit attached as Exhibit A)

M & G likewise alleges the following facts, none of which are supported by the evidence, and which have no basis in actual fact:

a. "WYMech willfully tampered with evidence related to the boiler and vent pipes at issue in this litigation in an effort to cover-up a known bad installation and otherwise case doubt onto others".

b. "It knew from a prior wrongful death claim against it that its installation would be questioned".

c. "Subsequently, it used the homeowner's request to 'figure out what happened", as an opportunity to attempt to conceal evidence."

**FACTS**

After Mrs. Herrera's death, Mr. Buckingham called David Gieck and asked him to go out to the house and figure out what is going on with the boiler. David Gieck asked him if it was okay if he went out there, if there was any investigation going on, and Mr. Buckingham told him the investigations were closed and that he needed him to go out and figure out what was going on with the boiler and get heat on in the house. (Gieck 5/3/16 depo 137:25-138-10) David Gieck was reluctant to inspect the boiler and discussed Mr. Buckingham's request with his insurance company and asked his father's opinion. His father told him to talk to his attorney and his insurance company and to honor the request of Mr. Buckingham. (David Gieck 5/3/16 depo. 162:4- 163:7) No one told him not to go out to the Buckingham home. (David Gieck 5/3/16 depo. 164:9-11)

M & G has ignored one of the key facts that was admitted by both M & G's expert engineer, Mr. Skaggs, and Triangle Tube's expert engineer, Mr. Caggiano, i.e. that on the evening when David Schuler went to investigate why Mrs. Herrera's vehicle was still at the Buckingham residence, he discovered that the vent pipe was apart and Mr. Schuler put it back together. He also attempted to turn the boiler off but believes it was eventually turned off by emergency personnel. Thus, when David Gieck went to the Buckingham home at Mr. Buckingham's request on February 2, 2015 to try and figure out what happened, the vent pipe and the boiler were no longer in the condition they had been at the time of exposure (Schuler 11/18/15 depo 42:2-17; Schuler 4/27/16 depo. 69:3- 13; Skaggs depo 73:18-75:3; Caggiano depo 98:9-99:19)

David Schuler was at the Buckingham's home with David Gieck and his employee, Shan, when they came out to look at the boiler to try and figure out what had happened. (Schuler

11/18/15 depo 97:17-25) He took notes during the inspection as the events were happening. (Schuler 11/18/15 depo 98:18-99:25, Schuler 5/3/16 depo 13:8-16) Part of the reason he was there was to observe what they were doing and to document what they did. (Schuler 5/3/16 depo 13: 4-7).

When David Gieck and his employee arrived at the Buckingham home, they were met by Mr. Schuler. They then performed a visual inspection of the system both outside and inside. They took pictures of the flue and pulled it apart to observe whether a gasket was in place at the elbow and then slipped the fittings back together. He pulled apart the gas valve to confirm that the boiler had the proper converted orifice. He fired the boiler and put a monometer on the gas supply coming into the gas valve to check gas pressure to see if it was within required parameters. He fired the boiler and checked the CO and turned it on and off to see if the banging could be recreated. He adjusted the throttle screw to bring it into manufacturer's parameters. All of his actions were taken to try and determine what had occurred to cause Mrs. Herrera's carbon monoxide exposure. He took notes and pictures to document what he did. All of his actions were taken to try and determine what had occurred to cause Mrs. Herrera's carbon monoxide exposure. (David Gieck 5/3/16 63:11-69:1) He ultimately could not determine what had occurred and did not feel comfortable putting his stamp of approval on it and walking away. As a result, he recommended that the boiler be replaced. (David Gieck 5/3/16 depo 139:19-22; 146:7-17)

M & G's expert, Mr. Skaggs testified that if he were the first one on the scene to investigate what had occurred with regard to Mrs. Herrera's death and he wanted to document the location of the throttle screw, he would take a photograph. Skaggs admitted that David Gieck did the same thing he would have done. (Skaggs depo 260:10- 261:1) He admits that Mr.

Gieck took a picture of the throttle screw as he found it shortly after the incident and that Mr. Freeman used that photograph to adjust the throttle screw back to the position it had been in when Mr. Gieck found it. As a result, investigators were able to determine the condition of the throttle at the time of the exposure. (Skaggs depo. 94:1-95:19; 97:18-98:2) He admits that because Mr. Schuler had reconnected the vent, M & G (and everyone else including David Gieck) was prevented from inspecting the venting as it existed at the time of the incident. (Skaggs depo 97:2-12) Mr. Skaggs admits that although he was not present during the February 9 inspection by Mr. Freeman, that he does not have to rely on Schuler and Freeman's descriptions of what occurred because there is a lot of documentation of what occurred during the inspection, including hours of video tapes, Mr. Freeman's data, notes and photos taken during the inspection. He admits that he has not watched all the videotape or reviewed the notes. (Skaggs depo 98:3-100:5) Mr. Skaggs testified that he would have liked to do additional testing but admits that when given the opportunity during two occasions when testing was performed at Mr. Freeman's lab in Denver, he did not request that the testing be performed. (Skaggs depo 100:6-102:25) He has given his opinion that a delayed ignition was the "more probable" cause of the vent pipe coming apart. A short, sharp, high pressure event can cause a delayed ignition which he would like to measure. He admitted, however, that in order to measure the pressure from such an event, you would have to be there when it occurred. Even though he was not present when the delayed ignition occurred, there is authoritative literature where such events have been measured on which he can rely. (Skaggs depo 58:20-65-13)

Triangle Tube has stated in its Joinder Motion that it was prejudiced because Triangle Tube attended the February 9, 2015, inspection conducted by Mr. Freeman for "observation" purposes only. However, Triangle Tube's expert, Mr. Caggiano, testified in his deposition to the

contrary. He testified that Triangle Tube was given the opportunity during the inspection to perform any testing he wanted performed at that time and that Triangle Tube did request some ignition tests. (Caggiano depo 110:6-19) He also testified that they were able to make an adjustment of the throttle screw by using David Gieck's pictures to get it back to where it had been when David Gieck found it. (Caggiano depo. 120:6-14)

Triangle Tube is critical of the way the boiler and vent pipe were transported to Mr. Freeman's lab in Denver. Mr. Robert's confirmed that Mr. McGill, Mr. Senk and Mr. Caggiano (Triangle Tube's attorney, company representative and expert engineer) were present at the February 9, 2016 inspection of the boiler at the Buckingham residence and that they participated in the inspection as far as he could observe. (Roberts depo 65:21-66:17) When it was determined that the boiler would be transported to Mr. Freeman's lab, no objections were made by Triangle Tube's attorney, company representative or expert engineer nor did they give any directions on how the boiler should be packaged and transported. (Roberts depo 66:18-5) He was the individual who personally transported the boiler and to his knowledge there was no damage to the boiler and as far as he knows, it was in the same condition when he delivered it to Mr. Freeman as it was in the Buckingham's home. (Roberts depo 67:6-17)

**DISCUSSION**

A good discussion of "spoiliation" (also referred to as "spoliation") is contained in *Rosenbilt v Zimmerman*, 766 A.2d 749, 752 (N.J. 2001):

> Courts use the spoliation inference during the underlying litigation as a method of evening the playing field where evidence has been hidden or destroyed. It essentially allows a jury in the underlying case to presume that the evidence the spoliator destroyed or otherwise concealed would have been unfavorable to him or her.

*Solum & Marzen*, supra, 36 Emory L.J. at 1087; Robert Gray Palmer, *Altered and 'Lost' Medical Records*, 35 May Trial 31, 35 (1999). See, e.g., *Dow Chem. Co. (U.K.) v. S.S. Giovannella D'Amico*, 297 F.Supp. 699, 701 (S.D.N.Y.1969) (stating that intentional destruction of evidence relevant to proof of an issue at trial gives rise to an inference unfavorable to spoliator); *Collins v. Throckmorton*, 425 A.2d 146, 150 (Del.1980) (recognizing "the general rule that where a litigant intentionally suppresses or destroys pertinent evidence, an inference arises that such evidence would be unfavorable to his case"); *Ritter v. Meijer, Inc.*, 128 Mich.App. 783, 341 N.W.2d 220, 222 (1983) ("When a party deliberately destroys evidence, a presumption arises that if the evidence were produced at trial, it would operate against the party who deliberately destroyed it."). Commentators have characterized the spoliation inference as a powerful tool. Theresa M. Owens, Note, *Should Iowa Adopt the Tort of Intentional Spoliation of Evidence in Civil Litigation*?, 41 Drake L.Rev. 179, 199 (1992).

Spoliation sanctions are proper when " (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant,* 505 F.3d 1013, 1032 (10th Cir.2007). But if the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith. " Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." *Aramburu*, 112 F.3d at 1407. Without a showing of bad faith, a district court may only impose lesser sanctions. *Henning*, 530 F.3d at 1220. *Turner v Public Service, Co. of Colorado*, 563. F.3d 1136, 1149 (Cir. 2009)

The essential elements of a claim of spoliation are not present in this case. There is no evidence that there was "intentional" or "deliberate" destruction of evidence or "bad faith". In this case just the opposite occurred. David Gieck was reluctant to inspect the boiler but was assured that the investigations had been concluded. He went ahead, after discussing it with his insurance agent and father to honor his customer's request to try and determine what was going on with the boiler and to get the heat going in the house. He documented what he did by taking

notes and pictures. He brought another employee with him to observe and the Buckingham's caretaker was also present to observe and document what he did. At the time of the inspection, no claim had been made against Wyoming Mechanical, and in fact no claim was made until many months later. There was no duty on Wyoming Mechanical's part at that point to preserve evidence. There was absolutely no bad faith or intentional destruction of "evidence".

M & G and Triangle Tube has not been prejudiced by David Gieck's inspection of the boiler and vent system. Because David Shuler put the vent back together the evening of the incident, had the ability to test the vent system in its configuration at the time of the incident. David Gieck took pictures documenting what he did which have been used by all the expert engineers in their inspections of the boilers. M & G contends that it would have liked to do additional testing not performed by Mr. Freeman and others but when given the opportunity to perform testing at Mr. Freeman's lab, no such tests were requested.

**CONCLUSION**

For the reasons set forth above, the Motions of M & G and Triangle Tube for sanctions should be denied.

**DATED** this 12th day of September, 2016.

By: /s/ Julie Nye Tiedeken
Julie Nye Tiedeken
Wyoming Bar #5-1949
McKellar, Tiedeken & Scoggin, LLC
P.O. Box 748
Cheyenne, WY 82003-0748
(307) 637-5575
jtiedeken@mtslegal.net

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 12^tht day of September, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF system which will send notification of such filing to the following e-mail addresses:

David Lewis
P.O. Box 8519
Jackson, WY 83002
davelewis@bresnan.net

Katherine Mead
P.O. Box 1809
Jackson, WY 83001
kate@meadlaw.net

Christopher R. Reeves
Dick Waltz, Esq.
Waltz/Reeves
1660 Lincoln Street, Suite 2510
Denver, CO 8800
creeves@waltzreeves.com
dwaltz@waltzreeves.com

Cameron S. Walker
Judith A. Studer
Schwartz, Bon, Walker & Studer, LLC
141 South Center Street, Suite 500
Casper, WY 82601
cam@schwartzbon.com
jstuder@schwartzbon.com

Joseph P. McGill
Jennifer A. Cupples
Foley, Baron, Metzger & Juip, PLLC
38777 Six Mile Road, Suite 300
Livonia, MI 48152
JMcGill@fbmjlaw.com
jcupples@fbmjlaw.com

                                                    By:  */s/ Julie Nye Tiedeken*
                                                        McKellar, Tiedeken & Scoggin, LLC