Exhibit A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
_____
                               )
FRANCISCO L. HERRERA and       )
JOANNA HERRERA, CO-WRONGFUL     )
DEATH REPRESENTATIVES, for     )
the exclusive benefit of       )
the beneficiaries of MONICA    )
HERRERA, deceased, who have    )
sustained damages for her      )
wrongful caused death,         )
              Plaintiffs,      )
                               )
        vs.                    )   Civil Action No.:
                               )     15-CV-128-F
GREGORY BUCKINGHAM and          )
DEBORAH BUCKINGHAM, both in    )
their individual capacities    )
as Trustees of the BUCKINGHAM )
FAMILY TRUST; and GREGORY      )
BUCKINGHAM and DEBORAH         )
BUCKINGHAM as individual       )
defendants; and WYOMING        )
MECHANICAL, INC., a Wyoming    )
Corporation; Triangle          )
TUBE/PHASE III CO., INC.,      )
a New Jersey Corporation;      )
and, M&G GROUP DURAVENT, INC.,)
a New York Corporation,        )
              Defendants.      )
_____

TRANSCRIPT OF DEPOSITION OF
RICK L. HIRSCHI, PH.D.

Taken at
235 East Broadway
Jackson, Wyoming
May 4, 2016
9:33 a.m.

COURT REPORTER: Denise Nowak
Certified Shorthand Reporter
and Notary Public

1  Q.    She had a high school diploma from where?

2  A.    I'm not sure.

3  Q.    Was it the United States?

4  A.    Yes, it's from California is my understanding.

5  Q.    Her yearly extra income, aside from the

6  hospital, was $5,400 a year?

7  A.    Correct.

8  Q.    Have you been able to verify that through any

9  documentation?

10  A.    I have not.

11  Q.    Do you typically verify income when you're

12  using a calculation?

13  A.    If at all possible, to this one, I have not

14  been able to verify it.  That would be upon the

15  family to provide that information.

16  Q.    In tab 6, in addition to the e-mail, you also

17  have something from the National Association of

18  Forensic Accountants for economics?  I apologize.

19  A.    Correct.

20  Q.    It's a statement of principles, correct?

21  A.    Yes.

22  Q.    Why do you have that in there?

23  A.    Just guidelines.

24  Q.    Then you have one piece of paper in here.

25  What is this?

1    Q.    Is this explained in your report?

2    A.    It's not.  It's just the financial

3    calculation.

4    Q.    Now we've talked about, so far, some income.

5    I want to talk about the $5,400.  I asked if you

6    saw any documentation supporting the $5,400.  Have

7    you seen any whatsoever?

8    A.    I have not.

9    Q.    Is it on the tax returns?

10    A.    It is not.

11    Q.    Is that fact mentioned in your report?

12    A.    I do not -- I don't think I mentioned that it

13    is not on the tax returns in the report.

14    Certainly, we recognized that she had income, given

15    that -- where the event took place, she was being

16    paid there.

17    Q.    I understand that, but I've got your report,

18    we've marked it as Exhibit 98, and it's a four-page

19    report.  I want to know where in the four-page

20    report --

21    A.    Do I mention the $5,400?

22    Q.    Yes.

23    A.    So on the third page, 5.

24    Q.    It's the page -- here's the top of the page.

25    A.    So page 3.

1   Q.    Okay.

2   A.    Under the number 5, if you look at B.

3   Q.    That's straight from the daughter?

4   A.    That's straight from the daughter; that's from

5   the e-mail that I received from her.

6   Q.    But my question is more specific.  In your

7   report, which goes through page 5, where do you

8   alert the person who's reading it that roughly 17

9   percent of her income is not reported?

10  A.    I do not.

11  Q.    Why not?

12  A.    The report separates them out for it, so I

13  have her W-2 information, and then as a separate

14  table under Tables, I have that as a separate one.

15  And that's -- that's to be brought up and confirmed

16  during the trial, was that $5,400 accurate?  It has

17  been stated there.  I have taken that, but I have

18  not verified that, but just take it as a fact that

19  was given and the burden will be upon them to prove

20  if that was actually there or not.

21  Q.    Your report was written November 2nd, 2015

22  correct?

23  A.    Correct.

24  Q.    I'm at May 3rd, so we're about five months --

25  six months away.  In that six months, have you

1  A.    I don't recall which one.

2  Q.    How much was Ms. Herrera paid -- strike that.

3        How much was the check for Ms. Herrera that

4  was written by the Buckinghams for the weekend she

5  worked there?

6  A.    I believe around a hundred dollars, but I'm

7  not sure on the exact amount.

8  Q.    I've looked at the exhibit.  We have Exhibit

9  25 here.  I tried hard to look at that and I

10 couldn't read it.  Can you read it?

11       MR. LEWIS:  You mean --

12       MR. WALTZ:  My eyes are failing me.

13       MR. LEWIS:  -- the amount of the check, is

14 that what --

15       MR. WALTZ:  Yes, sir.

16       MR. LEWIS:  He wants to know if you can see

17 that.

18       THE WITNESS:  Oh, up there.

19 A.    I am unable to tell that.

20 BY MR. WALTZ:

21 Q.    Did someone tell you it was a hundred dollars?

22 A.    Mr. Lewis mentioned it was somewhere in that

23 range.

24       MR. LEWIS:  $125.

25 BY MR. WALTZ:

1  Q.    It's $125?

2  A.    I think that's what it is.

3  Q.    How long did it take her to clean the

4  Buckingham home, typically?

5  A.    I do not know.

6  Q.    I'm trying to figure out hourly wage here.

7  Have you been given any idea how long it would take

8  her to -- strike that.

9        Have you done any calculation of what the

10 hourly wage would be for her housecleaning?

11 A.    I have not.

12 Q.    Have you asked for that?

13 A.    I have not.

14 Q.    If one is self-employed and one claims the

15 income on their tax return, there is a form that

16 can be filled out, correct?

17 A.    Correct.

18 Q.    And indeed, in this case, there are such forms

19 there were filled out for the husband's business,

20 correct?

21 A.    For the husband's business, there was.

22        MR. WALTZ:  If we could pass down the exhibit

23 notebook, it's the smaller of the two.  I'm going

24 to hand this to you.

25        THE WITNESS:  Thank you.

1   use this as an example, item numbered 9 under

2   Expenses:  Car and truck; do you see that?

3   A.     Correct.

4   Q.     Can I presume that she drove to the places

5   that she cleaned?

6   A.     Yes.

7   Q.     And what were the expenses that she incurred

8   under the IRS regulations for driving to the

9   various places she cleaned?

10  A.     What could she deduct?

11  Q.     Yes.

12  A.     She could deduct, I'm not sure of the current

13  rate, about 55 cents a mile.

14  Q.     And what was the mileage from her home to the

15  Buckingham residence?

16  A.     I am not sure.

17  Q.     How long did it take her?

18  A.     I don't know.

19  Q.     Would you agree that whatever you drive on

20  your car is wear and tear for your business?

21  A.     Yes.  And part of it is -- I question if she

22  cleaned, leaving from the hospital or left from her

23  home, what was the additional mileage.

24  Q.     My problem is I could do a lot of forensics

25  here today, I want to know what you did.

1    A.    I just took her gross amount.

2    Q.    In your understanding, she never bought any

3    supplies for any of her cleaning business?

4    A.    There's no information provided me that she

5    did.

6    Q.    So you don't know?

7    A.    I don't know.

8    Q.    You made a comment earlier that cleaning

9    supplies were made available to her.  That is true

10   at the Buckingham residence, correct?

11   A.    That is my assumption.

12   Q.    You didn't even know that?

13   A.    I did not know that.

14   Q.    Why did you say that, then?

15   A.    It was my assumption that I made.  Typically

16   on house cleaning, they are provided, but that will

17   vary by -- by household.

18   Q.    So when these people who clean at buildings

19   where I live and they bring in all these supplies

20   and this equipment to clean, what are they doing?

21   Because you know that happens.

22   A.    So -- so on those circumstances, then they

23   would be bringing those in.

24   Q.    And my question is:  How much money did she

25   spend monthly or yearly on supplies?

1    A.    I have -- do not have that information.

2    Q.    So if I understand correctly, then, the 5500

3    could be inflated, agreed?

4    A.    Agreed.

5    Q.    And it looks like it probably is inflated,

6    agreed?

7    A.    That's debatable.

8    Q.    Well, it's debatable, she had to drive.

9    A.    It certainly would have -- so in terms of the

10   revenue part there, but then yes, the expense for

11   what she would have deducted from that.

12         Now, certainly cleaning houses is a different

13   one, as you've gone through the landscaping, their

14   expenses are likely to be significantly different

15   than a household cleaning business.

16   Q.    You know, I don't want to talk about the

17   landscaping business; I want to talk about cleaning

18   houses.  If you got to drive a car, you got to

19   drive a car, correct?

20   A.    Correct.

21   Q.    She drove a car, we know that, correct?

22   A.    Correct.

23   Q.    How many miles a year did she put on it for

24   business?

25   A.    I do not know.

1  Q.    There's a figure that gets attached to that

2  when you're figuring out how much somebody makes,

3  isn't there?

4  A.    Correct.

5  Q.    Did you make that deduction?

6  A.    I did not.

7  Q.    If she bought supplies, you did not make that

8  deduction, right?

9  A.    I did not.

10  Q.    And what we do know is she never filed tax

11  returns for that amount ever?

12  A.    Correct.  At least for the four years that we

13  had the information for.

14  Q.    Okay.  If you had the past ten years, did she

15  file tax returns on the amount she earned from

16  cleaning?

17  A.    I don't have that information.

18  Q.    Is that a violation of the regulations?

19  A.    Yes, you have to declare that.

20  Q.    But $5,400 had to be declared?

21  A.    Yes.  She would have declared that.  So it had

22  -- if she included it on her taxes, she would have

23  included that as a revenue and also taken off the

24  expense portion.

25  Q.    No, no.  What I'm saying is on the 1040, she

1   averaged.

2   Q.    What were her -- strike that.

3         In four years that you have income for her,

4   did she receive any raises?

5   A.    I was looking at the amounts.  We can't tell

6   if she had raises or not simply because all that we

7   have -- we don't have an hourly rate.  All we have

8   is the total earnings for it.

9   Q.    You don't have her employment file?

10  A.    I don't have an employment file.

11  Q.    And then in paragraph B is where you have your

12  estimate of $5,400 a year, based upon information

13  provided to you by her daughter?

14  A.    Correct.

15  Q.    Paragraph 5C, you talk about fringe benefit

16  programs, and that's where you have the 18.27

17  percent on the average; is that correct?

18  A.    Correct.

19  Q.    Did she fall into the average employer

20  category?

21  A.    I have no reason to believe otherwise.

22  Q.    Paragraph 5D, she'd be an expected to work

23  additional 14.6 years beyond the date of the

24  incident, based on her age, general level of

25  education; is that correct?

1    household services?

2    A.    The average is just over four hours a day.

3    I've used the numbers based on all females in the

4    American Time Use Survey, actually Hispanics have a

5    higher -- Hispanic woman have a higher hourly

6    contribution than women as a whole, for it, but

7    I've used just the women as a whole rather than the

8    Hispanic women.

9    Q.    My question was:  How much time did she spend

10   on household services?

11   A.    I do not have that information.

12   Q.    Now, getting back to your average, when you

13   look at the data for Hispanic women, that's in the

14   United States?

15   A.    In the United States, yes.

16   Q.    Is that for Hispanic women who are working two

17   jobs outside the home?

18   A.    It's upon average.  It doesn't break it down,

19   it's just all Hispanic women.

20   Q.    Okay.  Let's turn to page 4 of your report.

21   A.    (Witness complies.)

22   Q.    Under Computational Methodology, are you

23   there?

24   A.    Yes.

25   Q.    In that paragraph you talk about how you come

1   Q.    If I understand that number, $14,433, if I

2   compared it to the past house cleaning, it's about

3   a third of the house cleaning, is that right, which

4   is $55,247 -- I misspoke, it's $4,297.  So it's --

5   A.    I'm not following which page you're on.

6   Q.    I'll withdraw the question.

7         Her past household services is $14,433.  Her

8   past housecleaning is $4,297, is that right?

9   A.    The past housecleaning?

10  Q.    No, just go to page 4, paragraph 1 page 6 of

11  your report, paragraph 1.

12  A.    (Witness complies.)  So the income from

13  housecleaning is your question?

14  Q.    Compared to the estimate you have of the past

15  loss for household services.

16  A.    Yes.

17  Q.    You have three times the amount for household

18  services, right?

19  A.    Yeah, roughly.

20  Q.    How many hours do you estimate she spends a

21  year on household services?

22  A.    The daily amount is 4.1-something.

23  Q.    4.1 hours?

24  A.    4.1 hours, I think.

25  Q.    So it's a simple calculation.  I do 4.1 hours

1    times 365 times $10.41?

2    A.    Yes.

3    Q.    And you think that comes out to $14,433?

4    A.    Well, it's that fraction for her past

5    household services would be that fraction because

6    it's not a full year.

7    Q.    I understand that.

8    A.    So it's from the date of her death to the date

9    of analysis.

10   Q.    If I take $10.41 and I multiply it by 4.1,

11   that's per week?

12   A.    4.14 per day.

13   Q.    Per day?

14   A.    Yes.

15   Q.    Times 365 days?

16   A.    Mm-hmm.

17   Q.    Is that correct?

18   A.    Correct.  And then times that by .840, which

19   would be the time difference for the fraction of

20   the full year.

21   Q.    How many hours a day did she spend cleaning?

22   A.    I based it on the national numbers.

23   Q.    Which is what?

24   A.    The 4.14.

25   Q.    I asked a bad question, it's my fault.  How

1   reports here.

2   Q.     So other than what's stated in your report

3   with respect to documents and evidence reviewed,

4   facts and computational assumptions and then the

5   computation of methodology and the attached tables,

6   is there anything else that you're relying upon in

7   formulating your opinion?

8   A.     So -- no, there was -- that information that

9   was provided there, the foundational documents and

10  then the additional consumer expenditures of 2014

11  was provided today, and that just has the numbers

12  on it.

13  Q.     And have you received the 2015 tax returns for

14  Mr. and Mrs. Herrera?

15  A.     I have not.

16  Q.     Have you requested that information?

17  A.     I have not.

18  Q.     Do you think that that information is relevant

19  to your analysis?

20  A.     We're not making a claim on Mr. Herrera's

21  income.

22  Q.     They filed joint returns, did they not?

23  A.     They filed joint returns for it, so we -- you

24  can potentially look at that and see where -- where

25  things were.

1    Q.    Do you know if the estate has filed a return

2    for 2015?

3    A.    I am not aware if they have or not.

4    Q.    Is that information that would be relevant to

5    your analysis?

6    A.    Yes, certainly up until the time of death, to

7    do that calculation would be another observation

8    point.

9    Q.    So with respect to the assumptions that are

10   referenced in your report, did you develop that

11   list of assumptions or is that something that Mr.

12   Lewis gave you?

13   A.    Which part are you referring to?

14   Q.    So facts and computational assumptions on page

15   2 of --

16   A.    Those ones, that I -- I did.

17   Q.    But those are generated on the information you

18   received from Mr. Lewis, correct?

19   A.    Correct, as well as, for example, life

20   expectancy, those are from government reports.  The

21   one with the -- to just go back, in terms of the

22   2015 income, given the short amount of time that

23   she worked, I mean January 30th of 2015, I don't

24   know that there would be great value in terms of

25   that information, certainly an observation point,

1   need for it.  So then you take that and combine it

2   with the standards for it and be able to go through

3   and do the analysis.

4   Q.     Do you consider yourself a gatekeeper of those

5   assumptions?

6   A.     Yes.

7   Q.     And from what I can tell from what you

8   testified, it sounds like to me, and this is my own

9   commonsense way of looking at it, it may be common

10  sense or maybe not, but it sounds like the gate is

11  wide open; is that a fair statement?

12  A.     In terms of what assumption I have the

13  opportunity to make?

14  Q.     Yes.

15  A.     Yes.

16  Q.     And you haven't rejected any assumptions?

17  A.     Yeah.  I mean, this all is very standard

18  format, so...

19  Q.     In your analysis, did you make any adjustment

20  for probability generally?

21  A.     So the reports, for example, the Skoog's

22  report, that factors in those probabilities, it

23  gives the probability of expected life in those

24  different ones.  So those probabilities are built

25  in in terms of their numbers that I'm providing.

1  Q.    So the probabilities are built into the

2  support materials that you've used to --

3  A.    Right.  Worklife expectancy --

4  Q.    -- prepare these.

5  A.    -- life expectancy, those probabilities are

6  built in there.

7  Q.    Okay.  So you haven't created your own

8  analysis of probabilities?

9  A.    Correct.

10  Q.    Now, setting aside the medical and funeral

11  expense issues, are there any other significant

12  factors that you think should be included in your

13  analysis that are not?

14  A.    Not for my analysis.

15  Q.    And I think Mr. Lewis asked you some questions

16  about discount rates and whatnot, but I want to run

17  through that with you quickly.

18  A.    Okay.

19  Q.    Give me a -- just a brief explanation of your

20  concept of the process of discounting feature

21  differences.

22  A.    Okay.  So as you look at discounting, you want

23  a risk-free discount rate.

24  Q.    You start with a risk-free rate?

25  A.    You want -- that's the standard that has been

1   A.    Yes.

2   Q.    Is it fair to say that some people personally

3   consume at an average rate and other people may

4   consume at double the average rate?

5   A.    Well, that's the whole point of an average is

6   it gives you a representation that there's going to

7   be individuals on both sides of that.

8   Q.    Right.  And so you don't know if Monica

9   Herrera consumed at an average rate or at some

10  other rate?

11  A.    Correct.

12  Q.    One of the things you talked about is that the

13  national average assumes that someone at Monica

14  Herrera's income level would put a portion of her

15  income into savings, right?

16  A.    Correct.

17  Q.    And that amount, then, would be available to

18  the family as a savings account that they could use

19  for expenses?

20  A.    Correct.

21  Q.    And you had used a figure, that $12,000

22  figure, at a $63,000 income level was the amount

23  that both a husband and wife would put into

24  savings, correct?

25  A.    No, that is not right.  That $12,000

1    correct?

2    A.    Correct.

3    Q.    Because that one element would be almost three

4    times what you're assuming she would personally

5    consume for the year?

6    A.    Under that assumption.

7    Q.    Okay.  You don't have any way of knowing

8    whether Monica personally consumed all of her

9    income and would have nothing available to

10   contribute to the rest of the family, correct?

11   A.    We do not have that information, the portion

12   of the payments.

13   Q.    And that may be the case.  You just don't

14   know?

15   A.    We do not have that information, correct.

16   Q.    Okay.  You don't have that information?

17   A.    Correct.

18   Q.    That information may be available, you just

19   haven't reviewed it?

20   A.    Yes.

21   Q.    And with regard to household duties around the

22   house, that kind of thing, you haven't actually

23   used any real data, you haven't asked Mr. Herrera,

24   for example, how much time his wife has spent on

25   household duties such as you've described?