David G. Lewis, Wyoming Bar No. 4-1150
Attorney at Law
P.O. Box 8519
Jackson, Wyoming 83002
(307) 739-8900
(307) 739-8902 (fax)
davelewis@bresnan.net

Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| FRANCISCO L. HERRERA, and JOANNA HERRERA, CO-WRONGFUL DEATH REPRESENTATIVES, for the exclusive benefit of the beneficiaries of MONICA HERRERA, deceased, who have sustained damages from her wrongfully caused death. <br><br> Plaintiffs, <br><br> vs. <br><br> GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM, but in their individual capacities as Trustees of the BUCKINGHAM FAMILY TRUST; and, GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM as individual defendants; and, WYOMING MECHANICAL, INC. a Wyoming Corporation; <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 15-cv-128-F |

## PLAINTIFFS' RESPONSE AND OPPOSITION TO DEFENDANT BUCKINGHAMS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON <u>PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES</u>

Plaintiffs hereby Responds and Opposes the Defendant Buckinghams'

Motion for Partial Summary Judgment on Plaintiffs' Claim for Punitive

Damages, and in Opposition to the Motion, Plaintiffs show the Court as follows:I.

## I.
### Introduction

On January 30, 2015, the Plaintiffs' Decedent, Monica Herrera, was killed from exposure to carbon monoxide in the residence of the Defendants Buckingham.  The Buckinhams reside in an estate or compound above the Teton Science School on Ditch Creek Road.  The Buckinghams have resided there for approximately ten years.

The Buckinghams own and operate a very successful chain of dry cleaning outlets on the West Coast and around other areas in the United States.  The company is entittled Dress for Success.  Their business takes them to California for much of the winter, which leaves their house vacant.  They have a caretaker at their estate who is employed to take care of the estate and the residences and buildings within the compound.  The caretaker, David Schuler resides in one of the residences on the estate with his wife rent free in exchange for his services.

At the time of Monica Herrera's death on January 30, 2015, the Buckinghams have heated their main residence with a Triangle Tube Prestige 175 boiler system that they purchased and had installed by the Defendant Wyoming Mechanical on November 14-15, 2016.

## II.
### The Events Leading To This Litigation

Monica Herrea was employed by St. John's Hospital for years.  She also worked for a few families in Teton County as a housekeeper.  She was married to Francisco Herrera since the were very young adults in California.  They have three adult childre who live and work in Idaho and Teton County, Wyoming.

They also have several grandchildren and other close relatives living with or near them.

On Friday, January 30, Mrs. Herrera drove to the Buckingham residence in order to clean it. As was usual, she arrived at the residence around 10:00 a.m. The Buckinghams were living in California at the time taking care of their thriving busiiness affairs, and visiting with old friends. Mrs. Buckingham entered the residence through the garage door. According to the Teton Couny Coroner's office, she dropped dead in the home within minutes after she walked in. She was found on the mudroom floor by the estate caretaker, David Schuler, wrapped in a vacuum hose that she had taken from the garage with her into the residence to begin her cleaning. The coroner determined that she died from carbon monoxide poisoning shorlty after she entered the garage and residence. Her oxyhemoglobin level was was 76%.

Prior to her arrival at the Buckingham residence on Friday, the Triangle Tube boiler had been creating anxiety in the residence for a over a week to ten days. The boiler had begun to make loud noises that shook the boiler and the walls of the house. Early in the week of January 26,2015, Greg Buckingham told David Schuler that the vent exhaust pipe had come apart at a joint and that he had climbed up on a ladder and pushed the segments back together. (Schuler Deposition, November 18, 2015). Schuler climbed the ladder himself and noticed that a blue seal through which the vent exited to the out-of-doors was not seated correctly so he reset the seal and checked all the pipe joints. (Schuler statement, Exhibit D).

At the precise point where Greg Buckingham pushed the pipe segments back together, the company that sells the vent placed large red stickers that

recite: "Warning.  Risk of carbon monoxide CO poisoning and risk of fire if improperly installed.  Follow all cautions, warnings, instructions regarding installations to vent pipe system."  (Photographs of the warning stickers are attached hereto as Exhibit G).  Mr. Buckingham has testified that he does not read warnings, not does he pay any attention to them.  He testified that the world is full of warnings and he ignores them, as certain selections from his deposition testimony shows Mr. Buckingham's attitude toward safety—even deadly peril—is almost too cavalier to comprehend.  (Exhibits B and C).

With the certain knowledge that Mrs. Herrera was arriving to clean the Buckingham residence on Friday morning (Exhibits E and F), no provision was made to warn her away from the carbon monoxide peril in the Buckingham residence.

Exhibit G covers photographs that show obvious warnings located intelligently around the vent pipe; and especially obvious at the spot where Mr. Buckingham climbed the ladder to push the segments back together, when he and Mr. Shuler both knew that the exhaust vent segments were continuing to separate.

Exhibit H presents certain Jury Instructions from two notable carbon monoxide cases in the United States District Court, Wyoming.  One of them in Jackson, and the other tried in Cheyenne by Jackson lawyers. The are included to remind the readers that Mr. Schuler was Mr. Buckingham's employee throughout.  Consequently, Mr. Buckingham is vicariously liable for the activities of Mr. Schuler within the course of his employment; and, Mr. Schuler's knowledge surrounding the defective condtions and the great dangers of carbon monoxide is also the Knowledge of Mr. Buckingham, by operation of law.

Mr. Buckingham's disdain for safety in his own home could certainly be found to reckless, willfull and wanton.  Making the conscious choice that he will not watch bother with serious safety issues he is responisble for in hie home for visitors or business invitees because he does not want to waste his time reading warnings in the face of a tremendous danger is almost incomprehensible

Respectfully submitted on this 15th day of September, 2016.


/s/ _____
        David G. Lewis

Exhibit A

# Defendant Buckingham's Motion For Partial Summary Judgment On Plaintiffs' Claim for Punitive Damages

Katherine L. Mead, Esq.
Mead & Mead
WY State Bar # 5-2432
1200 N. Spring Gulch Rd.
P.O. Box 1809
Jackson, WY 83001
(307) 733-0166
(307) 200-0233 fax
kate@meadlaw.net

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| FRANCISCO L. HERRERA, and JOANNA HERRERA, CO-WRONGFUL DEATH REPRESENTATIVES, for the exclusive benefit of the beneficiaries of MONICA HERRERA, deceased, who have sustained damages from her wrongfully caused death. | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CA 15-cv-128-F |
| GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM, but in their individual capacities as Trustees of the BUCKINGHAM FAMILY TRUST; and, GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM as individual defendants; and, WYOMING MECHANICAL, INC., a Wyoming Corporation; TRIANGLE TUBE/PHASE III CO., INC., a New Jersey Corporation; and, M&G GROUP DURAVENT, INC., a New York Corporation, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### DEFENDANT BUCKINGHAMS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES

The Defendant Buckinghams, by and through their attorney, Katherine L. Mead of Mead & Mead, submit the following brief in support of their Motion for Partial Summary Judgment on Plaintiffs' Claims for Punitive Damages.

After the Triangle Tube boiler was installed in the Buckingham home, it ran well for several weeks until the last part of January 2015. In Greg Buckingham's deposition, he recalls that on or about January 26 or 27, 2015, he noticed the Triangle Tube boiler making loud banging noises. Deposition of Greg Buckingham, June 6, 2016 p. 13, lines 1-8. On January 28, 2015, Greg Buckingham called Wyoming Mechanical about the boiler and stated, "David, Greg Buckingham, 733-7436. Leaving town in the morning, so if you get a chance to call me this afternoon that would be great. I want to chat with you about coming out here Monday.[1] I know that you have it on your schedule already and who you are bringing, so you don't wait your time. It sounds like a car that's hitting a wall. It's getting so loud when it bangs. And you may need to bring out the guy that sold you the boiler is what I'm thinking, but you definitely need two people. Okay, thanks. Bye." Stipulation of Undisputed Facts, ¶ 10.

Wyoming Mechanical did not return the phone call on January 28, but on January 29, a Thursday morning, David Gieck returned the call to Mr. Buckingham. *Id.* at ¶ 11. Mr. Buckingham again told Mr. Gieck that he was leaving town shortly and confirmed that Wyoming Mechanical was coming out for its prescheduled Monday appointment. Mr. Buckingham told David Gieck on Thursday morning that the vent pipe had come apart but that he and his caretaker had put it back together. At the time, Greg Buckingham had no understanding that the vent pipe coming apart was a dangerous condition. In fact, Greg Buckingham had found the vent pipe dislodged on the morning of January 29. He and his wife had slept in the home the evening of the 28th and had no ill effects that would have put them on notice that there was a problem.

---

[1] Mr. Buckingham had previously made an appointment with Wyoming Mechanical to have a leak in the garage floor plumbing evaluated. That leak is unrelated to this case, but was the reason for the reference to an upcoming appointment.

connected to the garage and he found Monica Herrera dead on the floor, a victim of carbon monoxide poisoning.

More than 20 depositions have been taken in this case. There has been no evidence to suggest that the Buckingham's had any knowledge that the vent piping coming apart in their garage was a dangerous condition. The parties have produced thousands of pages of documents. None of them contain a single hint to suggest the Buckinghams were willful or wanton or that their conduct was the kind of malicious or outrageous behavior that warrants the imposition of punitive damages. In their Amended Complaint, the Plaintiffs allege that the Buckingham's were negligent in failing to warn Mrs. Herrera of the dangerous condition created by the vent pipe coming apart. Amended Complaint at p. 60 (e). But, if the Buckinghams were unaware of the danger to themselves, their guests and their employees, how would they know to warn any of them?

Federal Rule of Civil Procedure, Rule 56 governs summary judgments. A summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. F.R.C.P. Rule 56 (a). *Loredo v. Solvay America, Inc.*, 2009 WY 93; 212 P.3d 614 (Wyo. 2009). The Wyoming Supreme Court has indicated "[A] genuine issue of material fact exists when a disputed fact, if it were proven, would establish or refute an essential element of a cause of action or a defense that the parties have asserted." *Christensen v. Carbon County,* 2004 WY 135 ¶ 8, 100 P.3d 411, 413 (Wyo. 2004) (quoting *Metz Beverage Company v. Wyoming Beverages, Inc.*, 2002 WY 21 ¶ 9; 39 P.3d 1051, 1055 (Wyo. 2002))47. The party requesting summary judgment bears the initial burden of establishing a *prima facie* case for summary judgment. *Id. Larsen; Kobieluz v. Wilson*, 701 P.2d 559 (Wyo. 1985).

The 10th Circuit went into exquisite detail with regards to the district court's mistaken decision to deny a JMOL filed on punitive damages against the Sunridge defendants. Starting with the standard of review, the 10th Circuit stated, "When applying the standard in diversity cases, 'the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate procedural question whether judgment as a matter of law is appropriate." *Jones v. UPS*, 674 F.3d 1187, 1195 (10th Cir. 2012). The 10th Circuit then went on to discuss the Wyoming standard for award of punitive damages. Quoting *Weaver v. Mitchell,* 715 P.2d 1361, 1369 (Wyo. 1986), the 10th Circuit stated, under Wyoming law, punitive damages are disfavored "and are to be allowed with caution within narrow limits." Punitive damages are only appropriate for circumstances involving outrageous conduct such as intentional torts, torts involving malice and torts involving willful and wanton misconduct. *Cramer v. Powder River Coal, LLC*, 2009 WY 45, 204 P.3d 974, 979 (Wyo. 2009)." Drilling down further, the 10th Circuit recognized that the Wyoming Supreme Court has defined willful and wanton misconduct as "the intentional doing or failing to do an act in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know that such conduct would, in a high degree of probability, result in harm to another." *Id.* Further, in Wyoming, "[t]he aggravating factor which distinguishes willful misconduct from ordinary negligence is the actor's state of mind. *Id.* A willful or wanton state of mind in one "that approaches intent to do harm." *Lompe v. Sunridge Partners, LLC*, 818 F. 3d 1041, 1047 (10th Cir, 2016).

The 10th Circuit applied this punitive damage standard in analyzing whether the trial evidence sufficiently showed that each defendant's actions in the *Lompe* case constituted the willful and wanton misconduct required to submit the question of punitive damages to the jury as

as to Sunridge because the trial evidence was insufficient to send the question of punitive damages to the jury. *Lompe* at 1048.

While the issue of the Buckingham's negligence may be a jury question, there can be no argument that the Buckinghams engaged in the type of conduct that Wyoming courts have termed "willful and wanton". Again, it is worth repeating that the Wyoming Supreme Court has defined such conduct as "the intentional doing or failing to do an act in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know that such conduct would, in a high degree of probability, result in harm to another." The evidence is clear that the Buckinghams did not know that the vent pipe coming apart was potentially dangerous. Wyoming Mechanical, Inc. did not warn them of the danger posed when Mr. Buckingham spoke to David Gieck about the problem on the day prior to Mrs. Herrera's death. In this matter, the Buckingham's did not act in reckless disregard of the safety of Mrs. Herrera. Mr. Buckingham contacted Wyoming Mechanical, Inc., a qualified technician to report the problem two days before Mrs. Herrera died. The Buckinghams did not act in a manner that even "approaches intent to do harm". *Cramer v. Powder River Coal, LLC*, 2009 WY 45, 204 P. 3d 974, 979 (Wyo. 2009).

## CONCLUSION

Allowing the jury to consider punitive damages against the Buckinghams would be an error of law. The evidence in this case is clear. The Buckinghams were completely unaware of any danger posed by the pipe coming apart. There is no evidence in the matter to sustain a punitive damages verdict against the Buckinghams.

Exhibit B

Selection of Deposition Testimony of Gregory
Buckingham dated November 18, 2015

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF WYOMING

 3    ------------------------------  )
      FRANCISCO L. HERRERA and        )
 4    JOANNA HERRERA, CO-WRONGFUL     )
      DEATH REPRESENTATIVES, for      )
 5    the exclusive benefit of        )
      the beneficiaries of MONICA     )
 6    HERRERA, deceased, who have     )
      sustained damages for her       )
 7    wrongful caused death,          )Case No.: 15-CV-128-F
                                      )
 8                  Plaintiffs,       )
                                      )
 9         vs.                        )
                                      )
10    GREGORY BUCKINGHAM and          )
      DEBORAH BUCKINGHAM, both in     )
11    their individual capacities     )
      as Trustees of the BUCKINGHAM   )
12    FAMILY TRUST; and GREGORY       )
      BUCKINGHAM and DEBORAH          )
13    BUCKINGHAM as individual        )
      defendants; and WYOMING         )
14    MECHANICAL, INC., a Wyoming     )
      Corporation,                    )
15                                    )
                    Defendants.       )
16    ------------------------------

17

18            TRANSCRIPT OF DEPOSITION OF

19              GREGORY BUCKINGHAM

20                  Taken at
                  MEAD & MEAD
21              Jackson, Wyoming
                November 18, 2015
22

23

24    COURT REPORTER: Denise Nowak,
      Certified Shorthand Reporter
25    and Notary Public
```

| 58 | 60 |

**58**

1  A.    Well, if something's not the way it's supposed
2  to be, I don't think that's a concern, but I
3  recognize the fact that it had come apart.
4  Q.    Exactly. And whatever the contents of the
5  pipe, it was meant to be taken outside and the left
6  in the garage; is that correct?
7  A.    Correct.
8  Q.    And so Mr. Schuler's statement goes on to say
9  that he "checked on it, did not see anything wrong,
10 and do not know where it had separated."
11 A.    Right.
12 Q.    I don't know why he said that. But it goes on
13 to say, "I did notice that the blue seal where the
14 exhaust (gray) pipe entered the pass-through was
15 not seated correctly."
16      Do you know what he meant by that?
17 A.    I'm assuming that the word seated means it
18 wasn't hooked together properly. And it appears,
19 from this statement, that he put it together how he
20 thought it should go together. "I reset the seal
21 and checked the joints."
22 Q.    Do you have any concern, as a layman as you
23 said, know nothing about boilers and furnaces and
24 such, of putting that pipe together again and
25 walking away?

Jackson Hole Court Reporting Service (307) 733-2637

**59**

1  A.    Absolutely not.
2  Q.    You --
3  A.    I had no concern.
4  Q.    You had no concern about it.
5      So after this first paragraph -- or in the
6  first paragraph, just the last part of it, he --
7  A.    I have it right here.
8  Q.    Right, and I've got my copy. Schuler said, "I
9  asked Greg if you wanted me to call" --
10 A.    Wait.
11 Q.    Last sentence.
12 A.    Right here, yes.
13 Q.    "Asked Greg if you wanted me to call Wyoming
14 Mechanical, he said he had (or would?) call and
15 make appointment." Did you make that call?
16 A.    I did.
17 Q.    Who did you talk to?
18 A.    I do not know.
19 Q.    What information did you pass on?
20 A.    Okay. There's a couple parts to it.
21 Q.    Okay.
22 A.    One, and I can't recall -- there is two
23 conversations here. One is that I don't know if
24 they are two separate conversations or whatever. I
25 called and somebody said --

Jackson Hole Court Reporting Service (307) 733-2637

**60**

1  Q.    Somebody on the other end of the phone?
2  A.    Someone on the other end of the phone.
3  Q.    At Wyoming Mechanical?
4  A.    At Wyoming Mechanical. I said it's making a
5  loud noise, a banging noise, and shaking. And it's
6  just like a car. Can you go sit in the garage and
7  watch it, because you need to know when it occurs.
8  And so I said, no, I'm not going to sit in the
9  garage, but if I notice it, or you can send
10 somebody out to sit in the garage.
11      So I happened to go out and be on the
12 elliptical machine --
13 Q.    That's an exercise machine?
14 A.    -- in the garage. Yes.
15 Q.    Okay.
16 A.    And I heard the machine go boom. And in my
17 brain it clicked as that's the same time the
18 thermostat setting is coming on, so I reported that
19 finding. I went back in and called and said it
20 appears to be that's when the thermostat is kicking
21 on.
22 Q.    Okay. So when you say -- does the thermostat
23 make a noise when it comes on or did you just
24 happen to be looking at it?
25 A.    I knew the time that the thermostat kicked on.

Jackson Hole Court Reporting Service (307) 733-2637

**61**

1  I'm pretty good with numbers. The machine went
2  boom. I don't know exactly what time it was, but
3  it was when the thermostat came on.
4  Q.    And when you say the machine, you are talking
5  about the boiler?
6  A.    The boiler. And so that was my best guess to
7  help them diagnose what initiated this malfunction
8  or whatever it was.
9  Q.    And you don't recall who you talked to?
10 A.    I do not.
11 Q.    And then that's the two things you described
12 that you passed on to them, Wyoming Mechanical?
13 A.    Yes, regarding that incident.
14 Q.    Pardon?
15 A.    Yes, regarding that incident. Sorry.
16 Q.    Did you say you had two conversations with
17 them that day?
18 A.    I don't know if it was that day; a
19 conversation in regards to booking it to get fixed
20 was it's making a loud banging noise. The pipes
21 have come loose, and it sounds like there's a car
22 going through the wall.
23 Q.    How long did that noise of the car going
24 through the wall last?
25 A.    No, it was just like --

Jackson Hole Court Reporting Service (307) 733-2637

## 62

1  Q.  Like bang?
2  A.  Like boom, shake the house.
3  Q.  It actually was shaking the house?
4  A.  Actually shook the house.
5  Q.  That worried you?
6  A.  Yeah.
7  Q.  And so then the next sentence -- excuse me,
8  the next paragraph.
9  A.  Yep.
10  Q.  It says, "Greg and I had a conversation."
11  Again, this is Schuler speaking?
12  A.  Yes.
13  Q.  "Had a conversation previously about the
14  thumping noise the boiler was making."
15      Do you recall the conversation?
16  A.  I do not.
17  Q.  Do you remember talking to Dave Schuler about
18  that prior to this event you just described while
19  you were on the elliptic machine?
20  A.  I would make the assumption that we did.
21  Q.  What are you basing the assumption on?
22  A.  Because Dave and I correspond; I mean we live
23  on the same property.
24  Q.  You don't have any reason to doubt that --
25  A.  Absolutely do not have a reason to doubt Dave.

Jackson Hole Court Reporting Service (307) 733-2637

## 63

1  Q.  And this is Mr. Schuler talking again, same
2  paragraph. "I had heard the noise that to me
3  sounds like heavy snow falling from high up a tree
4  and landing on the roof of the hallway near the
5  garage while shoveling snow in the mornings." Is
6  that what it sounded like to you, too?
7  A.  I don't know if I know what the sound of snow
8  falling on the roof would sound like compared to a
9  boiler, but I recognize the fact that Dave heard a
10  noise.
11  Q.  But he had not connected the noise to the
12  boiler?
13  A.  That's what it appears he said here.
14  Q.  You don't have any doubt -- going back to the
15  first sentence in that paragraph, you don't doubt
16  that Mr. Schuler has correctly relayed it that a
17  conversation took place.
18  A.  I agree with what he has written here.
19  Q.  Okay. After you made this repair, putting the
20  pieces of pipe back together again and reporting it
21  to Wyoming Mechanical, did you hear back from them,
22  do you recall?
23  A.  Yeah, we set an appointment.
24  Q.  And this is going to take a little while to
25  work through this because we are looking at

Jackson Hole Court Reporting Service (307) 733-2637

## 64

1  different documents. And I'm going to show you --
2  and your counsel has a copy of this document --
3  Exhibit Number 2.
4  A.  I have that right here.
5  Q.  Okay. If you would look at this Exhibit
6  Number 2.
7  A.  Yes.
8  Q.  Page 23. Do you see the numbers I put at the
9  bottom of that page?
10  A.  Okay.
11  Q.  Right in the center. If you look right there
12  at the bottom.
13      MS. MEAD: Right here.
14      THE WITNESS: Okay.
15      MR. LEWIS: These numbers.
16      THE WITNESS: Thank you for that. Okay.
17  BY MR. LEWIS:
18  Q.  And reading that it says that, "On January
19  28/29" --
20  A.  Wait. Where are we at here?
21  Q.  I'm sorry, we're at the bottom of the page.
22  "Gieck said Buckingham."
23  A.  All right.
24  Q.  So --
25  A.  Yes.

Jackson Hole Court Reporting Service (307) 733-2637

## 65

1  Q.  "Gieck said Buckingham contacted him on
2  Wednesday and Thursday, January 28/29, 2015, to
3  confirm maintenance work for the following Monday,
4  February 22, 2015."
5      And then, if you flip over to the next page it
6  says, "Buckingham mentioned to Gieck during the
7  phone call that there was another problem with the
8  boiler in addition to the water leak relating to
9  the flue pulling apart." That's kind of an awkward
10  sentence, it seems to me, the way it was written.
11  But I take it when he is talking about the water
12  leak, he's talking about problems you were having
13  not with the flue but with water that was being
14  pumped into the house; is that correct, or do you
15  know?
16  A.  No, I think it's a floor leak.
17  Q.  A floor leak? Okay.
18  A.  Yes. There is a pipe right in the garage that
19  had some type of leak there that created a problem
20  of excess water going out of some overflow tank.
21  I'm not sure if they are related or not.
22  Q.  And so the statement that the problem relating
23  to the flue pulling apart, had that happened again
24  since the 26th when you were talking about early in
25  the week, the 26th or 27th?

Jackson Hole Court Reporting Service (307) 733-2637

## 70

1   one, closest to the interior hallway wall two.
2   Q.   Okay.
3       (Witness marking exhibit.)
4       (Deposition Exhibit No. 22 was marked for
5   identification.)
6   BY MR. LEWIS:
7   Q.   Let me hand you Exhibit 22.
8   A.   Yes.
9   Q.   And I think that that picture is a photograph
10  of what you just described to me.  If you look at
11  this 22 --
12  A.   Mm-hmm.
13  Q.   -- this looks like where it's passing out
14  through the wall, right?
15  A.   Yes.
16  Q.   And then that's one 90-degree and that's the
17  other 90-degree?
18      MS. TIEDEKEN:  Well, for the record, nobody is
19  going to know what "that" is.
20      MR. LEWIS:  Well, that's okay.
21      THE WITNESS:  Can we label the first 90-degree
22  turn from the wall we've marked as Position 1?
23  BY MR. LEWIS:
24  Q.   That's Position 1.
25  A.   Okay.

## 71

1   Q.   And that's on Exhibit 21 for the record.
2   Q.   Okay.
3   Q.   And then two is?
4   A.   Is the next 90-degree turn, which is on the
5   interior hallway wall.
6   Q.   And which of those are you talking about in
7   that e-mail?
8   A.   I do not recall.
9   Q.   It's one or the other.
10  A.   It's one place where these sections come
11  together.
12  Q.   No, what I'm saying is that --
13  A.   I don't know.
14  Q.   -- that's the best you can define this?
15  A.   I don't know.
16  Q.   It's this turn --
17  A.   I don't know, Dave.
18  Q.   -- one or two?
19  A.   I'm just telling you at this point in time it
20  was not a problem.  Today it became a big problem.
21  Q.   You were just pushing the pipes back in?
22  A.   Yes.
23  Q.   Back in together?
24  A.   Yes.
25  Q.   And that's the repair that you made?

## 72

1   A.   Yes.
2       Are we finished with Exhibits 21 and 22?
3   Q.   Yes, that's fine.
4       Did you have to go up there to get to access
5   to these pipes?  Is that green ladder, is that what
6   that was for; is that how you got up there?
7   A.   Yes.
8   Q.   And that's just a little utility ladder that's
9   in your place?
10  A.   Yes.
11      MR. LEWIS:  Let's mark these as the next two
12  in sequence.
13      (Deposition Exhibit Nos. 23 and 24 were marked
14  for identification.)
15  BY MR. LEWIS:
16  Q.   Can you read -- these are photographs of the
17  area in which you've identified.  Pull up those
18  other previous two, if you would.
19  A.   (Witness complies.)
20  Q.   Within this area (pointing) where you've
21  identified.
22  A.   Mm-hmm.
23  Q.   And this exhibit, 24, is a close-up of this
24  tag that's there at that curve.
25      Can you read that tag?  I can help you out if

## 73

1   you can't.
2   A.   "Warning, notice.  Carbon monoxide poisoning
3   and risk of fire if improperly" something,
4   something, something, "warning and instructions
5   regarding installation of vent pipe system."
6   Q.   And 23 is -- it's round and it's difficult to
7   read it, but any part that you couldn't read would
8   be on 25, it's just a continuation of that.
9       The warning is in red, correct?
10  A.   Correct.
11  Q.   And there's another one of those warnings
12  here.
13  A.   Okay, I see that.
14  Q.   On 24 and 25 you see that as well?
15  A.   Yes.
16  Q.   Did you pay any attention to those when you
17  were making those repairs?
18  A.   No.
19  Q.   Did you ask anybody -- did you ask Mr. Gieck,
20  for example, if there was a danger of that thing
21  coming apart?
22  A.   Absolutely not, no.
23  Q.   And did he ever offer that information to you?
24  A.   No.
25      (Discussion off the record.)

---

**130**

1  piping had come apart?

2  A.    The second time for me that I recall was

3  Thursday morning, before we were leaving for the

4  airport, where I had contacted Dave to ask him if

5  he could double check -- Dave Schuler, if he could

6  double check that.

7  Q.    In that e-mail that you were shown, I think it

8  was at 8:30 morning.

9  A.    Okay.

10  Q.    Let me get it.

11  A.    Exhibit 19.

12        MS. TIEDEKEN: I don't believe we have it.

13        MS. LEWIS: No, we don't.

14        THE WITNESS: That's not the e-mail, that's a

15  letter.

16        MS. TIEDEKEN: Okay. I'm going to go ahead

17  and mark this as the next exhibit.

18        (Deposition Exhibit No. 26 was marked for

19  identification.)

20        MS. TIEDEKEN: And I only have one extra of

21  these.

22        MS. MEAD: I have it.

23  BY MS. TIEDEKEN:

24  Q.    I'm going to hand you Exhibit 26 and have you

25  take a look at the e-mail. I said 8:30, I

Jackson Hole Court Reporting Service (307) 733-2637

---

**131**

1  misspoke. It look likes it was sent at 8:26 on

2  January 29th.

3  A.    Yes.

4  Q.    Is that correct?

5  A.    Yes.

6  Q.    And it's an e-mail from you to Dave Schuler?

7  A.    Yes.

8  Q.    It's your testimony that you noticed the pipe

9  come apart in a different section sometime earlier

10  that morning before you e-mailed David Schuler.

11  A.    Yes.

12  Q.    How did you happen to notice that it had come

13  apart?

14  A.    I was walking out to get water bottles out of

15  the refrigerator to put in the car.

16  Q.    And so what did you do?

17  A.    I pushed it back -- I got up on the ladder and

18  pushed it back together.

19  Q.    What, if anything, did you do with the metal

20  clips?

21  A.    I don't recall.

22  Q.    Do you recall if the metal clip had come off

23  or not?

24  A.    I do not recall.

25  Q.    So at that point you were concerned enough

Jackson Hole Court Reporting Service (307) 733-2637

---

**132**

1  that you had e-mailed David Schuler to tell him

2  about that, correct?

3  A.    I can't really answer that question yes or no

4  based on your question. I wasn't concerned; I was

5  never concerned about the pipe.

6  Q.    I guess the word you had used previously, you

7  were e-mailing him so he could check it or take a

8  look at it?

9  A.    Right.

10  Q.    And whether you were concerned or not, you

11  wanted David Schuler to check it and take a look at

12  it?

13  A.    Yes, because it put water vapor in the garage.

14  And as somebody asked earlier, it's meant to be

15  together and go out, so...

16  Q.    Would you agree that these labels were visible

17  to you -- and I'm talking about the orange label

18  that says warning on it -- when you were on your

19  ladder putting the pipe together?

20  A.    From those photos it would appear that they

21  are.

22  Q.    And there is more than one of those warning

23  labels on the pipe.

24  A.    There is more than one.

25  Q.    Is it fairly obvious that it's a warning label

Jackson Hole Court Reporting Service (307) 733-2637

---

**133**

1  given there is the big word "warning" on it?

2  A.    Looking at that photo, it's fairly obvious

3  that there is a warning label right there.

4  Q.    Did you read the warning label when you were

5  on your ladder up there and it was right in front

6  you?

7  A.    No.

8  Q.    Why not?

9  A.    Because our world has four million warning

10  labels. Tell me anybody in this room that reads

11  all their warning labels.

12  Q.    So you didn't feel it was necessary to read a

13  warning label -- to read this warning label on the

14  exhaust pipe in your garage?

15  A.    I did not.

16  Q.    As I understand it, there was a plastic sleeve

17  on the side of it that had the boiler booklets in

18  them. Do you recall that?

19  A.    No.

20  Q.    Do you recall ever seeing sort of a plastic

21  sleeve stuck on the side of the boiler with

22  material in it?

23  A.    No.

24  Q.    Did you make any attempt to find the owner's

25  manual for the boiler when the vent came apart?

Jackson Hole Court Reporting Service (307) 733-2637

---

## 150

1  **A.  Not every other Friday, every two weeks.**

2  Q.  Every two weeks?

3  **A.  Roughly.**

4  Q.  And was it always on a Friday?

5  **A.  Umm, no, but usually.**

6  Q.  Okay.  And was she paid $25 an hour?

7  **A.  Correct.**

8  Q.  And did you issue a W-2 for her?

9  **A.  We did not.**

10  Q.  Or a 1099?

11  **A.  We did not.**

12  MS. TIEDEKEN:  That's all that I have.

13  MR. LEWIS:  I don't think I have anything

14  further.

15  THE WITNESS:  Okay.  We're good.

16  MS. MEAD:  Yes, we'll read and sign.

17  (Deposition concluded at 1:07 p.m.)

18

19

20

21

22

23

24

25

## 151

1  CERTIFICATE OF DEPONENT

2  I, **GREGORY BUCKINGHAM**, the deponent in the

3  foregoing deposition,

4  DO HEREBY CERTIFY that I have read the

5  foregoing and attached 150 typewritten pages, and

6  that the same are, with changes or corrections, if

7  any, set forth on the following correction sheets,

8  a full, true, accurate and correct transcript of my

9  deposition on oral examination given at the time

10  and place therein indicated.

11

12  Executed this _____ day of _____, 2015.

13

14  Signature: _____

15  GREGORY BUCKINGHAM

16

17  STATE OF          }

           } ss.:

18  COUNTY OF          }

19

20  Sworn to and subscribed before me this_____

21  day of _____, 2015.

22

23  _____

24  My Commission expires:

25

## 152

1  REPORTER'S CERTIFICATE

2

3  STATE OF IDAHO      }

           } ss.:

4  COUNTY OF FREMONT   }

5

6  I, Denise a Shorthand Reporter and

7  Notary Public within and for the State of

8  Idaho, do hereby certify:

9  That I reported the proceedings in

10  the within entitled matter, and that the within

11  transcript is a true record of such proceedings.

12  That I am neither attorney or counsel

13  for, nor related to or employed by, any of the

14  parties to the action in which said deposition is

15  taken; and, further, that I am not a relative or

16  employee of any attorney or counsel employed by the

17  parties hereto or financially interested in the

18  action.

19  IN WITNESS WHEREOF, I have hereunto

20  set my hand this 30th day of November, 2015.

21

22  _____

23  DENISE NOWAK

Notary Public State of Idaho

24  My Commission Expires: 3/13/2021

25

# Exhibit C

# Selection of Deposition Testimony of Gregory Buckingham dated June 6, 2016

1

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF WYOMING

3   FRANCISCO L. HERRERA and   )
     JOANNA HERRERA,         )
4   CO-WRONGFUL DEATH       )
     REPRESENTATIVES for     )
5   exclusive benefit of the  )
     Beneficiaries of MONICA   )
6   HERRERA, deceased, who    )
     have sustained Damages    )
7   from her wrongfully      )
     caused death,          )
8                     )
           Plaintiffs,   )
9                     )
     vs.                )  Case No.
10                    )  15-CV-128-F
     GREGORY BUCKINGHAM and   )
11  DEBORAH BUCKINGHAM, but   )
     in their individual     )
12  capacities as Trustees of )
     the BUCKINGHAM FAMILY    )
13  TRUST; and, GREGORY      )
     BUCKINGHAM and DEBORAH    )
14  BUCKINGHAM as individual  )
     defendants; and, WYOMING  )
15  MECHANICAL, INC., a      )
     Wyoming Corporation;     )
16  TRIANGLE TUBE/PHASE III   )
     CO. INC., a New Jersey    )
17  Corporation; and, M&G     )
     GROUP DURAVENT, INC., a   )
18  New York corporation,    )
                     )
19       Defendants.       )
                     )
20  ————————————————————————

21         **VIDEOTAPED DEPOSITION OF**

              **GREGORY BUCKINGHAM**
22        **Monday, June 6, 2016**
              **TAKEN AT**
23        Homewood Suites
          Jackson, Wyoming
24
     COURT REPORTER:
25  Michelle L. Cunningham

*Jackson Hole Court Reporting Service (307) 733-2637*

Deposition of Gregory Buckingham

**262**

1  Q. Sure. You bet.
2  A. (Reviewing document.)
3    Okay. I'm sorry.
4  Q. Okay. And I was beginning at Line 2, the
5  question that you were asked is, "You don't
6  recall one way or another?" And your answer
7  was? Do you want to read your answer, or do
8  you want me to read it?
9  A. You're welcome to.
10 Q. "Answer: I don't recall that I had an
11 appointment previously scheduled for that
12 Monday.
13    "Question: When you had your conversation
14 with the Wyoming Mechanical employee, did you
15 tell the individual that you were leaving
16 town and no one would be at home?"
17    Your answer was: "Yes."
18    The question was: "Okay.
19    "Answer: When they arrived on Monday,
20 you mean?"
21    And, question -- the questioner's now
22 answering your question.
23 A. Um-hum.
24 Q. No. When you called to schedule -- yeah,
25 when you called to schedule the appointment,

*Jackson Hole Court Reporting Service - (307) 733-2637*

**263**

1  you said I'm getting ready to leave town and
2  no one is gonna be home?
3    Your answer was: "Yes."
4    "Question: Did you tell the person that
5  you talked to that your caretaker would be
6  keeping an eye on the vent pipe while you
7  were gone?"
8    You said, "Answer: I don't recall that
9  conversation.
10    "Question: Were you aware that Monica was
11 going to come to clean your home while you
12 were gone."
13    Your question -- your answer was:
14 "Absolutely."
15    "And it was a regular appointment for
16 her?"
17    "Answer: Fairly regular. Every other
18 Friday."
19    And you saw the note that was left for
20 her.
21 MR. LEWIS: Now, what number are we on?
22 Does anybody know?
23    THE COURT REPORTER: 113.
24 MR. WALTZ: No, she'll mark them,
25 David. She'll mark it right here.

*Jackson Hole Court Reporting Service - (307) 733-2637*

**264**

1    MR. LEWIS: Oh, okay. 113 and 113A.
2    MS. TIEDEKEN: Do you have a copy of
3  those, Dave?
4    MR. LEWIS: I do.
5    (Whereupon, Deposition Exhibits 113 and
6  113A were marked for identification.)
7    THE WITNESS: (Reviewing document.)
8    MS. TIEDEKEN: Which page -- which
9  Bates stamp is 113, and which one is 113A?
10   THE WITNESS: 113 starts with, "We have
11 dinner guest coming." And 113A starts with
12 "Will do."
13   MS. MEAD: Thanks.
14   MR. LEWIS: 113, I think, has the Kuler
15 e-mail's number, I don't know who put that
16 on there, of 0278.
17   MS. TIEDEKEN: Okay. Got it.
18   MR. WALTZ: What's the question?
19   MR. LEWIS: I was just waiting to
20 see if he was still reading.
21   THE WITNESS: No, no. I'm ready.
22 Q. (By Mr. Lewis) The question is, at the
23 bottom line right above your, "Thanks GB" --
24 A. Um-hum.
25 Q. -- you say, "Monica here Friday. Just

*Jackson Hole Court Reporting Service - (307) 733-2637*

**265**

1  main house."
2    And you -- that was what you wrote to
3  David Schueler on January 27th, at 8:00 --
4  8:00 -- 8:08 --
5  A. A.m.
6  Q. -- a.m. --
7  A. Yes.
8  Q. -- on the 27th?
9    So you're -- you're reminding David
10 Schueler that Monica's gonna be here on
11 Friday in the main house; correct?
12 A. Correct.
13 Q. Was that something you typically did is to
14 write him and tell him if -- when -- if and
15 when Monica was going to be there?
16 A. If we were out of town.
17 Q. And why did you tell him that?
18 A. Just general communication, knowledge.
19 If he wanted to go over and check the doors
20 got locked properly, or if he decided he
21 saw a car there and wanted to know whose
22 car that was.
23 Q. But, in any event, you were notifying
24 Mr. Schueler that on Friday morning
25 following, Mrs. Herrera was going to be in

*Jackson Hole Court Reporting Service - (307) 733-2637*

Deposition of Gregory Buckingham

266

1  the Buckingham home --
2  A.  That is correct.
3  Q.  -- cleaning the house --
4  A.  That is correct.
5  Q.  -- correct?
6  A.  That is correct.
7  Q.  And David Schueler, then, in 113A
8  responded to you.  He responded to your
9  e-mail and left, at the bottom, an apparent
10  acknowledgment, "Monica here Friday.  Just
11  main house."
12      MR. WALTZ:  Object to form.
13  Q.  (By Mr. Lewis)  Correct?
14  A.  I think that's the same e-mail that we
15  just read, 113.
16  Q.  Do you see that at the bottom of 113A?
17      MS. MEAD:  Objection as to form.
18  That's the same e-mail.
19  Q.  (By Mr. Lewis)  Well, let me just -- it
20  says at the bottom --
21      MS. MEAD:  It's not -- I'm objecting as
22  to form.  Because you're asking him if Dave
23  Schueler wrote this same thing.  And this
24  is not Dave Schueler's e-mail.  His is the
25  one at the top.

*Jackson Hole Court Reporting Service - (307) 733-2637*

267

1      THE WITNESS:  Right.
2      MS. MEAD:  Answer if you can.
3  Q.  (By Mr. Lewis)  Dave -- Dave Schueler --
4  Dave Schueler responded to your e-mail?
5  A.  And he wrote, "Will do."
6  Q.  But at the top -- at the top of your
7  e-mail and -- and sent it back to you;
8  correct?
9      MR. WALTZ:  Object to -- object to
10  form.
11      THE WITNESS:  Yeah.  My understanding
12  is he responded to my e-mail and wrote,
13  "Will do.  Also noticed that one of the
14  daytime running lights on the Tahoe is out.
15  I'll fix it while you're away as well."
16      And that was his response to my e-mail
17  of Exhibit 113.
18  Q.  (By Mr. Lewis)  And you -- you know, from
19  Mr. Schueler's latest testimony, that he saw
20  Monica Herrera's car at the -- parked at --
21  near -- near your house at 10:00 in the
22  morning, on Friday, the day of her death?
23      MS. MEAD:  Objection.  Misstates
24  testimony.  This witness has not read
25  Mr. Schueler's testimony.

*Jackson Hole Court Reporting Service - (307) 733-2637*

268

1      MR. LEWIS:  Um-hum.
2      MS. MEAD:  Answer if you can.
3      THE WITNESS:  I have not read his
4  testimony.
5  Q.  (By Mr. Lewis)  Okay.  Do -- do you know,
6  from the sheriff's department -- have you
7  read the sheriff's department statement?
8  A.  I've read somewhere some information
9  about that.
10  Q.  And in the sheriff's department report,
11  Mr. Schueler also told, whoever the sheriff's
12  deputy he was talking to, that he saw
13  Monica's car there at 10:00 in the morning on
14  Friday.
15  A.  Okay.
16  Q.  And that wouldn't be unusual, would it?
17  A.  No.
18  Q.  For him to be able to see her car there in
19  the morning at that time?
20  A.  No, it would be unusual.  Usually, he's
21  at work, but he was not that day.
22  Q.  Any event, he -- he saw it -- he --
23  Mr. Schueler knew the pipes were coming
24  apart, the vent pipes were coming apart in
25  the house, didn't he?

*Jackson Hole Court Reporting Service - (307) 733-2637*

269

1  A.  He was aware of that.
2  Q.  Everybody out there seems to have known
3  except Mrs. Herrera.  Isn't that the case?
4  A.  "Everybody" is a pretty broad
5  statement.
6  Q.  Well, who else was out there?  You.  I --
7  Mr. Schueler.  I don't know if Mrs. Schueler
8  was around.  Was Mrs. Schueler around?
9  A.  (Nonverbal response.)
10  Q.  And your wife Deborah, she was there.  She
11  knew that the pipes were coming apart in the
12  house, didn't she?
13  A.  That's correct.
14      MS. MEAD:  This is mine.
15  Q.  (By Mr. Lewis)  I just wanted to ask you a
16  couple questions about some phone calls you
17  made on Friday evening after you found out
18  about Monica's death.
19      As I understand it, you called Boyd
20  Roberts?
21  A.  No.  Incorrect.
22  Q.  Okay.  When did you first talk to Boyd
23  Roberts about Mrs. Herrera's death in your --
24  in your home?
25  A.  I may have.  I talked to Steve

*Jackson Hole Court Reporting Service - (307) 733-2637*

Deposition of Gregory Buckingham

**290**

1    **Q.** So is it a fair statement that you didn't
2    read, really, any of the warning labels
3    associated with this -- the -- the Triangle
4    Tube boiler that was installed at your
5    property?
6    **A.** That's a fair statement.
7    **Q.** And is that your standard practice?
8    **A.** Yes.
9        MR. MCGILL: No further questions.
10   Thank you.
11       MR. LEWIS: I have nothing further.
12       THE VIDEOGRAPHER: Everybody done?
13       MR. WALTZ: Thank you.
14       MS. MEAD: Thank you. Read and sign.
15       THE VIDEOGRAPHER: This deposition is
16   now complete. We are off the record at
17   3:55 p.m.
18       (Whereupon, the deposition of Gregory
19   Buckingham was concluded at 3:55 p.m.)
20
21
22
23
24
25

*Jackson Hole Court Reporting Service - (307) 733-2637*

**291**

1    STATE OF:_____)
                             )
2    COUNTY OF: _____)

3

4        I, the undersigned, declare under penalty
5    of perjury that I have read the foregoing
6    transcript, and I have made any corrections,
7    additions or deletions that I was desirous of
8    making; that the foregoing is a true and
9    correct transcript of my testimony contained
10   herein.
11   Executed this _____day of _____, 2016
12   at _____'_____.
        (City)          (State)
13

14   _____
15   (Deponent's Name- please print)

16   _____
17   (Deponent's Signature)

18   Subscribed and sworn before me _____
     This ___ day of_____, 2016
19

20   _____ _____
21   Notary Name      Notary Signature

22   Seal

23

24   My commission expires: _____, _____
25

*Jackson Hole Court Reporting Service (307) 733-2637*

**292**

1    STATE OF WYOMING  )
                       )
2    COUNTY OF SUBLETTE )

3        I, Michelle L. Cunningham, Deputy and
4    Freelance Shorthand Reporter and notary Public
5    in and for the State of Wyoming, do hereby
6    certify that the foregoing proceeding was
7    reported by me and was thereafter transcribed
8    under my direction into typewriting consisting
9    of pages 1 to 292; that the foregoing is a
10   full, complete and true record of said
11   proceedings to the best of my ability.
12       I further certify that I am not of counsel
13   or attorney for either or any of the parties in
14   the foregoing proceeding and caption named, or
15   in any way interested in the outcome of the
16   cause named in said caption.
17       In witness whereof, I have hereunto set my
18   hand and affixed my seal this day.
19       Date: _____, 2016
20   _____
     Michelle L. Cunningham
21   Deputy and Freelance Reporter
     Notary Public
22
23
24
25

*Jackson Hole Court Reporting Service (307) 733-2637*

Exhibit D

Statement From David Schuler Pertaining To
His Recollection Of His Activities Surrounding
The Events of Monica Herrera's Death

Statement from David Schuler regarding Thursday, January 29th to Friday, January 30th
Written on 02/06/2015

Early in the week Greg asked me to look at the boiler pipes, possibly said the white one. He
had said that he had put it back together. I checked on it, did not see anything wrong, and do
not know where it had separated. I did notice that the blue seal where the exhaust (gray) pipe
entered the pass through was not seated correctly, so I reset the seal and checked the joints.
Asked Greg if you wanted me to call Wyoming Mechanical, he said he had (or would?) call and
make appointment.

Greg and I had a conversation previously about the thumping noise the boiler was making. I
had heard the noise that to me sounds like heavy snow falling from high up a tree and landing
on the roof of the hallway near the garage while shoveling snow in the mornings, but had not
connected the noise to the boiler until later.

Thursday received email from Greg in the AM that he had sent before flying out (forwarded to
Boyd Roberts the following Monday at his request). In the email Greg asked me to look at the
boiler exhaust again because he had found it separated in the morning and that Wyoming
Mechanical would be in on Monday to look at the boiler.

Thursday evening I parked the Buckinghams car in the garage. I glanced at the boiler exhaust
and intake pipes on my way in and noted that it was all together, then spent 15-20 minutes
inside the garage looking for the manual for the Tahoe trying to figure out how to replace a
blown DRL bulb. I went inside and spent 45 minutes in the house making various repairs
(bench hinge and toilet seat) that Greg had emailed told me about. When I finished in the
house I returned to the garage to look at the boiler more closely. The metal retaining clip from
one of the elbows was laying on top of the refrigerator, but the pipe was together. I
disassembled the joint at an elbow and re-assembled it with the clip in place and left the house.

I called in sick to work with a cold on Friday and spent most of the day on the couch reading and
napping. Around 10-11 am I took the dog for a short walk and noted that a white SUV was
parked across from the Buckinghams garage. I did not know then that Monica had replaced her
old red SUV and assumed that it was either hers or she had backed the Buckinghams Tahoe
out of the garage for some reason. I knew that she would not be cleaning any cabins other than
the main residence so did not expect to see her again from my house unless I happened to be
looking out when she left, typically around 2-3pm. After the walk I returned to napping on the
couch. I left my cabin again in the afternoon to go over to the guest cabin. At that time I don't
remember if I noticed if Monica's car was still there or not.

After my wife got home (around 6:00pm) we decided that she should go climbing the next day
with or without me depending on how I felt, so sometime after 7pm I drove my truck over to the
shed area to get our trailer out from under the barn. I saw that the white SUV was still parked
outside the garage next to the barn at that it had Idaho plates which led me to believe that it was
Monica's vehicle. At that point I was concerned, but thought that perhaps her car had broken


PLAINTIFF'S
EXHIBIT

13

11/18/15

her shoulder hard with no response. I think I paused a moment to mentally review CPR procedures then rolled the body over by grasping her shoulder and hip and pulling her toward me with my back to the washing machine.

As I rolled her over I noticed that her body was totally stiff, her lower jaw looked displaced to the side and her lips were dark greyish blue. I put my left ear to her mouth and right hand on her neck and did not find signs of breathing or pulse. I was feeling increasingly light headed at this point. Weighing the risk to myself against the likelihood of successful resuscitation I decided to not begin CPR. I picked up the phone and informed the dispatcher of my decision and hung up. I placed the phone in my pocket and went outside to meet my wife who had arrived around this time to wait for emergency services.

I think that we waited outside talking for a short time then decided to walk to the top of the driveway to make sure the the responders came to the right house. Soon after an LE Ranger arrived at the scene.

The Ranger glanced inside the mudroom door, sent Kate back up the driveway to intercept incoming emergency vehicles and asked me a couple questions. He then excused himself to radio in and slow down the response. Around 7:55pm, Monica's husband arrived and the Ranger and I decided that I should wait at my house. I then went to the top of the driveway to join my wife until the rest of the emergency responders arrived. After a fire engine and two ambulances had gone onto the property we both went to our home to wait for further instructions. Then I called the owner (Greg Buckingham) to inform him of the situation. Over the course of the next few hours, we answered questions with Jim Tucker and the fire department. Kurt (?) the Sheriff interviewed me. Once the CO levels were at zero (around 10:30pm), I was cleared by the fire department to go back into the house. I cleaned up the blood, rehung the jackets, and put away the vacuum and other cleaning supplies that Monica had gotten out. Kate and I then set up space heaters and closed the drapes to prevent the pipes from freezing.

Exhibit E

Email Messages Between Gregory Buckingham And David Schuler Acknowledging That The Are Aware Monica Herrera Will Be At The Buckingham Residence For Housekeeping On Friday, June 30, 2015, The Date And Place Of Her Death

From: **Greg Buckingham** leterbuck1@gmail.com
Subject: ranch 2 things
Date: January 27, 2015 at 8:08 AM America/Los_Angeles
To: David Schuler schul3rdavid@gmail.com

Hi Dave,

We have dinner guest coming Wednesday at 5pm, first time to our place, Can you please shovel walk ways in the morning so we can do the tour thing.

Also, while we are gone can you do two repairs. The bench seat in the entry way hinge and see if you can washer or something the toilet seat in the master from sliding. I tightened, but not staying.

Monica here Friday, just main house.

Thx gb

SCHULER EMAILS 0278

From: **David Schuler** schul3rdavid@gmail.com
Subject: Re: ranch 2 things
Date: January 27, 2015 at 2:02 PM America/Los_Angeles
To: **Greg Buckingham** leterbuck1@gmail.com

Will do.

Also noticed that one of the daytime running lights on the Tahoe is out. I'll fix it while you are away as well.

DRS

On Tue, Jan 27, 2015 at 9:08 AM, Greg Buckingham <leterbuck1@gmail.com> wrote:

Hi Dave,

We have dinner guest coming Wednesday at 5pm,first time to our place, Can you please shovel walk ways in the morning so we can do the tour thing.

Also, while we are gone can you do two repairs. The bench seat in the entry way hinge and see if you can washer or something the toilet seat in the master from sliding. I tightened, but not staying.

Monica here Friday, just main house.

Thx gb

SCHULER EMAILS  0279

Exhibit F

A Check For Payment Of Monica's Housekeeping Services Left In The Kitchen For Monica For January 30, 2015, And A Note That Food Has Been Left In The Refrigerator By The Buckinghams For Her Lunch

.









Exhibit G

Photographs Of The Exhaust Vent (Gray Pipe)
With Warnings Of Carbon Monoxide Which
Gregory Buckingham Chose To Ignore.

The Red Arrows Added By Plaintiffs' Counsel
Designate The Place Where Gregory
Buckingham Had Pushed The Pipe Segments
Back Together When He Had The Opportunity
To Read The Warnings







EXHIBIT H

JURY INSTRUCTIONS FROM THE UNITED
STATES DISTRICT COURT, WYOMING IN
THE *LOMPE* V. SUNRIDGE, AND IN
THE *WILLIAMS V. VAIL* MATTERS

INSTRUCTION NO. 24

The ability to obtain knowledge is, in law, the equivalent to actually having knowledge. If a person had information that would lead a reasonably prudent person to make inquiry through which that person would surely learn the facts, then this person may be found to have had actual knowledge of those facts (even if the person failed to inquire). Such a person is charged with the same knowledge as if that person had made such inquiry and had already learned such facts.

That is to say, the law charges a person with notice and knowledge and whatever that person would have learned, of making inquiry as it would have been reasonable to expect the person to make under the circumstances.

Knowledge or notice may also be established by circumstantial evidence. If it appears that a certain condition has existed for a substantial period of time, and that the person had opportunities to observe the condition, then you may, but are not required to, draw the inference that the person had knowledge of the condition.

INSTRUCTION NO. _26_

The conduct of an employee is within the scope of employment if it is of the kind the employee is employed to perform; it occurs substantially within the authorized time and space limits; and it is motivated, at least in part, by a purpose to serve the employer.  It is not necessary that a particular act or failure to act be expressly authorized by the employer but such act must bear some genuine relationship to the business of the employer.

The employer is legally responsible for the negligence of an employee acting within the scope of his employment.

INSTRUCTION NO. 23

An employee is acting within the scope of his employment if he is engaged in the work which has been assigned to him by his employer, or is doing that which is proper, usual, and necessary to accomplish the work assigned to him by his employer, or is doing that which is customary within the usage of the particular trade or business in which the employee is engaged to accomplish his work.

The negligence of an employee acting within the scope of his employment is the negligence of his employer.

INSTRUCTION NO. 25

Because the amount of care exercised by a reasonably prudent person varies in proportion to the danger known to be involved in what is being done, it follows that the amount of caution required in the use of ordinary care will vary with the nature of what is being done, and all the surrounding circumstances shown by the evidence in the case. To put it another way, any increase in foreseeable danger requires increased care.