

1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF WYOMING

2      _____  )
3      FRANCISCO L. HERRERA and         )
       JOANNA HERRERA, CO-WRONGFUL      )
4      DEATH REPRESENTATIVES, for       )
       the exclusive benefit of        )
5      the beneficiaries of MONICA      )
       HERRERA, deceased, who have      )
6      sustained damages for her        )
       wrongful caused death,           )
7                   Plaintiffs,         )
                                        )      Civil Action No.:
8             vs.                       )      15-CV-128-F
                                        )
9      GREGORY BUCKINGHAM and           )
       DEBORAH BUCKINGHAM, both in      )
10     their individual capacities      )
       as Trustees of the BUCKINGHAM    )
11     FAMILY TRUST; and GREGORY        )
       BUCKINGHAM and DEBORAH           )
12     BUCKINGHAM as individual         )
       defendants; and WYOMING          )
13     MECHANICAL, INC., a Wyoming      )
       Corporation; Triangle           )
14     TUBE/PHASE III CO., INC.,        )
       a New Jersey Corporation;        )
15     and, M&G GROUP DURAVENT, INC.,   )
       a New York Corporation,          )
16                  Defendants.         )
       _____  )

17

18              TRANSCRIPT OF DEPOSITION OF
19              RICK L. HIRSCHI, PH.D.

20                    Taken at
21               235 East Broadway
                 Jackson, Wyoming
22                  May 4, 2016
                    9:33 a.m.

23

24     COURT REPORTER: Denise Nowak
25     Certified Shorthand Reporter
       and Notary Public

           Jackson Hole Court Reporting Service (307) 733-2637

**2**

1        A P P E A R A N C E S

2

3    For the Plaintiffs:

4        David G. Lewis, Esquire
         P.O. Box 8519
         6540 Upper Cascades Drive
5        Jackson, Wyoming 83002
         (307) 739-8900
6        davelewis@bresnan.net

7

8    For Defendant Wyoming Mechanical, Inc.:

9        Julie Nye Tiedeken, Esquire
         McKellar, Tiedeken & Scoggin, LLC
         P.O. Box 748
10       702 Randall Avenue
         Cheyenne, Wyoming 82003
11       (307) 637-5575
         jtiedeken@mtslegal.net
12

13   For Defendants Gregory and Deborah Buckingham:

14       Katherine L. Mead, Esquire
         Mead & Mead
15       1200 N. Spring Gulch Road
         P.O. Box 1809
16       Jackson, Wyoming 83001
         (307) 733-0166
17       kate@meadlaw.net

18

19   For Defendant Triangle Tube/Phase III Co., Inc.:

20       Joseph P. McGILL, Esquire, pro hac vice
         Foley Baron Metzger Juip, PLLC
21       38777 Six Mile Road
         Suite 300
22       Livonia, Michigan 48152
         (734) 742-1825
23       jmcgill@fbmjlaw.com

24

25

**3**

1        A P P E A R A N C E S (cont'd)

2

3    For Defendant M&G Group DuraVent, Inc.:

4        Richard A. Waltz, Esquire
         The Waltz Law Firm
         1660 Lincoln Street
5        Suite 2510
         Denver, Colorado 80264
6        (303) 830-8800
         dwaltz@waltzlaw.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**4**

1              I N D E X

2

3    WITNESS:

     Rick L. Hirschi, Ph.D.                Page

4

     Examination by Mr. Waltz                5
5

     Examination by Mr. McGill              76
6

     Examination by Ms. Tiedeken           136
7

     Continued Examination by Mr. Waltz    147
8

9    EXHIBITS:

10   No.   Description                      Page

11   H-98 - Preliminary Report of Rick L.
          Hirschi, Ph.D., in Re Monica Herrera,
12        dated 11/2/2015                    5

13   H-99 - Curriculum Vitae of Rick L. Hirschi  12

14   H-100 - Time Log for Rick L. Hirschi    13

15   H-101 - Data Sheet, Death Cases, Key Dates
            and Ages                         14
16

     H-102 - Rule 26 Information Binder for Rick
17          L. Hirschi                       17

18

     REQUEST FOR PRODUCTION OF DOCUMENTS
19

     Page Request
20

     78 E-mails between Dr. Hirschi and Mr. Lewis
21

22

23

24

25

**5**

1    May 4, 2016

2    P R O C E E D I N G S:

3              RICK L. HIRSCHI, PH.D.

4    called as a witness at the instance of Defendant

5    M&G Group, DuraVent, Inc. and Triangle Tube, and

6    being first duly sworn, was examined and testified

7    as follows:

8              MR. WALTZ:  Would you mark this as 98, please?

9              (Deposition Exhibit No. 98 was marked for

10   identification.)

11             E X A M I N A T I O N

12   BY MR. WALTZ:

13   Q.    Would you state your full name and spell your

14   last name, please.

15   A.    Rick LaVail Hirschi.

16   Q.    Better spell both the middle and the last

17   name.

18   A.    L-A, V-A-L-L, Hirschi, H-I-R-S-C-H-I.

19   Q.    Do you go by Mister or Doctor?

20   A.    Doctor.

21   Q.    Dr. Hirschi, my name is Dick Waltz, I

22   represent a company called M&G DuraVent in a

23   lawsuit that's been filed against it by the family

24   of Monica Herrera.  You've had your deposition

25   taken before?

**6**

1  A.  I have.
2  Q.  If at any time I ask you a question today and
3  you do not understand it, please tell me, I'll try
4  to rephrase it, okay?
5  A.  Okay.
6  Q.  Because you're allowed to make revisions
7  later, if necessary, I'm trying to avoid you making
8  revisions because you didn't understand a question;
9  do you understand?
10 A.  Correct.
11 Q.  You are put under oath.  It's like being in
12 front of a judge and jury in this case if we should
13 go to trial.
14     You understand that?
15 A.  Correct.
16 Q.  I'm going to hand you Exhibit 98.  At the top
17 of the page you'll see there are Bates numbers, so
18 to speak, it starts at page 27 of 90.
19     Do you see that?
20 A.  Yes.
21 Q.  And then if you just look from page 27 of 90
22 to 31 of 90 only.  Does that constitute your entire
23 preliminary report, those pages?
24 A.  Yes.
25 Q.  Have you done any analysis of economic losses

**7**

1  of Ms. Herrera or the family since this report?
2  A.  I have not.
3  Q.  What did you do in preparation for your
4  deposition today?
5  A.  Preparation, I went back and reviewed the
6  documents, pulled up and reviewed the foundational
7  documents, and just became familiar with the case
8  again.
9  Q.  And how much time did you spend doing that?
10 A.  Two and a half hours, roughly, 2.75.
11 Q.  And how long did it take for you to get from
12 where you traveled?
13 A.  It took about an hour and 40 minutes.
14 Q.  Thank you for accommodating us and coming here
15 today.  Have you spoken to plaintiff's counsel?
16 A.  I visited with my lawyer.  Other than
17 introducing --
18 Q.  Your lawyer?
19 A.  The plaintiff.
20 Q.  He's not your lawyer, is he?
21 A.  Not the lawyer.
22 Q.  Has he ever represented you before?
23 A.  No, he has not.
24 Q.  So he is a lawyer just like some of us around
25 the table are?

**8**

1  A.  Correct.
2  Q.  I'm not your lawyer.
3      MR. McGILL:  Some of us.
4  A.  Mr. Lewis is the only one that I ever visited
5  with.
6  BY MR. WALTZ:
7  Q.  Did you talk to him over the last week about
8  your deposition?
9  A.  No.
10 Q.  You've been provided a number of documents --
11 A.  Wait, we did visit on the phone to verify the
12 time and place, to verify the place and driving
13 into town this morning.
14 Q.  Anything discussed that was substantive
15 relating to this case?
16 A.  No.  Just the -- a review of the facts, review
17 of the material, the situation of what happened.
18 Q.  Okay.  You have in front of you a folder, what
19 is that?
20 A.  These are my supporting documents.
21 Q.  Could I see that for a moment, please?
22 A.  Sure (handing).
23 Q.  You have a copy of your CV, correct?
24 A.  Yes, that's the copy there.
25 Q.  And then you have a copy of Rule 26

**9**

1  information, which is billing information, correct?
2  A.  Yes.
3  Q.  Trial testimony, has there only been one trial
4  you've given testimony in?
5  A.  In the last five years.  I did give one
6  previously in 2002.
7  Q.  The last five years you testified in the
8  Shockey matter; is that correct?
9  A.  Yes.
10 Q.  And that was federal or state court?
11 A.  Federal.
12 Q.  And for whom did you testify in that case?
13 A.  For the plaintiff.
14 Q.  And who represented the plaintiff in that
15 case?
16 A.  Gary Shockey.
17 Q.  Who was the plaintiff in that case, Barkhurst?
18 A.  Barkhurst, yes.
19 Q.  And then you also gave a deposition in one
20 other case; is that correct?
21 A.  Correct.
22 Q.  And that's the Willis case; is that right?
23 A.  Yes.
24 Q.  You testified for Rick Barton, that was a
25 plaintiff again?

```
                                          10
1   A.    Yes.
2   Q.    How much of your time is spent testifying --
3   strike that.
4         How much time of your professional life is
5   spent analyzing economic damages for plaintiffs or
6   defendants?
7   A.    Most of the cases I have done are for the
8   plaintiff.  There have been a few that I have done
9   for the defense side.
10  Q.    And what portion of your professional life is
11  spent doing that type of work?
12  A.    I am a full-time -- a full professor at BYU
13  Idaho and so this takes up a relatively small
14  portion of my professional time.
15  Q.    Have you ever worked with Mr. Lewis before?
16  A.    This is the first time.
17  Q.    In the last five years, is it true there's
18  only six cases on which you've worked?
19  A.    Six cases that I have done the analysis
20  primarily.  If you'll notice from my CV, I work
21  with Paul Randal & Associates.  And so with Paul, I
22  am just doing the -- the analysis and the write-up
23  of the cases; so I've done a significant number
24  more in that area.  And I typically range from
25  about six to ten cases with him a year.
```

```
                                          11
1   Q.    And what do you make on the average for those?
2   A.    On the average?
3   Q.    Yes, sir.
4   A.    $1,200.
5   Q.    $1,200 a case?
6   A.    Yes.
7   Q.    How much have you billed so far in this case?
8   A.    $1,500.
9   Q.    Are you portal billing?
10  A.    Meaning?
11  Q.    Have you ever heard the phrase, portal to
12  portal?
13  A.    I have not.
14  Q.    Door-to-door?
15  A.    I just do direct billing to the individual.
16  Q.    You bill for travel, correct?
17  A.    Correct.
18  Q.    $75 an hour?
19  A.    Correct.
20  Q.    Is that from the time you leave your house to
21  whenever you arrive?
22  A.    Yes.
23  Q.    And then you bill for the return?
24  A.    Yes.
25  Q.    And then time spent in preparation is at what
```

```
                                          12
1   hourly rate?
2   A.    The preparation part is $150 an hour.
3   Q.    And then for testimony is what hourly rate?
4   A.    It's $250 if it's outside the state, $200 if
5   it's within the state.
6   Q.    So this is $200 an hour?
7   A.    $250.
8   Q.    I should have not brought you across the state
9   line.
10        MR. WALTZ:  Let's mark his curriculum vitae,
11  please.
12        (Deposition Exhibit No. 99 was marked for
13  identification.)
14  BY MR. WALTZ:
15  Q.    Handing you Exhibit 99, would you identify
16  that, please?
17  A.    This is my vitae.
18  Q.    In this folder that I have in front of me, you
19  have a copy of the notice, correct, of deposition?
20  A.    Yes, that is the copy there.
21  Q.    You have a W-9; is that right?
22  A.    That's correct.
23  Q.    You have a summary of the amount of time you
24  spent on the case?
25  A.    Correct.
```

```
                                          13
1   Q.    I assume you have other copies of this?
2   A.    I have electronically, yes.
3         MR. WALTZ:  Would you mark this Exhibit 100.
4         (Deposition Exhibit No. 100 was marked for
5   identification.)
6   BY MR. WALTZ:
7   Q.    And Exhibit 100 is the amount of time, at
8   least up to the time you quit keeping track of it,
9   which looks like May 3rd of 2016, right?
10  A.    Correct.
11  Q.    We have a sheet called Data Sheet Death cases,
12  what is that?
13  A.    That's just the first sheet of the Excel file.
14  Q.    I don't remember seeing a copy of that in the
15  report; is there one?
16  A.    It's not.
17  Q.    Who developed this?
18  A.    Paul Randal was the original author of that.
19  Q.    Do you have extra copies of this?
20  A.    I do -- I'm not sure I have them with me, I
21  have the file.
22  Q.    You have them on the computer?
23  A.    I have it on the computer, yes.
24  Q.    So if I take this out and mark it?
25  A.    That's going to be fine.
```

14

1      (Deposition Exhibit No. 101 was marked for
2   identification.)
3   BY MR. WALTZ:
4   **Q.**   Exhibit 101, could you identify that one one
5   more time for me, please?
6   **A.      This is the information sheet for the Excel**
7   **file.**
8   **Q.**   In this file you have a tab called 1, and that
9   appears to be a copy of your report; is that
10  correct?
11  **A.      Correct.**
12  **Q.**   Then we have a tab -- excuse me, I misspoke,
13  it's a tab called A.
14  **A.      Tab A.**
15  **Q.**   That's your report, correct?
16  **A.      That's the report.**
17  **Q.**   And we have Tab B, which is our foundational
18  documents, but in these documents I see some
19  handwriting, some highlighting and underlining.
20  **A.      Yes, pursuant to the notice to respond.**
21  **Q.**   When did you do that?
22  **A.      Just in preparation for the deposition.**
23  **Q.**   So what I'm looking at here is your
24  handwriting done in the last few days?
25  **A.      Correct.**

Jackson Hole Court Reporting Service (307) 733-2637

15

1   **Q.**   Is all of -- strike that.
2      Are copies of all the foundational documents
3   attached to your report?
4   **A.      Copies of all the foundational documents with**
5   **the exception of what was provided to you on the**
6   **2014 Consumer Expenditure 1.  This one here**
7   **(indicating).**
8   **Q.**   And that was not provided?
9   **A.      That was not provided in the initial one.**
10  **Q.**   But all the other copies of documents in the
11  foundational documents were attached to your
12  report?
13  **A.      In -- that are in that file?**
14  **Q.**   Yes, sir.
15  **A.      There is an additional one, so there's that**
16  **additional one.  I believe there is --**
17  **Q.**   I'll hand it to you.
18  **A.      Also there's this additional one, this is more**
19  **for deposition purposes as opposed to foundational**
20  **documents.  It is the yield on treasury's, current**
21  **yields, just for reference.  You're welcome to make**
22  **a copy of that.**
23  **Q.**   When did you download this?
24  **A.      Yesterday.**
25      MR. WALTZ:  How do you all want to do these

Jackson Hole Court Reporting Service (307) 733-2637

16

1   foundational documents?  I don't have --
2      MR. LEWIS:  My preference would be to have a
3   complete copy of his file in the form he's
4   maintained it.
5      MR. WALTZ:  Okay.
6      THE WITNESS:  Just a copy of all of this?
7      MR. LEWIS:  That would be fine, the whole
8   file.
9      MR. WALTZ:  Put that back in, please.
10     THE WITNESS:  (Witness complies.)
11     MS. TIEDEKEN:  Yeah, and a color copy so we
12  can see; he's got different colors outlining --
13     MR. WALTZ:  She'll do that.
14     MS. TIEDEKEN:  -- the data.
15     MR. WALTZ:  Just stick that back in there.
16     THE WITNESS:  (Witness complies.)
17     MR. LEWIS:  This is Exhibit 102?
18     MR. WALTZ:  We haven't marked it yet.
19     Go ahead.
20  BY MR. WALTZ:
21  **Q.**   I'm just going to tell you there's some loose
22  stuff in here that --
23  **A.      That's just replicates of what else is in**
24  **there.**
25  **Q.**   Why don't you take out the replicates.

Jackson Hole Court Reporting Service (307) 733-2637

17

1      MR. WALTZ:  You don't care if he does that?
2      MR. LEWIS:  No.
3   **A.      So you want the W-9 left in?**
4   BY MR. WALTZ:
5   **Q.**   Sure.
6   **A.      Okay.**
7   **Q.**   You want to get paid, right?
8   **A.      Yes.  Those are the replicates.  I'll leave**
9   **that in.**
10     MR. WALTZ:  Would you please mark this?
11     (Deposition Exhibit No. 102 was marked for
12  identification.)
13  BY MR. WALTZ:
14  **Q.**   And we've marked this file 102, correct?
15  **A.      Correct.**
16  **Q.**   Then in this same file, you have a section
17  called 1, and that's the complaint and demand for
18  jury trial, correct?
19  **A.      Yes.  Those were the documents provided to me.**
20  **Q.**   In item number 2, there is a summary of W-2
21  income; is that right?
22  **A.      Yes.  That was also provided to me.**
23  **Q.**   There's something about Teton Glass.  Who was
24  paid by Teton Glass?
25  **A.      Ms. Herrera.  So in 2013 on her W-2s, she had**

Jackson Hole Court Reporting Service (307) 733-2637

**18**

1 her income from the hospital. In addition to her
2 income from the hospital in 2013, she had her
3 income from Teton Glass.
4 Q. And you have copies of these W-2s in here,
5 correct?
6 A. Yes.
7 Q. Under Tab 3, you have tax returns, which are
8 2011 through two thousand and --
9 A. '14, I believe.
10 Q. -- '14. Then you have a tab called number 4,
11 "Monica's family members she worked very hard for,"
12 and there is a list of people there, correct?
13 A. Correct.
14 Q. Is Ms. Herrera's father alive?
15 A. I do not know if her father is alive or not.
16 Q. Tab numbered 5 is a picture of Ms. Herrera, I
17 believe it's her obituary?
18 A. Obituary, yes.
19 Q. Tab numbered 6 in Exhibit 102 is an e-mail
20 from Joanna Herrera to Mr. Lewis indicating her
21 date of birth was November 7th of '67; is that
22 correct?
23 A. Yes.
24 Q. Is that correct?
25 A. Correct.

Jackson Hole Court Reporting Service (307) 733-2637

**19**

1 Q. She had a high school diploma from where?
2 A. I'm not sure.
3 Q. Was it the United States?
4 A. Yes, it's from California is my understanding.
5 Q. Her yearly extra income, aside from the
6 hospital, was $5,400 a year?
7 A. Correct.
8 Q. Have you been able to verify that through any
9 documentation?
10 A. I have not.
11 Q. Do you typically verify income when you're
12 using a calculation?
13 A. If at all possible, to this one, I have not
14 been able to verify it. That would be upon the
15 family to provide that information.
16 Q. In tab 6, in addition to the e-mail, you also
17 have something from the National Association of
18 Forensic Accountants for economics? I apologize.
19 A. Correct.
20 Q. It's a statement of principles, correct?
21 A. Yes.
22 Q. Why do you have that in there?
23 A. Just guidelines.
24 Q. Then you have one piece of paper in here.
25 What is this?

Jackson Hole Court Reporting Service (307) 733-2637

**20**

1 A. The purpose of this piece of paper is to
2 demonstrate that if we change the settlement date,
3 how you would make those adjustments to the present
4 value of the calculation.
5 Q. I don't understand, what does that mean?
6 A. So for example, my report, as you'll notice on
7 the date, the report was done as of December 1,
8 2015. If this goes to trial or it's settled, they
9 typically adjust the amount up to the current date
10 rather than the 2015 date. And so this is just to
11 demonstrate how you would be able to make that
12 calculation, bringing it forward from the initial
13 date of analysis up to whatever the settlement date
14 is.
15 Q. Now, how is this information derived?
16 A. How is this information derived?
17 Q. Yes.
18 A. And so this is just an example or example of
19 the calculations, if we looked over a ten-year
20 period, if I were to discount that back to the
21 initial period, the equations there show what the
22 present value is for it. You'll notice at the top,
23 there is a wage growth rate and then there's also a
24 discount rate.
25    When I do the calculations of present value, I

Jackson Hole Court Reporting Service (307) 733-2637

**21**

1 use the real discount rate, which accounts for both
2 the wage growth rate and the discount rate.
3 Q. All right. It's right about this time, the
4 jury's eyes start to glaze over, okay, just know
5 that.
6 A. Oh. Mm-hmm.
7 Q. What I'd like to know is in your right-hand
8 column, you've got numbers that are $94 and change.
9 $1,017, $1,048 and $1,052. I'm going the hand this
10 to you.
11 A. Okay.
12 Q. What do those numbers mean?
13 A. So the $948, if you'll notice off on the
14 left-hand side, it says the time period is zero.
15 So if it were the beginning of the ten-year
16 period, what that present value would be is if we
17 discounted those all back to that date.
18    So a hundred dollars over ten years, each year
19 for ten years, discounted back at the respective --
20 factoring in the wage growth rate and the discount
21 rate, that would be the present value at that
22 point.
23    If we move that forward one year, the second
24 calculation represents what that value would be at
25 the end of the first year. Not assuming that that

Jackson Hole Court Reporting Service (307) 733-2637

22

1  money gained any interest for us; so past losses
2  are not earning interest.
3       The second number, the $1,048, represents if
4  we moved that to the second year forward. And
5  that's assuming that past losses are not incurring
6  any prejudgment interest. Because that's what
7  those values represent.
8  Q.  There's four numbers there?
9  A.  And then the $1,052 represents if it were
10  earning prejudgement interest, what that value
11  would be.
12  Q.  Then you have the wages that start going 1 to
13  10. It starts with 103 and goes to 135. What is
14  that?
15  A.  Right. So the -- the column with the 100 --
16  we do it -- when we do a real discount rate, what
17  that factors in is rather than inflate numbers and
18  then deflate them back, you use that real discount
19  rate. The second column represents if we did not,
20  if we used the -- if we inflated the wages, so the
21  second one represents if we inflated the wages, and
22  then after we inflated those wages, inflate them
23  back not at the real discount rate, but at the
24  initial discount rate for it. The answers are the
25  same, you'll see, from the two columns there.

Jackson Hole Court Reporting Service (307) 733-2637

23

1  Q.  Is this explained in your report?
2  A.  It's not. It's just the financial
3  calculation.
4  Q.  Now we've talked about, so far, some income.
5  I want to talk about the $5,400. I asked if you
6  saw any documentation supporting the $5,400. Have
7  you seen any whatsoever?
8  A.  I have not.
9  Q.  Is it on the tax returns?
10  A.  It is not.
11  Q.  Is that fact mentioned in your report?
12  A.  I do not -- I don't think I mentioned that it
13  is not on the tax returns in the report.
14  Certainly, we recognized that she had income, given
15  that -- where the event took place, she was being
16  paid there.
17  Q.  I understand that, but I've got your report,
18  we've marked it as Exhibit 98, and it's a four-page
19  report. I want to know where in the four-page
20  report --
21  A.  Do I mention the $5,400?
22  Q.  Yes.
23  A.  So on the third page, 5.
24  Q.  It's the page -- here's the top of the page.
25  A.  So page 3.

Jackson Hole Court Reporting Service (307) 733-2637

24

1  Q.  Okay.
2  A.  Under the number 5, if you look at B.
3  Q.  That's straight from the daughter?
4  A.  That's straight from the daughter; that's from
5  the e-mail that I received from her.
6  Q.  But my question is more specific. In your
7  report, which goes through page 5, where do you
8  alert the person who's reading it that roughly 17
9  percent of her income is not reported?
10  A.  I do not.
11  Q.  Why not?
12  A.  The report separates them out for it, so I
13  have her W-2 information, and then as a separate
14  table under Tables, I have that as a separate one.
15  And that's -- that's to be brought up and confirmed
16  during the trial, was that $5,400 accurate? It has
17  been stated there. I have taken that, but I have
18  not verified that, but just take it as a fact that
19  was given and the burden will be upon them to prove
20  if that was actually there or not.
21  Q.  Your report was written November 2nd, 2015
22  correct?
23  A.  Correct.
24  Q.  I'm at May 3rd, so we're about five months --
25  six months away. In that six months, have you

Jackson Hole Court Reporting Service (307) 733-2637

25

1  asked for documentation?
2  A.  I have not.
3  Q.  Why not?
4  A.  I have not asked for additional information.
5  This is a preliminary report, I have not asked for
6  that information nor have I asked for the
7  information on medical expenses incurred or funeral
8  expenses that are -- were incurred that I did not
9  then have at the time.
10  Q.  My question was: Why have you not asked for
11  supporting documentation?
12       MR. LEWIS: Excuse me, I'll object to the form
13  of the question.
14       MR. WALTZ: What's wrong with it?
15       MR. LEWIS: It's been asked and answered
16  twice.
17       MR. WALTZ: He didn't answer it twice, so now
18  I'm going to ask it one more time.
19  BY MR. WALTZ:
20  Q.  Why have you not asked for supporting
21  documentation?
22  A.  There was not a followup on the report that
23  was asked for or requested.
24  Q.  No, no, I'm asking you as a forensic
25  accountant or economist. It is important to have

Jackson Hole Court Reporting Service (307) 733-2637

26

1  supporting documentation, is it not?
2  A.  Correct.
3  Q.  Why have you not, as a forensic accountant or
4  economist, asked for supporting documentation for
5  an item that comprises around 17 percent of
6  someone's claimed income?
7  A.  The reason being is that that information was
8  provided.  As an economist, the burden is upon them
9  to provide that information for it.
10 Q.  It's a twofold problem --
11 A.  True.
12 Q.  -- number one, you're putting in here an
13 estimate of $5,400 for her worklife expectancy
14 correct?
15 A.  Correct.
16 Q.  And you're asking for someone to pay for that
17 amount, correct?
18 A.  Correct.
19 Q.  At the same time, you know there's this
20 substantiated amount of money that is not appearing
21 on the tax returns, correct?
22 A.  Correct.
23 Q.  I'll try a different question, then.  Have you
24 asked why the amount was not on the tax returns?
25 A.  I have not.

27

1  Q.  Why not?
2  A.  I assume that that would be taken up in the
3  trial, and brought up and -- for the substantiation
4  at that point.
5  Q.  What else are you waiting to show up at trial
6  beside documentation of the income and an
7  explanation of why it's not claimed on the tax
8  returns?
9  A.  So in addition to that, the only other
10 adjustment we have at this point is the medical
11 expenses that she may have incurred and any funeral
12 expenses incurred.  And those are noted in the
13 first paragraph of the report.
14 Q.  And is this typical that you have
15 unsubstantiated income in your reports?
16 A.  Typically not.
17 Q.  Have you ever had a case before where you
18 included undocumented income in a report?
19 A.  There was information that was provided to me
20 that this was the amount being earned.  But they
21 were not able to provide the documentation for that
22 at the time I wrote the report.  And the case
23 settled prior to going to trial, so I did not do a
24 followup on that.
25 Q.  That's another file.  Which one is it?

28

1  A.  I don't recall which one.
2  Q.  How much was Ms. Herrera paid -- strike that.
3      How much was the check for Ms. Herrera that
4  was written by the Buckinghams for the weekend she
5  worked there?
6  A.  I believe around a hundred dollars, but I'm
7  not sure on the exact amount.
8  Q.  I've looked at the exhibit.  We have Exhibit
9  25 here.  I tried hard to look at that and I
10 couldn't read it.  Can you read it?
11     MR. LEWIS: You mean --
12     MR. WALTZ: My eyes are failing me.
13     MR. LEWIS: -- the amount of the check, is
14 that what --
15     MR. WALTZ: Yes, sir.
16     MR. LEWIS: He wants to know if you can see
17 that.
18     THE WITNESS: Oh, up there.
19 A.  I am unable to tell that.
20 BY MR. WALTZ:
21 Q.  Did someone tell you it was a hundred dollars?
22 A.  Mr. Lewis mentioned it was somewhere in that
23 range.
24     MR. LEWIS: $125.
25 BY MR. WALTZ:

29

1  Q.  It's $125?
2  A.  I think that's what it is.
3  Q.  How long did it take her to clean the
4  Buckingham home, typically?
5  A.  I do not know.
6  Q.  I'm trying to figure out hourly wage here.
7  Have you been given any idea how long it would take
8  her to -- strike that.
9      Have you done any calculation of what the
10 hourly wage would be for her housecleaning?
11 A.  I have not.
12 Q.  Have you asked for that?
13 A.  I have not.
14 Q.  If one is self-employed and one claims the
15 income on their tax return, there is a form that
16 can be filled out, correct?
17 A.  Correct.
18 Q.  And indeed, in this case, there are such forms
19 there were filled out for the husband's business,
20 correct?
21 A.  For the husband's business, there was.
22     MR. WALTZ: If we could pass down the exhibit
23 notebook, it's the smaller of the two.  I'm going
24 to hand this to you.
25     THE WITNESS: Thank you.

## 30

1  BY MR. WALTZ:
2  **Q.**  If you would turn to exhibit numbered 1.
3  **A.**  **(Witness complies.)**
4  **Q.**  Do you have it?
5  **A.**  **Yep.**
6  **Q.**  That's a 2012 tax return?
7  **A.**  **Correct.**
8  **Q.**  Now, if you would turn to the third page of
9  this, which is a Schedule C.
10 **A.**  **(Witness complies.)**
11 **Q.**  That Schedule C is a profit and loss from a
12 business, correct?
13 **A.**  **Correct.**
14 **Q.**  If you're self-employed, typically you have
15 P&Ls of some sort --
16 **A.**  **Mm-hmm.**
17 **Q.**  -- correct?
18 **A.**  **Correct.**
19 **Q.**  So if I make $5,400, I only make $5,400. I
20 make $5,400 less the expenses that are tendered to
21 make the $5,400, do you follow me?
22 **A.**  **Correct.**
23 **Q.**  When you were provided the information about
24 the $5,400, you understood that to be the gross
25 amount, correct?

## 31

1  **A.**  **Yes. But you wouldn't have -- my**
2  **understanding was is that the household cleaning**
3  **products were provided.**
4  **Q.**  The answer to that question, I believe, is
5  yes, correct?
6  **A.**  **That was my understanding. So that's why I**
7  **did the gross amount.**
8  **Q.**  I will ask you questions about that. But
9  typically, when you're paid a gross amount, then
10 you deduct from it any expenses, correct?
11 **A.**  **Correct.**
12 **Q.**  Now, if we look at Schedule C of her husband's
13 business, for example --
14      (Phone ringing.)
15      MR. WALTZ: I apologize.
16 BY MR. WALTZ:
17 **Q.**  He grossed for his business $60,025, correct.
18 **A.**  **Correct.**
19 **Q.**  And what was his net profit?
20 **A.**  **$2,047.**
21 **Q.**  And of that amount, was he any part of the
22 income? I'm talking about did he personally get a
23 salary, was he a contract laborer?
24 **A.**  **As it appears, he did not.**
25 **Q.**  So the total amount of money he made off of

## 32

1  $60,000 was $2,047, correct?
2  **A.**  **Correct.**
3  **Q.**  And if we go to Exhibit 2, which is the 2013
4  income, and if you look at his Schedule C, how much
5  did he gross?
6  **A.**  **$165,056.**
7  **Q.**  And what was his net profit?
8  **A.**  **$7,581.**
9      (Phone ringing.)
10     MR. WALTZ: It's happening again.
11 BY MR. WALTZ:
12 **Q.**  So we're at 2013 and we've confirmed that he
13 made --
14     (Phone ringing.)
15     MR. WALTZ: I apologize.
16     (Discussion off the record.)
17 BY MR. WALTZ:
18 **Q.**  And lastly, if we go to Exhibit 3, this is his
19 2014 -- their 2014 tax return. If you go to his
20 Schedule C, what's his gross receipts?
21 **A.**  **$193,212.**
22 **Q.**  And of that, what was his net profit?
23 **A.**  **$31,843.**
24 **Q.**  Now, on this profit and loss from business,
25 there are a number of things. One of them, just

## 33

1  use this as an example, item numbered 9 under
2  Expenses: Car and truck; do you see that?
3  **A.**  **Correct.**
4  **Q.**  Can I presume that she drove to the places
5  that she cleaned?
6  **A.**  **Yes.**
7  **Q.**  And what were the expenses that she incurred
8  under the IRS regulations for driving to the
9  various places she cleaned?
10 **A.**  **What could she deduct?**
11 **Q.**  Yes.
12 **A.**  **She could deduct, I'm not sure of the current**
13 **rate, about 55 cents a mile.**
14 **Q.**  And what was the mileage from her home to the
15 Buckingham residence?
16 **A.**  **I am not sure.**
17 **Q.**  How long did it take her?
18 **A.**  **I don't know.**
19 **Q.**  Would you agree that whatever you drive on
20 your car is wear and tear for your business?
21 **A.**  **Yes. And part of it is -- I question if she**
22 **cleaned, leaving from the hospital or left from her**
23 **home, what was the additional mileage.**
24 **Q.**  My problem is I could do a lot of forensics
25 here today, I want to know what you did.

## 34

1  A.   I just took her gross amount.
2  Q.   In your understanding, she never bought any
3  supplies for any of her cleaning business?
4  A.   There's no information provided me that she
5  did.
6  Q.   So you don't know?
7  A.   I don't know.
8  Q.   You made a comment earlier that cleaning
9  supplies were made available to her.  That is true
10 at the Buckingham residence, correct?
11 A.   That is my assumption.
12 Q.   You didn't even know that?
13 A.   I did not know that.
14 Q.   Why did you say that, then?
15 A.   It was my assumption that I made.  Typically
16 on house cleaning, they are provided, but that will
17 vary by -- by household.
18 Q.   So when these people who clean at buildings
19 where I live and they bring in all these supplies
20 and this equipment to clean, what are they doing?
21 Because you know that happens.
22 A.   So -- so on those circumstances, then they
23 would be bringing those in.
24 Q.   And my question is:  How much money did she
25 spend monthly or yearly on supplies?

Jackson Hole Court Reporting Service (307) 733-2637

## 35

1  A.   I have -- do not have that information.
2  Q.   So if I understand correctly, then, the 5500
3  could be inflated, agreed?
4  A.   Agreed.
5  Q.   And it looks like it probably is inflated,
6  agreed?
7  A.   That's debatable.
8  Q.   Well, it's debatable, she had to drive.
9  A.   It certainly would have -- so in terms of the
10 revenue part there, but then yes, the expense for
11 what she would have deducted from that.
12      Now, certainly cleaning houses is a different
13 one, as you've gone through the landscaping, their
14 expenses are likely to be significantly different
15 than a household cleaning business.
16 Q.   You know, I don't want to talk about the
17 landscaping business; I want to talk about cleaning
18 houses.  If you got to drive a car, you got to
19 drive a car, correct?
20 A.   Correct.
21 Q.   She drove a car, we know that, correct?
22 A.   Correct.
23 Q.   How many miles a year did she put on it for
24 business?
25 A.   I do not know.

Jackson Hole Court Reporting Service (307) 733-2637

## 36

1  Q.   There's a figure that gets attached to that
2  when you're figuring out how much somebody makes,
3  isn't there?
4  A.   Correct.
5  Q.   Did you make that deduction?
6  A.   I did not.
7  Q.   If she bought supplies, you did not make that
8  deduction, right?
9  A.   I did not.
10 Q.   And what we do know is she never filed tax
11 returns for that amount ever?
12 A.   Correct.  At least for the four years that we
13 had the information for.
14 Q.   Okay.  If you had the past ten years, did she
15 file tax returns on the amount she earned from
16 cleaning?
17 A.   I don't have that information.
18 Q.   Is that a violation of the regulations?
19 A.   Yes, you have to declare that.
20 Q.   But $5,400 had to be declared?
21 A.   Yes.  She would have declared that.  So it had
22 -- if she included it on her taxes, she would have
23 included that as a revenue and also taken off the
24 expense portion.
25 A.   No, no.  What I'm saying is on the 1040, she

Jackson Hole Court Reporting Service (307) 733-2637

## 37

1  should have included each year the income she made
2  from house cleaning?
3  A.   Yes, she would have filed -- similar to the
4  profit/loss from the business that her husband did,
5  she would have filled out a profit/loss for that
6  business.
7  Q.   And then what we have is an accurate figure
8  presumably of how much money taxes should be paid?
9  A.   Correct.
10 Q.   And for your purposes, that would be the full
11 $5,400?
12 A.   For what I included there.
13 Q.   Did you ask Mr. Lewis if she had a Schedule C?
14 A.   I did not.  He provided me the tax forms.  As
15 I looked through those, those were not included in
16 that, so I assumed that there was not a Schedule C
17 included for her.
18 Q.   Okay.  Let's talk about her income.  Why did
19 it go down -- I misspoke earlier, the percentage of
20 income that was not reported was about 13.4
21 percent.  Just know that to be true, okay?
22 A.   Okay.
23 Q.   Now what I wanted to ask you is:  Why did she
24 have about a 17 percent drop in income from the
25 hospital in from 2013 to 2014?

Jackson Hole Court Reporting Service (307) 733-2637

---

**38**

1  A.  I'm not aware of why that changed. She did
2  have the additional in 2013. She had the
3  additional forty- --
4  Q.  Mr. Hirschi, you're an expert. You've
5  testified before, correct?
6  A.  Correct.
7  Q.  Have you testified in court?
8  A.  Yes.
9  Q.  My question is simply: Why did she have a
10  drop in income of a roughly 17 percent from 2013 to
11  2014?
12  A.  I do not know.
13  Q.  I know, because I have the tax returns, that
14  she had an increase from 2012 to 2014 from $36,355
15  to $41,811, correct?
16  A.  Correct.
17  Q.  And that went from $41,811 down to $34,861 in
18  the year before her death?
19  A.  Correct.
20  Q.  Was she sick?
21  A.  Not to my knowledge.
22  Q.  Have you seen any medical records related to
23  health issues she may have had in the year before?
24  A.  I've had nothing that would indicate that she
25  was sick.

Jackson Hole Court Reporting Service (307) 733-2637

---

**39**

1  Q.  The assumptions you make in your calculations
2  is that she's healthy, correct?
3  A.  Yes.
4  Q.  If she's sick, you don't know that?
5  A.  Correct.
6  Q.  Do you have any idea what the medical
7  expenses, if any, were for the family back in 2014?
8  A.  I do not. Presumably since rigor mortis had
9  already set in --
10  Q.  No, 2014, we're not doing rigor mortis.
11  A.  No, I do not.
12  Q.  You know --
13  A.  As a family expense, no.
14  Q.  -- she passed away in 2015 --
15  A.  Right.
16  Q.  You know that?
17  A.  Yeah.
18  Q.  So I'm asking about 2014. If you go to
19  Exhibit 3, please.
20  A.  In this binder?
21  Q.  Yes, sir.
22  A.  Okay.
23  Q.  First page.
24  A.  Okay.
25  Q.  Line item 7, her income was $34,861, correct?

Jackson Hole Court Reporting Service (307) 733-2637

---

**40**

1  A.  Correct.
2  Q.  They did not itemize their damages, agreed?
3  A.  Correct.
4  Q.  Excuse me, strike that. They did not itemize
5  their deductions.
6  A.  Their deductions.
7  Q.  Correct?
8  A.  Correct.
9  Q.  Did they have a mortgage?
10  A.  I do not know.
11  Q.  Typically if there are medical expenses that
12  were out of pocket, you would see those on the
13  itemized deductions, correct?
14  A.  Yes.
15  Q.  Have you asked for what medical expenses she
16  may have had in, let's say, the three years prior?
17  A.  I have not.
18  Q.  Do you know if the -- let's assume she had a
19  health problem in 2014, assume that, okay?
20  A.  Okay.
21  Q.  Would that affect your belief her income from
22  house cleaning is what?
23  A.  And depending on how serious the medical
24  condition was.
25  Q.  If it was serious enough to have a drop in

Jackson Hole Court Reporting Service (307) 733-2637

---

**41**

1  income of roughly 17 percent from the hospital, do
2  you think that might impact her house cleaning?
3  A.  Potentially.
4  Q.  And you just don't know?
5  A.  I don't know.
6  Q.  Now, in your report -- and I'll go through the
7  specifics momentarily, but I just want to see
8  things that are verifiable. In your report, you
9  talk about fringe benefits, right?
10  A.  That's correct.
11  Q.  And you attach a percentage to that; is that
12  right?
13  A.  Correct.
14  Q.  Was it about 18 percent?
15  A.  Yes.
16  Q.  And it's based on some national data?
17  A.  Yes.
18  Q.  Do you have her W-2s in your file?
19  A.  The W-2s are in that booklet.
20  Q.  In this? Here you go (handing).
21  A.  Okay.
22  Q.  So let's look at, by way of example, her 2011
23  W-2. Are you with me?
24  A.  Okay.
25  Q.  You got it?

Jackson Hole Court Reporting Service (307) 733-2637

---

42

1  A.  I do.
2  Q.  She made how much money?
3  A.  $36,508.67.
4  Q.  I'm looking at $36,506 --
5  Q.  $5,006.67.
6  Q.  We both have glasses.
7  A.  Yes.
8  Q.  Now, how many -- strike that.
9      On that form, how much did her employer pay
10 for any fringe benefits?  The amount is not
11 indicated, however down in number -- below 13, it
12 does have an X by retirement plan.
13 A.  I don't know what that means.  That means she
14 had one?
15 A.  Yes, or they wouldn't put that there was a
16 participation there.
17 Q.  And how much did they pay that year?
18 A.  It's not indicated in there.
19 Q.  What other --
20 A.  That would consist of.
21 Q.  What other benefits are included in fringe
22 benefits besides retirement planning?
23 A.  So the only ones -- other ones I included were
24 the legally required benefits.
25 Q.  Which were what?

43

1  A.  The Social Security component on the
2  expenditure.  So the employer cost of employee
3  compensation and the service providing, and it has
4  the retirement savings cost and it has the legal
5  required benefits.
6  Q.  But what are they?
7  A.  Social Security and Medicare, unemployment --
8  federal unemployment insurance, state unemployment
9  insurance and Workers' Compensation.
10 Q.  Now, looking at 2011 W-2.
11 A.  (Witness complies.)
12 Q.  The Item 13, retirement plan has an X.  Have
13 you asked for the background information of how
14 much that was, if any?
15 A.  I have not.
16 Q.  Who told you there was a retirement plan?
17 A.  I assumed that from the X on the W-2.
18 Q.  When is the first time you noticed there was
19 an X on the retirement plan?
20 A.  As I looked at the W-2s, it's on there each
21 year.
22 Q.  So it's on 2012 again, correct?
23 A.  Yes.
24 Q.  Have you verified how much that is?
25 A.  I have not.  I just assumed, based on the

44

1  employer costs, based on compensation, I assumed
2  that for each of the years.
3  Q.  Now, on 2013, it has an X?
4  A.  The X remains there.
5  Q.  On 2014?
6  A.  Yes.
7  Q.  It has an X, right?
8  A.  Mm-hmm.
9  Q.  Is that correct?
10 A.  Correct.
11 Q.  I'm curious.  On these W-2s, there's a line
12 item 12A, Code DD, $24,792.84, what is that?
13 A.  I do not know what that code represents.
14 Q.  That amount appears in 2013, it goes down to
15 $21,140 in 2014.  Do you know why it goes down?
16 A.  I do not know.
17 Q.  And you do not know what that amount
18 represents?
19 A.  No.
20 Q.  Is that some kind of a disability fund?
21 A.  I do not know.
22 Q.  Do you know if Ms. Herrera claimed disability
23 in 2014?
24 A.  Not to my knowledge.
25 Q.  How would you typically get that information.

45

1  A.  Typically, it would be provided.
2  Q.  And you've been provided nothing like that?
3  A.  I've not been provided any indication that
4  there was disability.
5  Q.  Is there a reason why you went with the
6  estimate of fringe benefits rather than take the
7  actual fringe benefits she received?
8  A.  The national number in terms of calculation.
9  The government put a standard on what those
10 reflect, but I was not provided the individual
11 amounts.
12 Q.  Did you ask Mr. Lewis for that?
13 A.  I did not.
14 Q.  Okay.  Let's go to your report, which is
15 Exhibit 98.
16 A.  (Witness complies.)
17 Q.  I want to go to page 28, it's actually page 2
18 of your report.
19 A.  Page 2 of the report, okay.
20 Q.  It's 28 of 90.  Item numbered 6, the e-mail
21 from Joanna Herrera, we talked about that already,
22 correct?
23 A.  Correct.
24 Q.  Go down to Facts and Computational
25 Assumptions, paragraph number 2, do you know why

## 46

1  her date of birth is blacked out on this?
2  A.  I do not.
3  Q.  You did have it, we mentioned that earlier?
4  A.  Yes.
5  Q.  Her expected age at death is 85.42, based on
6  her race, and you attached the statistics in this
7  report, correct?
8  A.  Correct, foundational documents.
9  Q.  Paragraph numbered 3, who's her son?
10  MR. TIEDEKEN:  What was your question again?
11  MR. WALTZ:  There's a name blacked out here,
12  I'm trying to figure out who it is.
13  A.  I think that's in the other -- Francisco.
14  BY MR. WALTZ:
15  Q.  How old is he?
16  A.  I do not know, he's an adult.
17  Q.  Is he alive?
18  A.  To my knowledge, he is.  I do not know if that
19  is -- let's go back to the -- in her obituary, it
20  says she leaves her husband, Francisco (Keko)
21  Herrera, her mother, Juanita --
22  Q.  I'm sorry?
23  A.  Her mother, Juanita Luna --
24  Q.  Thank you.
25  A.  -- children, Francis Herrera, Joanna Herrera

## 47

1  and Francisco Herrera, Jr. (Poncho).  And then her
2  sisters and it goes on from there.
3  Q.  She has two young nieces; is that right?
4  A.  Two young ones that were living with her and
5  she was taking care of them.
6  Q.  Were they actual nieces?
7  A.  To my understanding, they were.
8  Q.  That was the information provided to you?
9  A.  Yes.  And the family members, Tina Torres and
10  Alexis Luna, and it has an option besides Monica's
11  nieces.
12  Q.  Turn to the next page, please.  As part of
13  your assumptions, in paragraph 5A, she worked as a
14  housekeeper at St. John's Medical Center, correct?
15  A.  Correct.
16  Q.  She'd been there for 20 years?
17  A.  Correct.
18  Q.  Her salary average was $36,250, from what you
19  calculate?
20  A.  From the hospital.
21  Q.  Right.
22  A.  Correct.
23  Q.  You took that from her W-2?
24  A.  I worked them from the W-2s and those are not
25  inflated.  They are just the normal amounts

## 48

1  averaged.
2  Q.  What were her -- strike that.
3  In four years that you have income for her,
4  did she receive any raises?
5  A.  I was looking at the amounts.  We can't tell
6  if she had raises or not simply because all that we
7  have -- we don't have an hourly rate.  All we have
8  is the total earnings for it.
9  Q.  You don't have her employment file?
10  A.  I don't have an employment file.
11  Q.  And then in paragraph B is where you have your
12  estimate of $5,400 a year, based upon information
13  provided to you by her daughter?
14  A.  Correct.
15  Q.  Paragraph 5C, you talk about fringe benefit
16  programs, and that's where you have the 18.27
17  percent on the average; is that correct?
18  A.  Correct.
19  Q.  Did she fall into the average employer
20  category?
21  A.  I have no reason to believe otherwise.
22  Q.  Paragraph 5D, she'd be an expected to work
23  additional 14.6 years beyond the date of the
24  incident, based on her age, general level of
25  education; is that correct?

## 49

1  A.  Correct.
2  Q.  That's the number you used in your
3  calculations?
4  A.  Yes.
5  Q.  When did she expect to retire, if at all, from
6  Teton County Hospital?
7  A.  Based on network life expectancy, she would
8  have been expected to retire at --
9  Q.  It's about 61?
10  A.  -- 61, roughly.
11  Q.  Yeah, but my question is this, maybe I didn't
12  ask it right:  We've seen her husband's business
13  increase in the three years prior to her death; we
14  just looked at that, remember that?
15  A.  Mm-hmm.
16  Q.  Okay.  Is that a yes?
17  A.  Correct, yes.
18  Q.  And that was not only gross sales or revenue
19  increase dramatically; would you agree?
20  A.  Yes.
21  Q.  So did his profit/loss?
22  A.  Yes.
23  Q.  We know that there were others living in their
24  home at the time, her mother, correct?
25  A.  Correct.

---

50

1  Q.   We know during that time she was working two
2  -- she, the decedent, Mrs. Herrera, was working two
3  jobs?
4  A.   **Correct.**
5  Q.   Do you know how many hours a day she was
6  working?
7  A.   **I do not.**
8  Q.   Do you know if there were any discussions now
9  that her husband's business was starting to
10 increase dramatically? Would you agree
11 dramatically is a good way to describe it?
12 A.   **Significantly for him on the revenue side,**
13 **yes.**
14 Q.   As well as the profit/loss?
15 A.   **The profit side, yes.**
16 Q.   I mean, we could do percentages, because you
17 do percentages, his profit goes up by about 2,000,
18 3,000 percent. Do you follow me?
19 A.   **Yes.**
20 Q.   Do you know why he had such an increase in his
21 revenue and profit?
22 A.   **I do not.**
23 Q.   Do you know if he had an expectation that as
24 his business started to become more successful,
25 that she could start to dial back on what amount of

---

51

1  time she was spending being away from the family
2  working two jobs?
3  A.   **I have no knowledge of that.**
4  Q.   Would you not expect that?
5  A.   **It would depend on their situation. She**
6  **certainly had a significant work history over the**
7  **last 20 years. She may or may not have, I don't**
8  **have that information.**
9  Q.   And you've read the depositions; is that
10 right?
11 A.   **I have read the complaint. I have not read**
12 **the depositions.**
13 Q.   Have you seen the depositions of the husband,
14 the daughters?
15 A.   **I have not.**
16 Q.   Have you asked for them?
17 A.   **I have not.**
18 Q.   Have you typically read those types of
19 documents in formulating your opinions?
20 A.   **When they are provided, yes.**
21 Q.   Let's go back to Exhibit 98, we're still at
22 page 3. You're now talking about household
23 services, correct, in paragraph 6?
24 A.   **Correct.**
25 Q.   How much time did she actually spend providing

---

52

1  household services?
2  A.   **The average is just over four hours a day.**
3  **I've used the numbers based on all females in the**
4  **American Time Use Survey, actually Hispanics have a**
5  **higher -- Hispanic woman have a higher hourly**
6  **contribution than women as a whole, for it, but**
7  **I've used just the women as a whole rather than the**
8  **Hispanic women.**
9  Q.   My question was: How much time did she spend
10 on household services?
11 A.   **I do not have that information.**
12 Q.   Now, getting back to your average, when you
13 look at the data for Hispanic women, that's in the
14 United States?
15 A.   **In the United States, yes.**
16 Q.   Is that for Hispanic women who are working two
17 jobs outside the home?
18 A.   **It's upon average. It doesn't break it down,**
19 **it's just all Hispanic women.**
20 Q.   Okay. Let's turn to page 4 of your report.
21 A.   **(Witness complies.)**
22 Q.   Under Computational Methodology, are you
23 there?
24 A.   **Yes.**
25 Q.   In that paragraph you talk about how you come

---

53

1  up with your discount rate, correct?
2  A.   **Correct.**
3  Q.   That seems to be where experts tend to vary
4  that I've dealt with over the last ten years, to be
5  candid with you, the past 40 years.
6  A.   **Okay.**
7  Q.   Do all economists agree that the discount rate
8  is 3.04 percent?
9  A.   **No.**
10 Q.   When you typically come up against a defense
11 economist, what discount rate do they use?
12 A.   **It varies by defense economist as to what that**
13 **rate would be, and the timeframe that they look at.**
14 Q.   And what percentages have you seen from those
15 defense economists?
16 A.   **Umm, they're often in this range, some are**
17 **higher.**
18 Q.   What have you seen?
19 A.   **There's only been a few defense reports that**
20 **I've seen.**
21 Q.   And give me some examples of the discount
22 rate.
23 A.   **The -- I don't recall the numbers right off**
24 **for it, I'd have to go back and look at those.**
25 Q.   What's the highest you've seen?

---

54

1  A.    4, as I recall right off.

2  Q.    4?

3  A.    I would have to go back and look, that's pure
4  speculation at this point.

5  Q.    Then you do a computation and summary of
6  losses, I want to go through these.  Paragraph
7  numbered 1, you're talking about what we call
8  typically past losses, correct?

9  A.    Yes.

10 Q.    So you calculate $28,843 from the hospital,
11 correct?

12 A.    Correct.

13 Q.    And that would be based upon what, which
14 amount?

15 A.    That would be based on the average, so her
16 four-year average prior to her death not inflated
17 or -- so just the average of those four years, from
18 the hospital and then the computation.  So based on
19 that average and then the -- from the time of death
20 until the time of the report.

21 Q.    So what we know is that her income was $34,861
22 -- strike that.

23       What we know is that in 2013, she had an
24 anomaly.  She was up in the $40,000 range, correct?

25 A.    Correct.

55

1  Q.    And that was because she was working two jobs.

2  A.    Yes, she had the additional job at Teton
3  Glass.  That's in the report.

4  Q.    When you did your average, did you include
5  that amount?

6  A.    I did not.  So that $4,000 -- that $4,500 from
7  Teton Glass is not included in that average.  So if
8  we were to include that, that would raise that
9  four-year average even more.

10 Q.    Why would you include that?

11 A.    What's that?

12 Q.    Why would you include it?

13 A.    Why would I include it?  Well, it wasn't
14 income for her.

15 Q.    I know, but did she ever have a third job like
16 that before?

17 A.    Not in the information that I was given.

18 Q.    So what you did was you looked at the W-2s
19 from the hospital to come up with your average
20 yearly income?

21 A.    Correct.

22 Q.    And then that's a simple calculation, you just
23 multiply by the number of months, right?

24 A.    Right, so the fraction of months between that
25 time.

56

1  Q.    Okay.  And then in paragraph number 1, you
2  also have $4,297 from house cleaning and that's
3  based off that $5,400; is that right?

4  A.    Yes.  So that would be the fraction of that
5  amount.

6  Q.    And any time we're looking at house cleaning
7  here, you're talking gross numbers?

8  A.    Yes.

9  Q.    Paragraph numbered 2 on page 4, Past Fringe
10 Benefit Losses, you have a value of $5,268 and
11 that's your 18.2 percent?

12 A.    Times the hospital income.

13 Q.    Only the hospital income?

14 A.    Only the hospital income.

15 Q.    And then paragraph numbered 3 -- I'm sorry,
16 paragraph number 2 and 1, you say "net or estimated
17 personal consumption," correct?

18 A.    Correct.

19 Q.    And that's because when you're doing an
20 estimate of loss, you have to back out personal
21 consumption, right?

22 A.    Correct.

23 Q.    And you actually have a table in here.  And if
24 you'll go down to Table 5, right?

25 A.    (No response.)

57

1  Q.    Let's go to page 36 of 90.  I didn't calculate
2  the whole report.

3  A.    Table 8.

4  Q.    You want table 8?

5  A.    That has those percentages for it.  Table 5
6  would be the one that has those personal
7  consumption amounts.

8  Q.    I want to talk about Table 5.

9  A.    Okay.

10 Q.    Table 5 is your present value of future losses
11 of capacity to earn from the hospital, correct?

12 A.    Correct.

13 Q.    And for that calculation, you're using for the
14 year 2015, a personal consumption of 13.31 percent,
15 agreed?

16 A.    Correct.

17 Q.    Where did you get that number?

18 A.    So if you'll turn to Table 8, Table 8, based
19 on consumer X --

20 Q.    Hold on a minute.  Hold on a minute.

21 A.    Okay.

22 Q.    Okay.

23 A.    So based on consumer expenditures, a portion
24 of those expenses were variable.  So --

25 Q.    You do it straight off statistics here?

## 58

1  A.    Yeah, these are just basic calculations.
2  Q.    For example, housing, you have 26.80 percent?
3  A.    Yes.
4  Q.    Did she have a housing expense?
5  A.    That's from the American -- or the consumer
6  expenditures, so those are national numbers.
7  That's what those values were.  So based on those
8  estimates, that's where I got those -- what percent
9  of that would be.  And then based on those variable
10 expenses, looking at how many were in the home,
11 what fraction of that would have been her variable
12 expenses.
13 Q.    What do you mean, the people in the home?
14 A.    And so of those variable expenses, so you've
15 got your family, and so the husband there, that --
16 the variable expenses that she would have been
17 expected to consume for it.
18 Q.    Well, who are you assuming lived with her when
19 you did this report?
20 A.    All I'm assuming is her husband and initially,
21 the two nieces.  I'm not including her mother in
22 terms of that calculation.
23 Q.    And when are the nieces going to move out?
24 A.    We assume they move out at age 18.
25 Q.    And when will they be 18?

## 59

1  A.    The one is 16, I believe, and the other one
2  was 12 at that time.
3  Q.    So what year do they move out?
4  A.    What year do they move out?
5  Q.    Yes.
6  A.    When they turn 18.
7  Q.    But what year is that?
8  A.    What year is that?
9  Q.    I'm just trying to find out the year.
10 A.    So the first one will move out in 2018, the
11 second will move out -- so in 2018 it shifts and in
12 2021, she will be gone.
13 Q.    You're looking at Table 5, right?
14 A.    They will be gone.  I'm looking at Table 5.
15 Q.    So what you have her consuming is 13.31
16 percent while both nieces live there, right?
17 A.    Correct.
18 Q.    And then you have her consuming 17.74 percent
19 when one of the nieces lived there?
20 A.    Correct.
21 Q.    And then you have her consuming 26.61 when
22 it's just her and her husband?
23 A.    Correct.
24 Q.    Does that mean he consumes 74 percent?
25 A.    Well, there's a -- these are -- this factors

## 60

1  in of the variable expenses, right, because the
2  fixed expenses aren't going to change.
3  Q.    This is where I have an issue with what you're
4  doing.  It's got to be 50/50 once it's just her and
5  him.
6  A.    No.
7  Q.    It has to be.
8  A.    No.  The reason being --
9  Q.    What is the variable expense?  Give me one.
10 A.    So think of -- so this is of the income
11 amount, right?  This is not of the variable
12 expenses, this is of the income.  So if given her
13 death, their home expenditures, the mortgage
14 payment, if they had one, has not changed.
15 Q.    They don't have a mortgage payment.  So we
16 don't have to talk about that.  That's a fixed
17 expense.
18 A.    So that would be a fixed expense, so that's an
19 example of an expense that would not change as
20 given her death for it.
21 Q.    Yeah, but I'm talking about consumption and
22 you're talking about the variables.  What
23 percentage of variables?  Set aside the fact of a
24 fixed percentage.  The fixed percent is the
25 mortgage, right, it's the house?

## 61

1  A.    Right.
2  Q.    And that percentage --
3  A.    As one of those items there.
4  Q.    And that is roughly 27 percent?
5  A.    Right.
6  Q.    Everything else is variable?
7  A.    Mm-hmm.
8  Q.    Is that correct?
9  A.    Yes.  Given this table, what we pulled out of
10 those.
11 Q.    And you're looking at Table 8?
12 A.    Table 8.
13 Q.    So of this amount --
14 A.    Now, not all the --
15 Q.    -- 73 percent are variable.
16 A.    Of this amount, 53 percent are variable.
17 Q.    Well, you can only be fixed for variable.  I
18 mean...
19 A.    Well, you got a savings.  I mean, if you're
20 saving a portion of your income --
21 Q.    Where is the savings on here?
22 A.    So you look at the total percent of income on
23 household or other personal items, on Table 8,
24 represents 80 percent, okay.  So the difference in
25 that would represent your savings portion of that.

## 62

1  **Q.**  Table 5. You have two people living together,
2  Mr. Herrera and his wife, correct?
3  **A.   Correct.**
4  **Q.**  Nobody else?
5  **A.   The nieces were living there as well.**
6  **Q.**  But I'm talking about by the year 2021.
7  **A.   In 2021?**
8  **Q.**  Yes.
9  **A.   Yes.**
10 **Q.**  She would be 53 years old, and how old would
11 he be?
12 **A.   He's just slightly older than her as well.**
13 **His birthday was January 1st, '67.**
14 **Q.**  And of all the expenses -- strike that.
15 Of all the earnings that year, she's going to
16 consume 26.61 percent?
17 **A.   Of the variable expense, yes.**
18 **Q.**  And then of the savings, how much were they
19 saving a year?
20 **A.   I do not have that information. It's simply**
21 **based on that government survey.**
22 **Q.**  I don't know about the government survey.
23 **A.   So the -- the report that this is pulled from**
24 **on consumer expenditures.**
25 **Q.**  Yeah, how much does the average family save a

## 63

1  year?
2  **A.   It would vary by family.**
3  **Q.**  No, no, I want to know for purposes of
4  statistics, how much they'll save in a year. It's
5  got to be somewhere in here.
6  **A.   So on this -- let's get to --**
7  **Q.**  You can go to your actual report if you want.
8  **A.   I'm going to get to the... $1,684 is the**
9  **national average.**
10 **Q.**  What?
11 **A.   For that income level.**
12 **Q.**  The national average of what income level?
13 **A.   So the -- based on the average income before**
14 **taxes and then the average annual expenditures, the**
15 **difference between that is 12,000.**
16 **Q.**  Holy cow. Hold on a second. Their combined
17 income, working hard, he's working enormous hours,
18 whatever his job is, she's working two or three
19 jobs. By 2014, their total income was $60,854,
20 okay?
21 **A.   Okay.**
22 **Q.**  And you're saying a family of two with an
23 income of $60,854 saves how much money?
24 **A.   $12,000.**
25 **Q.**  Nobody's going to believe that. I mean,

## 64

1  that's -- that is beyond any comprehension I have.
2  I've never heard of that. Are you saying there's
3  really a statistic out there that says that?
4  **A.   So that's the statistics from the consumer**
5  **expenditure report.**
6  **Q.**  Well, that would suggest that for those
7  families who are just living from hand to mouth,
8  because they have to just make ends meet, that
9  there are other families making $60,854 that are
10 putting away upward of $20,000 a year. Do you
11 follow what I'm saying from a logical standpoint?
12 Somebody has to be giving them more and somebody
13 has to be giving them less.
14 **A.   So on average, there's a range, yes.**
15 **Q.**  $12,000 for somebody making $60,000 year.
16 That's your testimony?
17 **A.   That -- yes, based on the consumer expenditure**
18 **survey, and that is the government number that is**
19 **provided.**
20 **Q.**  And you're saying that for each of these
21 years, because their income -- I want to know this
22 -- in 2012, their income was $38,258 for both of
23 them. How much did they put away?
24 **A.   So if we do that on a percentage basis --**
25 **Q.**  No, I want to know what your report says and

## 65

1  what the statistics show.
2  **A.   It does not give that level of income.**
3  **Q.**  What do you mean, it doesn't give that level
4  of income?
5  **A.   So the average -- on the consumer expenditure**
6  **survey, the average was $63,000, it just gives out**
7  **one number, it doesn't break them down into the**
8  **different categories.**
9  **Q.**  Well, the only time they made $63,000 was
10 never, right?
11 **A.   Right.**
12 **Q.**  So they never met your statistic?
13 **A.   It gives you a percentage to work with.**
14 **Q.**  Have you ever worked in Washington?
15 **A.   I have not.**
16 **Q.**  Because it's starting to sound like you did.
17 Do people in Washington really believe that people
18 with $63,000 income put away $12,000 a year?
19 **A.   That is what their survey has indicated.**
20 **Q.**  And is that what economists like yourself
21 would tell politicians? Are you really telling
22 them that?
23 **A.   It's between the difference there.**
24 **Q.**  When you teach at the university --
25 **A.   Mm-hmm.**

66

1  Q.    -- are you telling those students that if you
2  make $63,000 a year, you should be putting away
3  $12,000 in savings?
4        MR. LEWIS:  Asked and answered.
5  A.    It's a government number.  That's all I have
6  to work with on that.
7  BY MR. WALTZ:
8  Q.    Do you believe that there may be a significant
9  problem with that number?
10  A.   Well, certainly there's variability.
11  Q.   No, I mean a significant problem with it like
12  it's not credible.
13  A.   It's the best information that's available.
14  Q.   Where do they get it?
15  A.   They're doing surveys of individuals to come
16  up with these values.
17  Q.   This is above and beyond a retirement plan,
18  right, what you're talking about, the savings?
19  A.   So what this is showing is their average
20  income before taxes, now let's note that this is
21  also before taxes there, and then their average
22  annual expenditures.  So taxes would be a portion
23  of that $12,000.
24  Q.   Oh, I know that.
25  A.   So...

67

1  Q.    You're still saying they put away $10,000?
2  A.    No, that $12,000 -- a portion of that would be
3  taxes, right?  And then a portion of that would be
4  savings.
5  Q.    You're using savings, what is the amount of
6  savings?
7  A.    It doesn't provide savings.  It provides the
8  difference between the average income before taxes
9  and the average annual expenditures.
10  Q.   And the difference is how much money?
11  A.   And the difference is --
12        MS. TIEDEKEN:  He's looking at this
13  (indicating).
14  A.   -- $12,684.
15  BY MR. WALTZ:
16  Q.   $12,684, which is used for what?
17  A.   It would pay taxes, it's savings, it does not
18  disclose what that amount is used for.
19  Q.   Okay.  Getting back to your report, because I
20  have others here that want to ask you questions.
21  If you would turn to page 4, numbered 4, it's page
22  30 of 90.
23  A.   (Witness complies.)
24  Q.   Tell me when you're there.
25  A.   I'm there.

68

1  Q.    Paragraph 3, you do future income and what you
2  do is take the Teton County Hospital district and
3  you put in $370,869; is that right?
4  A.    Correct.
5  Q.    And then you also have the present value of
6  house cleaning, which is $55,247, correct?
7  A.    Correct.
8  Q.    And then again, between the two, you're giving
9  her a percentage of personal consumption, correct?
10  A.   Correct.
11  Q.   And that varies from 13 to 17 to 26 percent?
12  A.   Based on the numbers we discussed.
13  Q.   Have you seen other defense experts where they
14  have a different consumption value?
15  A.   I have not.
16  Q.   Now, if we turn to paragraph numbered 5.
17  A.   (Witness complies.)
18  Q.   -- that's past household services, correct, is
19  $14,433?
20  A.   Correct.
21  Q.   I'm curious.  What's the hourly rate for that?
22  A.   $10.41.
23  Q.   And where do you get that?
24  A.   That is based on the median value of wages for
25  respective activities.

69

1  Q.    If I understand that number, $14,433, if I
2  compared it to the past house cleaning, it's about
3  a third of the house cleaning, is that right, which
4  is $55,247 -- I misspoke, it's $4,297.  So it's --
5  A.    I'm not following which page you're on.
6  Q.    I'll withdraw the question.
7        Her past household services is $14,433.  Her
8  past housecleaning is $4,297, is that right?
9  A.    The past housecleaning?
10  Q.   No, just go to page 4, paragraph 1 page 6 of
11  your report, paragraph 1.
12  A.   (Witness complies.)  So the income from
13  housecleaning is your question?
14  Q.   Compared to the estimate you have of the past
15  loss for household services?
16  A.   Yes.
17  Q.   You have three times the amount for household
18  services, right?
19  A.   Yeah, roughly.
20  Q.   How many hours do you estimate she spends a
21  year on household services?
22  A.   The daily amount is 4.1-something.
23  Q.   4.1 hours?
24  A.   4.1 hours, I think.
25  Q.   So it's a simple calculation.  I do 4.1 hours

## 70

1 times 365 times $10.41?
2 **A.  Yes.**
3 **Q.**  And you think that comes out to $14,433?
4 **A.  Well, it's that fraction for her past**
5 **household services would be that fraction because**
6 **it's not a full year.**
7 **Q.**  I understand that.
8 **A.  So it's from the date of her death to the date**
9 **of analysis.**
10 **Q.**  If I take $10.41 and I multiply it by 4.1,
11 that's per week?
12 **A.  4.14 per day.**
13 **Q.**  Per day?
14 **A.  Yes.**
15 **Q.**  Times 365 days?
16 **A.  Mm-hmm.**
17 **Q.**  Is that correct?
18 **A.  Correct.  And then times that by .840, which**
19 **would be the time difference for the fraction of**
20 **the full year.**
21 **Q.**  How many hours a day did she spend cleaning?
22 **A.  I based it on the national numbers.**
23 **Q.**  Which is what?
24 **A.  The 4.14.**
25 **Q.**  I asked a bad question, it's my fault.  How

Jackson Hole Court Reporting Service (307) 733-2637

## 71

1 many hours a day did she spend cleaning houses
2 outside her home?
3 **A.  I do not have that information.**
4 **Q.**  And then in paragraph 6, you do a present
5 value of the future household services, correct?
6 **A.  Correct.**
7 **Q.**  And that is for her lifetime; is that right?
8 **A.  Yes.**
9 **Q.**  And then that percentage of time she spends
10 doing it goes down as she gets older, correct?
11 **A.  Right.  And that's why I used the age as**
12 **opposed to race, to be able to break that down by**
13 **year.**
14 **Q.**  Now, if you go to page 32 of 90, because I --
15 **A.  It's the next one over, okay.**
16 **Q.**  Are you with me?
17 **A.  Yes.**
18 **Q.**  This is Table Number 1, correct?
19 **A.  Yes.**
20 **Q.**  You're using 3.04 percent as a growth rate,
21 correct?
22 **A.  Correct.**
23 **Q.**  This is my question --
24 **A.  3.04 is a discount rate, 3.01 as the wage**
25 **growth rate.**

Jackson Hole Court Reporting Service (307) 733-2637

## 72

1 **Q.**  3.04 percent is a discount rate, correct?
2 **A.  Yes.**
3 **Q.**  And you use that by averaging numbers from
4 1990 through 2014?
5 **A.  Correct.**
6 **Q.**  And you choose years where we have interest
7 rates that were phenomenal compared to the --
8 **A.  A portion of those.**
9 **Q.**  Yeah, I mean, compared to the last eight
10 years --
11 **A.  Right.**
12 **Q.**  -- we're making no money, right?
13 **A.  Yeah.**
14 **Q.**  Correct?
15 **A.  Correct.**
16 **Q.**  So to give more money to someone, if you
17 decide to do that, you want a higher discount rate,
18 correct?
19 **A.  No, to give less money to someone --**
20 **Q.**  You want a higher discount?
21 **A.  -- you want a higher discount rate.**
22 **Q.**  So you think you're being fair with the 3.04
23 percent?
24 **A.  I do, because it's a risk-free rate based on**
25 **the three-month T-bill and that was that other page**

Jackson Hole Court Reporting Service (307) 733-2637

## 73

1 **that was included there is -- there's no way that**
2 **you can invest in the three months and get that**
3 **rate today.  So over that 25-year period.**
4 **The key for doing this is that you want to**
5 **match up the discount rate with the wage growth**
6 **rate.  And so by going historically and doing that,**
7 **you're able to see what those rates are.**
8 **Typically, if you have a higher wage rate, you**
9 **would also have a higher discount rate in those**
10 **years.  And so what we're after is looking at that**
11 **net difference between those.**
12 **Q.**  What I know is this:  Wages over the last --
13 since 2008 have dropped off significantly, have
14 they not?
15 **A.  Compared to previous years.**
16 **Q.**  Right?
17 **A.  Yes.  So you're still in the -- compared to --**
18 **to the '97s, the '90s for it, as you come down to**
19 **2008, you are still at 2.7 percent, 2009, you're at**
20 **3 percent, they drop down 2.4.  2012 is only at 1.5**
21 **and then they've increased back to 2 percent for**
22 **2013 and 2.3 percent for 2014.**
23 **Q.**  Have you heard of The Great Recession?
24 **A.  Yes.**
25 **Q.**  It started in 2008 --

Jackson Hole Court Reporting Service (307) 733-2637

74

1  A.   Mm-hmm.
2  Q.   -- is that correct?
3  A.   Correct.
4  Q.   And the earning power of money has diminished
5  dramatically in the last eight years?
6  A.   Based on the -- earning power of money?
7  Q.   For the average income.
8  A.   What you're able to invest in, yes.
9  Q.   And I'm not talking about just from what
10  consumers can buy, you know that it's dramatically
11  --
12  A.   But -- so if you look over on the third
13  column, that shows you what the consumer price
14  index has been, so how prices changed over that
15  time as well.  So they've actually adjusted 2011,
16  being 3.2 percent, but in 2012, you're at 2.1 and
17  then the last few years, 1.5 and 1.6.  So the CPI
18  reflects how much prices have increased over that
19  time.  The annual increase.
20  Q.   Now, if you would turn to -- where in your
21  narration, your report, do you discuss how you
22  calculate the personal consumption?
23  A.   So the personal consumption, if you look at --
24  so in the report, I mentioned personal consumption
25  in the tables, Table 8 is where we do the

Jackson Hole Court Reporting Service (307) 733-2637

75

1  calculations for that amount.
2  Q.   You just have to go straight to your tables to
3  see the percentage?
4  A.   Yeah, so in the table, and then as you go back
5  into the report, that gives you that fraction based on
6  the number of people in the household at that time.
7  Q.   Go to Table 9, please.
8  A.   Okay.
9  Q.   For the entire time you've done this
10  calculation from 2015 to 2029, which is her work
11  life, correct?
12  A.   Yes.
13  Q.   You estimate that there's 53.23 percent for
14  variable expenses, agreed?
15  A.   Correct.
16  Q.   And the rest are what, if they're not
17  variability?
18  A.   So the rest would be fixed expenses, savings
19  and taxes.
20  Q.   Your estimate of time spent on household
21  services appears on Table 11; is that correct?
22  That's page 42 of 90.
23  A.   Yes.
24      MR. WALTZ:  I think I'm going to pass the
25  witness at this time.  Thank you.

Jackson Hole Court Reporting Service (307) 733-2637

76

1      Do you want to move down here?
2      MR. McGILL:  No, I'm good.
3          EXAMINATION
4  BY MR. McGILL:
5  Q.   Dr. Hirschi, my name is Joseph McGill, I
6  represent Triangle Tube Company.  I'm going to ask
7  you some followup questions, one of the topics that
8  Mr. Waltz has not asked you, but I'll try not to be
9  too repetitive, if at all.
10      First of all could you take a look at this?
11  BY MR. McGILL:
12  Q.   First of all, take a look at this.  I'm
13  showing the witness what was the deposition notice
14  that was issued by our office for your testimony
15  today.
16  A.   Okay.
17  Q.   And on page 2, Item 6, it requests you to
18  bring with you any texts, regulations, standards,
19  guidelines, journal articles, et cetera that you
20  believe support or relates to your opinion.
21      Have you brought any of those with you?
22  A.   So I brought the standards and it's included
23  in this report, the ethical standards, what those
24  guidelines consists of --
25  Q.   Anything else?

Jackson Hole Court Reporting Service (307) 733-2637

77

1  A.   -- the analysis.  I have not.
2  Q.   Now, is there anything else that falls under
3  this category that you have in your possession that
4  you didn't bring with you today?
5  A.   No.
6  Q.   Okay.  And the standard that's included in
7  your file, is that the only standard that you
8  believe is authoritative that relates to your
9  opinion.
10  A.   It's certainly not the only standard, but in
11  terms of the economics, certainly is a valid
12  standard for what is expected in the profession.
13  Q.   All right.  When were you retained by Mr.
14  Lewis?
15  A.   October, I believe.
16  Q.   Is there a written retention agreement?
17  A.   I received a check, my retainer check of
18  $1,500.
19  Q.   Okay.  Are you not hearing me?  I'm sorry, Dr.
20  Hirschi, are you not hearing me?
21  A.   Yeah, I'm hearing you okay.
22  Q.   I asked you:  Is there a written retainer
23  agreement.
24  A.   There's not a written retainer.  I sent him my
25  fee schedule.  We do not have a written retainer

Jackson Hole Court Reporting Service (307) 733-2637

78

1  agreement.
2  Q.   And all the information that's contained in
3  your file related to this matter, you received from
4  Mr. Lewis?
5  A.   **Yes.  The obituary, I did pull off the**
6  **internet.  The other information was provided by**
7  **Mr. Lewis.**
8  Q.   And when Mr. Lewis contacted you, did you have
9  a phone conversation, was it e-mail, how was the
10  initial contact?
11  A.   **We initially started with a phone conversation**
12  **and then by e-mail as he sent me the documents.**
13  Q.   And are the e-mails that went back and forth
14  between you and Mr. Lewis contained in your file?
15  A.   **They are not --**
16        MR. McGILL:  Will you produce --
17        THE WITNESS:  -- the files from that are, but
18  I --
19        MR. McGILL:  Can you produce the e-mails as
20  well?
21        THE WITNESS:  I can produce the e-mails as
22  well.  Where would you like me to send those?
23        MR. McGILL:  I imagine it would be appropriate
24  to send them to Mr. Lewis' office, and then his
25  office can send them to us.

79

1        THE WITNESS:  Okay.  Do you what want those in
2  the Acrobat format?  What's the appropriate format
3  that you'd like?
4        MR. McGILL:  PDF is fine with us.
5        THE WITNESS:  The challenge to PDF is they
6  contain the files, but the files that were attached
7  are included.  Do you want me just to make a PDF of
8  the contents of the e-mail or would you like the
9  files sent to you as well?
10        MR. McGILL:  My preference would be if there
11  was an e-mail and there was an attachment to the
12  e-mail, I'd like to have the attachment included as
13  well.  So to save paper, the electronic format
14  would most likely be best.  If you want to do that,
15  and a Zip drive or a CD or whatever, that would be
16  okay with me.
17        THE WITNESS:  Would it be appropriate just to
18  forward it back to him, which would also include
19  the documents there.
20        MR. McGILL:  Well, that creates an additional
21  sort of send and date stamp on the document and it
22  creates an additional problem with proofs.
23        THE WITNESS:  Okay.
24        MR. McGILL:  So I'd prefer just copies and
25  then electronic format with attachments.

80

1        THE WITNESS:  Okay.
2  BY MR. McGILL:
3  Q.   Now, when you initially began speaking with
4  Mr. Lewis about this lawsuit, did he tell you the
5  purpose for which you were being retained?
6  A.   **Yes.**
7  Q.   And what was that?
8  A.   **To estimate the economic damages of Mrs.**
9  **Herrera.**
10  Q.   And you hold yourself out to the public as an
11  economist, right?
12  A.   **Correct.**
13  Q.   Not an accountant?
14  A.   **Nope.**
15  Q.   And then what was the specific scope of your
16  retention?
17  A.   **To estimate the economic damages.**
18  Q.   Past, present, future?
19  A.   **Past -- past -- past and future earnings with**
20  **respect to earnings, household services, benefits.**
21  Q.   Anything else?
22  A.   **Those were the primary ones, so the focus on**
23  **the economics portion.**
24  Q.   Okay.
25  A.   **Not the value of life.  Other lost care and**

81

1  **comfort, those items are not clouded in the report.**
2  Q.   And your report spans the -- just the worklife
3  expectancy of Mrs. Herrera?
4  A.   **So the earnings contain the worklife**
5  **expectancy and then household services to include**
6  **up to her expected time of death.**
7  Q.   Okay.
8  A.   **Normal expected time of death.**
9  Q.   Have you ever heard of the term, injury
10  adjusted life expectancy?
11  A.   **I've heard of it and can't give you the**
12  **details on particular ones.  Certainly the disabled**
13  **worker, there are tables on that that have the --**
14  **you do the adjustments and calculations for it.**
15  Q.   And what is your understanding with respect to
16  what the goal is of obtaining injury adjusted -- or
17  injury adjusted life expectancy?
18  A.   **So an injury adjusted, so if someone is**
19  **injured, as opposed to killed, they are expected to**
20  **exit the workforce earlier.  And so you would**
21  **adjust their earnings, so you'd compare the normal**
22  **earnings of that individual to when they are**
23  **expected to exit the workforce due to the injury.**
24  Q.   And is there an analogous analysis that you
25  would do for someone like Mrs. Herrera where you

82

1  would take into consideration her current health
2  condition as of the time that you're doing your
3  analysis?
4  A.   If -- if that were a serious factor there, you
5  know, for example, had she had cancer and it was
6  not treatable and her life expectancy was expected
7  to be shorter than that, then you could build that
8  into the model and adjust for that.  But that would
9  be caused from other than whatever the other
10 incident was.
11 Q.   Certainly.  Certainly, and that's exactly what
12 I'm referring to.
13 A.   Right.
14 Q.   You didn't do that in this instance?
15 A.   I did not.
16 Q.   Your report is marked preliminary and I
17 believe you were asked questions about additional
18 work that you might do, but can you give me a
19 better understanding of how -- what additional work
20 would be done on your report, which you've marked
21 as preliminary, to get it to the point where it's
22 no longer preliminary, it's a final report?
23 A.   Final.  Primarily just -- any medical expenses
24 or funeral expenses to be included in there.  Also
25 if the date of settlement were to change and they

83

1  would ask me to go through and redo those, redo
2  those calculations for it.
3  Q.   What does the -- first of all, tell me how you
4  define date of settlement.
5  A.   Date of settlement?  So, for example, if a
6  case settles prior to going to court, at the date
7  of settlement, they will say okay, we want you to
8  readjust your analysis up to give me a present
9  value not from the initial date of analysis, but
10 bring that up to today's date for it.  And they --
11 typically, they will specify what date that is.
12      If it goes to trial and there's a settlement
13 at that point in trial, same thing, that they will
14 bring that up and say this is the date of
15 settlement, we want you to calculate the present
16 value of those losses at this time.
17 Q.   So I think that's contained on a separate
18 sheet that's in your file?
19 A.   Just an example of that.  So I haven't
20 actually done those calculations.  I just included
21 that as an example to help the lay individual
22 understand:  Here's -- here's how you would do
23 these adjustments.
24 Q.   Do you have an electronic file related to this
25 matter?

84

1  A.   Which one?  The ones that were sent?
2  Q.   To your retention in this case.
3  A.   Yep.
4  Q.   An overall electronic file on your computer,
5  your laptop, whatever it is?
6  A.   Yes.
7  Q.   And has everything that's contained in that
8  file been produced today?
9  A.   It has.
10 Q.   Now, with respect to the settlement date in
11 that sheet that's in your binder --
12 A.   That one is not -- yeah, that's in there
13 that has been produced, so yes, the question
14 remains yes.
15 Q.   So that settlement analysis, that doesn't have
16 anything to do with your -- or does it have
17 anything to do with your -- what we have here as
18 your preliminary report?
19 A.   No.  No, this is entirely separate.  So if a
20 conclusion came, we want to come to a consensus
21 today to adjust this from the December 1st deadline
22 to today's date, how would we go about doing that?
23 That's simply an example of how that would take
24 place.
25 Q.   So is that outside the scope of your retention

85

1  in this case?
2  A.   In this case, it was, but oftentimes in cases,
3  they will ask you to -- they'll come back and have
4  you recalculate that and bring that up to the
5  present value.
6  Q.   Did Mr. Lewis ask you to prepare that?
7  A.   He did not.
8  Q.   And so why did you prepare that in this
9  instance?
10 A.   Just as a demonstration, because it often
11 comes up as a question in terms of okay, how would
12 do these adjustments.
13 Q.   But that question hasn't come up today?
14 A.   It has not.
15 Q.   So it was a demonstration to yourself?
16 A.   Yes -- well, and demonstration to myself and
17 then also to be able to show others how that would
18 be calculated.
19 Q.   For your Vitae, when was the last time this
20 was updated?
21 A.   Just recently.
22 Q.   In 2016?
23 A.   Yes.
24 Q.   So other than the funeral expenses and the
25 medical expenses, is there any other further work

---

86

1  you intend on doing on this report?
2  **A.    Not in terms of the reports, no.**
3  **Q.    Are there other individuals that you intend to**
4  speak with?
5  **A.    Not at this point.**
6  **Q.    And I take it that you've only reviewed some**
7  of the pleadings in this case, but not any of the
8  depositions?
9  **A.    Correct.**
10 **Q.    You've looked at the tax returns?**
11 **A.    I've looked at the tax returns and the W-2s.**
12 **Q.    So again, other than the medical information**
13 and the funeral expense information, is there any
14 other material that you intend to review for trial?
15 **A.    If Mr. Lewis would like me to read the**
16 **depositions before trial, I would be willing to do**
17 **that and become more familiar with the details and**
18 **opinions of those who have given deposition.**
19 **Q.    Do you understand what the term, working**
20 papers, means?
21 **A.    Yes.**
22 **Q.    What is your understanding of that term?**
23 **A.    A working paper is a paper that typically**
24 **academia, working paper is a paper that you have**
25 **come up with the ideas, you're working on it, it's**

---

87

1  not finalized yet, you produce it, which then allow
2  others to critique it, provide their input before
3  it becomes a finalized paper.
4  **Q.    Have you prepared any working papers with**
5  respect to your retention in this case?
6  **A.    I have not.**
7  **Q.    Do you have any preliminary drafts of the**
8  report that you prepared?
9  **A.    Preliminary, just this one here (indicating).**
10 **Q.    So your report that's been marked, whatever**
11 it's been marked this morning -- that's the only
12 draft of the report?
13 **A.    Yes.**
14 **Q.    So there were no earlier drafts where you made**
15 other conclusions?
16 **A.    No.**
17 **Q.    Did you work with anyone at the university**
18 preparing the report?
19 **A.    No.**
20 **Q.    So you've pretty much been in academia**
21 since --
22 **A.    Since my Ph.D.**
23 **Q.    Since 1999, so you didn't have any outside**
24 employment?
25 **A.    Actually since 1997 is when I began full-time**

---

88

1  **teaching, I finished up my doctorate.  I left ABD**
2  **and I finished up my doctorate in '99, but I**
3  **started teaching full-time in 1997.**
4  **Q.    And so university courses, there are no -- are**
5  any of those courses that you're teaching at BYU
6  Idaho in the business college?
7  **A.    Yes, they're all in the business college.**
8  **Q.    Are any of them under the accounting**
9  discipline?
10 **A.    No.  So under the economics discipline, I did**
11 **teach courses in the business department as well.**
12 **So I serve as an associate dean for the College of**
13 **Business and Communication.**
14 **Q.    For that campus?**
15 **A.    For that campus, yes.**
16 **Q.    And have you taken any course work or obtained**
17 any certification in forensic accounting?
18 **A.    I have not.**
19 **Q.    You list on your Curriculum Vitae several**
20 proceedings, papers and professional presentations.
21 Can you tell me the difference between proceeding
22 papers and professional presentations?
23 **A.    So a professional presentation is you simply**
24 **present there.  A proceedings paper, there is often**
25 **a paper that's produced or abstracts that are**

---

89

1  produced after that.
2  **Q.    Oh, I see.  So the proceeding papers are**
3  basically abstracts of the professional
4  presentations?
5  **A.    Correct.**
6  **Q.    And then your publications, is that other**
7  publications section of your Curriculum Vitae, are
8  those the only formal publications that you have?
9  **A.    Yes.**
10 **Q.    Have you written any textbooks?**
11 **A.    I have an electronic textbook that I've**
12 **written the principles of microeconomics.  It's**
13 **available on the web.**
14 **Q.    And have you referenced that at all in**
15 preparation of your report?
16 **A.    I have not.**
17 **Q.    Have you -- for the articles that are listed**
18 in your Curriculum Vitae, were those peer-reviewed?
19 **A.    No.**
20 **Q.    And it's --**
21 **A.    The presentations were not peer-reviewed.**
22 **Q.    The presentations weren't peer-reviewed, the**
23 publications weren't peer-reviewed and the
24 proceeding papers or abstracts weren't
25 peer-reviewed either?

---

90

1  A.    Correct.
2  Q.    Have you ever prepared a draft publication and
3  submitted it to a journal or a publication and it's
4  been rejected?
5  A.    No.
6  Q.    Are there any licensure requirements for any
7  of the areas of expertise that you're claiming in
8  this case?
9  A.    There is not.  A doctorate does the training
10  in terms of that portion.
11  Q.    So at BYU Idaho, the economics department is
12  in the business college?
13  A.    Correct.  So within the business college,
14  there is the accounting department, there's the
15  economics department, there's the computer
16  information technology department, there's a
17  business department and the communication
18  department.
19  Q.    Okay.  And how many courses in accounting have
20  you taken?
21  A.    Umm, two -- about four.
22  Q.    Were those in your undergrad?
23  A.    Yes.
24  Q.    So describe for me, you know in your business
25  degree, what were the nature of the courses that

91

1  you took?
2  A.    In the business degree?
3  Q.    Yes.
4  A.    So in business degree, you take operations
5  management, operation finance, finance marketing,
6  are the primaries that you get, your core, those
7  are the emphasis courses, you have others within
8  that.
9  Q.    When I use the term survey course, do you
10  understand what that means?
11  A.    Mm-hmm.
12  Q.    And would you describe all those courses as
13  survey courses?
14  A.    Within the upper division ones, those are more
15  -- those are not survey courses.  Survey courses
16  tends to be a lower "watered down," a little
17  broader.  These were not survey courses, these were
18  the actual emphasis courses.
19  Q.    Okay.  And have you taken cost accounting?
20  A.    I have not -- but yeah -- no, I did
21  managerial, but not cost accounting per se.
22  Q.    Did you take tax accounting?
23  A.    No.
24  Q.    Did you take auditing?
25  A.    No.

92

1  Q.    It appears as though your emphasis in
2  economics has been almost exclusively in the
3  agricultural area; is that a fair statement?
4  A.    It is.
5  Q.    And in agricultural economics, do you have the
6  occasion or need to do projections such as -- or do
7  an analysis, like you've done in this case?
8  A.    All the time.
9  Q.    For injured people?
10  A.    Well, in terms of the analysis, in terms of
11  computing incomes streams, expense streams, so
12  revenue streams/expense streams for it.  But -- but
13  not related to injury per se, but in terms of
14  discounting those components are a heavy part in
15  that.
16  Q.    Are those revenue streams resulting from
17  individual's activities or are they revenue streams
18  resulting from productivity of agricultural lands,
19  for example?
20  A.    You factor both of those in, so...  The
21  different enterprises, what revenue stream would
22  this generate, what would be the respective costs.
23  Q.    You have a publication -- actually, it's a
24  proceeding paper in agricultural floodplain
25  management strategies?

93

1  A.    Correct.
2  Q.    Is that relevant at all in your analysis in
3  this case?
4  A.    No, not other than the fact of the basic
5  finance part.
6  Q.    Okay.  So with respect to all of the
7  proceeding papers, are any of those relevant to
8  your analysis in this case?
9  A.    Not other than the financial streams.
10  Q.    And then certainly, as a result of -- the
11  professional presentations wouldn't be relative to
12  your analysis in this case either, would it?
13  A.    Correct.
14  Q.    All right.  Are any of the publications
15  relevant to your analysis in this case?
16  A.    Not other than the financial streams.
17  Q.    Have you taken any courses in finance?
18  A.    Yes.
19  Q.    How many?
20  A.    Oh, it depends on what you count as a finance
21  class.
22  Q.    Finances in the separate discipline at BYU.
23  A.    Well, so for example, at BYU Idaho, we have --
24  there's two different ones.
25        So within the business department, they have a

94

1  finance emphasis, and then in our economics
2  department, we have an economics major and then we
3  also have a financial economics major.
4          And so I teach the financial economics
5  courses. And that deals with primarily the
6  derivatives market, we also do company evaluation
7  in that. As we replicate the CFA challenge, the
8  students go through and replicate that and then
9  make recommendations on a company.
10 Q.    Okay. So I guess I'm not clear. Have you
11 taken all of those courses or...
12 A.    So taken all of those courses?
13 Q.    Taken or taught. Let's separate it out. Have
14 you taught any courses in finance?
15 A.    So in the financial economics, I teach the
16 finance econ course for it.
17 Q.    Okay. Anything outside of the economics
18 discipline in finance?
19 A.    I have taught agricultural finance when I was
20 at the Western Wyoming University as well. I have
21 not taught a finance class that was "pure finance."
22         So the difference being, for example, with
23 agriculture, is that you do all of the finance, but
24 then you have the anomalies -- or I shouldn't say
25 anomalies, but the differences that come about from
Jackson Hole Court Reporting Service (307) 733-2637

95

1  agriculture.
2  Q.    So the risk factors that are associated with
3  agriculture are factored into the course
4  presentation on finance?
5  A.    Right.
6  Q.    Which are different than the risk factors that
7  might be associated with investing in stocks, say,
8  for example?
9  A.    Right. Now typically, within that, so for
10 example, in the finance econ class, we are covering
11 equities; in the agricultural one, yes, you focus
12 on the agricultural components of that.
13 Q.    Okay. And so in your analysis in this case,
14 there are no agricultural risk factors that are
15 associated with the analysis you ^ on Mrs. Herrera?
16 A.    There is not.
17 Q.    Do you know the difference between a financial
18 forecast or financial projection? Let me -- first
19 of all, let me ask it this way. Do you know what a
20 forecast is?
21 A.    So a forecast is looking forward, what would
22 be -- we would expect that to be for it. Sometimes
23 those terms are interchangeable. As in terms of a
24 projection, I project this amount to happen
25 forward.
Jackson Hole Court Reporting Service (307) 733-2637

96

1  Q.    Okay. So I want to probe that a little bit.
2  Give me your understanding of what a forecast is.
3  A.    So a forecast is, for example, if we were to
4  look at where the stock market is going. What is
5  the -- what's the forecast? Do I expect the stock
6  market to be going up? Do I expect it to go down?
7  And what are the factors that would lead me to that
8  conclusion for it.
9          So what's happening in government, what's
10 happening with China or the international market,
11 you bring those in and measure those, and based on
12 those estimates, be able to make your forecast.
13 Now, sometimes those are interchangeable with
14 what's your projection.
15 Q.    Okay. Do you know of a specific discernible
16 definition for a projection?
17 A.    No, not that would be different -- projections
18 -- sometimes projections will be based on, okay,
19 where we're at, based on the information of today
20 what we expect to happen forward, I mean, not
21 bringing in as much of the other factors.
22         For example, in an econ metrics model, you
23 would use more of that to get your forecast. A
24 projection is more, okay, well, here's where we're
25 at, here's where we expect it to be in the future.
Jackson Hole Court Reporting Service (307) 733-2637

97

1  Q.    Okay. So would you agree that with the
2  forecast, assumptions -- or the difference between
3  a forecast and projection is the nature of the
4  assumption?
5  A.    In part, yes.
6  Q.    And would you agree that the forecast
7  assumptions in this matter represent what Mrs.
8  Herrera and family expect their actual future
9  financial condition to be?
10 A.    Yes. Based on -- based on what was happening
11 in the past, what we would expect to have happen in
12 the future.
13 Q.    So is your analysis more of a "what if"
14 scenario?
15 A.    Well, so it combines two different things.
16 One, we look historically and say here's what was
17 happening for it and -- but then we add to that the
18 government data to look at, okay, what is the life
19 expectancy of an individual at this age? What's
20 the worklife expectancy? What are the different
21 factors here?
22         So you're bringing those, not only what's
23 happened in the past in, but also based on
24 referencing of this other information as to where
25 we would have expected to go in the future.
Jackson Hole Court Reporting Service (307) 733-2637

## 98

1  Q.   So it sounds like to me that you are -- you're
2  using the terms interchangeably?
3  A.   Yes, in this instance.
4  Q.   So a portion of your analysis is sort of a
5  "what if" scenario based on what we know today?
6  A.   Mm-hmm.
7  Q.   And then the portion is based on past data?
8  A.   Right -- well, not only -- so what we know, we
9  know the past for it.  But then also based on
10 historical behavior, average expenditures, those
11 types of activities, what we would expect that to
12 be as we move forward.
13 Q.   Have you done any presentations that relate to
14 lost future income such as you prepared in this
15 case?
16 A.   At a professional conference or what are we
17 referring to?
18 Q.   Really at any level.
19 A.   So we have done -- even in my principles
20 class, they do a simple calculation.  Warren
21 Buffett once asked the question "If I could buy 10
22 percent of your future income, what would I have to
23 pay you?"  So I have our students walk through it,
24 a similar exercise in that area.  I have not
25 presented it at a professional conference for it.

## 99

1  Q.   And again, could you remind me of the number
2  of times you've been deposed in the last 12 months?
3  A.   In the last 12 months, I have not been
4  deposed.
5  Q.   And then in the last five years?
6  A.   In the last five years, I've been deposed
7  once.
8  Q.   And how many times have you testified in open
9  court?
10 A.   Twice -- well, so once in open court, once
11 with the judge.
12 Q.   What's the difference?
13 A.   So in the case, in the Barkers' case, the
14 individual is working -- the daughter was coming
15 back from working on the ranch and the defense
16 argued that the loss was to the ramp as opposed to
17 the family for it.  And so to the -- I testified in
18 front of the judge as to what happened, but it did
19 not go to the full before jury.
20 Q.   Do you have copies of either the transcripts
21 of your testimony in open court or your deposition
22 transcripts?
23 A.   I do not.
24 Q.   Where were those two cases pending?
25 A.   So the Barkers case was in Casper.  The

## 100

1  deposition was in Fremont County.
2  Q.   So Barkers was in federal court?
3  A.   Yes.
4  Q.   And the other one in Fremont County State
5  Court?
6  A.   Yes.
7  Q.   What were the names of the attorneys that
8  retained you?
9  A.   So in the Barkers, it was Gary Shockey.  In
10 the other case was -- so in the other one that I
11 testified in was Steven Brown.  And then the
12 deposition one was Breck Barton.
13 Q.   Have you ever been certified, to your
14 knowledge, by any court of law as an expert in any
15 field?
16 A.   In terms of certified by the court?
17 Q.   Yes.
18 A.   No.
19 Q.   And other than the deposition in the -- at the
20 testimony you've mentioned, you haven't testified
21 regarding calculation of financial and economic
22 damages in any other proceedings?
23 A.   Not that I've testified in court.
24 Q.   Have you ever been disqualified to act as an
25 expert in any court?

## 101

1  A.   No.
2  Q.   And I think you mentioned that there was a
3  small portion of your income associated with what
4  I'll call these consulting activities.  Can you
5  give me a better understanding of what that
6  percentage is?
7  A.   Umm, 10 percent.
8  Q.   And again, you haven't factored in any of the
9  conditions of Mrs. Herrera's health as of the date
10 of her death in your analysis?
11 A.   I have not.  I had no indication of any health
12 issues.
13 Q.   What are the types of health issues that might
14 impact your analysis?
15 A.   Well certainly, if that were a terminal
16 illness or other condition that would limit the
17 amount that she had the ability to work.
18 Q.   And so let's say, for example, just for
19 purposes of this hypothesis, I want you to assume
20 that she was a critical diabetic.  I want you to
21 assume that.  Now, how would you go about factoring
22 that health condition into your analysis?
23 A.   Where she's passed, we have known -- we can't
24 say for sure what would have happened, right.  Now,
25 you have those who are diabetic that could continue

102

1  to have a normal work life and contribute to it.
2       So what we'd have to explore is:  Was the
3  condition worse enough, and then to see, based on
4  government information, how does that potentially
5  impact worklife expectancy?
6  Q.    What government information would you turn to?
7  A.    So I would look at the -- I'd go back to the ^
8  report.  They don't recall if they had anything in
9  terms of that, but that would be one of the tables
10 that I would pursue to see if that would -- if they
11 had any information.
12      From there what I would look at is potential
13 to -- other articles in -- for Template Journal ^
14 and Economics.  That would give any indication on
15 any studies that would have been done for it.  The
16 Bureau of Labor Statistics also keeps track of some
17 different ones, and I would explore those avenues,
18 Department of Labor, to see if those would
19 potentially have an influence.
20 Q.    And depending on the condition, your analysis
21 could be impacted not only with respect to worklife
22 expectancy, but life expectancy?
23 A.    Both, because --
24 Q.    And you've factored in both worklife
25 expectancy and life expectancy in your financial

103

1  calculations in this case, correct?
2  A.    Yes.
3  Q.    Although, I mean, would you agree with me that
4  inquiring into those areas with respect to the
5  individual's health condition are important to your
6  analysis?
7  A.    Yes.  If they existed, I'd be able to look at
8  how much did that potentially have an impact.
9  Q.    Okay.  And Mr. Lewis didn't give you any
10 information like that, correct?
11 A.    No.
12 Q.    And you didn't ask him for any information
13 like that, correct?
14 A.    I did not.
15 Q.    You haven't interviewed any of the members of
16 the Herrera family?
17 A.    I have not.
18 Q.    You haven't spoken with anyone verbally other
19 than Mr. Lewis?
20 A.    Other than today.
21 Q.    Other than today?
22 A.    No, I met him.
23 Q.    So other than deposition transcripts, have you
24 reviewed any written statements of anyone in
25 preparing your opinion?

104

1  A.    I have not reviewed the deposition
2  transcripts.
3  Q.    Or any other written statements?
4  A.    Or any other written -- so the statements from
5  the documents reviewed today were the ones that --
6  that were provided to me.
7  Q.    What is the name of the computation or
8  methodology that's referenced in your report?
9  A.    The net discount rate.
10 Q.    And who was that developed by?
11 A.    Oh, that's been around, I don't know who --
12 who it actually gets attributed to.  It's been in
13 financial literature a long time.
14 Q.    And is that a forensic accounting or forensic
15 economic methodology?
16 A.    No, it's not limited to that, so agriculture
17 economics, that's a standard finance equation as
18 well.
19 Q.    Did you use any computer programs in preparing
20 your analysis?
21 A.    I used Excel, I used Word, I used Adobe
22 Acrobat Writer.
23 Q.    Did you do any simulations or modeling of any
24 of that software?
25 A.    No.  The calculations, what's included in the

105

1  reports here.
2  Q.    So other than what's stated in your report
3  with respect to documents and evidence reviewed,
4  facts and computational assumptions and the
5  computation of methodology and the attached tables,
6  is there anything else that you're relying upon in
7  formulating your opinion?
8  A.    So -- no, there was -- that information that
9  was provided there, the foundational documents and
10 then the additional consumer expenditures of 2014
11 was provided today, and that just has the numbers
12 on it.
13 Q.    And have you received the 2015 tax returns for
14 Mr. and Mrs. Herrera?
15 A.    I have not.
16 Q.    Have you requested that information?
17 A.    I have not.
18 Q.    Do you think that that information is relevant
19 to your analysis?
20 A.    We're not making a claim on Mr. Herrera's
21 income.
22 Q.    They filed joint returns, did they not?
23 A.    They filed joint returns for it, so we -- you
24 can potentially look at that and see where -- where
25 things were.

## 106

1  Q.   Do you know if the estate has filed a return
2  for 2015?
3  A.   I am not aware if they have or not.
4  Q.   Is that information that would be relevant to
5  your analysis?
6  A.   Yes, certainly up until the time of death, to
7  do that calculation would be another observation
8  point.
9  Q.   So with respect to the assumptions that are
10 referenced in your report, did you develop that
11 list of assumptions or is that something that Mr.
12 Lewis gave you?
13 A.   Which part are you referring to?
14 Q.   So facts and computational assumptions on page
15 2 of --
16 A.   Those ones, that I -- I did.
17 Q.   But those are generated on the information you
18 received from Mr. Lewis, correct?
19 A.   Correct, as well as, for example, life
20 expectancy, those are from government reports. The
21 one with the -- to just go back, in terms of the
22 2015 income, given the short amount of time that
23 she worked, I mean January 30th of 2015, I don't
24 know that there would be great value in terms of
25 that information, certainly an observation point,
Jackson Hole Court Reporting Service (307) 733-2637

## 107

1  but I'm not sure of the value of that.  We could
2  see what she worked up to that time period.
3  Q.   Well, certainly, yeah.
4  A.   One moment.
5  Q.   Right.  And your report is incomplete without
6  that information?
7  A.   Without that information.
8  Q.   That's correct?
9  A.   Yep.  Because it would provide the additional
10 past earnings that she actually earned from that.
11 Q.   Were there any assumptions that were presented
12 to you by Mr. Lewis or anyone else that you
13 rejected as not relevant to your report?
14 A.   No.
15 Q.   Were there any assumptions that you considered
16 and rejected as a portion of your report?
17 A.   No.
18 Q.   So basically everything Mr. Lewis told you and
19 then anything else that you came up with, you put
20 in your report?
21 A.   Put it in there.
22 Q.   Is that the standard what that you approach
23 these types of analyses or scenario?
24 A.   Yes, typically, as you do the analysis, you
25 request here's the key information that you will
Jackson Hole Court Reporting Service (307) 733-2637

## 108

1  need for it.  So then you take that and combine it
2  with the standards for it and be able to go through
3  and do the analysis.
4  Q.   Do you consider yourself a gatekeeper of those
5  assumptions?
6  A.   Yes.
7  Q.   And from what I can tell from what you
8  testified, it sounds like to me, and this is my own
9  commonsense way of looking at it, it may be common
10 sense or maybe not, but it sounds like the gate is
11 wide open; is that a fair statement?
12 A.   In terms of what assumption I have the
13 opportunity to make?
14 Q.   Yes.
15 A.   Yes.
16 Q.   And you haven't rejected any assumptions?
17 A.   Yeah.  I mean, this all is very standard
18 format, so...
19 Q.   In your analysis, did you make any adjustment
20 for probability generally?
21 A.   So the reports, for example, the Skoog's
22 report, that factors in those probabilities, it
23 gives the probability of expected life in those
24 different ones.  So those probabilities are built
25 in in terms of their numbers that I'm providing.
Jackson Hole Court Reporting Service (307) 733-2637

## 109

1  Q.   So the probabilities are built into the
2  support materials that you've used to --
3  A.   Right.  Worklife expectancy --
4  Q.   -- prepare these.
5  A.   -- life expectancy, those probabilities are
6  built in there.
7  Q.   Okay.  So you haven't created your own
8  analysis of probabilities?
9  A.   Correct.
10 Q.   Now, setting aside the medical and funeral
11 expense issues, are there any other significant
12 factors that you think should be included in your
13 analysis that are not?
14 A.   Not for my analysis.
15 Q.   And I think Mr. Lewis asked you some questions
16 about discount rates and whatnot, but I want to run
17 through that with you quickly.
18 A.   Okay.
19 Q.   Give me a -- just a brief explanation of your
20 concept of the process of discounting feature
21 differences.
22 A.   Okay.  So as you look at discounting, you want
23 a risk-free discount rate.
24 Q.   You start with a risk-free rate?
25 A.   You want -- that's the standard that has been
Jackson Hole Court Reporting Service (307) 733-2637

110

1  set is you want to use a risk-free rate.
2  Q.   What comprises the risk-free rate?
3  A.   So what has been determined as the risk-free
4  rate is the three-month T-bill rate.  Okay, now,
5  it's not only --
6  Q.   Okay.  And what is a three-month T-bill rate
7  comprised of?
8  A.   What is it comprised of?  So this is a
9  short-term government bond to be able to invest in
10  and get the return for it, so --
11  Q.   What risk factors are associated with that
12  rate?
13  A.   There are none, that's why it's typically used
14  for it.  So --
15  Q.   So there're no market risk, there's no
16  inflation risks, there's no risk that's associated
17  with that T-bill rate?
18  A.   Certainly, the government could fail and you
19  would have that.
20  Q.   And we've come close to that recently?
21  A.   But of all the places that you can invest,
22  that would be considered risk-free, that's as close
23  as we can get to it.
24  Q.   So that's my question.  What are the factors
25  that are used in determining what that risk-free

Jackson Hole Court Reporting Service (307) 733-2637

111

1  rates are?  What are the elements of risk that are
2  contained in that?
3  A.   So you have -- you have two components, you
4  have the default risk and then --
5  Q.   Which is?
6  A.   So a default risk is that they fail to pay on
7  it, so I give them my money and I don't get it
8  back.  So a junk bond, for example, that you have
9  the chance that they're not going to pay back on
10  the money that you've given them.  And then the
11  second factor is the inflation risk involved.
12  Q.   So default risk and inflation risks are the
13  only risks that are associated with the T-bill rate
14  that's characterized as the risk-free rate?
15  A.   Right.
16  Q.   And that basically -- what would have to
17  happen is the government would either have to fail
18  or inflation would have to go unchecked?
19  A.   Correct.
20  Q.   Okay.  So I sidetracked your discussion about
21  the discount.
22  A.   Yeah, so that's -- that's the discounting
23  part.  Now, the other component to that is you look
24  at the real discount rate, because you also match
25  that up with the wage growth rate.  And then you

Jackson Hole Court Reporting Service (307) 733-2637

112

1  look at that, and that net difference, as you look
2  at the difference between those to be able to
3  factor those in.
4       So certainly, as you look at the rate that
5  we're using for the average discount rate of 3.04
6  percent, even the 30-year bond doesn't yield that
7  amount today at 2.7 percent.  So note that you're
8  doing this over a 25-year period to look at not
9  only what's happened with wages during that time,
10  but what's happened with the discount rate.
11  Q.   Okay.  So is it fair to say that the lower the
12  discount rate that's applied to the future income
13  stream, the higher the present value of the stream
14  is going to go?
15  A.   Correct.
16  Q.   And in this instance you provide a 3.04
17  discount rate to your analysis?
18  A.   Yes.
19  Q.   So that basically means that for all of the
20  future income streams that you associated with Mr.
21  Herrera --
22  A.   Mm-hmm.
23  Q.   -- there is basically no risk associated with
24  her bringing those income streams in?
25  A.   Well, this is over a 25-year average, right.

Jackson Hole Court Reporting Service (307) 733-2637

113

1  So for example, as was mentioned over this
2  timeframe, I can't go ahead and invest in the
3  three-month T-bill today and earn a 3 percent rate
4  for it.  I can't even invest in the 30-year bond
5  and get that rate.
6       And the 30-year bond, you have even an added
7  risk because given where rates are, there's pretty
8  much only one direction that they're going to go,
9  right?
10  Q.   Their income yields are going to go down?
11  A.   Yeah, and so as the rate goes up, the price of
12  that goes down, and if you're trying to match up
13  the income stream, you know, what she would have
14  generated in terms of income with the payments
15  there, when those rates go up, to discount or to
16  cash out a 30-year bond, you're going to take a big
17  hit on that.  So there's a significant risk facing
18  that, given the direction that interest rates are
19  likely to head for it.
20       And so -- so this, as I mentioned, is a
21  25-year average rate for it, not what you could
22  necessarily invest in a three-month T-bill today.
23  Q.   Sure.  But the 3.04 percent discount rate
24  represents a -- very close to a risk-free rate
25  associated with the government security, government

Jackson Hole Court Reporting Service (307) 733-2637

114

1  bond?
2  A.    Over -- well, over the 25-year period for it.
3  Q.    Right.
4  A.    So those are not current rates, those --
5  that's a 25-year average, that discount rate for
6  it.
7  Q.    Sure.  But you've used that rate in your
8  analysis in calculating the present value of the
9  damages that Mrs. Herrera has incurred, right?
10 A.    Yes.
11 Q.    And so the point I'm making is and the
12 question I have for you is that you're not
13 associating really any real life risk of her
14 ability to obtain those income streams other than
15 this 3.04 percent discount rate, which basically
16 just takes into account that the government is
17 going to fail and inflation is going to go
18 unchecked.
19        Is that a fair statement?
20 A.    So state it again.  Make sure that I
21 understand it.
22 Q.    I don't know if I can state it again.
23        THE WITNESS:  Read that back.
24        (Record read.)
25 A.    So there's nothing in terms of her income

116

1  government fault and inflation risk in her ability
2  to obtain --
3  A.    To match those back --
4  Q.    -- to match those back?
5  A.    -- over the 25-year period.  Now, as was
6  mentioned, rates today are significantly lower, so
7  it would be tough to find a risk-free rate place
8  that you could invest and earn that 3.04 percent.
9  Q.    Right.  So do you know whether or not using
10 this risk-free rate is the standard practice for
11 economic for economics -- for economists?
12 A.    It is.
13 Q.    All right.  And what do you base that on?
14 A.    Based on the work that I've done with Paul
15 Randal, based on -- there's journal articles, court
16 proceedings that say that you should be using a
17 risk-free rate.
18 Q.    To discount future income streams?
19 A.    Yes.
20 Q.    So again, tell me what you contend is
21 authoritative with respect to the application of
22 that rate, and where do you get the authority to
23 apply that rate?
24 A.    To apply that rate?
25 Q.    Yes.

115

1  stream that is the initial part of that statement
2  there; we've assumed what that income stream is and
3  that it would continue as assumed.
4  BY MR. McGILL:
5  Q.    Okay.
6  A.    Now, the goal of discounting is to ideally
7  match up.  So as you take that lump sum amount
8  today and match that up, that would be equal to
9  those returns that she would have generated over
10 that same time period.
11 Q.    That she would have generated, right?
12 A.    Yes.
13 Q.    Okay.
14 A.    Or provided for.  So it's not just income as
15 looking at household services, the value of what
16 she was providing to her family.
17 Q.    Okay.  So this 3.04 discount rate is a very
18 low -- represents a very low risk factor?
19 A.    Yes.  Yes, it's in essence assumed to be
20 risk-free over that 25-year outreach.
21 Q.    And so -- and again, you're assuming really no
22 risk with respect to Mrs. Herrera's consistency in
23 obtaining those income streams?
24 A.    Right.
25 Q.    And then you're only factoring in basically

117

1  A.    So the court has indicated that she should be
2  using a risk-free rate.
3  Q.    What court?
4  A.    I'm not sure if it went to the Supreme Court
5  or not for it.
6  Q.    All right.  Anything else?
7  A.    No.
8  Q.    Have you factored in at all -- or -- and maybe
9  Mr. Waltz touched on this and I'm just not picking
10 it up, but it seems to me that in order for Mrs.
11 Herrera to generate -- I mean, if she generated
12 income in the future, she's going to have to pay
13 tax on it.
14       Is that a yes?
15 A.    This is a pretax amount.
16 Q.    Okay.  So all of your calculations are pretax
17 amounts?
18 A.    Yes.
19 Q.    It doesn't factor in the taxes that might be
20 associated with those income streams?
21 A.    Right.
22 Q.    And what is the marginal tax rate that she
23 would have had to pay on those income streams?
24 A.    I don't know right off, but the key is that
25 you want to have pretax with discounting them at a

---

118

1   pretax amount as well. If you use after tax, then
2   you have to use an after tax rate so they end up
3   being the exact same.
4   Q.    So --
5   A.    So you should use a pretax amount.
6   Q.    But you haven't done that in your report?
7   A.    Yes, I have used a pretax amount.
8   Q.    Okay. But how is the tax that she would have
9   to pay in the future factored into your bottom line
10  number?
11  A.    So as she receives those payments, she's going
12  to have to pay taxes on those.
13  Q.    Right.
14  A.    And so that's where the tax portion comes in.
15  Q.    So for the future income streams, you're
16  taking out the tax that she would be paying?
17  A.    No, it's calculated. So as she receives that
18  payment at the end, so take that present value and
19  you invest that, then you're paying taxes on it at
20  that point.
21  Q.    Okay.
22         MR. McGILL: So Mr. Waltz might have some
23  followup questions for you.
24  BY MR. McGILL:
25  Q.    But on your Table 12, Present Value of

---

119

1   Economic Losses, which I believe is your number,
2   the 1.1 earning $226,253; that's a gross number?
3   A.    That is a -- well, it has factored out
4   personal consumption on that.
5   Q.    But not tax?
6   A.    Not taxes.
7   Q.    Okay. So if -- would it be fair to say if she
8   had today received that money, she'd have to pay
9   tax on it and then going forward, she could invest
10  it and make earnings on it?
11  A.    So it's -- my understanding is that when you
12  invest in a three-month T-bill, you pay Federal
13  taxes on it.
14  Q.    Okay. So how much reduced would this number
15  be if you would have factored in the tax that would
16  be associated with it?
17  A.    It would be based on her tax rate.
18  Q.    Which you don't know?
19  A.    I don't have that information.
20  Q.    So let's assume that she's in a marginal tax
21  rate of 20 percent.
22  A.    So to do those adjustments -- now, part of it,
23  your -- for example, your household services would
24  not be a taxable item, right? That's an item that
25  she's providing, so it would be only the income

---

120

1   streams that would be adjusted. However,
2   indication is you should do it pre-tax.
3   Q.    Right. And who gave you those indications?
4   A.    Paul Randal is the one that I've worked with.
5   Q.    Who's Paul Randal?
6   A.    Paul Randal & Associates is an expert witness
7   and economist out of Logan, Utah. He's the one
8   that I've worked with since 2001 in these cases.
9   Now trying to retire.
10  Q.    So did you receive most of your training for
11  doing this kind of analysis from Mr. Randal?
12  A.    I did. Him and Curt Gifford are the two
13  primary ones.
14  Q.    What's the name of Mr. Randal's firm?
15  A.    Paul Randal & Associates.
16  Q.    Thank you. Did he point you to any
17  authoritative text or anything like that or was
18  were it just a hands-on work experience?
19  A.    There are some texts in the library that I
20  went through and read. I did that, but then
21  working with him and having questions.
22  Q.    So you don't recall what the texts are?
23  A.    I don't recall the name right off, something
24  about estimating economic damages.
25  Q.    Okay. With respect to the loss of future

---

121

1   household services, where, in your report, does it
2   indicate what those services are?
3   A.    So the value -- so this will be part of the --
4   where this is now marked here, so from the American
5   Time Use Survey, the key components that we used
6   were household activities, purchasing goods and
7   services, caring for and helping for household
8   members, and caring for and helping non household
9   members. The four that we pulled out of that time
10  factor at that time.
11  Q.    Are there on the factors that are listed
12  there, but you didn't use?
13  A.    There are. There's personal care activities,
14  there's eating and drinking, there are working and
15  related work activities, there's educational
16  activities, organizational, civic and religious
17  activities, leisure and sports, telephone calls,
18  mail and e-mail, and other activities not
19  classified elsewhere.
20  Q.    And why did you select the four activities?
21  A.    So those are the four that primarily relate to
22  the household services that she would be providing
23  to others.
24  Q.    And this may sound like a non question, but do
25  any of those categories have a negative factor or a

---

---

122

1  negative multiplier associated with them?
2  **A.    No, they're each positive.**
3  **Q.    They're all positive?**
4  **A.    Yeah.**
5  **Q.    Okay. So in your report, you don't factor in**
6  any expense that Mrs. Herrera would have to have
7  paid for her end-of-life care and services --
8  **A.    Correct.**
9  **Q.    -- do you, right? So those would be long-term**
10 care, hospice care, home services that she would
11 have to pay as an expense, correct?
12 **A.    Yeah, correct.**
13 **Q.    And would that be important to your analysis?**
14 **A.    Yeah. No, a portion of those, depends on what**
15 **portion would be covered under Medicare, other**
16 **government-provided services that she would have**
17 **earned through Social Security and whatnot, but**
18 **those are not -- not factored into that.**
19 **Q.    But that would be important to a portion of**
20 your report -- well, it could be important. It
21 could be factored in as an important portion of
22 your report with respect to her worklife expectancy
23 and/or her life expectancy --
24 **A.    Right.**
25 **Q.    -- assuming that perhaps she had some health**

---

123

1  condition that would shorten both her life
2  expectancy and her worklife expectancy?
3  **A.    You have the extremes. An individual may be**
4  **85 and healthy to the day they die, and go to sleep**
5  **and they're gone, so they have no additional**
6  **long-term medical care issues or they may have a**
7  **medical care requirement that lasts for an extended**
8  **period of time.**
9  **Q.    But certainly there are government statistics**
10 that cover all of those scenarios. There are
11 government statistics that you could access that
12 would factor in all of those scenarios and give you
13 a baseline number that you could have applied in
14 your report, fair statement?
15 **A.    Yes, this ties back to the probabilities that**
16 **you mentioned, so part of the worklife expectancy**
17 **is factoring in individuals who may get sick and**
18 **have a shorter work life. And so the worklife**
19 **expectancy builds that in, also the life expectancy**
20 **model factors those items in as well. But in terms**
21 **the care expense --**
22 **Q.    But before you move on, all of those**
23 expectancies are not injury specific or -- and you
24 didn't try to make them health condition specific,
25 correct?

---

124

1  **A.    Correct.**
2  **Q.    Okay. So continue.**
3  **A.    Yeah. So in terms of care expenses, I haven't**
4  **factored any of that in, none of what there would**
5  **be or wouldn't be for it.**
6  **Q.    But you don't know a lot of things about -- I**
7  mean, you don't have a crystal ball, right?
8  **A.    Correct.**
9  **Q.    Correct? So --**
10 **A.    That would solve all of our problems, wouldn't**
11 **it?**
12 **Q.    As long as it comes with the right hat. So**
13 you certainly could have factored in those
14 end-of-life services that she would have had to
15 have paid, but you didn't?
16 **A.    I did not. Not knowing what those potentially**
17 **would be.**
18 **Q.    All right. Well, there's a lot of things you**
19 don't know about the future --
20 **A.    Yeah.**
21 **Q.    -- that are factored into your report?**
22 **A.    Which ties back to the crystal ball.**
23 **Q.    Right, exactly, which ties into the selection**
24 of different losses, home services that you
25 selected from that set of categories?

---

125

1  **A.    Right.**
2  **Q.    And did anyone tell you to select those?**
3  **A.    It's fairly standard in terms of what I've**
4  **experienced from others for it.**
5  **Q.    Did you try and tie in the selection of those**
6  categories with the facts that you know about this
7  case?
8  **A.    Yes, because in part, it's what was she doing**
9  **for others, and that's really what you're trying to**
10 **replicate is, okay, what was she doing for others,**
11 **and in essence, try to tie down to if those**
12 **services had to be replaced, how much time, how**
13 **much expense would be involved in that.**
14 **Q.    Understood. Do you know what the term,**
15 mitigation, means in the context of wage loss
16 analysis?
17 **A.    Mitigation, for example, if an individual is**
18 **injured, that they're still able to work at a**
19 **reduced rate, those would be mitigating wages.**
20 **So you would have your normal income that they**
21 **would have then be expecting to earn, then their**
22 **mitigating wage would be, okay, they're not able to**
23 **earn what they were earning before, but they're**
24 **able to earn at a reduced rate. And those earnings**
25 **help to mitigate or reduce the loss of that normal**

126

1  wage from that.

2  Q.    And you didn't factor that into your analysis

3  in this case?

4  A.    **In this case, there is no mitigating wage**

5  **because she's no longer able to work.**

6  Q.    All right. So with respect to the worklife

7  expectancy, again, did you factor in things such as

8  gender, rate, marital status?

9  A.    **I -- yes. Yeah, so from the Skoog's report is**

10 **for Hispanics with a high school degree active at**

11 **the time of the incident.**

12 Q.    But health status was not one of the factors

13 you factored in?

14 A.    **No, if they were currently working, education**

15 **level and age and gender. Gender and race.**

16 Q.    Can you tell me what factors you considered in

17 projecting future lost wages?

18 A.    **Future lost wages. So as we look at future**

19 **lost wages, as I mentioned, I took the average for**

20 **the previous year from just the hospital part and I**

21 **had that separate from what the earnings were from**

22 **her housecleaning. So that gave a projection of**

23 **here's what she was earning, and then combined that**

24 **with the 25-year average for wage growth rates and**

25 **then discounted that at the 25-year average of the**

127

1  **discount rate. So you're looking at that real**

2  **discount rate or difference between those.**

3  **Then I factored in her worklife expectancy.**

4  **And so here's what she was earning if that were to**

5  **continue, based on those averages, what would be**

6  **the present value of those.**

7  Q.    Okay. So with respect to her prior earnings,

8  let's say you're metaphorically sitting in a race

9  car on an airplane landing strip, right? Your

10 prior earnings represent the rearview mirror,

11 correct?

12 A.    **Correct.**

13 Q.    And you've got that firmly in place and you've

14 got a real clear view of the rearview mirror,

15 right? The wage rate growth rates, let's call that

16 the accelerator. Is that good?

17 A.    **Okay.**

18 Q.    And the expectancy, that's the length of the

19 runway, okay?

20 A.    **Mm-hmm.**

21 Q.    So is it fair to say your analysis, you hopped

22 into that race car, put the rearview mirror out,

23 put your foot on the accelerator, pressed on the

24 gas and just went forward?

25 A.    **So you -- you go forward to the worklife**

128

1  expectancy and then you discount all of those back

2  to a present value for it.

3  Q.    Okay. Did you take into consideration any of

4  the factors associated with the job market for the

5  services that Mrs. Herrera was providing?

6  A.    **No, she had a substantial -- she worked 20**

7  **years at the hospital, umm, she'd been cleaning for**

8  **a number of years with no indication, for any**

9  **reason that I would assume different, from what was**

10 **happening there.**

11 Q.    Okay. So again, your eyes are clearly focused

12 on the rearview mirror, you're not looking at

13 anything else, you're just looking at her past

14 earnings, right?

15 A.    **Well, so the past earnings, yes, here's what's**

16 **documented, here's what she's done, okay. And then**

17 **taking that and say given that, what would be in**

18 **the future for it.**

19 Q.    Okay. So you haven't done any analysis of the

20 job market for the services that she's provided in

21 Teton County; Utah; Wyoming, in this geographic

22 area?

23 A.    **Correct.**

24 Q.    And you haven't done any analysis of the

25 unemployment rates associated with those

129

1  individuals providing those services for that

2  geographic area, have you?

3  A.    **Correct.**

4  Q.    And have you factored in any seasonal impacts

5  that may be associated with the services that Mrs.

6  Herrera was providing?

7  A.    **I have not. There's no indication that there**

8  **was -- based on the information that I had, that**

9  **there was wide seasonal variations.**

10 Q.    And again, did you factor in any unemployment

11 rates associated with this geographic area?

12 A.    **No.**

13 Q.    Do you know what the current demand is either

14 locally, I mean, and however -- you're the

15 economist, you would be able to better define what

16 the geographic economic market is, but did you

17 factor in any demand associated with the services

18 she was providing in your analysis?

19 A.    **Not for the local ones, no. Part of the**

20 **worklife expectancy factors that in, so based on**

21 **the national numbers, factors in some given**

22 **unemployment, those types of items of workers over**

23 **that timeframe, which would impact the worklife**

24 **expectancy there. But in terms of the regional**

25 **market, I have not done any calculations there.**

130

1  Q.   Okay. So national numbers are going to take
2  into account Dade County, Florida and Osceola
3  County in Michigan and, you know, whatever county
4  all over the country, right?
5  A.   Correct.
6  Q.   And so that's not a very specific or
7  scientific way to factor that into your analysis,
8  is it?
9  A.   **Well, so it gives you an estimate on average**
10 **for it. So --**
11 Q.   But an estimate is different than a forecast
12 or projection.
13 A.   **Sure. So you could look at what's the**
14 **unemployment rate in this area relative to the**
15 **national. So is she more likely to be unemployed**
16 **or less likely to be unemployed, based on the local**
17 **economies for it. But there's no indication that**
18 **based on the information that I had, that she would**
19 **become unemployed.**
20      She had a significant work history for it.
21 It's not like she were applying for a new job and
22 saying what am I going to make, how long before I
23 get employed. But she had this job and there was
24 no indication that she wouldn't retain that job
25 moving forward.

Jackson Hole Court Reporting Service (307) 733-2637

131

1  Q.   No indication based on the information that
2  you have?
3  A.   **Correct.**
4  Q.   What would be an indication that would cause
5  you to do that analysis?
6  A.   **So for example, if she didn't have a job and**
7  **were looking for employment, to be able to assess**
8  **what's the length of time to find a job, those**
9  **types of things.**
10 Q.   And so length of time to find a job and those
11 types of things?
12 A.   **Yes, likelihood of keeping that job or, for**
13 **example, reduced time. So is the economy slow**
14 **enough that she can find a job for ten hours a**
15 **week, but the she can't find a job full-time, a**
16 **variety of different factors, if we were in another**
17 **great recession.**
18 Q.   Okay. And I know Mr. Waltz asked you some
19 questions about savings and whatnot, but
20 specifically with respect to Mrs. Herrera's 401(k),
21 did you factor that at all into your analysis?
22 A.   **All I had was an indication that the hospital**
23 **had -- on her W-2 had had a retirement plan, I had**
24 **no information on what they were providing, so I**
25 **simply defaulted to the national numbers in terms**

Jackson Hole Court Reporting Service (307) 733-2637

132

1  of hearsay on employer cost.
2  Q.   Okay. So would it be fair to say that income
3  derived from the 401(k) would be a collateral
4  source of income that should be included in your
5  analysis?
6  A.   **So that's part of the benefits, what she would**
7  **have been expected to receive. So in addition to**
8  **her wage, she would have been expected to earn a**
9  **certain amount for her retirement for it. So**
10 **that's what that benefit package -- or the benefit**
11 **table includes.**
12 Q.   And can you show me in your report from actual
13 dollar amounts to that?
14 A.   **Yes. So if you look on Table 7.**
15 Q.   So it's $67,000?
16 A.   **So -- yeah, the $67,000 is the total amount**
17 **from all benefits, retirement package as well as**
18 **the legally required portions.**
19 Q.   Okay. But you don't know --
20 A.   **What the package consisted of? I don't.**
21 Q.   Right. So you don't know whether or not
22 there's $67,000 -- or you don't know whether or not
23 there's sufficient principle in that 401(k) account
24 to generate the number that you've used in your
25 report?

Jackson Hole Court Reporting Service (307) 733-2637

133

1  A.   **Well, this doesn't -- isn't just for the**
2  **retirement, this would also be the legally required**
3  **benefits in that number.**
4  Q.   Okay. Which would be what, health?
5  A.   **Roughly. Let's see, rather than saying, let**
6  **me look it up. So actually a greater portion,**
7  **$2.36 for the legally required, only $1.62 for the**
8  **retirement benefits and savings.**
9  Q.   And that's in your binder?
10 A.   **That's in the binder that's in the**
11 **foundational documents that was provided.**
12 Q.   Is there a page number? Under what tab is it
13 under?
14 A.   **It's under Tab B under the Foundational**
15 **Documents.**
16 Q.   Okay.
17 A.   **It's Table 1 under the Service Providing**
18 **category, and the Employer Cost Employee**
19 **Compensation September 2014.**
20 Q.   Good. What information would you need to make
21 that number more realistic?
22 A.   **More accurate for you?**
23 Q.   More accurate.
24 A.   **So if I had the details of what her retirement**
25 **package consisted of and get the fine details there**

Jackson Hole Court Reporting Service (307) 733-2637

134

1  on what was included for it.  Was it a set amount
2  or was it based on income levels.  Those types of
3  activities.
4  Q.  Would you expect that to be reported in the
5  2015 tax returns?
6  A.  It depends on the package.  What it actually
7  consisted of.
8  Q.  Do you know whether or not Mrs. Herrera had
9  any defined benefit or defined contribution?
10  A.  I don't.
11  Q.  And if there was a distribution, the total
12  distribution from that plan, shouldn't that be
13  reflected somewhere in the tax returns for 2015?
14  A.  Potentially.
15  Q.  I mean -- okay -- well, I mean, the plan can't
16  continue into 2016 for Mrs. Herrera because she's
17  no longer a participant because she's passed away,
18  correct?
19  A.  Correct.
20  Q.  So there would have to be some transfer of
21  that account out of the plan.  Fair statement?
22  A.  Yeah -- well, based on what it consisted of,
23  did it only pay out provided she was still alive or
24  in the event of her death, did it pay out?  So it
25  depends on what the plan consisted of as to what

Jackson Hole Court Reporting Service (307) 733-2637

135

1  would have happened.  And that would have been a
2  benefit that she would have earned.  You know, if
3  that was a payout, what was the benefit that she
4  had earned previous to that amount.
5  Q.  Right.  And would the analysis change at all
6  if it was a defined benefit plan as opposed to a
7  defined contribution plan?
8  A.  Yes.  So for a contribution, it would be a
9  portion that she would be contributing there, if
10  it's just a benefit, and then the other difference
11  is does it go up until her death, normal death for
12  it, or is there a payout in the event of her death.
13  Q.  Right.  So for a defined benefit plan, you can
14  either have -- or probably a combination too
15  rather, a death benefit, or only a death benefit,
16  or death benefit with the survivor or the ultimate
17  payee being allowed to receive the benefit once
18  they become age qualified or you could have a
19  combination of those?
20  A.  Yeah, so there's certainly some -- yes.
21  Q.  And you don't have any of that information?
22  A.  I don't have that information, that's why I
23  used the national numbers.
24  Q.  Have you been asked to prepare any analysis
25  with respect to the -- strike that.

Jackson Hole Court Reporting Service (307) 733-2637

136

1  Do you know what the term, punitive damages,
2  mean?
3  A.  Punitive, I have not been asked to provide any
4  punitive damages, just the economic damages have
5  been applied to here.
6  Q.  But you do know what that term means?
7  A.  I do.
8  Q.  And Mr. Lewis hasn't asked you to provide that
9  analysis?
10  A.  He has not.
11  Q.  Is there anything that you expect to testify
12  about at trial that we haven't talked about this
13  morning?
14  A.  Not that comes to mind.
15  MR. McGILL:  I'll pass the witness at this
16  time.  Thank you very much.
17  THE WITNESS:  Thank you.
18  MR. LEWIS:  Why don't we take a few minutes.
19  MS. TIEDEKEN:  Take a quick break.
20  (Recess taken.)
21  MS. TIEDEKEN:  Back on the record.  I'll go
22  next.
23  EXAMINATION
24  BY MS. TIEDEKEN:
25  Q.  Dr. Hirschi, I just have a few followup

Jackson Hole Court Reporting Service (307) 733-2637

137

1  questions for you.  As you've indicated, you have
2  calculated the economic loss suffered by Mrs.
3  Herrera's survivors, correct?
4  A.  Correct.
5  Q.  And so with regard to her income, you are
6  calculating an amount that she personally would
7  consume because if she personally consumes a
8  portion of her income, that amount would not be
9  available to her survivors, correct?
10  A.  Right.
11  Q.  In fact, a person who consumed all of their
12  income, there would be nothing for her survivors
13  and there'd be no loss, fair?
14  A.  In terms of that income amount.
15  A.  In terms of the income amount.
16  A.  Income portion, yes.
17  Q.  Okay.  And so you have not reviewed any of the
18  Herrera family's actual financial records, such as
19  banking statements, credit card statements, a
20  family budget or any kind of listing of expenses
21  that they have provided to you, which would reflect
22  what Monica Herrera actually personally consumed?
23  A.  Correct.
24  Q.  You've used a national average of what someone
25  at her income level would personally consume?

Jackson Hole Court Reporting Service (307) 733-2637

138

1   A.   Yes.

2   Q.   Is it fair to say that some people personally
3   consume at an average rate and other people may
4   consume at double the average rate?

5   A.   Well, that's the whole point of an average is
6   it gives you a representation that there's going to
7   be individuals on both sides of that.

8   Q.   Right.  And so you don't know if Monica
9   Herrera consumed at an average rate or at some
10  other rate?

11  A.   Correct.

12  Q.   One of the things you talked about is that the
13  national average assumes that someone at Monica
14  Herrera's income level would put a portion of her
15  income into savings, right?

16  A.   Correct.

17  Q.   And that amount, then, would be available to
18  the family as a savings account that they could use
19  for expenses?

20  A.   Correct.

21  Q.   And you had used a figure, that $12,000
22  figure, at a $63,000 income level was the amount
23  that both a husband and wife would put into
24  savings, correct?

25  A.   No, that is not right.  That $12,000

139

1   represents, because it was pretax income and then
2   consumption, so it represents the difference
3   between the pretax income and consumption.  A
4   portion of that would go to savings, but not all of
5   that because that would -- you'd have the tax
6   portion of that as well.

7   Q.   Okay.  So I want to pull out what portion of
8   Monica's income would be attributable to taxes.

9   A.   So we'd have to look at what her tax rate was
10  based on the number of deductions.  In her 2014, I
11  believe she claimed, in terms of deductions, so she
12  claimed Juanita and Alexis were listed as
13  dependants, so she'd have her husband and her --
14  both those two individuals.  It's my understanding
15  that Tina was also living there, she's not claimed
16  as a dependent on the tax.

17  Q.   So in 2014, what was her actual tax rate?

18  A.   So her income, we get down to -- her adjusted
19  gross income was $60,854, the taxable amount of
20  income was $32,654 and the tax -- so taxable income
21  was $32,654 and the tax was $3,994.

22  Q.   So what does that work out to?

23  A.   So if you take it based on -- now, that's --
24  do you want it on the adjusted gross or on the
25  taxable amount?

140

1   Q.   On the taxable amount.

2   A.   So just on the tax?

3   Q.   What I'm trying to find out, and I don't know,
4   you tell me, I'm trying to find out what part of
5   Monica's gross income in 2014 went to pay taxes.

6   A.   So if you look at gross income combined, so
7   gross income combined --

8   Q.   I don't want combined, I want just Monica's.

9   A.   Just hers.

10  Q.   Just hers.

11  A.   Well, she is filing jointly, so -- so we can't
12  say what portion --

13  Q.   Would just be hers?

14  A.   -- would just be hers for it.

15  Q.   Okay.  Go ahead, then, and tell me of the
16  joint, what percentage went to taxes.

17  A.   So -- so based on the -- and did you want that
18  on the taxable income or on the gross income?

19  Q.   The gross income.

20  A.   Okay.  So $3,994 divided by the gross income
21  of $6,854 gives a 6.5 percent.

22  Q.   Okay.  So what was Monica's gross income that
23  year?

24  A.   So Monica's gross income in 2014, just from
25  the hospital portion, was $34,861.

141

1   Q.   And so if you take that percent times that
2   amount, how much do you figure she would have paid
3   in taxes using that percent?

4   A.   Using that percent, represents $22,288.

5   Q.   Okay.  And then using the personal consumption
6   tables that you've used, what percent of the gross
7   income is attributable -- what was the total
8   percent of amount that should be attributable to
9   taxes and savings?

10       It was that $12,000 and I don't know what
11  percent that is.  Can you figure that for me?

12  A.   So the difference, let me go back to that
13  table, so there's $12,684.  And you wanted it to
14  be?

15  Q.   What percentage of that is the -- of the
16  $63,784?

17  A.   Oh, so percentage on that, $63,784 would be
18  19, almost 20 percent.

19  Q.   Almost 20 percent.  So what was the tax
20  percentage, 6 point something percent, is that what
21  you said?

22  A.   Yes.

23  Q.   So let's figure 14 percent of the income then
24  would be attributable to savings under that
25  assumption.

## 142

1  A.    Assumption, yes.
2  Q.    Okay.  So you used for Monica, to come up with
3  an average income for Monica, you used her
4  four-year tax returns, correct?
5  A.    Four-year average.
6  Q.    Tax years from 2011 to 2014?
7  A.    Right.  Not factoring in her Teton Glass
8  income.
9  Q.    Okay.  And so what would be 14 percent of that
10 average income, that under the average, she should
11 be socking away in savings?
12 A.    I think the actual amount here is $5,075.
13 Q.    Okay.  And if you take that times, let's say,
14 over that four-year period from 2011 to 2014, what
15 total amount should she have for those four years,
16 put in savings?  It would be 4 times that $5,075,
17 right?
18 A.    Yep.
19 Q.    And how much does that come out to?
20 A.    $20,000.
21 Q.    And as I understand it, you don't know how
22 much Monica Herrera actually deposited in savings
23 account for this four-year period, correct?
24 A.    Correct.
25 Q.    And if, in fact --

## 143

1  A.    The -- so a portion of this could be spent on
2  other -- there's not a forced savings amount,
3  right, so this is a national number.  If an
4  individual chooses to go out and spend it on some
5  other activity, that's their choice.
6  Q.    But the personal consumption list includes all
7  those activities, right?
8  A.    Mm-hmm.
9  Q.    It includes entertainment, cash contributions,
10 personal insurance.  The only thing that's not
11 included is savings and taxes, correct?
12 A.    Yes -- well --
13 Q.    Right.
14 A.    -- based on what they include in terms of
15 entertainment.
16 Q.    Right.
17 A.    Okay.
18 Q.    So if -- let's say Monica did not sock away
19 $20,000 in savings during those four years, would
20 it be fair to say that she did not meet the average
21 personal consumption statistics that you're relying
22 on?
23 A.    Yes.
24 Q.    Okay.  I looked at your table, if I'm
25 understanding your Table Number 5, you have

## 144

1  assumed, for example, that for 2016, that Monica would
2  have personally consumed $4,824 for the entire
3  year, correct?
4  A.    Correct.
5  Q.    And that would be the amount that, you know,
6  was just attributable to her personal consumption.
7  A.    Yes.
8  Q.    Do you know how much Monica spent on expense
9  for the use of her personal car that she used to
10 travel to and from work?
11 A.    I do not.
12 Q.    You don't know the amount of the car payment?
13 A.    No.
14 Q.    You don't know the amount of her insurance on
15 that vehicle?
16 A.    I do not.
17 Q.    And you don't know the amount she spent on gas
18 to commute from her home in Idaho to work in -- at
19 the hospital here in Jackson, correct?
20 A.    Correct.
21 Q.    If I ask you to assume that that amount was
22 more than $11,000 for the year, just for that
23 element of personal consumption, her vehicle, if
24 you assume that to be true, then Monica would not
25 be personally consuming at the average rate,

## 145

1  correct?
2  A.    Correct.
3  Q.    Because that one element would be almost three
4  times what you're assuming she would personally
5  consume for the year?
6  A.    Under that assumption.
7  Q.    Okay.  You don't have any way of knowing
8  whether Monica personally consumed all of her
9  income and would have nothing available to
10 contribute to the rest of the family, correct?
11 A.    We do not have that information, the portion
12 of the payments.
13 Q.    And that may be the case.  You just don't
14 know?
15 A.    We do not have that information, correct.
16 Q.    Okay.  You don't have that information?
17 A.    Correct.
18 Q.    That information may be available, you just
19 haven't reviewed it?
20 A.    Yes.
21 Q.    And with regard to household duties around the
22 house, that kind of thing, you haven't actually
23 used any real data, you haven't asked Mr. Herrera,
24 for example, how much time his wife has spent on
25 household duties such as you've described?

146

1  A.   Correct.

2  Q.   You know, and you've got 4.1 hours, I think,

3  for some of the times?

4  A.   Yeah, it varies, but that's one of the numbers

5  there.

6  Q.   And you don't know if maybe she spent one hour

7  and not four hours?

8  A.   Yeah, four, or spent six hours.  I don't know

9  either way.

10 Q.   Is it fair to assume that someone that's

11 working two jobs outside of the home and has a

12 substantial commute maybe isn't spending as much

13 time on household duties as maybe someone that does

14 not have a job outside the home and doesn't

15 commute?

16 A.   Certainly you would expect some difference

17 between those who are working and those who are

18 not.

19 Q.   Okay.  And as I understand it, you are

20 assuming that Mrs. Herrera will spend almost the

21 same time on household services right up until the

22 time she's 85?

23 A.   Based on the national numbers, yes, those are

24 the survey numbers that were provided.

25 Q.   And you don't take into account -- you're just

147

1  doing the averages, again --

2  A.   Yes.

3  Q.   -- you don't know if she will be in the

4  average or nowhere near the average?

5  A.   Right.  So as I mentioned, I used all females

6  as opposed to Hispanic workers, which had a higher

7  one, but did not adjust by the year.

8  Q.   Right.  But it is fair to say you don't have

9  any way of knowing that these figures are even

10 close because you don't know how much time she

11 actually spent with household services?

12 A.   Each individual could be different --

13 Q.   Right.

14 A.   -- these are based on surveys, large samples

15 to try to get estimates.

16 Q.   And as you say, you don't know if she fits the

17 average or is nowhere near the average?

18 A.   Correct.

19     MS. TIEDEKEN:  That's all I have.

20     MR. LEWIS:  Nothing.

21     MR. WALTZ:  Just give me a minute.

22         CONTINUED EXAMINATION

23 BY MR. WALTZ:

24 Q.   I have a set of documents that was produced in

25 this case and it's called Herrera Bank Statements

148

1  02-09-16-M, suggesting that they were produced on

2  or about February 9th of 2016.  And if I right-

3  click on the properties of that document, it

4  indicates it was created on November 14th of 2015;

5  just assume that to be true, okay?

6  A.   Okay.

7  Q.   And that particular bank statement is the bank

8  statement we believe of Mrs. Herrera, okay?

9  A.   Okay.

10 Q.   Has that been provided to you?

11 A.   It has not.

12 Q.   When did you receive the documents upon which

13 you rendered your opinion?

14 A.   Most of them were received from the end of

15 October, right around the end of October --

16 Q.   According to your timesheet --

17 A.   -- the 28th.

18 Q.   According to your timesheet, October 29th is

19 when it started?

20 A.   That's when I started working with them.  The

21 38th, I believe, is when I -- the first document,

22 the 29th was when most of the other documents were

23 provided.  And that was the evidence when I provide

24 the e-mails.

25     MR. WALTZ:  That's all I have.  Thank you.

149

1      MS. TIEDEKEN:  Nothing further from me.

2      MS. MEAD:  I have no questions.

3      MR. McGILL:  No questions.  Thank you very

4  much.

5      MR. WALTZ:  While you're still on the record,

6  I think he has a right to read and sign.  We don't

7  have an obligation to pay him for it, I don't

8  think, under the federal rules, so --

9      THE WITNESS:  That's fine.

10     MR. WALTZ:  -- do you want to read and sign?

11     THE WITNESS:  I want to read and sign.

12     MR. WALTZ:  You do want to?  You can

13 coordinate that through counsel and get back to

14 her.  That will be on your nickle or his nickle,

15 okay?

16     THE WITNESS:  Okay.

17     MR. WALTZ:  Thank you.

18     (Deposition concluded at 12:47 p.m.)

19

20

21

22

23

24

25

150

REPORTER'S CERTIFICATE

STATE OF IDAHO      }
                    } ss.:
COUNTY OF FREMONT   }


        I, Denise a Shorthand Reporter and
Notary Public within and for the State of
Idaho, do hereby certify:
        hat I reported the proceedings
in the within entitled matter, and that
the within transcript is a true record of
such proceedings.
        I further certify that I am not
related, by blood or marriage, to any of
the parties in this matter and that I am
in no way interested in the outcome of
this matter.
        IN WITNESS WHEREOF, I have
hereunto set my hand this 14th day of May,
2016.


_____

DENISE NOWAK
Notary Public State of Idaho
My Commission Expires: 3/13/2021

151

CERTIFICATE OF DEPONENT
        I, **Rick Hirschi, Ph.D.,** the deponent in the
foregoing deposition,
        DO HEREBY CERTIFY that I have read the
foregoing and attached 150 typewritten pages, and
that the same are, with changes or corrections, if
any, set forth on the following correction sheets,
a full, true, accurate and correct transcript of my
deposition on oral examination given at the time
and place therein indicated.


Executed this _____ day of _____, 2016.


Signature:    _____
              Rick Hirschi, Ph.D.



STATE OF        }
                } ss.:
COUNTY OF       }


Sworn to and subscribed before me this_____

day of _____, 2016.


_____


My Commission expires:

## $

**$1,017** [1] - 21:9
**$1,048** [2] - 21:9, 22:3
**$1,052** [2] - 21:9, 22:9
**$1,200** [1] - 11:4, 11:5
**$1,500** [1] - 11:8, 77:18
**$1,684** [1] - 63:8
**$1.62** [1] - 133:7
**$10,000** [1] - 67:1
**$10.41** [2] - 68:22, 70:1, 70:10
**$11,000** [1] - 144:22
**$12,000** [9] - 63:24, 64:15, 65:18, 66:3, 66:23, 67:2, 138:21, 138:25, 141:10
**$12,684** [3] - 67:14, 67:16, 141:13
**$125** [2] - 28:24, 29:1
**$14,433** [4] - 68:19, 69:1, 69:7, 70:3
**$150** [1] - 12:2
**$165,056** [1] - 32:6
**$193,212** [1] - 32:21
**$2,047** [2] - 31:20, 32:1
**$2.36** [1] - 133:7
**$20,000** [3] - 64:10, 142:20, 143:19
**$200** [2] - 12:4, 12:6
**$21,140** [1] - 44:15
**$22,288** [1] - 141:4
**$226,253** [1] - 119:2
**$24,792.84** [1] - 44:12
**$250** [2] - 12:4, 12:7
**$28,843** [1] - 54:10
**$3,994** [2] - 139:21, 140:20
**$31,843** [1] - 32:23
**$32,654** [2] - 139:20, 139:21
**$34,861** [4] - 38:17, 39:25, 54:21, 140:25
**$36,250** [1] - 47:18
**$36,355** [1] - 38:14
**$36,506** [1] - 42:4
**$36,508.67** [1] - 42:3
**$370,869** [1] - 68:3
**$38,258** [1] - 64:22
**$4,000** [1] - 55:6
**$4,297** [3] - 56:2, 69:4, 69:8
**$4,500** [1] - 55:6
**$4,824** [1] - 144:2
**$40,000** [1] - 54:24
**$41,811** [2] - 38:15, 38:17
**$5,006.67** [1] - 42:5
**$5,075** [2] - 142:12, 142:16
**$5,268** [1] - 56:10
**$5,400** [15] - 19:6, 23:5, 23:6, 23:21, 24:16, 26:13, 30:19, 30:20, 30:21, 30:24, 36:20,

37:11, 48:12, 56:3
**$55,247** [2] - 68:6, 69:4
**$6,854** [1] - 140:21
**$60,000** [2] - 32:1, 64:15
**$60,025** [1] - 31:17
**$60,854** [1] - 63:19, 63:23, 64:9, 139:19
**$63,000** [1] - 65:6, 65:9, 65:18, 66:2, 138:22
**$63,784** [2] - 141:16, 141:17
**$67,000** [3] - 132:15, 132:16, 132:22
**$7,581** [1] - 32:8
**$75** [1] - 11:18
**$94** [1] - 21:8
**$948** [1] - 21:13

## '

**'14** [2] - 18:9, 18:10
**'67** [2] - 18:21, 62:13
**'90s** [1] - 73:18
**'97s** [1] - 73:18
**'99** [1] - 88:2

## 0

**02-09-16-M** [1] - 148:1

## 1

**1** [13] - 14:8, 15:6, 17:17, 20:7, 22:12, 30:2, 54:7, 56:1, 56:16, 69:10, 69:11, 71:18, 133:17
**1.1** [1] - 119:2
**1.5** [2] - 73:20, 74:17
**1.6** [1] - 74:17
**10** [3] - 22:13, 98:21, 101:7
**100** [4] - 13:3, 13:4, 13:7, 22:15
**101** [2] - 14:1, 14:4
**102** [4] - 16:17, 17:11, 17:14, 18:19
**103** [1] - 22:13
**1040** [1] - 36:25
**11** [1] - 75:21
**11/2/2015** [1] - 4:12
**12** [5] - 4:13, 59:2, 99:2, 99:3, 118:25
**12,000** [1] - 63:15
**1200** [1] - 2:15
**12:47** [1] - 149:18
**12A** [1] - 44:12
**13** [4] - 4:14, 42:11, 43:12, 68:11
**13.31** [2] - 57:14, 59:15
**13.4** [1] - 37:20
**135** [1] - 22:13
**136** [1] - 4:6
**14** [3] - 4:15, 141:23,

142:9
**14.6** [1] - 48
**147** [1] - 4:7
**14th** [2] - 148:4, 150:19
**15-CV-128-F** [1] - 1:8
**150** [1] - 151:5
**16** [1] - 59:1
**1660** [1] - 3:4
**17** [7] - 4:17, 24:8, 26:5, 37:24, 38:10, 41:1, 68:11
**17.74** [1] - 59:18
**18** [4] - 41:14, 58:24, 58:25, 59:6
**18.2** [1] - 56:11
**18.27** [1] - 48:16
**1809** [1] - 21:3
**19** [1] - 141:18
**1990** [1] - 72:4
**1997** [2] - 87:25, 88:3
**1999** [1] - 87:23
**1st** [2] - 62:13, 84:21

## 2

**2** [10] - 17:20, 32:3, 45:17, 45:19, 45:25, 56:9, 56:16, 73:21, 76:17, 106:15
**2,000** [1] - 50:17
**2.1** [1] - 74:16
**2.3** [1] - 73:22
**2.4** [1] - 73:20
**2.7** [2] - 73:19, 112:7
**2.75** [1] - 7:10
**20** [6] - 47:16, 51:7, 119:21, 128:6, 141:18, 141:19
**2001** [1] - 120:8
**2002** [1] - 9:6
**2008** [3] - 73:13, 73:19, 73:25
**2009** [1] - 73:19
**2011** [6] - 18:8, 41:22, 43:10, 74:15, 142:6, 142:14
**2012** [6] - 30:6, 38:14, 43:22, 64:22, 73:20, 74:16
**2013** [11] - 17:25, 18:2, 32:3, 32:12, 37:25, 38:2, 38:10, 44:3, 44:14, 54:23, 73:22
**2014** [24] - 15:6, 32:19, 37:25, 38:11, 38:14, 39:7, 39:10, 39:18, 40:19, 44:5, 44:15, 44:23, 63:19, 72:4, 73:22, 105:10, 133:19, 139:10, 139:17, 140:5, 140:24, 142:6, 142:14
**2015** [13] - 20:8, 20:10, 24:21, 39:14, 57:14, 75:10, 105:13, 106:2, 106:22, 106:23, 134:5,

134:13, 148:4
**2016** [10] - 1:22, 5:1, 13:9, 85:22, 134:16, 144:1, 148:2, 150:20, 151:12, 151:21
**2018** [2] - 59:10, 59:11
**2021** [3] - 59:12, 62:6, 62:7
**2029** [1] - 75:10
**235** [1] - 1:21
**25** [1] - 28:9
**25-year** [1] - 73:3, 112:8, 112:25, 113:21, 114:2, 114:5, 115:20, 116:5, 126:24, 126:25
**2510** [1] - 3:5
**26** [3] - 4:16, 8:25, 68:11
**26.61** [2] - 59:21, 62:16
**26.80** [1] - 58:2
**27** [3] - 6:18, 6:21, 61:4
**28** [2] - 45:17, 45:20
**28th** [1] - 148:17
**29th** [2] - 148:18, 148:22
**2nd** [1] - 24:21

## 3

**3** [10] - 18:7, 23:25, 32:18, 39:19, 46:9, 51:22, 56:15, 68:1, 73:20, 113:3
**3,000** [1] - 50:18
**3.01** [1] - 71:24
**3.04** [11] - 53:8, 71:20, 71:24, 72:1, 72:22, 112:5, 112:16, 113:23, 114:15, 115:17, 116:8
**3.2** [1] - 74:16
**3/13/2021** [1] - 150:24
**30** [1] - 67:22
**30-year** [4] - 112:6, 113:4, 113:6, 113:16
**300** [1] - 2:21
**303** [1] - 3:6
**307** [3] - 2:5, 2:11, 2:16
**30th** [1] - 106:23
**31** [1] - 6:22
**32** [1] - 71:14
**36** [1] - 57:1
**365** [2] - 70:1, 70:15
**38777** [1] - 2:10
**38th** [1] - 148:21
**3rd** [2] - 13:9, 24:24

## 4

**4** [11] - 1:22, 5:1, 18:10, 52:20, 54:1, 54:2, 56:9, 67:21, 69:10, 142:16
**4.1** [5] - 69:23, 69:24, 69:25, 70:10, 146:2
**4.1-something** [1] - 69:22

**4.14** [2] - 70:12, 70:24
**40** [2] - 7:13, 53:5
**401(k** [3] - 131:20, 132:3, 132:23
**42** [1] - 75:22
**48152** [1] - 2:21

## 5

**5** [15] - 4:4, 4:12, 18:16, 23:23, 24:2, 24:7, 56:24, 57:5, 57:8, 57:10, 59:13, 59:14, 62:1, 68:16, 143:25
**50/50** [1] - 60:4
**53** [2] - 61:16, 62:10
**53.23** [1] - 75:13
**55** [1] - 33:13
**5500** [1] - 35:2
**5A** [1] - 47:13
**5C** [1] - 48:15
**5D** [1] - 48:22

## 6

**6** [8] - 18:19, 19:16, 45:20, 51:23, 69:10, 71:4, 76:17, 141:20
**6.5** [1] - 140:21
**61** [2] - 49:9, 49:10
**637-5575** [1] - 2:11
**6540** [1] - 2:4

## 7

**7** [2] - 39:25, 132:14
**702** [1] - 2:10
**73** [1] - 61:15
**733-0166** [1] - 2:16
**734** [1] - 2:22
**739-8900** [1] - 2:5
**74** [1] - 59:24
**742-1825** [1] - 2:22
**748** [1] - 2:9
**76** [1] - 4:5
**78** [1] - 4:20
**7th** [1] - 18:21

## 8

**8** [8] - 57:3, 57:4, 57:18, 61:11, 61:12, 61:23, 74:25
**80** [1] - 61:24
**80264** [1] - 3:5
**82003** [1] - 2:10
**830-8800** [1] - 3:6
**83001** [1] - 2:16
**83002** [1] - 2:5
**840** [1] - 70:18
**85** [2] - 123:4, 146:22
**85.42** [1] - 46:5
**8519** [1] - 2:4

**9**

9 [2] - 33:1, 75:7
90 [8] - 6:18, 6:21,
6:22, 45:20, 57:1,
67:22, 71:14, 75:22
98 [6] - 5:8, 5:9, 6:16,
23:18, 45:15, 51:21
99 [2] - 12:12, 12:15
9:33 [1] - 1:22
9th [1] - 148:2

**A**

a.m [1] - 1:22
ABD [1] - 86:1
ability [3] - 101:17,
114:14, 116:1
able [19] - 19:8, 19:14,
20:11, 27:21, 71:12,
73:7, 74:8, 85:17,
96:12, 103:7, 108:2,
110:9, 112:2, 125:18,
125:22, 125:24, 126:5,
129:15, 131:7
abstracts [2] - 88:25,
89:3, 89:24
academia [2] - 86:24,
87:20
accelerator [2] -
127:16, 127:23
access [1] - 123:11
accommodating [1] -
7:14
according [2] - 148:16,
148:18
account [7] - 114:16,
130:2, 132:23, 134:21,
138:18, 142:23, 146:25
accountant [3] - 25:25,
26:3, 80:13
Accountants [1] -
19:18
accounting [8] - 88:8,
88:17, 90:14, 90:19,
91:19, 91:21, 91:22,
104:14
accounts [1] - 21:1
accurate [5] - 24:16,
37:7, 133:22, 133:23,
151:8
Acrobat [2] - 79:2,
104:22
act [1] - 100:24
Action [1] - 1:8
active [1] - 126:10
activities [13] - 68:25,
92:17, 98:11, 101:4,
121:6, 121:13, 121:15,
121:16, 121:17, 121:18,
121:20, 134:3, 143:7
activity [1] - 143:5
actual [9] - 45:7, 47:6,
63:7, 91:18, 97:8,
132:12, 137:18, 139:17,

142:12
add [1] - 97:17
added [1] - 113:6
addition [4] - 18:1,
19:16, 27:9, 132:7
additional [16] - 15:15,
15:16, 15:18, 25:4,
33:23, 38:2, 38:3,
48:23, 55:2, 79:20,
79:22, 82:17, 82:19,
105:10, 107:9, 123:5
adjust [5] - 20:9,
81:21, 82:8, 84:21,
147:7
adjusted [8] - 74:15,
81:10, 81:16, 81:17,
81:18, 120:1, 139:18,
139:24
adjustment [2] - 27:10,
108:19
adjustments [5] - 20:3,
81:14, 83:23, 85:12,
119:22
Adobe [1] - 104:21
adult [1] - 46:16
affect [1] - 40:21
age [7] - 46:5, 48:24,
58:24, 71:11, 97:19,
126:15, 135:18
Ages [1] - 4:15
agree [7] - 33:19,
49:19, 50:10, 53:7,
97:1, 97:6, 103:3
agreed [8] - 35:3, 35:4,
35:6, 40:2, 57:15, 75:14
agreement [2] - 77:16,
77:23, 78:1
agricultural [1] - 92:3,
92:5, 92:18, 92:24,
94:19, 95:11, 95:12,
95:14
agriculture [4] - 94:23,
95:1, 95:3, 104:16
ahead [3] - 16:19,
113:2, 140:15
airplane [1] - 127:9
alert [1] - 24:8
Alexis [1] - 47:10,
139:12
alive [6] - 18:14, 18:15,
46:17, 134:23
allow [1] - 87:1
allowed [2] - 6:6,
135:17
almost [5] - 92:2,
141:18, 141:19, 145:3,
146:20
American [3] - 52:4,
58:5, 121:4
amount [64] - 12:23,
13:7, 20:9, 26:17,
26:20, 26:24, 27:20,
28:7, 28:13, 30:25,
31:7, 31:9, 31:21,
31:25, 34:1, 36:11,

36:15, 42:10, 44:14,
44:17, 50:25, 2, 14,
55:5, 56:5, 60:11,
61:13, 61:16, 67:5,
67:18, 69:17, 69:22,
75:1, 95:24, 101:17,
106:22, 112:7, 115:7,
117:15, 118:1, 118:5,
118:7, 132:9, 132:16,
134:1, 135:4, 137:6,
137:8, 137:14, 137:15,
138:17, 138:22, 139:19,
139:25, 140:1, 141:2,
141:8, 142:12, 142:15,
143:2, 144:5, 144:12,
144:14, 144:17, 144:21
amounts [6] - 45:11,
47:25, 48:5, 57:7,
117:17, 132:13
analogous [1] - 81:24
analyses [1] - 107:23
analysis [52] - 6:25,
10:19, 10:22, 20:13,
70:9, 77:1, 81:24, 82:3,
83:8, 83:9, 84:15, 92:7,
92:10, 93:2, 93:8,
93:12, 93:15, 95:13,
95:15, 97:13, 98:4,
101:10, 101:14, 101:22,
102:20, 103:6, 104:20,
105:19, 106:5, 107:24,
108:3, 108:19, 109:8,
109:13, 109:14, 112:17,
114:8, 120:11, 122:13,
125:16, 126:2, 127:21,
128:19, 128:24, 129:18,
130:7, 131:5, 131:21,
132:5, 135:5, 135:24,
136:9
analyzing [1] - 10:5
annual [4] - 63:14,
66:22, 67:9, 74:19
anomalies [1] - 94:24,
94:25
anomaly [1] - 54:24
answer [2] - 25:17,
31:4
answered [2] - 25:15,
66:4
answers [1] - 22:24
apologize [1] - 19:18,
31:15, 32:15
appearing [1] - 26:20
application [1] -
116:21
applied [3] - 112:12,
123:13, 136:5
apply [2] - 116:23,
116:24
applying [1] - 130:21
approach [1] - 107:22
appropriate [3] -
78:23, 79:2, 79:17
area [7] - 10:24, 92:3,
98:24, 128:22, 129:2,

129:11, 130:14
areas [2] - 90:7, 103:4
argued [1] - 99:16
arrive [1] - 11:21
articles [4] - 76:19,
89:17, 102:13, 116:15
aside [1] - 19:5, 60:23,
109:10
assess [1] - 131:7
associate [1] - 88:12
associated [18] - 95:2,
95:7, 95:15, 101:3,
110:11, 110:16, 111:13,
112:20, 112:23, 113:25,
117:20, 119:16, 122:1,
128:4, 128:25, 129:5,
129:11, 129:17
Associates [3] - 10:21,
120:6, 120:15
associating [1] -
114:13
Association [1] - 19:17
assume [13] - 13:1,
27:2, 40:18, 40:19,
58:24, 101:19, 101:21,
119:20, 128:9, 144:21,
144:24, 146:10, 148:5
assumed [8] - 37:16,
43:17, 43:25, 44:1,
115:2, 115:3, 115:19,
144:1
assumes [1] - 138:13
assuming [8] - 21:25,
22:5, 58:18, 58:20,
115:21, 122:25, 145:4,
146:20
assumption [7] -
34:11, 34:15, 97:4,
108:12, 141:25, 142:1,
145:6
Assumptions [1] -
45:25
assumptions [12] -
39:1, 47:13, 97:2, 97:7,
105:4, 106:9, 106:11,
106:14, 107:11, 107:15,
108:5, 108:16
attach [1] - 41:11
attached [7] - 15:3,
15:11, 36:1, 46:6, 79:6,
105:5, 151:5
attachment [2] - 79:11,
79:12
attachments [1] -
79:25
attorneys [1] - 100:7
attributable [5] -
139:8, 141:7, 141:8,
141:24, 144:6
attributed [1] - 104:12
auditing [1] - 91:24
author [1] - 13:18
authoritative [1] -
77:8, 116:21, 120:17
authority [1] - 116:22

available [7] - 34:9,
66:13, 89:13, 137:9,
138:17, 145:9, 145:18
Avenue [1] - 2:10
avenues [1] - 102:17
average [54] - 11:1,
11:2, 47:18, 48:17,
48:19, 52:2, 52:12,
52:18, 54:15, 54:16,
54:17, 54:19, 55:4,
55:7, 55:9, 55:19,
62:25, 63:9, 63:12,
63:13, 63:14, 64:14,
65:5, 65:6, 66:19,
66:21, 67:8, 67:9, 74:7,
98:10, 112:5, 112:25,
113:21, 114:5, 126:19,
126:24, 126:25, 130:9,
137:24, 138:3, 138:4,
138:5, 138:9, 138:13,
142:3, 142:5, 142:10,
142:20, 144:25, 147:4,
147:17
averaged [1] - 48:1
averages [2] - 127:5,
147:1
averaging [1] - 72:3
avoid [1] - 6:7
aware [2] - 38:1, 106:3

**B**

background [1] -
43:13
bad [1] - 70:25
ball [2] - 124:7, 124:22
Bank [1] - 147:25
bank [2] - 148:7
banking [1] - 137:19
Barkers [3] - 99:25,
100:2, 100:9
Barkers' [1] - 99:13
Barkhurst [2] - 9:17,
9:18
Baron [1] - 2:20
Barton [2] - 9:24,
100:12
base [1] - 116:13
based [52] - 41:16,
43:25, 44:1, 46:5,
48:12, 48:24, 49:7,
52:3, 54:13, 54:15,
54:18, 56:3, 57:18,
57:23, 58:7, 58:9,
62:21, 63:13, 64:17,
68:12, 68:24, 70:22,
72:24, 74:6, 75:5,
96:11, 96:18, 96:19,
97:10, 97:23, 98:5,
98:7, 98:9, 102:3,
116:14, 116:15, 119:17,
127:5, 129:8, 129:20,
130:16, 130:18, 131:1,
134:2, 134:22, 139:10,
139:23, 140:17, 143:14,

146:23, 147:14
**baseline** [1] - 123:13
**basic** [2] - 58:1, 93:4
**basis** [1] - 64:24
**Bates** [1] - 6:17
**became** [1] - 7:7
**become** [4] - 50:24, 86:17, 130:19, 135:18
**becomes** [1] - 87:3
**began** [2] - 80:3, 87:25
**beginning** [1] - 21:15
**behavior** [1] - 98:10
**belief** [1] - 40:21
**below** [1] - 42:11
**beneficiaries** [1] - 1:5
**Benefit** [1] - 56:10
**benefit** [14] - 1:4, 48:15, 132:10, 134:9, 135:2, 135:3, 135:6, 135:10, 135:13, 135:15, 135:16, 135:17
**benefits** [13] - 41:9, 42:10, 42:21, 42:22, 42:24, 43:5, 45:6, 45:7, 80:20, 132:6, 132:17, 133:3, 133:8
**beside** [1] - 27:6
**best** [2] - 66:13, 79:14
**better** [4] - 5:16, 82:19, 101:5, 129:15
**between** [15] - 4:20, 55:24, 63:15, 65:23, 67:8, 68:8, 73:11, 78:14, 88:21, 95:17, 97:2, 112:2, 127:2, 139:3, 146:17
**beyond** [3] - 48:23, 64:1, 66:17
**big** [1] - 113:16
**bill** [10] - 11:16, 11:23, 72:25, 110:4, 110:6, 110:17, 111:13, 113:3, 113:22, 119:12
**billed** [1] - 11:7
**billing** [3] - 9:1, 11:9, 11:15
**Binder** [1] - 4:16
**binder** [4] - 39:20, 84:11, 133:9, 133:10
**birth** [2] - 18:21, 46:1
**birthday** [1] - 62:13
**bit** [1] - 96:1
**blacked** [2] - 46:1, 46:11
**blood** [1] - 150:14
**bond** [7] - 110:9, 111:8, 112:6, 113:4, 113:6, 113:16, 114:1
**booklet** [1] - 41:19
**bottom** [1] - 118:9
**bought** [2] - 34:2, 36:7
**Box** [3] - 2:4, 2:9, 2:15
**break** [4] - 52:18, 65:7, 71:12, 136:19
**Breck** [1] - 100:12

**brief** [1] - 109:19
**bring** [7] - 34:19, 76:18, 77:4, 83:10, 83:14, 85:4, 96:11
**bringing** [5] - 20:12, 24:23, 96:21, 97:22, 112:24
**broader** [1] - 91:17
**Broadway** [1] - 1:21
**brought** [5] - 12:8, 24:15, 27:3, 76:21, 76:22
**brown** [1] - 100:11
**BUCKINGHAM** [5] - 1:9, 1:9, 1:10, 1:11, 1:12
**Buckingham** [4] - 2:13, 29:4, 33:15, 34:10
**Buckinghams** [1] - 28:4
**budget** [1] - 137:20
**Buffett** [1] - 98:21
**build** [1] - 82:7
**buildings** [1] - 34:18
**builds** [1] - 123:19
**built** [3] - 108:24, 109:1, 109:6
**burden** [2] - 24:19, 26:8
**Bureau** [1] - 102:16
**business** [26] - 29:19, 29:21, 30:12, 31:13, 31:17, 32:24, 33:20, 34:3, 35:15, 35:17, 35:24, 37:4, 37:6, 49:12, 50:9, 50:24, 88:6, 88:7, 88:11, 90:12, 90:13, 90:17, 90:24, 91:2, 91:4, 93:25
**Business** [1] - 88:13
**buy** [2] - 74:10, 98:21
**BY** [25] - 5:12, 8:6, 12:14, 13:6, 14:3, 16:20, 17:4, 17:13, 25:19, 28:20, 28:25, 30:1, 31:16, 32:11, 32:17, 46:14, 66:7, 67:15, 76:4, 76:11, 80:2, 115:4, 118:24, 136:24, 147:23
**BYU** [5] - 10:12, 88:5, 90:11, 93:22, 93:23

## C

**calculate** [5] - 47:19, 54:10, 57:1, 74:22, 83:15
**calculated** [3] - 85:18, 118:17, 137:2
**calculating** [2] - 114:8, 137:6
**calculation** [15] - 19:12, 20:4, 20:12, 21:24, 23:3, 29:9, 45:8,

55:22, 57:13, 59:22, 69:25, 75:10, 3 20, 100:21, 106:7
**calculations** [13] - 20:19, 20:25, 39:1, 49:3, 58:1, 75:1, 81:14, 83:2, 83:20, 103:1, 104:25, 117:16, 129:25
**California** [1] - 19:4
**campus** [2] - 88:14, 88:15
**cancer** [1] - 82:5
**candid** [1] - 53:5
**capacities** [1] - 1:10
**capacity** [1] - 57:11
**car** [9] - 33:2, 33:20, 35:18, 35:19, 35:21, 127:9, 127:22, 144:9, 144:12
**card** [1] - 137:19
**care** [11] - 17:1, 47:5, 80:25, 121:13, 122:7, 122:10, 123:6, 123:7, 123:21, 124:3
**caring** [2] - 121:7, 121:8
**Cascades** [1] - 2:4
**case** [38] - 6:12, 7:7, 8:15, 9:12, 9:15, 9:17, 9:20, 9:22, 11:5, 11:7, 12:24, 27:17, 27:22, 29:18, 83:6, 84:2, 85:1, 85:2, 86:7, 87:5, 90:8, 92:7, 93:3, 93:8, 93:12, 93:15, 95:13, 98:15, 99:13, 99:25, 100:10, 103:1, 125:7, 126:3, 126:4, 145:13, 147:25
**cases** [9] - 10:7, 10:18, 10:19, 10:23, 10:25, 13:11, 85:2, 99:24, 120:8
**Cases** [1] - 4:15
**cash** [2] - 113:16, 143:9
**Casper** [1] - 99:25
**categories** [4] - 65:8, 121:25, 124:25, 125:6
**category** [3] - 48:20, 77:3, 133:18
**caused** [2] - 1:6, 82:9
**CD** [1] - 79:15
**Center** [1] - 47:14
**cents** [1] - 33:13
**certain** [1] - 132:9
**certainly** [21] - 23:14, 35:9, 35:12, 51:6, 66:10, 77:10, 77:11, 81:12, 82:11, 93:10, 101:15, 106:6, 106:25, 107:3, 110:18, 112:4, 123:9, 124:13, 135:20, 146:16
**CERTIFICATE** [2] - 150:1, 151:1

**certification** [1] - 88:17
**Certified** [1] - 1:25
**certified** [2] - 100:13, 100:16
**certify** [2] - 150:8, 150:13
**CERTIFY** [1] - 151:4
**cetera** [1] - 76:19
**CFA** [1] - 94:7
**challenge** [2] - 79:5, 94:7
**chance** [1] - 111:9
**change** [6] - 20:2, 21:8, 60:2, 60:19, 82:25, 135:5
**changed** [2] - 38:1, 60:14, 74:14
**changes** [1] - 151:6
**characterized** [1] - 111:14
**check** [4] - 28:3, 28:13, 77:17
**Cheyenne** [1] - 2:10
**children** [1] - 46:25
**China** [1] - 96:10
**choice** [1] - 143:5
**choose** [1] - 72:6
**chooses** [1] - 143:4
**circumstances** [1] - 34:22
**civic** [1] - 121:16
**Civil** [1] - 1:8
**claim** [1] - 105:20
**claimed** [6] - 26:6, 27:7, 44:22, 139:11, 139:12, 139:15
**claiming** [1] - 90:7
**claims** [1] - 29:14
**class** [4] - 93:21, 94:21, 95:10, 98:20
**classified** [1] - 121:19
**clean** [2] - 29:3, 34:18, 34:20
**cleaned** [3] - 33:5, 33:9, 33:22
**cleaning** [19] - 31:2, 34:3, 34:8, 34:16, 35:12, 35:15, 35:17, 36:16, 37:2, 40:22, 41:2, 56:2, 56:6, 68:6, 69:2, 69:3, 70:21, 71:1, 128:7
**clear** [2] - 94:10, 127:14
**clearly** [1] - 128:11
**click** [1] - 148:3
**close** [4] - 110:20, 110:22, 113:24, 147:10
**clouded** [1] - 81:1
**CO** [2] - 1:3, 1:14
**Co** [1] - 2:18
**CO-WRONGFUL** [1] - 1:3
**code** [2] - 44:12, 44:13
**collateral** [1] - 132:3

**college** [4] - 88:6, 88:7, 90:12, 90:13
**College** [1] - 88:12
**color** [1] - 16:11
**Colorado** [1] - 3:5
**colors** [1] - 16:12
**column** [4] - 21:8, 22:15, 22:19, 74:13
**columns** [1] - 22:25
**combination** [2] - 135:14, 135:19
**combine** [1] - 108:1
**combined** [5] - 63:16, 126:23, 140:6, 140:7, 140:8
**combines** [1] - 97:15
**comfort** [1] - 81:1
**coming** [2] - 7:14, 99:14
**comment** [1] - 34:8
**Commission** [2] - 150:24, 151:25
**common** [1] - 108:9
**commonsense** [1] - 108:9
**Communication** [1] - 88:13
**communication** [1] - 90:17
**commute** [3] - 144:18, 146:12, 146:15
**Company** [1] - 76:6
**company** [3] - 5:22, 94:6, 94:9
**compare** [1] - 81:21
**compared** [6] - 69:2, 69:14, 72:7, 72:9, 73:15, 73:17
**compensation** [2] - 43:3, 44:1
**Compensation** [2] - 43:9, 133:19
**complaint** [2] - 17:17, 51:11
**complete** [1] - 16:3
**complies** [10] - 16:10, 16:16, 30:3, 30:10, 43:11, 45:16, 52:21, 67:23, 68:17, 69:12
**component** [2] - 43:1, 111:23
**components** [4] - 92:14, 95:12, 111:3, 121:5
**comprehension** [1] - 64:1
**comprised** [2] - 110:7, 110:8
**comprises** [2] - 26:5, 110:2
**computation** [4] - 54:5, 54:18, 104:7, 105:5
**computational** [2] - 105:4, 106:14

4

**Computational** [2] - 45:24, 52:22
**computer** [5] - 13:22, 13:23, 84:4, 90:15, 104:19
**computing** [1] - 92:11
**concept** [1] - 109:20
**concluded** [1] - 149:18
**conclusion** [2] - 84:20, 96:8
**conclusions** [1] - 87:15
**condition** [10] - 40:24, 82:2, 97:9, 101:16, 101:22, 102:3, 102:20, 103:5, 123:1, 123:24
**conditions** [1] - 101:9
**conference** [2] - 98:16, 98:25
**confirmed** [2] - 24:15, 32:12
**consensus** [1] - 84:20
**consider** [1] - 108:4
**consideration** [2] - 82:1, 128:3
**considered** [3] - 107:15, 110:22, 126:16
**consist** [1] - 42:20
**consisted** [5] - 132:20, 133:25, 134:7, 134:22, 134:25
**consistency** [1] - 115:22
**consists** [1] - 76:24
**constitute** [1] - 6:22
**consulting** [1] - 101:4
**consume** [7] - 58:17, 62:16, 137:7, 137:25, 138:3, 138:4, 145:5
**consumed** [5] - 137:11, 137:22, 138:9, 144:2, 145:8
**consumer** [9] - 57:19, 57:23, 58:5, 62:24, 64:4, 64:17, 65:5, 74:13, 105:10
**Consumer** [1] - 15:6
**consumers** [1] - 74:10
**consumes** [2] - 59:24, 137:7
**consuming** [4] - 59:15, 59:18, 59:21, 144:25
**consumption** [18] - 56:17, 56:21, 57:7, 57:14, 60:21, 68:9, 68:14, 74:22, 74:23, 74:24, 119:4, 139:2, 139:3, 141:5, 143:6, 143:21, 144:6, 144:23
**cont'd** [1] - 3:1
**contact** [1] - 78:10
**contacted** [1] - 78:8
**contain** [2] - 79:6, 81:4
**contained** [5] - 78:2, 78:14, 83:17, 84:7,

111:2
**contend** [1] - 116:20
**contents** [1] - 79:8
**context** [1] - 125:15
**continue** [5] - 101:25, 115:3, 124:2, 127:5, 134:16
**CONTINUED** [1] - 147:22
**Continued** [1] - 4:7
**contract** [1] - 31:23
**contribute** [2] - 102:1, 145:10
**contributing** [1] - 135:9
**contribution** [4] - 52:6, 134:9, 135:7, 135:8
**contributions** [1] - 143:9
**conversation** [2] - 78:9, 78:11
**coordinate** [1] - 149:13
**copies** [8] - 13:1, 13:19, 15:2, 15:4, 15:10, 18:4, 79:24, 99:20
**copy** [11] - 8:23, 8:24, 8:25, 12:19, 12:20, 13:14, 14:9, 15:22, 16:3, 16:6, 16:11
**core** [1] - 91:6
**Corporation** [3] - 1:13, 1:14, 1:15
**correct** [203] - 6:10, 6:15, 8:1, 8:23, 9:1, 9:8, 9:20, 9:21, 11:16, 11:17, 11:19, 12:19, 12:22, 12:25, 13:10, 14:10, 14:11, 14:15, 14:25, 17:14, 17:15, 17:18, 18:5, 18:12, 18:13, 18:22, 18:24, 18:25, 19:7, 19:19, 19:20, 24:22, 24:23, 26:2, 26:14, 26:15, 26:17, 26:18, 26:21, 26:22, 29:16, 29:17, 29:20, 30:7, 30:12, 30:13, 30:17, 30:18, 30:22, 30:25, 31:5, 31:10, 31:11, 31:17, 31:18, 32:1, 32:2, 33:3, 34:10, 35:19, 35:20, 35:21, 35:22, 36:4, 36:12, 37:9, 38:5, 38:6, 38:15, 38:16, 38:19, 39:2, 39:5, 39:25, 40:1, 40:3, 40:7, 40:8, 40:13, 41:10, 41:13, 43:22, 44:9, 44:10, 45:22, 45:23, 46:7, 46:8, 47:14, 47:15, 47:17, 47:22, 48:14, 48:17, 48:18, 48:25, 49:1, 49:17, 49:24, 49:25,

50:4, 51:23, 51:24, 53:1, 53:2, 54:1, 54:11, 54:12, 54:24, 54:25, 55:21, 56:17, 58:18, 56:22, 57:11, 57:12, 57:16, 59:17, 59:20, 59:23, 61:8, 62:2, 62:3, 68:4, 68:6, 68:7, 68:9, 68:10, 68:18, 68:20, 70:17, 70:18, 71:5, 71:6, 71:10, 71:18, 71:21, 71:22, 72:1, 72:5, 72:14, 72:15, 72:18, 74:2, 74:3, 75:11, 75:15, 75:21, 80:12, 86:9, 89:5, 90:1, 90:13, 93:1, 93:13, 103:1, 103:10, 103:13, 106:18, 106:19, 107:8, 109:9, 111:19, 112:15, 122:8, 122:11, 122:12, 123:25, 124:1, 124:8, 124:9, 127:11, 127:12, 128:23, 129:3, 130:5, 131:3, 134:18, 134:19, 137:3, 137:4, 137:9, 137:23, 138:11, 138:16, 138:20, 138:24, 142:4, 142:23, 142:24, 143:11, 144:3, 144:4, 144:19, 144:20, 145:1, 145:2, 145:10, 145:15, 145:17, 146:1, 147:18, 151:8
**correction** [1] - 151:7
**corrections** [1] - 151:6
**correctly** [1] - 35:2
**Cost** [1] - 133:18
**cost** [5] - 43:2, 43:4, 91:19, 91:21, 132:1
**costs** [2] - 44:1, 92:22
**counsel** [2] - 7:15, 149:13
**count** [1] - 93:20
**country** [1] - 130:4
**COUNTY** [2] - 150:4, 151:18
**county** [1] - 130:3
**County** [7] - 49:6, 68:2, 100:1, 100:4, 128:21, 130:2, 130:3
**course** [4] - 88:16, 91:9, 94:16, 95:3
**courses** [17] - 88:4, 88:5, 88:11, 90:19, 90:25, 91:7, 91:12, 91:13, 91:15, 91:17, 91:18, 93:17, 94:5, 94:11, 94:12, 94:14
**court** [14] - 9:10, 38:7, 83:6, 99:9, 99:10, 99:21, 100:2, 100:14, 100:16, 100:23, 100:25, 116:15, 117:1, 117:3
**Court** [2] - 100:5, 117:4

**COURT** [2] - 1:1, 1:24
**cover** [1] - 123:10
**covered** [1] - 122:15
**covering** [1] - 95:10
**cow** [1] - 63:16
**CPI** [1] - 74:17
**created** [2] - 109:7, 148:4
**creates** [1] - 79:20, 79:22
**credible** [1] - 66:12
**credit** [1] - 137:19
**critical** [1] - 101:20
**critique** [1] - 87:2
**crystal** [1] - 124:7, 124:22
**curious** [2] - 44:11, 68:21
**current** [6] - 15:20, 20:9, 33:12, 82:1, 114:4, 129:13
**curriculum** [1] - 12:10
**Curriculum** [4] - 4:13, 88:19, 89:7, 89:18
**curt** [1] - 122:12
**CV** [2] - 8:23, 10:20

**D**

**Dade** [1] - 130:2
**daily** [1] - 69:22
**damages** [11] - 1:6, 10:5, 40:2, 80:8, 80:17, 100:22, 114:9, 120:24, 136:1, 136:4
**data** [6] - 16:14, 41:16, 52:13, 97:18, 98:7, 145:23
**Data** [2] - 4:15, 13:11
**date** [24] - 18:21, 20:2, 20:7, 20:9, 20:10, 20:13, 21:17, 46:1, 48:23, 70:8, 79:21, 82:25, 83:4, 83:5, 83:6, 83:9, 83:10, 83:11, 83:14, 84:10, 84:22, 101:9
**dated** [1] - 4:12
**Dates** [1] - 4:15
**daughter** [4] - 24:3, 24:4, 48:13, 99:14
**daughters** [1] - 51:14
**davelewis@bresnan.net** [1] - 2:6
**David** [1] - 2:3
**days** [2] - 14:24, 70:15
**DD** [1] - 44:12
**deadline** [1] - 84:21
**deals** [1] - 94:5
**dealt** [1] - 53:4
**dean** [1] - 88:12
**DEATH** [1] - 1:4
**Death** [2] - 4:15, 13:11
**death** [20] - 1:6, 38:18, 46:5, 49:13, 54:16,

54:19, 60:13, 60:20, 70:8, 81:6, 81:8, 101:10, 106:6, 134:24, 135:11, 135:12, 135:15, 135:16
**debatable** [2] - 35:7, 35:8
**Deborah** [1] - 2:13
**DEBORAH** [2] - 1:9, 1:11
**deceased** [1] - 1:5
**decedent** [1] - 50:2
**December** [2] - 20:7, 84:21
**decide** [1] - 72:17
**declare** [1] - 36:19
**declared** [2] - 36:20, 36:21
**deduct** [3] - 31:10, 33:10, 33:12
**deducted** [1] - 35:11
**deduction** [2] - 36:5, 36:8
**deductions** [5] - 40:5, 40:6, 40:13, 139:10, 139:11
**default** [3] - 111:4, 111:6, 111:12
**defaulted** [1] - 131:25
**Defendant** [4] - 2:7, 2:18, 3:2, 5:4
**defendants** [2] - 1:12, 10:6
**Defendants** [2] - 1:16, 2:13
**defense** [7] - 10:9, 53:10, 53:12, 53:15, 53:19, 68:13, 99:15
**define** [2] - 83:4, 129:15
**defined** [5] - 134:9, 135:6, 135:7, 135:13
**definition** [1] - 96:16
**deflate** [1] - 22:18
**degree** [4] - 90:25, 91:2, 91:4, 126:10
**demand** [3] - 17:17, 129:13, 129:17
**demonstrate** [2] - 20:2, 20:11
**demonstration** [3] - 85:10, 85:15, 85:16
**DENISE** [1] - 150:23
**Denise** [2] - 1:24, 150:6
**Denver** [1] - 3:5
**Department** [1] - 102:18
**department** [9] - 88:11, 90:11, 90:14, 90:15, 90:16, 90:17, 90:18, 93:25, 94:2
**dependants** [1] - 139:13
**dependent** [1] - 139:16

DEPONENT [1] - 151:1
deponent [1] - 151:2
deposed [3] - 99:2, 99:4, 99:6
deposited [1] - 142:22
DEPOSITION [1] - 1:18
Deposition [6] - 5:9, 12:12, 13:4, 14:1, 17:11, 149:18
deposition [17] - 5:24, 7:4, 8:8, 9:19, 12:19, 14:22, 15:19, 76:13, 86:18, 99:21, 100:1, 100:12, 100:19, 103:23, 104:1, 151:3, 151:9
depositions [5] - 51:9, 51:12, 51:13, 86:8, 86:16
derivatives [1] - 94:6
derived [3] - 20:15, 20:16, 132:3
describe [3] - 50:11, 90:24, 91:12
described [1] - 145:25
Description [1] - 4:10
details [4] - 81:12, 86:17, 133:24, 133:25
determined [1] - 110:3
determining [1] - 110:25
develop [1] - 106:10
developed [2] - 13:17, 104:10
diabetic [2] - 101:20, 101:25
dial [1] - 50:25
Dick [1] - 5:21
die [1] - 123:4
difference [20] - 61:24, 63:15, 65:23, 67:8, 67:10, 67:11, 70:19, 73:11, 88:21, 94:22, 95:17, 97:2, 99:12, 112:1, 112:2, 127:2, 135:10, 139:2, 141:12, 146:16
differences [2] - 94:25, 109:21
different [19] - 16:12, 26:23, 35:12, 35:14, 65:8, 68:14, 92:21, 93:24, 95:6, 96:17, 97:15, 97:20, 102:17, 108:24, 124:24, 128:9, 130:11, 131:16, 147:12
diminished [1] - 74:4
diploma [1] - 19:1
direct [1] - 11:15
direction [2] - 113:8, 113:18
disability [3] - 44:20, 44:22, 45:4
disabled [1] - 81:12
discernible [1] - 96:15
discipline [4] - 88:9,

88:10, 93:22, 94:18
disclose [1] - 67:18
discount [38] - 20:20, 20:24, 21:1, 21:2, 21:20, 22:16, 22:18, 22:23, 22:24, 53:1, 53:7, 53:11, 53:21, 71:24, 72:1, 72:17, 72:20, 72:21, 73:5, 73:9, 104:9, 109:16, 109:23, 111:21, 111:24, 112:5, 112:10, 112:12, 112:17, 113:15, 113:23, 114:5, 114:15, 115:17, 116:18, 127:1, 127:2, 128:1
discounted [3] - 21:17, 21:19, 126:25
discounting [6] - 92:14, 109:20, 109:22, 111:22, 115:6, 117:25
discuss [1] - 74:21
discussed [2] - 8:14, 68:12
Discussion [1] - 32:16
discussion [1] - 111:20
discussions [1] - 50:8
disqualified [1] - 100:24
distribution [2] - 134:11, 134:12
district [1] - 68:2
DISTRICT [2] - 1:1, 1:1
divided [1] - 140:20
division [1] - 91:14
DO [1] - 151:4
Doctor [2] - 5:19, 5:20
doctorate [1] - 88:1, 88:2, 90:9
document [3] - 79:21, 148:3, 148:21
documentation [9] - 19:9, 23:6, 25:1, 25:11, 25:21, 26:1, 26:4, 27:6, 27:21
documented [1] - 128:16
DOCUMENTS [1] - 4:18
Documents [1] - 133:15
documents [24] - 7:6, 7:7, 8:10, 8:20, 14:18, 15:2, 15:4, 15:10, 15:11, 15:20, 16:1, 17:19, 46:8, 51:19, 78:12, 79:19, 104:5, 105:3, 105:9, 133:11, 147:24, 148:12, 148:22
dollar [1] - 132:13
dollars [3] - 21:18, 28:6, 28:21
done [21] - 6:25, 10:7, 10:8, 10:19, 10:23,

14:24, 20:7, 22:?, 75:9, 82:20, 83:20, 5  7, 98:13, 98:19, 102:15, 116:14, 118:6, 128:16, 128:19, 128:24, 129:25
door [2] - 11:14
door-to-door [1] - 11:14
double [1] - 138:4
down [21] - 29:22, 37:19, 38:17, 42:11, 44:14, 44:15, 45:24, 52:18, 56:24, 65:7, 71:10, 71:12, 73:18, 73:20, 76:1, 91:16, 96:6, 113:10, 113:12, 125:11, 139:18
download [1] - 15:23
Dr [5] - 4:20, 5:21, 76:5, 77:19, 136:25
draft [2] - 87:12, 90:2
drafts [2] - 87:7, 87:14
dramatically [5] - 49:19, 50:10, 50:11, 74:5, 74:10
drinking [1] - 121:14
Drive [1] - 2:4
drive [5] - 33:19, 35:8, 35:18, 35:19, 79:15
driving [2] - 8:12, 33:8
drop [4] - 37:24, 38:10, 40:25, 73:20
dropped [1] - 73:13
drove [2] - 33:4, 35:21
due [1] - 81:23
duly [1] - 5:6
DuraVent [3] - 3:2, 5:5, 5:22
DURAVENT [1] - 1:15
during [1] - 24:16, 50:1, 112:9, 143:19
duties [3] - 145:21, 145:25, 146:13
dwaltz@waltzlaw.com [1] - 3:6

## E

e-mail [10] - 18:19, 19:16, 24:5, 45:20, 78:9, 78:12, 79:8, 79:11, 79:12, 121:18
e-mails [4] - 78:13, 78:19, 78:21, 148:24
E-mails [1] - 4:20
earn [7] - 57:11, 113:3, 116:8, 125:21, 125:23, 125:24, 132:8
earned [6] - 27:20, 36:15, 107:10, 122:17, 135:2, 135:4
earning [8] - 22:2, 22:10, 74:4, 74:6, 119:2, 125:23, 126:23, 127:4

earnings [15] - 48:8, 62:15, 80:19, 80:20, 81:4, 81:21, 81:22, 107:10, 119:10, 125:24, 126:21, 127:7, 127:10, 128:14, 128:15
East [1] - 1:21
eating [1] - 121:14
econ [3] - 94:16, 95:10, 96:22
Economic [1] - 119:1
economic [11] - 6:25, 10:5, 80:8, 80:17, 100:21, 104:15, 116:11, 120:24, 129:16, 136:4, 137:2
economics [16] - 19:18, 77:11, 80:23, 88:10, 90:11, 90:15, 92:2, 92:5, 94:1, 94:2, 94:3, 94:4, 94:15, 94:17, 104:17, 116:11
Economics [1] - 102:14
economies [1] - 130:17
economist [8] - 25:25, 26:4, 26:8, 53:11, 53:12, 80:11, 120:7, 129:15
economists [4] - 53:7, 53:15, 65:20, 116:11
economy [1] - 131:13
education [2] - 48:25, 126:14
educational [1] - 121:15
eight [2] - 72:9, 74:5
either [7] - 89:25, 93:12, 99:20, 111:17, 129:13, 135:14, 146:9
electronic [5] - 79:13, 79:25, 83:24, 84:4, 89:11
electronically [1] - 13:2
element [2] - 144:23, 145:3
elements [1] - 111:1
elsewhere [1] - 121:19
emphasis [4] - 91:7, 91:18, 92:1, 94:1
employed [3] - 29:14, 30:14, 130:23
Employee [1] - 133:18
employee [1] - 43:2
Employer [1] - 133:18
employer [5] - 42:9, 43:2, 44:1, 48:19, 132:1
employment [4] - 48:9, 48:10, 87:24, 131:7
end [7] - 21:25, 118:2, 118:18, 122:7, 124:14, 148:14, 148:15
end-of-life [2] - 122:7,

124:14
ends [1] - 64:8
enormous [1] - 63:17
enterprises [1] - 92:21
entertainment [2] - 143:9, 143:15
entire [3] - 6:22, 75:9, 144:2
entirely [1] - 84:19
entitled [1] - 150:10
equal [1] - 115:8
equation [1] - 104:17
equations [1] - 20:21
equipment [1] - 34:20
equities [1] - 95:11
Esquire [5] - 2:3, 2:8, 2:14, 2:19, 3:3
essence [2] - 115:19, 125:11
estate [1] - 106:1
estimate [12] - 26:13, 45:6, 48:12, 56:20, 69:14, 69:20, 75:13, 75:20, 80:8, 80:17, 130:9, 130:11
estimated [1] - 56:16
estimates [3] - 58:8, 96:12, 147:15
estimating [1] - 120:24
et [1] - 76:19
ethical [1] - 76:23
evaluation [1] - 94:6
event [3] - 23:15, 134:24, 135:12
evidence [2] - 105:3, 148:23
exact [2] - 28:7, 118:3
exactly [2] - 82:11, 124:23
examination [1] - 151:9
EXAMINATION [4] - 5:11, 76:3, 136:23, 147:22
Examination [4] - 4:4, 4:5, 4:6, 4:7
examined [1] - 5:6
example [31] - 20:6, 20:18, 31:13, 33:1, 41:22, 58:2, 60:19, 82:5, 83:5, 83:19, 83:21, 84:23, 92:19, 93:23, 94:22, 95:8, 95:10, 96:3, 96:22, 101:18, 106:19, 108:21, 111:8, 113:1, 119:23, 125:17, 131:6, 131:13, 144:1, 145:24
examples [1] - 53:21
Excel [3] - 13:13, 14:6, 104:21
exception [1] - 15:5
exclusive [1] - 1:4
exclusively [1] - 92:2
excuse [3] - 14:12,

25:12, 40:4
   executed [1] - 151:12
   exercise [1] - 98:24
   exhibit [3] - 28:8,
29:22, 30:2
   Exhibit [19] - 5:9, 6:16,
12:12, 12:15, 13:3,
13:4, 13:7, 14:1, 14:4,
16:17, 17:11, 18:19,
23:18, 28:8, 32:3,
32:18, 39:19, 45:15,
51:21
   EXHIBITS [1] - 4:9
   existed [1] - 103:7
   exit [2] - 81:20, 81:23
   expect [13] - 49:5,
51:4, 95:22, 96:5, 96:6,
96:20, 96:25, 97:8,
97:11, 98:11, 134:4,
136:11, 146:16
   expectancies [1] -
123:23
   expectancy [30] -
26:13, 49:7, 81:3, 81:5,
81:10, 81:17, 82:6,
97:19, 97:20, 102:5,
102:22, 102:25, 106:20,
109:3, 109:5, 122:22,
122:23, 123:2, 123:16,
123:19, 126:7, 127:3,
127:18, 128:1, 129:20,
129:24
   expectation [1] - 50:23
   expected [14] - 46:5,
48:22, 49:8, 58:17,
77:12, 81:6, 81:8,
81:19, 81:23, 82:6,
97:25, 108:23, 132:7,
132:8
   expecting [1] - 125:21
   Expenditure [1] - 15:6
   expenditure [4] - 43:2,
64:5, 64:17, 65:5
   expenditures [9] -
57:23, 58:6, 60:13,
62:24, 63:14, 66:22,
67:9, 98:10, 105:10
   expense [17] - 35:10,
36:24, 39:13, 58:4,
60:9, 60:17, 60:18,
60:19, 62:17, 86:13,
92:11, 109:11, 122:6,
122:11, 123:21, 125:13,
144:8
   expenses [29] - 25:7,
25:8, 27:11, 27:12,
30:20, 31:10, 33:7,
35:14, 39:7, 40:11,
40:15, 57:24, 58:10,
58:12, 58:14, 58:16,
60:1, 60:2, 60:12,
62:14, 75:14, 75:18,
82:23, 82:24, 85:24,
85:25, 124:3, 137:20,
138:19

Expenses [1] - 33:2
   experience [1] -
120:18
   experienced [1] -
125:4
   expert [4] - 38:4,
100:14, 100:25, 120:6
   expertise [1] - 90:7
   experts [2] - 53:3,
68:13
   Expires [1] - 150:24
   expires [1] - 151:25
   explained [1] - 23:1
   explanation [2] - 27:7,
109:19
   explore [2] - 102:2,
102:17
   extended [1] - 123:7
   extra [2] - 13:19, 19:5
   extremes [1] - 123:3
   eyes [3] - 21:4, 28:12,
128:11

## F

facing [1] - 113:17
   fact [6] - 23:11, 24:18,
60:23, 93:4, 137:11,
142:25
   factor [16] - 82:4,
92:20, 111:11, 112:3,
115:18, 117:19, 121:10,
121:25, 122:5, 123:12,
126:2, 126:7, 129:10,
129:17, 130:7, 131:21
   factored [15] - 95:3,
101:8, 102:24, 117:8,
118:9, 119:3, 119:15,
122:18, 122:21, 124:4,
124:13, 124:21, 126:13,
127:3, 129:4
   factoring [5] - 21:20,
101:21, 115:25, 123:17,
142:7
   factors [20] - 22:17,
59:25, 95:2, 95:6,
95:14, 96:7, 96:21,
97:21, 108:22, 109:12,
110:11, 110:24, 121:11,
123:20, 126:12, 126:16,
128:4, 129:20, 129:21,
131:16
   facts [4] - 8:16, 105:4,
106:14, 125:6
   Facts [1] - 45:24
   fail [4] - 110:18, 111:6,
111:17, 114:17
   failing [1] - 28:12
   fair [15] - 72:22, 92:3,
108:11, 112:11, 114:19,
119:7, 123:14, 127:21,
132:2, 134:21, 137:13,
138:2, 143:20, 146:10,
147:8
   fairly [1] - 125:3

fall [1] - 48:1^6
   falls [1] - 77^6
   familiar [2] - 7:7, 86:17
   families [2] - 64:7, 64:9
   FAMILY [1] - 1:11
   family [19] - 5:23, 7:1,
18:11, 19:15, 39:7,
39:13, 47:9, 51:1,
58:15, 62:25, 63:2,
63:22, 97:8, 99:17,
103:16, 115:16, 137:20,
138:18, 145:10
   family's [1] - 137:18
   far [2] - 11:7, 23:4
   father [2] - 18:14,
18:15
   fault [2] - 70:25, 116:1
   feature [1] - 109:20
   February [1] - 148:2
   Federal [1] - 119:12
   federal [5] - 9:10, 9:11,
43:8, 100:2, 149:8
   fee [1] - 77:25
   females [2] - 52:3,
147:5
   few [6] - 10:8, 14:24,
53:19, 74:17, 136:18,
136:25
   field [1] - 100:15
   figure [9] - 29:6, 36:1,
37:7, 46:12, 138:21,
138:22, 141:2, 141:11,
141:23
   figures [1] - 147:9
   figuring [1] - 36:2
   file [21] - 13:13, 13:21,
14:7, 14:8, 15:13, 16:3,
16:8, 17:14, 17:16,
27:25, 36:15, 41:18,
48:9, 48:10, 77:7, 78:3,
78:14, 83:18, 83:24,
84:4, 84:8
   filed [6] - 5:23, 36:10,
37:3, 105:22, 105:23,
106:1
   files [4] - 78:17, 79:6,
79:9
   filing [1] - 140:11
   filled [3] - 29:16, 29:19,
37:5
   final [2] - 82:22, 82:23
   finalized [2] - 87:1,
87:3
   finance [16] - 91:5,
93:5, 93:17, 93:20,
94:1, 94:14, 94:16,
94:18, 94:19, 94:21,
94:23, 95:4, 95:10,
104:17
   finances [1] - 93:22
   financial [13] - 23:2,
93:9, 93:16, 94:3, 94:4,
94:15, 95:17, 95:18,
97:9, 100:21, 102:25,
104:13, 137:18

fine [5] - 13:25, 16:7,
79:4, 133:25, 149:9
   finished [2] - 88:1,
88:2
   Firm [1] - 3:4
   firm [1] - 120:14
   firmly [1] - 127:13
   first [3] - 5:6, 10:16,
13:13, 21:25, 27:13,
39:23, 43:18, 59:10,
76:10, 76:12, 83:3,
95:18, 148:21
   fits [1] - 147:16
   five [6] - 9:5, 9:7,
10:17, 24:24, 99:5, 99:6
   fixed [7] - 60:2, 60:16,
60:18, 60:24, 61:17,
75:18
   floodplain [1] - 92:24
   Florida [1] - 130:2
   focus [2] - 80:22,
95:11
   focused [1] - 128:11
   folder [2] - 8:18, 12:18
   Foley [1] - 2:20
   follow [3] - 30:21,
50:18, 64:11
   following [2] - 69:5,
151:7
   follows [1] - 5:7
   followup [5] - 25:22,
27:24, 76:7, 118:23,
136:25
   foot [1] - 127:23
   FOR [2] - 1:1, 4:18
   forced [1] - 143:2
   forecast [2] - 95:18,
95:20, 95:21, 96:2,
96:3, 96:5, 96:12,
96:23, 97:2, 97:3, 97:6,
130:11
   foregoing [2] - 151:3,
151:5
   Forensic [1] - 19:18
   forensic [5] - 25:24,
26:3, 88:17, 104:14
   forensics [1] - 33:24
   form [4] - 16:3, 25:12,
29:15, 42:9
   formal [1] - 89:8
   format [5] - 79:2,
79:13, 79:25, 108:18
   forms [2] - 29:18,
37:14
   formulating [2] -
51:19, 105:7
   forth [2] - 78:13, 151:7
   forty [1] - 38:3
   forward [12] - 20:12,
21:23, 22:4, 79:18,
95:21, 95:25, 96:20,
98:12, 119:9, 127:24,
127:25, 130:25
   foundational [10] - 7:6,
14:17, 15:2, 15:4,

15:11, 15:19, 16:1,
46:8, 105:9, 133:11
   Foundational [1] -
133:14
   four [21] - 22:8, 23:18,
23:19, 36:12, 48:3,
52:2, 54:16, 54:17,
55:9, 90:21, 121:9,
121:20, 121:21, 142:4,
142:5, 142:14, 142:15,
142:23, 143:19, 146:7,
146:8
   four-page [2] - 23:18,
23:19
   four-year [6] - 54:16,
55:9, 142:4, 142:5,
142:14, 142:23
   fraction [1] - 55:24,
56:4, 58:11, 70:4, 70:5,
70:19, 75:5
   Francis [1] - 46:25
   FRANCISCO [1] - 1:3
   Francisco [3] - 46:13,
46:20, 47:1
   free [15] - 72:24,
109:23, 109:24, 110:1,
110:2, 110:3, 110:22,
110:25, 111:14, 113:24,
115:20, 116:7, 116:10,
116:17, 117:2
   FREMONT [1] - 150:4
   Fremont [2] - 100:1,
100:4
   Fringe [1] - 56:9
   fringe [6] - 41:9, 42:10,
42:21, 45:6, 45:7, 48:15
   front [6] - 6:12, 8:18,
12:18, 99:18
   full [11] - 5:13, 10:12,
37:10, 70:6, 70:20,
87:25, 88:3, 99:19,
131:15, 151:8
   full-time [4] - 10:12,
87:25, 88:3, 131:15
   fund [1] - 44:20
   funeral [6] - 25:7,
27:11, 82:24, 85:24,
86:13, 109:10
   future [3] - 57:10,
68:1, 71:5, 80:18,
80:19, 96:25, 97:8,
97:12, 97:20, 98:14,
98:22, 112:12, 112:20,
116:18, 117:12, 118:9,
118:15, 120:25, 124:19,
126:17, 126:18, 128:18

## G

gained [1] - 22:1
   Gary [2] - 9:16, 100:9
   gas [1] - 127:24,
144:17
   gate [1] - 108:10
   gatekeeper [1] - 108:4

gender [3] - 126:8, 126:15
general [1] - 48:24
generally [1] - 108:20
generate [3] - 92:22, 117:11, 132:24
generated [5] - 106:17, 113:14, 115:9, 115:11, 117:11
geographic [4] - 128:21, 129:2, 129:11, 129:16
Gifford [1] - 120:12
given [16] - 9:4, 23:14, 24:19, 29:7, 55:17, 60:12, 60:20, 61:9, 86:18, 106:22, 111:10, 113:7, 113:18, 128:17, 129:21, 151:9
Glass [6] - 17:23, 17:24, 18:3, 55:3, 55:7, 142:7
glasses [1] - 42:6
glaze [1] - 21:4
goal [2] - 81:16, 115:6
goods [1] - 121:6
government [20] - 45:9, 62:21, 62:22, 64:18, 66:5, 96:9, 97:18, 102:4, 102:6, 106:20, 110:9, 110:18, 111:17, 113:25, 114:16, 116:1, 122:16, 123:9, 123:11
government-provided [1] - 122:16
Great [1] - 73:23
great [2] - 106:24, 131:17
greater [1] - 133:6
GREGORY [2] - 1:9, 1:11
Gregory [1] - 2:13
gross [20] - 30:24, 31:7, 31:9, 32:5, 32:20, 34:1, 49:18, 56:7, 119:2, 139:19, 139:24, 140:5, 140:6, 140:7, 140:18, 140:19, 140:20, 140:22, 140:24, 141:6
grossed [1] - 31:17
Group [2] - 3:2, 5:5
GROUP [1] - 1:15
growth [9] - 20:23, 21:2, 21:20, 71:20, 71:25, 73:5, 111:25, 126:24, 127:15
guess [1] - 94:10
guidelines [3] - 19:23, 76:19, 76:24
Gulch [1] - 2:15

H

H-100 [1] - 4:14

H-101 [1] - 4:15
H-102 [1] - 4:16
H-98 [1] - 4:11
H-99 [1] - 4:13
H-I-R-S-C-H-I [1] - 5:18
hac [1] - 2:19
half [1] - 7:10
hand [8] - 6:16, 15:17, 21:7, 21:9, 21:14, 29:24, 64:7, 150:19
handing [1] - 12:15
handing) [2] - 8:22, 41:20
hands [1] - 120:18
hands-on [1] - 120:18
handwriting [2] - 14:19, 14:24
hard [3] - 18:11, 28:9, 63:17
hat [1] - 124:12
head [1] - 113:19
health [12] - 38:23, 40:19, 82:1, 101:9, 101:11, 101:13, 101:22, 103:5, 122:25, 123:24, 126:12, 133:4
healthy [2] - 39:2, 123:4
heard [5] - 11:11, 64:2, 73:23, 81:9, 81:11
hearing [3] - 77:19, 77:20, 77:21
hearsay [1] - 132:1
heavy [1] - 92:14
help [2] - 83:21, 125:25
helping [2] - 121:7, 121:8
hereby [1] - 150:8
HEREBY [1] - 151:4
hereunto [1] - 150:19
Herrera [39] - 4:11, 5:24, 7:1, 17:25, 18:16, 18:20, 28:2, 28:3, 44:22, 45:21, 46:21, 46:25, 47:1, 50:2, 62:2, 80:9, 81:3, 81:25, 95:15, 97:8, 103:16, 105:14, 112:21, 114:9, 117:11, 122:6, 128:5, 129:6, 134:8, 134:16, 137:18, 137:22, 138:9, 142:22, 145:23, 146:20, 147:25, 148:8
HERRERA [3] - 1:3, 1:3, 1:5
Herrera's [7] - 18:14, 101:9, 105:20, 115:22, 131:20, 137:3, 138:14
high [2] - 19:1, 126:10
higher [10] - 52:5, 53:17, 72:17, 72:20, 72:21, 73:8, 73:9, 112:13, 147:6
highest [1] - 53:25
highlighting [1] -

14:19
HIRSCHI [2] - 7 19, 5:3
hirschi [1] - 4:3
Hirschi [14] - 4:11, 4:13, 4:14, 4:17, 4:20, 5:15, 5:18, 5:21, 38:4, 76:5, 77:20, 136:25, 151:2, 151:14
Hispanic [6] - 52:5, 52:8, 52:13, 52:16, 52:19, 147:6
Hispanics [2] - 52:4, 126:10
historical [1] - 98:10
historically [2] - 73:6, 97:16
history [2] - 51:6, 130:20
hit [1] - 113:17
hmm [13] - 21:6, 30:16, 44:8, 49:15, 61:7, 65:25, 70:16, 74:1, 91:11, 98:6, 112:22, 127:20, 143:8
hold [4] - 57:20, 63:16, 80:10
holy [1] - 63:16
home [14] - 29:4, 33:14, 33:23, 49:24, 52:17, 58:10, 58:13, 60:13, 71:2, 122:10, 124:24, 144:18, 146:11, 146:14
hopped [1] - 127:21
hospice [1] - 122:10
Hospital [2] - 49:6, 68:2
hospital [19] - 18:1, 18:2, 19:6, 33:22, 37:25, 41:1, 47:20, 54:10, 54:18, 55:19, 56:12, 56:13, 56:14, 57:11, 126:20, 128:7, 131:22, 140:25, 144:19
hour [5] - 7:13, 11:18, 12:2, 12:6, 146:6
hourly [7] - 12:1, 12:3, 29:6, 29:10, 48:7, 52:5, 68:21
hours [14] - 7:10, 50:5, 52:2, 63:17, 69:20, 69:23, 69:24, 69:25, 70:21, 71:1, 131:14, 146:2, 146:7, 146:8
house [12] - 11:20, 34:16, 37:2, 40:22, 41:2, 56:2, 56:6, 60:25, 68:6, 69:2, 69:3, 145:22
housecleaning [5] - 29:10, 69:8, 69:9, 69:13, 126:22
household [30] - 31:2, 34:17, 35:15, 51:22, 52:1, 52:10, 61:23, 68:18, 69:7, 69:15,

69:17, 69:21, 70:5, 71:5, 75:6, 75:20, 80:20, 81:5, 115:15, 119:23, 121:1, 121:6, 121:7, 121:8, 121:22, 145:21, 145:25, 146:13, 146:21, 147:14
housekeeper [1] - 47:14
houses [3] - 35:12, 35:18, 71:1
housing [2] - 58:2, 58:4
hundred [3] - 21:18, 28:6, 28:21
husband [3] - 37:4, 46:20, 51:13, 58:15, 58:20, 59:22, 138:23, 139:13
husband's [5] - 29:19, 29:21, 31:12, 49:12, 50:9
hypothesis [1] - 101:19

I

Idaho [7] - 10:13, 88:6, 90:11, 93:23, 144:18, 150:8, 150:23
IDAHO [1] - 150:3
idea [2] - 29:7, 39:6
ideally [1] - 115:6
ideas [1] - 86:25
identification [5] - 5:10, 12:13, 13:5, 14:2, 17:12
identify [2] - 12:15, 14:4
Ill [2] - 1:14, 2:18
illness [1] - 101:16
imagine [1] - 78:23
impact [5] - 41:2, 101:14, 102:5, 103:8, 129:23
impacted [1] - 102:21
impacts [1] - 129:4
important [8] - 25:25, 103:5, 122:13, 122:19, 122:20, 122:21
IN [2] - 1:1, 150:18
Inc [4] - 2:7, 2:18, 3:2, 5:5
INC [3] - 1:13, 1:14, 1:15
incident [3] - 48:24, 82:10, 126:11
include [6] - 55:4, 55:8, 55:10, 55:12, 55:13, 79:18, 81:5, 143:14
included [22] - 27:18, 36:22, 36:23, 37:1, 37:12, 37:15, 37:17, 42:21, 42:23, 55:7,

73:1, 76:22, 77:6, 79:7, 79:12, 82:24, 83:20, 104:25, 109:12, 132:4, 134:1, 143:11
includes [3] - 132:11, 143:6, 143:9
including [1] - 58:21
income [109] - 17:21, 18:1, 18:2, 18:3, 19:5, 19:11, 23:4, 23:14, 24:9, 26:6, 27:6, 27:15, 27:18, 29:15, 31:22, 32:4, 37:1, 37:18, 37:20, 37:24, 38:10, 39:25, 40:21, 41:1, 48:3, 54:21, 55:14, 55:20, 56:12, 56:13, 56:14, 60:10, 60:12, 61:20, 61:22, 63:11, 63:12, 63:13, 63:17, 63:19, 63:23, 64:21, 64:22, 65:2, 65:4, 65:18, 66:20, 67:8, 68:1, 69:12, 74:7, 98:14, 98:22, 101:3, 105:21, 106:22, 112:12, 112:20, 112:24, 113:10, 113:13, 113:14, 114:14, 114:25, 115:2, 115:14, 115:23, 116:18, 117:12, 117:20, 117:23, 118:15, 119:25, 125:20, 132:2, 132:4, 134:2, 137:5, 137:8, 137:12, 137:14, 137:15, 137:16, 137:25, 138:14, 138:15, 138:22, 139:1, 139:3, 139:8, 139:18, 139:19, 139:20, 140:5, 140:6, 140:7, 140:18, 140:19, 140:20, 140:22, 140:24, 141:7, 141:23, 142:3, 142:8, 142:10, 145:9
incomes [1] - 92:11
incomplete [1] - 107:5
increase [6] - 38:14, 49:13, 49:19, 50:10, 50:20, 74:19
increased [2] - 73:21, 74:18
incurred [6] - 25:7, 25:8, 27:11, 27:12, 33:7, 114:9
incurring [1] - 22:5
indeed [1] - 29:18
index [1] - 74:14
indicate [2] - 38:24, 121:2
indicated [6] - 42:11, 42:18, 65:19, 117:1, 137:1, 151:10
indicates [1] - 148:4
indicating [1] - 18:20
indicating) [3] - 15:7, 67:13, 87:9

indication [11] - 45:3, 101:11, 102:14, 102:20, 128:8, 129:7, 130:17, 130:24, 131:1, 131:4, 131:22
indications [1] - 120:3
individual [12] - 1:10, 1:12, 11:15, 45:10, 81:22, 83:21, 97:19, 99:14, 123:3, 125:17, 143:4, 147:12
individual's [2] - 92:17, 103:5
individuals [6] - 66:15, 86:3, 123:17, 129:1, 138:7, 139:14
inflate [2] - 22:17, 22:22
inflated [7] - 22:20, 22:21, 22:22, 35:3, 35:5, 47:25, 54:16
inflation [6] - 110:16, 111:11, 111:12, 111:18, 114:17, 116:1
influence [1] - 102:19
information [61] - 9:1, 14:6, 19:15, 20:15, 20:16, 24:13, 25:4, 25:6, 25:7, 26:7, 26:9, 27:19, 30:23, 34:4, 35:1, 36:13, 36:17, 43:13, 44:25, 47:8, 48:12, 51:8, 52:11, 55:17, 62:20, 66:13, 71:3, 78:2, 78:6, 86:12, 86:13, 90:16, 96:19, 97:24, 102:4, 102:6, 102:11, 103:10, 103:12, 105:8, 105:16, 105:18, 106:4, 106:17, 106:25, 107:6, 107:7, 107:25, 119:19, 129:8, 130:18, 131:1, 131:24, 133:20, 135:21, 135:22, 145:11, 145:15, 145:16, 145:18
Information [1] - 4:16
initial [7] - 15:9, 20:12, 20:21, 22:24, 78:10, 83:9, 115:1
injured [3] - 81:19, 92:9, 125:18
injury [7] - 81:9, 81:16, 81:17, 81:18, 81:23, 92:13, 123:23
input [1] - 87:2
inquiring [1] - 103:4
instance [5] - 5:4, 82:14, 85:9, 98:3, 112:16
insurance [4] - 43:8, 43:9, 143:10, 144:14
intend [3] - 86:1, 86:3, 86:14
interchangeable [2] - 95:23, 96:13

interchangeably [1] - 98:2
interest [6] - 22:1, 22:2, 22:6, 22:10, 72:6, 113:18
interested [1] - 150:16
international [1] - 96:10
internet [1] - 78:6
interviewed [1] - 103:15
introducing [1] - 7:17
invest [1] - 73:2, 74:8, 110:9, 110:21, 113:2, 113:4, 113:22, 116:8, 118:19, 119:9, 119:12
investing [1] - 95:7
involved [2] - 111:11, 125:13
IRS [1] - 33:8
issue [1] - 60:3
issued [1] - 76:14
issues [5] - 38:23, 101:12, 101:13, 109:11, 123:6
Item [2] - 43:12, 76:17
item [8] - 17:20, 26:5, 33:1, 39:25, 44:12, 45:20, 119:24
itemize [1] - 40:2, 40:4
itemized [1] - 40:13
items [5] - 61:3, 81:23, 81:1, 123:20, 129:22

## J

Jackson [4] - 1:21, 2:5, 2:16, 144:19
January [2] - 62:13, 106:23
Jersey [1] - 1:14
jmcgill@fbmjlaw.com [1] - 2:22
JOANNA [1] - 1:3
Joanna [3] - 18:20, 45:21, 46:25
job [1] - 55:2, 55:15, 63:18, 128:4, 128:20, 130:21, 130:23, 130:24, 131:6, 131:8, 131:10, 131:12, 131:14, 131:15, 146:14
jobs [6] - 50:3, 51:2, 52:17, 55:1, 63:19, 146:11
John's [1] - 47:14
joint [3] - 105:22, 105:23, 140:16
jointly [1] - 140:11
Joseph [2] - 2:19, 76:5
journal [3] - 76:19, 90:3, 116:15
Journal [1] - 102:13
Jr [1] - 47:1
jtiedeken@mtslegal.

net [1] - 2:11
Juanita [3] - 8:21, 46:23, 139:12
judge [3] - 6:12, 99:11, 99:18
Juip [1] - 2:20
Julie [1] - 2:8
junk [1] - 111:8
jury [3] - 6:12, 17:18, 19:19
jury's [1] - 21:4

## K

kate@meadlaw.net [1] - 2:17
Katherine [1] - 2:14
keeping [2] - 13:8, 131:12
keeps [1] - 102:16
Keko [1] - 46:20
Key [1] - 4:15
key [4] - 73:4, 107:25, 117:24, 121:5
killed [1] - 81:19
kind [4] - 44:20, 120:11, 137:20, 145:22
knowing [3] - 124:16, 145:7, 147:9
knowledge [5] - 38:21, 44:24, 46:18, 51:3, 100:14
known [1] - 101:23

## L

LA [1] - 5:18
Labor [2] - 102:16, 102:18
laborer [1] - 31:23
landing [1] - 127:9
lands [1] - 92:18
landscaping [2] - 35:13, 35:17
laptop [1] - 84:5
large [1] - 147:14
last [18] - 5:14, 5:16, 8:7, 9:5, 9:7, 10:17, 14:24, 51:7, 53:4, 72:9, 73:12, 74:5, 74:17, 85:19, 99:2, 99:3, 99:5, 99:6
lastly [1] - 32:18
lasts [1] - 123:7
LaVall [1] - 5:15
Law [1] - 3:4
law [1] - 100:14
lawsuit [2] - 5:23, 80:4
lawyer [6] - 7:16, 7:18, 7:20, 7:21, 7:24, 8:2
lay [1] - 83:21
lead [1] - 96:7
least [2] - 13:8, 36:12
leave [2] - 11:20, 17:8
leaves [1] - 46:20

leaving [1] - 33:22
left [4] - 17:3, 21:14, 33:22, 88:1
left-hand [1] - 21:14
legal [1] - 43:4
legally [4] - 42:24, 132:18, 133:2, 133:7
leisure [1] - 121:17
length [3] - 127:18, 131:8, 131:10
less [4] - 30:20, 64:13, 72:19, 130:16
level [10] - 48:24, 63:11, 63:12, 65:2, 65:3, 98:18, 126:15, 137:25, 138:14, 138:22
levels [1] - 134:2
Lewis [24] - 2:3, 4:20, 8:4, 10:15, 18:20, 28:22, 37:13, 45:12, 77:14, 78:4, 78:7, 78:8, 78:14, 80:4, 85:6, 86:15, 103:9, 103:19, 106:12, 106:18, 107:12, 107:18, 109:15, 136:8
LEWIS [13] - 16:2, 16:7, 16:17, 17:2, 25:12, 25:15, 28:11, 28:13, 28:16, 28:24, 66:4, 136:18, 147:20
Lewis' [1] - 78:24
library [1] - 120:19
licensure [1] - 90:6
life [22] - 10:4, 10:10, 49:7, 75:11, 80:25, 81:10, 81:17, 82:6, 97:18, 102:1, 102:22, 102:25, 106:19, 108:23, 109:5, 114:13, 122:7, 122:23, 123:1, 123:18, 123:19, 124:14
lifetime [1] - 71:7
likelihood [1] - 131:12
likely [5] - 35:14, 79:14, 113:19, 130:15, 130:16
limit [1] - 101:16
limited [1] - 104:16
Lincoln [1] - 3:4
line [2] - 12:9, 39:25, 44:11, 118:9
list [4] - 18:12, 88:19, 106:11, 143:6
listed [3] - 89:17, 121:11, 139:12
listing [1] - 137:20
literature [1] - 104:13
live [2] - 34:19, 59:16
lived [2] - 58:18, 59:19
living [6] - 47:4, 49:23, 62:1, 62:5, 64:7, 139:15
Livonia [1] - 2:21
LLC [1] - 2:9
local [2] - 129:19, 130:16

locally [1] - 129:14
Log [1] - 4:14
Logan [1] - 120:7
logical [1] - 64:11
long-term [2] - 122:9, 123:6
look [34] - 6:21, 24:2, 28:9, 31:12, 32:4, 41:22, 52:13, 53:13, 53:24, 54:3, 61:22, 74:12, 74:23, 76:10, 76:12, 96:4, 97:16, 97:18, 102:7, 102:12, 103:7, 105:24, 109:22, 111:23, 112:1, 112:4, 112:8, 126:18, 130:13, 132:14, 133:6, 139:9, 140:6
looked [2] - 20:19, 28:8, 37:15, 43:20, 49:14, 55:18, 86:10, 86:11, 143:24
looking [1] - 14:23, 42:4, 43:10, 48:5, 56:6, 58:10, 59:13, 59:14, 61:11, 67:12, 73:10, 95:21, 108:9, 115:15, 127:1, 128:12, 128:13, 131:7
looks [2] - 13:9, 35:5
loose [1] - 16:21
loss [10] - 30:11, 32:24, 56:20, 69:15, 99:16, 120:25, 125:15, 125:25, 137:2, 137:13
losses [2] - 6:25, 22:1, 22:5, 54:6, 54:8, 57:10, 83:16, 124:24
Losses [2] - 56:10, 119:1
lost [5] - 80:25, 98:14, 126:17, 126:18, 126:19
low [2] - 115:18
lower [3] - 91:16, 112:11, 116:6
lump [1] - 115:7
Luna [2] - 46:23, 47:10

## M

M&G [4] - 1:15, 3:2, 5:5, 5:22
mail [1] - 18:19, 19:16, 24:5, 45:20, 78:9, 78:12, 79:8, 79:11, 79:12, 121:18
mails [5] - 4:20, 78:13, 78:19, 78:21, 148:24
maintained [1] - 16:4
major [2] - 94:2, 94:3
management [2] - 91:5, 92:25
managerial [1] - 91:21
marginal [2] - 117:22, 119:20

marital [1] - 126:8
mark [5] - 5:8, 12:10, 13:3, 13:24, 17:10
marked [13] - 5:9, 12:12, 13:4, 14:1, 16:18, 17:11, 17:14, 23:18, 82:16, 82:20, 87:10, 87:11, 121:4
market [9] - 94:6, 96:4, 96:6, 96:10, 110:15, 128:4, 128:20, 129:16, 129:25
marketing [1] - 91:5
marriage [1] - 150:14
match [7] - 73:5, 111:24, 113:12, 115:7, 115:8, 116:3, 116:4
material [2] - 8:17, 86:14
materials [1] - 109:2
matter [7] - 9:8, 78:3, 83:25, 97:7, 150:10, 150:15, 150:17
McGill [20] - 2:19, 4:5, 8:3, 76:2, 76:4, 76:5, 76:11, 78:16, 78:19, 78:23, 79:4, 79:10, 79:20, 79:24, 80:2, 115:4, 118:22, 118:24, 136:15, 149:3
McKellar [1] - 2:9
MEAD [1] - 149:2
Mead [3] - 2:14, 2:14
mean [21] - 20:5, 21:12, 28:11, 50:16, 58:13, 59:24, 61:19, 63:25, 65:3, 66:11, 72:9, 96:20, 103:3, 106:23, 108:17, 117:11, 124:7, 129:14, 134:15, 136:2
mean.. [1] - 61:18
meaning [1] - 11:10
means [7] - 42:13, 86:20, 91:10, 112:19, 125:15, 136:6
measure [1] - 96:11
MECHANICAL [1] - 1:13
Mechanical [1] - 2:7
median [1] - 68:24
medical [13] - 25:7, 27:10, 38:22, 39:6, 40:11, 40:15, 40:23, 82:23, 85:25, 86:12, 109:10, 123:6, 123:7
Medical [1] - 47:14
Medicare [2] - 43:7, 122:15
meet [2] - 64:8, 143:20
members [5] - 18:11, 47:9, 103:15, 121:8, 121:9
mention [1] - 23:21
mentioned [13] -

23:11, 23:12, 28:22, 46:3, 74:24, 100:20, 101:2, 113:1, 113:20, 116:6, 123:16, 126:19, 147:5
met [2] - 65:12, 103:22
metaphorically [1] - 127:8
methodology [3] - 104:8, 104:15, 105:5
Methodology [1] - 52:22
metrics [1] - 96:22
Metzger [1] - 2:20
Michigan [2] - 2:21, 130:3
microeconomics [1] - 89:12
middle [1] - 5:16
might [6] - 41:2, 82:18, 95:7, 101:13, 117:19, 118:22
Mile [1] - 2:20
mile [1] - 33:13
mileage [2] - 33:14, 33:23
miles [1] - 35:23
mind [1] - 136:14
minute [3] - 57:20, 147:21
minutes [2] - 7:13, 136:18
mirror [4] - 127:10, 127:14, 127:22, 128:12
misspoke [3] - 14:12, 37:19, 69:4
Mister [1] - 5:19
mitigate [1] - 125:25
mitigating [3] - 125:19, 125:22, 126:4
mitigation [2] - 125:15, 125:17
model [3] - 82:8, 96:22, 123:20
modeling [1] - 104:23
moment [1] - 8:21
momentarily [1] - 41:7
money [16] - 22:1, 26:20, 31:25, 34:24, 37:8, 42:2, 63:23, 67:10, 72:12, 72:16, 72:19, 74:4, 74:6, 111:7, 111:10, 119:8
Monica [3] - 4:11, 5:24, 137:22, 138:8, 138:13, 142:2, 142:3, 142:22, 143:18, 144:1, 144:8, 144:24, 145:8
MONICA [1] - 1:5
Monica's [7] - 18:11, 47:10, 139:8, 140:5, 140:8, 140:22, 140:24
month [7] - 72:25, 107:4, 110:4, 110:6, 113:3, 113:22, 119:12

monthly [1] - 9:25
months [8] - 9:24, 24:25, 55:23, 55:24, 73:2, 99:2, 99:3
morning [3] - 8:13, 87:11, 136:13
mortgage [4] - 40:9, 60:13, 60:15, 60:25
mortis [2] - 39:8, 39:10
most [5] - 10:7, 79:14, 120:10, 148:14, 148:22
mother [4] - 46:21, 46:23, 49:24, 58:21
mouth [1] - 64:7
move [10] - 21:23, 58:23, 58:24, 59:3, 59:4, 59:10, 59:11, 76:1, 98:12, 123:22
moved [1] - 22:4
moving [1] - 130:25
MR [77] - 5:8, 5:12, 8:3, 8:6, 12:10, 12:14, 13:3, 13:6, 14:3, 15:25, 16:2, 16:5, 16:7, 16:9, 16:13, 16:15, 16:17, 16:18, 16:20, 17:1, 17:2, 17:4, 17:10, 17:13, 25:12, 25:14, 25:15, 25:17, 25:19, 28:11, 28:12, 28:13, 28:15, 28:16, 28:20, 28:24, 28:25, 29:22, 30:1, 31:15, 31:16, 32:10, 32:11, 32:15, 32:17, 46:10, 46:11, 46:14, 66:4, 66:7, 67:15, 75:24, 76:2, 76:4, 76:11, 78:16, 78:19, 78:23, 79:4, 79:10, 79:24, 80:2, 115:4, 118:22, 118:24, 136:15, 136:18, 147:20, 147:21, 147:23, 148:25, 149:3, 149:5, 149:10, 149:12, 149:17
MS [9] - 16:11, 16:14, 67:12, 136:19, 136:21, 136:24, 147:19, 149:1, 149:2
multiplier [1] - 122:1
multiply [2] - 55:23, 70:10

### N

name [9] - 5:13, 5:14, 5:17, 5:21, 46:11, 76:5, 104:7, 120:14, 120:23
names [1] - 100:7
narration [1] - 74:21
national [15] - 41:16, 45:8, 58:6, 63:9, 63:12, 70:22, 129:21, 130:1, 130:15, 131:25, 135:23, 137:24, 138:13, 143:3, 146:23

National [1] - 19:17
nature [2] - 90:25, 97:3
near [2] - 147:4, 147:17
necessarily [1] - 113:22
necessary [1] - 6:7
need [2] - 92:6, 108:1, 133:20
negative [2] - 121:25, 122:1
net [7] - 31:19, 32:7, 32:22, 56:16, 73:11, 104:9, 112:1
network [1] - 49:7
never [5] - 34:2, 36:10, 64:2, 65:10, 65:12
New [1] - 1:14, 1:15
new [1] - 130:21
next [3] - 47:12, 71:15, 136:22
nickle [2] - 149:14
nieces [8] - 47:3, 47:6, 47:11, 58:21, 58:23, 59:16, 59:19, 62:5
nobody [1] - 62:4
nobody's [1] - 63:25
non [2] - 121:8, 121:24
none [2] - 110:13, 124:4
normal [7] - 47:25, 81:8, 81:21, 102:1, 125:20, 125:25, 135:11
Notary [1] - 1:25, 150:7, 150:23
note [2] - 66:20, 112:7
notebook [1] - 29:23
noted [1] - 27:12
nothing [7] - 38:24, 45:2, 114:25, 137:12, 145:9, 147:20, 149:1
notice [7] - 10:20, 12:19, 14:20, 20:6, 20:22, 21:13, 76:13
noticed [1] - 43:18
November [3] - 18:21, 24:21, 148:4
NOWAK [1] - 150:23
Nowak [1] - 1:24
nowhere [2] - 147:4, 147:17
Number [2] - 71:18, 143:25
number [35] - 8:10, 10:23, 17:20, 18:10, 22:3, 24:2, 26:12, 32:25, 42:11, 45:8, 45:25, 49:2, 55:23, 56:1, 56:16, 57:17, 64:18, 65:7, 66:5, 66:9, 69:1, 75:6, 99:1, 118:10, 119:1, 119:2, 119:14, 123:13, 128:8, 132:24, 133:3, 133:12, 133:21, 139:10, 143:3

numbered [11] - 18:16, 18:19, 30:2, 33:1, 45:20, 46:9, 54:7, 56:9, 56:15, 67:21, 68:16
numbers [21] - 6:17, 21:8, 21:12, 22:8, 22:17, 52:3, 53:23, 56:7, 58:6, 68:12, 70:22, 72:3, 105:11, 108:25, 129:21, 130:1, 131:25, 135:23, 146:4, 146:23, 146:24
Nye [1] - 2:8

### O

oath [1] - 6:11
obituary [4] - 18:17, 18:18, 46:19, 78:5
object [1] - 25:12
obligation [2] - 149:7
observation [2] - 106:7, 106:25
obtain [2] - 114:14, 116:2
obtained [1] - 88:16
obtaining [2] - 81:16, 115:23
occasion [1] - 92:6
October [4] - 77:15, 148:15, 148:18
OF [9] - 1:1, 1:18, 4:18, 150:3, 150:4, 151:1, 151:17, 151:18
office [3] - 76:14, 78:24, 78:25
often [3] - 53:16, 85:10, 88:24
oftentimes [1] - 85:2
old [3] - 46:15, 62:10
older [2] - 62:12, 71:10
once [6] - 60:4, 98:21, 99:7, 99:10, 135:17
one [57] - 8:4, 9:3, 9:5, 9:19, 13:15, 14:4, 15:6, 15:9, 15:15, 15:16, 15:18, 19:13, 19:24, 21:23, 22:21, 24:14, 25:18, 26:12, 27:25, 28:1, 29:14, 32:25, 35:13, 42:14, 57:6, 59:1, 59:10, 59:19, 60:9, 60:14, 61:3, 65:7, 71:15, 76:7, 84:1, 84:12, 87:9, 95:11, 97:16, 100:4, 100:10, 100:12, 102:9, 106:21, 107:4, 113:8, 120:4, 120:7, 126:12, 138:12, 145:3, 146:4, 146:6, 147:7
ones [14] - 42:23, 47:4, 80:22, 81:12, 84:1, 91:14, 93:24, 102:17, 104:5, 106:16, 108:24,

**10**

120:13, 129:19
 open [4] - 99:8, 99:10, 99:21, 108:11
 operation [1] - 91:5
 operations [1] - 91:4
 opinion [5] - 76:20, 77:9, 103:25, 105:7, 148:13
 opinions [2] - 51:19, 86:18
 opportunity [1] - 108:13
 opposed [6] - 15:19, 71:12, 81:19, 99:16, 135:6, 147:6
 option [1] - 47:10
 or.. [1] - 94:11
 oral [1] - 151:9
 order [1] - 117:10
 organizational [1] - 121:16
 original [1] - 13:18
 Osceola [1] - 130:2
 otherwise [1] - 48:21
 outcome [1] - 150:16
 outlining [1] - 16:12
 outreach [1] - 115:20
 outside [8] - 12:4, 52:17, 71:2, 84:25, 87:23, 94:17, 146:11, 146:14
 overall [1] - 84:4
 own [1] - 108:8, 109:7

**P**

P&Ls [1] - 30:15
 p.m [1] - 149:18
 P.O [3] - 2:4, 2:9, 2:15
 package [5] - 132:10, 132:17, 132:20, 133:25, 134:6
 Page [3] - 4:3, 4:10, 4:19
 page [31] - 6:17, 6:18, 6:21, 23:18, 23:19, 23:23, 23:24, 23:25, 24:7, 30:8, 39:23, 45:17, 45:19, 47:12, 51:22, 52:20, 56:9, 57:1, 67:21, 69:5, 69:10, 71:14, 72:25, 75:22, 76:17, 106:14, 133:12
 pages [2] - 6:23, 151:5
 paid [8] - 17:7, 17:24, 23:16, 28:2, 31:9, 37:8, 122:7, 124:15, 141:2
 paper [11] - 19:24, 20:1, 79:13, 86:23, 86:24, 87:3, 88:24, 88:25, 92:24
 papers [7] - 86:20, 87:4, 88:20, 88:22, 89:2, 89:24, 93:7

paragraph [19] - 27:13, 45:25, 46:9, 47:13, 48:11, 48:15, 48:22, 51:23, 52:25, 54:6, 56:1, 56:9, 56:15, 56:16, 68:1, 68:16, 69:10, 69:11, 71:4
 part [19] - 12:2, 31:21, 33:21, 35:10, 47:12, 92:14, 93:5, 97:5, 106:13, 111:23, 115:1, 119:22, 121:3, 123:16, 125:8, 126:20, 129:19, 132:6, 140:4
 participant [1] - 134:17
 participation [1] - 42:16
 particular [2] - 81:12, 148:7
 parties [1] - 150:15
 pass [3] - 29:22, 75:24, 136:15
 passed [3] - 39:14, 101:23, 134:17
 past [23] - 22:1, 22:5, 36:14, 53:5, 54:8, 68:18, 69:2, 69:7, 69:8, 69:9, 69:14, 70:4, 80:18, 80:19, 97:11, 97:23, 98:7, 98:9, 107:10, 128:13, 128:15
 Past [1] - 56:9
 Paul [8] - 10:21, 13:18, 116:14, 120:4, 120:5, 120:6, 120:15
 pay [18] - 26:16, 42:9, 42:17, 67:17, 98:23, 111:6, 111:9, 117:12, 117:23, 118:9, 118:12, 119:8, 119:12, 122:11, 134:23, 134:24, 140:5, 149:7
 payee [1] - 135:17
 paying [2] - 118:16, 118:19
 payment [4] - 60:14, 60:15, 118:18, 144:12
 payments [3] - 113:14, 118:11, 145:12
 payout [1] - 135:3, 135:12
 PDF [3] - 79:4, 79:5, 79:7
 peer [5] - 89:18, 89:21, 89:22, 89:23, 89:25
 peer-reviewed [5] - 89:18, 89:21, 89:22, 89:23, 89:25
 pending [1] - 99:24
 people [10] - 18:12, 34:18, 58:13, 62:1, 65:17, 75:6, 92:9, 138:2, 138:3
 per [5] - 70:11, 70:12, 70:13, 91:21, 92:13

percent [55] - 2:13, 26:5, 37:21, 38:10, 41:1, 41:14, 48:17, 50:18, 53:8, 56:11, 57:14, 58:2, 58:8, 59:16, 59:18, 59:24, 60:24, 61:4, 61:15, 61:16, 61:22, 61:24, 62:16, 68:11, 71:20, 72:1, 72:23, 73:19, 73:20, 73:21, 73:22, 74:16, 75:13, 98:22, 101:7, 112:6, 112:7, 113:3, 113:23, 114:15, 116:8, 119:21, 140:21, 141:1, 141:3, 141:4, 141:6, 141:8, 141:11, 141:18, 141:19, 141:20, 141:23, 142:9
 percentage [15] - 37:19, 41:11, 60:23, 60:24, 61:2, 64:24, 65:13, 68:9, 71:9, 75:3, 101:6, 140:16, 141:15, 141:17, 141:20
 percentages [4] - 50:16, 50:17, 53:14, 57:5
 perhaps [1] - 122:25
 period [13] - 20:20, 20:21, 21:14, 21:16, 73:3, 107:2, 112:8, 114:2, 115:10, 116:5, 123:8, 142:14, 142:23
 person [2] - 24:8, 137:11
 personal [18] - 56:17, 56:20, 57:6, 57:14, 61:23, 68:9, 74:22, 74:23, 74:24, 119:4, 121:13, 141:5, 143:6, 143:10, 143:21, 146:6, 144:9, 144:23
 personally [10] - 31:22, 137:6, 137:7, 137:22, 137:25, 138:2, 144:2, 144:25, 145:4, 145:8
 Ph.D [2] - 1:19, 5:3
 Ph.D [5] - 4:3, 4:11, 87:22, 151:2, 151:14
 phenomenal [1] - 72:7
 phone [6] - 8:11, 31:14, 32:9, 32:14, 78:9, 78:11
 phrase [1] - 11:11
 picking [1] - 117:9
 picture [1] - 18:16
 piece [2] - 19:24, 20:1
 place [7] - 8:12, 23:15, 84:24, 116:7, 127:13, 151:10
 places [3] - 33:4, 33:9, 110:21
 plaintiff [6] - 7:19, 9:13, 9:14, 9:17, 9:25,

10:8
 plaintiff's [1] - 7:15
 plaintiffs [1] - 10:5
 Plaintiffs [2] - 1:7, 2:2
 plan [13] - 42:12, 43:12, 43:16, 43:19, 66:17, 131:23, 134:12, 134:15, 134:21, 134:25, 135:6, 135:7, 135:13
 planning [1] - 42:22
 pleadings [1] - 86:7
 PLLC [1] - 2:20
 pocket [1] - 40:12
 point [14] - 21:22, 27:4, 27:10, 54:4, 82:21, 83:13, 86:5, 106:8, 106:25, 114:11, 118:20, 120:16, 138:5, 141:20
 politicians [1] - 65:21
 Poncho [1] - 47:1
 portal [1] - 11:9, 11:11, 11:12
 portion [33] - 10:10, 10:14, 36:24, 57:23, 61:20, 61:25, 66:22, 67:2, 67:3, 72:8, 80:23, 90:10, 98:4, 98:7, 101:3, 107:16, 118:14, 122:14, 122:15, 122:19, 122:21, 133:6, 135:9, 137:8, 137:16, 138:14, 139:4, 139:6, 139:7, 140:12, 140:25, 143:1, 145:11
 portions [1] - 132:18
 positive [2] - 122:2, 122:3
 possession [1] - 77:3
 possible [1] - 19:13
 potential [1] - 102:12
 potentially [7] - 41:3, 102:4, 102:19, 103:8, 105:24, 124:16, 134:14
 power [2] - 74:4, 74:6
 practice [1] - 116:10
 pre [1] - 120:2
 pre-tax [1] - 120:2
 prefer [1] - 79:24
 preference [2] - 16:2, 79:10
 prejudgement [1] - 22:10
 prejudgment [1] - 22:6
 preliminary [6] - 6:23, 25:5, 82:16, 82:21, 82:22, 84:18, 87:7, 87:9
 Preliminary [1] - 4:11
 preparation [6] - 7:3, 7:5, 11:25, 12:2, 14:22, 89:15
 prepare [4] - 85:6, 85:8, 109:4, 135:24
 prepared [4] - 87:4, 87:8, 90:2, 98:14
 preparing [3] - 87:18,

103:25, 104:19
 Present [1] - 118:25
 present [18] - 20:3, 20:22, 20:25, 21:16, 21:21, 57:10, 68:5, 71:4, 80:18, 83:8, 83:15, 85:5, 88:24, 112:13, 114:8, 118:18, 127:6, 128:2
 presentation [2] - 88:23, 95:4
 presentations [7] - 88:20, 88:22, 89:4, 89:21, 89:22, 93:11, 98:13
 presented [2] - 98:25, 107:11
 pressed [1] - 127:23
 presumably [2] - 37:8, 39:8
 presume [1] - 33:4
 pretax [8] - 117:15, 117:16, 117:25, 118:1, 118:5, 118:7, 139:1, 139:3
 pretty [2] - 87:20, 113:7
 previous [3] - 73:15, 126:20, 135:4
 previously [1] - 9:6
 price [2] - 74:13, 113:11
 prices [2] - 74:14, 74:18
 primaries [1] - 91:6
 primarily [4] - 10:20, 82:23, 94:5, 121:21
 primary [2] - 80:22, 120:13
 principle [1] - 132:23
 principles [3] - 19:20, 89:12, 98:19
 pro [1] - 2:19
 probabilities [6] - 108:22, 108:24, 109:1, 109:5, 109:8, 123:15
 probability [2] - 108:20, 108:23
 probe [1] - 96:1
 problem [6] - 26:10, 33:24, 40:19, 66:9, 66:11, 79:22
 problems [1] - 124:10
 proceeding [5] - 88:21, 89:2, 89:24, 92:24, 93:7
 proceedings [6] - 88:20, 88:24, 100:22, 116:16, 150:9, 150:12
 process [1] - 109:20
 produce [4] - 78:16, 78:19, 78:21, 87:1
 produced [6] - 84:8, 84:13, 88:25, 89:1, 147:24, 148:1
 PRODUCTION [1] -

4:18
  productivity [1] - 92:18
  products [1] - 31:3
  profession [1] - 77:12
  professional [10] -
10:4, 10:10, 10:14,
88:20, 88:22, 88:23,
89:3, 93:11, 98:16,
98:25
  professor [1] - 10:12
  profit [8] - 30:11,
31:19, 32:7, 32:22,
32:24, 50:15, 50:17,
50:21
  profit/loss [4] - 37:4,
37:5, 49:21, 50:14
  programs [2] - 48:16,
104:19
  project [1] - 95:24
  projecting [1] - 126:17
  projection [8] - 95:18,
95:24, 96:14, 96:16,
96:24, 97:3, 126:22,
130:12
  projections [3] - 92:6,
96:17, 96:18
  proofs [1] - 79:22
  properties [1] - 148:3
  prove [1] - 24:19
  provide [10] - 19:15,
26:9, 27:21, 67:7, 87:2,
107:9, 112:16, 136:3,
136:8, 148:23
  provided [34] - 8:10,
15:5, 15:8, 15:9, 17:19,
17:22, 26:8, 27:19,
30:23, 31:3, 34:4,
34:16, 37:14, 45:1,
45:2, 45:3, 45:10, 47:8,
48:13, 51:20, 64:19,
78:6, 104:6, 105:9,
105:11, 115:14, 122:16,
128:20, 133:11, 134:23,
137:21, 146:24, 148:10,
148:23
  provides [1] - 67:7
  providing [11] - 43:3,
51:25, 108:25, 115:16,
119:25, 121:22, 128:5,
129:1, 129:6, 129:18,
131:24
  Providing [1] - 133:17
  public [1] - 80:10
  Public [3] - 1:25,
150:7, 150:23
  publication [1] - 90:2,
90:3, 92:23
  publications [5] - 89:6,
89:7, 89:8, 89:23, 93:14
  pull [2] - 78:5, 139:7
  pulled [1] - 7:6, 61:9,
62:23, 121:9
  punitive [3] - 136:1,
136:3, 136:4
  purchasing [1] - 121:6

pure [2] - 54:3, 94:21
purpose [2] - 20:1,
80:5
purposes [4] - 15:19,
37:10, 63:3, 101:19
pursuant [1] - 14:20
pursue [1] - 102:10
put [16] - 6:11, 16:9,
35:23, 42:15, 45:9,
64:23, 65:18, 67:1,
68:3, 107:19, 107:21,
127:22, 127:23, 138:14,
138:23, 142:16
putting [3] - 26:12,
64:10, 66:2

## Q

qualified [1] - 135:18
questions [11] - 31:8,
67:20, 76:7, 82:17,
109:15, 118:23, 120:21,
131:19, 137:1, 149:2,
149:3
quick [1] - 136:19
quickly [1] - 109:17
quit [1] - 13:8

## R

race [5] - 46:6, 71:12,
126:15, 127:8, 127:22
raise [1] - 55:8
raises [2] - 48:4, 48:6
ramp [1] - 99:16
ranch [1] - 99:15
Randal [5] - 10:21,
13:18, 116:15, 120:4,
120:5, 120:6, 120:11,
120:15
Randal's [1] - 120:14
Randall [1] - 2:10
range [5] - 10:24,
28:23, 53:16, 54:24,
64:14
rate [87] - 12:1, 12:3,
20:23, 20:24, 21:1,
21:2, 21:20, 21:21,
22:16, 22:19, 22:23,
22:24, 33:13, 48:7,
53:1, 53:7, 53:11,
53:13, 53:22, 68:21,
71:20, 71:24, 71:25,
72:1, 72:17, 72:21,
72:24, 73:3, 73:5, 73:6,
73:8, 73:9, 104:9,
109:23, 109:24, 110:1,
110:2, 110:4, 110:6,
110:12, 110:17, 111:13,
111:14, 111:24, 111:25,
112:4, 112:5, 112:10,
112:12, 112:17, 113:3,
113:5, 113:11, 113:21,
113:23, 113:24, 114:5,
114:7, 114:15, 115:17,
116:7, 116:10, 116:17,

116:22, 116:23, 116:24,
117:2, 117:2, 117:2,
119:17, 119:21, 125:19,
125:24, 126:8, 127:1,
127:2, 127:15, 130:14,
138:3, 138:4, 138:9,
138:10, 139:9, 139:17,
144:25
rates [13] - 72:7, 73:7,
109:16, 111:1, 113:7,
113:15, 113:18, 114:4,
116:6, 126:24, 127:15,
128:25, 129:11
rather [6] - 20:10,
22:17, 45:6, 52:7,
133:5, 135:15
Re [1] - 4:11
read [14] - 28:10, 51:9,
51:11, 51:18, 86:15,
114:23, 114:24, 120:20,
149:6, 149:10, 149:11,
151:4
reading [1] - 24:8
readjust [1] - 83:8
real [9] - 21:1, 22:16,
22:18, 22:23, 111:24,
114:13, 127:1, 127:14,
145:23
realistic [1] - 133:21
really [7] - 64:3, 65:17,
65:21, 98:18, 114:13,
115:21, 125:9
rearview [4] - 127:10,
127:14, 127:22, 128:12
reason [5] - 26:7, 45:5,
48:21, 60:8, 128:9
recalculate [1] - 85:4
receipts [1] - 32:20
receive [5] - 48:4,
120:10, 132:7, 135:17,
148:12
received [8] - 24:5,
45:7, 77:17, 78:3,
105:13, 106:18, 119:8,
148:14
receives [2] - 118:11,
118:17
recently [1] - 85:21,
110:20
Recess [1] - 136:20
Recession [1] - 73:23
recession [1] - 131:17
recognized [1] - 23:14
recommendations [1]
- 94:9
record [4] - 32:16,
136:21, 149:5, 150:11
Record [1] - 114:24
records [2] - 38:22,
137:18
redo [2] - 83:1
reduce [1] - 125:25
reduced [4] - 119:14,
125:19, 125:24, 131:13
reference [1] - 15:21

referenced [3] - 89:14,
104:8, 106:10
referencing [1] - 97:24
referring [3] - 82:12,
98:17, 106:13
reflect [2] - 45:10,
137:21
reflected [1] - 134:13
reflects [1] - 74:18
regard [2] - 137:5,
145:21
regarding [1] - 100:21
regional [1] - 129:24
regulations [3] - 33:8,
36:18, 76:18
rejected [4] - 90:4,
107:13, 107:16, 108:16
relate [2] - 98:13,
121:21
related [6] - 38:22,
78:3, 83:24, 92:13,
121:15, 150:14
relates [1] - 76:20,
77:8
relating [1] - 8:15
relative [1] - 93:11,
130:14
relatively [1] - 10:13
relevant [4] - 93:2,
93:7, 93:15, 105:18,
106:4, 107:13
religious [1] - 121:16
relying [1] - 105:6,
143:21
remains [2] - 44:4,
84:14
remember [2] - 13:14,
49:14
remind [1] - 99:1
rendered [1] - 148:13
repetitive [1] - 76:9
rephrase [1] - 6:4
replaced [1] - 125:12
replicate [1] - 94:7,
94:8, 125:10
replicates [2] - 16:23,
16:25, 17:8
Report [1] - 4:11
report [76] - 6:23, 7:1,
13:15, 14:9, 14:15,
14:16, 15:3, 15:12,
20:6, 20:7, 23:1, 23:11,
23:13, 23:17, 23:19,
23:20, 24:7, 24:12,
24:21, 25:5, 25:22,
27:13, 27:18, 27:22,
41:6, 41:8, 45:14,
45:18, 45:19, 46:7,
52:20, 54:20, 55:3,
57:2, 58:19, 62:23,
63:7, 64:5, 64:25,
67:19, 69:11, 74:21,
74:24, 75:5, 76:23,
81:1, 81:2, 82:16,
82:20, 82:22, 84:18,

86:1, 87:8, 87:10,
87:12, 87:18, 89:15,
102:8, 104:8, 105:2,
106:10, 107:5, 107:13,
107:16, 107:20, 108:22,
118:6, 121:1, 122:5,
122:20, 122:22, 123:14,
124:21, 126:9, 132:12,
132:25
reported [4] - 24:9,
37:20, 134:4, 150:9
REPORTER [1] - 1:24
Reporter [2] - 1:25,
150:6
REPORTER'S [1] -
150:1
reports [6] - 27:15,
53:19, 86:2, 105:1,
106:20, 108:21
represent [6] - 5:22,
22:7, 61:25, 76:6, 97:7,
127:10
representation [1] -
138:6
REPRESENTATIVES
[1] - 1:4
represented [2] - 7:22,
9:14
represents [13] -
21:24, 22:3, 22:9,
22:19, 22:21, 44:13,
44:18, 61:24, 113:24,
115:18, 139:1, 139:2,
141:4
REQUEST [1] - 4:18
request [1] - 107:25
Request [1] - 4:19
requested [2] - 25:23,
105:16
requests [1] - 76:17
required [5] - 42:24,
43:5, 132:18, 133:2,
133:7
requirement [1] -
123:7
requirements [1] -
90:6
residence [2] - 33:15,
34:10
respect [17] - 80:20,
81:15, 84:10, 87:5,
93:6, 102:21, 103:4,
105:3, 106:9, 115:22,
116:21, 120:25, 122:22,
126:6, 127:7, 131:20,
135:25
respective [3] - 21:19,
68:25, 92:22
respond [1] - 14:20
response [1] - 56:25
rest [3] - 75:16, 75:18,
145:10
result [1] - 93:10
resulting [2] - 92:16,
92:18

retain [1] - 130:24
retained [3] - 77:13, 80:5, 100:8
retainer [4] - 77:17, 77:22, 77:24, 77:25
retention [5] - 77:16, 80:16, 84:2, 84:25, 87:5
retire [3] - 49:5, 49:8, 120:9
retirement [13] - 42:12, 42:22, 43:4, 43:12, 43:16, 43:19, 66:17, 131:23, 132:9, 132:17, 133:2, 133:8, 133:24
return [6] - 11:23, 29:15, 30:6, 32:19, 106:1, 110:10
returns [18] - 18:7, 23:9, 23:13, 26:21, 26:24, 27:8, 36:11, 36:15, 38:13, 86:10, 86:11, 105:13, 105:22, 105:23, 115:9, 134:5, 134:13, 142:4
revenue [9] - 35:10, 36:23, 49:18, 50:12, 50:21, 92:12, 92:16, 92:17, 92:21
review [3] - 8:16, 86:14
reviewed [7] - 7:5, 7:6, 86:6, 89:18, 89:21, 89:22, 89:23, 89:25, 103:24, 104:1, 104:5, 105:3, 137:17, 145:19
revisions [2] - 6:6, 6:8
Richard [1] - 3:3
RICK [2] - 1:19, 5:3
rick [1] - 4:3
Rick [8] - 4:11, 4:13, 4:14, 4:16, 5:15, 9:24, 151:2, 151:14
right-hand [1] - 21:7
rigor [2] - 39:8, 39:10
ringing [3] - 31:14, 32:9, 32:14
risk [33] - 72:24, 95:2, 95:6, 95:14, 109:23, 109:24, 110:1, 110:2, 110:3, 110:11, 110:15, 110:16, 110:22, 110:25, 111:1, 111:4, 111:6, 111:11, 111:12, 111:14, 112:23, 113:7, 113:17, 113:24, 114:13, 115:18, 115:20, 115:22, 116:1, 116:7, 116:10, 116:17, 117:2
risk-free [15] - 72:24, 109:23, 109:24, 110:1, 110:2, 110:3, 110:22, 110:25, 111:14, 113:24, 115:20, 116:7, 116:10, 116:17, 117:2
risks [3] - 110:16, 111:12, 111:13

Road [2] - 2:15, 2:20
roughly [8] - 7:10, 24:8, 38:10, 41:1, 49:10, 61:4, 69:19, 133:5
Rule [2] - 4:16, 8:25
rules [1] - 149:8
run [1] - 109:16
runway [1] - 127:19

## S

salary [2] - 31:23, 47:18
sales [1] - 49:18
samples [1] - 147:14
save [3] - 62:25, 63:4, 79:13
saves [1] - 63:23
saving [1] - 61:20, 62:19
savings [27] - 43:4, 61:19, 61:21, 61:25, 62:18, 66:3, 66:18, 67:4, 67:5, 67:6, 67:7, 67:17, 75:18, 131:19, 133:8, 138:15, 138:18, 138:24, 139:4, 141:9, 141:24, 142:11, 142:16, 142:22, 143:2, 143:11, 143:19
saw [1] - 23:6
scenario [3] - 97:14, 98:5, 107:23
scenarios [2] - 123:10, 123:12
schedule [1] - 77:25
Schedule [7] - 30:9, 30:11, 31:12, 32:4, 32:20, 37:13, 37:16
school [2] - 19:1, 126:10
scientific [1] - 130:7
Scoggin [1] - 2:9
scope [2] - 80:15, 84:25
se [2] - 91:21, 92:13
seasonal [2] - 129:4, 129:9
second [6] - 21:23, 22:3, 22:4, 22:19, 22:21, 59:11, 63:16, 111:11
section [2] - 17:16, 89:7
security [1] - 113:25
Security [3] - 43:1, 43:7, 122:17
see [19] - 6:17, 6:19, 8:21, 14:18, 16:12, 22:25, 28:16, 33:2, 40:12, 41:7, 73:7, 75:3, 89:2, 102:3, 102:10, 102:18, 105:24, 107:2, 133:5

seeing [1] - ...:...
select [2] - 1...:...), 125:2
selected [1] - 124:25
selection [2] - 124:23, 125:5
self [2] - 29:14, 30:14
self-employed [2] - 29:14, 30:14
send [4] - 78:22, 78:24, 78:25, 79:21
sense [1] - 108:10
sent [4] - 77:24, 78:12, 79:9, 84:1
separate [7] - 24:13, 24:14, 83:17, 84:19, 93:22, 94:13, 126:21
separates [1] - 24:12
September [1] - 133:19
serious [3] - 40:23, 40:25, 82:4
serve [1] - 88:12
service [1] - 43:3
Service [1] - 133:17
services [32] - 51:23, 52:1, 52:10, 68:18, 69:7, 69:15, 69:18, 69:21, 70:5, 71:5, 75:21, 80:20, 81:5, 115:15, 119:23, 121:1, 121:2, 121:7, 121:22, 122:7, 122:10, 122:16, 124:14, 124:24, 125:12, 128:5, 128:20, 129:1, 129:5, 129:17, 146:21, 147:11
set [8] - 39:9, 60:23, 110:1, 124:25, 134:1, 147:24, 150:19, 151:7
setting [1] - 109:10
settled [2] - 20:8, 27:23
settlement [10] - 20:2, 20:13, 82:25, 83:4, 83:5, 83:7, 83:12, 83:15, 84:10, 84:15
settles [1] - 83:6
several [1] - 88:19
Sheet [2] - 4:15, 13:11
sheet [5] - 13:11, 13:13, 14:6, 83:18, 84:11
sheets [1] - 151:7
shifts [1] - 59:11
Shockey [3] - 9:8, 9:16, 100:9
short [2] - 106:22, 110:9
short-term [1] - 110:9
shorten [1] - 123:1
shorter [2] - 82:7, 123:18
Shorthand [1] - 1:25, 150:6
show [5] - 20:21, 27:5,

65:1, 85:17, 132:12
showing [2] - 66:19, 76:13
shows [1] - 74:13
sick [4] - 38:20, 38:25, 39:4, 123:17
side [4] - 10:9, 21:14, 50:12, 50:15
sides [1] - 138:7
sidetracked [1] - 111:20
sign [1] - 149:6, 149:10, 149:11
Signature [1] - 151:14
significant [7] - 10:23, 51:6, 66:8, 66:11, 109:11, 113:17, 130:20
significantly [4] - 35:14, 50:12, 73:13, 116:6
similar [2] - 37:3, 98:24
simple [1] - 55:22, 69:25, 98:20
simply [8] - 38:9, 48:6, 62:20, 84:23, 88:23, 131:25
simulations [1] - 104:23
sisters [1] - 47:2
sitting [1] - 127:8
situation [2] - 8:17, 51:5
Six [1] - 2:20
six [6] - 10:18, 10:19, 10:25, 24:25, 146:8
Skoog's [2] - 108:21, 126:9
sleep [1] - 123:4
slightly [1] - 62:12
slow [1] - 131:13
small [2] - 10:13, 101:3
smaller [1] - 29:23
so.. [2] - 66:25, 92:20, 108:18
Social [3] - 43:1, 43:7, 122:17
sock [1] - 143:18
socking [1] - 142:11
software [1] - 104:24
solve [1] - 124:10
someone [2] - 26:16, 28:21, 72:16, 72:19, 81:18, 81:25, 137:24, 138:13, 146:10, 146:13
sometimes [3] - 95:22, 96:13, 96:18
somewhere [3] - 28:22, 63:5, 134:13
son [1] - 46:9
sorry [3] - 46:22, 56:15, 77:19
sort [3] - 30:15, 79:21, 98:4
sound [2] - 65:16,

121:24
sounds [3] - 98:1, 108:8, 108:10
source [1] - 132:4
spans [1] - 81:2
speaking [1] - 80:3
specific [6] - 24:6, 80:15, 96:15, 123:23, 123:24, 130:6
specifically [1] - 131:20
specifics [1] - 41:7
specify [1] - 83:11
speculation [1] - 54:4
spell [2] - 5:13, 5:16
spend [8] - 7:9, 34:25, 51:25, 52:9, 70:21, 71:1, 143:4, 146:20
spending [2] - 51:1, 146:12
spends [2] - 69:20, 71:9
spent [13] - 10:2, 10:5, 10:11, 11:25, 12:24, 75:20, 143:1, 144:8, 144:17, 145:24, 146:6, 146:8, 147:11
spoken [2] - 7:15, 103:18
sports [1] - 121:17
Spring [1] - 2:15
ss [2] - 150:3, 151:18
St [1] - 47:14
stamp [1] - 79:21
standard [11] - 45:9, 77:6, 77:7, 77:10, 77:12, 104:17, 107:22, 108:17, 109:25, 116:10, 125:3
standards [4] - 76:18, 76:22, 76:23, 108:2
standpoint [1] - 64:11
start [4] - 21:4, 22:12, 50:25, 109:24
started [5] - 50:24, 73:25, 78:11, 88:3, 148:19, 148:20
starting [2] - 50:9, 65:16
starts [2] - 6:18, 22:13
state [8] - 5:13, 9:10, 12:4, 12:5, 12:8, 43:8, 114:20, 114:22
State [3] - 100:4, 150:7, 150:23
STATE [2] - 150:3, 151:17
statement [9] - 19:20, 92:3, 108:11, 114:19, 115:1, 123:14, 134:21, 148:7, 148:8
Statements [1] - 147:25
statements [5] - 103:24, 104:3, 104:4,

13

**STATES** [1] - 1:1
**States** [3] - 19:3, 52:14, 52:15
**statistic** [2] - 64:3, 65:12
**statistics** [8] - 46:6, 57:25, 63:4, 64:4, 65:1, 123:9, 123:11, 143:21
**Statistics** [1] - 102:16
**status** [2] - 126:8, 126:12
**Steven** [1] - 100:11
**stick** [1] - 16:15
**still** [7] - 51:21, 67:1, 73:17, 73:19, 125:18, 134:23, 149:5
**stock** [2] - 96:4, 96:5
**stocks** [1] - 95:7
**straight** [4] - 24:3, 24:4, 57:25, 75:2
**strategies** [1] - 92:25
**stream** [6] - 92:21, 112:13, 113:13, 115:1, 115:2
**streams** [16] - 92:11, 92:12, 92:16, 92:17, 93:9, 93:16, 112:20, 112:24, 114:14, 115:23, 116:18, 117:20, 117:23, 118:15, 120:1
**streams/expense** [1] - 92:12
**Street** [1] - 3:4
**strike** [10] - 10:3, 15:1, 28:2, 29:8, 40:4, 42:8, 48:2, 54:22, 62:14, 135:25
**strip** [1] - 127:9
**students** [3] - 66:1, 94:8, 98:23
**studies** [1] - 102:15
**stuff** [1] - 16:22
**submitted** [1] - 90:3
**subscribed** [1] - 151:20
**substantial** [2] - 128:6, 146:12
**substantiated** [1] - 26:20
**substantiation** [1] - 27:3
**substantive** [1] - 8:14
**successful** [1] - 50:24
**suffered** [1] - 137:2
**sufficient** [1] - 132:23
**suggest** [1] - 64:6
**suggesting** [1] - 148:1
**Suite** [2] - 2:21, 3:5
**sum** [1] - 115:7
**summary** [3] - 12:23, 17:20, 54:5
**supplies** [5] - 34:3, 34:9, 34:19, 34:25, 36:7
**support** [1] - 76:20,

109:2
**supporting** [6] - 8:20, 23:6, 25:11, 25:20, 26:1, 26:4
**Supreme** [1] - 117:4
**Survey** [2] - 52:4, 121:5
**survey** [11] - 62:21, 62:22, 64:18, 65:6, 65:19, 91:9, 91:13, 91:15, 91:17, 146:24
**surveys** [2] - 66:15, 147:14
**survivor** [1] - 135:16
**survivors** [3] - 137:3, 137:9, 137:12
**sustained** [1] - 1:6
**Sworn** [1] - 151:20
**sworn** [1] - 5:6

## T

**T-bill** [4] - 72:25, 110:4, 110:6, 110:17, 111:13, 113:3, 113:22, 119:12
**tab** [9] - 14:8, 14:12, 14:13, 14:14, 18:10, 18:16, 18:19, 19:16, 133:12
**Tab** [3] - 14:17, 18:7, 133:14
**table** [14] - 7:25, 24:14, 56:23, 57:3, 57:4, 57:5, 57:10, 61:9, 61:12, 62:1, 75:4, 132:11, 141:13, 143:24
**Table** [16] - 56:24, 57:8, 57:18, 59:13, 59:14, 61:11, 61:23, 71:18, 74:25, 75:7, 75:21, 118:25, 132:14, 133:17, 143:25
**Tables** [1] - 24:14
**tables** [6] - 74:25, 75:2, 81:13, 102:9, 105:5, 141:6
**taught** [4] - 94:13, 94:14, 94:19, 94:21
**tax** [42] - 18:7, 23:9, 23:13, 26:21, 26:24, 27:7, 29:15, 30:6, 32:19, 36:10, 36:15, 37:14, 38:13, 86:10, 86:11, 91:22, 105:13, 117:13, 117:22, 118:1, 118:2, 118:8, 118:14, 118:16, 119:5, 119:9, 119:15, 119:17, 119:20, 120:2, 134:5, 134:13, 139:5, 139:9, 139:16, 139:17, 139:20, 139:21, 140:2, 141:19, 142:4, 142:6
**taxable** [6] - 119:24, 139:19, 139:20, 139:25,

140:1, 140:10
**taxes** [21] - 37:8, 63:14, 66:20, 66:21, 66:22, 67:3, 67:8, 67:17, 75:19, 117:19, 118:12, 118:19, 119:6, 119:13, 139:8, 140:5, 140:16, 141:3, 141:9, 143:11
**teach** [4] - 65:24, 88:11, 94:4, 94:15
**teaching** [3] - 88:1, 88:3, 88:5
**tear** [1] - 33:20
**technology** [1] - 90:16
**telephone** [1] - 121:17
**Template** [1] - 102:13
**ten** [8] - 10:25, 20:19, 21:15, 21:18, 21:19, 36:14, 53:4, 131:14
**ten-year** [2] - 20:19, 21:15
**tend** [1] - 53:3
**tendered** [1] - 30:20
**tends** [1] - 91:16
**term** [10] - 81:9, 86:19, 86:22, 91:9, 110:9, 122:9, 123:6, 125:14, 136:1, 136:6
**terminal** [1] - 101:15
**terms** [30] - 35:9, 45:8, 58:22, 77:11, 85:11, 86:2, 90:10, 92:10, 92:13, 95:23, 98:2, 100:16, 102:9, 106:21, 106:24, 108:12, 108:25, 113:14, 114:25, 123:20, 124:3, 125:3, 129:24, 131:25, 137:14, 137:15, 139:11, 143:14
**testified** [11] - 5:6, 9:7, 9:24, 38:5, 38:7, 99:8, 99:17, 100:11, 100:20, 100:23, 108:8
**testify** [2] - 9:12, 
**testifying** [1] - 10:2
**testimony** [7] - 9:3, 9:4, 12:3, 64:16, 76:14, 99:21, 100:20
**Teton** [9] - 17:23, 17:24, 18:3, 49:6, 55:2, 55:7, 68:2, 128:21, 142:7
**text** [1] - 120:17
**textbook** [1] - 89:11
**textbooks** [1] - 89:10
**texts** [3] - 76:18, 120:19, 120:22
**THE** [19] - 1:1, 1:1, 16:6, 16:10, 16:16, 28:18, 29:25, 78:17, 78:21, 79:1, 79:5, 79:17, 79:23, 80:1, 114:23, 136:17, 149:9,

149:11, 149:16
**the..** [1] - 63:8
**there'd** [1] - 137:13
**there're** [1] - 110:15
**therein** [1] - 151:10
**they've** [2] - 73:21, 74:15
**third** [5] - 23:23, 30:8, 55:15, 69:3, 74:12
**thousand** [1] - 18:8
**three** [12] - 40:16, 49:13, 63:18, 69:17, 72:25, 73:2, 110:4, 110:6, 113:3, 113:22, 119:12, 145:3
**three-month** [6] - 72:25, 110:4, 110:6, 113:3, 113:22, 119:12
**tie** [2] - 125:5, 125:11
**TIEDEKEN** [9] - 16:11, 16:14, 46:10, 67:12, 136:19, 136:21, 136:24, 147:19, 149:1
**Tiedeken** [3] - 2:8, 2:9, 4:6
**ties** [3] - 123:15, 124:22, 124:23
**timeframe** [3] - 53:13, 113:2, 129:23
**timesheet** [2] - 148:16, 148:18
**Tina** [2] - 47:9, 139:15
**today** [22] - 6:2, 7:4, 7:15, 33:25, 73:3, 76:15, 77:4, 84:8, 84:21, 85:13, 96:19, 98:5, 103:20, 103:21, 104:5, 105:11, 112:7, 113:3, 113:22, 115:8, 116:6, 119:8
**today's** [2] - 83:10, 84:22
**together** [1] - 62:1
**took** [6] - 7:13, 23:15, 34:1, 47:23, 91:1, 126:19
**top** [5] - 6:16, 20:22, 23:24
**topics** [1] - 76:7
**Torres** [1] - 47:9
**total** [8] - 31:25, 48:8, 61:22, 63:19, 132:16, 134:11, 141:7, 142:15
**touched** [1] - 117:9
**tough** [1] - 116:7
**town** [1] - 8:13
**track** [2] - 13:8, 102:16
**training** [2] - 90:9, 120:10
**transcript** [2] - 150:11, 151:8
**TRANSCRIPT** [1] - 1:18
**transcripts** [4] - 99:20, 99:22, 103:23, 104:2

**transfer** [1] - 134:20
**travel** [2] - 11:16, 144:10
**traveled** [1] - 7:12
**treasury's** [1] - 15:20
**treatable** [1] - 82:6
**trial** [14] - 6:13, 9:3, 17:18, 20:8, 24:16, 27:3, 27:5, 27:23, 83:12, 83:13, 86:14, 86:16, 136:12
**Triangle** [4] - 1:13, 2:18, 5:5, 76:6
**tried** [1] - 28:9
**truck** [1] - 33:2
**true** [8] - 10:17, 26:11, 34:9, 37:21, 144:24, 148:5, 150:11, 151:8
**TRUST** [1] - 1:11
**Trustees** [1] - 1:10
**try** [7] - 6:3, 26:23, 76:8, 123:24, 125:5, 125:11, 147:15
**trying** [9] - 6:7, 29:6, 46:12, 59:9, 113:12, 120:9, 125:9, 140:3, 140:4
**Tube** [2] - 5:5, 76:6
**Tube/Phase** [1] - 2:18
**TUBE/PHASE** [1] - 1:14
**turn** [10] - 30:2, 30:8, 47:12, 52:20, 57:18, 59:6, 67:21, 68:16, 74:20, 102:6
**twice** [3] - 25:16, 25:17, 99:10
**two** [24] - 7:10, 18:8, 22:25, 29:23, 47:3, 47:4, 50:1, 50:2, 51:2, 52:16, 55:1, 58:21, 62:1, 63:18, 63:22, 68:8, 90:21, 93:24, 97:15, 99:24, 111:3, 120:12, 139:14, 146:11
**twofold** [1] - 26:10
**type** [1] - 10:11
**types** [8] - 51:18, 98:11, 101:13, 107:23, 129:22, 131:9, 131:11, 134:2
**typewritten** [1] - 151:5
**typical** [1] - 27:14
**typically** [20] - 10:24, 19:11, 20:9, 27:16, 29:4, 30:14, 31:9, 34:15, 40:11, 44:25, 45:1, 51:18, 53:10, 54:8, 73:8, 83:11, 86:23, 95:9, 107:24, 110:13

## U

**ultimate** [1] - 135:16

14

umm [4] - 53:16,
90:21, 101:7, 128:7
unable [1] - 28:19
unchecked [2] -
111:18, 114:18
under [20] - 6:11, 18:7,
24:2, 24:14, 33:1, 33:8,
52:22, 77:2, 88:8,
88:10, 122:15, 133:12,
133:13, 133:14, 133:17,
141:24, 142:10, 145:6,
149:8
undergrad [1] - 90:22
underlining [1] - 14:19
understood [2] -
30:24, 125:14
undocumented [1] -
27:18
unemployed [3] -
130:15, 130:16, 130:19
unemployment [7] -
43:7, 43:8, 128:25,
129:10, 129:22, 130:14
United [3] - 19:3,
52:14, 52:15
UNITED [1] - 1:1
university [3] - 65:24,
87:17, 88:4
University [1] - 94:20
unsubstantiated [1] -
27:15
up [44] - 7:6, 10:13,
10:22, 13:8, 20:9,
20:13, 24:15, 27:2,
27:3, 27:5, 28:18,
50:17, 53:1, 53:10,
54:24, 55:19, 66:16,
73:5, 81:6, 83:8, 83:10,
83:14, 85:4, 85:11,
85:13, 86:25, 88:1,
88:2, 96:6, 106:6,
107:2, 107:19, 111:25,
113:11, 113:12, 113:15,
115:7, 115:8, 117:10,
118:2, 133:6, 135:11,
142:2, 146:21
updated [1] - 85:20
Upper [1] - 2:4
upper [1] - 91:14
upward [1] - 64:10
Utah [2] - 120:7,
128:21

**V**

valid [1] - 77:11
VALL [1] - 5:18
value [26] - 20:4,
20:22, 20:25, 21:16,
21:21, 21:24, 22:10,
56:10, 57:10, 68:5,
68:14, 68:24, 71:5,
80:25, 83:9, 83:16,
85:5, 106:24, 107:1,
112:13, 114:8, 115:15,

118:18, 121:3, 127:6,
128:2
Value [1] - 118:25
values [3] - 22:7, 58:7,
66:16
variability [2] - 66:10,
75:17
variable [14] - 57:24,
58:9, 58:11, 58:14,
58:16, 60:1, 60:9,
60:11, 61:6, 61:15,
61:16, 61:17, 62:17,
75:14
variables [2] - 60:22,
60:23
variations [1] - 129:9
varies [3] - 53:12,
68:11, 146:4
variety [1] - 131:16
various [1] - 33:9
vary [3] - 34:17, 53:3,
63:2
vehicle [2] - 144:15,
144:23
verbally [1] - 103:18
verifiable [1] - 41:8
verified [2] - 24:18,
43:24
verify [5] - 8:11, 8:12,
19:8, 19:11, 19:14
vice [1] - 2:19
view [1] - 127:14
violation [1] - 36:18
visit [1] - 8:11
visited [2] - 7:16, 8:4
vitae [2] - 12:10, 12:17
Vitae [5] - 4:13, 85:19,
88:19, 89:7, 89:18
vs [1] - 1:8

**W**

W-2 [7] - 17:20, 24:13,
41:23, 43:10, 43:17,
47:23, 131:23
W-2s [9] - 17:25, 18:4,
41:18, 41:19, 43:20,
44:11, 47:24, 55:18,
86:11
W-9 [2] - 12:21, 17:3
wage [16] - 20:23,
21:2, 21:20, 29:6,
29:10, 71:24, 73:5,
73:8, 111:25, 125:15,
125:22, 126:1, 126:4,
126:24, 127:15, 132:8
wages [11] - 22:12,
22:20, 22:21, 22:22,
68:24, 73:12, 112:9,
125:19, 126:17, 126:18,
126:19
wait [1] - 8:11
waiting [1] - 27:5
walk [1] - 98:23
WALTZ [46] - 5:8, 5:12,

8:6, 12:10, 12:11, 13:3,
13:6, 14:3, 1:   16:5,
16:9, 16:13, 16:15,
16:18, 16:20, 17:1,
17:4, 17:10, 17:13,
25:14, 25:17, 25:19,
28:12, 28:15, 28:20,
28:25, 29:22, 30:1,
31:15, 31:16, 32:10,
32:11, 32:15, 32:17,
46:11, 46:14, 66:7,
67:15, 75:24, 147:21,
147:23, 148:25, 149:5,
149:10, 149:12, 149:17
Waltz [9] - 3:3, 3:4, 4:4,
4:7, 5:21, 76:8, 117:9,
118:22, 131:18
wants [1] - 28:16
Warren [1] - 98:20
Washington [2] -
65:14, 65:17
watered [1] - 91:16
wear [1] - 33:20
web [1] - 89:13
week [3] - 8:7, 70:11,
131:15
weekend [1] - 28:4
welcome [1] - 15:21
Western [1] - 94:20
whatnot [3] - 109:16,
122:17, 131:19
whatsoever [1] - 23:7
WHEREOF [1] - 150:18
whole [5] - 16:7, 52:6,
52:7, 57:2, 138:5
wide [2] - 108:11,
129:9
wife [3] - 62:2, 138:23,
145:24
willing [1] - 86:16
Willis [1] - 9:22
withdraw [1] - 69:6
WITNESS [19] - 4:2,
16:6, 16:10, 16:16,
28:18, 29:25, 78:17,
78:21, 79:1, 79:5,
79:17, 79:23, 80:1,
114:23, 136:17, 149:9,
149:11, 149:16, 150:18
witness [8] - 5:4,
16:10, 16:16, 30:3,
75:25, 76:13, 120:6,
136:15
Witness [7] - 30:10,
43:11, 45:16, 52:21,
67:23, 68:17, 69:12
woman [1] - 52:5
women [6] - 52:6, 52:7,
52:8, 52:13, 52:16,
52:19
Word [1] - 104:21
worker [1] - 81:13
workers [2] - 129:22,
147:6
Workers' [1] - 43:9

workforce [1] - 81:20,
81:23
worklife [17] - 26:13,
81:2, 81:4, 97:20,
102:5, 102:21, 102:24,
109:3, 122:22, 123:2,
123:16, 123:18, 126:6,
127:3, 127:25, 129:20,
129:23
worse [1] - 102:3
write [1] - 10:22
write-up [1] - 10:22
Writer [1] - 104:22
written [11] - 24:21,
28:4, 77:16, 77:22,
77:24, 77:25, 89:10,
89:12, 103:24, 104:3,
104:4
WRONGFUL [1] - 1:3
wrongful [1] - 1:6
wrote [1] - 27:22
WYOMING [2] - 1:1,
1:12
Wyoming [8] - 1:13,
1:21, 2:5, 2:7, 2:10,
2:16, 94:20, 128:21

**Y**

year [46] - 10:25, 19:6,
20:19, 21:15, 21:18,
21:23, 21:25, 22:4,
35:23, 37:1, 38:18,
38:23, 42:17, 43:21,
48:12, 54:16, 55:9,
57:14, 59:3, 59:4, 59:7,
59:8, 59:9, 62:6, 62:15,
62:19, 63:1, 63:4,
64:10, 64:15, 65:18,
66:2, 69:21, 70:6,
70:20, 71:13, 126:20,
140:23, 142:4, 142:5,
142:14, 142:23, 144:3,
144:22, 145:5, 147:7
yearly [3] - 19:5, 34:25,
55:20
years [32] - 9:5, 9:7,
10:17, 21:18, 21:19,
36:12, 36:14, 40:16,
44:2, 47:16, 48:3,
48:23, 49:13, 51:7,
53:4, 53:5, 54:7, 57:7,
62:10, 64:21, 72:6,
72:10, 73:10, 73:15,
74:5, 74:17, 99:5, 99:6,
128:7, 128:8, 142:6,
142:15, 143:19
yesterday [1] - 15:24
yield [2] - 15:20, 112:6
yields [2] - 15:21,
113:10
York [1] - 1:15
young [2] - 47:3, 47:4
yourself [4] - 65:20,
80:10, 85:15, 108:4

**Z**

zero [1] - 21:14
Zip [1] - 79:15