David G. Lewis, Wyoming Bar No. 4-1150
Attorney at Law
P.O. Box 8519
Jackson, Wyoming 83002
(307) 739-8900
(307) 739-8902 (fax)
davelewis@bresnan.net

Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

FRANCISCO L. HERRERA, and JOANNA ) 
HERRERA, CO-WRONGFUL DEATH )
REPRESENTATIVES, for the exclusive )
benefit of the beneficiaries of MONICA )
HERRERA, deceased, who have sustained )
damages from her wrongfully caused death. )
                                        )
       Plaintiffs, )
                                          )
   vs. )
                                          )   Case No. 15-cv-128-F
GREGORY BUCKINGHAM and DEBORAH )
BUCKINGHAM, but in their individual capacities as )
Trustees of the BUCKINGHAM FAMILY TRUST; )
and, GREGORY BUCKINGHAM and DEBORAH )
BUCKINGHAM as individual defendants; and, )
WYOMING MECHANICAL, INC. a Wyoming )
Corporation; )
                                          )
       Defendants. )

## PLAINTIFFS' RESPONSE AND OPPOSITION TO DEFENDANT BUCKINGHAMS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES

Plaintiffs hereby Respond and Oppose the Defendant Buckinghams'

Motion for Partial Summary Judgment on Plaintiffs' Claim for Punitive

Damages, and in Opposition to the Motion, Plaintiffs show the Court as follows:

# I.
## Introduction

On January 30, 2015, the Plaintiffs' Decedent, Monica Herrera, was killed from exposure to carbon monoxide in the residence of the Defendants Buckingham. The Buckinghams reside in an estate or compound above the Teton Science School on Ditch Creek Road. The Buckinghams say they have resided there for approximately eight years.

The Buckinghams own and operate a very successful chain of approximately 200 dry cleaning outlets on the West Coast and around other areas in the United States. The company is entitled, Dress for Success. Their business takes them to California for much of the winter, which leaves their Jackson Hole house vacant. They have a caretaker at their estate who is employed to take care of the estate and the residences and other buildings within the compound. The caretaker, David Schuler, resides in one of the residences on the estate with his wife, rent free, in exchange for his services for the Buckinghams.

At the time of Monica Herrera's death on January 30, 2015, the Buckinghams heated their main residence with a Triangle Tube Prestige 175 boiler system that they purchased and had installed by the Defendant Wyoming Mechanical on November 14-15, 2014.

# II.
## The Factual Events Leading To This Litigation

Monica Herrera was employed by St. John's Hospital for 20 years. She also worked for a few families in Teton County as a housekeeper. She moved to Driggs, Idaho from California where she and her husband, Francisco, were born, raised, and married as young adults. They have three adult children who live

and work in Idaho and Teton County, Wyoming. They also have several grandchildren, Monica's Mother, and other close relatives living with or near them.

On Friday, January 30, 2015, Mrs. Herrera drove to the Buckingham residence in order to clean it. As was usual, she arrived at the residence around 10:00 a.m. The Buckinghams were living in California at the time, taking care of their thriving business affairs. Mrs. Herrera entered the residence through the garage door. According to the Teton County Coroner's office, she dropped dead in the home within minutes after she walked in. David Schuler, the caretaker of the estate, found Mrs. Herrera on the mudroom floor, hand stretched out toward the exit door, tangled in a vacuum hose that she had taken from the garage into the residence to begin her cleaning. The coroner determined that she died from carbon monoxide poisoning shortly after she entered the garage and residence. Her carboxyhemoglobin level was at an extremely high level of 76%.

Prior to her arrival at the Buckingham residence on Friday, the Triangle Tube boiler had been creating anxiety in the residence for over a week to ten days, according to the residents. According to Mr. and Mrs. Buckingham, the boiler began to create very loud noises, growing louder and louder, while the boiler shook itself and the walls of the house. It sounded as if a car was crashing through the walls, according to their description. (Gregory Buckingham, 1st Deposition, pages 60-61; 125; for example).

Early in the week of January 26, 2015, Greg Buckingham told David Schuler that the vent exhaust pipe had come apart at more than one joint. He further related that he had climbed up on a ladder next to the refrigerator and pushed the segments back together on occasion. (Schuler Deposition, Page 35,

November 18, 2015).  Schuler climbed the ladder himself and noticed that a blue

seal through which the vent exited to the out-of-doors was not seated correctly so

he reset the seal and checked all the pipe joints.  (Schuler statement, Exhibit D).

At the precise point where Greg Buckingham had occasionally pushed the

pipe segments back together, there were several large, red stickers glued on to

the vent pipe that recite:

> "WARNING.  Risk of carbon monoxide CO poisoning and risk of
>
> fire if improperly installed.  Follow all cautions, warnings, and
>
> instructions regarding installations to the vent pipe system."

Photographs of the warning stickers attached to the pipe accompany this

Response as Exhibit G.  Mr. Buckingham has testified that he does not read

warnings, nor does he pay any attention to them.  He testified that the world is

full of warnings and he ignores them, as certain selections from his deposition

testimony show, Mr. Buckingham's attitude toward safety—even deadly peril—

is almost too cavalier to comprehend.  (Exhibits B and C).

With the certain knowledge that Mrs. Herrera was arriving to clean the

Buckingham residence on Friday morning (Exhibits E and F), no provision was

made to warn her away from the carbon monoxide peril in the Buckingham

residence.

Exhibit G displays photographs that show obvious warnings located

intelligently around the vent pipe; and especially obvious at the spot where Mr.

Buckingham climbed the ladder occasionally to push the segments back together,

when he and Mr. Schuler both knew that the exhaust vent segments were

continuing to separate.

Exhibit H presents certain Jury Instructions from two notable carbon monoxide litigation cases in the United States District Court, Wyoming. One of them in Jackson, and the other tried in Cheyenne. They are included to remind the Court and parties that Mr. Schuler was Mr. Buckingham's employee throughout. Consequently, Mr. Buckingham is vicariously liable for the activities of Mr. Schuler within the course of his employment; and, Mr. Schuler's knowledge surrounding the defective conditions and the great dangers of carbon monoxide are also the Knowledge of Mr. Buckingham, by operation of law.

Mr. Buckingham's disdain for safety in his own home could certainly be found to be reckless, willfull and wanton. Mr. Buckingham, making the conscious choice that he would not watch the boiler with obvious and serious safety issues, is abdicating his responsibility to visitors or business invitees in his home. All because he does not want to waste his time reading warnings in the face of a tremendous danger; an arrogant, reckless and intentional disregard for the lives of others.

Respectfully submitted on this 15th day of September, 2016.


/s/ _____
          David G. Lewis


## CERTIFICATE OF SERVICE

The undersigned certifies that on the 15th day of September, 2016, he caused the above initial disclosure to be served upon the defendants as follows:


Julie Tiedeken, Esq.                          Richard Waltz, Esq.
jtiedeken@mtslegal.net                        DWaltz@Waltzlaw.com
P. O. Box 748                                 1660 Lincoln Street, Ste. 2510

Cheyenne, Wyoming 82003                    Denver, CO 80264

Katherine L. Mead                          Joseph P. McGill, Esq.
kate@meadlaw.net                           jmcgill@fbmjlaw.com
P. O. Box 1809                             38777 Six Mile Road, Ste. 300
Jackson, Wyoming 83001                     Livonia, MI 48152


                                           _____
                                           David G. Lewis

Exhibit A

Defendant Buckingham's Motion For Partial
Summary Judgment On Plaintiffs' Claim for
Punitive Damages

Katherine L. Mead, Esq.
Mead & Mead
WY State Bar # 5-2432
1200 N. Spring Gulch Rd.
P.O. Box 1809
Jackson, WY  83001
(307) 733-0166
(307) 200-0233 fax
kate@meadlaw.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| FRANCISCO L. HERRERA, and JOANNA HERRERA, CO-WRONGFUL DEATH REPRESENTATIVES, for the exclusive benefit of the beneficiaries of MONICA HERRERA, deceased, who have sustained damages from her wrongfully caused death. | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CA 15-cv-128-F |
| GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM, but in their individual capacities as Trustees of the BUCKINGHAM FAMILY TRUST; and, GREGORY BUCKINGHAM and DEBORAH BUCKINGHAM as individual defendants; and, WYOMING MECHANICAL, INC., a Wyoming Corporation; TRIANGLE TUBE/PHASE III CO., INC., a New Jersey Corporation; and, M&G GROUP DURAVENT, INC., a New York Corporation, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANT BUCKINGHAMS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES

The Defendant Buckinghams, by and through their attorney, Katherine L. Mead of Mead

& Mead, submit the following brief in support of their Motion for Partial Summary Judgment on

Plaintiffs' Claims for Punitive Damages.

---

**<u>Local Rule 7.1 Certification</u>**

Undersigned counsel, pursuant to L.R. 7.1, certifies that she has consulted with counsel for the Plaintiffs and asked that he dismiss or withdraw the punitive damage element from his complaint against the Buckinghams. Plaintiff's counsel refused to do so and opposes this partial summary judgment motion.

---

## FACTS

The cause of action at issue in this motion is the claim made by Plaintiffs for punitive damages against the Buckinghams. And the missing essential element of that cause of action is evidence that the Buckinghams acted outrageously – that their conduct was willful and wanton. The parties have filed a Stipulation of Undisputed Facts. Those facts in short hand, tell the story of what caused the death of Monica Herrera in the home of Greg and Deborah Buckingham on January 30, 2015.

In November of 2014, the Buckinghams hired Wyoming Mechanical, Inc. to replace an existing boiler system located in the garage of their home at 8935 E. Ditch Creek Road outside of Jackson, Wyoming. Wyoming Mechanical proposed the installation of a boiler made by Triangle Tube because Wyoming Mechanical had had good luck with Triangle Tube's boilers prior to the installation in the Buckingham home and believed it was a quality product. The depositions of the Buckinghams indicate that they did not have any information with regards to Triangle Tube nor did they request any prior to installation of the Triangle Tube boiler by Wyoming Mechanical. The boiler, a Prestige Trimax Solo 175 was installed on November 13-14, 2014. At the time of the installation, Wyoming Mechanical did not install nor did they suggest to the Buckinghams that they should install carbon monoxide detectors. Deposition of Aaron McCormick Deposition, April 26, 2016, p. 47, lines 22-25; p. 48, lines 1-5.

After the Triangle Tube boiler was installed in the Buckingham home, it ran well for several weeks until the last part of January 2015. In Greg Buckingham's deposition, he recalls that on or about January 26 or 27, 2015, he noticed the Triangle Tube boiler making loud banging noises. Deposition of Greg Buckingham, June 6, 2016 p. 13, lines 1-8. On January 28, 2015, Greg Buckingham called Wyoming Mechanical about the boiler and stated, "David, Greg Buckingham, 733-7436. Leaving town in the morning, so if you get a chance to call me this afternoon that would be great. I want to chat with you about coming out here Monday.[1] I know that you have it on your schedule already and who you are bringing, so you don't wait your time. It sounds like a car that's hitting a wall. It's getting so loud when it bangs. And you may need to bring out the guy that sold you the boiler is what I'm thinking, but you definitely need two people. Okay, thanks. Bye." Stipulation of Undisputed Facts, ¶ 10.

Wyoming Mechanical did not return the phone call on January 28, but on January 29, a Thursday morning, David Gieck returned the call to Mr. Buckingham. *Id.* at ¶ 11. Mr. Buckingham again told Mr. Gieck that he was leaving town shortly and confirmed that Wyoming Mechanical was coming out for its prescheduled Monday appointment. Mr. Buckingham told David Gieck on Thursday morning that the vent pipe had come apart but that he and his caretaker had put it back together. At the time, Greg Buckingham had no understanding that the vent pipe coming apart was a dangerous condition. In fact, Greg Buckingham had found the vent pipe dislodged on the morning of January 29. He and his wife had slept in the home the evening of the 28th and had no ill effects that would have put them on notice that there was a problem.

---

[1] Mr. Buckingham had previously made an appointment with Wyoming Mechanical to have a leak in the garage floor plumbing evaluated. That leak is unrelated to this case, but was the reason for the reference to an upcoming appointment.

David Gieck of Wyoming Mechanical did not tell Mr. Buckingham during their phone conversation on the morning of January 29th that the vent pipe coming apart was dangerous. Deposition of David Gieck, November 19, 2015, page 63, line 2. Failing to warn Mr. Buckingham of the danger posed by the vent pipe coming apart, has been opined by Wyoming Mechanical's own expert to be a violation of the standard of care of a mechanical contractor. Deposition of Mark Passamaneck, July 26, 2016, p. 71 lns. 17-19.

On January 29, 2015, Thursday evening, Mr. Schuler went over to the Buckingham house to perform some small repairs around the house. After he performed the repairs, he checked on the boiler vent system because Mr. Buckingham had asked him to keep an eye on it because it had previously pulled apart. When he checked on it that Thursday evening, the venting system was together and was not pulled apart. However, he found the connector ring for the vent joint on top of the refrigerator so he pulled the vent apart and put the ring into place and put the vent back together.

On January 30, 2015, at approximately 10 a.m., Dave Schuler noticed Monica Herrera's car outside the Buckinghams' home. He knew that Mrs. Herrera accessed the Buckingham's home through the garage where the boiler was located, but was not worried about the vent coming apart again and didn't check on it. Mr. Schuler observed Mrs. Herrera's vehicle around 6:00 p.m., unmoved from 10:00 that morning.

When Mr. Schuler went to investigate, he opened the garage door and found both vehicles inside were dripping wet. He saw the boiler exhaust pipe was separated in the same location where he previously reinstalled the locking band. He put the pipes back together and attempted to turn off the subject boiler. He then went into the house through the mudroom door

connected to the garage and he found Monica Herrera dead on the floor, a victim of carbon monoxide poisoning.

More than 20 depositions have been taken in this case. There has been no evidence to suggest that the Buckingham's had any knowledge that the vent piping coming apart in their garage was a dangerous condition. The parties have produced thousands of pages of documents. None of them contain a single hint to suggest the Buckinghams were willful or wanton or that their conduct was the kind of malicious or outrageous behavior that warrants the imposition of punitive damages. In their Amended Complaint, the Plaintiffs allege that the Buckingham's were negligent in failing to warn Mrs. Herrera of the dangerous condition created by the vent pipe coming apart. Amended Complaint at p. 60 (e). But, if the Buckinghams were unaware of the danger to themselves, their guests and their employees, how would they know to warn any of them?

Federal Rule of Civil Procedure, Rule 56 governs summary judgments. A summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. F.R.C.P. Rule 56 (a). *Loredo v. Solvay America, Inc.*, 2009 WY 93; 212 P.3d 614 (Wyo. 2009). The Wyoming Supreme Court has indicated "[A] genuine issue of material fact exists when a disputed fact, if it were proven, would establish or refute an essential element of a cause of action or a defense that the parties have asserted." *Christensen v. Carbon County,* 2004 WY 135 ¶ 8, 100 P.3d 411, 413 (Wyo. 2004) (quoting *Metz Beverage Company v. Wyoming Beverages, Inc.*, 2002 WY 21 ¶ 9; 39 P.3d 1051, 1055 (Wyo. 2002))47. The party requesting summary judgment bears the initial burden of establishing a *prima facie* case for summary judgment. *Id. Larsen; Kobieluz v. Wilson*, 701 P.2d 559 (Wyo. 1985).

The Plaintiffs have alleged negligence on the part of the Buckinghams for failing to warn Mrs. Herrera, the decedent, of an unreasonably dangerous condition in their home, failing to select a contractor that "would promptly respond to the inspection and repair of dangerous and deadly conditions found to exist in the newly installed heating system" among other negligence allegations. Amended Complaint at ¶ 60(a)-(k).

This Motion does not address whether the negligence claims against the Buckinghams should be sustained. Instead, its focus is on the punitive damages claim that Plaintiffs' have made against the Buckinghams.

## DISCUSSION AND ARGUMENT

Another case involving exposure to high levels of carbon monoxide and punitive damages was decided by the 10th Circuit on April 1, 2016, as corrected June 13, 2016, *Lompe v. Sunridge Partners, LLC, et al.*, 818 F.3d 1041 (10th Circuit 2016).

In *Lompe*, the 10th Circuit looked at the federal district court's failure to grant a motion for judgment as a matter of law (JMOL) on the issue of punitive damages claimed by Ms. Lompe who suffered from CO exposure as a result of at least two malfunctioning furnaces on the floor of the apartment building where she lived. Her physical damages from the CO exposure were severe and permanent and she alleged that the defendants were aware of a previous CO exposure in the complex and aware that the furnaces in the complex were old and a danger to the residents. *Id.* at 1048. The plaintiff sought punitive damages against the defendants.

The apartment building where Ms. Lompe lived was owned by Sunridge Partners but managed on a day-to-day basis by AMC who was in the business of managing apartment complexes.

The 10th Circuit went into exquisite detail with regards to the district court's mistaken decision to deny a JMOL filed on punitive damages against the Sunridge defendants. Starting with the standard of review, the 10th Circuit stated, "When applying the standard in diversity cases, 'the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate procedural question whether judgment as a matter of law is appropriate." *Jones v. UPS*, 674 F.3d 1187, 1195 (10th Cir. 2012). The 10th Circuit then went on to discuss the Wyoming standard for award of punitive damages. Quoting *Weaver v. Mitchell*, 715 P.2d 1361, 1369 (Wyo. 1986), the 10th Circuit stated, under Wyoming law, punitive damages are disfavored "and are to be allowed with caution within narrow limits." Punitive damages are only appropriate for circumstances involving outrageous conduct such as intentional torts, torts involving malice and torts involving willful and wanton misconduct. *Cramer v. Powder River Coal, LLC*, 2009 WY 45, 204 P.3d 974, 979 (Wyo. 2009)." Drilling down further, the 10th Circuit recognized that the Wyoming Supreme Court has defined willful and wanton misconduct as "the intentional doing or failing to do an act in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know that such conduct would, in a high degree of probability, result in harm to another." *Id*. Further, in Wyoming, "[t]he aggravating factor which distinguishes willful misconduct from ordinary negligence is the actor's state of mind. *Id*. A willful or wanton state of mind in one "that approaches intent to do harm." *Lompe v. Sunridge Partners, LLC*, 818 F. 3d 1041, 1047 (10th Cir, 2016).

The 10th Circuit applied this punitive damage standard in analyzing whether the trial evidence sufficiently showed that each defendant's actions in the *Lompe* case constituted the willful and wanton misconduct required to submit the question of punitive damages to the jury as

a matter of law. *Lompe* at 1047,1048. Upon reviewing the record, the 10th Circuit was convinced that "viewed in the light most favorable to Ms. Lompe, the evidence and all reasonable inferences to be drawn from it point but one way – that they do not show willful and wanton misconduct by Sunridge." *Lompe* at 1047.

The trial evidence showed that Sunridge had purchased the property for investment purposes and hired a reputable property manager to take care of the day-to-day management of the apartments. *Id.* Sunridge had no knowledge of a previous CO poisoning in 2009 as AMC, their management company had not informed them, nor had Sunridge received any complaints about the furnaces in the building. *Id.* at 1048.

The plaintiff showed evidence that a report provided to Sunridge prior to their investment in the property, by a company called Land America had recommended, somewhat generally, that money be put aside to replace the furnaces on a rolling basis over a five-year period. The report contained no warning that the furnaces in the apartment building posed a potential danger to tenants. *Id.* Nor was there evidence at trial that the policy of Sunridge of replacing furnaces as they failed was an "extreme departure from ordinary care." *Lompe* at 1048, citing *Danculovich v. Brown*, 593 P.2d 187, 191 (Wyo. 1979).

The 10th Circuit held that "even if the evidence of Sunridge's minimal involvement in the operation of the apartments could support a finding of negligence, it is insufficient as a matter of law to establish the willful and wanton misconduct necessary to support an award of punitive damages in Wyoming. *Lompe* at 1048, citing *Weaver*, 715 P.2d at 1370 ("Punitive damages are not appropriate in circumstances involving inattention, inadvertence, thoughtlessness, mistake, or even gross negligence."). As a result, the 10th Circuit reversed the district court's denial of JMOL

as to Sunridge because the trial evidence was insufficient to send the question of punitive damages to the jury. *Lompe* at 1048.

While the issue of the Buckingham's negligence may be a jury question, there can be no argument that the Buckinghams engaged in the type of conduct that Wyoming courts have termed "willful and wanton". Again, it is worth repeating that the Wyoming Supreme Court has defined such conduct as "the intentional doing or failing to do an act in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know that such conduct would, in a high degree of probability, result in harm to another." The evidence is clear that the Buckinghams did not know that the vent pipe coming apart was potentially dangerous. Wyoming Mechanical, Inc. did not warn them of the danger posed when Mr. Buckingham spoke to David Gieck about the problem on the day prior to Mrs. Herrera's death. In this matter, the Buckingham's did not act in reckless disregard of the safety of Mrs. Herrera. Mr. Buckingham contacted Wyoming Mechanical, Inc., a qualified technician to report the problem two days before Mrs. Herrera died. The Buckinghams did not act in a manner that even "approaches intent to do harm". *Cramer v. Powder River Coal, LLC*, 2009 WY 45, 204 P. 3d 974, 979 (Wyo. 2009).

## CONCLUSION

Allowing the jury to consider punitive damages against the Buckinghams would be an error of law. The evidence in this case is clear. The Buckinghams were completely unaware of any danger posed by the pipe coming apart. There is no evidence in the matter to sustain a punitive damages verdict against the Buckinghams.

DATED this 1ST day of September, 2016.

/s Katherine L. Mead
Katherine L. Mead
Attorney for the Defendant

CERTIFICATE OF SERVICE

This is to certify that on the 1st day of September, 2016, I served a true and accurate copy of the above and foregoing document with the Clerk of Court using CM/ECF system which will send notification of such filing to the following e-mail addresses by electronic transmission as follows:

David G. Lewis, Esq.
PO Box 8519
Jackson WY  83002-8519
davelewis@bresnan.net

Julie Tiedeken, Esq.
PO Box 748
Cheyenne WY  82003-0748
jtiedeken@mtslegal.net

Christopher R. Reeves, Esq
Richard A. Waltz, Esq.
The Waltz Law Firm
1660 Lincoln Street, Ste 2510
Denver, CO  80264
creeves@waltzlaw.com

Cameron S. Walker, Esq.
Judith A. Studer, Esq.
Schwartz, Bon, Walker & Studer, LLC
141 South Center Street, Suite 500
Casper, WY  82601
cam@schwartzbon.com
jstuder@schwartzbon.com

Joseph P. McGill, Esq.
Foley, Baron, Metzger & Juip, PLLC
38777 Six Mile Road, Suite 300
Livonia, MI  48152
jmcgill@fbmjlaw.com

s/ Katherine L. Mead
Katherine L. Mead
kate@meadlaw.net

Exhibit B

Selection of Deposition Testimony of Gregory
Buckingham dated November 18, 2015

1

1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF WYOMING

3   ------------------------------- )
    FRANCISCO L. HERRERA and        )
4   JOANNA HERRERA, CO-WRONGFUL     )
    DEATH REPRESENTATIVES, for      )
5   the exclusive benefit of        )
    the beneficiaries of MONICA     )
6   HERRERA, deceased, who have     )
    sustained damages for her       )
7   wrongful caused death,          ) Case No.: 15-CV-128-F
                                     )
8                  Plaintiffs,       )
                                     )
9        vs.                         )
                                     )
10  GREGORY BUCKINGHAM and           )
    DEBORAH BUCKINGHAM, both in      )
11  their individual capacities      )
    as Trustees of the BUCKINGHAM   )
12  FAMILY TRUST; and GREGORY        )
    BUCKINGHAM and DEBORAH           )
13  BUCKINGHAM as individual         )
    defendants; and WYOMING          )
14  MECHANICAL, INC., a Wyoming      )
    Corporation,                     )
15                                   )
                   Defendants.       )
16  ------------------------------- 

17

18            TRANSCRIPT OF DEPOSITION OF

19              GREGORY BUCKINGHAM

20                   Taken at
                   MEAD & MEAD
21               Jackson, Wyoming
                 November 18, 2015

22

23

24  COURT REPORTER: Denise Nowak,
    Certified Shorthand Reporter
25  and Notary Public

Jackson Hole Court Reporting Service (307) 733-2637

58

1  A.    Well, if something's not the way it's supposed
2  to be, I don't think that's a concern, but I
3  recognize the fact that it had come apart.
4  Q.    Exactly.  And whatever the contents of the
5  pipe, it was meant to be taken outside and not left
6  in the garage; is that correct?
7  A.    Correct.
8  Q.    And so Mr. Schuler's statement goes on to say
9  that he "checked on it, did not see anything wrong,
10 and do not know where it had separated."
11 A.    Right.
12 Q.    I don't know why he said that.  But it goes on
13 to say, "I did notice that the blue seal where the
14 exhaust (gray) pipe entered the pass-through was
15 not seated correctly."
16      Do you know what he meant by that?
17 A.    I'm assuming that the word seated means it
18 wasn't hooked together properly.  And it appears,
19 from this statement, that he put it together how he
20 thought it should go together.  "I reset the seal
21 and checked the joints."
22 Q.    Do you have any concern, as a layman as you
23 said, know nothing about boilers and furnaces and
24 such, of putting that pipe together again and
25 walking away?

59

1  A.    Absolutely not.
2  Q.    You --
3  A.    I had no concern.
4  Q.    You had no concern about it.
5       So after this first paragraph -- or in the
6  first paragraph, just the last part of it, he --
7  A.    I have it right here.
8  Q.    Right, and I've got my copy.  Schuler said, "I
9  asked Greg if you wanted me to call" --
10 A.    Wait.
11 A.    Last sentence.
12 A.    Right here, yes.
13 Q.    "Asked Greg if you wanted me to call Wyoming
14 Mechanical, he said he had (or would?) call and
15 make appointment."  Did you make that call?
16 A.    I did.
17 Q.    Who did you talk to?
18 A.    I do not know.
19 Q.    What information did you pass on?
20 A.    Okay.  There's a couple parts to it.
21 Q.    Okay.
22 A.    One, and I can't recall -- there is two
23 conversations here.  One is that I don't know if
24 they are two separate conversations or whatever.  I
25 called and somebody said --

60

1  Q.    Somebody on the other end of the phone?
2  A.    Someone on the other end of the phone.
3  Q.    At Wyoming Mechanical?
4  A.    At Wyoming Mechanical.  I said it's making a
5  loud noise, a banging noise, and shaking.  And it's
6  just like a car.  Can you go sit in the garage and
7  watch it, because you need to know when it occurs.
8  And so I said, no, I'm not going to sit in the
9  garage, but if I notice it, or you can send
10 somebody out to sit in the garage.
11      So I happened to go out and be on the
12 elliptical machine --
13 Q.    That's an exercise machine?
14 A.    -- in the garage.  Yes.
15 Q.    Okay.
16 A.    And I heard the machine go boom.  And in my
17 brain it clicked as that's the same time the
18 thermostat setting is coming on, so I reported that
19 finding.  I went back in and called and said it
20 appears to be that's when the thermostat is kicking
21 on.
22 Q.    Okay.  So when you say -- does the thermostat
23 make a noise when it comes on or did you just
24 happen to be looking at it?
25 A.    I knew the time that the thermostat kicked on.

61

1  I'm pretty good with numbers.  The machine went
2  boom.  I don't know exactly what time it was, but
3  it was when the thermostat came on.
4  Q.    And when you say the machine, you are talking
5  about the boiler?
6  A.    The boiler.  And so that was my best guess to
7  help them diagnose what initiated this malfunction
8  or whatever it was.
9  Q.    And you don't recall who you talked to?
10 A.    I do not.
11 Q.    And then that's the two things you described
12 that you passed on to them, Wyoming Mechanical?
13 A.    Yes, regarding that incident.
14 Q.    Pardon?
15 A.    Yes, regarding that incident.  Sorry.
16 Q.    Did you say you had two conversations with
17 them that day?
18 A.    I don't know if it was that day; a
19 conversation in regards to booking it to get fixed
20 was it's making a loud banging noise.  The pipes
21 have come loose, and it sounds like there's a car
22 going through the wall.
23 Q.    How long did that noise of the car going
24 through the wall last?
25 A.    No, it was just like --

---

**62**

1   Q.   Like bang?

2   A.   Like boom, shake the house.

3   Q.   It actually was shaking the house?

4   A.   Actually shook the house.

5   Q.   That worried you?

6   A.   Yeah.

7   Q.   And so then the next sentence -- excuse me,

8   the next paragraph.

9   A.   Yep.

10  Q.   It says, "Greg and I had a conversation."

11  Again, this is Schuler speaking?

12  A.   Yes.

13  Q.   "Had a conversation previously about the

14  thumping noise the boiler was making."

15       Do you recall the conversation?

16  A.   I do not.

17  Q.   Do you remember talking to Dave Schuler about

18  that prior to this event you just described while

19  you were on the elliptic machine?

20  A.   I would make the assumption that we did.

21  Q.   What are you basing the assumption on?

22  A.   Because Dave and I correspond; I mean we live

23  on the same property.

24  Q.   You don't have any reason to doubt that --

25  A.   Absolutely do not have a reason to doubt Dave.

Jackson Hole Court Reporting Service (307) 733-2637

---

**63**

1   Q.   And this is Mr. Schuler talking again, same

2   paragraph. "I had heard the noise that to me

3   sounds like heavy snow falling from high up a tree

4   and landing on the roof of the hallway near the

5   garage while shoveling snow in the mornings." Is

6   that what it sounded like to you, too?

7   A.   I don't know if I know what the sound of snow

8   falling on the roof would sound like compared to a

9   boiler, but I recognize the fact that Dave heard a

10  noise.

11  Q.   But he had not connected the noise to the

12  boiler?

13  A.   That's what it appears he said here.

14  Q.   You don't have any doubt -- going back to the

15  first sentence in that paragraph, you don't doubt

16  that Mr. Schuler has correctly relayed it that a

17  conversation took place.

18  A.   I agree with what he has written here.

19  Q.   Okay. After you made this repair, putting the

20  pieces of pipe back together again and reporting it

21  to Wyoming Mechanical, did you hear back from them,

22  do you recall?

23  A.   Yeah, we set an appointment.

24  Q.   And this is going to take a little while to

25  work through this because we are looking at

Jackson Hole Court Reporting Service (307) 733-2637

---

**64**

1   different documents. And I'm going to show you --

2   and your counsel has a copy of this document --

3   Exhibit Number 2.

4   A.   I have that right here.

5   Q.   Okay. If you would look at this Exhibit

6   Number 2.

7   A.   Yes.

8   Q.   Page 23. Do you see the numbers I put at the

9   bottom of that page?

10  A.   Okay.

11  Q.   Right in the center. If you look right there

12  at the bottom.

13       MS. MEAD: Right here.

14       THE WITNESS: Okay.

15       MR. LEWIS: These numbers.

16       THE WITNESS: Thank you for that. Okay.

17  BY MR. LEWIS:

18  Q.   And reading that it says that, "On January

19  28/29" --

20  A.   Wait. Where are we at here?

21  Q.   I'm sorry, we're at the bottom of the page.

22  "Gieck said Buckingham."

23  A.   All right.

24  Q.   So --

25  A.   Yes.

Jackson Hole Court Reporting Service (307) 733-2637

---

**65**

1   Q.   "Gieck said Buckingham contacted him on

2   Wednesday and Thursday, January 28/29, 2015, to

3   confirm maintenance work for the following Monday,

4   February 22, 2015."

5        And then, if you flip over to the next page it

6   says, "Buckingham mentioned to Gieck during the

7   phone call that there was another problem with the

8   boiler in addition to the water leak relating to

9   the flue pulling apart." That's kind of an awkward

10  sentence, it seems to me, the way it was written.

11  But I take it when he is talking about the water

12  leak, he's talking about problems you were having

13  not with the flue but with water that was being

14  pumped into the house; is that correct, or do you

15  know?

16  A.   No, I think it's a floor leak.

17  Q.   A floor leak? Okay.

18  A.   Yes. There is a pipe right in the garage that

19  had some type of leak there that created a problem

20  of excess water going out of some overflow tank.

21  I'm not sure if they are related or not.

22  Q.   And so the statement that the problem relating

23  to the flue pulling apart, had that happened again

24  since the 26th when you were talking about early in

25  the week, the 26th or 27th?

Jackson Hole Court Reporting Service (307) 733-2637

---

---

**70**

1  one, closest to the interior hallway wall two.
2  Q.  Okay.
3     (Witness marking exhibit.)
4     (Deposition Exhibit No. 22 was marked for
5  identification.)
6  BY MR. LEWIS:
7  Q.  Let me hand you Exhibit 22.
8  A.  Yes.
9  Q.  And I think that that picture is a photograph
10  of what you just described to me.  If you look at
11  this 22 --
12  A.  Mm-hmm.
13  Q.  -- this looks like where it's passing out
14  through the wall, right?
15  A.  Yes.
16  Q.  And then that's one 90-degree and that's the
17  other 90-degree?
18     MS. TIEDEKEN:  Well, for the record, nobody is
19  going to know what "that" is.
20     MR. LEWIS:  Well, that's okay.
21     THE WITNESS:  Can we label the first 90-degree
22  turn from the wall we've marked as Position 1?
23  BY MR. LEWIS:
24  Q.  That's Position 1.
25  A.  Okay.

---

**71**

1  Q.  And that's on Exhibit 21 for the record.
2  A.  Okay.
3  Q.  And then two is?
4  A.  Is the next 90-degree turn, which is on the
5  interior hallway wall.
6  Q.  And which of those are you talking about in
7  that e-mail?
8  A.  I do not recall.
9  Q.  It's one or the other.
10  A.  It's one place where these sections come
11  together.
12  Q.  No, what I'm saying is that --
13  A.  I don't know.
14  Q.  -- that's the best you can define this?
15  A.  I don't know.
16  Q.  It's this turn --
17  A.  I don't know, Dave.
18  Q.  -- one or two?
19  A.  I'm just telling you at this point in time it
20  was not a problem.  Today it became a big problem.
21  Q.  You were just pushing the pipes back in?
22  A.  Yes.
23  Q.  Back in together?
24  A.  Yes.
25  Q.  And that's the repair that you made?

---

**72**

1  A.  Yes.
2     Are we finished with Exhibits 21 and 22?
3  Q.  Yes, that's fine.
4     Did you have to go up there to get to access
5  to these pipes?  Is that green ladder, is that what
6  that was for; is that how you got up there?
7  A.  Yes.
8  Q.  And that's just a little utility ladder that's
9  in your place?
10  A.  Yes.
11     MR. LEWIS:  Let's mark these as the next two
12  in sequence.
13     (Deposition Exhibit Nos. 23 and 24 were marked
14  for identification.)
15  BY MR. LEWIS:
16  Q.  Can you read -- these are photographs of the
17  area in which you've identified.  Pull up those
18  other previous two, if you would.
19  A.  (Witness complies.)
20  Q.  Within this area (pointing) where you've
21  identified.
22  A.  Mm-hmm.
23  Q.  And this exhibit, 24, is a close-up of this
24  tag that's there at that curve.
25     Can you read that tag?  I can help you out if

---

**73**

1  you can't.
2  A.  "Warning, notice.  Carbon monoxide poisoning
3  and risk of fire if improperly" something,
4  something, something, "warning and instructions
5  regarding installation of vent pipe system."
6  Q.  And 23 is -- it's round and it's difficult to
7  read it, but any part that you couldn't read would
8  be on 25, it's just a continuation of that.
9     The warning is in red, correct?
10  A.  Correct.
11  Q.  And there's another one of those warnings
12  here.
13  A.  Okay, I see that.
14  Q.  On 24 and 25 you see that as well?
15  A.  Yes.
16  Q.  Did you pay any attention to those when you
17  were making those repairs?
18  A.  No.
19  Q.  Did you ask anybody -- did you ask Mr. Gieck,
20  for example, if there was a danger of that thing
21  coming apart?
22  A.  Absolutely not, no.
23  Q.  And did he ever offer that information to you?
24  A.  No.
25     (Discussion off the record.)

---

---

130

1 piping had come apart?
2 A.    The second time for me that I recall was
3 Thursday morning, before we were leaving for the
4 airport, where I had contacted Dave to ask him if
5 he could double check -- Dave Schuler, if he could
6 double check that.
7 Q.    In that e-mail that you were shown, I think it
8 was at 8:30 morning.
9 A.    Okay.
10 Q.    Let me get it.
11 A.    Exhibit 19.
12     MS. TIEDEKEN:  I don't believe we have it.
13     MS. LEWIS:  No, we don't.
14     THE WITNESS:  That's not the e-mail, that's a
15 letter.
16     MS. TIEDEKEN:  Okay.  I'm going to go ahead
17 and mark this as the next exhibit.
18     (Deposition Exhibit No. 26 was marked for
19 identification.)
20     MS. TIEDEKEN:  And I only have one extra of
21 these.
22     MS. MEAD:  I have it.
23 BY MS. TIEDEKEN:
24 Q.    I'm going to hand you Exhibit 26 and have you
25 take a look at the e-mail.  I said 8:30, I

---

131

1 misspoke.  It look likes it was sent at 8:26 on
2 January 29th.
3 A.    Yes.
4 Q.    Is that correct?
5 A.    Yes.
6 Q.    And it's an e-mail from you to Dave Schuler?
7 A.    Yes.
8 Q.    It's your testimony that you noticed the pipe
9 come apart in a different section sometime earlier
10 that morning before you e-mailed David Schuler.
11 A.    Yes.
12 Q.    How did you happen to notice that it had come
13 apart?
14 A.    I was walking out to get water bottles out of
15 the refrigerator to put in the car.
16 Q.    And so what did you do?
17 A.    I pushed it back -- I got up on the ladder and
18 pushed it back together.
19 Q.    What, if anything, did you do with the metal
20 clips?
21 A.    I don't recall.
22 Q.    Do you recall if the metal clip had come off
23 or not?
24 A.    I do not recall.
25 Q.    So at that point you were concerned enough

---

132

1 that you had e-mailed David Schuler to tell him
2 about that, correct?
3 A.    I can't really answer that question yes or no
4 based on your question.  I wasn't concerned; I was
5 never concerned about the pipe.
6 Q.    I guess the word you had used previously, you
7 were e-mailing him so he could check it or take a
8 look at it?
9 A.    Right.
10 Q.    And whether you were concerned or not, you
11 wanted David Schuler to check it and take a look at
12 it?
13 A.    Yes, because it put water vapor in the garage.
14 And as somebody asked earlier, it's meant to be
15 together and go out, so...
16 Q.    Would you agree that these labels were visible
17 to you -- and I'm talking about the orange label
18 that says warning on it -- when you were on your
19 ladder putting the pipe together?
20 A.    From those photos it would appear that they
21 are.
22 Q.    And there is more than one of those warning
23 labels on the pipe.
24 A.    There is more than one.
25 Q.    Is it fairly obvious that it's a warning label

---

133

1 given there is the big word "warning" on it?
2 A.    Looking at that photo, it's fairly obvious
3 that there is a warning label right there.
4 Q.    Did you read the warning label when you were
5 on your ladder up there and it was right in front
6 you?
7 A.    No.
8 Q.    Why not?
9 A.    Because our world has four million warning
10 labels.  Tell anybody in this room that reads
11 all their warning labels.
12 Q.    So you didn't feel it was necessary to read a
13 warning label -- to read this warning label on the
14 exhaust pipe in your garage?
15 A.    I did not.
16 Q.    As I understand it, there was a plastic sleeve
17 on the side of it that had the boiler booklets in
18 them.  Do you recall that?
19 A.    No.
20 Q.    Do you recall ever seeing sort of a plastic
21 sleeve stuck on the side of the boiler with
22 material in it?
23 A.    No.
24 Q.    Did you make any attempt to find the owner's
25 manual for the boiler when the vent came apart?

---

150

1  A.  Not every other Friday, every two weeks.
2  Q.  Every two weeks?
3  A.  Roughly.
4  Q.  And was it always on a Friday?
5  A.  Umm, no, but usually.
6  Q.  Okay.  And was she paid $25 an hour?
7  A.  Correct.
8  Q.  And did you issue a W-2 for her?
9  A.  We did not.
10 Q.  Or a 1099?
11 A.  We did not.
12     MS. TIEDEKEN:  That's all that I have.
13     MR. LEWIS:  I don't think I have anything
14 further.
15     THE WITNESS:  Okay.  We're good.
16     MS. MEAD:  Yes, we'll read and sign.
17     (Deposition concluded at 1:07 p.m.)
18
19
20
21
22
23
24
25

151

1        CERTIFICATE OF DEPONENT
2     I, GREGORY BUCKINGHAM, the deponent in the
3  foregoing deposition,
4     DO HEREBY CERTIFY that I have read the
5  foregoing and attached 150 typewritten pages, and
6  that the same are, with changes or corrections, if
7  any, set forth on the following correction sheets,
8  a full, true, accurate and correct transcript of my
9  deposition on oral examination given at the time
10 and place therein indicated.
11
12     Executed this _____ day of _____, 2015.
13
14 Signature:  _____
15            GREGORY BUCKINGHAM
16
17 STATE OF        }
              } ss.:
18 COUNTY OF       }
19
20 Sworn to and subscribed before me this_____
21 day of _____, 2015.
22
23     _____
24     My Commission expires:
25

152

1        REPORTER'S CERTIFICATE
2
3  STATE OF IDAHO     }
                 } ss.:
4  COUNTY OF FREMONT  }
5
6     I, Denise a Shorthand Reporter and
7  Notary Public within and for the State of
8  Idaho, do hereby certify:
9     That I reported the proceedings in
10 the within entitled matter, and that the within
11 transcript is a true record of such proceedings.
12     That I am neither attorney or counsel
13 for, nor related to or employed by, any of the
14 parties to the action in which said deposition is
15 taken; and, further, that I am not a relative or
16 employee of any attorney or counsel employed by the
17 parties hereto or financially interested in the
18 action.
19     IN WITNESS WHEREOF, I have hereunto
20 set my hand this 30th day of November, 2015.
21
22     _____
23     DENISE NOWAK
       Notary Public State of Idaho
24     My Commission Expires: 3/13/2021
25

Exhibit C

Selection of Deposition Testimony of Gregory
Buckingham dated June 6, 2016

Deposition of Gregory Buckingham

1

```
 1           IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF WYOMING

 3   FRANCISCO L. HERRERA and    )
     JOANNA HERRERA,             )
 4   CO-WRONGFUL DEATH           )
     REPRESENTATIVES for         )
 5   exclusive benefit of the    )
     Beneficiaries of MONICA     )
 6   HERRERA, deceased, who      )
     have sustained Damages      )
 7   from her wrongfully         )
     caused death,               )
 8                               )
               Plaintiffs,       )
 9                               )
     vs.                         )   Case No.
10                               )   15-CV-128-F
     GREGORY BUCKINGHAM and      )
11   DEBORAH BUCKINGHAM, but     )
     in their individual         )
12   capacities as Trustees of   )
     the BUCKINGHAM FAMILY       )
13   TRUST; and, GREGORY         )
     BUCKINGHAM and DEBORAH      )
14   BUCKINGHAM as individual    )
     defendants; and, WYOMING    )
15   MECHANICAL, INC., a         )
     Wyoming Corporation;        )
16   TRIANGLE TUBE/PHASE III     )
     CO. INC., a New Jersey      )
17   Corporation; and, M&G       )
     GROUP DURAVENT, INC., a     )
18   New York corporation,       )
                                 )
19       Defendants.             )
     ---------------------------
20
                   VIDEOTAPED DEPOSITION OF
21
                   GREGORY BUCKINGHAM
22                 Monday, June 6, 2016
                         TAKEN AT
23                   Homewood Suites
                     Jackson, Wyoming
24
     COURT REPORTER:
25   Michelle L. Cunningham


       Jackson Hole Court Reporting Service (307) 733-2637
```

## 262

1　Q. Sure. You bet.
2　A. (Reviewing document.)
3　　　　Okay. I'm sorry.
4　Q. Okay. And I was beginning at Line 2, the
5　question that you were asked is, "You don't
6　recall one way or another?" And your answer
7　was? Do you want to read your answer, or do
8　you want me to read it?
9　A. You're welcome to.
10　Q. "Answer: I don't recall that I had an
11　appointment previously scheduled for that
12　Monday.
13　　　　"Question: When you had your conversation
14　with the Wyoming Mechanical employee, did you
15　tell the individual that you were leaving
16　town and no one would be at home?"
17　　　　Your answer was: "Yes."
18　　　　The question was: "Okay.
19　　　　"Answer: When they arrived on Monday,
20　you mean?"
21　　　　And, question -- the questioner's now
22　answering your question.
23　A. Um-hum.
24　Q. No. When you called to schedule -- yeah,
25　when you called to schedule the appointment,

*Jackson Hole Court Reporting Service - (307) 733-2637*

## 263

1　you said I'm getting ready to leave town and
2　no one is gonna be home?
3　　　　Your answer was: "Yes."
4　　　　"Question: Did you tell the person that
5　you talked to that your caretaker would be
6　keeping an eye on the vent pipe while you
7　were gone?"
8　　　　You said, "Answer: I don't recall that
9　conversation.
10　　　　"Question: Were you aware that Monica was
11　going to come to clean your home while you
12　were gone."
13　　　　Your question -- your answer was:
14　"Absolutely."
15　　　　"And it was a regular appointment for
16　her?"
17　　　　"Answer: Fairly regular. Every other
18　Friday."
19　　　　And you saw the note that was left for
20　her.
21　　　　MR. LEWIS: Now, what number are we on?
22　Does anybody know?
23　　　　THE COURT REPORTER: 113.
24　　　　MR. WALTZ: No, she'll mark them,
25　David. She'll mark it right here.

*Jackson Hole Court Reporting Service - (307) 733-2637*

## 264

1　　　　MR. LEWIS: Oh, okay. 113 and 113A.
2　　　　MS. TIEDEKEN: Do you have a copy of
3　those, Dave?
4　　　　MR. LEWIS: I do.
5　　　　**(Whereupon, Deposition Exhibits 113 and**
6　　　　**113A were marked for identification.)**
7　　　　THE WITNESS: (Reviewing document.)
8　　　　MS. TIEDEKEN: Which page -- which
9　Bates stamp is 113, and which one is 113A?
10　　　　THE WITNESS: 113 starts with, "We have
11　dinner guest coming." And 113A starts with
12　"Will do."
13　　　　MS. MEAD: Thanks.
14　　　　MR. LEWIS: 113, I think, has the Kuler
15　e-mail's number, I don't know who put that
16　on there, of 0278.
17　　　　MS. TIEDEKEN: Okay. Got it.
18　　　　MR. WALTZ: What's the question?
19　　　　MR. LEWIS: I was just waiting to
20　see if he was still reading.
21　　　　THE WITNESS: No, no. I'm ready.
22　Q. (By Mr. Lewis) The question is, at the
23　bottom line right above your, "Thanks GB" --
24　A. Um-hum.
25　Q. -- you say, "Monica here Friday. Just

*Jackson Hole Court Reporting Service - (307) 733-2637*

## 265

1　main house."
2　　　　And you -- that was what you wrote to
3　David Schueler on January 27th, at 8:00 --
4　8:00 -- 8:08 --
5　A. A.m.
6　Q. -- a.m. --
7　A. Yes.
8　Q. -- on the 27th?
9　　　　So you're -- you're reminding David
10　Schueler that Monica's gonna be here on
11　Friday in the main house; correct?
12　A. Correct.
13　Q. Was that something you typically did is to
14　write him and tell him if -- when -- if and
15　when Monica was going to be there?
16　A. If we were out of town.
17　Q. And why did you tell him that?
18　A. Just general communication, knowledge.
19　If he wanted to go over and check the doors
20　got locked properly, or if he decided he
21　saw a car there and wanted to know whose
22　car that was.
23　Q. But, in any event, you were notifying
24　Mr. Schueler that on Friday morning
25　following, Mrs. Herrera was going to be in

*Jackson Hole Court Reporting Service - (307) 733-2637*

**266**

1  the Buckingham home --
2  A. That is correct.
3  Q. -- cleaning the house --
4  A. That is correct.
5  Q. -- correct?
6  A. That is correct.
7  Q. And David Schueler, then, in 113A
8  responded to you. He responded to your
9  e-mail and left, at the bottom, an apparent
10  acknowledgment, "Monica here Friday. Just
11  main house."
12      MR. WALTZ: Object to form.
13  Q. (By Mr. Lewis) Correct?
14  A. I think that's the same e-mail that we
15  just read, 113.
16  Q. Do you see that at the bottom of 113A?
17      MS. MEAD: Objection as to form.
18  That's the same e-mail.
19  Q. (By Mr. Lewis) Well, let me just -- it
20  says at the bottom --
21      MS. MEAD: It's not -- I'm objecting as
22  to form. Because you're asking him if Dave
23  Schueler wrote this same thing. And this
24  is not Dave Schueler's e-mail. His is the
25  one at the top.

**267**

1      THE WITNESS: Right.
2      MS. MEAD: Answer if you can.
3  Q. (By Mr. Lewis) Dave -- Dave Schueler --
4  Dave Schueler responded to your e-mail?
5  A. And he wrote, "Will do."
6  Q. But at the top -- at the top of your
7  e-mail and -- and sent it back to you;
8  correct?
9      MR. WALTZ: Object to -- object to
10  form.
11      THE WITNESS: Yeah. My understanding
12  is he responded to my e-mail and wrote,
13  "Will do. Also noticed that one of the
14  daytime running lights on the Tahoe is out.
15  I'll fix it while you're away as well."
16      And that was his response to my e-mail
17  of Exhibit 113.
18  Q. (By Mr. Lewis) And you -- you know, from
19  Mr. Schueler's latest testimony, that he saw
20  Monica Herrera's car at the -- parked at --
21  near -- near your house at 10:00 in the
22  morning, on Friday, the day of her death?
23      MS. MEAD: Objection. Misstates
24  testimony. This witness has not read
25  Mr. Schueler's testimony.

**268**

1      MR. LEWIS: Um-hum.
2      MS. MEAD: Answer if you can.
3      THE WITNESS: I have not read his
4  testimony.
5  Q. (By Mr. Lewis) Okay. Do -- do you know,
6  from the sheriff's department -- have you
7  read the sheriff's department statement?
8  A. I've read somewhere some information
9  about that.
10  Q. And in the sheriff's department report,
11  Mr. Schueler also told, whoever the sheriff's
12  deputy he was talking to, that he saw
13  Monica's car there at 10:00 in the morning on
14  Friday.
15  A. Okay.
16  Q. And that wouldn't be unusual, would it?
17  A. No.
18  Q. For him to be able to see her car there in
19  the morning at that time?
20  A. No, it would be unusual. Usually, he's
21  at work, but he was not that day.
22  Q. Any event, he -- he saw it -- he --
23  Mr. Schueler knew the pipes were coming
24  apart, the vent pipes were coming apart in
25  the house, didn't he?

**269**

1  A. He was aware of that.
2  Q. Everybody out there seems to have known
3  except Mrs. Herrera. Isn't that the case?
4  A. "Everybody" is a pretty broad
5  statement.
6  Q. Well, who else was out there? You. I --
7  Mr. Schueler. I don't know if Mrs. Schueler
8  was around. Was Mrs. Schueler around?
9  A. (Nonverbal response).
10  Q. And your wife Deborah, she was there. She
11  knew that the pipes were coming apart in the
12  house, didn't she?
13  A. That's correct.
14      MS. MEAD: This is mine.
15  Q. (By Mr. Lewis) I just wanted to ask you a
16  couple questions about some phone calls you
17  made on Friday evening after you found out
18  about Monica's death.
19      As I understand it, you called Boyd
20  Roberts?
21  A. No. Incorrect.
22  Q. Okay. When did you first talk to Boyd
23  Roberts about Mrs. Herrera's death in your --
24  in your home?
25  A. I may have. I talked to Steve

290

1    Q.   So is it a fair statement that you didn't
2    read, really, any of the warning labels
3    associated with this -- the -- the Triangle
4    Tube boiler that was installed at your
5    property?
6    A.   That's a fair statement.
7    Q.   And is that your standard practice?
8    A.   Yes.
9        MR. MCGILL:  No further questions.
10   Thank you.
11       MR. LEWIS:  I have nothing further.
12       THE VIDEOGRAPHER:  Everybody done?
13   MR. WALTZ:  Thank you.
14       MS. MEAD:  Thank you.  Read and sign.
15       THE VIDEOGRAPHER:  This deposition is
16   now complete.  We are off the record at
17   3:55 p.m.
18       (Whereupon, the deposition of Gregory
19   Buckingham was concluded at 3:55 p.m.)
20
21
22
23
24
25

*Jackson Hole Court Reporting Service - (307) 733-2637*

---

291

1        STATE OF:_____)
2                                 )
3        COUNTY OF: _____)
4        I, the undersigned, declare under penalty
5    of perjury that I have read the foregoing
6    transcript, and I have made any corrections,
7    additions or deletions that I was desirous of
8    making; that the foregoing is a true and
9    correct transcript of my testimony contained
10   herein.
11   Executed this ____day of _____, 2016
12   at _____/_____.
          (City)           (State)
13
14   _____
15   (Deponent's Name- please print)
16   _____
17   (Deponent's Signature)
18   Subscribed and sworn before me _____
19   This ___ day of_____, 2016
20   _____
21   Notary Name       Notary Signature
22   Seal
23
24   My commission expires: _____, _____
25

*Jackson Hole Court Reporting Service (307) 733-2637*

---

292

1    STATE OF WYOMING   )
                        )
2    COUNTY OF SUBLETTE )
3        I, Michelle L. Cunningham, Deputy and
4    Freelance Shorthand Reporter and notary Public
5    in and for the State of Wyoming, do hereby
6    certify that the foregoing proceeding was
7    reported by me and was thereafter transcribed
8    under my direction into typewriting consisting
9    of pages 1 to 292; that the foregoing is a
10   full, complete and true record of said
11   proceedings to the best of my ability.
12       I further certify that I am not of counsel
13   or attorney for either or any of the parties in
14   the foregoing proceeding and caption named, or
15   in any way interested in the outcome of the
16   cause named in said caption.
17       In witness whereof, I have hereunto set my
18   hand and affixed my seal this day.
19       Date: _____, 2016
20   _____
21       Michelle L. Cunningham
         Deputy and Freelance Reporter
              Notary Public
22
23
24
25

*Jackson Hole Court Reporting Service (307) 733-2637*

Exhibit D

Statement From David Schuler Pertaining To
His Recollection Of His Activities Surrounding
The Events of Monica Herrera's Death

Statement from David Schuler regarding Thursday, January 29th to Friday, January 30th
Written on 02/06/2015

Early in the week Greg asked me to look at the boiler pipes, possibly said the white one. He had said that he had put it back together. I checked on it, did not see anything wrong, and do not know where it had separated. I did notice that the blue seal where the exhaust (gray) pipe entered the pass through was not seated correctly, so I reset the seal and checked the joints. Asked Greg if you wanted me to call Wyoming Mechanical, he said he had (or would?) call and make appointment.

Greg and I had a conversation previously about the thumping noise the boiler was making. I had heard the noise that to me sounds like heavy snow falling from high up a tree and landing on the roof of the hallway near the garage while shoveling snow in the mornings, but had not connected the noise to the boiler until later.

Thursday received email from Greg in the AM that he had sent before flying out (forwarded to Boyd Roberts the following Monday at his request). In the email Greg asked me to look at the boiler exhaust again because he had found it separated in the morning and that Wyoming Mechanical would be in on Monday to look at the boiler.

Thursday evening I parked the Buckinghams car in the garage. I glanced at the boiler exhaust and intake pipes on my way in and noted that it was all together, then spent 15-20 minutes inside the garage looking for the manual for the Tahoe trying to figure out how to replace a blown DRL bulb. I went inside and spent 45 minutes in the house making various repairs (bench hinge and toilet seat) that Greg had emailed told me about. When I finished in the house I returned to the garage to look at the boiler more closely. The metal retaining clip from one of the elbows was laying on top of the refrigerator, but the pipe was together. I disassembled the joint at an elbow and re-assembled it with the clip in place and left the house.

I called in sick to work with a cold on Friday and spent most of the day on the couch reading and napping. Around 10-11 am I took the dog for a short walk and noted that a white SUV was parked across from the Buckinghams garage. I did not know then that Monica had replaced her old red SUV and assumed that it was either hers or she had backed the Buckinghams Tahoe out of the garage for some reason. I knew that she would not be cleaning any cabins other than the main residence so did not expect to see her again from my house unless I happened to be looking out when she left, typically around 2-3pm. After the walk I returned to napping on the couch. I left my cabin again in the afternoon to go over to the guest cabin. At that time I don't remember if I noticed if Monica's car was still there or not.

After my wife got home (around 6:00pm) we decided that she should go climbing the next day with or without me depending on how I felt, so sometime after 7pm I drove my truck over to the shed area to get our trailer out from under the barn. I saw that the white SUV was still parked outside the garage next to the barn at that it had Idaho plates which led me to believe that it was Monica's vehicle. At that point I was concerned, but thought that perhaps her car had broken



PLAINTIFF'S
EXHIBIT

19

11/18/15

down and did not start, or maybe she had the cold that was going around and decided to take a rest and fell asleep. I opened the shed door, started the ATV inside, then the ATV and Cherokee behind the barn and moved the Cherokee and left all three running to warm up and charge while I went inside to return a tool to the garage and see if Monica was still at the house.

When I opened the garage door using the code panel the garage was very warm and humid and the boiler was running. Both vehicles in the garage were dripping wet and the exhaust pipe was separated at the joint where I had replaced the clamp the night before. This is the point at which I began to be concerned about the situation and carbon monoxide.

I entered the garage leaving the garage door open and replaced the tool in the toolbox on the way to the boiler. I placed the ladder that was in the garage from looking at the boiler pipes previously against the refrigerator and hit the power button on the boiler. I don't think that I shut it off correctly because Jim Tucker later told me that they had shut it down and there was still exhaust blowing out the separated pipe, but at that time I was in a hurry to get it back together and get inside the house to look for Monica and assumed that the boiler was evacuating the remaining fumes as it shut down. I quickly replaced the retaining clamp that was lying on the refrigerator and put the pipe back together then hurried to the man-door from the garage to the mudroom.

When I opened the mudroom door I discovered Monica on the ground face down with her right arm outstretched facing the exterior door to the mudroom. The vacuum was partially under her with the cord retracted, there was a ~2"-wide puddle of blood on the floor directly under her nose and mouth, and a couple of coats had been knocked off the rack to the floor.

I cannot be sure of the exact sequence of events in the next few minutes, but I am sure of the accuracy of the events themselves. I think that I first shouted Monica's name and shook her shoulder with no reaction. I opened the mudroom door to the outside then went to the front door and opened it to get crossflow of air through the mudroom on the way to the kitchen to retrieve a phone. Being sick and under stress I cannot be sure of the cause, but I began to notice that I was feeling more light headed and progressively fuzzy by the time I returned to the mudroom with the phone.

I dialed 911 and spoke to the dispatcher while checking for a pulse at her right wrist and did not feel one. I decided that I wanted to hang up and call my wife (Kate) to have her meet me before beginning CPR in case I needed to swap out doing CPR or move the body outside. I was also concerned about succumbing to CO myself and wanted my wife nearby to to observe any symptoms and wanted technical (she is also trained in first aid) and emotional support. I asked her to retrieve the first aid kit in our truck parked nearby on her way over. I walked outside for fresh air while making the call to Kate. According to the call records on her cell phone, I called her at 7:35pm.

When I hung up with my wife I moved back inside and called 911 back and set the phone down. At some point I moved the vacuum out of the way and shouted in Monica's ear while pinching

her shoulder hard with no response. I think I paused a moment to mentally review CPR procedures then rolled the body over by grasping her shoulder and hip and pulling her toward me with my back to the washing machine.

As I rolled her over I noticed that her body was totally stiff, her lower jaw looked displaced to the side and her lips were dark greyish blue. I put my left ear to her mouth and right hand on her neck and did not find signs of breathing or pulse. I was feeling increasingly light headed at this point. Weighing the risk to myself against the likelihood of successful resuscitation I decided to not begin CPR. I picked up the phone and informed the dispatcher of my decision and hung up. I placed the phone in my pocket and went outside to meet my wife who had arrived around this time to wait for emergency services.

I think that we waited outside talking for a short time then decided to walk to the top of the driveway to make sure the the responders came to the right house. Soon after an LE Ranger arrived at the scene.

The Ranger glanced inside the mudroom door, sent Kate back up the driveway to intercept incoming emergency vehicles and asked me a couple questions. He then excused himself to radio in and slow down the response. Around 7:55pm, Monica's husband arrived and the Ranger and I decided that I should wait at my house. I then went to the top of the driveway to join my wife until the rest of the emergency responders arrived. After a fire engine and two ambulances had gone onto the property we both went to our home to wait for further instructions. Then I called the owner (Greg Buckingham) to inform him of the situation. Over the course of the next few hours, we answered questions with Jim Tucker and the fire department. Kurt (?) the Sheriff interviewed me. Once the CO levels were at zero (around 10:30pm), I was cleared by the fire department to go back into the house. I cleaned up the blood, rehung the jackets, and put away the vacuum and other cleaning supplies that Monica had gotten out. Kate and I then set up space heaters and closed the drapes to prevent the pipes from freezing.

Exhibit E

Email Messages Between Gregory Buckingham And
David Schuler Acknowledging That They Are
Aware Monica Herrera Will Be At The Buckingham
Residence For Housekeeping On Friday, January 30,
2015, The Date And Place Of Her Death

From: **Greg Buckingham** leterbuck1@gmail.com
Subject: ranch 2 things
Date: January 27, 2015 at 8:08 AM America/Los_Angeles
To: **David Schuler** sch@oschules@gmail.com



Hi Dave,

We have dinner guest coming Wednesday at 5pm,first time to our place, Can you please shovel
walk ways in the morning so we can do the tour thing.

Also, while we are gone can you do two repairs. The bench seat in the entry way hinge and see if
you can washer or something the toilet seat in the master from sliding. I tightened, but not staying.

Monica here Friday, just main house.

Thx gb

SCHULER EMAILS  0278

From: **David Schuler** schuler@gmail.com
Subject: Re: ranch 2 things
Date: January 27, 2015 at 2:02 PM America/Los_Angeles
To: **Greg Buckingham** leterbuck1@gmail.com



Will do.

Also noticed that one of the daytime running lights on the Tahoe is out.  I'll fix it while you are away as well.

DRS

On Tue, Jan 27, 2015 at 9:08 AM, Greg Buckingham <leterbuck1@gmail.com> wrote:

Hi Dave,


We have dinner guest coming Wednesday at 5pm,first time to our place, Can you please shovel walk ways in the morning so we can do the tour thing.


Also, while we are gone can you do two repairs. The bench seat in the entry way hinge and see if you can washer or something the toilet seat in the master from sliding. I tightened, but not staying.


Monica here Friday, just main house,


Thx gb

SCHULER EMAILS  0279

Exhibit F

A Check For Payment Of Monica's
Housekeeping Services Left In The Kitchen For
Monica For January 30, 2015, And A Note That
Food Has Been Left In The Refrigerator By The
Buckinghams For Her Lunch

.









Exhibit G

Photographs Of The Exhaust Vent (Gray Pipe)
With Warnings Of Carbon Monoxide Which
Gregory Buckingham Chose To Ignore.

The Red Arrows Added By Plaintiffs' Counsel
Designate The Place Where Gregory
Buckingham Had Pushed The Pipe Segments
Back Together When He Had The Opportunity
To Read The Warnings







# EXHIBIT H

# JURY INSTRUCTIONS FROM THE UNITED STATES DISTRICT COURT, WYOMING IN THE *LOMPE* V. SUNRIDGE, AND IN THE *WILLIAMS V. VAIL* MATTERS

INSTRUCTION NO. *23*

An employee is acting within the scope of his employment if he is engaged in the work which has been assigned to him by his employer, or is doing that which is proper, usual, and necessary to accomplish the work assigned to him by his employer, or is doing that which is customary within the usage of the particular trade or business in which the employee is engaged to accomplish his work.

The negligence of an employee acting within the scope of his employment is the negligence of his employer.

INSTRUCTION NO. _26_

The conduct of an employee is within the scope of employment if it is of the kind the employee is employed to perform; it occurs substantially within the authorized time and space limits; and it is motivated, at least in part, by a purpose to serve the employer.  It is not necessary that a particular act or failure to act be expressly authorized by the employer but such act must bear some genuine relationship to the business of the employer.

The employer is legally responsible for the negligence of an employee acting within the scope of his employment.

INSTRUCTION NO. 24

The ability to obtain knowledge is, in law, the equivalent to actually having knowledge. If a person had information that would lead a reasonably prudent person to make inquiry through which that person would surely learn the facts, then this person may be found to have had actual knowledge of those facts (even if the person failed to inquire). Such a person is charged with the same knowledge as if that person had made such inquiry and had already learned such facts.

That is to say, the law charges a person with notice and knowledge and whatever that person would have learned, of making inquiry as it would have been reasonable to expect the person to make under the circumstances.

Knowledge or notice may also be established by circumstantial evidence. If it appears that a certain condition has existed for a substantial period of time, and that the person had opportunities to observe the condition, then you may, but are not required to, draw the inference that the person had knowledge of the condition.

INSTRUCTION NO. 25

Because the amount of care exercised by a reasonably prudent person varies in proportion to the danger known to be involved in what is being done, it follows that the amount of caution required in the use of ordinary care will vary with the nature of what is being done, and all the surrounding circumstances shown by the evidence in the case. To put it another way, any increase in foreseeable danger requires increased care.